**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **YANPING CHEN**, | |
| Plaintiff, | |
| v. | Case No. 18-cv-3074 (CRC) |
| **FEDERAL BUREAU OF INVESTIGATION**, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

In 2017, Fox News Network aired a series of investigative reports about Plaintiff Yanping

Chen.  The thrust of the stories, principally authored by journalist Catherine Herridge, was that

Ms. Chen had concealed her former membership in the Chinese military on her U.S. immigration

forms and might have been using a professional school she founded in Virginia to funnel valuable

information about the American military to the Chinese government.  The reports also contained

materials—including photographs and images of internal government documents—that Chen

alleges were leaked by government personnel to Herridge and Fox, in violation of the Privacy Act.

After extensive discovery and several opinions by this Court, Chen has been unable to identify the

source of the alleged leak.  She thus issued subpoenas to Herridge and Fox, seeking to compel

them to reveal their confidential source or sources.  Asserting the First Amendment's qualified

privilege for journalists, and urging the Court to adopt a federal common law newsgathering

privilege, Herridge and Fox moved to quash the subpoenas.

The Court recognizes both the vital importance of a free press and the critical role that

confidential sources play in the work of investigative journalists like Herridge.  But applying the

binding case law of this Circuit, the Court concludes that Chen's need for the requested evidence

overcomes Herridge's qualified First Amendment privilege in this case.  The identity of

Herridge's source is central to Chen's claim, and despite exhaustive discovery, Chen has been

unable to ferret out his or her identity.  The only reasonable option left is for Chen to ask Herridge

herself.

### I.  Background

As it has already detailed the factual and procedural background of this case in several

previous opinions, the Court provides only a brief summary here.  See Chen v. FBI, 435 F. Supp.

3d 189 (D.D.C. 2020); Chen v. FBI, Case No. 20-mc-107 (CRC), 2020 WL 7668880 (D.D.C. Dec.

24, 2020); Chen v. FBI, Case No. 20-mc-107 (CRC), 2021 WL 6125379 (D.D.C. Nov. 23, 2021);

Chen v. FBI, Case No. 22-mc-0074 (CRC), 2022 WL 17851618 (D.D.C. Oct. 18, 2022).  Plaintiff,

Dr. Yanping Chen, founded the University of Management and Technology ("UMT"), an

educational institution that attracted a substantial number of military servicemembers who

attended with tuition assistance from the Department of Defense ("DOD").  Compl. ¶¶ 13, 42.

Beginning in 2010, Chen, a naturalized U.S. citizen, became the focus of an FBI investigation

concerning statements she made on certain immigration forms about her work in China in the

1980s.  Id. ¶ 15.  As a part of that investigation, the FBI executed search warrants for Chen's home

and the main office of UMT, seizing materials during both searches.  Id. ¶¶ 18, 20.

Prosecutors eventually informed Chen that no charges would be filed against her, but about

a year later, Fox News Network ("Fox") ran a series of television segments and news articles

about her.  The articles, authored by then-Fox reporter Catherine Herridge, focused on Chen's

alleged ties to the Chinese military and former role as a colonel in the People's Liberation Army.

Id. ¶¶ 22, 25–31; see Catherine Herridge, Fox News Investigation: DoD-Funded School at Center

of Federal Probes over Suspected Chinese Military Ties, Fox News (Feb. 24, 2017),

https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-

probes-over-suspected-chinese-military-ties.  The reporting also included family photographs of Chen; excerpts from Chen's immigration forms; and a snippet from what appears to be an FBI memorandum summarizing an interview conducted for the investigation.  Compl. ¶¶ 25–31.

Believing that someone in the government leaked these materials to Herridge and Fox, in December 2018, Chen filed this Privacy Act lawsuit against the FBI, the Department of Defense ("DOD"), and two other federal agencies.  Compl. ¶ 23.  Since then, Chen has endeavored to suss out the identity of the potential leaker, including by serving scores of document requests, interrogatories, and requests for admission, taking eighteen depositions of current and former government employees, issuing over a dozen third-party subpoenas, and obtaining declarations from 22 government personnel who had a connection to the FBI's investigation.  Opp. to Herridge Mot. at 2.  Through that discovery, Chen has developed a theory for how Herridge and Fox obtained the allegedly leaked materials: that they came from an internal FBI PowerPoint presentation created by the lead agent on Chen's case.  Id. at 1.  She has also homed in on a few individuals who, she thinks, may have leaked that PowerPoint—namely FBI special agent Timothy Pappa (who created the PowerPoint), alleged FBI-informant Stephen Rhoads (who was an on-the-record source for Herridge's reporting), and a few other government agents who, at one time or another, might have possessed the PowerPoint.  Id. at 10–11.  Despite her efforts, Chen has been unable to obtain direct evidence that any of them, or any other person, was responsible for the alleged leak.

Accordingly, Chen now seeks to pursue the one seemingly surefire method to discover how Herridge and Fox obtained the materials in question: to ask them herself.  Chen served Fox and Herridge with deposition subpoenas in May and June of 2022, respectively.  See Notice of Filing Dep. Subpoena (Herridge deposition subpoena); Fox Mot. to Quash ("Fox Mot."), Ex. H. (Fox deposition subpoena).  She also served both with subpoenas for documents and

communications relating to the materials in question.  See Herridge Mot. to Quash ("Herridge

Mot."), Ex. L (Herridge document subpoena); Fox Mot., Ex. G (Fox document subpoena).

Among other things, the document subpoenas ask Herridge and Fox to produce "all Private

Documents and Information in your possession" and to produce documents or communications

"sufficient to identify the individual(s) that transmitted or provided the Private Documents and

Information to you."  Herridge Mot., Ex. L, Schedule A at 6–7.  The subpoenas define "Private

Documents and Information" to include "any and all documents and information concerning Dr.

Chen and/or the University that were provided to or obtained by you from a third party and that

were presented in, referred to, or considered in relation to the" Fox reporting on Chen, including in

particular the photographs depicting her, FBI and immigration documents relating to her, and any

"PowerPoint presentation, compilation, and/or report concerning" her.  Id. at 3.

  Herridge and Fox moved to quash the subpoenas, relying primarily on the qualified First

Amendment journalist's privilege.  Specifically, Herridge and Fox contend that Chen's subpoenas

are overbroad, that she has not sufficiently exhausted alternative avenues to identify the alleged

leaker, and, more broadly, that the public interest in maintaining the confidentiality of journalists'

sources outweighs Chen's personal interest in her Privacy Act suit.  Additionally, Herridge and

Fox urge the Court to apply a common law newsgathering privilege to quash the subpoenas.

