**PUBLIC COPY—SEALED MATERIAL DELETED**

**No. 24-5050**

IN THE

# United States Court of Appeals for the District of Columbia Circuit

YANPING CHEN,
*Plaintiffs-Appellees*,

*v.*

FEDERAL BUREAU OF INVESTIGATION, et al.,
*Defendants-Appellees*,

CATHERINE V. HERRIDGE,
*Appellant.*

On Appeal from the United States District Court for the District of Columbia,
No. 1:18-cv-03074-CRC

## BRIEF FOR APPELLANT CATHERINE V. HERRIDGE

Patrick F. Philbin
Kyle T. West
Chase Harrington
TORRIDON LAW PLLC
1155 F Street, N.W.
Suite 750
Washington, DC 20004
(202) 249-6900
pphilbin@torridonlaw.com

June 20, 2024                    *Counsel for Catherine V. Herridge*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Non-Party-Appellant certifies as follows:

## A.  Parties, Intervenors, and Amici Curiae

Appellant in this case and non-party witness in the district court is Catherine V. Herridge.  Fox News Network LLC is also a non-party witness in the district court.

Appellee in this case and Plaintiff in the district court is Yanping Chen.

Defendants in the district court are the Federal Bureau of Investigation, the U.S. Department of Justice, the U.S. Department of Defense, and the U.S. Department of Homeland Security.

Reporters Committee for Freedom of the Press filed a brief as amicus curiae in the district court.

## B.  Rulings Under Review

The rulings under review are: (1) the Order of the District Court for the District of Columbia entered on August 1, 2023 (ECF No. 140) (redacted version filed on August 17, 2023, ECF No. 148) denying Ms. Herridge's motion to quash and compelling her to give deposition testimony identifying her confidential source(s); (2) the Order of the District Court for the District of Columbia entered on

February 29, 2024 adjudging Ms. Herridge in civil contempt, and (3) all other orders antecedent to such orders and thus incorporated therein. Each of the rulings under review was issued by United States District Judge Christopher R. Cooper. These Rulings are reproduced at JA__ and JA__.

**C.     Related Cases**

This case was previously before this Court in *Chen v. FBI*, No. 23-5198 (2023), which the Court dismissed for lack of appellate jurisdiction. Undersigned counsel is not aware of any related cases pending in this Court or any other court.

June 20, 2024

Respectfully submitted,

/s/ *Patrick F. Philbin*

Patrick F. Philbin
Kyle T. West
Chase Harrington
TORRIDON LAW PLLC
1155 F Street, N.W.
Suite 750
Washington, DC 20004
(202) 249-6900
pphilbin@torridonlaw.com

*Counsel for Catherine V. Herridge*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.........................................................5

ISSUES ON APPEAL .............................................................................5

BACKGROUND .....................................................................................5

    A.    Ms. Herridge's Work as an Investigative National Security Journalist ................................................................5

    B.    The Counterespionage Investigation into Plaintiff and Ms. Herridge's Reporting....................................................7

    C.    Information About Plaintiff on the Public Record in an FBI Search Warrant Affidavit ....................................10

    D.    DOD ██████████ Terminates Funding "On National Security Grounds".......................12

    E.    Plaintiff Sues the Government Under the Privacy Act and Subpoenas Ms. Herridge To Uncover Her Confidential Sources.......13

    F.    The District Court's Rulings ................................................14

SUMMARY OF ARGUMENT ...............................................................16

STANDARD OF REVIEW .....................................................................19

ARGUMENT ........................................................................................19

I.    The District Court Erred by Reducing *Zerilli* to a Two-Factor Test Based on Centrality and Exhaustion.............................22

    A.    *Zerilli* Calls for a Broad Balancing of Interests, Not an Inquiry Cabined to Centrality and Exhaustion.................................22

    B.    Balancing Under *Zerilli* Requires Assessing Defects in Plaintiff's Case and the Extent to Which It May Fail on Summary Judgment. .........................................29

C.    The District Court Failed To Conduct the Balancing Called for by *Zerilli*. ...........................................................................32

II.    When *Zerilli* Is Properly Applied, It Is Plain That the First Amendment Privilege Should Prevail and the Subpoena Should Have Been Quashed. ..................................................................................33

A.    Plaintiff's Private Interest in Securing Damages Under the Privacy Act Weighs Little in the Balance. ...........................................34

1.    Plaintiff Cannot Secure Privacy Act Damages for DOD's Independent Decision to Cut Off Funds to UMT "On National Security Grounds."......................................34

2.    There Is a Serious Risk that Plaintiff Is Using Her Privacy Act Suit to Have the Government Pay Her Compensation for Passing Information to the CCP.............................38

3.    Plaintiff's Privacy Act Damages Are Limited, Because Almost All the Information That Was Damaging to Plaintiff Did Not Involve Any Privacy Act Disclosures. .........42

4.    This Case Is Not Like Prior Cases in which the Government Had Made Egregious Errors. ...............................47

B.    The Public Interest in Upholding Protections for a Free Press Overwhelms Plaintiff's Interest in Minimal Damages. .....................48

III.    The Court Should Recognize a Federal Common Law Reporter's Privilege...................................................................................52

CONCLUSION.............................................................................................55

ADDENDUM ..............................................................................................A1

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alemu v. Dep't of For-Hire Vehicles*,
   327 F. Supp. 3d 29 (D.D.C. 2018)...................................................................35

*Atlanta Journal-Constitution v. Jewell*,
   555 S.E.2d 175 (Ga. App. 2001) ......................................................................31

*Baker v. F&F Investment*,
   470 F.2d 778 (2d Cir. 1972) ...............................................................19, 20, 24

*Barry v. U.S. Dep't of Just.*,
   63 F. Supp. 2d 25 (D.D.C. 1999)......................................................................43

*Bartel v. FAA*,
   725 F.2d 1403 (D.C. Cir. 1984).........................................................................44

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*,
   633 F.2d 583 (1st Cir. 1980)..........................................................................4, 30

*Carey v. Hume*,
   492 F.2d 631 (D.C. Cir. 1974)......................................................................21, 30

*Cervantes v. Time, Inc.*,
   464 F.2d 986 (8th Cir. 1972) ............................................................................30

*Chen v. FBI*,
   No. 23-5198 (2023)................................................................................... ii, 15

*Cheney v. U.S. District Court*,
   542 U.S. 367 (2004)...........................................................................................24

*State ex rel. Classic III, Inc. v. Ely*,
   954 S.W.2d 650 (Mo. App. 1997) ....................................................................31

*Danks v. Zinke*,
   No. 1:17-cv-114, 2018 WL 8646658 (D.N.D. Nov. 27, 2018) .........................44

*Douglas v. Agric. Stabilization & Conservation Serv.*,
   33 F.3d 784 (7th Cir. 1994) ..............................................................................36

*Galen v. Cnty. of Los Angeles*,
477 F.3d 652 (9th Cir. 2007) ...................................................................36

*In re Grand Jury Subpoena, Judith Miller*,
438 F.3d 1141 (D.C. Cir. 2006) ..........................................................53, 54

*Hand v. Gary*,
838 F.2d 1420 (5th Cir. 1988) ................................................................36

*Hatfill v. Ashcroft*,
404 F. Supp. 2d 104 (D.D.C. 2005) ........................................................47

*Hollis v. Dep't of the Army*,
856 F.2d 1541 (D.C. Cir. 1988) ..............................................................44

*Hotel Oakland Assocs. v. Doyle Real Est. Advisors, LLC*,
No. 21-CV-05389-SK, 2022 WL 1493267 (N.D. Cal. May 3,
2022) .................................................................................................35

*Jaffee v. Redmond*,
518 U.S. 1 (1996) ........................................................19, 52, 53, 54, 55

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ..............................................................................27

*Kleiman v. Dep't of Energy*,
956 F.2d 335 (D.C. Cir. 1992) ................................................................36

*Lee v. Dep't of Justice*,
401 F. Supp. 2d 123 (D.D.C. 2005) ............................................23, 47, 48

*Lee v. Dep't of Justice*,
413 F.3d 53 (D.C. Cir. 2005) ......................................................21, 27, 28

*Lee v. Dep't of Justice*,
428 F.3d 299 (D.C. Cir. 2005) ..........................................3, 25, 26, 46, 52

*Leib v. Veterans' Admin.*,
546 F. Supp. 758 (D.D.C. 1982) .............................................................36

*Luckey v. Miller*,
929 F.2d 618 (11th Cir. 1991) ................................................................28

*Mideast Sys. & China Civ. Constr. Saipan Joint Venture v. Hodel*,
    792 F.2d 1172 (D.C. Cir. 1986) ........................................................... 35

*Mitchell v. USDA*,
    No. 13-cv-500-bbc, 2014 WL 7240671 (W.D. Wis. Dec. 17, 2014) ................ 44

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971) ......................................................... 4, 50, 52, 54

*O'Grady v. Superior Court*,
    44 Cal. Rptr. 3d 72 (Cal. Ct. App. 2006) ............................................ 31

*Estate of Parsons v. Palestinian Auth.*,
    952 F. Supp. 2d 61 (D.D.C. 2013) .................................................... 28

*Shoen v. Shoen*,
    5 F.3d 1289 (9th Cir. 1993) ........................................................... 20

*Time, Inc. v. Hill*,
    385 U.S. 374 (1967) .................................................................... 48

*United States v. Lee*,
    No. CR-99-1417, 2000 WL 36739632 (D.N.M. Aug. 31, 2000) ...................... 47

*Zerilli v. Smith*,
    656 F.2d 705 (D.C. Cir. 1981) ........................ 2, 5, 16, 17, 19, 20, 21, 22, 23, 24
                                  25, 26, 29, 32, 33, 40, 46, 48, 49, 53

**Statutes**

5 U.S.C. § 552a(b) ......................................................................... 43

28 U.S.C. § 1291 ............................................................................. 5

28 U.S.C. § 1292(b) ........................................................................ 14

**Rules**

Fed. R. Civ. P. 28(a)(1) ...................................................................... i

Fed. R. Evid. 501 .......................................................................... 52

**Other Authorities**

Awards and Recognitions, Cong. Medal of Honor Soc'y,
https://perma.cc/GJ92-UL9B ................................................................................7

Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions,* 31 Case W. Reserve L. Rev. 84 (1980) .........................9

Winners: SEJ 20th Annual Awards for Reporting on the Environment," Soc'y of Env't Journalists (Oct. 20, 2021),
https://perma.cc/FR4C-86MZ .............................................................................6

# GLOSSARY

CCP ................................................................ Chinese Communist Party

NCIS ........................................................ Naval Criminal Investigative Service

PLA ........................................................ People's Liberation Army

UMT ........................................................ University of Management Technology

## INTRODUCTION

The district court held Catherine V. Herridge—an award-winning national security reporter—in contempt for asserting the First Amendment reporter's privilege and refusing to disclose her confidential source(s) to Plaintiff in this Privacy Act case. The Department of Defense (DOD) has determined that Plaintiff

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████ In 2018, acting on "national security grounds," DOD publicly cut off taxpayer funding for a university founded and run by Plaintiff. JA___[Dkt._96-1_at_12 & n.14]. DOD found that the university (which recruited primarily U.S. military personnel) ████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

Plaintiff never challenged DOD's findings in court. Instead, she filed this Privacy Act suit seeking taxpayer funds as damages to compensate her for the taxpayer funds that DOD cut off for national security reasons. Her theory: DOD only acted because some articles published by Ms. Herridge exposed Plaintiff's past in the Chinese military, and the articles included information that came from government files in violation of the Privacy Act. In aid of that theory, the district court overrode the First Amendment reporter's privilege and ordered Ms. Herridge

to disclose her confidential source(s)—that is, presumptively, government personnel knowledgeable about counterespionage investigations—to a former colonel in the PLA who was suspected of passing information on U.S. servicemembers to China.

