**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

—————— • ——————

### No. 24-5050

—————— • ——————

YANPING CHEN,

*Plaintiff-Appellee,*

*v.*

FEDERAL BUREAU OF INVESTIGATION; UNITED STATES
DEPARTMENT OF JUSTICE; UNITED STATES DEPARTMENT OF
DEFENSE; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellees.*

CATHERINE HERRIDGE,

*Interested Party-Appellant.*

*On Appeal from the United States District Court for the District of Columbia in
No. 1:18-cv-03074-CRC, Honorable Christopher Reid Cooper, U.S. District Judge.*

## BRIEF OF *AMICUS CURIAE* SENATOR TED CRUZ IN
## SUPPORT OF INTERESTED PARTY-APPELLANT

JUDD E. STONE II
   *Counsel of Record*
ARI CUENIN
CODY C. COLL
STONE HILTON PLLC
P.O. Box 150112
Austin, Texas 78715
judd@stonehilton.com
(737) 465-7248

*Counsel for Amicus Curiae*

June 27, 2024



### Certificate as to Parties, Rulings, and Related Cases

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellant.

References to the rulings at issue appear in the Brief for Appellant.

To counsel's knowledge, there are no related cases.

/s/ *Judd E. Stone II*
Judd E. Stone II

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................ i

TABLE OF AUTHORITIES ................................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................ 1

SUMMARY OF ARGUMENT ................................................................ 1

ARGUMENT ........................................................................................ 4

    I.    The Court should clarify that grounds for asserting a qualified reporter's privilege may be tailored to the facts of the case ........................................................ 6

    II.    A highly relevant consideration that should weigh in favor of nondisclosure is the national security risk that may flow from disclosure ................................. 14

    III.    Chen should not be allowed to undermine First Amendment protections so that she might further profit from her espionage ........................................ 18

CONCLUSION ................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Boumediene v. Bush*,
      553 U.S. 723 (2008) ....................................................................... 17

*Branzburg v. Hayes*
      408 U.S. 665 (1972) ...........................................1-2, 6, 7, 8, 13, 17-18

*C.I.A. v. Sims*,
      471 U.S. 159 (1985) ....................................................................... 16

*Cable News Network, Inc. v. F.B.I.*,
      384 F. Supp. 3d 19 (D.D.C. 2019) ................................................... 16

*Carey v. Hume*,
      492 F.2d 631 (D.C. Cir. 1972) ....................................7, 8, 10, 11, 13

*Estate of Klieman v. Palestinian Authority*,
      293 F.R.D. 235 (D.D.C. 2013)......................................................... 10

*Fitzgibbon v. C.I.A.*,
      911 F.2d 755 (D.C. Cir. 1990) ........................................................ 15

*Green v. Am. Broad. Cos. Inc.*,
      647 F. Supp. 1359 (D.D.C. 1986) ................................................... 12

*Lee v. Department of Justice*,
      413 F.3d 53 (D.C. Cir. 2005) .................................................9, 10, 11

*N.Y. Times Co. v. United States*,
      403 U.S. 713 (1971) ......................................................................... 8

*Wolf v. C.I.A.*,
      473 F.3d 370 (D.C. Cir. 2007) ..................................................15, 16

*Zerilli v. Smith*,
      656 F.2d 705 (D.C. Cir. 1981) ...............................8, 9, 10, 11, 13, 14

iii

**Statutes & Other Authorities:**

U.S. Const., amend. I............................1, 2, 3, 4, 6, 7, 8, 11, 12, 13, 14, 18

5 U.S.C. § 552a(i) .......................................................................17

Audrey Perry, *Confidential Sources*, Free Speech Center at
    Md. Tenn. State U. (Aug. 8, 2023) ....................................5

Jill I. Goldenziel, *Information Lawfare: Messaging and the
    Moral High Ground*, 12 J. Nat'l Security L. & Pol'y 233
    (2022) ....................................................................18-19, 21

Julian Ku, *How China's Spies Fooled an America That Wanted
    to Be Fooled*, Lawfare, Mar. 29, 2023 .....................................19, 20

Nadia Helmy, *How the Chinese Civilian and Military
    Intelligence Agencies Are Confronting CIA and the
    Pentagon*, Modern Diplomacy, Mar. 3, 2024 ..............................20

Phillip Lenczycki, *Chinese Intel Arm Quietly Operates 'Service
    Centers' in 7 US Cities*, Daily Caller, June 17, 2023 .................20

