**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Appeal No. 24-5050**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

YANPING CHEN,

*Appellee*,

v.

FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE,
U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND
SECURITY,

*Appellees*,

CATHERINE HERRIDGE,

*Appellant.*

On Appeal from the United States District Court for the District of
Columbia, Case No. 1:18-cv-03074-CRC (Hon. Christopher R. Cooper)

**BRIEF OF AMICI CURIAE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AND 25 NEWS MEDIA
ORGANIZATIONS IN SUPPORT OF APPELLANT**

[Caption continued on next page]

Bruce D. Brown
   *Counsel of Record*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Ste. 1020
Washington, DC 20005
bruce.brown@rcfp.org
(202) 795-9300
*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici curiae Reporters Committee for Freedom of the Press, The Associated Press, The Atlantic Monthly Group LLC, CBS Broadcasting Inc. d/b/a CBS News, The Center for Investigative Reporting (d/b/a Reveal), Committee to Protect Journalists, Dow Jones & Co., Inc., Gannett Co., Inc., The Guardian U.S., Hearst Corporation, Los Angeles Times Communications LLC, National Newspaper Association, The National Press Club, National Press Photographers Association, NBCUniversal Media, LLC, The New York Times Co., News/Media Alliance, POLITICO LLC, Pro Publica, Inc., Radio Television Digital News Association, Reuters News & Media Inc., The Seattle Times Company, Society of Professional Journalists, TEGNA Inc., TIME USA, LLC, and The Washington Post (collectively, "Amici"), certify as follows:

A.    Parties and Amici

With the exception of The Associated Press, The Atlantic Monthly Group LLC, CBS Broadcasting Inc. d/b/a CBS News, The Center for Investigative Reporting (d/b/a Reveal), Committee to Protect Journalists, Dow Jones & Co., Inc., Gannett Co., Inc., The Guardian

i

U.S., Hearst Corporation, Los Angeles Times Communications LLC,

National Newspaper Association, The National Press Club, National

Press Photographers Association, NBCUniversal Media, LLC, The New

York Times Co., News/Media Alliance, POLITICO LLC, Pro Publica,

Inc., Radio Television Digital News Association, Reuters News & Media

Inc., The Seattle Times Company, Society of Professional Journalists,

TEGNA Inc., TIME USA, LLC, and The Washington Post, all parties,

intervenors, and amici curiae appearing before the district court and in

this Court as of the filing of this brief are listed in the brief for

Appellant.

B.    Rulings Under Review

References to the rulings at issue appear in Appellant's brief.

C.    Related Cases

To the knowledge of Amici's counsel, there are no other cases

within the meaning of Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Amici certify as follows:

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc. No publicly held corporation owns 10% or more of its stock.

CBS Broadcasting Inc. d/b/a CBS News is an indirect, wholly owned subsidiary of ViacomCBS Inc. ViacomCBS Inc. is a publicly traded company. National Amusements, Inc., a privately held company, beneficially owns the majority of the Class A voting stock of ViacomCBS Inc. ViacomCBS Inc. is not aware of any publicly held entity owning 10% or more of its total common stock, i.e., Class A and Class B on a combined basis.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section

501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

The Committee to Protect Journalists is a nonprofit organization with no parent corporation and no stock.

Dow Jones & Company, Inc. ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company. Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC. No publicly traded corporation currently owns ten percent or more of the stock of Dow Jones.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.

Guardian U.S.'s legal entity is Guardian News & Media LLC, a company incorporated in Delaware, whose registered office is at 315 West 36th St, New York, NY 10018. Guardian News & Media LLC's parent corporation is Guardian News & Media Limited, a private company. No publicly held corporation owns 10% or more of Guardian US's stock.

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

Los Angeles Times Communications LLC is wholly owned by NantMedia Holdings, LLC.

National Newspaper Association is a non-stock nonprofit Florida corporation.  It has no parent corporation and no subsidiaries.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company.  It issues no stock and does not own any of the parties' or amici's stock.

Comcast Corporation and its consolidated subsidiaries own 100% of the common equity interests of NBCUniversal Media, LLC.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held company owns 10% or more of its stock.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the United States and internationally.  It is a

nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia.  It has no parent company.

POLITICO LLC is wholly owned by POLITICO Media Group LLC, which is, in turn, wholly owned by Axel Springer SE, and no publicly held corporation owns ten percent or more of its stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

Reuters News & Media Inc. is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company.  Reuters News & Media Inc. and Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly-held corporation, which is traded on the New York Stock Exchange and Toronto Stock Exchange.  There are no

intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly held, and there are no publicly-held companies that own 10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares.

The Seattle Times Company: The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Society of Professional Journalists is a non-stock corporation with no parent company.

TEGNA Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in TEGNA, Inc.

Time USA, LLC is a privately held limited liability company. No publicly held corporation owns 10% or more of its stock.

