NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals
# for the District of Columbia Circuit

---•---

## No. 24-5050

---•---

YANPING CHEN,

*Plaintiff-Appellee,*

*v.*

FEDERAL BUREAU OF INVESTIGATION; UNITED STATES
DEPARTMENT OF JUSTICE; UNITED STATES DEPARTMENT OF
DEFENSE; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellees.*

CATHERINE HERRIDGE,

*Interested Party-Appellant.*

On Appeal from the United States District Court for the
District of Columbia in No. 1:18-cv-03074-CRC

---

**BRIEF OF ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION
FUND AND ASIAN AMERICAN ADVOCACY ORGANIZATIONS
AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE**

---

Elizabeth Koo
Michael Shang
Jane Shim
    *Counsel of Record*
ASIAN AMERICAN LEGAL
    DEFENSE AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, New York 10013
(212) 966-5932
jshim@aaldef.org

*Counsel for Amici Curiae*

July 29, 2024



## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amici curiae* the Asian American Legal Defense and Education Fund, along with Asian Americans Advancing Justice Southern California, Asian Americans United, the Asian Law Alliance, the Asian Law Caucus, the APA Justice Task Force, Chinese for Affirmative Action, the Fred T. Korematsu Center for Law and Equality, Helen Zia and the Vincent Chin Institute, the Japanese Americans Citizens League, Muslim Advocates, and Stop AAPI Hate ("Asian American Advocacy Organizations"), (collectively, "*Amici*"), certify as follows:

Except for the foregoing *Amici*, *amicus curiae* Senator Cruz, and the *amici curiae* identified in the brief of the Reporters' Committee for Freedom of the Press, all parties, intervenors, and *amici curiae* appearing before the district court and in this Court are listed in the Brief for Appellant.  References to the rulings at issue appear in Appellant's brief.  To counsel's knowledge, there are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No counsel for any party authored this brief, in whole or in part, nor did counsel for any party or either party make a monetary contribution intended to fund this brief in whole or in part.  No person or entity other than *Amici* and counsel for *Amici* contributed monetarily to this brief's preparation or submission.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, *Amici* certify as follows:

The Asian American Legal Defense and Education Fund is not a publicly held corporation, does not issue stock, and does not have parent corporations. Consequently, no publicly held corporation owns ten percent or more of the stock of the Asian American Legal Defense and Education Fund.

Asian Americans Advancing Justice Southern California ("AJSOCAL") is a community-based civil rights organization established under Section 501(c)(3) of the Internal Revenue Code.  AJSOCAL does not have any parent corporation or issue stock and consequently there exists no publicly held corporation which owns 10 percent or more of its stock.

Asian Americans United is not a publicly held corporation, does not issue stock, and does not have parent corporations.  Consequently, no publicly held corporation owns ten percent or more of the stock of Asian Americans United.

The Santa Clara County Asian Law Alliance is not a publicly held corporation, does not issue stock, and does not have parent corporations. Consequently, no publicly held corporation owns ten percent or more of the stock of the Santa Clara County Asian Law Alliance.

The Asian Law Caucus is a community-based civil rights organization established under Section 501(c)(3) of the Internal Revenue Code.  It has no parent corporation, does not issue stock, and no publicly held corporation has an ownership interest in it.

The APA Justice Task Force is an unregistered, nonprofit voluntary platform.  For the avoidance of doubt, none of its members have issued shares or debt securities to the public.

Chinese for Affirmative Action ("CAA") is a community-based civil rights organization established under Section 501(c)(3) of the Internal Revenue Code. CAA does not have any parent corporation or issue stock and consequently there exists no publicly held corporation which owns 10 percent or more of its stock.

The Fred T. Korematsu Center for Law and Equality ("Korematsu Center") is a research and advocacy organization based at the University of California, Irvine, which is part of The Regents of the University of California, a tax-exempt educational institution under Section 501(c)(3) of the Internal Revenue Code.  The Korematsu Center does not have any parent corporation or issue stock and consequently there exists no publicly held corporation which owns 10 percent or more of its stock.

The Vincent Chin Institute is not a publicly held corporation, does not issue stock, and does not have parent corporations. Consequently, no publicly held corporation owns ten percent or more of the stock of the Vincent Chin Institute.

The Japanese American Citizens League states that it is a nonprofit corporation established in California, that it is not a subsidiary of any corporation, and that it does not have any stock which can be owned by a publicly held corporation.

Muslim Advocates ("MA") is a not-for-profit organization.  MA does not have a parent corporation and does not issue stock, and no publicly held corporation owns 10% or more of the stock of MA.

Stop AAPI Hate is fiscally sponsored by Chinese for Affirmative Action, whose disclosure is provided above.

## **TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ..........i

CORPORATE DISCLOSURE STATEMENT ......................................................... ii

TABLE OF AUTHORITIES .....................................................................................vi

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................................1

CERTIFICATE REGARDING SEPARATE BRIEFING........................................2

SUMMARY OF ARGUMENT ..................................................................................2

ARGUMENT ..............................................................................................................4

I.      THE FOREVER FOREIGNER STEREOTYPE HAS OPERATED
        FOR OVER A CENTURY TO DENY ASIAN AMERICANS THEIR
        RIGHTS AND EXCLUDE THEM FROM FULL PARTICIPATION
        IN AMERICAN SOCIETY .............................................................................4

II.     THE MEDIA HAS PLAYED A MAJOR ROLE IN
        PERPETUATING THE FOREVER FOREIGNER STEREOTYPE
        AND ENABLING GOVERNMENT ABUSES OF POWER ......................15

        A.      "A Viper is a Viper Wherever Hatched": Media Sensationalism
                Has Fueled Racism Against Asian Americans ...................................15

        B.      Media Stereotyping Has Empowered False Accusations of
                Espionage Against Asian Americans, Leading To Law
                Enforcement Overreach.......................................................................20

III.    APPELLANT'S BRIEF RELIES ON THE FOREVER FOREIGNER
        STEREOTYPE—WHICH THIS COURT SHOULD REJECT ..................25

CONCLUSION .........................................................................................................28

CERTIFICATE OF COMPLIANCE.......................................................................29

CERTIFICATE OF SERVICE ................................................................................30

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*Chen v. Fed. Bureau of Investigation*,
  No. 18-CV-3074 (CRC), 2024 WL 864093 (D.D.C. Feb. 29, 2024).................27

*Frick v. Webb*,
  263 U.S. 326 (1923)........................................................................8

*Hohri v. United States*,
  782 F.2d 227 (D.C. Cir. 1986).........................................................9

*Korematsu v. United States*,
  323 U.S. 214 (1944)......................................................................12

*Lee v. Dep't of Just.*,
  413 F.3d 53 (D.C. Cir. 2005).........................................................21

*Ozawa v. United States*,
  260 U.S. 178 (1922)........................................................................6

*Plessy v. Ferguson*,
  163 U.S. 537 (1896)........................................................................6

*Porterfield v. Webb*,
  263 U.S. 225 (1923)........................................................................8

*Trump v. Hawaii*,
  585 U.S. 667 (2018)......................................................................12

*United States v. Thind*,
  261 U.S. 204 (1923)........................................................................7

*Webb v. O'Brien*,
  263 U.S. 313 (1923)........................................................................8

**Statutes & Rules**

Chinese Exclusion Act, 22 Stat. 58, ch. 126 (1882) .........................................6, 18

Geary Act, 27 Stat. 25, ch. 60 (1892) ..................................................................6, 7

**Page(s)**

Page Law, 18 Stat. 477, ch. 141 (1875)..................................................5

Removal of Regulations Relating to Special Registration Process for
    Certain Nonimmigrants, 81 Fed. Reg. 94231 (Dec. 23, 2016)..........................11