Having held a hearing, the Court will now address the motions.

## II. Legal Standards

  The Court "must quash or modify a subpoena" that "requires disclosure of privileged or

other protected matter, if no exception or waiver applies."  Fed. R. Civ. P. 45(d)(3)(A).  "The

individual or entity seeking relief from subpoena compliance bears the burden of demonstrating

that a subpoena should be modified or quashed."  U.S. Dep't of the Treasury v. Pension Benefit

Guar. Corp., 301 F.R.D. 20, 25 (D.D.C. 2014) (quoting Sterne Kessler Goldstein & Fox, PLLC v.

Eastman Kodak Co., 276 F.R.D. 376, 379 (D.D.C. 2011)).  As relevant here, a "party asserting the reporter's privilege . . . bears the burden of showing that it applies in a particular case."  U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos., 507 F. Supp. 2d 45, 50 (D.D.C. 2007).  If the information sought by the subpoena falls within the privilege as a threshold matter, the party seeking the information may nevertheless compel compliance with the subpoena by showing that the balance of factors set forth in Zerilli v. Smith, 656 F.2d 705 (D.C. Cir. 1981), warrants disclosure.  See Lee v. Dep't of Justice, 413 F.3d 53, 59–60 (D.C. Cir. 2005); Hutira v. Islamic Republic of Iran, 211 F. Supp. 2d 115, 119 n.4 (D.D.C. 2002) ("Courts engage in the [Zerilli] balancing test . . . only after the reporter . . . has demonstrated that the privilege applies." (citing Shoen v. Shoen, 5 F.3d 1289, 1296 (9th Cir. 1993))); Goldberg v. Amgen, Inc., 123 F. Supp. 3d 9, 15 (D.D.C. 2015) ("In other words, if the privilege applies, [the requesting party] bears the burden of abrogating it.").

### III.  Analysis

Herridge and Fox primarily invoke the First Amendment journalist's privilege.  The Court therefore begins by assessing whether Chen has overcome that privilege, which she does not dispute applies in the first instance.  The Court then assesses whether a federal common law newsgathering privilege may also warrant quashing the subpoenas.

### A.  First Amendment Journalist's Privilege

The D.C. Circuit's opinion in Zerilli provides the test for applying "a non-party journalist's qualified privilege in a civil action such as this one, where testimony of journalists is sought because government officials have been accused of illegally providing the journalists with private information."  Lee, 413 F.3d at 59.  As a threshold matter, the parties agree that the Zerilli test governs this case and that the test begins, at least, by considering whether the information Chen seeks goes to "the heart of the matter" and whether Chen has exhausted "every reasonable

alternative source of information." Id. (quoting Zerilli, 656 F.2d at 713). They disagree, however, about whether the Zerilli test ends with those two considerations or, instead, requires (or at least permits) the Court to balance a host of other factors bearing on the parties' interests and the stakes of the case. The Court therefore begins by clarifying the contours of the Zerilli inquiry before proceeding to apply the relevant factors.

### 1. The Zerilli Framework

Chen asserts that Zerilli established a "two-part test for determining when a Privacy Act plaintiff seeking information about the disclosure of her protected information is entitled to obtain that information from a non-party reporter." Opp. to Herridge Mot. at 14. Those two elements, she says, are (1) whether the information sought is "central" to her claim and (2) whether she has exhausted other reasonable avenues of obtaining the information before seeking it from the journalist. Id. Herridge and Fox counter that the "[a]nalysis under Zerilli does not abruptly end with a mechanical assessment" of those two factors but rather requires "a broad balancing analysis," weighing such considerations as the plaintiff's personal interest in damages, her likelihood of success on the merits, the egregiousness of the government's alleged misconduct, and the importance of journalism in the context of reporting on national security matters. See Herridge Mot. at 22–39. In the Court's view, Zerilli, particularly as interpreted and applied in Lee, does not contemplate the kind of free-form, anything-goes analysis that Herridge and Fox seek. To be sure, Zerilli calls for a balancing test and counsels that, properly applied, the test should result in the privilege "prevail[ing] in all but the most exceptional cases." 656 F.2d at 712. But, as the Court will explain, Zerilli also channeled district courts' discretion by identifying the specific factors that weigh in the balance.

As here, Zerilli concerned the application of the First Amendment reporter's privilege to a Privacy Act suit brought against government officials accused of leaking sensitive information

about the plaintiffs—transcripts of incriminating conversations obtained during an FBI investigation—to the Detroit News.  Id. at 707–08.  In affirming the district court's denial of the plaintiffs' motion to compel the reporter to reveal his source for the transcripts, the D.C. Circuit first reiterated its previous conclusion that "to determine whether the privilege applies courts should look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure."  Id. at 712 (citing Carey v. Hume, 492 F.2d 631, 636 (D.C. Cir. 1974)).  "In general," Zerilli explained, courts must "be mindful of the preferred position of the First Amendment and the importance of a vigorous press."  Id. Accordingly, the rules governing compelled disclosure of confidential sources must "minimize impingement upon the reporter's ability to gather news."  Id.  Zerilli further predicted that, properly applying those rules, "the civil litigant's interest in disclosure should yield to the journalist's privilege" in "all but the most exceptional cases."  Id.

Zerilli did not, however, end the analysis with that "general" guidance; rather, it proceeded to identify a "number of more precise guidelines" that "can be applied to determine how the balance should be struck in a particular case."  Id. at 712–13.  First, the court explained that the "civil litigant's need for the information he seeks" must be "of central importance," that is, go to "the heart of the matter" and be "crucial to his case."  Id. at 713 (quoting Carey, 492 F.2d at 636). If the requested information is of central importance, "then the argument in favor of compelled disclosure may be relatively strong."  Id.

Zerilli then added a second consideration—the "efforts made by the litigants to obtain the information from alternative sources"—which the court explained was "also of central importance."  Id.  "Even when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information."  Id.  That reasonable exhaustion requirement, the

court added, would reflect the "values resident in the protection of the confidential sources of newsmen."  Id. (quoting Carey, 492 F.2d at 638).