That result gutted the First Amendment reporter's privilege and gravely misapplied this Court's decision in *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981). *Zerilli* instructs that, in applying the reporter's privilege, a court must "weigh[] the public interest in protecting the reporter's sources against the private interest in compelling disclosure," and that the privilege should prevail "in all but the most exceptional cases." *Id.* at 712. The district court reduced *Zerilli* to just two factors: (i) whether the information sought is central to the plaintiff's claim ("centrality"), and (ii) whether the plaintiff exhausted other avenues for obtaining the information ("exhaustion"). Because the identity of the source is always deemed "central" to a Privacy Act claim, that approach reduces *Zerilli* to a mere exhaustion requirement under which *every* Privacy Act plaintiff can *always* get access to confidential sources eventually, no matter how trivial or tenuous the plaintiff's claims. That approach eviscerates the First Amendment privilege and inverts the clear instruction from *Zerilli* that "in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege." *Id.* The district court decision undermines First Amendment protections and would stifle the flow of information to the press, because investigative journalists cannot function without credible assurances of

confidentiality to their sources.

The district court itself acknowledged that "there are … substantial grounds for a difference of opinion regarding the Court's ruling." JA___[Dkt.152_at_2]. Indeed, the last time this Court faced this exact question about the scope of balancing under *Zerilli*, it produced a four-four vote denying rehearing en banc and no clear resolution. *See Lee v. Dep't of Justice*, 428 F.3d 299, 300 & nn. 1, 5 (D.C. Cir. 2005) (per curiam). As Judge Tatel explained, reducing *Zerilli* to the "arid two-factor test" used by the district court here would "allo[w] the exigencies of even the most trivial litigation to trump core First Amendment values." *Id.* at 301 (Tatel, J., dissenting from denial of reh'g en banc). It prevents a court from giving proper weight to "the public's interest in protecting journalists' ability to report without reservation on sensitive issues of national security." *Id.* at 302.

The Court should clarify that *Zerilli* requires a broad, case-by-case balancing and cannot be reduced to a mechanical test of "centrality" and "exhaustion."

When *Zerilli* is properly applied, the contempt judgment below cannot stand. Multiple factors diminish the weight of Plaintiff's "private interest" in this litigation and tip the scales in favor of protecting the First Amendment. For example, it is unlikely that Plaintiff can prove causation of damages for her Privacy Act claim, because the damages she claims (or the vast bulk of them) were caused by DOD's independent decision to announce that it was cutting off Plaintiff's school "on

national security grounds." Plaintiff cannot trace causation through that intervening agency action. In addition, as two national security experts have explained in affidavits, there is a serious risk that Plaintiff was using her school as a front to gather information on U.S. military personnel to be passed to China and that her Privacy Act lawsuit actually seeks to recover funding for that activity. JA___[Dkt._176-4_¶¶10-21]; ████████████████. That, too, should have weighed in the balance. The district court, however, refused to examine whether these and other weaknesses would scuttle Plaintiff's case.

These obvious defects in Plaintiff's case (and others) should have been examined—on partial summary judgment briefing if necessary—*before* taking the irretrievable step of ordering the disclosure of confidential sources. Other courts employ that approach, *see, e.g.*, *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597 (1st Cir. 1980), and for good reason. Disclosing confidential sources has a devastating and systemic chilling effect on vital First Amendment activity and undermines the ability of the press to "bare the secrets of government and inform the people." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). It makes no sense to incur those costs only to find out on summary judgment that Plaintiff's Privacy Act claim fails (or largely fails).

The Court should reverse the contempt order and quash the subpoena to Ms. Herridge.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered a final judgment of contempt on February 29, 2024, JA___[Dkt._193], and Ms. Herridge timely filed a notice of appeal on March 8, 2024, JA___[Dkt._194].

## ISSUES ON APPEAL

1.      Whether the district court erred in holding that the balancing test announced in *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981), is effectively confined to two factors: (i) whether the information sought is central to the plaintiff's claim ("centrality"); and (ii) whether the plaintiff exhausted all other reasonable avenues for obtaining the information ("exhaustion").

2.      Whether, under a proper application of *Zerilli*, the First Amendment reporter's privilege should prevail in this case.

3.      Whether this Court should recognize a federal common law reporter's privilege that shields Ms. Herridge's confidential sources from disclosure.

## BACKGROUND

### A.      Ms. Herridge's Work as an Investigative National Security Journalist

Catherine Herridge is an Emmy Award-winning investigative journalist with 32 years of experience reporting on national security and intelligence matters, most recently as Senior Investigative correspondent for CBS News. JA___[Dkt._96-4_¶¶1-2]. Her work has consistently focused on raising issues of accountability and

has been a catalyst for legislative change positively impacting the lives of more than a million servicemembers and their families. For example, she worked on investigative reporting that uncovered the true extent of the injuries U.S. servicemembers suffered from an Iranian ballistic missile attack on a U.S. base in Iraq in January 2020. JA___[*id.* at ¶7]. As a result of Herridge's reporting, 50 soldiers received Purple Hearts. *Id.*

Ms. Herridge also received the Kevin Carmody Award for Outstanding Investigative Reporting for reports that exposed serious health hazards from toxic waste at a U.S. military base in Uzbekistan where thousands of U.S. servicemembers have been stationed. *Id.* Her "tenacious reporting" led to a promise from the Acting Secretary of Defense to remedy the situation. *See* "Winners: SEJ 20th Annual Awards for Reporting on the Environment," Soc'y of Env't Journalists (Oct. 20, 2021), https://perma.cc/FR4C-86MZ. Indeed, it drove legislation and led to an Executive Order in January 2021 mandating a comprehensive study to address the health consequences for those who served at the base. [JA___[Dkt._96-4_¶7].

Ms. Herridge and the CBS News Investigative Unit's Emmy-nominated series "Decades of Exposure" probing toxic water supplies at Camp Lejeune is credited with helping to spur passage of the Camp Lejeune Justice Act in August 2022 as part of the PACT Act, benefiting nearly a million veterans.

Ms. Herridge's work also earned the Congressional Medal of Honor Society's Tex McCrary Award for Journalism, which "is reserved for those persons from the fourth estate who, through their life's work, have distinguished themselves by service or unbiased coverage of the United States Military through journalism in peace and war." Awards and Recognitions, Cong. Medal of Honor Soc'y, https://perma.cc/GJ92-UL9B (emphasis added).

## B. The Counterespionage Investigation into Plaintiff and Ms. Herridge's Reporting

In 2017, Ms. Herridge (then the Chief Intelligence Correspondent for Fox News Network) was the lead reporter on a series of articles focusing on another matter that involved U.S. servicemembers being placed at risk. *See* JA___[Dkt._96-3, 96-5, 96-6]. Her reports described a counterespionage investigation into Plaintiff and a possible PLA intelligence operation targeting U.S. military personnel.

Plaintiff founded and runs the University of Management Technology (UMT), a university in Arlington, Virginia, that caters primarily to U.S. military personnel. ████████████████. In December 2012, the FBI had publicly executed search warrants at UMT's offices and at Plaintiff's home. JA___[Dkt._96-3_at_1]. In March 2016, the U.S. Attorney's Office for the Eastern District of Virginia informed Plaintiff that she would not be prosecuted. JA___[Dkt._1_¶22].

In 2017, Ms. Herridge reported on the investigation in a series of three articles published on February 24, April 28, and June 28. JA___[Dkt._96-3, 96-5, 96-6].

The stories presented evidence that Plaintiff had been a colonel in the PLA and that she sought to hide that fact by lying on immigration forms and telling others to lie under oath to a federal grand jury to conceal her past. *Id.* Among other things, the stories featured on-camera interviews with Stephen Rhoads, a whistleblower who had worked at UMT and had served as an undercover FBI informant. *Id.* Rhoads explained that Plaintiff had admitted to him that she had been a colonel in the PLA and made efforts to conceal that fact. Plaintiff told Rhoads she "was an Army officer," and when he asked where she trained, she "laughed and said, 'Oh, no, I was in the Chinese army, you know.'" JA___[Dkt._96-3_at_2]. When Rhoads told Plaintiff that the FBI wanted him to testify before a grand jury, Plaintiff told him to lie: "Oh, you don't tell them anything .… You don't—you don't know I was a colonel in the P.L.A. They'll never have proof to say that." JA___[*id.* at 3].

Rhoads also explained that UMT was collecting information about U.S. servicemembers' military history that could then be remotely accessed: "It got uploaded into an O-drive, they called it … their personal military bio, you know, where they were trained, how they were trained, how long, that could be remotely accessed." *Id.* Plaintiff asked Rhoads specifically to recruit students at one of the Air Force's most technology-and-research-heavy locations—Wright-Patterson Air Force Base. *Id.* An expert on the Chinese military, Peter Mattis, explained that the personnel records would provide a "curated database" that would be of interest to

8

the PLA for two reasons: "The first is, militaries everywhere want to know what a potential adversary might look like—what are their capabilities, how will they act? The second is this might also serve as a vehicle for recruiting individuals." JA___[Dkt._96-5_at_2].

Rhoads explained that UMT was also receiving approximately $250,000 to $300,000 per month in taxpayer dollars from DOD through a tuition assistance program. JA___[*id._at_1*]. As Rhoads summed it up: "It's a bad deal for the soldiers … it's a bad deal for the taxpayer." *Id.*

The stories explained that the FBI and the U.S. Attorney's Office disagreed about prosecuting Plaintiff based in part on concerns about disclosing intelligence sources and methods.[1] JA___[Dkt._96-3_at_3]. In addition, the Naval Criminal Investigative Service (NCIS) confirmed on the record that there was "still an active multi-agency investigation" into UMT. JA___[Dkt._96-6_at_1].