## Identity and Interest of Amicus Curiae

As a member of the United States Senate, *amicus curiae* Senator Ted Cruz is committed to protecting the free-speech rights guaranteed by the First Amendment and has a special interest in protecting the First Amendment rights of his constituents and of all Americans. The proper application of the reporter's privilege ensures the freedom and efficacy of the vigorous press apparatus essential to a free state and a free people. When, as here, the application of those principles touches on matters of national security, the interests of *amicus* as a member of Congress are all the more pressing. Therefore, *amicus* has a strong interest in speaking to the important issues presented in this case. *Amicus* has authority to file this brief because all parties have consented to *Amicus*'s participation.[*]

## Summary of Argument

I. This Court's precedents recognizing a qualified reporter's privilege expanded on the Supreme Court's reasoning in *Branzburg v.*

---

[*] No counsel for any party authored this brief, in whole or in part, nor did counsel for any party or either party make a monetary contribution intended to fund this brief in whole or part. No person or entity other than amicus and counsel for amicus contributed monetarily to this brief's preparation or submission.

*Hayes*. Those precedents established the balancing test that district courts must conduct when deciding whether a journalist's privilege against disclosing confidential sources should yield to a civil litigant's private interests. This Court has announced "precise guidelines" for that analysis, but courts applying that test risk construing it too narrowly.

Specifically, courts have focused on whether the information sought goes to the heart of the requesting party's case, whether the requesting party has reasonably exhausted all other sources of the information, and whether the requesting party's case is frivolous. This Court and district courts have also considered whether the reporter's assertion of privilege would shield the reporter from liability. But only the latter speaks to the weight of the reporter's and the public's interest in maintaining the First Amendment's protection of a free and vigorous press.

An overly mechanical application of this Court's existing "precise guidelines" risks undervaluing the reporter's and the public's interest in deeply important First Amendment concerns. The Court should clarify that the exhaustion and frivolity inquiries are threshold issues that any requesting party must overcome before performing a case-specific analysis tailored to each case. Further, the Court should clarify that

2

district courts have leeway to consider the unique circumstances presented by the parties in the fact intensive, case-by-case analysis required by the Supreme Court and this Court's precedents.

II. The facts of this case present important national security concerns if the reporter is required to disclose her confidential source. Here, the confidential source is a member of an FBI counterintelligence team. In other words, that person's identity is sensitive information that constitutes "sources and methods" knowledge of the kind that is closely guarded by the intelligence community and, indeed, by the law and policy of the United States. And the requesting party is a suspected spy and a known national security threat. Federal law places such profound emphasis on protecting national secrets and sources and methods of intelligence operations that agencies may even refuse to confirm or deny the existence of such information. The Supreme Court has said it is unequivocally not the role of judges to question what information should and should not be designated as sensitive to national security.

While uncovering the identity of government agents who illegally leak sensitive information is also a worthwhile national security pursuit, this attempt to override the First Amendment rights of the reporter is

3

neither a desirable nor proper way to accomplish that goal. The government has ample opportunity to root out those persons. It could initiate a grand jury investigation and obtain that person's identity in a confidential setting, or it could take any other number of routes to ensure that the security of national secrets remains intact.

III. Finally, the requesting party in this case has engaged in lawfare—weaponizing the judicial system to attack civil liberties—that should not be rewarded. She is seeking to extract taxpayer dollars from government agencies that were withheld not because of any journalism, but because of the requesting party's own ties to the Chinese Communist Party and her suspected espionage against the United States. She has funneled information about US servicemembers and extracted knowledge from them regarding training, capabilities, and personnel of the armed services. She should not be permitted to overcome the First Amendment rights those servicemembers fought for in order to recover money she lost as a result of disloyalty as alleged in this case.

## Argument

The Founding Fathers believed "[t]hat the freedom of the press is one of the greatest bulwarks of liberty and can never be restrained but

by despotic governments." Virginia Declaration of Rights, art. XII (1776), available at https://avalon.law.yale.edu/18th_century/virginia.asp. That freedom is bolstered by the free flow of information to journalists and by their ability to gather information from confidential sources. *See* Audrey Perry, *Confidential Sources*, FREE SPEECH CENTER AT MD. TENN. STATE U. (Aug. 8, 2023), available at https://firstamendment.mtsu.edu/article/confidential-sources/. That function, as the Framers of the Constitution understood, is undeniably critical to an informed voting public necessary for a democratic society to function.