WP Company LLC d/b/a The Washington Post is a wholly-owned subsidiary of Nash Holdings LLC, a holding company owned by Jeffrey P. Bezos. WP Company LLC and Nash Holdings LLC are both privately held companies with no securities in the hands of the public.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................. i

CORPORATE DISCLOSURE STATEMENT ........................................... iii

TABLE OF AUTHORITIES ..................................................... x

STATUTES AND REGULATIONS ....................................................... xiii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE ................................................................. xiii

RULE 29(a)(4)(E) CERTIFICATION .................................................... xv

CERTIFICATE REGARDING SEPARATE BRIEFING ....................... xv

INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 16

ARGUMENT ..................................................................... 4

I.   Circuit law must consider the harm to public interest journalism from compelling journalists to disclose the identities of their confidential sources. ............................................. 4

II.  Changes to the Department of Justice's policy on compulsory process affecting the press underscore the sensitivity of forcing journalists to disclose confidential source information. .................................................. 8

III. Confidential sources are essential to the free flow of information to the public. .............................................. 11

IV.  The district court should have quashed the subpoena under the common law reporter's privilege. ............................................. 16

CONCLUSION .................................................................... 20

APPENDIX A ..................................................................... 22

CERTIFICATE OF COMPLIANCE ........................................... 33

CERTIFICATE OF SERVICE ................................................................ 34

# TABLE OF AUTHORITIES

## Cases

*Branzburg v. Hayes,*
   408 U.S. 665 (1972) ................................................................................. 17

*Chen v. FBI,*
   No. 18-cv-3074 (CRC), 2023 WL 5289432 (D.D.C. Aug. 17, 2023) ....... 6

*Chen v. FBI,*
   No. 18-cv-3074 (CRC), 2024 WL 864093 (D.D.C. Feb. 29, 2024) 5, 7, 17

*In re Grand Jury Subpoena,*
   438 F.3d 1141 (D.C. Cir. 2006) ............................................................ 19

*Jaffee v. Redmond,*
   518 U.S. 1 (1996) .................................................................... 17, 18, 19

*Lee v. Dep't of Justice,*
   413 F.3d 53 (D.C. Cir. 2005) .................................................................. 5

*Lee v. Dep't of Justice,*
   428 F.3d 299 (D.C. Cir. 2005) ..................................................... 5, 6, 7

*Mgmt. Info. Techs., Inc. v. Alyeska Pipeline Serv. Co.,*
   151 F.R.D. 471 (D.D.C. 1993) .............................................................. 11

*N.Y. Times Co. v. United States,*
   403 U.S. 713 (1971) .............................................................................. 18

*Riley v. City of Chester,*
   612 F.2d 708 (3d Cir. 1979) ....................................................... 4, 17, 19

*Trammel v. United States,*
   445 U.S. 40 (1980) ................................................................................ 17

*Zerilli v. Smith,*
   656 F.2d 707 (D.C. Cir. 1981) ................................. 1, 2, 3, 4, 5, 7, 11, 12

## Other Authorities

23A Charles A. Wright & Arthur R. Miller, Federal Practice and
Procedure § 5426 (1st ed. updated 2024) .............................................. 17

Alexander M. Bickel, The Morality of Consent (1975) .......................... 12

Brief of Amici Curiae Media Organizations in Support of Appellant,
*Hatfill v. Mukasey*, No. 08-5049 (D.C. Cir. Mar. 28, 2008) ............... xvi

Brief of Amici Curiae Newsgathering Organizations and Reporters'
Groups in Support of Appellants Urging Reversal,
*Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005)
(No. 04-5301(L)), 2005 WL 319711 ................................................ 13, 14

Bruce D. Brown & Gabe Rottman, *The Nuts and Bolts of the Revised
Justice Dept. News Media Guidelines*, Lawfare (May 23, 2023),
https://perma.cc/Q6NR-XDMH ............................................................ 9

Charlie Savage & Luke Broadwater, *House Passes 2-Year Surveillance
Law Extension Without Warrant Requirement*,
N.Y. Times (Apr. 12, 2024),
https://www.nytimes.com/2024/04/12/us/politics/surveillance-bill-
fisa.html ........................................................................................... 15

David Kravets, *Reporters Challenge Bonds' Leak Subpoena*,
Associated Press (May 31, 2006),
https://perma.cc/2JS6-5N7C ................................................................ 13

Eric Umansky, *How American Journalists Covered Torture After 9/11*,
Colum. Journalism Rev. (Sept./Oct. 2006),
https://perma.cc/GU5N-D54D ............................................................. 13

Fed. R. Evid. 501 ........................................................................................ 17

Gabe Rottman, *The Privacy Act and Media Leaks*,
Reporters Comm. for Freedom of the Press (June 5, 2023),
https://www.rcfp.org/the-privacy-act-and-media-leaks/........................ 1

James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005), https://www.nytimes.com/2005/12/16/politics/bush-lets-us-spy-on-callers-without-courts.html ................................................................ 14

Jesse Eisinger et al., *The Secret IRS Files: Trove of Never-Before-Seen Records Reveal How the Wealthiest Avoid Income Tax*, ProPublica (June 8, 2021), https://perma.cc/63FG-D5RA ............................................................. 16

John N. Mitchell, U.S. Att'y Gen., *Free Press and Fair Trial: The Subpoena Controversy*, Address Before the House of Delegates of the American Bar Association (Aug. 10, 1970), https://perma.cc/9NLP-BL52 .................................................................. 8

Kevin Goldberg*, Reporter's Privilege: Protecting the Right to Know*, Freedom Forum, https://www.freedomforum.org/reporters-privilege/ (last accessed June 27, 2024) ............................................................. 19

Laura K. Donohue, *Section 702 and the Collection of International Telephone and Internet Content*, 38 Harv. J.L. & Pub. Pol'y 117 (2015).................................................. 15

Michael Farrell, *Anonymous Sources*, Soc'y Pro. Journalists, https://perma.cc/5BQBSRA3 ................................................................. 11

Robert Faturechi, *ProPublica's Tax Revelations Lead to Calls for Reforms – and Investigation*, ProPublica (June 9, 2021), https://perma.cc/TN6Z-KGVK ............................................................ 16

**Regulations**

28 C.F.R. § 50.10.................................................................................... 9, 10

## STATUTES AND REGULATIONS

All applicable statutes are contained in the brief for Appellant.