**Other Authorities**

Aaron Wagner, *Word Choice and Media Exposure Affected Anti-Asian Boycotts During the Pandemic*, PENNSTATE: HEALTH & HUM. DEV. (Nov. 15, 2022), https://www.psu.edu/news/health-and-human-development/story/word-choice-and-media-exposure-affected-anti-asian-boycotts/.............................................19

Alvin Hoi-Chun Hung, *Deconstructing the Decolonizing Plot of the Tydings-Mcduffie Act: A Review of America's International Relations in Asia in the Early Twentieth Century*, 19 U. PENN. ASIAN L. REV. 141 (2023)........................................................8

Chris Westfall, *Battling Discrimination and the Bamboo Ceiling: The Bias Facing Asian American Managers*, FORBES (Sept. 14, 2021), https://www.forbes.com/sites/chriswestfall/2021/09/14/discrimination-and-bamboo-ceiling-the-unconscious-bias-facing-asian-american-managers/..............................................13

Claire Jean Kim, *The Racial Triangulation of Asian Americans*, 27 POL. & SOC'Y 105 (1999)................................................5, 16, 17, 19

Edgar Chen, *With New "Alien Land Laws" Asian Immigrants Are Once Again Targeted By Real Estate Bans*, JUST SEC. (May 26, 2023), https://www.justsecurity.org/86722/with-new-alien-land-laws-asian-immigrants-are-once-again-targeted-by-real-estate-bans..............14

Eileen Guo et al., *The US Crackdown on Chinese Economic Espionage Is a Mess. We Have the Data to Show It.*, MIT TECH. REV. (Dec. 2, 2021), https://www.technologyreview.com/2021/12/02/1040656/china-initative-us-justice-department/..............................................14

Eric Boehlert, *How the New York Times Helped Railroad Wen Ho Lee*, SALON (Sept. 21, 2000), https://www.salon.com/2000/09/21/nyt_6/..............................................24

**Page(s)**

Ethan Wong, *Forever Foreigner: The Growing Anti Asian-American Sentiment During the Covid-19 Pandemic*, 9 INT'L J. SOC. SCI. & HUMANS. RSCH. 296 (2021) ................................................................19

From the Desk of Secretary Antony J. Blinken, https://www.politico.com/f/?id=00000187-0a39-d989-a7a7-afbd4d460000 ................................................................13

Huong Vu, *Us Against Them: The Path to National Security Is Paved by Racism*, 50 DRAKE L. REV. 661 (2002)..................................10, 18, 22, 23, 24

*The Immigration Act of 1924 (The Johnson-Reed Act)*, OFFICE OF THE HISTORIAN, FOREIGN SERVICE INSTITUTE, U.S. DEPARTMENT OF STATE, https://history.state.gov/milestones/1921-1936/immigration-act ................................................................7

James Risen & Jeff Gerth, *BREACH AT LOS ALAMOS: A Special Report.; China Stole Nuclear Secrets for Bombs, U.S. Aides Say*, N.Y. TIMES (Sept. 26, 2000), https://www.nytimes.com/1999/03/06/world/breach-los-alamos-special-report-china-stole-nuclear-secrets-for-bombs-us-aides.html?pagewanted=all................................................................21

Jeff Swiatek & Kristine Guerra, *Feds Dismiss Charges Against Former Eli Lilly Scientists Accused of Stealing Trade Secrets*, INDYSTAR (Dec. 5, 2014), https://www.indystar.com/story/news/crime/2014/12/05/feds-dismiss-charges-former-eli-lilly-scientists-accused-stealing-trade-secrets/19959235/ ................................................................20

Justin D. Levinson et al., *Guilty by Implicit Racial Bias: The Guilty/Not Guilty Implicit Association Test*, 8 OHIO ST. J. CRIM. L. 187 (2010) ................................................................27

Kathrina Szymborski Wolfkot, *Treatment of First Muslim Federal Appellate Nominee Has Damaged Our Institutions*, BRENNAN CTR. FOR JUST. (Apr. 5, 2024), https://www.brennancenter.org/our-work/analysis-opinion/end-justice-departments-china-initiative-brings-little-relief-us ................................................................14

**Page(s)**

Keith Aoki, *No Right to Own? The Early Twentieth-Century "Alien Land Laws" As a Prelude to Internment*, 40 B.C. L. Rev. 37 (1998) ...................................................................................8

Kerry Abrams, *Polygamy, Prostitution, and the Federalization of Immigration Law*, 105 COLUM. L. REV. 641 (2005) ............................................5

Kimmy Yam, *After Being Falsely Accused of Spying for China, Sherry Chen Wins Significant Settlement*, NBC NEWS (Nov. 15, 2022), https://www.nbcnews.com/news/asian-america/falsely-accused-spying-china-sherry-chen-wins-significant-settlement-rcna56847 ...................................................................................20

Leo Yu, *From Criminalizing China to Criminalizing the Chinese*, 55 COLUM. HUM. RTS. L. REV. 45 (2023) .............................. 7, 18, 22, 23

Louise Cainkar, *Special Registration: A Fervor for Muslims,* 7 J. OF ISLAMIC L. & CULTURE 73 (2002) ...................................................11

Lowen Liu, *Just the Wrong Amount of American*, SLATE (Sept. 11, 2016), https://slate.com/news-and-politics/2016/09/the-case-of-scientist-wen-ho-lee-and-chinese-americans-under-suspicion-for-espionage.html ...................................................20, 21

Mae M. Ngai, *Nationalism, Immigration Control, and the Ethnoracial Remapping of America in the 1920s*, ORG. OF AM. HISTORIANS MAG. OF HIST., Jul. 2007 ...................................................7

Mark Jia, *American Law in the New Global Conflict*, 99 N.Y.U. L. REV. 636 (2024) ...................................................21

Matthew S. Erie, *Property as National Security*, 2024 WIS. L. REV. 255 (2024) ...................................................14

Michael German & Alex Liang, *End of Justice Department's"China Initiative" Brings Little Relief to U.S. Academics*, BRENNAN CTR. FOR JUST. (Mar. 25, 2022), https://www.brennancenter.org/our-work/analysis-opinion/end-justice-departments-china-initiative-brings-little-relief-us ...................................................14

**Page(s)**

Nate Raymond, *Kansas Researcher Wins Reversal of Conviction in Trump-era China Probe*, REUTERS (Jul. 11, 2024), https://www.reuters.com/world/us/kansas-researcher-wins-reversal-conviction-trump-era-china-probe-2024-07-11/ ................................. 21

Neil G. Ruiz et al., *Asian Americans and the "Forever Foreigner" Stereotype*, PEW RESEARCH CENTER (Nov. 30, 2023), https://www.pewresearch.org/2023/11/30/asian-americans-and-the-forever-foreigner-stereotype/ ....................................................... 4, 12

Niala Boodhoo, *Asian Americans Least Likely to Feel They Belong in U.S., Study Finds*, AXIOS (May 7, 2023), https://www.axios.com/2023/05/07/asian-americans-belonging-us-hate-discrimination ............................................................. 15

Nicole Gaouette, *Asian American Diplomats Say Discrimination Holds Them Back as US Competes with China*, CNN (May 7, 2021), https://amp.cnn.com/cnn/2021/05/07/politics/state-diversity-aapi-china ................................................................ 13

Nicole Perlroth, *Accused of Spying for China, Until She Wasn't*, N.Y. TIMES (May 9, 2015), https://www.nytimes.com/2015/05/10/business/accused-of-spying-for-china-until-she-wasnt.html?_r=0 ............................................... 20

Robert S. Chang, *The Invention of Asian Americans*, 3 UC IRVINE L. REV. 947 (2013) ............................................................... 6