Last, Zerilli explained that courts must mind the distinction "between civil cases in which the reporter is a party, as in a libel action, and cases in which the reporter is not a party."  Id. at 714.  If "the journalist is a party, and successful assertion of the privilege will effectively shield him from liability," that fact will "weigh somewhat more heavily in favor of disclosure," as application of the privilege in such circumstances, particularly in libel cases, "would effectively prevent recovery" most of the time.  Id.  Even so, the court emphasized that this third factor must be balanced against the "other relevant factors" recounted in the opinion—such as whether the information sought is crucial for the plaintiff's case—to determine whether "the privilege should prevail."  Id.

"Applying these guidelines to the facts of the case," Zerilli concluded that the district court did not abuse its discretion by upholding the assertion of the First Amendment privilege.  Id. (emphasis added).  Although the suit was "not frivolous" and the information sought was "crucial" to the case, Zerilli held that the plaintiffs had "not fulfilled their obligation to exhaust possible alternative sources of information," noting in particular the plaintiffs' failure to depose individuals the Government identified as either possessing or knowing a great deal about the allegedly leaked transcripts.  Id. at 714–15 (citing failure to depose "the four employees who had the greatest knowledge about the logs").  Zerilli thus prescribed a balancing test, but it did not give district courts free rein to populate that test with whatever factors they please.  Rather than judge in the abstract "the civil litigant's interest" against "the public interest in protecting a newspaper's confidential sources," Zerilli instructed courts to weigh three "more precise guidelines" of "central importance" to the balancing analysis.  Id. at 712–713.

8

That courts must tailor the balancing test to those central factors identified in Zerilli is confirmed by the D.C. Circuit's subsequent application of the analysis in Lee v. Department of Justice, 413 F.3d 53 (D.C. Cir. 2005).  There, as here, the court considered the application of the First Amendment reporter's privilege to a Privacy Act claim stemming from an alleged leak by government personnel of sensitive personal information about the plaintiff.  Id. at 55–56.  After making hundreds of written discovery requests and deposing twenty government officials, the plaintiff finally issued subpoenas to the journalists who had published the information.  Id. at 56. Applying Zerilli, the district court denied the journalists' motions to quash the subpoenas, and the D.C. Circuit affirmed in relevant part.[1]  Id. at 55, 57.

Zerilli, Lee explained, "provides for a non-party journalist's qualified privilege in a civil action such as this one, where testimony of journalists is sought because government officials have been accused of illegally providing the journalists with private information."  Id. at 59.  After acknowledging Zerilli's consideration of the distinction between cases in which the reporter is a party and those in which the reporter is not a party, id. 57 n.1, Lee proceeded to identify the two remaining "guidelines [for] determining when a court can compel a non-party journalist to testify about a confidential source"—namely, whether the information sought goes to "the heart of the matter" and whether the litigant has exhausted "every reasonable alternative source of information," id. at 59 (quoting Zerilli, 656 F.2d at 713).

Emphasizing that "the protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist, no matter how newsworthy the government official

---

[1] The Circuit vacated the district court's contempt order as to one of the reporters not based on the Zerilli analysis but rather because it found no clear and convincing evidence that that reporter had actually violated the district court's discovery order requiring the journalists to truthfully answer questions regarding the identities of the alleged leakers.  Id. at 56, 63–64.

may feel the information is," <u>Lee</u> applied "the factors laid out in <u>Zerilli</u>" to find that the district court "did not abuse its discretion in requiring the journalists to testify." <u>Id.</u> at 60.  Without the "identities of the leakers," the court reasoned, the plaintiff's ability "to show the other elements of the Privacy Act claim, such as willfulness and intent, will be compromised." <u>Id.</u>  As to exhaustion, <u>Lee</u> observed that "the number of depositions necessary for exhaustion must be determined on a case-by-case basis" and concluded that, although the plaintiff "did not depose every individual who conceivably could have leaked the information," such absolute exhaustion is not necessary. <u>Id.</u> at 61.  Requiring exhaustion of "every individual who could have had any kind of access to the information regardless of other evidence that the deponents on whom [the plaintiff] focused were in fact the sources of the leaks," the court continued, would impose an "unreasonable burden of discovery" on Privacy Act plaintiffs.  <u>Id.</u>

Like <u>Zerilli</u>, then, <u>Lee</u> did not apply a free-form balancing of interests but rather struck the balance between private and public interests by reference to the specific factors identified in <u>Zerilli</u>—the centrality of the requested discovery and the exhaustion of reasonable alternatives.  To be sure, the Court does not read <u>Lee</u> and <u>Zerilli</u> to *prohibit* district courts from considering additional factors.  For instance, as Herridge points out, <u>Zerilli</u> also observed at the outset of its balancing analysis that "appellants' suit" there was "not frivolous."  <u>Zerilli</u>, 656 F.2d at 714; <u>see</u> Herridge Reply at 9.  One of <u>Zerilli</u>'s chief sources for its balancing test, <u>Carey v. Hume</u>, 492 F.2d 631 (D.C. Cir. 1974), likewise noted that "the facts disclosed by the record" there were "inadequate to support a conclusion that" the plaintiff's likelihood of ultimate success on the merits was so remote "that no purpose would be served by disclosure of the identity of the sources." <u>Id.</u> at 638.  These comments are fairly read to contemplate some limited consideration of the merits of a Privacy Act plaintiff's underlying claim, at least insofar as requiring disclosure

in a frivolous suit would serve "no purpose."[2]  But consideration of a lawsuit's patent futility is a far cry from the full-blown preview of summary judgment briefing that Herridge and Fox seek here.  Moreover, Carey itself cautioned against such an extensive interrogation of the merits at this stage of a case, observing that there had "been no motion by appellant for summary judgment" and "thus no showing of facts bearing upon the likelihood" of plaintiff's success on the merits, and emphasizing that the court did not "intimate any opinion as to" whether the plaintiff "will ultimately prevail."  Id. at 637–38.  In any case, whether or not Carey and Zerilli suggest that some consideration of the merits in frivolous cases might be permitted, Lee's affirmance of the district court based on balancing centrality and exhaustion alone suggests that those factors will be dispositive in the mine-run of cases.