Finally, the stories included some information that Plaintiff later claimed had come from government files and was subject to the Privacy Act. Plaintiff points to pictures allegedly seized in the FBI raids (including pictures of her wearing the

---

[1] Prosecuting an espionage case consistent with the defendant's constitutional rights may force the government to disclose classified information, including intelligence sources and methods. The government may decide that the prosecution is not worth further compromising national security. *See generally* Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980).

uniform of a colonel in the PLA), *see* JA___[Dkt._1_¶¶26, 31], portions of her immigration forms (including a form showing her false denial that she had ever been affiliated with the Communist Party), JA___[*id._*¶¶25, 27]; and images or information from FBI memoranda memorializing interviews with her and with her daughter, including, in particular, an interview in which she denied having held rank in the PLA, JA___[*id._*¶¶26, 29].

## C. Information About Plaintiff on the Public Record in an FBI Search Warrant Affidavit

When Ms. Herridge's stories ran, almost all of the information that later became the basis for Plaintiff's Privacy Act claim was already a matter of public record in the Eastern District of Virginia in the affidavit the FBI had used to secure search warrants for its raids in 2012 (the "FBI Affidavit").

In March 2017, after the first article ran, Plaintiff filed a motion in EDVA seeking sanctions against the government on the theory that the government must have leaked the FBI Affidavit to Ms. Herridge. JA___[Dkt._96-7]. In denying that motion, the magistrate judge who had originally sealed the affidavit held that, on its face, the sealing order expired on March 4, 2013 (90 days after the application) and that the information in the FBI Affidavit was available to the public after that date. JA___[Dkt._96-8_at_29:21-30:3]; *see also* JA___[Dkt._96-9]. As he explained, "my order was specific in that the information that was contained in the application

10

and affidavit … was not considered to be under the Court's sealing order after March 4, 2013." JA___[Dkt._96-8_at_29:21-24]; *see also* JA___[Dkt._96-9].

The clerk's office apparently had "overlooked" the limited duration of the sealing order and failed to place the materials on the publicly accessible docket. JA___[Dkt._96-8_at_29:11-16]. But the magistrate judge held that clerical error made no difference to the legal status of the document. He explained that after March 4, 2013, "there was no court order that allowed those proceedings to remain under seal." JA___[*id._*at_4:7-8, 14-15, 19-20]. He went on: "[T]he information is the information. And if it is no longer to be under seal, whether somebody looks at it or not, it still should be public information." JA___[*id._*at_26:10-13].[2]

Short of providing the actual pictures of Plaintiff in her colonel's uniform that were allegedly seized in the FBI raid, the FBI Affidavit detailed every bit of information that Plaintiff has pointed to as the basis for her Privacy Act claim—and more. *See* JA___[Dkt._96-11]. It included transcribed cuts from tape recordings in which Plaintiff admitted that she had been a colonel in the PLA to an FBI informant wearing a wire. *See* JA___[*id._*¶¶15-16]. It described Plaintiff's false statement on an immigration form that she had never been affiliated with the Communist Party—

---

[2] On April 25, 2017, the court made clear that only filings *after* February 23, 2017, should be under seal, which resulted in earlier filings being placed on the public docket. *See* JA__[Dkt._96-8_at_2:16-21]. The FBI Affidavit was available on PACER before the second of Ms. Herridge's articles ran on April 28, 2017.

the same form that appeared in Ms. Herridge's articles. JA___[*id._*¶¶20-21]. It also listed multiple further false statements on immigration forms that were not mentioned in the articles. JA___[*id._*¶¶18-19, 24-29]. It spelled out that a "UMT employee" had confirmed that personnel at UMT's Beijing offices had access to the database of information UMT had compiled on U.S. servicemembers. JA___[*id._*¶14]. And it detailed Plaintiff's denial that she had held rank in the PLA during her 2012 interview by the FBI. JA___[*id._*¶¶48-49].

**D.  DOD** ████████████████████████████████████
**Terminates Funding "On National Security Grounds"**

In 2018, DOD publicly announced that it had concluded an inquiry and was terminating UMT from the tuition assistance program "on national security grounds." JA___[Dkt._176_at_1].

DOD determined that Plaintiff ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

Plaintiff never challenged those factual determinations in court.

### E. Plaintiff Sues the Government Under the Privacy Act and Subpoenas Ms. Herridge To Uncover Her Confidential Sources

Rather than challenging DOD's findings, Plaintiff sued several agencies under the Privacy Act seeking to have the federal government compensate her for the revenue she lost when DOD cut off UMT's funding on national security grounds. She sought to blame her losses, not on DOD's national security findings, but on an alleged leak of Privacy Act information to Ms. Herridge.

Over the next several years, Plaintiff obtained substantial discovery into the details of the counterespionage investigation into her activities. She conducted eighteen depositions of government personnel with knowledge of the investigation or related briefings, JA___[Dkt._148_at_3], and received 8,000 documents from the government, JA___[Dkt._67_at_3].

In June 2022, Plaintiff served subpoenas seeking to discover the confidential source(s) for Ms. Herridge's stories.

## F.      The District Court's Rulings

Ms. Herridge moved to quash the subpoenas and, as relevant here, the district court denied the motion and ordered Ms. Herridge to sit for a deposition to disclose her confidential source(s).  JA___[Dkt._96]; JA___[Dkt._148].  The court rejected a broad balancing of interests to assess the First Amendment reporter's privilege and instead held that *Zerilli* required a narrower "test focused primarily … on centrality and exhaustion."  JA___[Dkt._148_at_11]; *see also* JA___[*id.*_at_10].

To the extent the court suggested that considering other factors in the balance "likely would not change the outcome," JA___[*id.*_at_22], the court did not consider weaknesses undermining Plaintiff's Privacy Act case beyond the superficial conclusion that the "suit is not frivolous."  *Id.*  The court, moreover, went out of its way to explain that its "prediction" did not provide an alternative holding and "was far from conclusive."  JA___[Dkt._152_at_2].  The court emphasized that it "remains possible that any refinement of the applicable test [under *Zerilli*] by the Circuit on appeal would alter the result."  *Id.*

On a motion to certify an interlocutory appeal under 28 U.S.C. § 1292(b), JA___[Dkt._144], the district court agreed that "there are substantial grounds for a difference of opinion regarding the Court's ruling," JA___[Dkt._152_at_2], but

refused to certify an appeal. The court held that Ms. Herridge's only avenue for appeal was to be held in contempt. JA___[*id._*at_1].[3]

Ms. Herridge was then deposed and declined to answer questions about her confidential source(s). She invoked the First Amendment reporter's privilege and explained: "I have complete respect for the court and its authority …. I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek further judicial review, I must now disobey the order." JA___[Dkt._176-7_at_20:17-21:13]. Ms. Herridge also explained that she does not want to provide information about source(s) who presumably are U.S. government personnel to a person whom DOD publicly announced was a national security risk. JA___[*id._*at_221:6-12].

In opposing Plaintiff's subsequent motion for a contempt order, Ms. Herridge renewed her arguments under *Zerilli* and also introduced additional affidavits (i) from experts in investigative journalism, who explained the broad chilling effect on journalism that would result from compelling disclosure of sources and (ii) from national security experts explaining that Plaintiff's actions fit the pattern of CCP

_____

[3] Ms. Herridge also attempted to appeal under the collateral order doctrine, but this Court dismissed that appeal for lack of jurisdiction. *Chen v. FBI*, No. 23-5198, Per Curiam Order, Doc. 2018838 (D.C. Cir. Sept. 25, 2023).

intelligence gathering and there was a serious risk that Plaintiff had been involved in passing information on U.S. military members to China.  *See* JA___[Dkt._183].

The district court adhered to its narrow reading that *Zerilli* "struck the balance between private and public interests by reference to th[e] two central factors" of centrality and exhaustion.  JA___[Dkt._193_at_11].  Holding that "those two factors are dispositive here," the court held Ms. Herridge in contempt.  JA___[*id._at_12*, 24].  The court set a civil contempt fine of $800 per day, but stayed that sanction pending this appeal.  JA___[*id._at_24*].

## SUMMARY OF ARGUMENT

1.  The district court erred by reducing the balancing approach in *Zerilli* to a mechanical test based on two factors: "(1) whether the requested discovery is central to the plaintiff's claim and (2) whether the plaintiff has exhausted other reasonable means of accessing the information."  JA___[*id._at_11*].

*Zerilli* instructed that courts should "weigh[] the public interest in protecting a reporter's sources and the private interest in compelling disclosure," and made clear that the privilege should "prevail in all but the most exceptional cases."  *Zerilli*, 656 F.2d at 712.  Reducing the analysis to the factors of centrality and exhaustion contradicts that core instruction from *Zerilli*, especially in a Privacy Act case.  Because the identity of a source is always central in a Privacy Act case, limiting *Zerilli* to "centrality" and "exhaustion" effectively means converting it to an

exhaustion test under which a plaintiff can eventually get access to confidential sources in *every case*. But not *every* Privacy Act case can qualify as a "most exceptional" case that warrants disclosing a reporter's sources.

Proper balancing under *Zerilli* also requires evaluating the strength of a plaintiff's underlying claim. Without that analysis, courts could end up irrationally impairing First Amendment rights and incurring the costs that come from exposing a journalist's confidential sources only to find that a claim collapses (or largely collapses) on summary judgment. To avoid that outcome, other courts examine how a plaintiff's claim is likely to fare on summary judgment *before* ordering disclosure of confidential sources.

2. Proper balancing under *Zerilli* shows that the scales in this case tip overwhelmingly in favor of the First Amendment reporter's privilege. Plaintiff's "private interest in compelling disclosure," 656 F.2d at 712, is undermined by multiple defects leaving it with relatively little weight in the balance. First, Plaintiff cannot recover most (if not all) of the damages she claims, because they were caused by DOD's independent decision to cut off funding to UMT "on national security grounds." Second, there is a serious risk that Plaintiff was engaged in providing information on U.S. military members to China and that her Privacy Act suit seeks to recover taxpayer funds to compensate her for that activity. That fact necessarily undermines the weight the Court can give her interest under *Zerilli*. Third, Plaintiff's

Privacy Act claim is further undermined by the fact that all of the information that allegedly damaged Plaintiff was presented in Ms. Herridge's articles through sources *other than* information subject to the Privacy Act. As a result, it is unlikely that Plaintiff will be able to prove that any damages were caused by the few bits of Privacy Act information in the stories (such as pictures of her wearing her PLA uniform) rather than by the mountain of other information about her.