At the same time, these principles may stand in tension with judicial proceedings. Journalists are often called upon to testify about or otherwise reveal the identity of sources in both civil and criminal cases. *Id.* So, to protect the rights of journalists and preserve the free press' vital role, courts have recognized a qualified reporter's privilege keep some sources anonymous. As Justice Powell put it,

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-

> case basis accords with the tried and traditional
> way of adjudicating such questions.

*Branzburg v. Hayes*, 408 U.S. 665, 710 (1972) (Powell, J., concurring).

This Court's precedents applying a qualified reporter's privilege in the civil litigation context warrant clarification tailored to the circumstances of each case, as judges risk too narrowly construing the reporter's privilege in view of this Court's analytical guidance. The Court should clarify the threshold elements and balancing test factors to better guide district court decisions. A key consideration that lower courts should be permitted to consider, and one deeply relevant to this case, is national security and the concern that disclosure of certain information can jeopardize sources and methods of importance to the intelligence community. Furthermore, district courts should consider whether a plaintiff's efforts to uncover a reporter's sources amount to nothing more than opportunistic lawfare.

## I. The Court should clarify that grounds for asserting a qualified reporter's privilege may be tailored to the facts of the case.

A. In *Branzburg v. Hayes*, the Supreme Court recognized that the First Amendment's protection of confidential sources is not absolute. *Branzburg* involved three journalists who sought to quash grand jury

subpoenas compelling testimony about information obtained through reporting. 480 U.S. at 667-75. The question presented was "whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the First Amendment." *Id.* at 667. Writing for the majority, Justice White rejected the petitioners' invitation to recognize a categorical federal privilege shielding reporters from grand jury subpoenas. *Id.* at 690. But Justice Powell, writing separately, clarified his view that confidential sources could be protected from disclosure on a "case-by-case basis." *Id.* at 710 (Powell, J., concurring).

Not long after *Branzburg*, this Court addressed a reporter's privilege claim in *Carey v. Hume*, 492 F.2d 631 (D.C. Cir. 1972). *Carey* built on the Supreme Court's *Branzburg* decision and established a balancing test for overcoming the reporter's privilege in civil cases. In conducting its "case-by-case" analysis of the facts, the Court considered whether the information sought was essential to the plaintiff's case, *id.* at 636-37, whether the plaintiff's case was frivolous, *id.* at 636-38, and whether the information was available from someone other than the reporter, *id.* at 638-39. The Court decided that the district court had not

"abused the discretion vested in it to grant or to deny a motion to compel discovery," and, echoing *Branzburg*, explained that the First Amendment's protection of confidential sources was not absolute. *Id.* at 639.

This Court elaborated on *Carey* in its seminal *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981), decision. The Court began by recognizing the importance of a free press to "bare the secrets of the government and inform the people." *Id.* at 711 (quoting *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring)). Thus, compelling disclosure of a reporter's confidential source "significantly interfere[s] with th[e] news gathering ability" of the reporter, as promises of confidentiality are "often essential to establishing a relationship with an informant." *Id.* This interference weakens "the press' function as a vital source of information." *Id.* The Court explained that "courts should look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure." *Id.* at 712 (citing *Carey*, 492 F.2d at 636). Ordinarily, this balancing would come out in favor of the journalist and his asserted privilege, given the "preferred position of the First Amendment and the importance of a

8

vigorous press." *Id.* The privilege would yield to private interests in "the most exceptional cases," thereby signaling that potential sources should remain confident that compelled disclosure would be unlikely. *Id.* The Court introduced three "precise guidelines" that should inform a district court's analysis.

First, the argument for disclosure will be stronger where the information sought goes to "the heart of the matter" and "if it is crucial to [the requesting party's] case." *Id.* at 713 (citation omitted). Second, the privilege should yield only when the requesting party "has shown that he has exhausted every reasonable alternative source of information." *Id.* Compelled disclosure should "normally [be] the end, and not the beginning." *Id.* And third, the privilege is more likely to yield when maintaining it would shield the reporter himself from liability, such as in a libel case brought by a public figure. *Id.* at 714. In *Zerilli*, the Court said that the requesting party had not exhausted alternative sources, and therefore affirmed the district court's decision not to require disclosure. *Id.* at 714-15, 718.