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

Amici are the Reporters Committee for Freedom of the Press (the "Reporters Committee") and 25 news media organizations (collectively, "Amici").

Both the U.S. Government-Appellees and Appellant Catherine Herridge consented to the filing of this amici brief, and Appellee Yanping Chen stated that she did not oppose or object to its filing. *See* Fed. R. App. P. 29(a)(2); Cir. R. 29(b).

Proposed amici are the Reporters Committee for Freedom of the Press and other news and media organizations dedicated to defending the First Amendment and newsgathering rights of the press: The Associated Press, The Atlantic Monthly Group LLC, CBS Broadcasting Inc. d/b/a CBS News, The Center for Investigative Reporting (d/b/a Reveal), Committee to Protect Journalists, Dow Jones & Co., Inc., Gannett Co., Inc., The Guardian U.S., Hearst Corporation, Los Angeles Times Communications LLC, National Newspaper Association, The National Press Club, National Press Photographers Association,

NBCUniversal Media, LLC, The New York Times Co., News/Media Alliance, POLITICO LLC, Pro Publica, Inc., Radio Television Digital News Association, Reuters News & Media Inc., The Seattle Times Company, Society of Professional Journalists, TEGNA Inc., TIME USA, LLC, and The Washington Post.  Because of the vital role that confidential journalistic sources play in the free flow of information to the public, Amici have a strong interest in ensuring that journalists can offer credible assurances of confidentiality to their sources.

Lead amicus the Reporters Committee is an unincorporated nonprofit association founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.  The Reporters Committee frequently serves as amicus curiae, including in this Court, in matters implicating the reporter's privilege and journalists' reliance on confidential sources for newsgathering.  *See, e.g.*, Brief of Amici Curiae

Media Organizations in Support of Appellant, *Hatfill v. Mukasey*, No. 08-5049 (D.C. Cir. Mar. 28, 2008).

The orders under review here, if allowed to stand, will undermine that ability and chill confidential sources from providing reporters with information in the public interest. Accordingly, Amici respectfully submit this brief in support of Appellant Catherine Herridge and urge the Court to reverse.

## RULE 29(a)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amici certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than Amici, their members, or counsel—contributed money that was intended to fund preparing or submitting the brief.

## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), Amici certify that this brief is necessary to provide the perspective of a broad range of news organizations that rely on their ability to credibly assure journalistic sources that their identities will remain confidential in order to gather

news in the public interest.  Amici have a critical interest in ensuring

that the reporter's privilege be applied to protect that ability.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The compelled disclosure of the identities of a journalist's

confidential sources has a particular and substantial impact on the

integrity of the newsgathering and reporting process.  Accordingly,

Amici make four points in support of Appellant Catherine Herridge and

reversal of the orders entered by the district court.

First, while Privacy Act cases involving efforts to compel the

disclosure of the identities of confidential journalistic sources are rare,

such cases are "hugely consequential for the work of the press."  Gabe

Rottman, *The Privacy Act and Media Leaks*, Reporters Comm. for

Freedom of the Press (June 5, 2023), https://www.rcfp.org/the-privacy-

act-and-media-leaks/; *Zerilli v. Smith*, 656 F.2d 707, 711 (D.C. Cir.

1981) ("Compelling a reporter to disclose the identity of a source may

significantly interfere with this news gathering ability; journalists

frequently depend on informants to gather news, and confidentiality is

often essential to establishing a relationship with an informant.").  For

that reason, it is essential that the reporter's privilege in this Circuit

properly assess the harm to the public interest from the compelled disclosure of source identities. This is especially true in the context of national security reporting, which would often be impossible absent credible assurances by a reporter that source identities will be kept confidential given the risks, including criminal exposure, for sources who are publicly identified. The lower court's reading of *Zerilli*—which discounts these public interest considerations and focuses primarily on whether the information sought is central to the claim and whether the plaintiff has reasonably exhausted other avenues to obtain it—strikes the wrong balance. *Cf. Zerilli*, 656 F.2d at 712 ("[I]n the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege."). And this is particularly so in Privacy Act cases in which the journalist is a non-party. In such cases, the equities should lean even further in favor of protecting the free flow of news to the public. *Id.* at 715 (noting non-party journalist was "not asserting the privilege in order to protect himself from liability").