Rose Cuison Villazor, *Rediscovering Oyama v. California: At the Intersection of Property, Race, and Citizenship*, 87 WASH. U. L. REV. 979 (2010) ............................................................... 8

Ryan Heath, *Foreigners in Their Own Country: Asian Americans at State Department Confront Discrimination*, POLITICO (Mar. 18, 2021), https://www.politico.com/news/2021/03/18/asian-americans-state-department-477106 ............................................... 13

Sahar F. Aziz, *A Muslim Registry: The Precursor to Internment?*, 2017 B.Y.U. L. REV. 779 (2017) ........................................... 7

**Page(s)**

Shoba S. Wadhia & Margaret Hu, *Decitizenizing Asian Pacific American Women*, 93 U. COLO. L. REV. 325 (2022) ............................................6

Shoba Sivaprasad Wadhia, *Is Immigration Law National Security Law?*, 66 EMORY L.J. 669 (2017) ....................................................11

*Special Registration: Discrimination and Xenophobia as Government Policy*, AALDEF (Jan. 2004) https://cdn.sanity.io/files/iroghafc/production/07ffa89b5f4d7b3ff12 5e2c447ec2af412d90630.pdf..................................................11

Stephanie Buck, *Overlooked No More: Mitsuye Endo, A Name Linked to Justice for Japanese-Americans*, N.Y. TIMES, https://www.nytimes.com/2019/10/09/obituaries/mitsuye-endo-overlooked.html (Nov. 15, 2019) ....................................................10

Stuart Creighton Miller, *The Unwelcome Immigrant: The American Image of the Chinese, 1785-1882* (Berkeley: University of Cal. Press, 1969)) ....................................................16

Sungil Han et al., *Anti-Asian American Hate Crimes Spike During the Early Stages of the COVID-19 Pandemic*, 38 J. INTERPERS. VIOLENCE 3513 (Jun. 3, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9168424/..............................19

Thomas W. Joo, *Presumed Disloyal: Executive Power, Judicial Deference, and the Construction of Race Before and After September 11*, 34 COLUM. HUM. RTS. L. REV. 1 (2002) ..............................5, 6, 9

*Timeline of Systemic Racism Against AAPI*, STANFORD LIBRARIES, https://exhibits.stanford.edu/riseup/feature/timeline-of-systemic-racism-against-aapi ....................................................16

From the Editors, *The Times and Wen Ho Lee*, N.Y. TIMES (Sept. 26, 2000) ....................................................25

Timothy Noah, *Two Cheers for the Times' Non-Apology Apology*, SLATE (Sept. 26, 2000), https://slate.com/news-and-politics/2000/09/two-cheers-for-the-times-non-apology-apology.html ....................................................24

**Page(s)**

*Special Registration Procedures [Text Version]* 1 U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, (Sept. 11, 2002), https://www.ice.gov/doclib/nseers/SRProc.pdf ....................................................11

Vinay Harpalani, *DesiCrit: Theorizing the Racial Ambiguity of South Asian Americans*, 69 N.Y.U. ANN. SURV. AM. L. 77 (2013) .............................13

Vinay Harpalani, *The Need for an Asian American Supreme Court Justice*, 137 Harv. L. Rev. F. 23 (2023) ..............................................................14

Vinay Harpalani, *Racial Triangulation, Interest-Convergence, and the Double-Consciousness of Asian Americans*, 37 GA. ST. U. L. REV. 1361 (2021) ..............................................................................................................5

*World War II Japanese American Incarceration: Mass Removal and Incarceration*, NATIONAL ARCHIVES, https://www.archives.gov/research/aapi/ww2/incarceration ................................9

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici* are the Asian American Legal Defense and Education Fund ("AALDEF") and Asian American Advocacy Organizations.

Both the U.S. Government-Appellees and Appellee Yanping Chen consented to the filing of this *amici* brief; Appellant Catherine Herridge stated that she does not oppose its filing. *See* Fed. R. App. P. 29(a)(2); D.C. Cir. R. 29(b).

Proposed *Amici* are AALDEF and other advocates that seek to protect civil rights and raise awareness of issues impacting Asian Americans: Asian Americans Advancing Justice Southern California, Asian Americans United, the Asian Law Alliance, the Asian Law Caucus, the APA Justice Task Force, Chinese for Affirmative Action, the Fred T. Korematsu Center for Law and Equality, Helen Zia and the Vincent Chin Institute, the Japanese Americans Citizens League, Muslim Advocates, and Stop AAPI Hate.

Lead *amicus* AALDEF, founded in 1974, is a non-profit organization based in New York City that protects and promotes the civil rights of Asian Americans. By combining litigation, advocacy, education, and organizing, AALDEF works with Asian American communities across the country to secure human rights for all. Discriminatory governmental targeting of Asians has repeatedly featured in the history of Asian immigration to the United States. AALDEF has a particular interest in countering stereotyping of Asian Americans by media and government

officials and in educating courts on the history of abuses of power driven by such stereotypes.

The District Court's orders faithfully applied the law and rejected harmful stereotyping based on national origin and/or race.  Accordingly, *Amici* respectfully submit this brief in support of Appellee Dr. Yanping Chen.

## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), *Amici* certify that this brief is necessary to provide the perspective of Asian American advocates on the history of stereotyping that has impacted media coverage and government action concerning Asian Americans accused of disloyalty to the United States.  *Amici* have a critical interest in ensuring that the full context of that history and its implications for the instant appeal are available to the Court.

## SUMMARY OF ARGUMENT

Dr. Yanping Chen is a United States citizen.  She has not been convicted of any crime, whether related to espionage or otherwise.  She has not even been *charged* with any crime.  But to read Appellant's brief uncritically would suggest otherwise.  Although this action concerns Dr. Chen's civil claim for violation of the Privacy Act, and her yearslong efforts to reveal who illegally leaked confidential information about her and her family to Appellant, Appellant attempts to recast this case as a referendum on Dr. Chen herself.  Appellant suggests that

Dr. Chen should be denied the relief she seeks because she is—in Appellant's view—a hostile agent of China conspiring against American democracy.  But as the District Court recognized, Appellant's scaremongering depiction of Dr. Chen is a red herring; it ignores well-settled principles of law and distracts from the legal analysis at issue here.  Moreover, as Dr. Chen makes clear (*see*, *e.g.*, Appellee Br. at 5-7), Appellant's accusations of disloyalty are based in fiction rather than fact; Dr. Chen has not been deemed a national security threat.

Appellant nonetheless continues to smear Dr. Chen's loyalty, integrity and reputation.  Such attacks have no place in the American justice system—but unfortunately, Appellant's dangerous insinuation that Asian Americans like Dr. Chen should be presumed disloyal based on their ancestral ties to other countries, rather than actual evidence of disloyalty, is all too familiar to Asian Americans.  It even has a name: the "forever foreigner" stereotype.

Born in the context of *Plessy*-era racism, the "forever foreigner" stereotype has been used to justify some of the worst instances of institutional discrimination in American history.  This stereotype has been continually perpetuated and reinforced, for over a century, by incendiary media coverage portraying Asian Americans as inherently disloyal to the United States.  Governmental abuses have relied on this perception of disloyalty to justify the denial of Asian Americans' fundamental civil rights.  This brief aims to help educate the Court on the history

of this anti-Asian stereotype, which *Amici* believe adds critical context as to why this Court should treat Appellant's framing of the case with skepticism.

Dr. Chen's race and country of origin do not change the fact that she has the same privacy rights as any other citizen. Just as the District Court did, so too should this Court recognize the danger presented by the stereotyping of Asian Americans, and the role such stereotypes play in enabling—rather than exposing—government abuses of power.