Reading Zerilli and Lee to require a balancing test focused primarily, even if not exclusively, on centrality and exhaustion (and, where applicable, whether the journalists are parties or non-parties) also accords with the approach of other courts in this district.  Take Hatfill v. Gonzales, 505 F. Supp. 2d 33 (D.D.C. 2007).  Although the court there rejected "[a]s an initial matter" the non-party journalists' arguments that "the disclosures at issue" did not violate the Privacy Act, id. at 37–39, it then explained that Lee provided "direct and unequivocal guidance and instruction" for the plaintiff's motion to compel responses from the journalists, holding that the plaintiff had "satisfied both prongs of the Zerilli guidelines necessary to defeat the journalists' qualified privilege," id. at 40–43.  In later rejecting the journalists' request that the court recognize a federal common law reporters' privilege, the court concluded that requiring courts to balance the

---

[2] Indeed, some consideration of the merits of a plaintiff's case may also factor into the analysis of the centrality of the sought-after information; if an obvious flaw will prevent a plaintiff from succeeding on her Privacy Act claim, then it might be said that the leaker's identity does not go to "the heart of the matter."  Zerilli, 656 F.2d at 713 (quoting Carey, 492 F.2d at 636).

private interest, measured by the harm the leak caused, against the public interest in

newsgathering, measured by the leaked information's value—the same considerations invoked by

Herridge and Fox here—would be "inherently unworkable," putting courts in the position of

judging "the newsworthiness of" a reporter's story.  Id. at 46–47 & n.8 (quoting Lee v. Dep't of

Justice (Lee II), 401 F. Supp. 2d 123, 139 (D.D.C. 2005)).  Herridge correctly observes that there

is some variation in how other courts have categorized or numbered the relevant factors.  But the

weight of authority is that Zerilli and Lee set forth the applicable considerations and did not give

trial courts free rein to consider private and public interests in disclosure in the abstract.  See, e.g.,

Tripp v. Dep't of Def., 284 F. Supp. 2d 50, 55 (D.D.C. 2003) (describing factors to be considered

as centrality, exhaustion, "whether the journalist" is a party, and "whether the information sought

is confidential or non-confidential in nature"); Hutira, 211 F. Supp. 2d at 119, 121–22 & n.8

(listing centrality and exhaustion as primary considerations, although exhaustion was dispositive,

and noting that "the Court was unable to find any case in this circuit that suggests that it should

appraise the underlying civil action so as to decide whether it is worth abrogating the privilege");

Goldberg, 123 F. Supp. 3d at 16 ("Courts must consider two main factors in deciding whether to

compel a journalist to provide evidence."); id. at 17 (evaluating "the two Zerilli factors"); In re

Subpoena to Goldberg, 693 F. Supp. 2d 81, 85 (D.D.C. 2010) (explaining that Zerilli "articulated a

three-part test to determine the appropriate balance between the litigant's interest in the

information and the public's interest," composed of centrality, exhaustion, and party-non-party

status); McGraw-Hill Cos., 507 F. Supp. at 50 ("The balancing test requires evaluation of two

factors: (1) the need for the information and (2) whether the party seeking the information has

exhausted all reasonably available alternative sources.").[3]

---

[3]  Herridge cites Grunseth v. Marriott Corp., 868 F. Supp. 333 (D.D.C. 1994), as an
example of a court looking beyond the factors identified in Zerilli to consider also the relative

Before applying the Zerilli test to the facts at hand, the Court emphasizes that restricting

the test largely to the "precise guidelines" set forth in that case "does not leave journalists without

protection." Lee, 413 F.3d at 60.  Herridge and Fox worry that if the Zerilli test mainly boils

down to consideration of centrality and exhaustion, then Privacy Act plaintiffs "will eventually get

access to confidential sources in *every* case," contrary to Zerilli's admonition that the privilege

should prevail "in all but the most exceptional cases."  Herridge Mot. at 3 (quoting Zerilli, 656

F.2d at 712); see also id. at 23–24.  Vigilant application of the centrality and exhaustion factors,

however, should ensure that compelled disclosure will be the exception, not the rule.  For one,

ensuring that the requested information is central to a plaintiff's claim, even in Privacy Act cases,

will preclude overly broad subpoenas that reach further into the journalist's privilege than is

required.  Moreover, it is no easy task to exhaust all reasonable alternative sources of information.

Many of the cases cited above concluded that plaintiffs had failed to do just that.  See, e.g., Hutira,

211 F. Supp. 2d at 121–22; Tripp, 284 F. Supp. 2d at 60–61; In re Subpoena to Goldberg, 693 F.

Supp. 2d at 88.  In the Court's view, it is likely that, when forced to exhaust all reasonable

alternatives, plaintiffs will often be able to identify the source of a journalist's reporting without

resort to the journalist.  And even where the Zerilli factors favor disclosure, "the usual

requirements of relevance, need, and limited burdens on the subpoenaed person still apply."  Lee,

_____

"societal interest[s]" implicated by a request for disclosure of a journalist's source, id. at 335–36
(after analyzing the three Zerilli factors, observing that the case did not involve "election fraud, or
governmental corruption, or any other issue that affects the fundamental validity of the electoral
process" but only the plaintiff's demand for damages).  Grunseth's consideration of societal
interests unmoored from the Zerilli factors, however, is inconsistent with both Lee's analysis and
the trend in this district.  And as explained below, even if the Court were to analyze such
considerations, Chen's interest in enforcing the Privacy Act here implicates public interests to a
greater degree than the gubernatorial candidate in Grunseth who sought to identify sources of a
newspaper report that he had an extramarital affair.  Id. at 334.

413 F.3d at 60.  In short, the Court is less troubled by Herridge and Fox's parade of horribles, particularly since there appears to have been no such widespread fallout since <u>Lee</u>.[4]

> 2. *Centrality*

The Court now turns to the first <u>Zerilli</u> factor: whether the information sought by Chen's subpoenas goes to "the heart of" her Privacy Act claim.  <u>Lee</u>, 413 F.3d at 59 (quoting <u>Zerilli</u>, 656 F.2d at 713).  The document subpoena to Herridge consists of four requests:

> **REQUEST NO. 1:**
> Produce all Private Documents and Information in your possession, in the form in which you received them.
>
> **REQUEST NO. 2:**
> Produce all Documents and Communications comprising, reflecting, or relating to transmission or provision of the Private Documents and Information to you.
>
> **REQUEST NO. 3:**
> Produce Documents or Communications sufficient to identify the individual(s) that transmitted or provided the Private Documents and Information to you.
>
> **REQUEST NO. 4:**
> Produce all Communications between or among, you, on the one hand, and, on the other hand, Stephen Rhoads and/or Timothy Pappa.