On the other side of the scales, the First Amendment interest in protecting confidential sources to promote the newsgathering process is at its highest in cases, like this, involving reporting on national security issues—especially reporting that exposes threats to national security. The secrecy that often surrounds the national security realm means that no sources will talk to the press without credible assurances of confidentiality. And at the same time that secrecy also means that errors, incompetence, or wrongdoing can easily remain hidden and those responsible can escape accountability. Forcing disclosure of confidential sources would have a ripple effect, deterring potential sources from working with the press and thereby hobbling the ability of the press to keep the public informed and to hold the government accountable to the people.

At a minimum, the Court should hold that the district court should have postponed a decision on disclosing source(s) until *after* partial summary judgment briefing clarified how much (if any) of Plaintiff's claim might survive.

3.  If the Court determines that the First Amendment privilege does not apply, the Court should recognize a reporter's privilege under federal common law.  The criteria used for recognizing evidentiary privileges under federal common law, *see Jaffee v. Redmond*, 518 U.S. 1, 8 (1996), are all satisfied here.

## STANDARD OF REVIEW

The proper scope of balancing under *Zerilli* and recognizing a federal common law privilege present questions of law subject to *de novo* review.  Because the district court did not apply the correct legal standard, properly applying *Zerilli* also presents a matter for *de novo* consideration in this Court.

## ARGUMENT

The district court erred by failing to apply the First Amendment reporter's privilege to protect Ms. Herridge's confidential source(s).  It is well settled that the First Amendment provides journalists a qualified privilege from compelled disclosure of confidential sources.  *See, e.g.*, *Zerilli v. Smith*, 656 F.2d 705, 710-11 (D.C. Cir. 1981).  As this Court explained in *Zerilli*, "[t]he First Amendment guarantees a free press primarily because of the important role it can play as a 'vital source of public information.'"  *Id.* at 710.  Indeed, "[a] representative democracy, such as ours, cannot exist unless there is a free press both willing and able to keep the public informed of all the news."  *Baker v. F&F Investment*, 470 F.2d 778, 783 (2d Cir. 1972).  This Court recognized, however, that "journalists frequently depend

on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." *Zerilli*, 656 F.2d at 711. As a result, "[c]ompelling a reporter to disclose the identity of a source may significantly interfere with [the press's] news gathering ability." *Id*. As the Court explained, "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired," *id.*, and thus such compelled disclosure of confidential sources "raises obvious First Amendment problems." *Id*. at 710. Without confidential sources, the press could not uncover information vital for informing the public— especially about the inner workings of government—and the citizens would be deprived of information essential for them to make "informed political, social, and economic choices." *Id*. at 711. "The deterrent effect such disclosure is likely to have upon future … investigative reporting … threatens freedom of the press and the public's need to be informed." *Baker*, 470 F.2d at 782.

To protect the ability of a free press to inform the people, the journalist's privilege protects against compelled disclosure of sources. "Rooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the news gathering process, and in ensuring the free flow of information to the public, is an interest of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) (quotations omitted).

A litigant seeking to uncover a reporter's confidential sources—like Plaintiff here—bears the burden of overcoming the First Amendment privilege. To determine whether a plaintiff can carry that burden, this Court instructed in *Zerilli* that courts must "look to the facts of each case, weighing the public interest in protecting a reporter's sources and the private interest in compelling disclosure." *Zerilli*, 656 F.2d at 712.[4] *Zerilli* warned, moreover, that "when striking the balance," courts must "be mindful of the preferred position of the First Amendment" and expressly cautioned that "[i]f the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished." *Id.*

The district court erred by reducing the broad balancing of interests called for by *Zerilli* into essentially a two-factor mechanical test. When the genuine balancing called for by *Zerilli* is properly applied, it is plain that Plaintiff's subpoenas should have been quashed and the contempt order must be reversed.[5]

---

[4] *See also Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974) ("[T]he court will look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired.").

[5] Review of the contempt order "logically includes a review of the underlying issue of whether the journalist's privilege applies in this case." *Lee v. Dep't of Justice*, 413 F.3d 53, 59 (D.C. Cir. 2005).

I. **The District Court Erred by Reducing *Zerilli* to a Two-Factor Test Based on Centrality and Exhaustion.**

The district court wrongly reduced *Zerilli* effectively to a two-prong test based on centrality and exhaustion. That approach cannot be reconciled with the plain terms of *Zerilli* itself, and it produces results flatly at odds with the clear instruction from *Zerilli* that the First Amendment privilege should prevail "in all but the most exceptional cases." *Id.*

A. ***Zerilli* Calls for a Broad Balancing of Interests, Not an Inquiry Cabined to Centrality and Exhaustion.**

*Zerilli* straightforwardly announced a broad balancing analysis, explaining that "to determine whether the [First Amendment] privilege applies courts should look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure." *Id.* Indeed, *Zerilli* repeatedly emphasized that "a balancing approach should be applied." *Id.*; *see also id.* (explaining that courts should "strik[e] [a] balance between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources"). The Court rejected calls for tests providing more "specificity" and instead defended "the case-by-case balancing approach we have adopted." *Id.* at 712 n.46.

To be sure, *Zerilli* also identified "[a] number of more precise guidelines" to aid in "determin[ing] how the balance should be struck in a particular case." *Id.* at

713. One factor the Court identified was whether the information sought goes to "the heart of the matter," *id.*, in other words, whether it is "central" to a litigant's case, *Lee v. Dep't of Justice*, 401 F. Supp. 2d 123, 132 (D.D.C. 2005) (citation omitted). A second factor was whether the litigant had "exhausted every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713.[6] Those factors are important for assigning weight to the litigant's "private interest in compelling disclosure," *id.* at 712, because if the information is not central to a case and a litigant has not pursued alternatives, a court cannot place significant weight on the side of the scales favoring disclosure. As *Zerilli* explained, "if the information sought is only marginally relevant, disclosure may be very difficult to justify." *Id.* at 713. But simply by announcing these "guidelines" to assist in valuing how "the equities weigh," *id.* at 714, *Zerilli* did not jettison its fundamental call for an overall balancing of interests. And it plainly did not *replace* a balancing of interests with a mechanical two-part test.

Indeed, *Zerilli* itself made clear that the factors of centrality and exhaustion were *not* a complete test in themselves. *Zerilli* held that, while the identity of the reporter's sources in that case was central to the plaintiff's claims, the plaintiff had

---

[6] *Zerilli* also noted that another relevant factor is whether the reporter is a party to the case, as in a case for defamation. That factor does not come into play in this case.

not exhausted alternative avenues of discovery. But the Court also went out of its way to flag that it was not deciding "whether compelled disclosure would have been appropriate if appellants had fulfilled their obligation to exhaust alternative sources." *Id.* at 714 n.52. In other words, *even if* the plaintiff had met *both* the centrality and exhaustion requirements, that would not necessarily mean that the plaintiff should get access to a reporter's confidential sources. The Court rejected such a formulaic result and indicated that a further case-by-case weighing of interests would still be required before the Court could order disclosure of sources.

In addition, reducing analysis to centrality and exhaustion would contradict the core instruction from *Zerilli* that courts should protect the "preferred position of the First Amendment" and ensure that the privilege would "prevail in all but the most exceptional cases." *Id.* at 712. *Zerilli* repeatedly cautioned that "in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege" and that an "interest sufficiently compelling to override [the] privilege will be rare." *Id.* at 712 & n.45 (citing *Baker v. F&F Investment*, 470 F.2d 778, 783 (2d Cir. 1972)). That approach rightly reflected that "the right to production of relevant evidence in civil proceedings does not have the same 'constitutional dimensions'" as in the criminal context, *Cheney v. U.S. District Court*, 542 U.S. 367, 384 (2004), and when a conflict with the First Amendment arises, the protection of First Amendment rights should prevail.

Simplifying the analysis to consider just centrality and exhaustion contradicts those instructions, especially in a Privacy Act case. Courts in this Circuit have treated the identity of a source as a central issue in every Privacy Act case. As a result, focusing solely on centrality and exhaustion would reduce *Zerilli* to an exhaustion test. After pursuing other discovery options, a Privacy Act plaintiff could get access to confidential sources *in every case*, no matter how minimal the alleged violation or claimed damages, no matter how dubious the merits of the claim, and no matter how important the First Amendment interests involved. That result cannot be squared with the plain terms of *Zerilli*. Not *every* Privacy Act claim can qualify as a "most exceptional" case or "rare circumstance" worthy of overriding First Amendment protections. *Zerilli*, 656 F.2d at 712 & n.46. To the contrary, if the privilege must "prevail in all but the most exceptional cases," *id.* at 712, that necessarily means that there will be *unexceptional* civil cases (including Privacy Act cases) in which it will *not* be worth overriding First Amendment protections.

The last time the scope of *Zerilli* was before this Court, Judge Tatel and then-Judge Garland made this exact point dissenting from the denial of rehearing en banc in the *Lee* case—another Privacy Act case addressing access to a reporter's confidential sources. As Judge Tatel explained, reducing *Zerilli* to an "arid two-factor test" based on centrality and exhaustion would "allo[w] the exigencies of even the most trivial litigation to trump core First Amendment values." *Lee v. Dep't of*

*Just.*, 428 F.3d 299, 301 (D.C. Cir. 2005) (Tatel, J., dissenting from denial of reh'g en banc).  But that result was flatly at odds with *Zerilli*.  Similarly, then-Judge Garland explained that limiting *Zerilli* to centrality and exhaustion would create a test "inconsistent" with the "commitment [the Court] made in *Zerilli*, where we promised that 'when striking the balance between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources, we will be mindful of the preferred position of the First Amendment.'"  *Id.* at 303 (Garland, J., joined by Tatel, J., dissenting from denial of reh'g en banc).

The fundamental problem with reducing analysis to centrality and exhaustion is that it replaces a balancing of interests calibrated to protect a fundamental constitutional right with a mechanical two-factor test that guts First Amendment protections.  It creates a test under which, if a civil litigant can show (i) that he needs the information for his case and (ii) that he cannot get it elsewhere, his need trumps First Amendment protections every time.  But that is not the constitutional rule that *Zerilli* adopted.  Instead, *Zerilli* instructed that, in the vast majority of cases, a civil litigant's need for privileged information would not justify incurring the societal costs of overriding the First Amendment privilege.  And it directed courts to determine when First Amendment interests could be overcome by "weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure." 656 F.2d at 712.

Nor is that approach surprising. It parallels the balancing used in other contexts when First Amendment rights come into conflict with other important values. For example, as the Supreme Court recently explained, "[t]o account for the complexity associated with the interplay between free speech rights and government employment," "our cases suggest that courts should attempt to engage in 'a delicate balancing of the competing interests surrounding the speech and its consequences.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527-28 (2022) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006)). In that balance, courts consider "whether an employee's speech interests are outweighed by 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 528. *Zerilli* calls for a similar balancing of competing interests.