More recently, this Court decided *Lee v. Department of Justice*, 413 F.3d 53 (D.C. Cir. 2005). The Court identified the centrality and

exhaustion factors from *Carey* and *Zerilli*, and decided the case only on those two factors, concluding that the requesting party had met both. *Id.* at 59-61. That analysis, informed by *Zerilli's* "precise guidelines" did not consider any factors on the other side of the scale beyond the nebulous idea that the reporter's privilege is "not absolute." *Id.* at 59. Other cases applying this Court's precedent have similarly turned exclusively on those two factors (albeit with passing mention of frivolousness and shielding liability), as exemplified by the district court's decision in this case. *See* ECF No. 148 at 11-13 (collecting cases and discussing the "weight of authority"); *see also, e.g.*, *Estate of Klieman v. Palestinian Authority*, 293 F.R.D. 235, 241-43 (D.D.C. 2013) (analyzing only whether the requested information went to the "heart of the matter" of the claims at issue and whether the party seeking disclosure had exhausted other means of obtaining that information). As a result, while courts nominally apply precedent premised on recognizing a case-by-case basis for shielding information, a number of the circumstances that ought to inform that analysis have practically fallen by the wayside.

**B.**    Although it can be said that those courts are hewing to this Court's instructions, as most recently announced in *Lee*, they have

nevertheless devalued the reporter's privilege and thereby weakened the First Amendment's guarantee of a free press. The Court should ensure that the qualified reporter's privilege operates as originally intended—on a true case-by-case basis.

The Court's decisions in *Carey*, *Zerilli*, and *Lee* illustrate several considerations relevant to the inquiry: (1) whether the requesting party's suit is frivolous, (2) whether the requesting party has exhausted alternative sources, (3) whether the information requested is central to the case, and (4) whether the reporter might avoid liability by use of the privilege. But these considerations may not fully capture all considerations that might be relevant in a particular case. For example, only one of these factors goes to the weight of the reporter's interest—whether the reporter is shielded from liability, a fact that weakens the reporter's assertion of privilege. The others all go to the weight of the requesting party's claim (or lack thereof). As a result, even where the requesting party's claim is relatively weak, these factors may otherwise suggest vitiating a reporter's privilege claim notwithstanding significant undermining of confidential sources' confidence in the First Amendment's robust protections. *See Zerilli*, 656 F.2d at 712. Not only is

this distribution of factors lopsided, a claim for protecting confidential sources could be diminished when the public's interest in the benefits from robust First Amendment protections is at its highest.

The Court should thus clarify two important principles from its precedents. First, the Court should state plainly that its frivolousness inquiry and exhaustion requirement are threshold showings that any requesting party must make before a balancing of interests becomes necessary. Establishing that a claim is not frivolous poses a minimal burden on the requesting party, as frivolousness has long been, and is often, a reason courts cite for denying relief. *See, e.g.*, *Green v. Am. Broad. Cos. Inc.*, 647 F. Supp. 1359, 1367-68 (D.D.C. 1986) (explaining that if a proposed claim is frivolous, a court need not grant leave to amend). Likewise, treating exhaustion as a precondition distinguishes the ability of a requesting party to obtain information from the weight of the requesting party's interest (which is more appropriately determined by the centrality of that information to the requesting party's claim). Once those two showings are made, a district court may balance the requesting party's interest, with the weight of that interest determined primarily by

the centrality of the information sought, against First Amendment and public interests protected by nondisclosure.

And second, the Court should reinforce that district courts are free to consider other relevant matters and arguments in conducting the balancing test. After all, as the district court here pointed out, the core inquiry, established in *Carey* and further developed in *Zerilli*, is "weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure." *Zerilli*, 656 F.2d at 712 (citing *Carey*, 492 F.2d at 636). Indeed, as Justice Powell wrote in *Branzburg*, the entire purpose of a "case-by-case" inquiry is to ensure "the striking of a proper balance" between freedom of the press and obligations supporting disclosure. 480 U.S. at 710 (Powell, J., concurring).

The *Zerilli* factors risk capturing only one side of that weighing analysis: they essentially ask how important the information is to the requesting party's case and whether the requesting party could have gotten it elsewhere. An overly strict application of *Zerilli* may fail to examine what weight to place on the other side of the scale beyond nebulous, though deeply important, First Amendment concerns. The

13

Court should emphasize that its precedents allow parties to propose considerations that may fall on the nondisclosure side of the scale. This approach would allow district courts to give appropriate weight to such relevant matters as the party resisting disclosure may bring to the district court's attention.