Second, the Justice Department revised in 2021 and 2022 its internal policy governing the use of compulsory process to demand the production of information or testimony from a journalist or journalists'

records from a third-party communications or business provider.  While

that policy does not have the force of statute, its existence underscores

the strong public interest in protecting reporters from compelled

disclosure of their sources.  Indeed, were this a criminal national

security "leak" case, the new policy would bar the Department from

seeking source identity information from a reporter in Herridge's

position.  That the Department has restrained itself in this manner

should tip the *Zerilli* balancing analysis in the context of a civil Privacy

Act claim—"where the public interest in effective criminal law

enforcement is absent"—even further in favor of protecting the free flow

of information to the public by shielding the reporter from being

compelled to identify her sources.  *Zerilli*, 656 F.2d at 711.

Third, credible assurances of confidentiality to journalistic sources

have been, historically, an essential ingredient in a wide array of news

reporting in the public interest, from Watergate to warrantless

surveillance post-9/11 to recent coverage concerning tax avoidance

strategies by wealthy Americans.  Given the nature of Privacy Act

cases, which necessarily involve alleged disclosures from government

officials, compelling non-party journalists to identify confidential

sources poses a special threat to some of the most important reporting on public issues and institutions.

Finally, the same considerations should have led the district court to recognize a reporter's privilege as a matter of federal common law. Indeed, "[t]he legislative history of Rule 501 manifests that its flexible language was designed to encompass, inter alia, a reporter's privilege not to disclose a source." *Riley v. City of Chester*, 612 F.2d 708, 714 (3d Cir. 1979). This Court should now recognize this common law privilege.

For these reasons, Amici respectfully urge this Court to reverse the orders of the court below denying in part Appellant's motion to quash, compelling her to give deposition testimony identifying her source or sources in this matter, and finding her in contempt.

## <u>ARGUMENT</u>

**I.    Circuit law must consider the harm to public interest journalism from compelling journalists to disclose the identities of their confidential sources.**

*Zerilli* instructs that the application of the reporter's privilege must "strik[e] the balance between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources" and that courts doing so must be "mindful of the preferred position of the First Amendment and the importance of a

4

vigorous press." *Zerilli*, 656 F.2d at 712.  To be sure, *Zerilli* offered "[a] number" of "guidelines" to inform that balancing, including a requirement that the information sought go to the "heart of the matter" (centrality) and that litigants "exhaust[] every reasonable alternative source of information" before they can pierce the privilege (exhaustion). *Id.* at 712–14 (citation omitted).  Here, however, the district court concluded that centrality, exhaustion, and whether the reporter is a party are the primary factors a court may consider in its privilege analysis.  *Chen v. FBI*, No. 18-cv-3074 (CRC), 2024 WL 864093, at *5 (D.D.C. Feb. 29, 2024).  In doing so, the district court discounted the collateral harm from the compelled disclosure of source identity information to the public interest in "protecting journalists' ability to report without reservation on sensitive issues of national security", *see Lee v. Dep't of Justice*, 428 F.3d 299, 302 (D.C. Cir. 2005) (Tatel, J., joined by Garland, J., dissenting from denial of rehearing en banc).

The district court based that conclusion on its reading of the panel decision in *Lee v. Department of Justice*, 413 F.3d 53 (D.C. Cir. 2005), which, in affirming a finding of contempt against four journalists in a Privacy Act case, found that the centrality and exhaustion requirements

had been met.  But that panel decision did not expressly foreclose the consideration of other factors; it just applied those two.  More fundamentally, as noted by Judge Tatel in dissenting from the denial of rehearing en banc, were such an "arid two-factor test" the rule in Privacy Act cases, it would "allow[] the exigencies of even the most trivial litigation to trump core First Amendment values." *Lee*, 428 F.3d at 301 (Tatel, J., joined by Garland, J., dissenting from denial of rehearing en banc).[1]  That is because, "[b]arring an unexpected confession by the leaker, in most such cases the subject of the leak will be able to satisfy the centrality and exhaustion requirements" and if the "privilege is limited to those requirements, it is effectively no privilege at all." *Id.* at 302 (Garland, J., joined by Tatel, J., dissenting from denial of rehearing en banc).  And, while *Zerilli* may not call for a "free-

---

[1]    Judges Tatel and Garland wrote separate opinions, in which each joined the other, in dissenting from the denial of rehearing en banc in *Lee*.  Both noted that cabining the *Zerilli* balancing inquiry to the centrality and exhaustion factors would lead to the reporter's privilege being overcome in most, if not all, Privacy Act cases.  Judge Garland also expressly cautioned that weak scrutiny of third-party subpoenas under *Zerilli* could more broadly harm reporting on government activities.  *See Lee*, 428 F.3d at 303 ("[B]ridled by nothing other than plaintiffs' private interests, the more such strategies succeed, the more they will be employed.").

6

form, anything-goes analysis," *Chen v. FBI*, No. 18-cv-3074 (CRC), 2023 WL 5289432, at *3 (D.D.C. Aug. 17, 2023), it does indisputably call for courts to specifically weigh the "public interest in protecting the reporter's sources against the private interest in compelling disclosure," *Lee*, 428 F.3d at 301 (Tatel, J., joined by Garland, J., dissenting from denial of rehearing en banc) (citation omitted).  To ignore those considerations would convert many, if not all, "ordinary" Privacy Act cases to "the most exceptional cases," *Zerilli*, 656 F.2d at 712, severely weakening the privilege in this Circuit.  At the very least, an "arid two-factor test" will necessarily discount the harm to the public interest in investigative reporting if the privilege is effectively negated in most Privacy Act cases.