## ARGUMENT

### I.
### THE FOREVER FOREIGNER STEREOTYPE HAS OPERATED FOR OVER A CENTURY TO DENY ASIAN AMERICANS THEIR RIGHTS AND EXCLUDE THEM FROM FULL PARTICIPATION IN AMERICAN SOCIETY

The "forever foreigner" stereotype refers to the categorization of Asian Americans as an inherently, and immutably, foreign (*i.e.*, "un-American") group based on national origin and/or race.[1] Central to the forever foreigner stereotype is the closely related concept of dual loyalty, or "the assumption that Asian Americans have more ties and loyalties to their ancestral homelands than to the

---

[1] Neil G. Ruiz et al., *Asian Americans and the "Forever Foreigner" Stereotype*, PEW RESEARCH CENTER (Nov. 30, 2023), https://www.pewresearch.org/2023/11/30/asian-americans-and-the-forever-foreigner-stereotype/.

4

United States[.]"[2]  This proposition has been employed to deny Asian Americans their civil rights and prevent their full participation in American society for well over a century—from laws restricting immigration, citizenship, and landownership; to the displacement and mass incarceration of Japanese Americans during World War II; to continuing discrimination in society today.

As early as the 1800s, Asian Americans were considered a "racial wild card," neither "Black" nor "White," but viewed as "permanently foreign and unassimilable[.]"[3]  These two pillars of the forever foreigner stereotype—perpetual foreignness and "[p]utative unassimilability"—were formally codified into American law.[4]  The federal government enacted the first racially-specific federal immigration restriction with the Page Law of 1875.[5]  On its face, the Page Law barred immigration from "China, Japan, or any Oriental country" for contracted labor or prostitution, but in practice Chinese women were targeted and effectively

---

[2] Vinay Harpalani, *Racial Triangulation, Interest-Convergence, and the Double-Consciousness of Asian Americans*, 37 GA. ST. U. L. REV. 1361, 1369 (2021).

[3] Claire Jean Kim, *The Racial Triangulation of Asian Americans*, 27 POL. & SOC'Y 105, 108-09 (1999); *see also* Thomas W. Joo, *Presumed Disloyal: Executive Power, Judicial Deference, and the Construction of Race Before and After September 11*, 34 COLUM. HUM. RTS. L. REV. 1, 13-17 (2002).

[4] Kim, *supra* note 3, at 110, 115.

[5] Kerry Abrams, *Polygamy, Prostitution, and the Federalization of Immigration Law*, 105 COLUM. L. REV. 641, 643 (2005); *see also* Page Law, 18 Stat. 477, ch. 141 (1875).

barred for immigration because they were seen as prostitutes and "a moral threat to American society."[6]

In 1882, "the federal government enacted the first of a series of Chinese Exclusion laws" which, among other restrictions, declared Chinese immigrants ineligible to become naturalized citizens.[7]  The rationale for such policy was that "Asians were incapable of assimilation into American society and culture."[8]  As Justice Harlan famously wrote: "[t]here is a race so different from our own that we do not permit those belonging to it to become citizens of the United States.  Persons belonging to it are, with few exceptions, *absolutely excluded* from our country.  I allude to the Chinese race."[9]  The Chinese Exclusion Act functionally ended Chinese immigration for six decades.[10]  In addition, the 1892 Geary Act "required noncitizens of Chinese origin to register" with the government, using

---

[6] Shoba S. Wadhia & Margaret Hu, *Decitizenizing Asian Pacific American Women*, 93 U. COLO. L. REV. 325, 337, 342 (2022).

[7] Robert S. Chang, *The Invention of Asian Americans*, 3 UC IRVINE L. REV. 947, 953 (2013); *see also* Chinese Exclusion Act, 22 Stat. 58, ch. 126 (1882) (codified as amended at 23 Stat. 115, ch. 220 (1884)).

[8] Joo, *supra* note 3, at 15.

[9] *Plessy v. Ferguson*, 163 U.S. 537, 561 (1896) (Harlan, J., dissenting) (emphasis added).

[10] Congress repealed the Act through the Magnuson Act of 1943, ch. 344, 57 Stat. 600 (1943).

"[s]pecial registration" as "a tool of stigmatization aimed to make Chinese nationals feel sufficiently unwelcome to cause them to leave the U.S."[11]

The Naturalization Act of 1906 kept in place statutory language that only permitted "free white persons" and "persons of African descent" to become citizens.[12] When Takao Ozawa, a Japanese American born in Japan, and Bhagat Singh Thind, an Indian American born in India, applied to naturalize, the Supreme Court found both men ineligible because they were not white.[13] The federal government revoked Thind's citizenship shortly after passing the Immigration Act of 1917, which categorically excluded Asian immigrants from a "barred zone" spanning from Afghanistan to the Pacific.[14] With the Immigration Act of 1924, Congress effectively barred all immigration from Asian countries by banning immigration for anyone who would be ineligible for naturalization.[15] In 1934, while the Philippines was still a United States colony, Congress also passed a law

---

[11] Sahar F. Aziz, *A Muslim Registry: The Precursor to Internment?*, 2017 B.Y.U. L. REV. 779, 795-96 (2017); *see also* Geary Act, 27 Stat. 25, ch. 60 (1892).

[12] *Ozawa v. United States*, 260 U.S. 178, 190 (1922) (citing Naturalization Act of 1906, Pub. L. No. 59-338, 34 Stat. 596 (1906)).

[13] *Id.*; *United States v. Thind*, 261 U.S. 204 (1923).

[14] Mae M. Ngai, *Nationalism, Immigration Control, and the Ethnoracial Remapping of America in the 1920s*, ORG. OF AM. HISTORIANS MAG. OF HIST., Jul. 2007, at 13.

[15] *The Immigration Act of 1924 (The Johnson-Reed Act)*, OFFICE OF THE HISTORIAN, FOREIGN SERVICE INSTITUTE, U.S. DEPARTMENT OF STATE, https://history.state.gov/milestones/1921-1936/immigration-act (last visited July 24, 2024).

that reclassified Filipinos as "aliens" unless born in the contiguous United States and imposed an annual quota of fifty immigrants.[16]

"Alien Land Laws" targeting Asian Americans arose out of the same "virulent nineteenth-century Sinophobia" that led to the passage of the aforementioned immigration laws.[17] Western states including California and Washington passed laws barring "aliens ineligible to citizenship" from owning or leasing agricultural property.[18] The Supreme Court upheld a series of Alien Land Laws in 1923 "on the grounds that states traditionally have authority to regulate the property rights of noncitizens."[19]

Perhaps the most infamous example of discriminatory policies drawing on the forever foreigner stereotype is the mass incarceration in prison camps of 120,000 Japanese Americans during World War II pursuant to Executive Order

---

[16] Alvin Hoi-Chun Hung, *Deconstructing the Decolonizing Plot of the Tydings-Mcduffie Act: A Review of America's International Relations in Asia in the Early Twentieth Century*, 19 U. PENN. ASIAN L. REV. 141, 174 (2023).

[17] Keith Aoki, *No Right to Own? The Early Twentieth-Century "Alien Land Laws" As a Prelude to Internment*, 40 B.C. L. Rev. 37, 37, 68 (1998).

[18] *Id.* at 38-40.

[19] Rose Cuison Villazor, *Rediscovering Oyama v. California: At the Intersection of Property, Race, and Citizenship*, 87 WASH. U. L. REV. 979, 984 (2010) (citing *Terrace v. Thompson*, 263 U.S. 197, 222 (1923); *Porterfield v. Webb*, 263 U.S. 225, 233 (1923); *Webb v. O'Brien*, 263 U.S. 313, 322-24 (1923); and *Frick v. Webb*, 263 U.S. 326, 333-34 (1923)).