Herridge Mot., Ex. L, Schedule A at 6–7.  The phrase "Private Documents and Information," in turn, is defined to include "any and all documents and information concerning Dr. Chen and/or the University that were provided to or obtained by you from a third party and that were presented in, referred to, or considered in relation to" Fox's broadcasts and news stories that contained the allegedly leaked information about Chen.  <u>Id.</u> at 3.  The document subpoena to Fox includes four similar requests.  Fox Mot., Ex. G, Schedule A at 7.  Herridge and Fox contend that these

---

[4] In his dissent from the denial of rehearing en banc in <u>Lee</u>, Judge Tatel expressed a concern similar to the one raised by Herridge and Fox, but they point to no evidence that the floodgates to journalists' notepads have opened in the eighteen years since then.  <u>See</u> <u>Lee v. Dep't of Justice</u>, 428 F.3d 299, 301–02 (D.C. Cir. 2005) (Tatel, J., dissenting from denial of reh'g en banc).

subpoenas are overbroad as written because they would require disclosure of every document or piece of information obtained from anyone relating to Chen or her university, whether or not the documents or information bear any relation to the alleged release of records protected under the Privacy Act.  Herridge Mot. at 17.

The Court agrees with Herridge and Fox that, as drafted, the subpoenas sweep beyond the information that is central to Chen's case.  "As in Zerilli, the relevant information is the identity of the individuals who may have leaked information in violation of the Privacy Act," and without that information, Chen's "ability to show the other elements of the Privacy Act claim, such as willfulness and intent, will be compromised."  Lee, 413 F.3d at 60.  Read at their broadest, however, the subpoenas could require the disclosure of all of Herridge's sources who contributed information to her reporting, even if that information is not protected by the Privacy Act.

But this overbreadth does not doom Chen's requests.  The Court has authority under Rule 45 to "quash or modify" a subpoena, Fed. R. Civ. P. 45(d)(3)(A), and "when appropriate," courts should "consider the possibility of modifying the subpoena rather than quashing" it, Est. of Klieman v. Palestinian Auth., 293 F.R.D. 235, 240 (D.D.C. 2013) (quoting Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 403 (D.C. Cir. 1984)).  Here, Herridge and Fox's counsel suggested at oral argument that the centrality factor would not be an obstacle for Chen if the subpoenas are "cut down to focus only on the deposition for the . . . identity of the source or sources" who provided Herridge with the material purportedly covered by the Privacy Act, namely, the photographs of Chen, the FBI interview reports, the immigration or naturalization documents, and the PowerPoint presentation created by Agent Pappa.  Hearing Transcript at 9; see also Herridge Mot., Ex. L, Schedule A at 3 (listing relevant documents).  The Court thus finds that the centrality factor favors disclosure if, as discussed below, the Court quashes the other subpoenas but enforces Chen's deposition subpoena of Herridge.

*3. Exhaustion of Alternatives*

Next, <u>Zerilli</u> and <u>Lee</u> require that "reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." <u>Zerilli</u>, 656 F.2d at 713; <u>accord Lee</u>, 413 F.3d at 59. Although the exhaustion requirement is "very substantial," "there are some limits to the obligation to pursue alternative sources." <u>Zerilli</u>, 656 F.2d at 714. A Privacy Act plaintiff need not, for instance, "depose every individual who conceivably could have leaked the information" or "who could have had any kind of access to the information regardless of other evidence that the deponents on whom [she] focused were in fact the sources of the leaks and were denying it." <u>Lee</u>, 413 F.3d at 61. To that end, litigants need not "be made to carry wide-ranging and onerous discovery burdens where the path is . . . ill-lighted." <u>Id.</u> (alteration in original) (quoting <u>Carey</u>, 492 F.2d at 639). Nor does <u>Zerilli</u> "require proof positive that the knowledge exists nowhere else on earth but in the minds of the journalists and their anonymous confidants." <u>Lee v. U.S. Dep't of Justice (Lee III)</u>, 287 F. Supp. 2d 15, 23 (D.D.C. 2003). The number of depositions or extent of other discovery required for "reasonable" exhaustion "must be determined on a case-by-case basis," considering such factors as the efforts already undertaken, the burden of further discovery, and the likelihood that it would uncover the relevant information. <u>Lee</u>, 413 F.3d at 60–61.

Here, Chen's request to compel disclosure of the leaker's identity from Herridge and Fox has come at "the end, and not the beginning, of the inquiry." <u>Zerilli</u>, 656 F.2d at 713 (quoting <u>Carey</u>, 492 F.2d at 638). Chen has served the defendants in this case with 67 requests for production of documents, 67 interrogatories, and 57 requests for admission. Opp. to Herridge Mot. at 2. She has taken eighteen depositions of current and former government employees, including four 30(b)(6) depositions of FBI employees, issued thirteen third-party subpoenas, and obtained 22 declarations from other government personnel who were either part of or aware of the

**MATERIAL UNDER SEAL DELETED**

underlying investigation into Chen.  Id.  In particular, she has deposed both FBI Agent Pappa—the

creator of the PowerPoint Chen believes to be the source of the leaked material—and Stephen

Rhoads—Herridge's on-the-record source who was privy to Pappa's work, who, in an email

intended to prompt a Congressional investigation into Chen, boasted that "[n]obody on the planet

[knew] more about this case than" he, and who proclaimed that he had "documents, emails,

recordings and pictures that nobody else has."  Id., Ex. 25 (cleaned up).  During her depositions of

other government employees, moreover, Chen also asked if they had any idea who might have

provided the private documents used in Herridge's reporting.  See, e.g., id., Ex. 17 at 164 ███

████████████████████████████████████████████████████████████

███ ; id., Ex. 18 at 248 ██████████████████████████████████████

████████████████████████████████████████████████████████

███████████ ; id., Exs. 20 & 21 ███████████████████████████████

█████████████████████████ ; id., Ex. 32 at 129 ███████████████████

████████████████████████████████████████████████████

███████ .  In a word, Chen's pursuit of discovery has been probing, yet she has been unable to

ascertain the alleged leaker's identity.  Indeed, her efforts have been far more extensive than those

of the plaintiffs in Zerilli, who had made no attempt to depose any of the individuals who were

most familiar with or who had access to documents from the investigation there.  656 F.2d at 714–

15; see also Tripp, 284 F. Supp. 2d at 59 (upholding privilege where "the party seeking to compel

disclosure has made no effort whatsoever, or insufficient efforts, to obtain the information sought

from alternative sources, or has made conclusory claims that the information cannot be obtained

from other sources"); In re Subpoena to Goldberg, 693 F. Supp. 2d at 88 (requiring litigant to seek

out other sources that could "likely" provide requested information); Goldberg, 123 F. Supp. 3d at

20 (pointing out failure to seek "information from the obvious alternative sources").