No subsequent decision of this Court has modified *Zerilli* to restrict analysis to the two "guidelines" of centrality and exhaustion. The district court pointed to *Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005), but *Lee* did not rewrite *Zerilli*. The Court in *Lee* merely addressed the centrality and exhaustion factors without discussing any further balancing of interests one way or another. *See id.* at 60-61.

Nor did the denial of rehearing en banc in *Lee* establish precedent restricting the scope of balancing under *Zerilli*. As noted above, Judge Tatel and then-Judge Garland dissented from denial of rehearing en banc on the ground that *Zerilli* called for a broader balancing of interests, which the panel had failed to conduct. *See id.*

at 301-02 (Tatel, J., joined by Garland, J., dissenting from denial of reh'g en banc); *id.* at 302-03 (Garland, J., joined by Tatel, J., dissenting from denial of reh'g en banc). Judge Rogers, also dissenting, noted that it was "evident" that "there are different views regarding the proper application of *Zerilli* in Privacy Act cases." *Id.* at 300 (Rogers, J., dissenting from denial of reh'g en banc). The Court denied rehearing without opinion on an equally divided 4-4 vote. *See id.* at 300 & nn. 1, 5 (per curiam). That outcome did not convert the panel's unexplained *failure to apply* broader balancing into a holding *forbidding* that analysis. And it certainly cannot be treated as a holding rejecting the arguments advanced by Judges Tatel and Garland. "[A] summary denial of rehearing en banc is insufficient to confer any implication or inference regarding the court's opinion relative to the merits of a case," even as to an argument "raised in dissent." *Luckey v. Miller*, 929 F.2d 618, 622 (11th Cir. 1991); *see also Estate of Parsons v. Palestinian Auth.*, 952 F. Supp. 2d 61, 69 n.6 (D.D.C. 2013) ("[S]ummary denial of a petition for rehearing has no binding effect on the arguments raised therein."). The disagreement in *Lee* highlighted an important question about how to understand *Zerilli*. It did not supply an answer as binding circuit precedent.

The Court should clarify that *Zerilli* means what it said: "a balancing approach should be applied," and that calls for "weighing the public interest in protecting the

reporter's sources against the private interest in compelling disclosure." *Zerilli*, 656 F.2d at 712.

**B.** **Balancing Under *Zerilli* Requires Assessing Defects in Plaintiff's Case and the Extent to Which It May Fail on Summary Judgment.**

Importantly, the balancing demanded by *Zerilli* also logically requires evaluating the strength of the underlying claim pressed by the litigant seeking discovery. After all, assigning weight to a litigant's "private interest in compelling disclosure," *id.* at 712, requires assessing the importance or value of the claim in aid of which the disclosure is sought. Otherwise, courts could be sacrificing First Amendment protections that are critical for the functioning of the press for trivial or tenuous claims that are unlikely to survive. In *Zerilli*, the Court assured itself that the plaintiff's claim was "not frivolous" before considering other factors. *Id.* at 714. Beyond that, evaluating the weight to assign to a litigant's claim must include an assessment of weaknesses that might cause the claim to fail on summary judgment. That is simply common sense. The whole point of the balancing analysis is to ensure that the societal costs that come from compelling disclosure of journalists' confidential sources will not be incurred unless a litigant has a sufficiently weighty claim to justify it. It would be pointless to incur those costs for a case that is likely to collapse—or largely collapse—on summary judgment.

As this Court has cautioned, moreover, "courts must always be alert to the possibilities of limiting impingements upon press freedom to the minimum," and

compelled disclosure by a journalist should be a "last resort." *Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1974). One way to ensure that compelled disclosures are a last resort is to ensure that, before ordering disclosure, a court examines defects that may undermine a claim on summary judgment—or permits partial summary judgment briefing to establish definitively the extent to which a claim will survive.

Other courts using a balancing test to apply the reporter's privilege use exactly this approach. For example, the First Circuit has explained that, before a court compels discovery of confidential sources, a "plaintiff should show that it can establish jury issues on the essential elements of its case not the subject of the contested discovery." *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597 (1st Cir. 1980). In other words, the plaintiff must show that its claim will not fail on summary judgment due to a weakness in another element of the claim. Similarly, the Eighth Circuit has held that it is proper to require a showing that a plaintiff can survive summary judgment because "compulsory disclosure of anonymous news sources without first inquiring into the substance of a[n] … action would emasculate" First Amendment protections. *Cervantes v. Time, Inc.*, 464 F.2d 986, 993 (8th Cir. 1972).

In demanding similar showings before compelling disclosure of sources, state courts have expressly recognized that "the application of this balancing test will involve legal analysis similar to, perhaps even identical to, that required in ruling

upon a motion for summary judgment." *Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175, 181 (Ga. App. 2001) (applying balancing as a matter of public policy under Georgia law); *see also O'Grady v. Superior Court*, 44 Cal. Rptr. 3d 72, 115 (Cal. Ct. App. 2006) (calling for "consideration of the demonstrated strength of the plaintiff's case on the merits," because "a *weak* showing of ultimate success tends to militate *against* disclosure because it increases the likelihood that any disclosure, and the accompanying violence to expressional interests, will prove to have been needless" (emphases in original)); *State ex rel. Classic III, Inc. v. Ely*, 954 S.W.2d 650, 659 (Mo. App. 1997) (demanding analysis of the strength of plaintiff's case, because "[i]f the case is weak, then little purpose will be served by allowing such discovery, yet great harm will be done by revelation of [the] privileged [confidential source] information").

That approach reflects the common sense recognition that there is no point in overriding First Amendment protections and disclosing confidential source(s) in aid of a claim that will fail (or largely fail) on summary judgment. Nothing requires a court to rush to judgment on the irretrievable step of uncovering confidential sources when developments in the litigation may help clarify whether a litigant's interest is actually substantial enough to justify the societal costs involved with overriding the First Amendment privilege.

## C. The District Court Failed To Conduct the Balancing Called for by *Zerilli*.

There can be no dispute that the court below failed to conduct the genuine balancing of interests called for by *Zerilli*. The court repeatedly rejected what it pejoratively derided as a "free-form balancing," JA___[Dkt._148_at_10], or "open-ended weighing," JA___[Dkt._193_at_11], or "anything-goes" analysis, JA___[Dkt._148_at_6], that would, on a case-by-case basis, broadly "weigh[] the public interest in protecting the reporter's sources against the private interest in compelling disclosure." *Zerilli*, 656 F.2d at 712. Instead, the court held that "courts should anchor their analysis to *Zerilli*'s two guideposts: centrality and exhaustion," and explained that *Zerilli* "call[s] on courts to focus primarily (even if not exclusively)[7] on centrality and exhaustion, *and those two factors are dispositive here*." JA___[Dkt._193_at_5, 12] (emphasis added). The court made plain that it "does not read *Zerilli* … to require … an assessment of the public and private interests at play beyond" evaluating those factors. JA___[Dkt._148_at_22]. Indeed, the Court acknowledged that it had "restrict[ed] review to centrality and exhaustion."

---

[7] The court included the caveat that *Zerilli* did not limit analysis *exclusively* to those two factors because *Zerilli* also called for courts to consider whether the journalist was a *party* to the case. *See* JA___[Dkt._148_at_8, 21-22]. That factor plays no role in this case. *Id.*

JA___[Dkt._152_at_2]; *see also id.* (acknowledging that the court had "largely cabined the relevant inquiry" to those two factors).

Beyond those two factors, the court acknowledged only that it could consider whether Plaintiff's claims were "frivolous," JA___[Dkt._193_at_6]; JA___[Dkt._148_at_10-11, 13, 22], but refused to conduct any more searching examination to determine whether Plaintiff's claims would collapse on summary judgment. *See, e.g.*, JA___[Dkt._193_at_6] (stating it was "premature to preview summary judgment"). The court refused to consider, for example, whether Plaintiffs' damages claims would be largely wiped out by her inability to prove causation for any alleged damages derived from DOD's decision to cut off her tuition assistance funds. In the district court's view, if *any portion* of Plaintiff's claim could survive, that was all that mattered for her claim to count as "not frivolous" under *Zerilli* and there could be no further weighing of the value of her claim against the cost created by compelled disclosure of Ms. Herridge's confidential national security sources. *See* JA___[Dkt._148_at_22].

## II. When *Zerilli* Is Properly Applied, It Is Plain That the First Amendment Privilege Should Prevail and the Subpoena Should Have Been Quashed.

Under a proper application of *Zerilli*, the First Amendment privilege should prevail in this case. Plaintiff's "private interest in compelling disclosure," 656 F.2d at 712, suffers from multiple defects that give it little weight in the balance. On the other side of the scale, the First Amendment interest in protecting confidential

sources to promote a robust free press is at its zenith in a case such as this involving matters of national security.

### A. Plaintiff's Private Interest in Securing Damages Under the Privacy Act Weighs Little in the Balance.

Plaintiff's interest in ferreting out confidential sources so that she can recover damages is a purely parochial, private interest of her own. The district court reasoned that her claim also advanced a broader interest by vindicating the principles of the Privacy Act. *See* JA___[*id.* at 24]; JA___[Dkt. 193 at 6]. But that rationale is fatally undermined by numerous defects in Plaintiff's Privacy Act claim showing that it is likely to fail (or largely fail) as soon as the district court proceeds to summary judgment. In weighing Plaintiff's "private interest in compelling disclosure," those defects ought to be considered *now*, before taking the irretrievable step of forcing disclosure of a confidential source in aid of a claim that will entirely (or largely) fail.

#### 1. Plaintiff Cannot Secure Privacy Act Damages for DOD's Independent Decision to Cut Off Funds to UMT "On National Security Grounds."

The weight that can be assigned to Plaintiff's claim is necessarily limited by the fact that Plaintiff will not be able to recover most of the damages she claims in her Complaint. The bulk of damages that Plaintiff seeks arose from DOD's decision to terminate UMT from its tuition assistance program and to publicly announce that action was taken "on national security grounds." *See* JA___[Dkt. 1 ¶¶42, 55, 56].

DOD based that decision on a series of independent, devastating factual findings that

Plaintiff has not challenged. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Based on those findings, DOD terminated UMT "based on national security

grounds." JA___[*id._at_1*].

For a host of reasons, Plaintiff cannot recover damages in this Privacy Act suit

for that independent action by DOD. To start with, Plaintiff cannot prove causation.