## II.    A highly relevant consideration that should weigh in favor of nondisclosure is the national security risk that may flow from disclosure.

As discussed above, courts conducting a balancing inquiry should have the benefit of the parties' argument on whatever case-by-case matters might be pertinent. While *Zerilli* defined a framework of "precise guidelines" to guide a court's legal analysis, they do not capture the breadth of factual circumstances that might exist in any given case.

This case is a prime example of the unique facts that can shape the First Amendment inquiry. Here, there are deep national security concerns that arise from the threat of disclosure. As was argued below, Ms. Herridge is asked to reveal the name of a member of an FBI counterintelligence team. ECF Nos. 193 at 3; 176 at 29-30. But that would jeopardize the work and safety of that team. And Ms. Chen is a person known to the federal government to pose a national security risk,

and she is a suspected spy. ECF No. 176 at 11-12. In determining whether to override the reporter's privilege, courts should be permitted to weigh matters such as the highly sensitive nature of sources and methods information.

The law and policy of the United States place great emphasis on protecting national secrets and the intelligence community's sources, methods, and personnel. Source and method information is exempted from the Freedom of Information Act and can be withheld from the requesting public. *Wolf v. C.I.A.*, 473 F.3d 370, 374-75 (D.C. Cir. 2007). While the Supreme Court has mandated that FOIA exemptions should be given a narrow reading, courts must give substantial weight to classification determinations that are "logical" or "plausible." *Id.*

The government and the courts are mindful that "each individual piece of intelligence information, much like a piece of a jigsaw puzzle, may aid in piecing together other bits of information." *Id.* at 377 (quoting *Fitzgibbon v. C.I.A.*, 911 F.2d 755, 763 (D.C. Cir. 1990)). For this reason, even the smallest bits of knowledge are closely guarded. The intelligence community even has the right under FOIA to refuse to confirm or deny whether records exist when they involve sources, methods, or material

impactful to the foreign relations of this country. *See id.* at 374, 375. It is the responsibility of the intelligence agencies to determine whether a piece of information relates to sources and methods or whether it could reasonably lead to unauthorized disclosure. *Cable News Network, Inc. v. F.B.I.*, 384 F. Supp. 3d 19, 30-31 (D.D.C. 2019) (citing *C.I.A. v. Sims*, 471 U.S. 159, 173 (1985)). It is not the judiciary's burden "to weigh the variety of complex and subtle factors inherent in the intelligence context." *Id.* at 31 (cleaned up).

If protecting classified and sensitive information is of such great importance to the United States—to the point that Congress restricts citizens' access to information about their government—then protecting that information should be a relevant consideration when the identity of a counterintelligence officer is put at risk of disclosure. And even if that identity is only revealed to the requesting party and not as a matter of public record, the potential harm remains. Especially when the requesting party is a suspected foreign intelligence asset herself.

The district court minimized the national security implications of this case by pointing to a supposed competing public benefit in identifying government employees who leak sensitive information in violation of the

16

law. ECF No. 193 at 14. There is no question that rooting out untrustworthy government employees who illegally divulge confidential and sensitive counterintelligence information is a worthy cause. But courts are ill-suited to balancing national security harms against ostensible policy benefits. *Cf., e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("Unlike the President and some designated Members of Congress, neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people.").

The government itself has avenues to obtain the identity of the leaker outside of private civil litigation where disclosure does not involve revealing personnel data to a suspected, if not confirmed, Chinese intelligence asset. The government already knows, of course, that it has a leaker among its ranks (or possibly its former ranks). And the government has every opportunity to seek the identity of that person from Ms. Herridge itself. For example, it could initiate a grand jury investigation into the leak and subpoena Ms. Herridge in a confidential setting. *See* 5 U.S.C. § 552a(i) (establishing criminal liability for government employees who violate the Privacy Act); *see also Branzburg*,

480 U.S. at 690. Or it could conduct an internal investigation and request Ms. Herridge's voluntary cooperation. Given the ample tools available to the government in service of public integrity, the Court should not conclude that Dr. Chen's interest in that information overrides Ms. Herridge's First Amendment rights in maintaining the confidentiality of her reporting.