In sum, limiting the *Zerilli* balancing inquiry to just the centrality and exhaustion factors threatens to undercut the privilege significantly in Privacy Act cases where the plaintiff seeks to compel a reporter to identify confidential sources.  While such cases may be rare, they present significant First Amendment concerns.  Indeed, the district court recognized the weighty constitutional considerations at play in such cases in rejecting calls by the Appellee to apply more punitive

7

sanctions for contempt and in staying the order pending this appeal.
*See Chen*, 2024 WL 864093, at *9 (adopting fine in the "low-end of th[e]
range" in past Privacy Act cases and staying sanction to provide "ample
room" for Appellant to litigate privilege claim).  Given the potential
harm to government transparency and accountability if the balance is
off, it is essential that the *Zerilli* analysis be properly calibrated to
ensure the privilege may be pierced in only the most exceptional of
cases.

## II.    Changes to the Department of Justice's policy on compulsory process affecting the press underscore the sensitivity of forcing journalists to disclose confidential source information.

Following a "bitter dispute" in the early 1970s over government
attempts to compel journalists to disclose confidential source
information, the Justice Department implemented an internal policy
limiting its ability to use subpoenas targeting the press.  John N.
Mitchell, U.S. Att'y Gen., *Free Press and Fair Trial: The Subpoena
Controversy* at 4, Address Before the House of Delegates of the
American Bar Association (Aug. 10, 1970), https://perma.cc/9NLP-BL52.
These "news media guidelines" were expanded over the years to include
other forms of compulsory process, and they went through a dramatic

8

overhaul in 2021 and 2022, following revelations that the Justice

Department had, in 2020, authorized wide-ranging subpoenas and court

orders for journalists' phone and email records in investigations into the

unauthorized disclosure of government information.  *See* Bruce D.

Brown & Gabe Rottman, *The Nuts and Bolts of the Revised Justice

Dept. News Media Guidelines*, Lawfare (May 23, 2023),

https://perma.cc/Q6NR-XDMH.

The revisions expressly recognize "the important national interest

in protecting journalists from compelled disclosure of information

revealing their sources, sources they need to apprise the American

people of the workings of their Government."  28 C.F.R. § 50.10(a)(2).

They do so by imposing a bright-line rule prohibiting the use of

compulsory process to obtain information from journalists acting within

the "scope of newsgathering"—with exceptions only for when the

journalist consents, when exigent circumstances exist, or when the

journalist is needed to authenticate already published information.  *Id.*

§ 50.10(c).  The prohibition defines "newsgathering" to include the

receipt, possession, or publication of government information, including

classified information.  *Id.* § 50.10(b)(2)(ii)(A).

Although the guidelines, as revised, reflect the Department's internal policy and are not directly at issue in this case, their existence is relevant to determining the weight of the public interest at stake. Under the revised guidelines, were this a national security leak case, the Department of Justice would be restricted from using a subpoena to compel the disclosure of the identities of Herridge's sources. Indeed, the only circumstance in which the Department would use a subpoena to compel testimony from a journalist identifying confidential sources (outside of the narrow exceptions noted above) is when the journalist is directly suspected of criminal activity unrelated to newsgathering—that is, if the journalist was "not acting within the scope of newsgathering" and is the "subject or target of an investigation and suspected of having committed an offense." 28 C.F.R. § 50.10(d)(1)(i).[2] There is no scenario under the guidelines—other than the narrow consent, exigency, and authentication exceptions noted above—permitting a subpoena to a journalist in Herridge's position, even if this were a criminal matter.

The restriction set forth in the guidelines is notable given the

---

[2]    And even in such a case, unless there is no "nexus" to newsgathering, the guidelines still require approval by the deputy attorney general. *Id.* § 50.10(f).

clear command of the D.C. Circuit that in the "ordinary" civil case, where "the public interest in effective criminal law enforcement is absent," the "litigant's interest in disclosure should yield to the journalist's privilege." *Zerilli*, 656 F.2d at 711–12 ("[I]f the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished."). It also underscores the weight to be given the fact that Herridge is not a party to this civil dispute. *Mgmt. Info. Techs., Inc. v. Alyeska Pipeline Serv. Co.*, 151 F.R.D. 471, 477 (D.D.C. 1993) ("A leading indicator for the importance of the reporter's information to the case is whether the reporter is a party.").

That the nation's leading law enforcement agency has enacted a policy that would bar it from seeking to compel disclosure of the same information that Appellee seeks here, including in a criminal matter, highlights the profound public interest that is served by protecting confidential source identities.

## III. Confidential sources are essential to the free flow of information to the public.

The ability of journalists to assure sources that their identities will remain confidential is central to preserving the press's structural role as a check on government, particularly in the national security

11

sphere. *See* Michael Farrell, *Anonymous Sources*, Soc'y Pro. Journalists, https://perma.cc/5BQBSRA3 ("Anonymous sources are sometimes the only key to unlocking that big story, throwing back the curtain on corruption, fulfilling the journalistic missions of watchdog on the government and informant to the citizens."). When sources stop talking to journalists because they fear their identities cannot be protected, that loss impairs the electorate's ability to make informed political, social, and economic decisions, and to hold elected officials and others in power accountable. *See Zerilli*, 656 F.2d at 711. Further, the information provided by confidential sources is often unavailable through other channels. *See* Alexander M. Bickel, The Morality of Consent 84 (1975) ("Forcing reporters to divulge such confidences would dam the flow to the press, and through it to the people, of the most valuable sort of information: not the press release, not the handout, but the firsthand story based on the candid talk of a primary news source.").