9066.[20]  Then-Attorney General of California, and later Supreme Court Justice,

Earl Warren defended the wholesale incarceration of Japanese Americans, stating

that "when we are dealing with the Caucasian race, we have methods that will test

the loyalty of them . . . But when we deal with the Japanese, we are in an entirely

different field and we cannot form any opinion."[21]  General John DeWitt framed

disloyalty as a question of race rather than individual choice, stating that "[t]he

Japanese race is an enemy race and while many second and third generation

Japanese born on United States soil, possessed of United States citizenship, have

become 'Americanized,' the racial strains are undiluted."[22]

   Japanese Americans were targeted based on their national origin and race

rather than based on plausible evidence of individual disloyalty to the United

States.  Indeed, even where individual Japanese Americans, like Mitsuye Endo,

were able to prove their loyalty to the United States, the specter of the disloyal

---

[20] *See*, *e.g.*, *World War II Japanese American Incarceration: Mass Removal and Incarceration*, NATIONAL ARCHIVES, https://www.archives.gov/research/aapi/ww2/incarceration (last visited Jul. 25, 2024).

[21] Joo, *supra* note 3, at 20 (citing Leo Katcher, EARL WARREN: A POLITICAL BIOGRAPHY 144 (1967)).

[22] *Hohri v. United States*, 782 F.2d 227, 231 (D.C. Cir. 1986) (quoting Lieutenant General John L. Dewitt, U.S. Army, Final Recommendation of the Commanding General, Western Defense Command and Fourth Army, to the Secretary of War, Joint App. at 109 (Feb. 14, 1942)).

Japanese American remained powerful.[23]  And though the country was also at war with Germany and Italy, neither German Americans nor Italian Americans were subject to mass imprisonment, nor was it ever "seriously considered."[24]  The imprisonment of the "small number of German Americans and Italian Americans . . . . was based on a review of their personal records and loyalty[,]" rather than their race or national origin.[25]

Ultimately, not a single Japanese American incarcerated during World War II "was ever charged with any crimes against the United States."[26]  This was no surprise: even during the war, "sources of intelligence reported to President Roosevelt that the Japanese Americans were not the danger that some politicians and military officials made them out to be."[27]  The federal government eventually admitted that  "there was never any evidence that any persons of Japanese descent had committed or were planning to commit crimes against the United States."[28]

---

[23] *See* Stephanie Buck, *Overlooked No More: Mitsuye Endo, A Name Linked to Justice for Japanese-Americans*, N.Y. TIMES, https://www.nytimes.com/2019/10/09/obituaries/mitsuye-endo-overlooked.html (Nov. 15, 2019).

[24] Huong Vu, *Us Against Them: The Path to National Security Is Paved by Racism*, 50 DRAKE L. REV. 661, 674 (2002).

[25] *Id.*

[26] *Id.* at 675.

[27] *Id.* at 674.

[28] *Id.*

While the second half of the twentieth century brought the repeal of some racial restrictions, modern policies based on the perpetual foreigner stereotype continued to harm the Asian American community.  For instance, Asian Americans again came under suspicion following the September 11 attacks.  In the wake of 9/11, the Immigration and Nationality Service ("INS") created the National Security Entry-Exit Registration System (NSEERS) and finalized the program in August 2002.[29]  NSEERS required nearly 100,000 men from Muslim-majority countries, including several Asian countries, residing in the United States to report for fingerprinting and interrogation.[30]  Individuals were required to report to INS after 30 days and once every year after entry and had to notify INS of any changes in residence, employment, or education institution.[31]  Over 13,000 people were ultimately put into removal proceedings due to the special registration program.[32] In other words, their voluntary compliance led to their deportation.[33]  In 2017,

---

[29] Removal of Regulations Relating to Special Registration Process for Certain Nonimmigrants, 81 Fed. Reg. 94231 (Dec. 23, 2016) (removing 8 C.F.R. 264.1(f)).
[30] *See Special Registration: Discrimination and Xenophobia as Government Policy*, AALDEF, at 5-6 (Jan. 2004) https://cdn.sanity.io/files/iroghafc/production/07ffa89b5f4d7b3ff125e2c447ec2af4 12d90630.pdf.
[31] *Special Registration Procedures [Text Version]* 1 U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,  (Sept. 11, 2002), https://www.ice.gov/doclib/nseers/SRProc.pdf.
[32] Louise Cainkar, *Special Registration: A Fervor for Muslims,* 7 J. OF ISLAMIC L. & CULTURE 73, 74 (2002).
[33] Shoba Sivaprasad Wadhia, *Is Immigration Law National Security Law?*, 66 EMORY L.J. 669, 692 (2017).

President Trump's travel ban borrowed the logic of the NSEERS registration program, targeting immigration from a slew of primarily Muslim-majority countries on the assumption that individuals of those backgrounds posed a national security threat.[34]

Still today, "Asian Americans are often seen by others as foreigners, regardless of their citizenship status or how long they or their family have lived in the U.S."[35]  78% of Asian Americans have experienced an incident demonstrating the forever foreigner stereotype, such as another person assuming they do not speak English or telling them to "go back to their home country."[36]  Even stereotypes that purport to embrace the cultures of Asian countries depict Asian Americans as eternal outsiders.  For instance, "South Asians in America have also been racialized informally as mystical, exotic foreigners . . . based on Hindu and

---

[34] Justice Sotomayor compared the Supreme Court's decision upholding the travel ban to its notorious decision in *Korematsu v. United States*, 323 U.S. 214 (1944). She wrote, "By blindly accepting the Government's misguided invitation to sanction a discriminatory policy motivated by animosity toward a disfavored group, all in the name of a superficial claim of national security, the Court redeploys the same dangerous logic underlying *Korematsu* and merely replaces one 'gravely wrong' decision with another."  *Trump v. Hawaii*, 585 U.S. 667, 754 (2018) (Sotomayor, J., dissenting).

[35] Ruiz et al., *supra* note 1.

[36] *Id.*

Buddhist religious symbolism[,]" which is "used to reinforce the image of South Asians as foreigners."[37]

The stereotype of Asian Americans as inherently and immutably foreign has persisted in shaping discrimination against Asian Americans, including, but not limited to:

- The issuance of "assignment restrictions" on Asian American public servants, particularly diplomats, from working in the country of their ancestry, which was only abolished after pressure from the diplomatic community;[38]

- The underrepresentation of Asian Americans in the federal and state judiciary,[39] exacerbated by events like a recent confirmation hearing

---

[37] Vinay Harpalani, *DesiCrit: Theorizing the Racial Ambiguity of South Asian Americans*, 69 N.Y.U. ANN. SURV. AM. L. 77, 159 (2013) (describing "New Age Orientalism").

[38] Nicole Gaouette, *Asian American Diplomats Say Discrimination Holds Them Back as US Competes with China*, CNN (May 7, 2021), https://amp.cnn.com/cnn/2021/05/07/politics/state-diversity-aapi-china; *see also* Ryan Heath, *Foreigners in Their Own Country: Asian Americans at State Department Confront Discrimination*, POLITICO (Mar. 18, 2021), https://www.politico.com/news/2021/03/18/asian-americans-state-department-477106; From the Desk of Secretary Antony J. Blinken, https://www.politico.com/f/?id=00000187-0a39-d989-a7a7-afbd4d460000.

[39] Chris Westfall, *Battling Discrimination and the Bamboo Ceiling: The Bias Facing Asian American Managers*, FORBES (Sept. 14, 2021), https://www.forbes.com/sites/chriswestfall/2021/09/14/discrimination-and-bamboo-ceiling-the-unconscious-bias-facing-asian-american-managers/; *see also*

in which members of the Senate asked a Pakistani American nominee to a federal appellate court whether he "celebrate[s] 9/11;"[40]

- The profiling of Asian American scientists as putative spies under the China Initiative;[41] and

- The resurgence of laws that ban Chinese citizens from purchasing property, recalling the Alien Land Laws from the early twentieth century.[42]  By one count, there are at least 150 such bills across the country.[43]

---

Vinay Harpalani, *The Need for an Asian American Supreme Court Justice*, 137 Harv. L. Rev. F. 23 (2023).