MATERIAL UNDER SEAL DELETED

Despite Chen's efforts, Herridge and Fox identify several stones they believe she must turn to exhaust reasonable alternative sources.  Particularly in light of the extensive discovery Chen has already undertaken, however, the Court does not believe further exploration of any of these additional sources offers more than a speculative prospect of identifying the source of the leak.

First, Herridge and Fox insist that Chen should have secured a comprehensive list of—and either deposed or sought declarations from—all FBI personnel who might have had access to Agent Pappa's PowerPoint ██████████████████████████████████████ ████████.  That group, they say, would include ████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.  Herridge Mot. at 18. But Chen did try, unsuccessfully, to identify the relevant subset of those individuals who accessed the PowerPoint from that location.  See Opp. to Herridge Mot., Ex. 30 at 29 (FBI 30(b)(6) deponent stating that ██████████████████████████████████████████ ████████████████████████); id., Ex. 11 at 6 (FBI response to interrogatory stating that the ██████████████████████████████████████████████████ ████████).  In any event, requiring Chen to seek depositions or declarations from every person who nominally had access ████████████████████████—without any evidence that those individuals actually did access the PowerPoint (or, for that matter, were aware of its existence)—would be contrary to Lee's instruction that plaintiffs need not depose every individual "who could have had any kind of access to the information."  413 F.3d at 61.

Similarly speculative is Herridge and Fox's argument that Chen should have further pursued information about individuals who ████████████████████████████████ ████████████████████████████.  Specifically, Herridge and Fox point to ████ ████████████████████████████████████████████████████████████████.

**MATERIAL UNDER SEAL DELETED**

See Herridge Mot. at 19; Opp. to Herridge Mot., Ex. 30 at 100.  They also point to ████████

████████████████████████████████████████████████████ to his

supervisors.  Herridge Mot. at 18; id., Ex. P at 90–91, 178–79.  ██████████████, Herridge

and Fox contend that Chen should have identified and deposed (or sought declarations from)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ .

   The foundation for such suppositions, however, is far too shaky.  Although Pappa stated in

his deposition that he believed ████████████████████████████████

████████████████████████████████████████████████ , he also

emphasized ████████████████████████████████████████████████

████████████████████████  Opp. to Herridge Mot., Ex. 5 at 214.  At best, he could not recall

████████████████████████████████████████████  Id. at 215; see also

id. at 217 (Pappa stating he could not recall ████████████████████████████

████ ); id. at 228–29 (Pappa stating that he could not recall ████████████████████

████████████████████████████ ); id. at 298 (Pappa stating he did not

recall ████████████████████ ).  One ████████████████████████

████████ recalled that ████████████████████████████ but also remembered that

████████████████████████ .  Opp. to Herridge Mot., Ex. 33 at 28.  ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████  Id., Ex. 14 at 88–91.  As lukewarm as these leads are, Chen nevertheless attempted to

**MATERIAL UNDER SEAL DELETED**

ascertain the identities of ██████████████ through the FBI's 30(b)(6) deponent, who stated

████████████████████████████████. Id., Ex. 30 at 35–

36, 38.  In short, Chen did conduct follow-up discovery to ascertain ███████████████

██████, and in any case, Herridge and Fox have identified nothing in the record to suggest it is

reasonably likely someone from ████████████ accessed, absconded with, or leaked the

PowerPoint.

      Finally, the Court is unpersuaded by the remaining specters Herridge and Fox cite as

potential recipients of the PowerPoint.  They point to the possibility that Agent Pappa might have

given a copy of the PowerPoint to ████████████████ employee named

████████████ to convey to ████████████████ (whom Chen deposed).  But

█████████████████████████████████████████

███████████████████████████████████████████████

████████████. Id., Ex. 13.  And ██████████ testified that he could not ████████████

█████████████████. Id., Ex. 15 at 86–87.  Herridge and Fox cite

another email in which a ███████████████████, requested that

Pappa send ████████████████ based on the PowerPoint to ██████████

███. Herridge Mot. at 18–19.  But neither ██████████ nor another recipient of that email, both of

whom Chen deposed, could say ████████████████████, Opp. to

Herridge Mot., Ex. 16 at 114; id., Ex. 32 at 65, nor is there any reason to believe ██████████

████████████████, had any contact with or reason to leak to Herridge.  Last,

Herridge and Fox cite ████████████████████████

████████████████████████████████████

██████████████████. Herridge Mot., Ex. R.  Once again, Chen asked

████████████████ in his deposition.  He replied that ████████████████

**MATERIAL UNDER SEAL DELETED**

███████████████████████████████████████████████████████

███████████████████████████████████████████████. Opp. to

Herridge Mot., Ex. 32 at 110–11.

To summarize, none of the potential leads on which Herridge and Fox rely amounts to

anything more than speculation that some government officials might have seen or potentially had

access to the alleged Privacy Act materials in this case.  Moreover, far from amounting to "a

reasonably well-defined number of possible alternative sources," Goldberg, 123 F. Supp. 3d at 18,

the number of potential sources Herridge and Fox would require Chen to exhaust would balloon to

██████████████████████████████████████████████, all without any

non-speculative evidence that they ever possessed, let alone leaked, the relevant materials.  To

require Chen to pursue these "ill-lighted" paths after the extensive discovery she has already

conducted, and when evidence suggests that other individuals (such as Rhoads) both had access to

the Chen investigation and an interest in publicizing it, see Opp. to Herridge Mot., Ex. 18 at 90–

91, 184–86; id., Ex. 25, would read the word "reasonable" out of Zerilli's exhaustion requirement.

This factor, accordingly, tilts sharply in Chen's favor.