An independent decision by a government authority is a supervening cause breaking

any chain of causation tracing back to acts (including tortious acts) prior to the

government action.[8] To trace causation from the alleged leak through DOD's

independent decision, Plaintiff would have to establish that the DOD decision itself

---

[8] *See, e.g.*, *Mideast Sys. & China Civ. Constr. Saipan Joint Venture v. Hodel*, 792 F.2d 1172, 1177-78 (D.C. Cir. 1986); *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 52 (D.D.C. 2018); *Hotel Oakland Assocs. v. Doyle Real Est. Advisors, LLC*, No. 21-CV-05389-SK, 2022 WL 1493267, at *10 (N.D. Cal. May 3, 2022).

was somehow tainted and improperly based on the alleged leak (the tortious act) and *not* based on review of the record before the agency. *See, e.g.*, *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988) ("An independent intermediary breaks the chain of causation unless it can be shown that the deliberations of that intermediary were in some way tainted ….").[9]

But even entertaining an argument along those lines would raise a further fatal problem: the agency decision is entitled to a presumption of regularity and cannot be collaterally attacked in this Privacy Act suit. *See, e.g.*, *Kleiman v. Dep't of Energy*, 956 F.2d 335, 337-38 (D.C. Cir. 1992) (the Privacy Act "is not, however, a vehicle for amending the *judgments* of federal officials" (emphasis in original; quotation marks and citations omitted)); *Douglas v. Agric. Stabilization & Conservation Serv.*, 33 F.3d 784, 785 (7th Cir. 1994) (explaining that the "Privacy Act does not authorize relitigation of the substance of agency decisions"); *Leib v. Veterans' Admin.*, 546 F. Supp. 758, 762 (D.D.C. 1982) ("The Privacy Act was not intended to be and should not be allowed to become a 'backdoor mechanism' to subvert the finality of agency determinations."). If Plaintiff had any basis to

---

[9] *See also, e.g.*, *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 663 (9th Cir. 2007) ("Pursuant to traditional tort law principles of causation, … a judicial officer's exercise of independent judgment in the course of his official duties is a superseding cause that breaks the chain of causation ….").

challenge DOD's factual determinations, she could have pursued further direct review six years ago.

In addition, Plaintiff's claim would perversely make the Privacy Act a means to get damages for *correct* agency decisions. Plaintiff was cut off from a stream of taxpayer funding because DOD found that UMT presented a national security threat. Now Plaintiff wants to get *more* taxpayer dollars as damages for that decision simply because someone allegedly released information showing that DOD was *right* that Plaintiff and UMT presented a genuine national security threat. Nothing in the Privacy Act permits that absurd result. And it is more than a bit ironic that Plaintiff now claims the mantel of the Privacy Act after DOD terminated funding to UMT precisely because ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

The district court reasoned that Plaintiff has asserted *other* damages separate from the DOD decision and that, as long as there were *any* other potential damages, no matter how small, that was all that mattered under *Zerilli*. JA___[Dkt._148_at_22]. That reasoning is doubly flawed. First, the supposed damages the court identified (consulting fees and "reputation management services") were also caused at least as much by DOD publicly announcing that UMT had been cut off "on national security grounds" as by Ms. Herridge's stories.

Second, if only minimal damages claims can survive, that matters for determining the weight of Plaintiff's claim in the balance under *Zerilli*. The dramatically curtailed magnitude of any claim tips the scales decisively in favor of the First Amendment.

> **2. There Is a Serious Risk that Plaintiff Is Using Her Privacy Act Suit to Have the Government Pay Her Compensation for Passing Information to the CCP.**

Any weight that can be assigned to Plaintiff's Privacy Act claim is also undermined by another factor: there is a serious risk that Plaintiff was passing information to the CCP and that she is now using this Privacy Act suit to recover funding for that conduct.

DOD has already made a formal determination that ████████████████ ████████████████████████████████████████████████████ UMT posed a national security threat ████████████████████████ ████████████████ Ms. Herridge also presented declarations from two national security experts explaining how the facts here fit exactly with CCP intelligence methods and that there was a serious risk that Plaintiff was collecting information for China. JA___[Dkt._176-4_¶11]; ████████████████████ William Evanina spent 24 years working in counterintelligence in the FBI and CIA, ultimately serving as Director of the National Counterintelligence and Security Center within the Office of the Director of National Intelligence. JA___[Dkt._176-

4_¶¶1-6].  Holden Triplett served for almost 15 years with the FBI and then as Director for Counterintelligence at the National Security Council. ████████████

████ They both explained that UMT fit the CCP's practice of using "non-traditional collectors," including academics and front organizations, to carry out information gathering in the United States.  JA___[Dkt._176-4_¶¶11-13]; ██████████████████

In addition, past cases show that the CCP has been focused on gathering swaths of data about U.S. government personnel, security clearance holders, and servicemembers—including the 2015 hack of the Office of Personnel Management. JA___[Dkt._176-4_¶¶13-16].  Such information is highly valuable as a guide to personnel who may be targeted for recruitment.  JA___[id._¶14]; ████████████ ████████ Here again, Evanina and Triplett explained, the type of information that UMT was gathering, which included military training and unit history, is precisely the type of information the CCP would seek to gather.  See JA___[Dkt._176-4_¶¶17-18]; ██████████████████

In fact, information that became public only recently further confirms that the data gathered by UMT would have fit perfectly into an ongoing effort by the PLA to identify, target, and recruit former U.S. servicemembers with particular training or skill sets.  On September 5, 2023, the Chief of Staff of the Air Force sent a letter to all Airmen warning that foreign companies were being used by the PLA to

"targe[t] and recrui[t] U.S. and NATO-trained military talent" to "exploit your knowledge and skill to fill gaps in their military capability." JA___[Dkt._176-6]. Using front companies that might seem innocuous, the PLA is focused on "exploit[ing] veterans with valuable skills" to get them to "train the trainer." JA___[Dkt._176_at_10 & n.5]. The fact that the information UMT collected about servicemembers' training history coincides exactly with the type of information that the PLA was targeting to "fill gaps" in its capabilities provides strong support for the assessment that there is a serious risk that Plaintiff and UMT were involved in providing information to the CCP. JA___[Dkt._176-4_¶¶17-18]; ██████████ ██████.

The district court refused to consider any of this national security risk information and dismissed it simply as an effort to suggest that Plaintiff was not "worthy of the law's protection" or that Plaintiff "had it coming." JA___[Dkt._193_at_14]. That fundamentally misses the point.

Where the court is charged with weighing a litigant's "private interest in compelling disclosure," 656 F.2d at 712, against the public interest in preserving the newsgathering function of the press, the nature and objectives of the plaintiff's suit necessarily matter. If the weight of the evidence shows that the object of Plaintiff's litigation is to recover lost funding for what was, in reality, an intelligence operation

for the CCP, that must matter under *Zerilli*. If the objective of Plaintiff's lawsuit is to recover funding *for illicit activity*, that cannot be dismissed as irrelevant.

Indeed, if the government can show by a preponderance of the evidence that ███████████████████ Plaintiff was making servicemembers' information available to China, the government may have an unclean hands defense that would defeat Plaintiff's Privacy Act claim entirely. Plaintiff's claims are essentially like the case of a fraudster who has had a disability pension revoked by the government on the grounds that he is not disabled because he is playing tennis every day. Instead of challenging that decision, though, he sues the government under the Privacy Act, arguing that the government only acted because of some news stories with pictures (allegedly from government files) showing him playing tennis—and he seeks to recover his pension payments as Privacy Act damages. Such a claim fundamentally perverts the objectives of the Privacy Act, and the government would have a compelling argument that Congress never intended to authorize such a result.

At a very minimum, the factors outlined above are relevant under *Zerilli* and counsel in favor, once again, of waiting until the government has presented its defenses on these points on summary judgment *before* taking the irretrievable step of forcing disclosure of confidential source(s).

3. **Plaintiff's Privacy Act Damages Are Limited, Because Almost All the Information That Was Damaging to Plaintiff Did Not Involve Any Privacy Act Disclosures.**

The weight on Plaintiff's side of the scales is also dramatically reduced by the fact that almost all of the information in Ms. Herridge's stories that was damaging to Plaintiff came from sources *other than* Privacy Act information. In other words, Plaintiff is unlikely to be able to show any damages caused by a Privacy Act violation, because the stories conveyed all the negative information about her *without* using materials covered by the Privacy Act.

Stephen Rhoads, who was an undercover FBI informant, explained on camera that Plaintiff had admitted to him that she had been a colonel in the PLA—and told him to lie about it to a federal grand jury. JA___[Dkt._96-3_at_3]. Rhoads also explained that UMT targeted recruiting at U.S. military members and uploaded their service records onto UMT's computer system where they could be accessed remotely. *Id.* An expert on the Chinese military, Peter Mattis, explained why a school like UMT would interest the Chinese military. JA___[Dkt._96-5_at_2]. Rhoads also explained that the DOD itself was using taxpayer dollars to fund this potential front for Chinese espionage. JA___[Dkt._96-3_at_3].

Sources indicated that the FBI and the U.S. Attorney's Office disagreed about prosecuting and that the case had been dropped partly for fear that proceeding might compromise methods of collecting intelligence. *Id.* And the NCIS publicly

confirmed that there was "still an active multi-agency investigation" into UMT. JA___[Dkt._96-6_at_1].

The core concerns underpinning the counterintelligence investigation were thus fully set out entirely apart from any alleged Privacy Act information. In fact, Ms. Herridge even submitted exhibits below showing that the articles with the alleged Privacy Act material removed still presented complete stories that conveyed all the essential elements of the report. *See* JA___[Dkt._96-25]; JA___[Dkt._96-26].

Plaintiff's claims are further fatally undermined by the fact that virtually all the information underpinning her Privacy Act claim was also contained in an FBI Affidavit that the Eastern District of Virginia has held was a public document since 2013. As explained above, the magistrate judge who had sealed the affidavit held that the sealing order had automatically expired on March 4, 2013, and from that point forward the document was legally available to the public. JA___[Dkt._96-8_at_2:19-20, 29:22-24]; *see also supra* pp. 10-12.

Given that ruling, Plaintiff cannot establish that any release of the information contained in the FBI Affidavit constituted a "disclosure" under the Privacy Act. *See* 5 U.S.C. § 552a(b). There is no disclosure for Privacy Act purposes where there is no "protectable privacy interest" in the information. *Barry v. U.S. Dep't of Just.*, 63 F. Supp. 2d 25, 28 (D.D.C. 1999). And there can be no such interest where the

information is legally available as a public record, "subject to disclosure" or "releasable." *Danks v. Zinke*, No. 1:17-cv-114, 2018 WL 8646658, at *3 (D.N.D. Nov. 27, 2018); *Mitchell v. USDA*, No. 13-cv-500-bbc, 2014 WL 7240671, at *5 (W.D. Wis. Dec. 17, 2014); *see also Hollis v. Dep't of the Army*, 856 F.2d 1541, 1545 (D.C. Cir. 1988) (approving view that, "when a release consists merely of information to which the general public already has access … the Privacy Act is not violated"). Indeed, it would make no sense to say that there could be an impermissible "disclosure" of information that was already a public record on a court docket.[10] Nor can a clerk's error failing to make the FBI Affidavit physically accessible on the docket—contrary to the court's sealing order—alter its legal status as a public record or create a protectable interest in information that was supposed to be available to the public for years.