## III. Chen should not be allowed to undermine First Amendment protections so that she might further profit from her espionage.

Finally, Dr. Chen has engaged in action to extract, from American taxpayers, monies she was denied not because of reporting Ms. Herridge conducted, but because of her own ties to the Chinese Communist Party, her own anti-American espionage, and her own abetting of foreign powers operating against the United States. Dr. Chen has, at least allegedly, engaged in a scheme to funnel important personnel, training, and capabilities information to a foreign intelligence organization. And she seeks to do so most immediately by invoking the judicial process to vitiate the First Amendment freedom of the press to unmask confidential national security information. This "lawfare" reflects the American legal system's "potential to be used as a weapon of war between states." Jill I.

18

Goldenziel, *Information Lawfare: Messaging and the Moral High Ground*, 12 J. NAT'L SECURITY L. & POL'Y 233, 233-34 (2022). The Court should not reward it.

Dr. Chen's lawfare counsels against granting her discovery in derogation of the reporter's privilege and underscores the national security concerns identified above. Dr. Chen should not be permitted to take advantage of servicemen who have sworn allegiance to the Constitution and then seek to undermine the constitutional rights granted to members of the press, and fought for by those soldiers, airmen, and sailors, in order to further profit from her scheme. When a "rogue state" can cloak the "supposed legality of its actions" in "the language of law," a hostile actor can "justify the legitimacy of its actions." Goldenziel, *supra*, at 244.

Chinese intelligence agencies have expansive operations in the United States, gathering information and influencing culture, business, and government. *See* Julian Ku, *How China's Spies Fooled an America That Wanted to Be Fooled*, LAWFARE, March 29, 2023, available at https://www.lawfaremedia.org/article/how-chinas-spies-fooled-america-wanted-be-fooled. These operations infiltrate business, news, and

politics, and often establish fictitious and front businesses. *Id.*; Nadia Helmy, *How the Chinese Civilian and Military Intelligence Agencies Are Confronting CIA and the Pentagon*, MODERN DIPLOMACY, Mar. 3, 2024, available at https://moderndiplomacy.eu/2024/03/03/how-the-chinese-civilian-and-military-intelligence-agencies-confronting-cia-and-the-pentagon/. China is known to conduct "thousands of small-scale espionage operations" that may seem worthless but overwhelm adversaries and provide successful intelligence gathering. Helmy, *supra*. Indeed, the Chinese government has been so brazen as to open "service centers" in major US cities, which claim to provide support and services to ethnic Chinese persons. Phillip Lenczycki, *Chinese Intel Arm Quietly Operates 'Service Centers' in 7 US Cities*, DAILY CALLER, June 17, 2023, available at https://dailycaller.com/2023/06/17/china-intelligence-service-centers-ccp/.

Dr. Chen is alleged to have run a similar operation, recruiting servicemembers to her school and then harvesting their personnel data and their knowledge of US military training and capabilities. That was the reason the Department of Defense eliminated her access to tuition assistance for servicemembers attending her school. Now, Dr. Chen

simply seeks to replace that taxpayer funding by resorting to the American court system. And she would derogate Ms. Herridge's rights— and the right of the American people to have a free and vigorous press— in the process. The Court should reject her attempts to cloak those efforts in "the language of law" and bolster a hostile actor's "own legitimacy in the public eye." Goldenziel, *supra*, at 244.

## Conclusion

For the reasons stated above, the Court should reverse the decision of the district court denying Ms. Herridge's motion to quash, and it should vacate the decision of the district court holding Ms. Herridge in civil contempt.

Respectfully submitted.

June 27, 2024                                           /s/ *Judd E. Stone II*
                                                        Judd E. Stone II
                                                        Ari Cuenin
                                                        Cody C. Coll
                                                        STONE HILTON PLLC
                                                        P.O. Box 150112
                                                        Austin, Texas 78715
                                                        judd@stonehilton.com
                                                        ari@stonehilton.com
                                                        cody@stonehilton.com
                                                        (737) 465-7248

                                                        *Counsel for Amicus Curiae*

21

## Certificate of Compliance

I hereby certify under Federal Rule of Appellate Procedure 32(g)(1) that this brief complies with Rules 29(a)(5) and 32(a)(7)(B) because it contains 4,017 words except those parts of the brief excluded by Rule 32(f) and Circuit Rule 32(e)(1).

/s/ *Judd E. Stone II*
Judd E. Stone II