Confidential sources have enabled journalists to tell some of the most important public interest stories of the last half-century. As Carl Bernstein recalled with respect to Watergate, "Almost all of the articles I co-authored with [Bob] Woodward on Watergate could not have been

reported or published without the assistance of our confidential sources and without the ability to grant them anonymity, including the individual known as Deep Throat." David Kravets, *Reporters Challenge Bonds' Leak Subpoena*, Associated Press (May 31, 2006), https://perma.cc/2JS6-5N7C. And, as relevant here, confidential sources have been particularly important to national security reporting, where government secrecy is at its zenith and investigative newsgathering is often the only way that newsworthy information about government activities can get to the public. The Iran-Contra scandal, the massacre at My Lai during the Vietnam War, the Aldrich Ames spy scandal, revelations of "enhanced interrogation" tactics by intelligence agencies post-9/11, and detainee abuse at Abu Ghraib prison in Iraq were all brought to light through disclosures made by confidential sources. *See* Brief of Amici Curiae Newsgathering Organizations and Reporters' Groups in Support of Appellants Urging Reversal at 3, *Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005) (No. 04-5301(L)), 2005 WL 319711; Eric Umansky, *How American Journalists Covered Torture After 9/11*, Colum. Journalism Rev. (Sept./Oct. 2006), https://perma.cc/GU5N-D54D. And in the context of national security

reporting, information provided by confidential sources is doubly crucial

because of the universally acknowledged problem of government

overclassification.  *See* Brief of Amici Curiae, 2005 WL 319711, at *4–5

("Since virtually everything is classified, the verification of something

as mundane as a press briefing involves talking to scores of sources who

are not authorized to add further detail and could be subject to

sanctions for doing so." (quoting Affidavit of Scott Armstrong ¶ 14 (J.A.

1796–97))).

Often, these disclosures will directly inform important public

policy debates and give the electorate visibility into secret government

actions that would otherwise go unexamined.  In 2005, for instance, The

New York Times relied on confidential sources in breaking the news

that the National Security Agency had been monitoring, without a

warrant, communications in and out of the country involving suspected

foreign terrorists.  James Risen & Eric Lichtblau, *Bush Lets U.S. Spy

on Callers Without Courts*, N.Y. Times (Dec. 16, 2005),

https://www.nytimes.com/2005/12/16/politics/bush-lets-us-spy-on-

callers-without-courts.html.  That revelation led Congress to hold

hearings and ultimately to pass Section 702 of the Foreign Intelligence

Surveillance Act, which authorized the program under the auspices of the Foreign Intelligence Surveillance Court.  *See* Laura K. Donohue, *Section 702 and the Collection of International Telephone and Internet Content*, 38 Harv. J.L. & Pub. Pol'y 117, 124–42 (2015) (surveying history of Section 702, including the public debate facilitated by the 2005 news coverage).  Indeed, because of the public controversy over the disclosures, Congress only authorized the collection program subject to reconsideration and reauthorization every five years.  *Id.* at 125.  And the debate spurred by The Times's coverage continues today, as Congress just recently reauthorized Section 702 for two years after lengthy deliberation over the inclusion of possible reforms.  *See* Charlie Savage & Luke Broadwater, *House Passes 2-Year Surveillance Law Extension Without Warrant Requirement*, N.Y. Times (Apr. 12, 2024), https://www.nytimes.com/2024/04/12/us/politics/surveillance-bill-fisa.html.

More recent disclosures likewise confirm the importance of news reporting that relies on the ability of reporters to promise sources confidentiality.  For instance, in a special report that prompted a Privacy Act claim against the Treasury Department and the Internal

Revenue Service, ProPublica revealed, based on confidential tax documents, certain tax avoidance strategies uniquely available to wealthy Americans.  Jesse Eisinger et al., *The Secret IRS Files: Trove of Never-Before-Seen Records Reveal How the Wealthiest Avoid Income Tax*, ProPublica (June 8, 2021), https://perma.cc/63FG-D5RA; Robert Faturechi, *ProPublica's Tax Revelations Lead to Calls for Reforms – and Investigation*, ProPublica (June 9, 2021), https://perma.cc/TN6Z-KGVK.

This discussion highlights only a small sampling of the type of journalism that could be impeded were reporters unable to assure sources that they have a strong legal basis to keep their identities confidential.  And it illustrates more precisely the contours of the public interest in protecting confidential journalistic source identities, particularly in Privacy Act cases where the alleged harm arises from a government disclosure, not the actions of the non-party journalist, and where piercing the privilege has the potential to chill reporting more broadly.

## IV.  The district court should have quashed the subpoena under the common law reporter's privilege.

In addition to the protection the First Amendment affords reporters to protect their sources, federal courts in federal question

16

cases are likewise authorized "to define new privileges by interpreting 'common law principles . . . in the light of reason and experience.'" *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996) (quoting Fed. R. Evid. 501). Those considerations have led other courts to recognize a reporter's privilege under the federal common law. Although it declined to do so, the district court, in staying the contempt sanction, noted that this Court could recognize such a privilege. *Chen*, 2024 WL 864093, at *10. Amici respectfully urge this Court to do exactly that.