[40] Kathrina Szymborski Wolfkot, *Treatment of First Muslim Federal Appellate Nominee Has Damaged Our Institutions*, BRENNAN CTR. FOR JUST. (Apr. 5, 2024), https://www.brennancenter.org/our-work/analysis-opinion/treatment-first-muslim-federal-appellate-nominee-has-damaged-our.

[41] *See* Michael German & Alex Liang, *End of Justice Department's"China Initiative" Brings Little Relief to U.S. Academics*, BRENNAN CTR. FOR JUST. (Mar. 25, 2022), https://www.brennancenter.org/our-work/analysis-opinion/end-justice-departments-china-initiative-brings-little-relief-us; Eileen Guo et al., *The US Crackdown on Chinese Economic Espionage Is a Mess. We Have the Data to Show It.*, MIT TECH. REV. (Dec. 2, 2021), https://www.technologyreview.com/2021/12/02/1040656/china-initative-us-justice-department/.

[42] *See* Edgar Chen, *With New "Alien Land Laws" Asian Immigrants Are Once Again Targeted By Real Estate Bans*, JUST SEC. (May 26, 2023), https://www.justsecurity.org/86722/with-new-alien-land-laws-asian-immigrants-are-once-again-targeted-by-real-estate-bans.

[43] Matthew S. Erie, *Property as National Security*, 2024 WIS. L. REV. 255, 257 (2024).

The common thread through this bitter history is the false perception that (1) Asian Americans cannot be trusted because their loyalties lie elsewhere—specifically, with the countries of their ancestry; and (2) their inclusion in American society is tantamount to a foreign invasion.  The forever foreigner stereotype sends the message that—notwithstanding America's celebrated heritage as a "melting pot," combining different cultures into something distinctly American—Asian Americans do not, and *will never*, "belong."[44]  As discussed in more detail below, and as particularly relevant to the case at hand, media coverage has played a key role in perpetuating the forever foreigner stereotype and the harms that have come with it.

## II.
## THE MEDIA HAS PLAYED A MAJOR ROLE IN PERPETUATING THE FOREVER FOREIGNER STEREOTYPE AND ENABLING GOVERNMENT ABUSES OF POWER

### A.    "A Viper is a Viper Wherever Hatched": Media Sensationalism Has Fueled Racism Against Asian Americans

Appellant's list of journalistic victories "informing the public" on weighty matters,[45] while undeniably important, obscures the dark underbelly of American

---

[44] Niala Boodhoo, *Asian Americans Least Likely to Feel They Belong in U.S., Study Finds*, Axios (May 7, 2023), https://www.axios.com/2023/05/07/asian-americans-belonging-us-hate-discrimination.

[45] *See*, *e.g.*, Appellant's Br. at 50.

15

journalism equally relevant to this case: its extensive trafficking in the false trope of Asian American disloyalty.

Media coverage rife with stereotypes has played a key role in justifying discriminatory policies against Asian Americans.  In the 1880s, newspaper editors expressed that "while the Chinese were not biologically suited for America's melting pot, it would be foolish not to exploit their cheap labor before shipping them back to China."[46]  Newspapers like the San Francisco *Daily Alta* crafted an essentialist image of the Chinese immigrant who "knows and cares nothing more of the laws and language of the people among whom he lives than will suffice to keep him out of trouble and enable him to drive a thrifty trade[.]"[47]  In the American media's telling of this story, while European immigrants could assimilate and *become* American, Asian Americans could not.

With "outsider" status came the fear of a threat to the "insider."  In 1873, the *San Franciso Chronicle* ran the headline "The Chinese Invasion! They are Coming, 900,000 STRONG."[48]  The image of Chinese Americans "was closely

---

[46] Kim, *supra* note 3, at 109 (citing Stuart Creighton Miller, THE UNWELCOME IMMIGRANT: THE AMERICAN IMAGE OF THE CHINESE, 1785-1882 (Berkeley: University of Cal. Press, 1969)).

[47] Kim, *supra* note 3, at 111.

[48] *Timeline of Systemic Racism Against AAPI*, STANFORD LIBRARIES, https://exhibits.stanford.edu/riseup/feature/timeline-of-systemic-racism-against-aapi (last visited Jul. 25, 2024).

attached to Chinatowns, the symbol of foreignness in oriental style: dirty, slimy, and sexually predatory."[49]  Movies made during the 1900s "showcased a devilish image of Chinatowns as full of drug dens hoping to trap innocent, young white women[,]" and white unions lobbied "for restrictions against Chinese restaurants owned by the Chinese."[50]  Like Chinese immigrants, Japanese immigrants were smeared as a "yellow peril"—*i.e.*, foreign invaders[51]— threatening white American identity.[52]  And while government institutions struggled to ascribe a racial category to South Asians, they too were "racialized jointly with other Asian immigrants as 'foreigners'" and subjected to discriminatory attitudes and policies, including exclusion from citizenship.[53]

Asian American descendants of immigrants fared no better, because their permanent exclusion was premised just as much on race as on national origin. During World War II, the *Los Angeles Times* wrote, "*A viper is nonetheless a viper wherever the egg is hatched*—so a Japanese American, born of Japanese parents, grows up to be a Japanese, not an American."[54]  In other words, even an American

---

[49] Leo Yu, *From Criminalizing China to Criminalizing the Chinese*, 55 COLUM. HUM. RTS. L. REV. 45, 63 (2023).

[50] *Id.*

[51] *See id.*

[52] Kim, *supra* note 3, at 116.

[53] Harpalani, *supra* note 37, at 124.

[54] Kim, *supra* note 3, at 116 (emphasis added).

citizen who was born on American soil and had never once set foot in Japan was considered presumptively loyal to Japan rather than the United States, based solely on her race rather than her conduct. The view that "no Japanese can ever be loyal to any other nation than Japan" was openly accepted, from the media to all three branches of the federal government.[55]

As America's adversaries shifted and changed over time, media portrayals of the forever foreigner stereotype likewise evolved to fit geopolitical tensions. During the 1800s, "China was perceived as a faraway, poor, oriental treaty partner that was a part of the United Kingdom's Asian colonial empire[,]" unable to compete with the United States.[56] Anti-communist sentiment during the Cold War impacted views of Chinese Americans, but China was still not yet viewed as an economic threat, unlike Japan—leading to "widespread anti-Japanese sentiment."[57] However, since the 1990s, China's rising economic power has led to the "China Threat [T]heory," the American distrust of China's "agenda on the international stage."[58] Whereas "[t]he Chinese were already perceived as perpetually foreign, stealing jobs . . . now, they [are] perceived as having come here to steal *for*

---

[55] Vu, *supra* note 24, at 673.

[56] Yu, *supra* note 49, at 61. As Yu further explains, "the Chinese Exclusion Act was not about deterring China; it was created to deter immigrants from China." *Id.*

[57] *Id.* at 64.

[58] *Id.* at 66.

*China*"—including the theft of intelligence that could be used to undermine American interests.[59]  This suspicion extends to Asian Americans as a group, not just specific individuals with an actual connection to China.[60]

Over the last four years, hostility toward Asian Americans exploded in the wake of the Covid-19 pandemic.[61]  Statements by government officials and news sources referring to Covid-19 as "the Chinese virus" and the "Wuhan virus" have been linked to a drastic increase in hate crimes targeting Asian Americans[62] as well as boycotts of Asian American businesses.[63]  Once more, the media has cast Asian Americans in the role of the foreign threat.