       *4.  Reporter's Status*

Next, as instructed by Zerilli, the Court considers the distinction between cases in which

"the reporter is a party" and those "in which the reporter is not a party."  656 F.2d at 714.  As

Zerilli explained, this factor can point strongly in favor of disclosure when the reporter is a party

and "successful assertion of the privilege will effectively shield him from liability," as in libel

cases that require proof of actual malice.  Id.  Herridge and Fox are not parties to this case, so

Zerilli's concern about the "equities" does not decisively favor disclosure.  At the same time,

neither does that fact weigh against disclosure.  Indeed, Lee acknowledged that the reporters there

were all non-parties and yet did not hesitate to affirm the district court's disclosure ruling based on the weight of the centrality and exhaustion factors there.  413 F.3d at 57 n.1.

     5.  *Other Factors and Considerations*

     For the reasons discussed above, the Court does not read <u>Zerilli</u> or <u>Lee</u> to require either a full-bore analysis of Chen's likelihood of success on the merits of her Privacy Act claim or an assessment of the public and private interests at play beyond the factors discussed above.  But, for the sake of completeness, the Court briefly explains here why Herridge and Fox's arguments along these lines likely would not change the outcome here in any event.

     The Court will group Herridge and Fox's remaining arguments into two considerations.  First, they maintain that their First Amendment interests outweigh Chen's interest in pursuing her Privacy Act claim because, in their view, she will be unable to obtain damages at the end of the day, either because Chen's alleged damages were caused by the Defense Department's independent decision to cut off tuition assistance to her university or because much (but not all) of Fox's reporting on her was derived from sources that do not implicate the Privacy Act.  Herridge Mot. at 26–34.  To these arguments, it is sufficient to repeat <u>Zerilli</u>'s observation that Chen's "suit is not frivolous."  656 F.2d at 714.  The Court need not, and does not, decide now whether Herridge and Fox are correct that Chen is barred from pursuing damages based on the Defense Department's revocation of tuition assistance, as those are not the only damages Chen alleges she suffered.  She also seeks economic damages for consulting fees and reputation management services she claims to have incurred to remediate the harm caused by the Fox reporting.  Opp. to Herridge Mot., Ex. 34 at 2; <u>cf. Fleck v. Dep't of Veterans Affs. Off. of Inspector Gen.</u>, 596 F. Supp. 3d 24, 57 (D.D.C. 2022) ("Legal fees that a plaintiff incurs to protect against the effects of an agency's Privacy Act violations are cognizable damages under Section 552a(g)(4).").  She seeks further damages for lost profits, a sum that might include lost business opportunities without

regard to the loss of tuition assistance from the Defense Department.  Opp. to Herridge Mot., Ex.

34 at 2; Compl. ¶ 56 ("The illegal leak of personal information has diminished Dr. Chen's income,

limited her professional opportunities, and decreased the value of the university that she wholly

owns and into which she has invested the last two decades.").

Even if Chen may ultimately have to distinguish between damages caused by the leak of

information covered by the Privacy Act—such as the compromising photographs of herself and

her husband—and not by other information in the Fox reporting that was either not so protected or

was publicly available, the Court cannot say at this juncture that she will be unable to do so,

particularly without expert opinions that could be crucial to that analysis.  Indeed, even if Herridge

and Fox are correct that only the photographs that appeared in the reporting could serve as the

basis for Privacy Act damages—a question the Court does not decide—the Court does not doubt

that the images of Chen holding or wearing a Chinese military uniform could have given the Fox

reporting more traction than it otherwise would have had and caused Chen more damage than she

otherwise would have suffered.  A picture, after all, "is worth a thousand words."  Andy Warhol

Found. for the Visual Arts v. Goldsmith, 143 S. Ct. 1258, 1295 (2023) (Kagan, J., dissenting).

Were the photographs here irrelevant, moreover, the Court wonders why Herridge would have

thought to include them in her reporting, notwithstanding the rather obvious legal implications of

doing so.  Although the Court does not intimate "any opinion as to whether" Chen "will ultimately

prevail," the current record does not support the conclusion "that no purpose would be served by

disclosure of the identity of the sources."  Carey, 492 F.2d at 638.

Second, Herridge and Fox urge the Court to conclude that Chen's "purely parochial,

private interest" in her Privacy Act claim, absent evidence that the government "smeared an

innocent person," simply does not outweigh the First Amendment interest in promoting a robust

free press, particularly in the area of reporting on national security.  Herridge Mot. at 26, 34–39.

At the outset, the Court rejects the assertion that Chen's Privacy Act claim implicates only her own personal interests.  To make out a Privacy Act claim, a litigant must show that the government's disclosure of covered material was "intentional or willful," 5 U.S.C. § 552a(g)(4), and Congress has recognized the weightiness of such willful disclosures by creating a private right of action to deter them.  Nor does the Court read Lee, Hatfill, or any of the other D.C. Circuit cases discussing the reporter's privilege to turn on whether the Privacy Act plaintiff was wrongfully "smeared" by government leaks or, to paraphrase Herridge and Fox's argument, "had it coming."  For good reason:  The Privacy Act protects not just Chen but all private citizens, whether blameworthy or blameless, from the risk that government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals.

Of course, the Court does not question the vital role of a free press in "bar[ing] the secrets of government and inform[ing] the people."  N.Y. Times Co. v. United States, 403 U.S. 713, 717 (1971) (Black, J., concurring).  But here, if Herridge and Fox are correct that only a few (in their view, insignificant) elements of their stories even implicated the Privacy Act, then that press function, including the reliance on confidential sources, need not have come into conflict with Chen's statutory privacy rights at all.  And, at the end of the day, the binding precedent of this Circuit does not permit this Court to cast aside all the "more precise guidelines" analyzed above based solely on the abstract "importance of a vigorous press."  Zerilli, 656 F.2d at 712–13.

*   *   *

The Court is mindful both "of the preferred position of the First Amendment," Zerilli, 656 F.2d at 712, and of the fact that "the protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist, no matter how newsworthy the government official may feel the information is," Lee, 413 F.3d at 60.  As described above, the

two most important factors identified by Zerilli and Lee point decidedly in Chen's favor.  The
subpoenas, as modified, go to the heart of her Privacy Act claim, and she has exhausted all but the
speculative alternative sources of information suggested by Herridge and Fox.  That Herridge and
Fox are not parties to the case does not outweigh those factors, nor do their concerns about the
extent of Chen's damages or the importance of Herridge's work.  Accordingly, balancing the
foregoing factors, the Court concludes that Chen has overcome the qualified First Amendment
privilege in this case.