Public availability of that information alone forecloses virtually all of Plaintiff's Privacy Act claim. The FBI Affidavit spelled out every bit of information Plaintiff has identified as the basis for her claims—with the one exception that it did not include the actual photographs of Plaintiff in her PLA uniform (which she does

---

[10] This Court has also acknowledged in *dicta* that there is no disclosure under the Privacy Act where information is "in the public domain" and of a type "traditionally released by an agency to the public without [a] FOIA request." *Bartel v. FAA*, 725 F.2d 1403, 1413 (D.C. Cir. 1984). That principle also applies to the FBI Affidavit. Once the affidavit was filed to secure a search warrant, all the information in it was required to become public when the seal expired.

not deny is her). The FBI Affidavit included transcribed cuts from tape recordings in which Plaintiff admitted that she had been a colonel in the PLA. JA___[Dkt._96-11_¶¶15-16]. It detailed Plaintiff's false statement on an immigration form that she had never been affiliated with the Communist Party. JA___[*id._*¶¶20-21]. It also listed multiple additional false statements on immigration forms that were not in the stories. JA___[*id._*¶¶18-19, 24-29]. It explained that personnel at UMT's Beijing offices could access the information UMT had compiled on U.S. servicemembers (corresponding to the information from the FBI's interview with Plaintiff's daughter shown in the stories). JA___[*id._*¶14]. And it detailed Plaintiff's denial that she had held rank in the PLA during her 2012 interview by the FBI. JA___[*id._*¶¶48-49]. Once all of that information is knocked out, the only remaining basis for Plaintiff's Privacy Act claim is the photographs of her in her PLA colonel's uniform. And there is no likelihood that, with all the other information in the stories, Plaintiff would be able to establish that the photographs alone caused her alleged damages.

The district court should have taken these defects in Plaintiff's case into account. Instead, it dismissed them and then, in *dicta*, counterintuitively suggested that if there was minimal Privacy Act information in the stories (and thus minimal harm from Privacy Act disclosures), that cut *against* protecting Ms. Herridge's source(s). In the district court's view, if almost all the information in the stories was available from other sources, that meant Ms. Herridge could have conveyed the news

without using Privacy Act information. JA___[Dkt._193_at_13]. The court reasoned as if it should force disclosure of confidential sources as a sort of punishment to teach reporters to keep Privacy Act information out of their stories unless it was really necessary for its "informational value" to inform the public. *Id.*[11] But that is not what *Zerilli* called for at all. That approach would have courts inserting themselves into the editorial process, second-guessing journalists' editorial judgments and exposing confidential sources based on a post-hoc reconsideration of how "important" particular pieces of information were. Instead, the interest that *Zerilli* requires weighing on the First Amendment side of the balance is the public's interest in avoiding the systemic damage to the newsgathering process that results every time a journalist is required to disclose a confidential source. As Judge Tatel put it in *Lee*, the "countervailing interest is the value, rooted in the First Amendment, of an 'unfettered press' that ensures that citizens are 'able to make informed political, social, and economic choices.'" *Lee v. Dep't of Just.*, 428 F.3d 299, 302 (D.C. Cir. 2005) (Tatel, J., dissenting from denial of reh'g en banc) (quoting *Zerilli*, 656 F.2d at 711). Weighed against that interest, a Privacy Act claim that is weak because the plaintiff cannot show any significant causation of damages cannot possibly justify

---

[11] *See also* JA__[*id._*at_6] (questioning "just how much the public interest was actually advanced by Herridge including the purportedly leaked materials in the reporting when, on her own account, these records added little of substance to her stories").

the systemic public injury to the operation of the press that comes from disclosing confidential sources.

### 4. This Case Is Not Like Prior Cases in which the Government Had Made Egregious Errors.

Finally, the weight on Plaintiff's side of the scale is further reduced given that this case is wholly unlike prior cases in which courts ordered the disclosure of reporters' sources. In those cases, government leaks either smeared an innocent person (Hatfill) or grossly exaggerated the target's conduct (Lee). In *Hatfill*, DOJ had even called a university to bar Hatfill from working on DOJ-funded contracts, which allegedly cost Hatfill his job. *Hatfill v. Ashcroft*, 404 F. Supp. 2d 104, 108 (D.D.C. 2005). In *Lee*, government leaks painted Lee as a spy who had handed China the most sensitive nuclear secrets since the Rosenberg case. In the end, after the FBI recanted some testimony[12]—and after Lee had served nine months in solitary pretrial confinement—Lee pleaded guilty solely to one misdemeanor count of mishandling documents. *Lee v. Dep't of Just.*, 401 F. Supp. 2d 123, 126 (D.D.C. 2005). The outrageous circumstances of those cases influenced the rulings on the journalists' privilege. Indeed, in *Lee*, the court went out of its way to say that "the manner in which Dr. Lee was treated by the Government appears to have been

---

[12] *See United States v. Lee*, No. CR-99-1417, 2000 WL 36739632, at *4 (D.N.M. Aug. 31, 2000).

particularly egregious" and that another federal judge believed that government's handling of the case had "embarrassed our entire nation." *Id.* at 126 n.1.

By contrast, there are no egregious government errors or false information here. Plaintiff makes much of the fact that she was never prosecuted for espionage. But, as Evanina and Triplett explain, decisions not to prosecute in national security cases can be made for many reasons. *See* JA___[Dkt._176-4_¶¶20-21]; █████████████████████ More important, the government has other means to protect national security. Here, DOD terminated UMT from tuition assistance "on national security grounds." JA___[Dkt._94-2_at_1]. Plaintiff, moreover, has never challenged DOD's findings in court. Nor has she ever sued for defamation claiming that the stories were false. This case is thus a far cry from *Hatfill* or *Lee*.

## B. The Public Interest in Upholding Protections for a Free Press Overwhelms Plaintiff's Interest in Minimal Damages.

On the other side of the balance, the First Amendment interest in protecting confidential sources to promote the functioning of the press is at its zenith in a case such as this involving reporting that exposes threats to national security. The First Amendment protects the press "primarily because of the important role it can play as 'a vital source of public information.'" *Zerilli*, 656 F.2d at 711 (citation omitted); *see also Time, Inc. v. Hill,* 385 U.S. 374, 389 (1967) (the guarantee of a free press is "not for the benefit of the press so much as for the benefit of all of us"). But to fulfill that "essential role in our democracy," *id.*, journalists necessarily rely on confidential

sources to secure the information the public needs to know. As the court in *Zerilli* explained, "journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." 656 F.2d at 711. The Dean of the Columbia Journalism School, Jelani Cobb, echoed that point in a declaration filed below, explaining that confidential sources are "vital for the functioning of a free and independent press." JA___[Dkt._176-2_¶5]. Without confidential sources, reporters cannot "contradict official government narratives on sensitive matters of policy" or uncover government actions that might be hidden from view. JA___[*id._*¶7]. As a result, "[c]ompelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability." *Zerilli*, 656 F.2d at 711. Dean Cobb reinforces that point: "The act of disclosing a confidential source, even as the result of a court order, erodes the ability of journalists everywhere to credibly promise confidentiality to sources who demand it, and would have a chilling effect on the flow of important information to journalists reporting on government matters." JA___[Dkt._176-2_¶11].

All of the factors favoring protection for confidential sources under the First Amendment are magnified where, as here, reporting on national security matters is concerned. To start with, the need for confidentiality is particularly acute. Given the potential repercussions for leaking information in the national security field, no government employees would provide information to the press if they could not be

assured of confidentiality. JA___[Dkt._96-4_¶9]. As Steve Coll, a two-time Pulitzer Prize winning investigative journalist in the national security field emphasized, "it simply is not possible" to contradict official government positions on matters in the national security realm—or to evaluate leaks directed by high-level officials—without providing credible assurances of confidentiality to sources. JA___[Dkt._176-3_¶¶6-8]. In addition, matters touching on national security are some of the most important on which the citizenry depends on the press for information. Such matters range from justifications for war or peace (such as the intelligence failures preceding the invasion of Iraq in 2003), to errors in the conduct of a war (exposed by the Pentagon Papers concerning Vietnam), to information exposing simple negligence or incompetence in a host of matters relevant to safeguarding the national interest. The need for the press to play a role in informing the public is also especially heightened given the tendency toward secrecy in matters involving national security. Secrecy that justifiably shrouds much government activity is also subject to misuse to conceal actions infringing on civil liberties or simply mistakes, incompetence, and waste. *Cf. N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring in judgment) ("Only a free and unrestrained press can effectively expose deception in government."). Here, Ms. Herridge's reports brought to light a situation in which, for years, DOD had paid millions of taxpayer dollars to an entity that may have been a front for Chinese

espionage and that was placing at risk sensitive information on thousands of U.S. servicemembers.

Exposing confidential sources undermines the ability of the press to inform the public on all these matters. In the narrowest terms, requiring Ms. Herridge to reveal her source(s) would destroy her credibility with contacts across the intelligence community and thereby destroy her ability to function as an investigative journalist. *See* JA___[Dkt._96-4_¶¶7-11]; JA___[Dkt._176-3_¶¶9-10]. By effectively ending her career it would also put an end to her impact reporting on stories that force accountability and that have produced concrete benefits in the lives of tens of thousands of servicemembers and their families. *See supra* p. 5-7.

More important, as Mr. Coll explained, forcing a reporter "to disclose a national security source would have a broad chilling effect on the flow of critical information to the press and thus to the people." JA___[Dkt._176-3_¶11]. "It would have a ripple effect discouraging government personnel with critical knowledge—including whistleblowers with knowledge of wrongdoing or government incompetence—from serving as sources." *Id.* The result would be "undermin[ing] the ability of the press to hold powerful decisionmakers accountable before the public" and "impair[ing] the ability of the press to fulfill its function of keeping the people informed about the actions of their government." *Id.*

In other words, it would hobble the ability of the press to "bare the secrets of government and inform the people." *N.Y. Times Co.*, 403 U.S. at 717 (Black, J., concurring). If potential sources knew that, every time a Privacy Act case is filed, it will only be a matter of time until a court orders disclosure of the source's identity, no one would serve as a source.