Rule 501 was intended "not [to] freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather [to] direct[] federal courts to 'continue the evolutionary development of testimonial privileges.'" *Jaffee*, 518 U.S. at 8–9 (quoting *Trammel v. United States*, 445 U.S. 40, 47 (1980)). Because *Branzburg v. Hayes*, 408 U.S. 665 (1972), was decided several years before the adoption of Rule 501, the Supreme Court has never had occasion to address the existence or scope of a federal common law reporter's privilege. But as other federal courts correctly have observed, "[t]he legislative history of Rule 501 manifests that its flexible language was designed to encompass, inter alia, a reporter's privilege not to

17

disclose a source." *Riley v. City of Chester*, 612 F.2d 708, 714 (3d Cir. 1979); *accord* 23A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 5426 (1st ed. updated 2024) ("The legislative history suggests that Congress expected that Rule 501 would be used to create a privilege for newsmen.").

As the Supreme Court explained in *Jaffee*, the analysis whether to recognize a privilege under Rule 501 weighs three factors: (1) whether the privilege serves significant public and private interests, 518 U.S. at 10–11; (2) whether those interests outweigh the burden on truth-seeking that the privilege may impose, *id.* at 11–12; and (3) whether such a privilege is widely recognized by the states, *id.* at 12–13. Each factor strongly supports recognition of the common law reporter's privilege. As discussed in detail above, the public has an urgent interest in safeguarding the press's ability to "bare the secrets of government and inform the people," *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring)—so much so that the Justice Department as discussed above has willingly forgone access to reporter-source communications even in criminal cases implicating national security. And the judgment of the states, for their part, is

18

overwhelming: Forty states and the District of Columbia have adopted a statutory reporter's privilege, while nine of the remaining ten recognize a privilege either as a matter of constitutional or common law, or pursuant to rules of court. *See* Kevin Goldberg*, Reporter's Privilege: Protecting the Right to Know*, Freedom Forum, https://www.freedomforum.org/reporters-privilege/ (last accessed June 27, 2024).

The results of that national referendum are unambiguous: both "reason and experience" make clear the vital importance of reporter-source confidentiality to effective newsgathering—and with it the workings of our democracy. *Jaffee*, 518 U.S. at 12–13; *see In re Grand Jury Subpoena*, 438 F.3d 1141, 1164 (D.C. Cir. 2006) (Tatel, J., concurring in the judgment) (arguing that "the consensus of forty-nine states plus the District of Columbia—and even the Department of Justice—would require us to protect reporters' sources as a matter of federal common law"). And just as in the First Amendment context, courts cannot give that interest due weight by looking narrowly to "the need for the evidence sought to be obtained in the case at hand"; instead, they must "balance" that consideration against "the policies

19

which give rise to the privilege and their applicability to the facts at hand." *Riley*, 612 F.2d at 716. The district court, under the mistaken impression that its hands were tied by this Court's precedent, did not consider those public interests in this case. Whether under the First Amendment or the federal common law, its decisions to compel Appellant to identify her source or sources and to hold Appellant in contempt should be reversed.

## **CONCLUSION**

For all these reasons, Amici respectfully urge the Court to reverse the district court's orders denying in part Appellant's motion to quash and finding Appellant in contempt.

Dated: July 1, 2024

Respectfully submitted,

 */s/ Bruce D. Brown*
Bruce D. Brown
   *Counsel of Record*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Ste. 1020
Washington, DC 20005
bruce.brown@rcfp.org

(202) 795-9300

*Counsel for Amici Curiae*

# APPENDIX A

## SUPPLEMENTAL STATEMENTS OF INTEREST OF AMICI CURIAE

**The Reporters Committee for Freedom of the Press** is an unincorporated nonprofit association.  The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

**The Associated Press** ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York.  The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers.  The AP operates from 280 locations in more than 100 countries.  On any given day, AP's content can reach more than half of the world's population.

**The Atlantic Monthly Group LLC** is the publisher of *The Atlantic* and TheAtlantic.com.  Founded in 1857 by Oliver Wendell

22

Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, *The Atlantic* continues its 160-year tradition of publishing award-winning journalism that challenges assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

**CBS Broadcasting Inc. d/b/a CBS News** produces and broadcasts news, public affairs and entertainment programming.  The CBS News Division produces morning, evening and weekend news programming, as well as news and public affairs newsmagazine programs, such as "60 Minutes" and "48 Hours."  CBS Broadcasting Inc. also directly owns and operates television stations across the country, including WCBS-TV in New York City, which produces daily news programming.

**The Center for Investigative Reporting, Inc.** is the nation's oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios.  Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance.  Reveal produces investigative journalism

for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels.  Reveal often works in collaboration with other newsrooms across the country.

**The Committee to Protect Journalists** is an independent, nonprofit organization that promotes press freedom worldwide.  We defend the right of journalists to report the news without fear of reprisal.  CPJ is made up of about 40 experts around the world, with headquarters in New York City.  A board of prominent journalists from around the world helps guide CPJ's activities.