---

[59] *Id.* (emphasis added).

[60] For instance, following the 1996 campaign finance controversy involving John Huang and Charlie Yah-lin Trie, the Democratic National Committee "telephoned Asian American donors (identified by their Asian sounding last names) and interrogated them as to their citizenship status, income level, credit history, and so on[,]" then "announced that it would accept donations from 'citizens only' in the future." Kim, *supra* note 3, at 128.

[61] Ethan Wong, *Forever Foreigner: The Growing Anti Asian-American Sentiment During the Covid-19 Pandemic*, 9 INT'L J. SOC. SCI. & HUMANS. RSCH. 296 (2021).

[62] Sungil Han et al., *Anti-Asian American Hate Crimes Spike During the Early Stages of the COVID-19 Pandemic*, 38 J. INTERPERS. VIOLENCE 3513 (Jun. 3, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9168424/.

[63] Aaron Wagner, *Word Choice and Media Exposure Affected Anti-Asian Boycotts During the Pandemic*, PENNSTATE: HEALTH & HUM. DEV. (Nov. 15, 2022), https://www.psu.edu/news/health-and-human-development/story/word-choice-and-media-exposure-affected-anti-asian-boycotts/.

B.   **Media Stereotyping Has Empowered False Accusations of Espionage Against Asian Americans, Leading To Law Enforcement Overreach**

Unsurprisingly, the forever foreigner stereotype—disseminated through inflammatory media rhetoric—has repeatedly fueled espionage investigations targeting Asian Americans presumed, without proof, to be disloyal.  Many Asian Americans have been investigated, publicly targeted, and humiliated in the course of these investigations, only for the government's case against them to collapse for insufficient evidence.  This list includes, just in the last dozen years alone, Guoqing Cao and Shuyu Li in 2013 (accused of selling proprietary information that turned out not to be proprietary);[64] Sherry Chen in October 2014 (accused of economic espionage for researching publicly available information for a colleague in China);[65] Xiaoxing Xi in May 2015 (accused of attempting to transfer designs for proprietary technology until it came out that the designs were for a completely

---

[64] Lowen Liu, *Just the Wrong Amount of American*, SLATE (Sept. 11, 2016), https://slate.com/news-and-politics/2016/09/the-case-of-scientist-wen-ho-lee-and-chinese-americans-under-suspicion-for-espionage.html; Jeff Swiatek & Kristine Guerra, *Feds Dismiss Charges Against Former Eli Lilly Scientists Accused of Stealing Trade Secrets*, INDYSTAR (Dec. 5, 2014), https://www.indystar.com/story/news/crime/2014/12/05/feds-dismiss-charges-former-eli-lilly-scientists-accused-stealing-trade-secrets/19959235/.

[65] Liu, *supra* note 64; *see also* Nicole Perlroth, *Accused of Spying for China, Until She Wasn't*, N.Y. TIMES (May 9, 2015), https://www.nytimes.com/2015/05/10/business/accused-of-spying-for-china-until-she-wasnt.html?_r=0; Kimmy Yam, *After Being Falsely Accused of Spying for China, Sherry Chen Wins Significant Settlement*, NBC NEWS (Nov. 15, 2022), https://www.nbcnews.com/news/asian-america/falsely-accused-spying-china-sherry-chen-wins-significant-settlement-rcna56847.

different device);[66] Franklin Tao in 2019 (conviction overturned by an appellate court that found that his failure to disclose an affiliation with a Chinese University was incapable of influencing a funding decision);[67] and Gang Chen in 2021 (accused of concealing Chinese affiliations in a grant application that he was never required to disclose in the first place).[68]  Of course, this list also includes the plaintiff in question the last time this Circuit considered the *Zerilli* factors: Dr. Wen Ho Lee, the scientist falsely accused of stealing nuclear secrets for China.[69] In its coverage of Dr. Lee, the media waded deep into the forever foreigner stereotype and played a critical role in creating a villain in the public eye—who turned out not to be a villain at all.

On March 6, 1999, the *New York Times* reported that China had obtained nuclear secrets "stolen from an American government laboratory," and tested a weapon "remarkably" similar to a key American nuclear weapon.[70]  The *Times*

---

[66] Liu, *supra* note 64.

[67] Nate Raymond, *Kansas Researcher Wins Reversal of Conviction in Trump-era China Probe*, REUTERS (Jul. 11, 2024), https://www.reuters.com/world/us/kansas-researcher-wins-reversal-conviction-trump-era-china-probe-2024-07-11/.

[68] Mark Jia, *American Law in the New Global Conflict*, 99 N.Y.U. L. REV. 636, 662 (2024).

[69] *See Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005).

[70] James Risen & Jeff Gerth, *BREACH AT LOS ALAMOS: A Special Report.; China Stole Nuclear Secrets for Bombs, U.S. Aides Say*, N.Y. TIMES ), https://www.nytimes.com/1999/03/06/world/breach-los-alamos-special-report-china-stole-nuclear-secrets-for-bombs-us-aides.html?pagewanted=all (Sept. 26, 2000).

pointed the finger at "a Los Alamos computer scientist who is Chinese-American[,]" outed days later by the newspaper as Dr. Lee.[71]  The Clinton administration "cultivated this crisis without evidence and put it into action in court[,]" essentially "creating a Chinese spy from nothing."[72]

Dr. Lee, a 65 year-old American citizen of Taiwanese descent, was "targeted" by investigators who "disregarded white employees with similar backgrounds and foreign contacts."[73]  Within months, the FBI arrested Dr. Lee.[74] He was indicted on 59 counts of espionage and mishandling information.[75]  The government successfully opposed bail on the ground that "[h]undreds of millions of people could be killed, . . . [t]he breadth of the potential harm [was] so great that . . . even a reduced risk [was] too great to take that gamble."[76]  Dr. Lee was held "in solitary confinement without bail for more than nine months," and "almost died as a result."[77]

The media seized the moment, dubbing Dr. Lee the "spy of the century," an "evil China spy," and "the Dragon."[78]  This rhetoric linked "all Chinese in America

---

[71] *Id.*

[72] Yu, *supra* note 49, at 67-68.

[73] Vu, *supra* note 24, at 688.

[74] Yu, *supra* note 49, at 68.

[75] *Id.*

[76] Vu, *supra* note 24, at 685-86 (alterations in original).

[77] Yu, *supra* note 49, at 68.

[78] *Id.*

with a groundless Chinese espionage crisis" fueled by racial profiling.[79]  With

media support, the Lee affair was "tainted by 'the racialized stereotypes of Asian

Pacific Americans as suspect and perpetual foreigners.'"[80]

Then reality hit.  It turned out that "[t]he government's entire case was based

on Lee's two visits to China to attend approved conferences and the fact that he

hired a Chinese research assistant."[81]  In the absence of actual evidence, "[t]he case

fell apart before going to trial[,]" and Dr. Lee "pled guilty only to one count of

unlawful gathering of information[.]"[82]  Subsequent developments revealed the

extent to which the prosecution of Dr. Lee was tainted by stereotypes rather than

credible evidence.  Former FBI Director Louis Freeh testified that "all discussions

about Lee's motive revolved around his ethnicity"; "[n]o other motive was

suggested." [83] FBI and CIA officers "admitted there was never any evidence to

support espionage charges against Lee."[84]  The government misconduct at issue in

Dr. Lee's case was so egregious that the presiding judge *apologized* to Dr. Lee

---

[79] *Id.* at 69.

[80] Vu, *supra* note 24, at 687.

[81] *Id.*

[82] Yu, *supra* note 49, at 69.

[83] Vu, *supra* note 24, at 689.