   B.  Common Law Newsgathering Privilege

   Although most of the parties' briefing is devoted to the qualified First Amendment
privilege, Herridge and Fox also urge the Court to recognize a newsgathering privilege under
federal common law.  See Herridge Mot. at 39–45; Fox Mot. at 13–14.  For the same reasons
stated by Judge Collyer in Lee II and Judge Walton in Hatfill, the Court declines to recognize a
federal common law newsgathering privilege here.

   Herridge and Fox contend that the relationship between a journalist and her confidential
source is "rooted in the imperative need for confidence and trust" and serves important public
ends.  Herridge Mot. at 40–41 (quoting Jaffee v. Redmond, 518 U.S. 1, 10 (1996)).  But to
"qualify as an exception from the general rule disfavoring testimonial privileges requires a public
good transcending the normally predominant principle of utilizing all rational means for
ascertaining the truth."  Hatfill, 505 F. Supp. 2d at 44 (alterations and internal quotation marks
omitted) (quoting Jaffee, 518 U.S. at 9).  The "transcendent importance of a free press is that
reporters can report the news and express opinions without fear of Government oppression or
interference," and the use of confidential sources is "not a *sine qua non* of journalism but only an
important and useful tool."  Lee II, 401 F. Supp. 2d at 141; accord Hatfill, 505 F. Supp. 2d at 45.

Moreover, "[u]nlike the psychotherapist's privilege recognized in <u>Jaffee</u>, 'the likely evidentiary benefit that would result from the denial of the [reporter's] privilege'" could be substantial.  <u>Hatfill</u>, 505 F. Supp. 2d at 45 (second alteration in original) (quoting <u>Jaffee</u>, 518 U.S. at 11).  Even if not absolute, a common law privilege that would preclude disclosure of a confidential source in a case such as this one, which the Court has found satisfies the <u>Zerilli</u> and <u>Lee</u> test, would "circumvent" this Circuit's First Amendment privilege case law and would risk undermining "the fundamental purpose of the Privacy Act" of "discourag[ing] the kind of [alleged] leaks that are at issue in this action." <u>Lee II</u>, 401 F. Supp. 2d at 139, 141–42.  Moreover, as noted above, the balancing of interests contemplated by Herridge and Fox's proposed common law privilege "would create a subjective and elastic standard whose outcome could not be predicted," saddling district courts with the "daunting and well-nigh impossible task" of determining "whether the harm caused by leaked information outweighs the 'value' of that information to the citizenry." <u>Id.</u> at 139.  Given that this Circuit already has a well-established First Amendment privilege that both protects journalists' interests and channels judicial discretion in balancing that interest against evidentiary need, Herridge and Fox fail to "demonstrate with a high degree of clarity and certainty that" their proposed privilege "will effectively advance a public good" relative to these potential drawbacks. <u>Id.</u> at 137 (quoting <u>In re Sealed Case</u>, 148 F.3d 1073, 1076 (D.C. Cir. 1998)).

To be sure, as Herridge and Fox point out, almost all of the states have adopted some form of reporter's privilege, although the contours of those protections vary significantly from state to state. <u>See</u> <u>In re Grand Jury Subpoena, Judith Miller</u>, 438 F.3d 1141, 1157–58 (D.C. Cir. 2006) (Sentelle, J., concurring).  That factor weighs somewhat in favor of recognizing a similar federal common law privilege.  But "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." <u>United</u>

States v. Nixon, 418 U.S. 683, 710 (1974).  For that reason, "new privileges should be created

sparingly and with caution."  Lee II, 401 F. Supp. 2d at 136.  And, although not dispositive,

recognizing the common law privilege Herridge and Fox seek would stand in some tension with

the Supreme Court's pronouncement that "the common law recognized no such privilege," at least

in the criminal context.  Branzburg v. Hayes, 408 U.S. 665, 698 (1972); see id. at 685 ("At

common law, courts consistently refused to recognize the existence of any privilege authorizing a

newsman to refuse to reveal confidential information to a grand jury.").  Accordingly, the Court

will not create a federal common law newsgathering privilege here.

    C.  Sequencing of Discovery

    The Court must tackle one last question—Fox's arguments that the subpoenas to it should

be quashed as duplicative of the Herridge subpoenas, at least until discovery efforts are exhausted

with respect to her.  Fox contends that Zerilli's exhaustion requirement demands that Chen seek

discovery from Herridge first and that requiring Fox to submit to a deposition would be

unnecessarily cumulative and duplicative under Federal Rule of Civil Procedure 26(b)(2)(C).  Fox

Mot. at 12–13, 14–16.  Although Chen contends that Herridge and Fox may be able to provide

different materials relevant to her claim, she does not oppose sequencing discovery to require

Fox's compliance with the subpoenas only if the discovery sought from Herridge is incomplete.

Opp. to Fox Mot. at 18–19.

    The Court agrees with this proposed approach.  The "names of the sources who leaked

information about Dr. [Chen] to the media are central to [her] Privacy Act claim[]," and Chen's

subpoena to depose Herridge is "directly targeted at obtaining" that information.  Hatfill, 505 F.

Supp. 2d at 49.  Until Chen has exhausted her efforts to obtain the alleged leaker's identity from

Herridge, she will not have exhausted reasonable alternative sources sufficient to require Fox to

submit to a subpoena as well.  Id.  Of course, "depending upon the outcome of the reporter's

deposition[], it may be necessary for the Court to revisit in the future whether corporate representatives of" Fox "should be compelled to provide deposition testimony." <u>Id.</u>  But, at least for now, the Court believes it prudent to proceed one step at a time.

Accordingly, the Court will grant Herridge's motion insofar as it defers enforcement of Chen's document subpoena and cabins her deposition subpoena, but it will otherwise deny her motion.  Consistent with this opinion, Chen may depose Herridge regarding the identity and intent of the source or sources of the documents and images allegedly provided to her in violation of the Privacy Act, and any non-privileged other matters relevant to her Privacy Act claim.  The Court will grant Fox's motion, without prejudice to Chen renewing her subpoenas to Fox in the event Herridge cannot provide the information she seeks.

## IV.  Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. Nos. 94 & 96] Catherine Herridge's Motion to Quash is GRANTED in part and DENIED in part.  It is further

**ORDERED** that [Dkt. Nos. 95 & 97] Fox News Network's Motion to Quash is GRANTED.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date:  August 1, 2023