The balance of interests here is not close. The First Amendment interest in the journalist's privilege vastly outweighs Plaintiff's personal interest in damages. As Judge Tatel has put it, "it's hard to imagine" how a plaintiff's personal interest in Privacy Act damages "could outweigh the public's interest in protecting journalists' ability to report without reservation on sensitive issues of national security." *Lee*, 428 F.3d at 302 (Tatel, J., dissenting from denial of reh'g en banc). That is especially true here, given the hurdles Plaintiff faces in proving any actual damages under the Privacy Act.

## III. The Court Should Recognize a Federal Common Law Reporter's Privilege.

If the Court decides that the First Amendment journalist's privilege does not prevail, the Court should recognize a federal common law privilege that allows the Court to consider the balancing of interests outlined above. "Rule 501 of the Federal Rules of Evidence authorizes federal courts to define new privileges by interpreting 'common law principles … in the light of reason and experience.'" *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996) (quoting Fed. R. Evid. 501). This Court has never

rejected a reporter's common law privilege. The last time it considered the issue, it produced three splintered opinions. *See In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006).[13] As explained below, all the factors identified in *Jaffee* strongly favor recognizing such a privilege.

First, like other relationships that have justified evidentiary privileges (such as the psychotherapist-patient privilege in *Jaffee*), the relationship between a journalist and a confidential source is plainly "rooted in the imperative need for confidence and trust." *Jaffee*, 518 U.S. at 10. This Court has readily acknowledged that assurances of confidentiality are often "essential" for journalists to secure information from sources. *Zerilli*, 656 F.2d at 711. Confidentiality does not merely promote the better functioning of the relationship by encouraging a more open exchange between two parties. *Cf. Jaffee*, 518 U.S. at 10. Instead, confidentiality is the bedrock condition without which the relationship would never be formed.

Second, recognizing a common law privilege would "serve public ends." *Jaffee*, 518 U.S. at 11. The core purpose of the privilege is to protect journalists' ability to gather news and thereby to ensure that the press can "fulfill its essential

---

[13] Judge Sentelle rejected a common law privilege. *See* 438 F.3d at 1154-59 (Sentelle, J., concurring). Judge Tatel argued in favor of it. *See id.* at 1164-83 (Tatel, J., concurring in judgment). And Judge Henderson concluded only that, if such a privilege existed, it would have been overcome in that case. *Id.* at 1159 (Henderson, J., concurring).

role in our democracy" to "bare the secrets of government and inform the people." *N.Y. Times Co.*, 403 U.S. at 717 (Black, J., concurring). The press cannot fulfill its role without confidential sources. "Reporters could reprint government statements, but not ferret out underlying disagreements among officials; they could cover public governmental actions, but would have great difficulty getting potential whistleblowers to talk about government misdeeds." *In re Miller*, 438 F.3d at 1168 (Tatel, J., concurring in judgment). Promoting the functioning of a free press that can disclose information otherwise shrouded in government secrecy certainly merits recognition as a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Jaffee*, 518 U.S. at 9.

Third, "policy decisions of the States" overwhelmingly confirm that a privilege protecting confidential sources should be recognized. *Jaffee*, 518 U.S. at 12. Forty-nine States and the District of Columbia have recognized such a privilege. *See* Addend. In twenty-one States and the District of Columbia, the privilege is *absolute* in civil cases (with exceptions for narrow circumstances not present here). *See id.* And in at least twenty-two States and the District of Columbia, where the privilege is qualified, overcoming the privilege requires not only (i) showing that the evidence is central to the case and (ii) exhausting other avenues of discovery, but also (iii) showing that the balance of interests favors overcoming the privilege. *See id.*

Fourth, benefits arising from the privilege must be weighed against the "likely evidentiary benefit that would result from denial of the privilege." *Jaffee*, 518 U.S. at 11. Here, it is critical that the common law privilege would be qualified, not absolute, and subject to a balancing of interests in each case. Accordingly, the privilege would not deny access to evidence in every case. Where there are sufficiently weighty public interests at stake, the privilege would be overcome. Without any balancing of interests, the alternative rule is that, eventually, the plaintiff will be able to uncover a confidential source in *every* Privacy Act case.

For all these reasons, the Court should recognize a journalists' privilege under the federal common law.

## CONCLUSION

The judgment below should be reversed.


June 20, 2024                              Respectfully submitted,

                                          /s/ *Patrick F. Philbin*
                                          Patrick F. Philbin
                                          Kyle T. West
                                          Chase Harrington
                                          TORRIDON LAW PLLC
                                          1155 F Street, N.W.
                                          Suite 750
                                          Washington, DC 20004
                                          (202) 249-6633
                                          pphilbin@torridonlaw.com

                                          *Counsel for Catherine V. Herridge*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,976 words. This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

June 20, 2024

/s/ Patrick F. Philbin
Patrick F. Philbin

# CERTIFICATE OF SERVICE

I hereby certify, in accordance with Federal Rule of Appellate Procedure 25(c) and Circuit Rule 25(c), that on June 20, 2024, the foregoing document was electronically filed with the Clerk of the Court using the Clerk's Box system. I have transmitted a true and correct copy of the forgoing Appellant's Brief and its attachments to counsel for the Appellee Yanping Chen and to the other parties as follows:

Counsel for Yanping Chen:

Andrew C. Phillips
andy.phillips@mwpp.com

Counsel for Federal Bureau of Investigation, United States Department of Justice, United States Department of Defense, and United States Department of Homeland Security:

Bradley A. Hinshelwood
Bradley.A.Hinshelwood@usdoj.gov

Michael Raab
Michael.Raab@usdoj.gov

June 20, 2024                                    /s/ Patrick F. Philbin
                                                 Patrick F. Philbin

**ADDENDUM**

**States Recognizing Reporter's Privilege**

| State | Statute or Case Outlining Privilege | Recognizes Privilege | Absolute[1] Privilege in Civil Cases | Requires Balancing of Interests |
|-------|-------------------------------------|----------------------|--------------------------------------|----------------------------------|
| Alabama | Ala. Code § 12-21-142 | X | X | |
| Alaska | Alaska Stat. § 09.25.310(b) | X | | X |
| Arizona | A.R.S. § 12-2237 | X | X | |
| Arkansas | Ark. Code Ann. § 16-85-510 | X | | |
| California | Cal. Evid. Code § 1070 | X | X | |
| Colorado | Colo. Rev. Stat. § 13-90-119(3) | X | | X |
| Connecticut | Conn. Gen. Stat. § 52-146t(d) | X | | X |
| Delaware | 10 Del. Code § 4320-26 | X | | |
| District of Columbia | D.C. Code §§ 16-4702, 16-4703 | X | X | X |
| Florida | *McCarty v. Bankers Ins. Co., Inc.*, 195 F.R.D. 39, 45 (N.D. Fla. 1998) | X | | X |
| Georgia | Ga. Code Ann. § 24-5-508 | X | | |

---

[1] With some exceptions not relevant here.

A1

| State | Citation | | | |
|---|---|---|---|---|
| Hawaii | Belanger v. City and Cnty. of Honolulu, Civ. No. 93-047-10 (Haw. 1st Cir. Ct. May 4, 1994) (unpublished) | X | | |
| Idaho | In re Contempt of Wright, 700 P.2d 40, 44 (Idaho 1985) | X | | X |
| Illinois | 735 Ill. Compiled Stat. 5/8-907 | X | | X |
| Indiana | Ind. Code § 34-46-4-2 | X | X | |
| Iowa | Lamberto v. Bown, 326 N.W.2d 305, 309 (Iowa 1982) | X | | X |
| Kansas | Kan. Stat. § 60-482 | X | | X |
| Kentucky | Ky. Rev. Stat. § 421.100; Lexington Herald-Leader Co. v. Beard, 690 S.W.2d 374, 376 (Ky. 1984) | X | X | X |
| Louisiana | La. Rev. Stat. § 45:1453 | X | | X |
| Maine | 16 Maine Rev. Stat. § 61(2) | X | | X |
| Maryland | Md. Cts. & Jud. Proc. Code Ann. § 9-112 | X | X | X |
| Massachusetts | In re John Doe Grand Jury Investigation, 574 N.E.2d 373, 375 (Mass. 1991) | X | | X |
| Michigan | Mich. Comp. Laws Ann. §§ 767.5a, 767A.6 | X | | |
| Minnesota | Minn. Stat. §§ 595.023, 595.025 | X | X | |
| Mississippi | Hawkins v. Williams, Civ. No. 2900054 (Cir. Ct. 1st Jud. Dist. Hinds Cnty., Mar. 16, 1983) | X | | |
| Missouri | State ex rel. Classic III Inc. v. Ely, 954 S.W.2d 650, 655 (Mo. Ct. App. 1997) | X | | |
| Montana | Mont. Code § 26-1-902 | X | X | |

A2

| | | | | |
|---|---|---|---|---|
| Nebraska | Neb. Rev. Stat. § 20-146 | X | X | |
| Nevada | Nev. Rev. Stat. § 49.275 | X | X | |
| New Hampshire | *Keene Publ'g Corp. v. Cheshire Cnty. Super. Ct.*, 406 A.2d 137, 138 (N.H. 1979) | X | | |
| New Jersey | N.J. Stat. § 2A:84A-21 | X | X | |
| New Mexico | N.M. R. Evid. Rule 11-514 | X | | X |
| New York | N.Y. Civ. Rights Law § 79-h (McKinney) | X | X | |
| North Carolina | N.C. Gen. Stat. Ann.§ 8-53.11 | X | | |
| North Dakota | *Grand Forks Herald v. Dist. Ct. in & for Grand Forks Cnty.*, 322 N.W.2d 850, 857 (N.D. 1982) | X | | X |
| Ohio | Ohio Rev. Code § 2739.12 | X | X | |
| Oklahoma | Okla. Stat. Ann. tit. 12, § 2506 | X | | |
| Oregon | Or. Rev. Stat. § 44.520 | X | X | |
| Pennsylvania | 42 Pa. Cons. Stat. § 5942 | X | X | |
| Rhode Island | R.I. Gen. Laws Ann. §§ 9-19.1, 9-19-2 | X | X | |
| South Carolina | S.C. Code Ann. § 19-11-100 | X | | |
| South Dakota | S.D. Codified Laws § 19-2-15 | X | X | |
| Tennessee | Tenn. Code § 24-1-208 | X | | X |
| Texas | Tex. Civ. Prac. & Rem. Code § 22.024 | X | | X |
| Utah | Utah R. Evid. 509 | X | X | X |
| Vermont | 12 Vt. Stat. § 1615(b) | X | X | X |
| Virginia | *Clemente v. Clemente*, 56 Va. Cir. 530, at *1 (2001) | X | | X |
| Washington | Wash. Rev. Code § 5.68.010 | X | X | X |

| | | | | |
|---|---|---|---|---|
| West Virginia | W. Va. Code § 57-3-10 | X | X | |
| Wisconsin | Wis. Stat. § 885.14 | X | X | X |