**Dow Jones & Company** is the world's leading provider of news and business information.  Through *The Wall Street Journal*, *Barron's*, MarketWatch, Dow Jones Newswires, and its other publications, Dow Jones has produced journalism of unrivaled quality for more than 130 years and today has one of the world's largest newsgathering operations.  Dow Jones's professional information services, including the Factiva news database and Dow Jones Risk & Compliance, ensure that businesses worldwide have the data and facts

they need to make intelligent decisions.  Dow Jones is a News Corp company.

**Gannett** is the largest local newspaper company in the United States.  Our more than 200 local daily brands in 43 states — together with the iconic USA TODAY — reach an estimated digital audience of 140 million each month.

**Guardian U.S.** is the New York City-based American online presence, through the website https://www.theguardian.com/us, of the British print newspaper The Guardian and its website theguardian.com.  Launched in September 2011, Guardian US covers American and international news for an online, global audience.  Guardian US is renowned for the Paradise Papers investigation and other award-winning work including the NSA revelations, Panama Papers and The Counted investigations.  The website theguardian.com is one of the world's leading English-language newspaper websites and operates two international online editions of the Guardian - Guardian US (Guardian News & Media LLC) and Guardian Australia (GNM Australia PTY Ltd).  Traffic from outside the

UK now represents around two-thirds of the Guardian's total digital audience.

**Hearst** is one of the nation's largest diversified media, information and services companies with more than 360 businesses. Its major interests include ownership of 15 daily and more than 30 weekly newspapers, including the San Francisco Chronicle, Houston Chronicle, and Albany Times Union; hundreds of magazines around the world, including Cosmopolitan, Good Housekeeping, ELLE, Harper's BAZAAR and O, The Oprah Magazine; 31 television stations such as KCRA-TV in Sacramento, Calif. and KSBW-TV in Monterey/Salinas, CA, which reach a combined 19 percent of U.S. viewers; ownership in leading cable television networks such as A&E, HISTORY, Lifetime and ESPN; global ratings agency Fitch Group; Hearst Health; significant holdings in automotive, electronic and medical/pharmaceutical business information companies; Internet and marketing services businesses; television production; newspaper features distribution; and real estate.

**Los Angeles Times Communications LLC** is one of the largest daily newspapers in the United States. Its popular news and

information website, www.latimes.com, attracts audiences throughout California and across the nation.

**National Newspaper Association** ("NNA") is a 2,000 member organization of community newspapers founded in 1885. Its members include weekly and small daily newspapers across the United States. It is based in Pensacola, Florida.

**The National Press Club** is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all

its forms, especially as it relates to visual journalism.  The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**NBCUniversal Media, LLC** is one of the world's leading media and entertainment companies in the development, production and marketing of news, entertainment and information to a global audience. Among other businesses, NBCUniversal Media, LLC owns and operates the NBC television network, the Spanish-language television network Telemundo, NBC News, several news and entertainment networks, including MSNBC and CNBC, and a television-stations group consisting of owned-and-operated television stations that produce substantial amounts of local news, sports and public affairs programming.  NBC News produces the "Today" show, "NBC Nightly News with Lester Holt," "Dateline NBC" and "Meet the Press."

**The New York Times Company** is the publisher of *The New York Times* and operates the news website nytimes.com.

**The News/Media Alliance** ("N/MA") represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and

from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. The Alliance diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

**POLITICO** is a global news and information company at the intersection of politics and policy. Since its launch in 2007, POLITICO has grown to nearly 300 reporters, editors and producers. It distributes 30,000 copies of its Washington newspaper on each publishing day and attracts an influential global audience of more than 35 million monthly unique visitors across its various platforms.

**Pro Publica, Inc.** ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its

website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**Reuters**, the news and media division of Thomson Reuters, is the world's largest multimedia news provider. Founded in 1851, it is committed to the Trust Principles of independence, integrity and freedom from bias. With unmatched coverage in over 16 languages, and reaching billions of people worldwide every day, Reuters provides

trusted intelligence that powers humans and machines to make smart decisions.  It supplies business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

**The Seattle Times Company**, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with the *Yakima Herald-Republic* and *Walla Walla Union-Bulletin*, all in Washington state.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism.  It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior.  Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**TEGNA Inc.** owns or services (through shared service agreements or other similar agreements) 64 television stations in 52 markets.

**TIME** is a global multimedia brand that reaches a combined audience of more than 100 million around the world.  TIME's major franchises include the TIME 100 Most Influential People, Person of the Year, Firsts, Best Inventions, Genius Companies, World's Greatest Places and more.  With 45 million digital visitors each month and 40 million social media followers, TIME is one of the most trusted and recognized sources of news and information in the world.

**The Washington Post** (formally, WP Company LLC d/b/a The Washington Post) is a news organization based in Washington, D.C.  It publishes The Washington Post newspaper and the website www.washingtonpost.com, and produces a variety of digital and mobile news applications.  The Post has won Pulitzer Prizes for its journalism, including the award in 2020 for explanatory reporting.

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 5,941 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: July 1, 2024
Washington, D.C.          */s/ Bruce D. Brown*
Bruce D. Brown
*Counsel of Record for Amici Curiae*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on July 1, 2024, I electronically re-filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. All parties are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.

<u>*/s/ Bruce D. Brown*</u>
Bruce D. Brown
*Counsel of Record for*
*Amici Curiae*

Dated: July 1, 2024