[84] Yu, *supra* note 49, at 68.  In addition, a subsequent FBI investigation further
revealed that "two FBI agents lied to Lee and told him that he failed a polygraph
that he passed, and they also tried to trick Lee to sign a confession with espionage
offense when his attorney was not present."  *Id.* at 69.

during his plea hearing, stating that the Executive Branch had "embarrassed our entire nation and each of us who is a citizen of it. . . . I sincerely apologize to you, Dr. Lee, for the unfair manner you were held in custody by the Executive Branch."[85]

While the court rightfully acknowledged the role of the executive branch in Dr. Lee's prosecution, the government did not act alone in its witch hunt. According to a government spokesperson, the *Times* "singled out Wen Ho Lee as the primary suspect and now it seems to have developed collective amnesia about its earlier reporting and editorializing."[86]  A year and a half after its initial article, under pressure from critics, the *Times* issued an "assessment" of its coverage of Dr. Lee and a "non-apology apology" that largely shifted the blame to its sources.[87] Yet, even then, the *Times* admitted that, among numerous other failures, it failed to "push[] harder to uncover weaknesses in the F.B.I. case against Dr. Lee[,]" failed to question whether it should have uncritically repeated "the sense of alarm"

---

[85] Vu, *supra* note 24, at 686-87 (alteration in the original).

[86] Eric Boehlert, *How the New York Times Helped Railroad Wen Ho Lee*, SALON (Sept. 21, 2000), https://www.salon.com/2000/09/21/nyt_6/.

[87] Timothy Noah, *Two Cheers for the Times' Non-Apology Apology*, SLATE (Sept. 26, 2000), https://slate.com/news-and-politics/2000/09/two-cheers-for-the-times-non-apology-apology.html.

voiced by certain sources, and "never prepared a full-scale profile of Dr. Lee, which might have humanized him and provided some balance."[88]

This is exactly how the forever foreigner stereotype works. It reflexively villainizes Asian Americans as fundamentally disloyal in narratives divorced from fact. It turns Asian Americans into spies first, individuals second (or never). This history is precisely why this Court should be skeptical of Appellant's efforts to import improper innuendo into the *Zerilli* standard.

## III.
### APPELLANT'S BRIEF RELIES ON THE FOREVER FOREIGNER STEREOTYPE—WHICH THIS COURT SHOULD REJECT

The foregoing context reveals Appellant's arguments distorting the *Zerilli* test for what they really are: baseless attacks on Dr. Chen's loyalty, rooted in stereotyping rather than fact, that seek to distract the Court from the weaknesses underpinning her legal arguments.

Appellant faces an uphill battle on the merits of this appeal. The District Court clearly explicated the law, under governing Circuit precedent, regarding when a reporter may be compelled to disclose her sources in connection with a Privacy Act case, and then carefully applied the law to the facts before it—not once, but twice. Appellant does not meaningfully contest that analysis. Instead,

---

[88] From the Editors, *The Times and Wen Ho Lee*, N.Y. TIMES (Sept. 26, 2000), at Section A, Page 2.

Appellant breaks out a playbook that is sadly all too familiar to the Asian American community: flying the banner of national security in a bid to distract the Court and justify the erosion of our rights.

Appellant blithely tars Dr. Chen with the brush of criminal disloyalty, contrasting Dr. Chen with "an *innocent* person," and insinuates that the District Court's faithful application of established Circuit precedent will ultimately "recover funding" for the Chinese Communist Party.[89]  Supporting *amicus* Senator Cruz goes even further, openly accusing Dr. Chen of "disloyalty" and charging that her assertion of her rights under the Privacy Act is an act of "lawfare."[90]

This rhetoric disregards the public record, which shows that Dr. Chen has been a United States citizen for over two decades; expressly renounced her Chinese citizenship decades ago; and was never charged, let alone convicted, of any crime.  And contrary to Appellant's claim that Dr. Chen never challenged the Department of Defense's termination of funding to her school, UMT, Dr. Chen *did* vigorously challenge that termination, including in a detailed 2018 letter to the government that was publicly filed on the District Court docket (yet is not once mentioned in Appellant's brief).[91]  Ironically, while Appellant's brief extols the

---

[89] Appellant's Br. at 38, 47 (emphasis added).

[90] Senator Cruz Br. at 4, 18-21.

[91] *See* Feb. 9, 2018 Ltr. to Patrick M. Shanahan, ECF No. 123-35, *Chen v. Fed. Bureau of Investigation*, No. 18-cv-3074 (D.D.C. Sept. 6, 2022).  Appellant

virtues of "a free press both willing and able to keep the public informed of all the news[,]" it keeps the reader in the dark as to these facts and more.[92]

*Amici* are well-aware of how unfounded accusations, such as those Appellant makes against Dr. Chen, perpetuate the idea that people of color should be presumed guilty in contravention of basic principles of the American legal system.[93]  Appellant advanced the same accusations before the District Court, which forcefully rejected them.  As the District Court explained, its role "is to apply the law evenhandedly, not to adjudicate who is worthy of the law's protection."[94]  Indeed, the District Court was correct that the argument "[t]hat the plaintiff 'had it coming' is not a viable defense under the Privacy Act[,]" which "protects 'all private citizens, whether blameworthy or blameless, from the risk

---

assumes that the government's decision not to charge Dr. Chen was to protect unnamed intelligence sources (*see* Appellant's Br. at 9) rather than the obvious alternative—that the charges against Dr. Chen lacked evidentiary support.

[92] Appellant's Br. at 19 (citation omitted).

[93] Scholars have observed that implicit bias based on race impacts whether an individual is perceived as guilty.  For example, the results of one study of implicit bias confirmed that "participants held strong associations between Black and Guilty, relative to White and Guilty, and these implicit associations predicted the way mock jurors evaluated ambiguous evidence."  Justin D. Levinson et al., *Guilty by Implicit Racial Bias: The Guilty/Not Guilty Implicit Association Test*, 8 OHIO ST. J. CRIM. L. 187, 190 (2010).

[94] *Chen v. Fed. Bureau of Investigation*, No. 18-CV-3074 (CRC), 2024 WL 864093, at *6 (D.D.C. Feb. 29, 2024).

that government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals.'"[95]

## <u>CONCLUSION</u>

*Amici* respectfully request that this Court unequivocally reject the smear campaign against Dr. Chen, as did the District Court.  Dr. Chen has already endured the harms of the forever foreigner stereotype for over seven years, since Appellant released Dr. Chen's name and personal information to the public, fueling accusations and damaging her reputation, career, and livelihood.  Viewed in historical context, Appellant's attacks on Dr. Chen should be recognized for what they are—unfounded accusations of disloyalty that have no place in the application of the *Zerilli* factors.

Dated:  New York, New York
July 29, 2024

Respectfully Submitted,

 */s/ Jane Shim*
Elizabeth Koo
Michael Shang
Jane Shim
*Counsel of Record*
ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND
99 HUDSON STREET, 12TH FL.
NEW YORK, NY 10013-2815

*Counsel for Amici Curiae*

---

[95] *Id.* (citation omitted).

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify under Federal Rule of Appellate Procedure 32(g)(1) that this brief complies with Rules 29(a)(5) and 32(a)(7)(B) because it contains 6,177 words except those parts of the brief excluded by Rule 32(f) and Circuit Rule 32(e)(1). I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: July 29, 2024

*/s/ Jane Shim*
Jane Shim
*Counsel of Record for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 29, 2024, I electronically filed the foregoing brief with

the United States Court of Appeals for the District of Columbia Circuit using the

CM/ECF system.  All parties are registered CM/ECF users, and service upon them

will be accomplished by the appellate CM/ECF system.

Dated: July 29, 2024

*/s/ Jane Shim*

Jane Shim
*Counsel of Record for Amici Curiae*