**No. 24-5050**

IN THE

# United States Court of Appeals for the District of Columbia Circuit

YANPING CHEN,
*Plaintiff-Appellee*,

*v.*

FEDERAL BUREAU OF INVESTIGATION, et al.,
*Defendants-Appellees*,

CATHERINE V. HERRIDGE,
*Appellant*.

On Appeal from the United States District Court for the District of Columbia,
No. 1:18-cv-03074-CRC

## PUBLIC JOINT APPENDIX—MATERIAL UNDER SEAL IN SEPARATE SUPPLEMENT


Patrick F. Philbin
Kyle T. West
Chase Harrington
TORRIDON LAW PLLC
801 Seventeenth Street, N.W.
Suite 1100
Washington, DC 20006
(202) 249-6900
pphilbin@torridonlaw.com

*Counsel for Catherine V. Herridge*

Andrew C. Phillips (Bar No. 64792)
MEIER WATKINS PHILLIPS PUSCH LLP
919 18th St NW, Suite 650
Washington, DC 20006
andy.phillips@mwpp.com

*Counsel for Yanping Chen*


August 19, 2024

## Table of Contents


| Document | Dkt. No. | Start Page |
|---|---|---|
| Complaint | 1 | JA001 |
| Opinion and Order Denying Motion to Dismiss | 13 | JA015 |
| Amended Scheduling Order | 55 | JA028 |
| Government's Opposition to Plaintiff's Second Motion to Compel [Pages 1-9]<br>(*Public Redacted Version*) | 67 | JA030 |
| Status Conference Transcript | 77 | JA043 |
| Memorandum in Support of Catherine V. Herridge's Motion to Quash<br>(*Public Redacted Version*) | 96-1 | JA054 |
| February 2017 Fox News Article<br>(*Exhibit B to Catherine V. Herridge's Motion to Quash*) | 96-3 | JA111 |
| Declaration of Catherine V. Herridge<br>(*Exhibit C to Catherine V. Herridge's Motion to Quash*) | 96-4 | JA115 |
| April 2017 Fox News Article<br>(*Exhibit D to Catherine V. Herridge's Motion to Quash*) | 96-5 | JA119 |
| June 2017 Fox News Article<br>(*Exhibit E to Catherine V. Herridge's Motion to Quash*) | 96-6 | JA122 |
| Motion to Show Cause, Search Warrant Litigation<br>(*Exhibit F to Catherine V. Herridge's Motion to Quash*) | 96-7 | JA124 |
| Motions Hearing Transcript, Search Warrant Litigation [Pages 1-31]<br>(*Exhibit G to Catherine V. Herridge's Motion to Quash*) | 96-8 | JA129 |

| | | |
|---|---|---|
| Order Granting Motion to Unseal, Search Warrant Litigation<br>(*Exhibit H to Catherine V. Herridge's Motion to Quash*) | 96-9 | JA160 |
| Search Warrant Application, Search Warrant Litigation<br>(*Exhibit J to Catherine V. Herridge's Motion to Quash*) | 96-11 | JA161 |
| Example February 2017 Fox News Article with Privacy Act Material Removed<br>(*Exhibit X to Catherine V. Herridge's Motion to Quash*) | 96-25 | JA186 |
| Example April 2017 Fox News Article with Privacy Act Material Removed<br>(*Exhibit Y to Catherine V. Herridge's Motion to Quash*) | 96-26 | JA189 |
| Memorandum in Support of Fox News Network, LLC's Motion to Quash<br>(*Public Redacted Version*) | 97-1 | JA192 |
| Memorandum Opinion and Order Granting in Part and Denying in Part Motions to Quash<br>(*Public Redacted Version*) | 148 | JA213 |
| Opinion and Order Denying Motion for Certificate of Appealability | 152 | JA241 |
| Catherine V. Herridge's Memorandum in Response to the Order to Show Cause<br>(*Public Redacted Version*) | 176 | JA246 |
| Declaration of William Jelani Cobb<br>(*Exhibit B to Catherine V. Herridge's Memorandum in Response to the Order to Show Cause*) | 176-2 | JA293 |
| Declaration of Stephen W. Coll<br>(*Exhibit C to Catherine V. Herridge's Memorandum in Response to the Order to Show Cause*) | 176-3 | JA297 |
| Declaration of William R. Evanina<br>(*Exhibit D to Catherine V. Herridge's Memorandum in Response to the Order to Show Cause*) | 176-4 | JA300 |

| | | |
|---|---|---|
| Letter from Gen. Charles Q. Brown, Jr., USAF<br>(*Exhibit F to Catherine V. Herridge's Memorandum in Response to the Order to Show Cause*) | 176-6 | JA306 |
| Deposition of Catherine V. Herridge [Pages 2-5, 20-22, 220-221]<br>(*Exhibit G to Catherine V. Herridge's Memorandum in Response to the Order to Show Cause*) | 176-7 | JA307 |
| Memorandum Opinion and Order Holding Catherine V. Herridge in Contempt | 193 | JA319 |
| Notice of Appeal | 194 | JA343 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YANPING CHEN<br>2122 21st Road North<br>Arlington, Virginia 22201<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION<br>935 Pennsylvania Ave. NW<br>Washington, DC, 20535<br><br>U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Ave. NW<br>Washington, DC, 20530<br><br>U.S. DEPARTMENT OF DEFENSE<br>The Pentagon<br>Washington, DC 20301<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY<br>245 Murray Lane, SW<br>Washington, DC 20528,<br><br>Defendants. | Civil Action No. 1:18-cv-3074 |

## COMPLAINT

1. Plaintiff Yanping Chen brings this action against Defendants the Federal Bureau of Investigation, the United States Department of Justice, the United States Department of Defense, and the United States Department of Homeland Security (collectively, the "Government" or "Defendants"), for monetary, injunctive, and declaratory relief to rectify injuries she has suffered as a result of the Government's illegal and unwarranted

public disclosure of her personal information in violation of the Privacy Act, 5 U.S.C. § 552a.

2. Enacted in the wake of the Watergate scandal, the Privacy Act balances the federal government's occasional need to collect sensitive information about U.S. citizens with those citizens' constitutional rights, including the right to privacy. The Privacy Act does this in relevant part by prohibiting government agencies from publicly disclosing private information about individuals without their consent. One or more of Defendants here violated these prohibitions by leaking to Fox News a wealth of private information and documents, including family photographs seized from Dr. Chen's home as part of an investigation that resulted in no charges. These leaks were unlawful and resulted in serious and ongoing harm to Dr. Chen, her family, and her business.

3. Defendants have disregarded the protections afforded by the Privacy Act—and by the Constitution—by using the federal government's investigatory powers to gather extensive information about Dr. Chen and then selectively releasing information to smear her reputation and damage her livelihood.

## PARTIES

4. Plaintiff Yanping Chen is a citizen of the United States and a resident of the Commonwealth of Virginia.

5. Defendant Federal Bureau of Investigation ("FBI") is an executive agency of the United States of America and an "agency" within the meaning of 5 U.S.C. § 552a(a)(1).

6. Defendant United States Department of Justice ("DOJ") is an executive agency of the United States of America and an "agency" within the meaning of 5 U.S.C. § 552a(a)(1).

7. Defendant United States Department of Defense ("DOD") is an executive agency of the United States America and an "agency" within the meaning of 5 U.S.C. § 552a(a)(1). The Naval Criminal Investigative Service ("NCIS") is a civilian law enforcement agency within DOD.

8. Defendant United States Department of Homeland Security ("DHS") is an executive agency of the United States of America and an "agency" within the meaning of 5 U.S.C. § 552a(a)(1).

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552a(g)(1)(D) because Dr. Chen alleges she has been adversely affected by the Government's violations of the Privacy Act and of her rights under the U.S. Constitution.

10. The District of Columbia is a proper venue for this action pursuant to 5 U.S.C. § 552a(g)(5) and 28 U.S.C. § 1391.

## STATEMENT OF FACTS

11. Dr. Chen was born in China. She came to the United States in 1987 to study as a visiting scholar at George Washington University, following on her work as a cardiologist and medical researcher with the Chinese astronaut program. Dr. Chen earned a Master's Degree and a Ph.D. in Public Policy from George Washington University.

12. While at George Washington University, Dr. Chen met her now-husband, Dr. J. Davidson Frame, a U.S. citizen. Dr. Chen chose to make the United States her home, becoming a lawful permanent resident in 1993 and a U.S. citizen in 2001.

13. In 1998, Dr. Chen founded the University of Management and Technology, an educational institution that provides post-secondary and graduate education to working adults. The university is headquartered in Arlington, Virginia. More than 12,000 students have received degrees from the university over its 20-year history.

14. Dr. Chen wholly owns the University of Management and Technology and derives a substantial part of her income from its operations.

15. In 2010, Dr. Chen—like many Chinese-American scientists around that time—became the focus of an FBI investigation. The investigation appeared to focus on statements Dr. Chen made on immigration forms concerning her work in the 1980s as a scientist for the Chinese astronaut program.

16. Thereafter, over a six-year period, the FBI probed deeply into Dr. Chen's personal and professional life. Agents of the U.S. Government conducted interviews of her family and colleagues, obtained her immigration records, monitored her travel, seized her computer from her as she was transiting through an airport, employed an undercover informant to covertly gather information about her, and secretly monitored and recorded her conversations.

17. During the course of the investigation, in 2012, FBI Special Agent Timothy S. Pappa applied to the U.S. District Court for the Eastern District of Virginia for warrants to search Dr. Chen's home and the main office of the University of Management and Technology, both located in Arlington, Virginia.

18. On December 5, 2012, the FBI executed search warrants for Dr. Chen's home and the main office of the University of Management and Technology. NCIS and DHS personnel were present during the FBI's searches.

19. Even though the court had ordered that the warrant applications and warrants be kept secret and under seal, news media reported on the searches as they occurred.

20. During the searches, the FBI collected 51 boxes of materials from Dr. Chen's home and 24 items from her office. Those materials included tax records and business documents, family photographs, family and personal communications, business communications, personal memorabilia, computers and digital storage devices (including an iPad and two iPods), video tapes, and cell phones. The personal photographs seized from Dr. Chen's home included photographs that showed her at home with her husband; posing with her then-minor daughter, also a U.S. citizen; and paying respects at her father's gravesite.

21. The FBI labeled and stored the materials seized from Dr. Chen's home using labels that listed a specific file number, i.e., 200D-WF-240088; the date of seizure; a designated item number; a description of the item; and the location of the search (which, in the case of the searches of Dr. Chen's home, included her personal residential address). Those materials accordingly became part of "a group of any records … from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned" to records related to Dr. Chen. 5 U.S.C. § 552a(a)(5) (definition of "system of records"). Attached hereto as Exhibit A is a copy of a photograph that fairly and accurately depicts one of the labels that the FBI used to identify seized materials.

22. After six years of investigation, in March 2016, the U.S. Attorney's Office for the Eastern District of Virginia informed Dr. Chen's attorney that no charges would be filed against her.

23. On information and belief, starting at some time before late February 2017, one or more agents of the FBI (or, possibly, other Defendants) unlawfully disclosed to one or more persons associated with Fox News various records and information pertaining to Dr. Chen and her private affairs that the FBI had collected or generated in the course of its investigation of her and that the FBI thereafter had stored in one or more of its systems of records (hereinafter the "Leaked Records"). On information and belief, some of the Leaked Records had also been stored in one or more systems of records of other Defendants.

24. As a direct and foreseeable result of the unlawful disclosure of the Leaked Records to Fox News, Fox News in turn published, broadcast, and otherwise disseminated much of the contents of the Leaked Records to its nationwide audiences, resulting in personal, professional, and financial harm to Dr. Chen.

25. On February 24, 2017, Fox News aired the first of three negative reports about Dr. Chen that drew heavily from contents of the Leaked Records. In an "exclusive" report during its primetime broadcast, which draws millions of viewers, Fox News used some of the Leaked Records as purported support for the report's allegation that, many years earlier, Dr. Chen had lied on her immigration forms about whether she had previously worked for the Chinese military. The print version of the February 24 report is attached hereto as Exhibit B.

26. Among other things, the February 24, 2017 Fox News report revealed information derived from, and images of, an FBI FD-302 Form, bearing file number "200D-WF-240088," that purported to memorialize an FBI interview of Dr. Chen's daughter. Attached hereto as Exhibit C is an image of this form from the February 24, 2017 Fox

News Report. This Fox News Report also displayed images of personal photographs seized from Dr. Chen's home during the FBI search. On information and belief, before they were disclosed to Fox News, that FBI form and those photographs had been stored in one or more FBI system(s) of records.

27. The February 24, 2017 Fox News report also revealed data taken from, and images of, Dr. Chen's immigration and naturalization forms; Dr. Chen's certificate of U.S. Citizenship, which includes her birthdate, INS Registration Number, height, and marital status; and Dr. Chen's immigration application. On information and belief, before they were disclosed to Fox News, these documents were stored in one or more systems of records maintained by the FBI and/or in one or more systems of records maintained by the U.S. Citizenship and Immigration Services, a component of Defendant DHS.

28. The February 24, 2017 Fox News report stated that representatives of Fox News had reviewed other documents showing that the FBI searched Dr. Chen's home and the University of Management and Technology's main office as part of a counter-intelligence case. On information and belief, those documents were also among the Leaked Records and, before having been disclosed to Fox News, were stored in one or more systems of records maintained by the FBI and/or in one or more systems of records maintained by the other Defendants.

29. The February 24, 2017 Fox News report also selectively discussed details of FBI interviews of Dr. Chen and her daughter as well as information purportedly drawn from Dr. Chen's immigration paperwork. On information and belief, these aspects of the report were also drawn from or based upon some of the Leaked Records.

30. Fox News published and broadcast additional "exclusive" reports about Dr. Chen on April 28, 2017 and June 28, 2017. These reports, like the initial report, subsequently received additional coverage from other media sources. The print version of the April 28 report is attached hereto as Exhibit D and the print version of the June 28 report is attached hereto as Exhibit E.

31. The April 28, 2017 Fox News report publicly displayed the contents of additional personal photographs that the agents of one or more of the Defendants seized from Dr. Chen's home, including photographs depicting Dr. Chen's daughter and the gravesite of her father. The June 28, 2017 Fox News report publicly displayed similar material.

32. Fox News continues to host the reports based on the Leaked Records and images of some of the Leaked Records themselves on its website.

33. Before the government's execution of the search warrant at Dr. Chen's home, the only known copies of the photographs published by Fox News were kept in Dr. Chen's home.

34. On May 8, 2017, James Gillis, an Assistant U.S. Attorney involved in the investigation of Dr. Chen and an agent of Defendant DOJ, conceded during a hearing before Magistrate Judge Anderson of the United States District Court for the Eastern District of Virginia that the photographs featured in the Fox News reports "came from the search take."

35. On June 25, 2018, Dr. Chen, through her counsel, asked the Office of Inspector General for Defendant DOJ to investigate the illegal disclosure of the Leaked Records. The DOJ Office of Inspector General advised counsel for Dr. Chen that it would not conduct any such investigation.

36. On November 15, 2018, the Office of Inspector General for Defendant DOJ told counsel for Dr. Chen, as part of its purported rationale for declining to conduct the requested

investigation, that Defendants DOD and DHS (or components thereof) had also had access to the records in Dr. Chen's FBI file, and therefore could have been sources of any leak that resulted in the Fox News reports. This representation by a representative of Defendant DOJ is a part of the basis for naming DOD and DHS as additional defendants.

37. The widespread publication, broadcast, and dissemination of the Fox News reports that were initially aired on February 24, 2017, April 28, 2017, and June 28, 2017 (hereinafter the "Leak-Based Fox News Reports"), which were based on the unlawfully Leaked Records—which, in turn, had been obtained during the course of a U.S. government investigation of Dr. Chen that resulted in no charges whatsoever—upended Dr. Chen's personal and professional life.

38. The unwanted storm of negative media attention focused on Dr. Chen that resulted from Defendants' disclosure of the Leaked Records, and from the subsequent dissemination of the Leak-Based Fox News Reports, was so severe that it caused persons unknown to Dr. Chen to send hateful mail and other communications to, and direct death threats at, Dr. Chen and other staff at the University of Management and Technology.

39. Dr. Chen suffered financial harm as a result of the illegal disclosure of the Leaked Records by one or more of the Defendants.

40. The University of Management and Technology's enrollments and revenues sharply decreased in the wake of the Leak-Based Fox News Reports. This decrease has had a severe and negative effect on Dr. Chen's income and the value of her personal investment in the University of Management and Technology, which she wholly owns.

41. The illegal disclosures of the Leaked Records to Fox News also led to inquiries from Members of Congress and the DOD about Dr. Chen and the University of Management and Technology.

42. On January 23, 2018, and apparently as a direct consequence of the Leak-Based Fox News Reports, DOD suspended (and on March 28, 2018 ultimately terminated) the University of Management and Technology's long-standing participation in the DOD Tuition Assistance program. The Tuition Assistance program pays a significant portion of tuition expenses for military students and is a critical source of funding for servicemembers seeking to further their education. The termination of the university's participation in the Tuition Assistance program directly caused further decreases in enrollments and revenues to the University of Management and Technology, directly resulting in further substantial injury, including substantial personal financial losses, to Dr. Chen.

43. According to the Leak-Based Fox News Reports, the FBI and U.S. Attorney's Office refused to provide any comment on the record to Fox News regarding the matters discussed and disclosed in those reports. The reports did, however, cite anonymous sources who reportedly had described conflict between the FBI and the U.S. Attorney's Office over whether to bring charges against Dr. Chen. The same Fox News reports also cited (but did not name) a Special Agent in the FBI's Washington Field Office who, according to the reports, was upset that the University of Management and Technology was continuing to participate in the DOD's Tuition Assistance program. Attached hereto as Exhibit F is an image of an email from the unnamed Special Agent to an FBI informant displayed in the February 24, 2017 report.

44. Soon after Dr. Chen was informed that no charges would be brought against her, and in violation of federal law, one or more agents of the Defendants, who possessed or had access to confidential FBI records pertaining to the investigation, caused the Leaked Records to be disclosed to one or more employees or agents of Fox News.

## COUNT ONE: VIOLATION OF THE PRIVACY ACT

45. Plaintiff hereby restates and incorporates by reference paragraphs 1-44 of this Complaint as if fully set forth herein.

46. The Privacy Act requires that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," subject to certain exceptions. 5 U.S.C. § 552a(b).

47. While there are limited exceptions to this prohibition on disclosure, *see* 5 U.S.C. § 552a(b)(1) through (12), none of those exceptions authorized or allowed the disclosure to Fox News of the records and information concerning Dr. Chen that are the subject of this suit.

48. At no time did Dr. Chen authorize any of the Defendants or their agents to disclose any information pertaining to her to anyone outside the federal government, including anyone associated with Fox News.

49. The United States is liable for actual damages, costs of the action, and attorneys' fees if the court determines that an agency willfully or intentionally disclosed records pertaining to an individual without their permission. 5 U.S.C. § 552a(g)(4).

50. The Leaked Records broadcast in the Fox News reports included "records" within the meaning of the Privacy Act. These records could not have been obtained by Fox News except from the Defendants, either directly or indirectly.

51. At least some and likely all of the Leaked Records, before being unlawfully disclosed as described above, were contained in a system of records within, and under the control of, the FBI, the DHS, and/or other Defendants.

52. As a matter of policy and practice, the records and information that the FBI collects or creates during the course of an investigation are incorporated into and thereafter maintained in the FBI's Central Records System, which the FBI has designated a "system of records" for Privacy Act purposes. *See* 63 Fed. Reg. 8659, 8671; *see also* 66 Fed. Reg. 17200; 66 Fed. Reg. 29994. Such records also may be accessed through the SENTINEL system, which allows for electronic case management. On information and belief, this policy and practice was followed with respect to at least some, if not all, of the Leaked Records.

53. Some of the Leaked Records (including but not necessarily limited to immigration forms and other records pertaining to Dr. Chen) were contained in, or derived from records contained in, a system of records maintained by DHS. Some or all of these DHS records were maintained in the Citizenship and Immigration Data Repository, which DHS has designated a "system of records" for Privacy Act purposes. *See* 75 Fed. Reg. 54642, 54644.

54. The disclosure or disclosures of the Leaked Records by one or more employees or agents of the Defendants was a willful and intentional violation of the Privacy Act.

55. As a direct and foreseeable result of the illegal leak or leaks of Dr. Chen's private information to Fox News, three Fox News reports were published and broadcast, leading to the destruction of Dr. Chen's livelihood and the termination of the University of Management and Technology's participation in DOD's Tuition Assistance program.

56. Although the government has never charged Dr. Chen in court with any misconduct, her reputation has suffered substantial harm and she has been financially damaged as a result of Defendants' unlawful conduct. The illegal leak of personal information has diminished Dr. Chen's income, limited her professional opportunities, and decreased the value of the university that she wholly owns and into which she has invested the last two decades.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court provide the following relief:

a. Enjoin Defendants from further unauthorized and illegal disclosures of Dr. Chen's private information;

b. Award Dr. Chen actual damages, the exact amount of which is to be determined at trial;

c. Award Dr. Chen reasonable costs and attorney's fees as provided by the Privacy Act;

d. Refer any Government officials responsible for violating the Privacy Act for prosecution under 5 U.S.C. § 552a(i)(1);

e. Direct the Defendants to state publicly that the documents underlying the Fox News reports were illegally and selectively leaked with the intent to harm Dr. Chen; and

f. Grant such further and other relief as this Court deems just and proper.

Dated: December 21, 2018

Respectfully submitted,

**/s/ Patrick Carome**

Matt Jones (D.C. Bar No. 502943)
Patrick Carome (D.C. Bar No. 385676)
Justin Baxenberg (D.C. Bar No. 1034258)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
matt.jones@wilmerhale.com
patrick.carome@wilmerhale.com
justin.baxenberg@wilmerhale.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **YANPING CHEN,**<br><br>Plaintiff,<br><br>v.<br><br>**FEDERAL BUREAU OF INVESTIGATION, *et al.*,**<br><br>Defendants. | Case No. 18-cv-3074 (CRC) |

**OPINION AND ORDER**

Plaintiff Yanping Chen, a naturalized citizen of the United States, was investigated by the Federal Bureau of Investigation regarding statements she made on certain immigration forms. In the course of that investigation, the FBI executed search warrants at Dr. Chen's home and office and collected a trove of documentary evidence. Years later, after she had been informed that no charges would be brought against her, Fox News ran a series of negative reports about Dr. Chen and the for-profit university she runs in Virginia. As a result of the coverage, Dr. Chen alleges that both she and her business suffered financial and reputational harm.

Dr. Chen believes the FBI was the source for the Fox News stories and that the evidence revealed in the reports—including snippets of her immigration forms, a summary of an FBI interview with her daughter, and personal photographs of her and her husband—was taken from the materials seized by the FBI in executing its search warrants. Suspecting someone at the FBI unlawfully disclosed her personal information, she sought sanctions against the agency in a motion before the federal magistrate judge in the Eastern District of Virginia who had issued the search warrants. Among other things, Dr. Chen contended that the FBI violated the Privacy Act, 5 U.S.C. § 552a, which generally makes it unlawful for the government to disclose an

individual's personal information without their consent. After she was rebuffed for not filing her Privacy Act claim as an original civil action in district court, she filed this suit against the FBI and several other government agencies that may have had access to her investigatory file. The Government has moved to dismiss the case. It maintains that Dr. Chen is precluded from raising her Privacy Act claim here because two dispositive issues were already litigated and decided against her in the prior search warrant proceeding. Upon consideration of the motion and briefing, the Court finds that Dr. Chen may pursue her claim through this suit.

## I. Background

In 2012, Magistrate Judge John Anderson in the Eastern District of Virginia signed two search warrants related to an FBI investigation into whether Dr. Chen lied on her immigration forms about her previous work as a scientist for the Chinese space program. Compl. ¶¶ 15, 17. FBI agents seized various items from Dr. Chen's home and office during the execution of the warrants, including Dr. Chen's business records, computers and other electronic devices, and personal family photographs. Id. ¶ 20. After some six years of investigation, Dr. Chen was informed that no charges would be filed. Id. ¶¶ 16, 22. Almost a year later, Fox News ran a series of "exclusive" investigative reports on Dr. Chen, her university, and her alleged ties to the Chinese military. Id. ¶¶ 25–31. According to Dr. Chen, the photographs and documentary evidence used in the reports could only have come from the documents the FBI collected during the search. Id. ¶¶ 33–34. She alleges that someone within the FBI or another Government agency with access to her investigatory file leaked her personal papers and effects to Fox News. Id. ¶¶ 34, 43. She claims the reports have caused her reputational and monetary harm. Id. ¶¶ 37–42.

In 2017, Dr. Chen filed a motion with Magistrate Judge Anderson under Federal Rule of Criminal Procedure 41, which governs federal search warrants, seeking an order to show cause why the Government should not be sanctioned for the disclosure of her personal information. Among other objections to the alleged disclosures, Dr. Chen argued that the Government had violated the Privacy Act by providing materials seized during the searches of her home and office to Fox News without her consent. Defs.' App. 22a. The Government responded that the court lacked jurisdiction to hear her Privacy Act objection in the context of a Rule 41 proceeding because the Act permits redress to be sought only through an original civil action filed in District Court. Defs.' App. 26a (citing 5 U.S.C. §§ 552a(g)(1), (g)(5)).

Magistrate Judge Anderson denied Dr. Chen's motion, concluding that while the "allegations describe a troubling and potentially improper course of conduct[,] . . . a proceeding for the issuance of a search warrant cannot provide the relief sought by the movant under the Privacy Act." Defs.' App. 47a. Dr. Chen appealed Judge Anderson's ruling to the District Court Judge Liam O'Grady. Defs.' App. 48a–56a. In its opposition, the Government reiterated its position that the court did not have jurisdiction under the Privacy Act to hear the claim in a search warrant proceeding. Defs.' App. 64a. In the alternative, the Government argued that Dr. Chen had failed to show that the records at issue were stored in a "system of records" (as required to establish a violation of the Act's wrongful-disclosure provisions) and that evidence obtained via a search warrant are not covered by the Privacy Act at all. Defs.' App. 65a–70a.

Judge O'Grady adopted Magistrate Judge Anderson's opinion in full, including his conclusion that a Rule 41 proceeding is not "an appropriate forum in which to raise a Privacy Act claim." In re Search of 2122 21st Rd. N. Arlington, Va., No. 17-cr-236, 2018 WL 534161, at *1, *5 (E.D. Va. Jan. 23, 2018) ("In re Search"). He also discussed the two Privacy Act issues

that Magistrate Judge Anderson did not reach. Id. at *4. First, Judge O'Grady held that Dr. Chen "failed to show" that the allegedly leaked records were stored in a system of records. Id. at *4. Second, he opined that materials seized pursuant to a search warrant were not covered by the Privacy Act because it would be "illogical" to allow the subject of an investigation to view their investigatory file. Id. In support of this conclusion, he added that he had found no case in which someone has recovered under the Privacy Act based on disclosure of evidence seized in the execution of a search warrant. Id. Finally, he suggested that Dr. Chen pursue her Privacy Act claim by filing an original civil action in District Court, as the Act provides. Id. at *5. Dr. Chen appealed, and the Fourth Circuit summarily affirmed the District Court's opinion. United States v. In re Search of 2122 21st Rd. N. Arlington, Va., 735 Fed. App'x 66 (Mem.) (4th Cir. 2018). In its appellate briefing, the Government echoed Judge O'Grady's observations that a search warrant proceeding was an inappropriate forum for Dr. Chen's Privacy Act claim and that she should instead pursue it through an original civil action. Defs.' App. 159a–163a.

Thrice spurned, Dr. Chen followed Judge O'Grady's and the Government's suggestion: She filed a Privacy Act suit in this Court. The Government now moves to dismiss the suit under Federal Rule of Civil Procedure 12(b)(6) on the basis of issue preclusion.

## II. Legal Standards

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint that fails to state a legally valid claim, such as claims that are barred by the doctrine of issue preclusion. The Government, as "the moving party[,] bears the burden of proving all the elements of issue preclusion." Lans v. Adduci Mastriani & Schaumberg LLP, 786 F. Supp. 2d 240, 303 (D.D.C. 2011). In addition, "the preclusive effect of federal court litigation," like the prior litigation at issue here, "is a question of federal law." Athridge v. Aetna Cas. & Sur. Co.,

351 F.3d 1166, 1171 (D.C. Cir. 2003) (citing 17 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4226, at n.10 (2d ed. 1988)).

The doctrine of issue preclusion bars "successive litigation of an issue of fact or law actually litigated and resolved in a . . . prior judgment." Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (quoting New Hampshire, 532 U.S. 742, 748–49 (2001)). "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." McLaughlin v. Bradlee, 803 F.2d 1197, 1201 (D.C. Cir. 1986) (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980)). Issue preclusion doctrine seeks to "avert needless relitigation and disturbance of repose, without inadvertently inducing extra litigation or unfairly sacrificing a person's day in court." Otherson v. Dep't of Justice, 711 F.2d 267, 273 (D.C. Cir. 1983).

The party moving to use preclusion to prevent relitigation of an issue has the burden to show three elements are met: (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case;" (2) "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case;" and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." Martin v. Dep't of Justice, 488 F.3d 446, 454 (D.C. Cir. 2007). As the Supreme Court has explained, "a party who has had one fair and full opportunity to prove a claim and has failed in that effort, should not be permitted to go to trial on the merits of that claim a second time. Both orderliness and reasonable time saving in judicial administration require that this be so unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case." Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 324–25 (1971). Whether the second court agrees with the first is

irrelevant to the analysis. See Consol. Edison Co. of N.Y. v. Bodman, 449 F.3d 1254, 1257 (D.C. Cir. 2006) ("A court conducting an issue preclusion analysis does not review the merits of the determinations in the earlier litigation."). When the first two elements of issue preclusion doctrine are met, the plaintiff "must be permitted to demonstrate, if he can, that he did not have a fair opportunity procedurally, substantively, and evidentially to pursue his claim the first time." Id. at 333 (internal quotation marks omitted); see also Montana v. U.S., 440 U.S. 147, 164 n.11 (1979) ("Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation."). That being said, "if the parties have the same incentive to litigate in both the earlier and the subsequent litigation, if there is no change in the controlling law and if there is no concern about procedural defects in the first litigation, the application of issue preclusion is unlikely to result in a 'compelling' showing of unfairness to the party against which it is asserted." Canonsburg Gen. Hosp. v. Burwell, 807 F.3d 295, 306 (D.C. Cir. 2015).

## III. Analysis

The Government contends that Judge O'Grady made (and the Fourth Circuit affirmed) two dispositive rulings against Dr. Chen that preclude her Privacy Act claim here: first, that the information published by Fox News was not "contained in a system of records" as required to establish a Privacy Act violation and, second, that a government disclosure of search warrant evidence cannot violate the Privacy Act as a matter of law. Dr. Chen disputes the Government's characterization, and thus the preclusive effect, of Judge O'Grady's rulings.[1]

---

[1] Dr. Chen argues that because Judge O'Grady's resolution of each of these two issues would independently support the result, neither is precluded from relitigation. Opp. 12–13 (citing Restatement (Second) of Judgments § 27 cmt. i (1980) ("If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would

As a threshold matter, Dr. Chen argues that Judge O'Grady found that he lacked jurisdiction to entertain her Privacy Act claims in the context of a search warrant proceeding, which means his rulings regarding the Act were not determined by a "court of competent jurisdiction." See Martin, 488 F.3d at 454. As a result, she contends that she is free to litigate her Privacy Act claim here regardless of what Judge O'Grady may have ruled on the merits of the relevant issues. The Government responds that Judge O'Grady's ruling was not so much a jurisdictional finding but "is better read as a determination that a show-cause hearing for sanctions is not an available remedy under the Privacy Act." Reply 8. While the Court leans towards the Government's argument, it need not resolve the dispute because it finds that Dr. Chen is not precluded in this original action from raising the two merits issues discussed by Judge O'Grady.

The first prong of issue preclusion—that the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case—is met for both issues. See Defs.' App. 75a–76a, 115a–117a. The Court finds, however, that neither issue is precluded. First, the issue of whether the seized materials were held in a "system of records" was not fully and fairly litigated in the search warrant proceeding because Dr. Chen lacked access to any discovery procedures that would have enabled her to make that showing. Especially considering that all the evidence needed to prove that issue is in the primary control of

be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone.")). In the D.C. Circuit, however, when the first court makes two determinations, either of which are sufficient to reach the judgment, a party *is* precluded from relitigating both. Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992)). Dr. Chen argues that the D.C. Circuit is wrong, Opp. 12, but that argument is better made to the Circuit. This Court is bound to apply Yamaha and therefore must analyze the preclusive effect of each of Judge O'Grady's alternative grounds.

the Government, it would "work a basic a fairness" to Dr. Chen if she were bound by that determination here. See Martin, 488 F.3d at 454. Second, Judge O'Grady did not conclusively hold that materials seized under a search warrant can never be the basis of a wrongful-disclosure claim under the Privacy Act. His thoughts on the subject are best viewed as dicta. That issue, therefore, was not "actually . . . determined" and may be relitigated here. Id.

*1. System of Records*

In the Government's telling, Judge O'Grady held that the documents seized in the search of Dr. Chen's home and office were not contained in a system of records. Mot. to Dismiss 9. What he actually found, however, was that Dr. Chen "*failed to show* that evidence seized during a search conducted in a criminal investigation constitutes records that are 'contained in a system of records' under the Privacy Act." In re Search, 2018 WL 534161, at *4 (emphasis added). Regardless of how it is characterized, however, Judge O'Grady's finding is not preclusive in a subsequent suit because Dr. Chen did not have a full and fair opportunity to litigate whether the FBI stored her particular records in a system of records due to her inability to take discovery in the search warrant proceeding.

Applying issue preclusion may well be unfair to a litigant "where the second action affords the [party against whom preclusion is being invoked] procedural opportunities unavailable in the first action that could readily cause a different result." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 & n.15 (1979) (citing unavailability of discovery as an example);[2]

---

[2] Although Parklane Hosiery indicates it would be "unfair to apply *offensive* estoppel" in these circumstances, footnote 15 adds that "differences in available procedures may sometimes justify not allowing a prior judgment to have estoppel effect in a subsequent action even between the same parties, or *where defensive estoppel is asserted against a plaintiff who has litigated and lost*." 439 U.S. at 331 & n.15.

see also Canonsburg Gen. Hosp., 807 F.3d at 306 (acknowledging that preclusion is inappropriate if the "prior proceedings were seriously defective").[3] The inability to conduct discovery can prevent a litigant from having "an opportunity to fully litigate [an] issue." Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances, 723 F.2d 357, 361 (3d Cir. 1983) (holding that the district court's closing of discovery in the prior proceeding prevented the plaintiff from having "had an opportunity to fully litigate the issue"). This is especially true when the evidence needed to prove the issue is in the primary control of the opposing party.

The Second Circuit's decision in Sprecher v. Graber illustrates the point. 716 F.2d 968 (2d Cir. 1983). The court there confronted whether an original civil action claiming abuse of process by the SEC was precluded by the plaintiff's unsuccessful defense in an earlier subpoena enforcement proceeding in a different federal court. When the SEC sought to enforce a subpoena against him, Mr. Sprecher "vigorously opposed" the effort on the grounds that the investigation was religiously motivated and that the materials sought were protected by the

[3] The prior proceedings here were not "defective" in the sense that either Magistrate Judge Anderson or Judge O'Grady denied Dr. Chen any procedural rights to which she was entitled, as the Government suggests must be found to escape issue preclusion. See Reply 13 ("Chen provides no basis for this Court to reach the remarkable conclusion that the procedures used at three levels of federal courts in the prior case fell below th[e] bare minimum standard."). The procedures were lacking in relation to this particular issue only because the posture of the case did not allow for *any* discovery on a disputed factual issue. That finding does not disparage the federal system or the prior proceedings, it merely relies on the differences in available procedures. See Sprecher v. Graber, 716 F.2d 968 (2d Cir. 1983) (finding procedures defective such that issue preclusion did not apply in a prior federal subpoena enforcement proceeding that the circuit itself affirmed); see also Parklane Hosiery, 439 U.S. at 331 & n.15 (explaining that "differences in available procedures," including lack of discovery, "may not justify" applying preclusive effects of a prior judgment). Judge O'Grady himself recognized the inadequacy of the procedures available to Dr. Chen in the search warrant proceeding when he suggested that she file "a civil complaint in which [she] could be entitled to obtain discovery . . . ." In re Search, 2018 WL 534161, at *5.

attorney-client privilege. Id. at 971. The district court rejected his arguments as frivolous and dismissed his contention that he should have been provided an evidentiary hearing. Id. at 971–72. Shortly after the circuit disposed of Sprecher's appeal in the subpoena proceeding, the SEC moved to dismiss his abuse-of-process action, claiming that relitigation of the issues was precluded by the circuit's rejection of his defenses to the subpoena. The district court agreed, but the Second Circuit this time reversed. It held that the subpoena proceeding did not preclude Mr. Sprecher's abuse-of-process claims because, unlike in that proceeding, "in a plenary action for abuse of process, allegations alone may suffice to obtain discovery" and the "defendants would bear the burden on a motion for summary judgment and only after discovery was had." Id. at 972. "In view of the substantially disparate opportunities for discovery and differing burdens in the two proceedings," the Second Circuit concluded that the prior case "cannot have a preclusive effect . . . unless it is shown that these differences would not affect the outcome." Id. The availability of discovery prevented such a showing. Id.[4]

The Second Circuit's reasoning applies here.[5] The search warrant proceeding offered no mechanism whatsoever for discovery on Dr. Chen's Privacy Act claim, and, absent some other purely legal challenge to the Complaint, Dr. Chen would have an opportunity here to conduct

---

[4] In contrast to the abuse-of-process issues, the Second Circuit found that the prior action did preclude the plaintiff's argument that the subpoena violated the attorney-client privilege. For that issue, the court explained, "[d]iscovery is unnecessary since the client and Sprecher had the relevant information at their disposal." Id. at 973.

[5] See also Compagnie des Bauxites de Guinee, 723 F.2d at 361 (no full and fair opportunity to litigate when the prior court closed the issue to discovery); cf. Porter v. Shah, 606 F.3d 809, 814 (D.C. Cir. 2010) (full and fair opportunity to litigate afforded despite lack of discovery because the Plaintiff "had the opportunity to—and did—submit extensive documentary evidence"); Lans v. Adduci Mastriani & Schaumberg LLP, 786 F. Supp. 2d 240, 315 (D.D.C. 2011) (despite absence of "full discovery," full and fair opportunity to litigate afforded where party took two depositions, had an evidentiary hearing, and submitted evidence).

discovery on whether the materials seized from her home and office were stored in "system of records." Further, like Mr. Sprecher's abuse of process claims, evidence of whether the seized evidence was stored in "system of records" is wholly within the control of the Government; it is only through discovery that Dr. Chen could begin to probe that issue. And the Government has failed to show "that these differences would not affect the outcome." Id. at 972. Indeed, the Government itself argued to the Fourth Circuit that Chen would need to "file her own suit under the [Privacy] Act" to "pursue . . . discovery" about whether her information was stored in a system of records. Def.'s App. at 162a. Now that she has filed an original civil action, she should have a chance to do just that.

*2. Applicability of the Privacy Act to Materials Seized through a Search Warrant*

For an issue to be precluded, it must have been "actually and necessarily determined" by the prior court. Martin, 488 F.3d at 454. "[M]ere *dicta*" does not preclude relitigation of an issue. McKinley v. City of Mansfield, 404 F.3d 418, 429 (6th Cir. 2005); see also Athridge v. Aetna Cas. & Sur. Co., 604 F.3d 625, 643 (D.C. Cir. 2010) ("[I]ssue preclusion does not apply . . . where the determination of an issue was dictum and not essential to the judgment.") (applying D.C. law) (internal quotation omitted); Anthan v. Prof'l Air Traffic Controllers Org., 672 F.2d 706, 710 (8th Cir. 1982) ("The determination of an issue in an earlier proceeding must be essential to the judgment; it cannot be dicta.").

Contrary to the Government's description of his opinion, Judge O'Grady did not squarely hold that the fruits of a search warrant are exempt from the Privacy Act's wrongful-disclosure provisions as a matter of law. He merely observed that (1) he was unable to find a case in which the disclosure of the fruits of a search warrant was found to violate the Privacy Act and (2) it would "def[y] logic to conclude that Congress intended . . . to permit the subject of a criminal

investigation 'to gain access to his record.'" In re Search, 2018 WL 534161, at *4 (quoting 5 U.S.C. § 552a(d)). But simply noting that you cannot find a case for a proposition and that the proposition "defies logic," without more, is not a holding; it is dicta. And, importantly, section 552a(d) of the Privacy Act—the provision that provides access to records—is not at issue in this case. The Court agrees that it would be illogical to assume that Congress would permit criminal suspects to *access* their case files, which is presumably why Congress explicitly exempted them—or anyone else—from obtaining investigatory files through the Privacy Act. See 5 U.S.C. § 552a(k)(2) (specifically permitting an agency to exempt "investigatory material compiled for law enforcement" from the provisions allowing access to records). But Congress did not include a similar exemption for the wrongful-disclosure provisions. Judge O'Grady did not indicate whether he thought Congress would logically permit the subject of an investigation to sue under the wrongful-disclosure provisions of the Act, which are the only ones at issue here. As a result, the Court finds that this discussion was dicta without preclusive effect. Lest there be any doubt, Judge O'Grady himself acknowledged that this discussion was not essential to his judgment when noted that Dr. Chen "would better pursue the avenues for civil relief provided by the Privacy Act, such as a civil complaint . . . ." In re Search, 2018 WL 534161, at *5. Had he held that the Privacy Act categorically did not permit her claims, that suggestion would have made no sense. Because the Court finds that this portion of the prior court's opinion was dicta and therefore not preclusive, Dr. Chen may raise her Privacy Act claims in this court.

## IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (ECF No. 9) is DENIED.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: January 27, 2020

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **YANPING CHEN,**<br><br>Plaintiff,<br><br>v.<br><br>**FEDERAL BUREAU OF INVESTIGATION et al.,**<br><br>Defendants. | Case No. 18-cv-3074 (CRC) |

**AMENDED SCHEDULING ORDER**

Upon consideration of the parties' [54] Joint Motion to Modify the Scheduling Order, the Court GRANTS the motion. It is hereby ORDERED that the Court's March 11, 2020 Scheduling Order (ECF No. 18), the June 14, 2021 Minute Order, and the October 11, 2021 Minute Order, be amended as follows:

1. The case shall be bifurcated into two phases. The first phase will address liability on plaintiff's Privacy Act claim. The second phase, which will occur if and only if plaintiff prevails on liability in the first phase, will address the extent of plaintiff's recoverable damages, if any.

2. Absent agreement of the parties, the following limits on the number of depositions shall apply: no more than 15 depositions for plaintiff during the liability phase; no more than 15 depositions for defendants collectively during the liability phase; no more than 20 total depositions for plaintiff across both phases; and no more than 20 depositions for defendants collectively across both phases.

3. These limits shall not apply to any attempt by plaintiff to depose third-party media entities or journalists regarding the source(s) of the alleged disclosure(s).

4. Notwithstanding the provision in Federal Rule of Civil Procedure 30(d)(1) that a deposition is generally limited to one day, the deposition of any party or any party's current

employee started during the liability phase after the date of the parties' [54] motion may be continued on a second day during the damages phase, subject to the provision in Rule 30(d)(1) that the entirety of the deposition is limited to seven hours.

5. The fact discovery deadline for the liability phase shall be November 19, 2021.

6. The post-discovery status conference scheduled for November 9, 2021, at 11:00 AM is continued to a date to be determined. A separate Minute Order will be forthcoming.

7. The deposition of Stephen Rhoads may be taken after the November 19, 2021 liability phase fact discovery deadline, but no later than December 31, 2021.

8. The parties are ordered to file a joint status report within 14 days after the conclusion of the liability phase of the case setting forth their proposed schedule(s) for the damages phase of the case. The deadlines for Rule 26(a)(2) statements and depositions with respect to damages experts are adjourned until the parties' submission of the proposed schedule(s) for the damages phase.

**SO ORDERED.**

CHRISTOPHER R. COOPER
United States District Judge

Date: October 15, 2021

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| **Yanping Chen**,<br><br>Plaintiff,<br><br>v.<br><br>**Federal Bureau of Investigation, U.S. Department of Justice, U.S. Department of Defense,** and **U.S. Department of Homeland Security**,<br><br>Defendants. | No. 18-cv-3074<br><br>Hon. Christopher R. Cooper<br>United States District Judge |

**GOVERNMENT'S OPPOSITION TO PLAINTIFF'S SECOND MOTION TO COMPEL**

## Table of Contents

Table of Authorities .......... iv

I. Introduction .......... 1

II. Facts and Procedural Background .......... 2

III. Legal Standard .......... 5

A. The law enforcement privilege .......... 5

[redacted] .......... 6

IV. Argument .......... 7

A. The law enforcement privilege protects the information sought by Chen .......... 7

1. The law enforcement privilege has been properly asserted .......... 7

2. The public interest against disclosure outweighs any need that Chen has for the privileged information .......... 8

a. Disclosure of the privileged information would risk serious harm to multiple law enforcement interests .......... 8

b. Chen has not shown a need for the privileged information sufficient to outweigh the substantial public interests against disclosure .......... 9

i. The deposition questions at issue do not concern the existence of any FBI-to-Rhoads disclosure, the relevant issue under Chen's theory .......... 9

ii. The redacted information in the documents challenged by Chen does not concern how Fox News got her records and is thus unimportant to her claim .......... 12

iii. Chen's need for information allegedly concerning Xiaoming Gao is minimal, and in any event that need would be fully addressed by the government's proposed stipulations .......... 14

iv. The privileged information concerning numerous other FBI investigations has no conceivable relevance to Chen's claim .......... 16

[redacted] .......... 17

C. Two categories of Chen's privilege challenges are academic .......... 18

V. Conclusion .......... 19

Appendix A .......... 1a

## Table of Authorities

### Cases

*Black v. Sheraton Corp. of America*,
47 F.R.D. 263 (D.D.C. 1969) ........ 6

*BuzzFeed, Inc. v. U.S. Department of Justice*,
318 F. Supp. 3d 347 (D.D.C. 2018) ........ 6

*In re Sealed Case*,
856 F.2d 268 (D.C. Cir. 1988) ........ 5, 7, 11, 13, 16, 17

*Tuite v. Henry*,
181 F.R.D. 175 (D.D.C. 1998) ........ 1, 5

*Tuite v. Henry*,
98 F.3d 1411 (D.C. Cir. 1996) ........ 5, 6

*United States v. Reynolds*,
345 U.S. 1 (1953) ........ 9

### Rules

Federal Rule of Civil Procedure 37 ........ 16

## I. Introduction

On the last day of discovery in this Privacy Act case, plaintiff Yanping Chen filed this motion challenging the government's withholding of information in certain investigative documents produced by the FBI and objections to certain deposition questions to government witnesses involved in the FBI investigation into Chen. Chen contends that the privileged information might be relevant to her theory that the FBI violated the Privacy Act by allegedly giving Chen's records to Stephen Rhoads, who was an on-the-record source for the Fox News reports about Chen.

However, the information sought by Chen is protected by the law enforcement privilege, which exists "to preserve the integrity of law enforcement techniques and confidential sources." *Tuite v. Henry*, 181 F.R.D. 175, 176–77 (D.D.C. 1998), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999).[1] Here, the privileged information concerns confidential sources or witnesses and investigative methods used in the FBI's investigation of Chen, as well as subjects, sources or witnesses, and methods in dozens of other FBI investigations, including ongoing national security investigations. The public interests against disclosure of this information are described in detail in the classified declaration of FBI Assistant Director Alan E. Kohler, Jr., as well as in his unclassified public declaration, to the extent possible. Disclosing the identity of a source or witness would risk serious harm to the FBI's ability to obtain essential information from individuals, which is provided in large part because of the FBI's assurance of confidentiality. And disclosing

[1] For the Court's convenience, citations to legal authorities and docket entries in the PDF version of this brief are linked to the cited authority in Westlaw and ECF, respectively.

the identity of subjects and certain investigative methods would enable subjects to alter their behavior to avoid detection.

Chen has not demonstrated a need for the privileged information that outweighs these public interests against disclosure. As shown in the government's ex parte submissions, the privileged information does not go to the key issue under Chen's FBI-to-Rhoads theory of the case — whether the FBI gave Rhoads any records or information in the Fox News reports. The government has not asserted the law enforcement privilege over whether any such disclosure occurred, and many government witnesses have answered numerous deposition questions on that topic. Chen can thus pursue her theory without the privileged information, minimizing her interest in disclosure.

In addition to the information protected by the law enforcement privilege, [redacted]. Finally, the Court need not decide the merits of two categories of Chen's privilege challenges because a ruling in her favor would not result in the disclosure of any additional information.

The motion to compel should be denied.

## II. Facts and Procedural Background

Chen alleges that she came under investigation by the FBI in 2010 for statements she made on immigration forms. Compl. ¶ 15, ECF No. 1. As part of that investigation, the FBI executed search warrants at her home in December 2012 and collected photographs and other documents. Compl. ¶¶ 17–21. Over four years later, in 2017, Fox News published three reports about Chen, her statements on immigration forms, and her university, which had been receiving significant funding from the Department of Defense. Compl. ¶¶ 24–25, 41–42. The reports displayed photos of Chen, snippets of her

immigration forms, and a purported partial summary of an FBI interview of her daughter. Compl. ¶¶ 25–31. Chen filed this civil case against the FBI and three other federal agencies asserting a single Privacy Act claim alleging the unlawful disclosure of her records to Fox News. Compl. ¶ 23.

Discovery in this case generally ran from March 2020 through November 2021. ECF No. 18 ¶ 1; ECF No. 55. Chen issued 67 document requests, 67 interrogatories, and 57 requests for admission; propounded 14 document subpoenas to non-parties; and noticed 15 depositions. In response to these requests, the FBI has produced over 8,000 pages of documents. In certain instances when Chen raised questions about particular documents, the government re-reviewed the documents and in some instances re-produced them with certain redactions lifted.

Earlier this year, Chen moved to compel the FBI to disclose whether or not it used Stephen Rhoads as an informant or witness. ECF No. 36. Rhoads was an employee of Chen's for-profit university who was interviewed on-camera for the Fox News reports and stated that he was an FBI informant in the investigation. ECF No. 46 at 2. Notwithstanding Rhoads's claims, the Court found that the government has a legitimate and substantial interest in refusing to officially confirm or deny whether it used Rhoads as an informant or witness, which would erode the assurance of confidentiality used by the FBI to attract sources.[2] ECF No. 46 at 8. The Court concluded that this substantial public interest outweighed Chen's need for the information because Chen could attempt

---

[2] The Court found that this conclusion was further supported by the FBI's classified declaration. ECF No. 46 at 8 n.2. However, because the government's public filings established a "substantial public interest in nondisclosure" sufficient to outweigh Chen's need for the information, the Court ultimately did not need to rely on the classified declaration. ECF No. 46 at 8 n.2.

to prove her theory of the case — that the FBI gave Rhoads information about Chen from an agency system of records in violation of the Privacy Act — without discovery on any informant or witness relationship Rhoads might have had with the FBI. ECF No. 46 at 9–10. The Court thus denied the motion to compel without prejudice. ECF No. 46 at 1.

On the last day of discovery, Chen filed this second motion to compel the disclosure of information that the government has withheld under the law enforcement privilege. Specifically, Chen challenges the government's objections to certain deposition questions to government witnesses.[3] *See* Matthew T. Jones Decl. ¶¶ 3–7 & Exs. 1–5. However, Chen does not seek to revisit the Court's prior ruling that the law enforcement privilege protects whether or not Rhoads served as an investigative source for the FBI. Pl.'s Br. at 4 n.3.

Chen's motion also challenges certain redactions in 54 investigative documents produced by the FBI.[4] *See* Jones Decl. Exs. 6–59. A number of the challenged redactions in these documents are for information protected not only by the law enforcement privilege, but also by the attorney-client privilege and the deliberative process

[3] Chen asserts that the government refused to explain why the law enforcement privilege applies to these questions. Pl.'s Br. at 6. However, the government explained that it could not provide additional information about why the privilege applies without revealing privileged information. Coyle Decl. Ex. 1.

[4] Chen asserts that the government refused to review these redactions to confirm that they are proper. Pl.'s Br. at 1, 2, 7–8. That assertion is not accurate. The government offered to "re-review the law enforcement privilege redactions in a subset" of documents selected by Chen, "provided that if the FBI determine[d] in its discretion to remove any redactions from these documents, that fact w[ould] not be used to argue that the FBI should review the redactions in additional documents." Jones Decl. Ex. 68 at 4. Chen refused the government's offer. Jones Decl. Ex. 69 at 3.

privilege — though Chen disclaims any challenge to those other privileges.[5] Pl.'s Br. at 2 n.2; *see* Jones Decl. Exs. 10, 21, 23, 40, 55, 58, 59 (deliberative process privilege); Jones Decl. Exs. 51, 53, 56 (deliberative process privilege and attorney-client privilege).

## III. Legal Standard

### A. The law enforcement privilege

The law enforcement privilege is designed to "prevent disclosure of information that would be contrary to the public interest in the effective functioning of law enforcement," "preserve the integrity of law enforcement techniques and confidential sources," and "protect[] witnesses and law enforcement personnel." *Tuite*, 181 F.R.D. at 176–77.

The government must satisfy three requirements to assert the law enforcement privilege: "(1) [T]here must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege." ECF No. 46 at 4–5 (quoting *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988)) (brackets in original).

Once the law enforcement privilege has been asserted, the Court must "weigh the public interest in nondisclosure against the [requesting party's] need for access to the privileged information." ECF No. 46 at 5 (quoting *Tuite*, 98 F.3d 1411, 1417 (D.C. Cir.

---

[5] Chen suggests that the FBI has acted improperly by redacting the internal FBI file number for its investigation concerning Chen. Pl.'s Br. at 1. However, the parties previously entered into a stipulation concerning the file number, and as part of that stipulation, Chen agreed not to challenge any redactions of the file number. These redactions are therefore not at issue in this motion, as Chen acknowledges. Pl.'s Br. at 2.

1996)) (brackets in original). The burden is on Chen, as the requesting party, to establish the need for disclosure of the privileged information. *BuzzFeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 362 (D.D.C. 2018). The D.C. Circuit has identified the following factors "as illustrative of the factors the district court must consider" in balancing these interests:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is nonfrivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources[;] (10) the importance of the information sought to the plaintiff's case.

ECF No. 46 at 5 (quoting *Tuite*, 98 F.3d at 1417).

In assessing the importance of the information sought, courts are more likely to uphold the privilege in civil cases than in criminal cases, given the constitutional guarantees provided to criminal defendants. *See Black v. Sheraton Corp. of Am.*, 47 F.R.D. 263, 272 (D.D.C. 1969), *aff'd*, 564 F.2d 531 (D.C. Cir. 1977).

[redacted]

[redacted]

## IV. Argument

### A. The law enforcement privilege protects the information sought by Chen

#### 1. The law enforcement privilege has been properly asserted

The three requirements for asserting the law enforcement privilege have been satisfied here. *See* ECF No. 46 at 4–5 (citing *In re Sealed Case*, 856 F.2d at 271). FBI Assistant Director Alan E. Kohler, Jr., the head of the FBI's Counterintelligence Division, has been delegated the authority to assert privilege for the FBI and has formally asserted the law enforcement privilege here. Unclassified Kohler Decl. ¶ 7. The privilege assertion is based on Assistant Director Kohler's personal consideration of the information at issue here. Unclassified Kohler Decl. ¶ 7. Assistant Director Kohler has specified the information over which the privilege is asserted and has explained why it

properly falls within the scope of the privilege. Unclassified Kohler Decl. ¶¶ 4, 7–11; Classified Kohler Decl.

### 2. The public interest against disclosure outweighs any need that Chen has for the privileged information

#### *a. Disclosure of the privileged information would risk serious harm to multiple law enforcement interests*

The classified declaration of Assistant Director Kohler describes in detail the reasons why disclosure of the information sought by Chen would jeopardize the public interest in the effective functioning of law enforcement.[6] *See* Classified Kohler Decl. To the extent possible, Assistant Director Kohler also describes in his public declaration the expected harms from disclosure of the information at issue. *See* Unclassified Kohler Decl. ¶¶ 8–11. Disclosing a source's identity would risk serious harm to the FBI's ability to obtain essential information from sources, which is provided in large part because of the FBI's assurance of confidentiality. Unclassified Kohler Decl. ¶ 11. Disclosing certain sensitive investigative methods used in FBI investigations would risk thwarting their effectiveness by allowing individuals to alter their behavior to evade detection. Unclassified Kohler Decl. ¶ 10. Finally, disclosing the identity of subjects in other FBI investigations, including ongoing national security investigations, would risk serious harm to those investigations. Unclassified Kohler Decl. ¶ 9.

Chen contends that the government should not be permitted to present these law enforcement interests in an ex parte declaration. Pl.'s Br. at 11. But in deciding this type

[6] To assist the Court in understanding how the full and complete answers to the deposition questions challenged by Chen would jeopardize these law enforcement interests, the government has lodged the classified declarations of SSA-8 and Assistant U.S. Attorney James P. Gillis setting forth their answers to the challenged questions.

of privilege challenge, the Court "must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect." *United States v. Reynolds*, 345 U.S. 1, 8 (1953). Because the full explanation of the law enforcement interests at issue here is itself privileged, the privileged portions of the explanation are provided in Assistant Director Kohler's classified declaration.

Chen also contends that the law enforcement interests at issue could be protected by ordering disclosure of the information subject to the protective order in this case. Pl.'s Br. at 15, 21–22, 23. However, Assistant Director Kohler's classified declaration explains why the protective order is not sufficient to prevent the expected harms from disclosure of the information sought by Chen.

*b. Chen has not shown a need for the privileged information sufficient to outweigh the substantial public interests against disclosure*

Notwithstanding these law enforcement interests, Chen contends that the privileged information could be important to litigating her claim in this civil case. However, a close review of the privileged information shows that it does not go to the key issues in this case, and that Chen's alleged need for the information is substantially outweighed by the countervailing public interests against disclosure.

*i. The deposition questions at issue do not concern the existence of any FBI-to-Rhoads disclosure, the relevant issue under Chen's theory*

First, Chen challenges the government's law enforcement privilege objections to a number of deposition questions. Pl.'s Br. at 11–16; Jones Decl. Exs. 1–5. Chen contends that she needs information about any FBI disclosure of documents to Stephen Rhoads to assess whether any such disclosure constituted a Privacy Act violation. Pl.'s Br. at 4.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
YANPING CHEN,
CA No: 1:18-cv-03074-CRC
Plaintiff,
Washington, D.C.
Tuesday, February 9, 2022
vs.
11:00 a.m.

FEDERAL BUREAU OF INVESTIGATION, et al.,

Defendant.
- - - - - - - - - - - - - - - - x

---

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff: **MATTHEW T. JONES, ESQ.**
**WILMER HALE**
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6018
matt.jones@wilmerhale.com

For the Defendant: **GARRETT JOSEPH COYLE, ESQ.**
**U.S. DEPARTMENT OF JUSTICE**
Civil Division,
Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 616-8016
garrett.coyle@usdoj.gov

Court Reporter: Lisa A. Moreira, RDR, CRR
Official Court Reporter
U.S. Courthouse, Room 6718
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3187

P R O C E E D I N G S

THE COURTROOM DEPUTY: Your Honor, we're on the record for Civil Case 18-3074, *Yanping Chen vs. The Federal Bureau of Investigation, et al.*

Counsel, please approach and lectern and identify yourselves for the record.

MR. JONES: Good morning, Your Honor; Matt Jones on behalf of the plaintiff, Yanping Chen, who is also here with us today.

THE COURT: Okay. Good morning, Mr. Jones. You can feel free to take your mask off if you're addressing the Court, if you're comfortable doing so. It's your preference.

Good morning, Ms. Chen.

And I'm sorry, who else do we have?

MR. JONES: We're also joined here by my colleague Sean Kim from WilmerHale.

THE COURT: Okay. Pleasure to meet you.

MS. KIM: Pleasure to meet you, Your Honor.

MR. COYLE: Good morning, Your Honor; Garrett Coyle from the justice department. Also here from the government are Laurel Lum, Lauren Renaud, Elizabeth Shapiro, Carol Federighi, and Dennis Barghaan.

THE COURT: Okay. Good morning, everyone.

Just for the record, the Court has already or has

just concluded an ex parte session with the government where it discussed materials in the classified declarations that the government has submitted to the Court as well as some of the redacted material that has been withheld from the plaintiffs in discovery based on the law enforcement and other privileges.

So let me just start by informing the plaintiffs where I have come out on both your motion to compel and the government's motion for a protective order with respect to the 30(b)(6) witnesses.

As to the first, the Court will largely uphold the government's law enforcement privilege assertions based on the classified declarations that have been provided with, I believe, two exceptions of material that the government will unredact and provide to the plaintiffs. I know that it is or I would imagine that it is frustrating for the plaintiffs not to be able to have access to the bases for the privilege assertions and the Court's reasoning for upholding them, but it is classified, and that is just simply the way that it works. Rest assured that the Court reviewed all of the material in camera, spent time with it, and gave it its best consideration.

The Court will also grant the government's motion for a protective order with respect to the 30(b)(6) notice based also on the classified declarations.

Having said that, I called this hearing and spent a fair amount of time during the ex parte with the government to provide some observations about the case based on my review of the materials submitted in conjunction with these motions, and I will generally convey those same thoughts to the plaintiff in a way that does not implicate any of the classified material that the government has provided the Court.

It seems to me that this case is at somewhat of a crossroads. In the last hearing and the ruling that we issued on the prior discovery dispute I talked about how there were seemingly two avenues to liability in this case. The first, from the FBI to Fox News, seems to, at least based on the materials that I've reviewed -- and I will caveat all of this by saying that you all know much more about your case than I do. I don't have access to all of the discovery materials, to all of the facts. I haven't read the deposition transcripts, and so, you know, take all of what I say with that caveat. And I haven't prejudged, obviously, any of these issues, but it seems that that first avenue may be difficult for the plaintiffs to establish based on the current factual record.

Which leaves the second avenue, disclosure from Rhoads to Fox, still open.

The first avenue was the path of least resistance

in the Court's initial ruling, and I had hoped to avoid some of the law enforcement privilege issues and potentially other issues that could be raised by pursuing that second avenue, but, if this case continues, I think it may be inevitable that some of those issues will come back before the Court. There is also the issue of system of records, which obviously is an element of the statute.

And the second avenue raises the issue of Mr. Rhoads's relationship with the FBI, whether his employment with DOD is an independent basis for Privacy Act liability. I don't know because there are a host of issues -- and potentially very difficult issues -- that the Court would have to pass along the way if it pursued that second avenue.

All of that led me to the idea of suggesting to the parties that it might be fruitful at this point to seek some mediation services.

I have spoken with Magistrate Judge Harvey, who formerly worked in the National Security Section of the U.S. Attorney's Office. I'm sure you're familiar with him. He holds a clearance. He is knowledgeable about this area of law. He is sensitive to the equities on each side, including the potential national security issues and classified information issues that are at play.

And I understand from the government that there

may be some threshold legal issues that might impede mediation or successful mediation at this point, but I would nevertheless suggest to you that you consider that. The government says that it would be willing to consider that, but I will leave it to you folks to discuss that amongst yourselves.

And, Ms. Chen, it is not appropriate for the judge that is presiding over the case to get involved in the parties' settlement discussions because that would or could potentially cause me to be exposed to issues that I would not have been exposed to just ruling on the legal issues, and it might lead one side or the other to believe that the Court did not favor that side because of their settlement position. And so generally I can't get involved in your settlement discussions, but I can certainly suggest that this might be a good time for you to consider that.

And I can't force you to do it. It takes two to tango. If there are some threshold legal issues that you would suggest get teed up for me or for, you know, another third party to resolve, we can do that.

Judge Harvey certainly is capable of -- you know, he's not capable of ruling, but he can opine on some of those issues, including where he thinks the district court generally could come out on some issues. And so I want you all to think about that.

I owe you a ruling on the Rhoads/T-Mobile records. You will get that within the next day or so, so that could -- I'm not sure if that informs -- how much that informs the broader issues in the case. My guess is probably not a lot, but you'll have that in the mix as well.

And so with all that, I would encourage you -- Judge Harvey is available. He checked. He does not have a conflict. He's had no prior exposure to the plaintiff or the criminal investigation or anything like that.

All right. Anything else, Counsel?

You can feel free to respond, if you'd like. The government gave me a few views, you know, this morning in response to that same essential message, and I would invite you to now, or not.

MR. JONES: Thank you, Your Honor. Just two points.

One, we are, of course, disappointed about our inability to participate in the adjudication process by addressing some of the items that the government presented under seal, and I wanted to just register our opposition to that for the record.

Second, we look forward to engaging with the government on the possibility of mediating before Magistrate Judge Harvey. Thank you.

THE COURT: Okay. So if you'd like to do that,

you don't have to file a notice. You can just jointly email chambers, and we will refer the case for 60 or 90 days to mediation and stay whatever pending discovery deadlines there may be.

Remind me, where are you on discovery?

MR. JONES: On discovery, we are in the -- at long last in the tail end of the liability phase. We just have these 30(b)(6) depositions with respect to the FBI, and then, of course, the deposition of Mr. Rhoads, which could be determinative as to the Path 1/Path 2 discussion that you described previously. I think we're circling around the date of March 24th for that deposition after consulting with the parties as well as Mr. Rhoads's counsel.

Upon completion of that --

THE COURT: And do you need -- if the Court grants your motion to release some amount of further T-Mobile records, do you need those -- do you need to have those before you depose him? And is it possible to get that done in the next, what, five weeks?

MR. JONES: I would hope so. Counsel for Mr. Rhoads has, of course, explained their belief about the burdensomeness of the process --

THE COURT: I don't want to argue that issue. He's not here.

MR. JONES: I understand, but they've had the

records for some time now.

THE COURT: It's a factor, I take it.

MR. JONES: Right, absolutely. They've had the records for some time now, and so I'm hopeful that they will be able to complete that prior to the 24th so we can do this all in one fell swoop.

THE COURT: Okay.

MR. JONES: I would just flag that, as Your Honor knows, there is one very simple and straightforward way to gather information about the disclosure to Fox News, which is one that we have refrained from undertaking under the circuit precedent regarding pursuit of information from members of the media, and after the Rhoads deposition, we would then, in our view, have exhausted other reasonable alternative means of discovery such that we would assess whether at that point it was prudent to seek discovery, third-party discovery, from the members of the media.

THE COURT: All right. So just thinking ahead, I mean, is it your position that you have enough now on that question to at least create a genuine issue of material fact for summary judgment purposes?

MR. JONES: On the disclosure question itself?

THE COURT: Whether Mr. Rhoads provided the material that appeared to Ms. Herridge or somebody else at Fox News.

MR. JONES: I think that's going to rise or fall on what testimony we get in the Rhoads deposition, and so we'll have to make a call after that point on --

THE COURT: To even create a question of fact?

MR. JONES: No, I think we have enough, clearly circumstantially, even today to create a genuine issue of material fact.

THE COURT: Okay, so --

MR. JONES: In terms of --

THE COURT: So let's assume, for the sake of argument, that you're right. Any testimony from media witnesses could be deferred to trial in theory.

MR. JONES: Yes.

THE COURT: So it's not necessarily a discovery issue. It's more a trial issue.

MR. JONES: That's right. That's right.

THE COURT: Okay. All right. Anything else?

MR. JONES: Thank you, Your Honor.

THE COURT: Mr. Coyle?

MR. COYLE: No, Judge. Thank you.

THE COURT: All right. Thank you very much. We are adjourned, and we'll get out something not pro forma but a summary order with respect to the two motions, okay? And good luck.

(Whereupon the hearing was concluded at 11:13 a.m.)

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 18th day of February, 2022.

/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001

**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YANPING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | **Case No. 1:18-cv-03074-CRC**<br><br>**Hon. Christopher R. Cooper**<br>**United States District Judge**<br><br>**Oral Argument Requested** |

**MEMORANDUM IN SUPPORT OF NON-PARTY CATHERINE V. HERRIDGE'S MOTION TO QUASH**

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Patrick F Philbin (453620)
pphilbin@egcfirm.com

1155 F Street, NW, Suite 750
Washington, DC 20004
Telephone: (202) 249-6900
Facsimile: (202) 249-6899

*Counsel for Catherine V. Herridge*

July 29, 2022

**PUBLIC VERSION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..........1

BACKGROUND ..........4

1. Information from an FBI Informant, a Chinese Military Expert, and Other Sources ..........6

2. Information allegedly subject to the Privacy Act ..........8

ARGUMENT ..........13

I. The Subpoenas Should Be Quashed Because They Invade the First Amendment Journalist's Privilege. ..........13

A. The Subpoenas Seek Information Protected by the Journalist's Privilege. ..........16

B. Plaintiff Cannot Show That the Information Sought in Her Subpoenas Is "Central" to Her Case Because the Subpoenas Are Vastly Overbroad. ..........16

C. Plaintiff Cannot Carry Her Burden of Showing That She Has Exhausted Alternative Avenues of Discovery. ..........17

D. The Public Interest in First Amendment Protections That Support a Robust Free Press Outweighs Plaintiff's Personal Interest in Seeking Damages in Her Privacy Act Lawsuit. ..........22

1. *Zerilli* Calls for a Balancing of Interests. ..........22

2. The Balance of Interests Overwhelmingly Favors the Public Interest in First Amendment Protections that Promote a Robust Free Press. ..........26

a. Plaintiff's Personal Interest in Damages Weighs Little in the Balance, Especially Given the Weaknesses in her Claims. ..........26

(i) Plaintiff Cannot Obtain Privacy Act Damages for DoD's Decision to Terminate Tuition Assistance "Based on National Security Grounds." ..........27

(ii) All the Key Elements of the Story Appeared in the Fox Reporting Through Sources *Other Than* the Few Pieces of Information Allegedly Implicating the Privacy Act. ..........29

(iii) Virtually All the Information Underpinning Plaintiff's Claims Was in an FBI Affidavit That Was Legally a Matter of Public Record Since 2013..........31

(iv) This Case Is Not Like *Hatfill* or *Lee,* Where the Government Had Made Egregious Errors..........................34

b. The Public Interest in First Amendment Protections for a Free Press Overwhelms Plaintiff's Interest in Damages................36

II. The Subpoenas Should Be Quashed Because They Invade the Newsgathering Privilege under Federal Common Law. ................................................................39

CONCLUSION........................................................................................................................45

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Albright v. United States*,
732 F.2d 181 (D.C. Cir. 1984) ....................27

*Alemu v. Dep't of For-Hire Vehicles*,
327 F. Supp. 3d 29 (D.D.C. 2018) ....................27

*Alpha-Omega Ins. Servs., Inc. v. Prudential Ins. Co.*,
272 F.3d 276 (5th Cir. 2001) ....................25

*Ashwander v. Tenn. Valley Auth.*,
297 U.S. 288 (1936) ....................44

*Baltimore Sun Co. v. Goetz*,
886 F.2d 60 (4th Cir. 1989) ....................31

*Barry v. U.S. Dep't of Just.*,
63 F. Supp. 2d 25 (D.D.C. 1999) ....................32

*Bartel v. FAA*,
725 F.2d 1403 (D.C. Cir. 1984) ....................33

*Belanger v. City and Cnty. of Honolulu*,
Civ. No. 93-4047-10 (Haw. 1st Cir. Ct. May 4, 1994) ....................43

*Broaddrick v. Exec. Off. of Pres.*,
139 F. Supp. 2d 55 (D.D.C. 2001) ....................25

*Carey v. Hume*,
492 F.2d 631 (D.C. Cir. 1974) ....................14

*State ex rel. Classic III Inc. v. Ely*,
954 S.W.2d 650 (Mo. Ct. App. 1997) ....................43

*Clemente v. Clemente*,
56 Va. Cir. 530 (2001) ....................43

*Connick v. Myers*,
461 U.S. 138 (1983) ....................44

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) ....................32

*Danks v. Zinke*,
No. 1:17-cv-114, 2018 WL 8646658 (D.N.D. Nov. 27, 2018)........................................32, 33

*Dellums v. Powell*,
566 F.2d 167 (D.C. Cir. 1977)..............................................................................27

*Douglas v. Agric. Stabilization & Conservation Serv.*,
33 F.3d 784 (7th Cir. 1994)..................................................................................28

*Estate of Parsons v. Palestinian Auth.*,
952 F. Supp. 2d 61 (D.D.C. 2013)..........................................................................25

*FDIC v. Dye*,
642 F.2d 833 (5th Cir. 1981)..................................................................................32

*Goldberg v. Amgen*,
123 F. Supp. 3d 9 (D.D.C. 2015)..................................................................21, 22, 25

*Grand Forks Herald v. Dist. Ct. in & for Grand Forks Cnty.*,
322 N.W.2d 850 (N.D. 1982)..................................................................................43

*Grunseth v. Marriott Corp.*,
868 F. Supp. 333 (D.D.C. 1994)............................................................................26

*Hand v. Gary*
838 F.2d 1420 (5th Cir. 1988)................................................................................28

*Hatfill v. Ashcroft*,
404 F. Supp. 2d 104 (D.D.C. 2005)........................................................................34

*Hatfill v. Gonzales*,
505 F. Supp. 2d 33 (D.D.C. 2007)..................................................................*passim*

*Hawkins v. Williams*,
Civ. No. 2900054 (Cir. Ct. 1st Jud. Dist. Hinds Cnty., Mar. 16, 1983)..............................43

*Hollis v. Dep't of the Army*,
856 F.2d 1541 (D.C. Cir. 1988)..............................................................................32

*Hotel Oakland Assocs. v. Doyle Real Est. Advisors, LLC*,
No. 21-CV-05389-SK, 2022 WL 1493267 (N.D. Cal. May 3, 2022)..................................27

*Hutira v. Islamic Republic of Iran*,
211 F. Supp. 2d 115 (2002)...................................................................................16

*In re Contempt of Wright*,
700 P.2d 40 (Idaho 1985).....................................................................................43

*In re Exec. Off. of Pres.*,
215 F.3d 20 (D.C. Cir. 2000) ....................25

*In re Grand Jury Subpoena, Judith Miller*,
438 F.3d 1141 (D.C. Cir. 2006) ....................40, 41

*In re John Doe Grand Jury Investigation*,
574 N.E.2d 373 (Mass. 1991) ....................43

*In re Leopold to Unseal Certain Elec. Surveillance Apps. & Ords.*,
964 F.3d 1121 (D.C. Cir. 2020) ....................31

*In re Search of: 2122 21st Road North, Arlington, Virginia*,
No. 1:12-sw-01002-JFA (2017) ....................9, 10, 31

*In re Slack*,
768 F. Supp. 2d 189 (D.D.C. 2011) ....................16

*In re Subpoena to Goldberg*,
693 F. Supp. 2d 81 (D.D.C. 2005) ....................25

* *Jaffee v. Redmond*,
518 U.S. 1 (1996) .................... *passim*

*Keene Publ'g Corp. v. Cheshire Cnty. Super. Ct.*,
406 A.2d 137 (N.H. 1979) ....................43

*Kleiman v. Dep't of Energy*,
956 F.2d 335 (D.C. Cir. 1992) ....................28

*Lamberto v. Bown*,
326 N.W.2d 305 (Iowa 1982) ....................43

*Lee v. Dep't of Just.*,
287 F. Supp. 2d 15 (D.D.C. 2003) ....................35

*Lee v. Dep't of Just.*,
401 F. Supp. 2d 123 (D.D.C. 2005) .................... *passim*

*Lee v. Dep't of Just.*,
413 F.3d 53 (D.C. Cir. 2005) ....................15, 16, 24

*Lee v. Dep't of Just.*,
428 F.3d 299 (D.C. Cir. 2005) .................... *passim*

*Leib v. Veterans' Admin.*,
546 F. Supp. 758 (D.D.C. 1982) ....................28

*Lexington Herald-Leader Co. v. Beard*,
690 S.W.2d 374 (Ky. 1984) ....................43

*Luckey v. Miller*,
929 F.2d 618 (11th Cir. 1991) ....................25

*Martin v. Dep't of Just.*,
488 F.3d 446 (D.C. Cir. 2007) ....................31

*Maughan v. NL Indus.*,
524 F. Supp. 93 (D.D.C. 1981) ....................16

*McCarty v. Bankers Ins. Co., Inc.*,
195 F.R.D. 39 (N.D. Fla. 1998) ....................43

*Mideast Sys. & China Civ. Constr. Saipan Joint Venture v. Hodel*,
792 F.2d 1172 (D.C. Cir. 1986) ....................27

*Mitchell v. USDA*,
No. 13-cv-500-bbc, 2014 WL 7240671 (W.D. Wis. Dec. 17, 2014) ....................32

*Moore v. Anderson*,
222 F.3d 280 (7th Cir. 2000) ....................25

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ....................4, 36, 37, 41

*Reese v. Geneva Enters., Inc.*,
No. CIV.A. 96-1575-LFO, 1997 WL 214864 (D.D.C. Apr. 18, 1997) ....................27

*Riley v. City of Chester*,
612 F.2d 708 (3d Cir. 1979) ....................44

*Russo v. United States*,
576 F. Supp. 2d 662 (D.N.J. 2008) ....................33

*Shoen v. Shoen*,
5 F.3d 1289 (9th Cir. 1993) ....................14

*Snyder v. Phelps*,
562 U.S. 443 (2011) ....................44

*Tavoulareas v. Piro*,
93 F.R.D. 35 (D.D.C. 1981) ....................16

*Tripp v. Dep't of Def.*,
284 F. Supp. 2d 50 (D.D.C. 2003) ....................22, 25

*U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos.*,
507 F. Supp. 2d 45 (D.D.C. 2007) ....................26

*U.S. Dep't of Just. v. Reporters' Comm. for Freedom of Press*,
489 U.S. 749 (1989) ....................32

*United States v. Lee*,
No. CR-99-1417, 2000 WL 36739632 (D.N.M. Aug. 31, 2000) ....................34

*United States v. Libby*,
467 F. Supp. 2d 20 (D.D.C. 2006) ....................8

* *Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) .................... *passim*

**STATUTES**

42 Pa. Cons. Stat. § 5942 ....................42

5 U.S.C. § 552a(b) ....................32

18 U.S.C. app. III § 6(e)(1) ....................8

Ala. Code § 12-21-142 ....................42

Alaska Stat. § 09.25.310(b) ....................43

Ark. Code Ann. § 16-85-510 ....................43

Cal. Evid. Code § 1070 ....................42

Colo. Rev. Stat. § 13-90-119(3) ....................43

Conn. Gen. Stat. § 52-146t(d) ....................43

D.C. Code § 16-4702 ....................42

D.C. Code § 16-4703 ....................43

Del. Code § 4320-26 ....................43

Ga. Code Ann. § 24-5-508 ....................43

Ind. Code § 34-46-4-2 ....................42

Kan. Stat. § 60-482 ....................43

Ky. Rev. Stat. § 421.100 ....................42

La. Rev. Stat. § 45:1453 ........ 43

Maine Rev. Stat. § 61(2) ........ 43

Md. Cts. & Jud. Proc. Code Ann. § 9-112 ........ 42, 43

Mich. Comp. Laws Ann. §§ 767.5a, 767A.6 ........ 43

Minn. Stat. §§ 595.023, 595.025 ........ 42

Mont. Code § 26-1-902 ........ 42

N.C. Gen. Stat. Ann. § 8-53.11 ........ 43

N.J. Stat. § 2A:84A-21 ........ 42

N.Y. Civ. Rights Law § 79-h ........ 42

Neb. Rev. Stat. § 20-146 ........ 42

Nev. Rev. Stat. § 49.275 ........ 42

Ohio Rev. Code § 2739.12 ........ 42

Okla. Stat. Ann. tit. 12, § 2506 ........ 43

Or. Rev. Stat. § 44.520 ........ 42

S.C. Code Ann. § 19-11-100 ........ 43

S.D. Codified Laws § 19-2-15 ........ 42

Tenn. Code § 24-1-208 ........ 43

Tex. Civ. Prac. & Rem. Code § 22.024 ........ 43

Vt. Stat. § 1615(b) ........ 42, 43

W. Va. Code § 57-3-10 ........ 42

Wash. Rev. Code § 5.68.010(2)(b) ........ 42, 43

Wis. Stat. § 885.14 ........ 42, 43

**RULES**

Fed. R. Civ. P. 26 ........ 17

Fed. R. Evid. 501 ........ 39, 40, 45

N.M. R. Evid. Rule 11-514 ....................43

Utah R. Evid. 509 ....................42

**OTHER AUTHORITIES**

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com, (Feb. 24, 2017) ....................5

Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says* FOXNews.com, (June 28, 2017) ....................5

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com, (Feb. 24, 2017) ....................5

Exec. Order No. 13982, 86 Fed. Reg. 6833 (Jan. 19, 2021) ....................38

*FBI raids in Rosslyn area*, WTOP News (Dec. 5, 2012, 11:20 AM) ....................5

*FBI Raids Two Locations in Arlington,* NBC4 Wash. (Dec. 5, 2012, 10:26 PM) ....................5

Gail Huff, *FBI raids Rosslyn University of Management and Technology offices*, WJLA (Dec. 5, 2012, 11:31 AM) ....................5

Joseph Marks, *Lawyers are nearing a settlement deal for the infamous 2015 OPM hack*, Wash. Post (May 9, 2022) ....................12

Josh Fruhlinger, *The OPM hack explained: Bad Security practices meet China's Captain America*, CSO (Feb. 12, 2020) ....................11–12

Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980) ....................8

Michael Kaplan, *Army to award Purple Hearts to 50 soldiers injured in Iran missile attack following CBS News investigation*, CBS News (Dec. 20, 2021) ....................38

Natalie Gross, *DoD bans popular TA school from accepting the benefit*, Military Times (Apr. 6, 2018) ....................12

Stephen Battaglio, *How this CBS journalist and organ-donating mom finds purpose in military vet reporting*, L.A. Times (May 4, 2022) ....................38

Vernon Loeb & Walter Pincus, *Whistleblower or Demagogue?*, Wash. Post (Aug. 29, 1999) ....................34

Winners: SEJ 20th Annual Awards for Reporting on the Environment, Soc'y of Environmental Journalists, https://www.sej.org/winners-sej-20th-annual-awards-reporting-environment ....................................................................................................38

## INTRODUCTION

Plaintiff's subpoenas to Catherine V. Herridge, former Chief Intelligence Correspondent for Fox News Network ("FNN"), strike at the heart of the First Amendment journalist's privilege. They seek to uncover confidential source(s) used for reporting on a counterintelligence probe into Plaintiff and the University of Management Technology ("UMT"). Under governing law, the journalist's privilege protecting such sources must prevail "in all but the most exceptional cases." *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981). Plaintiff cannot remotely carry her burden to show that this is an exceptional case that warrants overriding the privilege.

In 2017, FNN published a series of articles (the "Fox Reporting") about an investigation into Plaintiff and UMT and included information indicating that Plaintiff had been a colonel in the Chinese military—the People's Liberation Army—that she sought to hide that fact (by lying on immigration forms and telling others to lie), and that UMT, which Plaintiff founded and ran, was gathering data on thousands of U.S. servicemembers and making it remotely accessible from China. In 2018, the Department of Defense ("DoD") entered findings of fact [redacted] Based on these findings, DoD terminated UMT "on national security grounds" from a tuition assistance program that had provided a large portion of UMT's revenues.

[redacted]

Plaintiff did not challenge that decision or any of DoD's findings in court. Instead, she sued several agencies under the Privacy Act. In her view, because the Fox Reporting included some information allegedly from government files (photos of her in her PLA uniform, immigration forms showing false statements, and information from FBI interview memoranda) she was owed damages—mostly arising from the loss of DoD tuition assistance. Most of her privacy claim thus boils down to this: she should be compensated for the fallout from DoD's unchallenged finding in 2018 that UMT raised national security concerns because someone earlier released information showing that DoD was *correct* that UMT raised real national security concerns.

The central question on this motion is whether, to support her Privacy Act claim, Plaintiff should be allowed to breach the First Amendment journalist's privilege and expose the source(s) who provided some information for the Fox Reporting exposing a situation that (in DoD's view) was a genuine national security threat. The answer is no.

Under *Zerilli*, to determine whether the First Amendment journalist's privilege can be overcome, the Court must "look to the facts of [the] case, weighing the public interest in protecting a reporter's sources and the private interest in compelling disclosure." 656 F.2d at 712. Two "guidelines" inform that balancing: (i) whether the information is "central" to the case, and (ii) whether Plaintiff has "exhausted every reasonable alternative source of information." *Id.* at 713. Plaintiff fails on all prongs of the analysis.

First, the information Plaintiff seeks is not "central" to her claim because her subpoenas are sweepingly overbroad. They seek information without any link to her Privacy Act claims.

Second, Plaintiff has not "exhausted every reasonable alternative source of information." 656 F.2d at 713. Plaintiff's discovery has identified multiple situations in which people had access to a particular document (a PowerPoint) that Plaintiff believes was leaked. But Plaintiff failed to

find the identity of all those individuals and ascertain whether they could be the source. Plaintiff must follow all those leads before demanding confidential sources from journalists.

Third, *Zerilli* calls for a balancing of the interests at stake. Recent decisions reducing *Zerilli* to a bare consideration of the centrality and exhaustion guidelines distort the decision. In Privacy Act cases, that approach turns *Zerilli* into a mere exhaustion test under which the plaintiff will eventually get access to confidential sources in *every* case, no matter how trivial or tenuous the claim. That illogical result cannot be squared with *Zerilli*'s admonition that the privilege must prevail "in all but the most exceptional cases." *Zerilli*, 656 F.2d at 712.

Here, the balance of interests overwhelmingly favors protecting sources. Plaintiff's private interest in Privacy Act damages carries no broader public interest. Moreover, given the infirmities in the merits of her case, it is unlikely that Plaintiff can ever establish significant damages at all.

The bulk of Plaintiff's alleged damages turn on DoD's decision to terminate UMT from tuition assistance "on national security grounds." But Plaintiff cannot get damages under the Privacy Act for that decision. The agency's independent action was a superseding cause, and in any event, it cannot be collaterally attacked here.

Plaintiff also faces another causation problem. If the few photos and documents allegedly subject to the Privacy Act are excised from the Fox Reporting, the stories still present (from other sources) all the basic information that Plaintiff claims has harmed her. Interviews with other sources (some on camera) showed that Plaintiff admitted being a colonel in the PLA—and told others to lie about it; that UMT was recruiting U.S. servicemembers, gathering massive amounts of data on them, and making it remotely accessible in a database that the Chinese military would love to get at. To top it off, DoD was funding UMT with hundreds of thousands of taxpayer dollars a year. The FBI was not happy about a decision not to prosecute and the Naval Criminal

Investigative Service confirmed that there was an ongoing investigation into UMT. Given all that information (and more)—none of which Plaintiff has even alleged is covered by the Privacy Act—Plaintiff faces insurmountable hurdles in proving that it was the few documents and photos allegedly subject to the Act (not the rest of the reporting) that caused her damages.

Plaintiff's claims are further undermined by the fact that an FBI affidavit detailing virtually all the information underpinning her claim (other than the actual photos of Plaintiff) was legally a matter of public record ever since a sealing order expired in 2013—which forecloses Plaintiff's claim that there has been a "disclosure" under the Privacy Act.

By contrast, the First Amendment interest in protecting journalists' sources is at its highest in cases, like this, involving reporting on national security. Matters affecting national security are some of the most important in which the press plays its vital role to "bare the secrets of government and inform the people." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). And confidentiality is critical for government sources who may face punishment for speaking to the press. Ms. Herridge has spent a career securing the confidence of contacts in the national security field. Forcing her to disclose her source(s) would destroy her credibility and cripple her ability to play a role in bringing important information to light for the public.

The balance of interests is not even close and overwhelmingly favors First Amendment protections for Ms. Herridge. The motion to quash should be granted.

## BACKGROUND

### A. The Government's Investigation into Plaintiff and UMT and Fox's Reporting

Plaintiff, Yanping Chen, is the founder and sole owner of the University of Management Technology ("UMT"). Compl. ¶¶ 13–14, ECF No. 1. On December 5, 2012, the FBI executed

search warrants at UMT's offices and at Plaintiff's home. Compl. ¶ 18. The raids were carried out publicly and were widely reported in local media at the time.[2]

In March 2016, the U.S. Attorney's Office for the Eastern District of Virginia informed Plaintiff that she would not be prosecuted. Compl. ¶ 22. As investigative reporting by FNN later revealed, the years-long investigation involved counterintelligence concerns, and not everyone was satisfied that the outcome had protected national security.

On February 24, 2017, FNN ran the first in a series of articles detailing the investigation into UMT and Plaintiff. (Ex. B).[3] Ms. Herridge, who at the time was FNN's Chief Intelligence Correspondent, was the lead reporter on the series. *See* Decl. of Catherine V. Herridge ¶ 5 (Ex. C) ("Herridge Decl.").[4] The investigative series, which appeared in three web articles published on February 24, 2017; April 28, 2017 (Ex. D);[5] and June 28, 2017 (Ex. E),[6] and two related news

---

[2] *See FBI Raids Two Locations in Arlington,* NBC4 Wash. (Dec. 5, 2012, 10:26 PM), https://www.nbcwashington.com/news/local/fbi-raids-two-locations-in-arlington/1937628/; Gail Huff, *FBI raids Rosslyn University of Management and Technology offices,* WJLA (Dec. 5, 2012, 11:31 AM), https://web.archive.org/web/20121209051420/http:/www.wjla.com:80/articles/2012/12/fbi-raids-rossyln-university-of-management-and-technology-offices-arlnow-reports-82782.html; *FBI raids in Rosslyn area,* WTOP News (Dec. 5, 2012, 11:20 AM), https://wtop.com/news/2012/12/developing-fbi-raids-in-rosslyn-area/.

[3] Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com, (Feb. 24, 2017), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties.

[4] Ms. Herridge is now a senior investigative correspondent at CBS News.

[5] Catherine Herridge, Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com, (updated May 1, 2017), https://www.foxnews.com/politics/congress-investigating-taxpayer-backed-school-over-alleged-ties-to-chinese-military-after-fox-news-report.

[6] Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says*, FOXNEWS.COM, (June 28, 2017), https://www.foxnews.com/politics/fbi-reopening-probe-of-dod-funded-school-with-suspected-chinese-military-ties-rep-says.

segments[7] (collectively, the "Fox Reporting"), detailed that federal officials were concerned that Plaintiff had ties to the Chinese military and that UMT was being used to help the Chinese government collect data on U.S. servicemembers enrolled at UMT.

### 1. Information from an FBI Informant, a Chinese Military Expert, and Other Sources

The Fox Reporting featured on-camera interviews with Stephen Rhoads, a whistleblower who had worked at UMT and had served as an undercover FBI informant for the investigation. As an ideal inside source, Rhoads shared a wide array of information about Plaintiff, UMT, and the government investigation. Indeed, Rhoads set out all the basic elements of the story.

First, he revealed that Plaintiff had admitted that she had been a colonel in the People's Liberation Army or "PLA" and that Plaintiff made efforts to conceal that fact. As Rhoads told FNN, "One of the first sentences she [Plaintiff] ever threw out—after she found out I was an Army officer, was, 'Well . . . I was a colonel in the army.'" Ex. B at 2.[8] When Rhoads asked where she trained, Plaintiff "laughed and said, 'Oh, no, I was in the Chinese army, you know.'" *Id.* But when Rhoads told Plaintiff that the FBI wanted him to testify before a grand jury, Plaintiff told him to lie: "Oh, you don't tell them anything. We don't know each other. . . . You don't—you don't know I was a colonel in the P.L.A. They'll never have proof to say that." *Id.* at 3.

Rhoads also explained how UMT could be used by the Chinese government to collect information on U.S. servicemembers who attended the school. According to Rhoads, UMT was collecting copious amounts of information about U.S. servicemembers' military history that could then be remotely accessed: "It got uploaded into an O-drive, they called it … their personal military

[7] Fox News, *Taxpayer-funded school suspected of Chinese military ties*, https://www.youtube.com/watch?v=jh2Xk42PVA8; Fox News, *Congress investigating school's alleged ties to China*, https://video.foxnews.com/v/5417408120001.

[8] Citations are to the page number of each article attached as an exhibit to this memorandum.

bio, you know, where they were trained, how they were trained, how long, that could be remotely accessed." *Id.* Plaintiff asked Rhoads specifically to recruit students for UMT at one of the Air Force's most technology-and-research-heavy locations—Ohio's Wright-Patterson Air Force Base. *Id.* An expert on the Chinese military, Peter Mattis, explained why a school like UMT would be of interest to the Chinese military. The personnel records would provide a "curated database" that would be of interest for two reasons: "The first is, militaries everywhere want to know what a potential adversary might look like – what are their capabilities, how will they act? The second is this might also serve as a vehicle for recruiting individuals." April 28 Article at 2.

Rhoads also told FNN that UMT received approximately $250,000 to $300,000 per month in taxpayer dollars from the U.S. government. *Id.* at 1. UMT was a participant in DoD's tuition assistance program. This financial pipeline drew the ire of members of Congress, including Rep. Jason Chaffetz (R-Ut.). Rep. Chaffetz wrote a letter to the Secretary of Defense asking to know what was going on with the investigation. *Id.* As Rhoads summed up the situation: "It's a bad deal for the soldiers . . . it's a bad deal for the taxpayer." *Id.*

FNN also managed to unearth Plaintiff's family ties to a senior leader in the PLA. FNN found Plaintiff's dissertation for the PhD she had earned at George Washington University in 1999, which had been paid for by the Chinese government. She dedicated the dissertation to her father, General Chen Bin, a former general in the PLA who had overseen weapon and technology development. Ex. B at 3. As FNN's expert on the Chinese military explained on camera, Plaintiff's father "supposedly participated in the Long March and that . . . gives her credentials not unlike being an officer in the continental army." Ex. D at 2.

The Fox Reporting also explained that, according to sources, the FBI and the U.S. Attorney's Office were not able to agree whether to prosecute Plaintiff and that the conflict had

been based in part on concerns about disclosing intelligence gathering sources and methods.[9] Ex. B at 3. In addition, the Naval Criminal Investigative Service ("NCIS") confirmed on the record that there was "still an active multi-agency investigation" into UMT. Ex. E at 1.

### 2. Information allegedly subject to the Privacy Act

The Fox Reporting also included some materials that later became the subject of Plaintiff's Privacy Act claims. Plaintiff alleges that certain pictures and documents in the Fox Reporting came from government files. Specifically, she points to pictures allegedly seized in the FBI raids (including pictures of her wearing the uniform of a colonel in the PLA), *see* Compl. ¶¶ 26, 31, portions of her immigration forms (including a form showing her denial that she had ever been affiliated with the Communist Party) *id.* ¶¶ 25, 27; and images or information from FBI memoranda memorializing interviews with her and with her daughter, including, in particular, an interview in which she denied having held rank in the PLA, *id.* ¶¶ 26, 29.

## B. Public Access to the FBI Affidavit Filed in Support of the 2012 Searches

Shortly after the first Fox article had run, on March 10, 2017, Plaintiff filed a motion in the Eastern District of Virginia seeking an order to show cause why the government should not be

---

[9] Prosecuting a case related to espionage consistent with the defendant's constitutional rights may force the government to disclose classified information, including sensitive intelligence gathering sources and methods. The government may decide that the prosecution is not worth further compromising national security. *See generally* Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980). The Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. III §§ 1–16, does not eliminate this dilemma. It primarily provides procedures allowing courts to rule on evidentiary issues, including redacting material provided to the defendant or using substitute information, "to permit the government to ascertain the potential damage to national security of proceeding with a given prosecution before trial." *United States v. Libby*, 467 F. Supp. 2d 20, 24 (D.D.C. 2006) (quoting S. Rep. No. 96-823, at 1 (1980)). Ultimately, the defendant's rights may require disclosing sensitive information, which can lead to avoiding prosecution. *See* 18 U.S.C. app. III § 6(e)(1) (requiring court to dismiss the prosecution if the Attorney General objects to disclosing information necessary for fair trial).

sanctioned for allegedly violating the order sealing the original search warrant application from 2012. Mot. to Show Cause, *In re Search of: 2122 21st Road North, Arlington, Virginia*, No. 1:12-sw-01002-JFA (E.D. Va. Mar. 10, 2017) ("*Search Warrant Litig.*"), ECF No. 9 ("Mot. To Show Cause") (Ex. F). Plaintiff argued that information in the Fox Reporting came from the affidavit filed in support of the search warrant application ("FBI Affidavit") and from the search. *Id.* at 2.

In denying Plaintiff's motion, the magistrate judge who had entered the sealing order held that, on its face, the order expired on March 4, 2013 (90 days after the application) and that the information in the FBI Affidavit was available to the public after that date. May 8, 2017 H'rg Tr. at 29:21–30:3, *Search Warrant Litig.,* ECF No. 20 (Ex. G) ("May 8, 2017 Tr."); *see also* Order, *Search Warrant Litig.*, ECF No. 3 ("Sealing Order") (Ex. H). As he explained, "my order was specific in that the information that was contained in the application and affidavit . . . was not considered to be under the Court's sealing order after March 4, 2013," and "I don't find that there is any violation of the sealing order and having the information that was contained in the affidavit in support of the search warrant made public to anyone." May 8, 2017 H'rg Tr. at 29:21–30:3; *see also* Sealing Order.

The clerk's office apparently had "overlooked" the limited duration of the sealing order and failed to place the materials on the publicly accessible docket, May 8, 2017 H'rg Tr. at 29:13, but the magistrate judge held that the error made no difference. For a judicial record to be under seal, "there has to be a reason for it," and after March 4, 2013, "there was no court order that allowed those proceedings to remain under seal," and it "should have been removed from the sealed portion of the court's file." *Id.* at 4:7–8, 14–15, 19–20. He went on: "[T]he information is the information. And if it is no longer to be under seal, whether somebody looks at it or not, it still

should be public information." May 8, 2017 Tr. at 26:10–13.[10] Plaintiff challenged other aspects of the judge's ruling, but waived any challenge to the ruling that, under the court's sealing order, the FBI Affidavit had become subject to public inspection and release in 2013.[11]

Short of providing the actual pictures of Plaintiff allegedly seized in the FBI raid, the FBI Affidavit detailed every bit of information that Plaintiff has pointed to as the basis for her Privacy Act claim—and more. *See* Aff. in Support of Two Appls. for Search Warrants, *Search Warrant Litig.*, ECF No. 1. ("FBI Aff.") (Ex. J). The FBI Affidavit detailed allegations that Plaintiff had been a colonel in the PLA, including transcribed cuts from tape recordings in which Plaintiff admitted that fact. FBI Aff. at ¶¶ 15–16. It described Plaintiff's allegedly false statement on an immigration form that she had never been affiliated with the Communist Party—the same form that appeared in the Fox Reporting. *Id.* ¶¶ 20–21. It also listed multiple additional false statements on immigration forms that were not mentioned in the Fox Reporting. *Id.* ¶¶ 18–19, 24–29. It spelled out that a "UMT employee" had confirmed that personnel at UMT's Beijing offices had access to the database of information UMT had compiled on U.S. servicemembers (corresponding to the information in the FBI memorandum summarizing the interview with Plaintiff's daughter shown in the Fox Reporting). *Id.* ¶ 14. And it detailed Plaintiff's denial that she had held rank in the PLA during her 2012 interview by the FBI—the same information presented in the Fox Reporting allegedly from the FBI memorandum summarizing that interview. *Id.* ¶¶ 48–49.

---

[10] Prior to the hearing on May 8, 2017, the court *sua sponte* entered an order on April 25, 2017, making it express that only filings in the matter *after* February 23, 2017 should be under seal. That order apparently resulted in the clerk's office placing earlier filings on the public docket. *See* May 8, 2017 Tr. at 2:16–21. The FBI Affidavit was thus publicly available on PACER before FNN ran the second in its series of articles on April 28, 2017.

[11] *See* Objections to U.S. Magistrate Judge's Denial of Mot. to Show Cause at 2 n.1, *Search Warrant Litig.*, ECF No. 27 ("Judge Anderson's denial of relief based on a violation of the Court's seal is not included in this appeal.") (Ex. I).

### C. DoD Terminates UMT's Participation in the Tuition Assistance Program "On National Security Grounds"

Almost a year after the Fox Reporting began, in January 2018, DoD [redacted] that UMT's participation in the tuition assistance program was being "terminated on national security grounds." [redacted]

Based on the record before it, DOD [redacted]

[redacted].

[13] It is no secret that China has intelligence efforts focused on databases with information on government personnel. *See, e.g.*, Josh Fruhlinger, *The OPM hack explained: Bad Security*

[redacted] Plaintiff did not challenge the DoD decision—or any of the findings on which it was based—in court.

### D. Plaintiff's Privacy Act Suit

In late 2018, Plaintiff sued multiple agencies alleging a Privacy Act violation and seeking damages. Plaintiff alleges that the photographs, excerpted immigration forms, and information from two FBI interviews that appeared in the Fox Reporting were released in violation of the Privacy Act. *See* Compl. ¶¶ 23, 25–29, 31. Plaintiff expressly claims damages based, in large part, on DoD's decision to terminate UMT from its tuition assistance program. *Id.* ¶ 42.

### E. Plaintiff's Subpoenas to Ms. Herridge

In June 2022, Plaintiff served Ms. Herridge with subpoenas for documents and a deposition. In part, the subpoenas seek the identity of any source(s) who provided the photos and documents forming the basis for Plaintiff's Privacy Act suit. Thus, the document subpoena seeks documents "sufficient to identify the individual(s) that transmitted or provided" documents

*practices meet China's Captain America*, CSO (Feb. 12, 2020), https://www.csoonline.com/article/3318238/the-opm-hack-explained-bad-security-practices-meet-chinas-captain-america.html; Joseph Marks, *Lawyers are nearing a settlement deal for the infamous 2015 OPM hack*, Wash. Post (May 9, 2022), https://www.washingtonpost.com/politics/2022/05/09/lawyers-are-nearing-settlement-deal-infamous-2015-opm-hack/.

[14] The decision was also publicly reported. *See, e.g.*, Natalie Gross, *DoD bans popular TA school from accepting the benefit*, Military Times (Apr. 6, 2018), https://www.militarytimes.com/news/education/2018/04/06/dod-bans-popular-ta-school-from-accepting-the-benefit/.

concerning Plaintiff. Subpoena to Prod. Docs. Issued to Catherine Herridge Schedule A at 7 ("Herridge Subpoena") (Ex. L).

But the subpoenas also seek vastly more than just information bearing on source(s) who may have released information from government files. The document subpoena defines "Private Documents and Information" as "*any and all* documents and information concerning Dr. Chen and/or the University that were provided to or obtained by you *from a third party* and that were presented in, referred to, or *considered* in relation to" the Fox Reporting." *Id.* Schedule A at 3 (emphases added). By demanding that Ms. Herridge produce "all Private Documents and Information," Plaintiff is actually seeking *every* document and piece of information *from anyone* relating to Plaintiff and/or UMT, whether the document has any relation to a possible release of Privacy Act information from government files or not. The subpoena literally seeks production of the *entire* investigative reporting file Ms. Herridge compiled while working on the Fox Reporting, to the extent such documents are still in her possession.

## ARGUMENT

### I. THE SUBPOENAS SHOULD BE QUASHED BECAUSE THEY INVADE THE FIRST AMENDMENT JOURNALIST'S PRIVILEGE.

The subpoenas should be quashed because they plainly seek information protected by the journalist's privilege under the First Amendment and Plaintiff cannot bear her burden of overcoming that privilege. It is settled law that the First Amendment provides journalists a qualified privilege from compelled disclosure of their newsgathering activities, including especially the identity of confidential sources. *See, e.g., Zerilli v. Smith*, 656 F.2d 705, 710–11 (D.C. Cir. 1981). As the D.C. Circuit has explained, "[t]he First Amendment guarantees a free press primarily because of the important role it can play as a 'vital source of public information.'" *Id.* at 710. But "journalists frequently depend on informants to gather news, and confidentiality is

often essential to establishing a relationship with an informant." *Id.* at 711. As a result, "[c]ompelling a reporter to disclose the identity of a source may significantly interfere with [the press's] news gathering ability." *Id.* at 711. Thus, such compelled disclosure "raises obvious First Amendment problems." *Id.* at 710. Without confidential sources, the press could not uncover information vital for informing the public—especially about the inner workings of government—and the citizens would be deprived of information essential for them to make "informed political, social, and economic choices." *Id.* at 711.

To protect the ability of a robust free press to play its role in informing the electorate, the journalist's privilege generally protects against compelled disclosure of sources. "Rooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the news gathering process, and in ensuring the free flow of information to the public, is an interest of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993).

To determine whether a plaintiff can overcome the privilege, the D.C. Circuit has instructed that courts must "look to the facts of each case, weighing the public interest in protecting a reporter's sources and the private interest in compelling disclosure." *Zerilli*, 656 F.2d at 712.[15] In particular, *Zerilli* identified two "guidelines" that are of "central importance" in the balance. First, to justify disclosure, a plaintiff must show that the information sought goes to "the heart of the matter," *id.* at 713, in other words, that it is "central" to her case, *Lee v. Dep't of Just.*, 401 F. Supp. 2d 123, 132 (D.D.C. 2005). Second, the litigant must have "exhausted every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713. Plaintiff bears the burden of showing

[15] *See also Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974) ("[T]he court will look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired.").

that these guidelines have been satisfied and that the balance tips in her favor. And that is a heavy burden. The D.C. Circuit warned that "when striking the balance," courts must "be mindful of the preferred position of the First Amendment" and expressly cautioned that "[i]f the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished." *Zerilli*, 656 F.2d at 712. Plaintiff cannot carry her burden here.

First, she cannot show that the information she seeks is "central" to her claims because her subpoenas are stunningly overbroad. The only information even arguably "central" to Plaintiff's Privacy Act claim is the identity of any source(s) who released information covered by the Privacy Act. *See, e.g.*, *Lee v. Dep't of Just.*, 413 F.3d 53, 60 (D.C. Cir. 2005). But Plaintiff's subpoena seeks essentially Ms. Herridge's *entire* investigative reporting file without any limitation connecting the documents Plaintiff seeks to alleged releases from government files.

Second, Plaintiff cannot show that she has "exhausted every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713. Plaintiff believes that a particular PowerPoint document was the source of the disputed information in the Fox Reporting. But Plaintiff has failed to pursue many discovery leads related to personnel who had access to the PowerPoint.

Third, the balance of interests weighs overwhelmingly against Plaintiff. Her private interest in Privacy Act damages carries no broader public interest. That is especially the case where her primary claim for damages rests on the legally insupportable theory that she can seek damages in a Privacy Act suit for DoD's independent decision to terminate UMT from tuition assistance on national security grounds. The Privacy Act is not an all-purpose avenue for collaterally attacking agency decisions. On the other side of the balance, the First Amendment interest in protecting journalists' confidential sources is at its strongest in a case, like this, involving reporting in the national security field and the potential misuse of taxpayer dollars.

Plaintiff's Privacy Act suit simply does not qualify as a "most exceptional case," *Zerilli*, 656 F.2d at 712, that merits overriding First Amendment protections.

**A. The Subpoenas Seek Information Protected by the Journalist's Privilege.**

There can be no question that the subpoenas seek information protected by the journalist's privilege. Part of Plaintiff's goal is to uncover confidential source(s) who allegedly provided documents that form the basis for Plaintiff's Privacy Act claims, and confidential sources are at the very heart of the journalist's privilege. *See, e.g.*, *Zerilli*, 656 F.2d at 711–12; *see also, e.g.*, *In re Slack,* 768 F. Supp. 2d 189, 193–94 (D.D.C. 2011) (noting that courts "rigorously" protect confidential information). Indeed, the privilege applies both to discovery directly seeking a source's identity and to discovery that would likely lead to identifying a source. *Tavoulareas v. Piro*, 93 F.R.D. 35, 40 (D.D.C. 1981). In addition, "the privilege for journalists shields both confidential and nonconfidential information from compelled disclosure." *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 120 (2002). Thus, the privilege also applies to "resource materials prepared by a reporter in anticipation of writing a news article," such as drafts or notes. *Maughan v. NL Indus.*, 524 F. Supp. 93, 95 (D.D.C. 1981) (quoting *United States v. Cuthbertson*, 630 F.2d, 139, 147 (3d Cir. 1980)). As a result, *all* of the documents that Plaintiff seeks from Ms. Herridge (including communications she had with third parties) are covered by the privilege.

**B. Plaintiff Cannot Show That the Information Sought in Her Subpoenas Is "Central" to Her Case Because the Subpoenas Are Vastly Overbroad.**

Plaintiff fails on the first step of the *Zerilli* analysis because her subpoenas are overbroad and seek information that is not remotely "central" to her claim. The only information that is even arguably "central" to Plaintiff's case and potentially in Ms. Herridge's possession is information bearing on the identity of any government source(s) who may have released information allegedly in violation of the Privacy Act. *See, e.g., Lee*, 413 F.3d at 60. But Plaintiff's subpoenas seek much

more than that. The document subpoena seeks all "Private Documents and Information." The definition of that term, however, has nothing to do with information protected by the Privacy Act. Instead, the subpoena defines "Private Documents and Information" as "*any and all* documents and information concerning Dr. Chen and/or the University that were provided to or obtained by you *from a third party* and that were presented in, referred to, or *considered* in relation to" the Fox Reporting. Herridge Subpoena Schedule A at 3 (emphases added). Plaintiff is thus asking for *every* document and bit of information *from anyone* relating to Plaintiff and/or UMT whether the document has any relation to a possible release of Privacy Act information or not. The subpoena thus effectively seeks the *entire* investigative reporting file that Ms. Herridge assembled, to the extent she still has it. It is difficult to imagine a more comprehensive—and more unjustified—invasion of the journalists' privilege.

Plaintiff cannot remotely justify her sweeping requests under *Zerilli*.[16] They have nothing to do with the only information potentially "central" to Plaintiff's case. For that reason alone, Plaintiff's subpoenas should be quashed or radically restricted under a protective order.

### C. Plaintiff Cannot Carry Her Burden of Showing That She Has Exhausted Alternative Avenues of Discovery.

Plaintiff also cannot carry her burden to show that she "has exhausted every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713. She has failed to pursue multiple reasonable avenues of discovery for determining the source(s) of the alleged Privacy Act information in the Fox Reporting. Plaintiff believes that the source for the alleged Privacy Act

[16] Indeed, they could not even be justified under the ordinary standard of Rule 26. Sources for information other than the few pieces of information that Plaintiff claims were covered by the Privacy Act are utterly irrelevant to Plaintiff's claims, and seeking discovery concerning those sources necessarily falls outside the scope of allowable discovery under Rule 26(b), which prohibits discovery where the burden of the discovery is disproportionate to its likely benefit. Fed. R. Civ. P. 26(b)(1).

information was a PowerPoint created by FBI agent Timothy Pappa. But even accepting that narrow focus, Plaintiff's discovery efforts have left huge gaps that must be pursued before the Court could possibly contemplate overriding the journalist's privilege.

To start with, it does not appear that Plaintiff ever secured a comprehensive list of personnel who had access to the PowerPoint at the FBI. At the FBI, the PowerPoint was [redacted] where [redacted]" had access. [redacted] Nonetheless, as far as the discovery materials Plaintiff has provided reveal, Plaintiff never demanded a comprehensive list of all these individuals and never pursued depositions or declarations from this entire group.

Next, deposition testimony revealed a number of individuals who likely obtained copies of the PowerPoint, but whom the Plaintiff never pursued. For example, in November 2013, the lead DHS agent on the investigation sent an email [redacted] stating that he planned to give a copy of the PowerPoint to a [redacted] colleague named [redacted] Plaintiff has not deposed or obtained a declaration from anyone named [redacted] testified that he may have provided copies of the PowerPoint to his direct supervisors, [redacted] He further testified that he may have used the PowerPoint to brief two higher level supervisors. [redacted] Plaintiff has not deposed or secured declarations from any of these individuals. Plaintiff has also failed to depose or obtain a declaration from [redacted], even though [redacted] asked Pappa to send [redacted]

[redacted] based on the PowerPoint. [redacted] An email from [redacted] also shows that DoD determined that [redacted] But Plaintiff failed to identify what [redacted] documents the email was referencing and failed to depose or obtain a declaration from three of the email recipients.

Lastly, there was evidence that [redacted]. [redacted] Pappa recalls [redacted], [redacted] and [redacted], *see* [redacted]. Pappa acknowledges that [redacted] [redacted]. [redacted] Pappa does not recall [redacted], [redacted], and [redacted] (he was never even asked if he deleted it). The Government has also admitted that [redacted]. [redacted] Although Plaintiff had information showing that [redacted]

[redacted] it appears that Plaintiff did not determine whether [redacted].

Finally, Pappa [redacted], and it is not clear what happened to [redacted]. [redacted] Pappa does not recall [redacted], another witness recalls [redacted] but cannot remember if they were collected at the end of the briefing, and a third believes they were collected, but does not know who took them. [redacted]

Given that testimony, anyone present at those briefings could potentially have released the PowerPoint. As a result, it was incumbent on Plaintiff to determine who was present at each meeting and depose (or get a declaration) from each attendee. But Plaintiff never did that. For the [redacted] Briefing, Plaintiff failed to ask the government's 30(b)(6) witnesses for a complete list of attendees and failed to follow up or move to compel after the government objected when Plaintiff asked Pappa about attendees, [redacted] Although [redacted] identified two attendees (in addition to [redacted]), Plaintiff failed to follow up on that information and has not deposed or obtained a declaration from either of them. [redacted] For the [redacted] Briefing, Plaintiff failed to ask Pappa about attendees, and other deponents were unable to recall attendees, aside from [redacted] and an unnamed person from [redacted] As far as the materials provided by Plaintiff show, Plaintiff has not deposed or obtained declarations from any [redacted]

personnel. For the [redacted] Briefing, Plaintiff never asked Pappa for a list of attendees, but an email in Plaintiff's possession includes a partial list of invitees, [redacted]

To the extent that the deponents could not provide the names of any specific attendees for the [redacted] or [redacted] Briefings, that does not exhaust Plaintiff's obligation. Through RFPs, interrogatories, or 30(b)(6) testimony, Plaintiff should have determined definitively whether building or office visitor logs were available (building logs of outside visitors certainly are created at [redacted] secure facilities) and whether the scheduling assistants for any of the known attendees had any records showing invitees. Given security requirements, it is virtually impossible for a meeting including outside visitors from other agencies to take place in a secure building like the [redacted] or [redacted] without records showing the point of contact within the building, which would provide a direct lead to the schedulers in the building and to attendees.

To exhaust "every reasonable alternative source of information," *Zerilli*, 656 F.2d at 713, Plaintiff should be required to pursue all of these leads. To the extent Plaintiff complains that she "cannot reasonably be expected to depose a large quantity of" people, the answer is clear: "that is precisely what the law in this circuit requires." *Goldberg v. Amgen*, 123 F. Supp. 3d 9, 18 (D.D.C. 2015). Where there is "a reasonably well-defined number of possible alternative sources for the same information sought from the journalist, the party seeking to compel testimony must demonstrate reasonable efforts to exhaust those possible sources." *Id.* And that specifically

includes pursuing all those who are known to have had access to particular documents at issue. *See, e.g.*, *Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 61 (D.D.C. 2003) (requiring plaintiff to depose employees at three agencies "who have access to personnel files").

As the D.C. Circuit has explained, the obligation to exhaust reasonable alternatives "is clearly very substantial," and "an alternative requiring the taking of as many as 60 depositions might be a reasonable prerequisite to compelled disclosure." *Zerilli,* 656 F.2d at 714. Plaintiff's tally of 17 fact depositions is nowhere near that mark. The gaps in discovery outlined above delineate a "reasonably well-defined number of possible alternative sources," *Goldberg*, 123 F. Supp. 3d at 18, and Plaintiff must pursue them all before seeking discovery from Ms. Herridge.

### D. The Public Interest in First Amendment Protections That Support a Robust Free Press Outweighs Plaintiff's Personal Interest in Seeking Damages in Her Privacy Act Lawsuit.

Analysis under *Zerilli* does not abruptly end with a mechanical assessment of (i) whether subpoenaed information is central to a plaintiff's case (centrality) and (ii) whether plaintiff has exhausted other avenues of discovery (exhaustion). Instead, *Zerilli* calls for balancing the plaintiff's interest in securing the information against vital First Amendment protections that are essential for promoting the public interest in a robust free press. *See Zerilli*, 656 F.2d at 712. Although some decisions in this district have reduced *Zerilli* to a mere two-part test foreclosing a broader balancing of interests, that is contrary to what *Zerilli* described, and no decision of the D.C. Circuit requires that result. A case-by-case balancing of interests is necessary, and that balancing overwhelmingly favors upholding the journalist's privilege in this case.

#### 1. *Zerilli* Calls for a Balancing of Interests.

*Zerilli* itself straightforwardly announced a broad balancing analysis, explaining that "to determine whether the privilege applies courts should look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling

disclosure." 656 F.2d at 712. Indeed, the *Zerilli* court repeatedly emphasized that "a balancing approach should be applied." *Id.*; *see also id.* (explaining that courts should "strik[e] a balance between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources"). The court even rejected calls for tests providing more "specificity" and instead defended "the case-by-case balancing approach we have adopted." *Id.* at 712 n.46. And in describing particular factors that should inform that balancing, *Zerilli* did not announce a two-part test producing a mechanical result. Instead, it announced "guidelines" to be used in deciding "how the balance should be struck in a particular case." *Id.* at 713.

Treating *Zerilli* as if it demanded an end to analysis whenever the centrality and exhaustion guidelines have been met would also flatly contradict *Zerilli*'s core instruction that courts should protect the "preferred position of the First Amendment" and ensure that the privilege would "prevail in all but the most exceptional cases." 656 F.2d at 712. The contradiction is clear in cases, like this, involving the Privacy Act. Because courts in this circuit have treated the identity of a source as a central issue in Privacy Act cases, if *Zerilli* could be reduced to a two-part test turning on centrality and exhaustion, as a practical matter it would become nothing more than an exhaustion requirement. Under that approach, the journalist's privilege could be overcome in *every* Privacy Act case once a plaintiff had run to ground other discovery options, no matter how minimal the alleged violation or claimed damages, no matter how dubious the merits of the claim, and no matter how important the First Amendment interests involved. As Judge Tatel has observed, reducing *Zerilli* to such an "arid two-factor test" would "allo[w] the exigencies of even the most trivial litigation to trump core First Amendment values." *Lee v. Dep't of Just.*, 428 F.3d 299, 301 (D.C. Cir. 2005) (Tatel, J., dissenting from denial of rehearing en banc). That result cannot be squared with *Zerilli*. The core teaching from *Zerilli* is that First Amendment protections

must not be eroded. Instead, a balancing of interests should ensure that the privilege would be overcome only in "the most exceptional cases" and "only in rare circumstances." 656 F.2d at 712 & n.46.

If the words retain any meaning, *every* Privacy Act case cannot qualify as a "most exceptional" case or "rare circumstance" worthy of overriding First Amendment protections. To the contrary, if the privilege must "prevail in all but the most exceptional cases," *id.* at 712, that necessarily means that there will be *unexceptional* civil cases (including Privacy Act cases) in which it will *not* be worth overriding First Amendment protections, even if the civil litigant has no other way to get at the information he seeks. Put simply, *Zerilli* did not hold that a showing of genuine *need* for information (because it is central to a case and cannot be found elsewhere) trumps First Amendment interests embodied in the journalist's privilege *every time*.

No subsequent decision of the D.C. Circuit has rewritten *Zerilli* to mandate that analysis must end whenever a plaintiff meets the two "guidelines" of centrality and exhaustion. In particular, *Lee* did not mandate that result. *Lee* merely addressed the centrality and exhaustion factors without addressing any further balancing of interests one way or another. *See Lee*, 413 F.3d at 60–61. Silence on that point cannot rewrite the clear instructions in *Zerilli* to ensure that a balancing of interests favors the First Amendment "in all but the most exceptional cases."

Nor did the denial of rehearing en banc in *Lee* provide any holding on the use of balancing simply because Judge Tatel raised the issue in dissent. The court of appeals denied rehearing without opinion on an equally divided 4-4 vote. *See Lee*, 428 F.3d at 300 & nn. 1&5 (Judges Edwards, Rogers, Tatel, and Garland voted to grant rehearing, and Judges Brown and Griffith did not participate). Judge Tatel and then-Judge Garland dissented on the ground that *Zerilli* provided for a balancing of interests, which the panel had failed to conduct. *See id.* at 301–03 (Tatel, J.,

joined by Garland, J., dissenting from denial of reh'g en banc). But nothing in that outcome provides a holding *banning* a balancing of interests. Denial of rehearing en banc leaves the panel opinion undisturbed. It cannot convert a silent *failure to apply* a particular mode of analysis into a holding *forbidding* that analysis. To the contrary, "a summary denial of rehearing en banc is insufficient to confer any implication or inference regarding the court's opinion relative to the merits of a case" even as to an argument "raised in dissent." *Luckey v. Miller*, 929 F.2d 618, 622 (11th Cir. 1991); *see also Estate of Parsons v. Palestinian Auth.*, 952 F. Supp. 2d 61, 69 n.6 (D.D.C. 2013) ("[S]ummary denial of a petition for rehearing has no binding effect on the arguments raised therein.").[17] Other decisions in this district that have read *Lee* to preclude balancing mistakenly rely on the disposition of the petition for rehearing. *See Lee v. Dep't of Just.*, 401 F. Supp. 2d 123, 132 n.14 (D.D.C. 2005); *see also Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 47 (D.D.C. 2007) (citing the district court in *Lee*). Such decisions are not persuasive, and this Court is not bound to follow them. *See, e.g.*, *Broaddrick v. Exec. Off. of Pres.*, 139 F. Supp. 2d 55, 59 (D.D.C. 2001); *see also In re Exec. Off. of Pres.*, 215 F.3d 20, 24 (D.C. Cir. 2000) (district court decisions do not establish "law of the district").

Other decisions in this district have described *Zerilli* as requiring the court to "consider two *main* factors," *Goldberg*, 123 F. Supp. 3d at 16 (emphasis added), to consider *three* factors, *In re Subpoena to Goldberg*, 693 F. Supp. 2d 81, 85 (D.D.C. 2005), and to consider *four* factors, *see Tripp*, 284 F. Supp. 2d at 55. These varying descriptions reflect that *Zerilli* calls for *balancing*,

[17] *Accord Moore v. Anderson*, 222 F.3d 280, 284 (7th Cir. 2000) ("[B]ecause a summary denial of petition for rehearing does not explain the bases for the denial, it is 'insufficient to confer any implication or inference regarding a court's opinion relative to the merits of a case.'") (citation omitted); *Alpha-Omega Ins. Servs., Inc. v. Prudential Ins. Co.*, 272 F.3d 276, 281 (5th Cir. 2001) ("[T]he denial of a petition for rehearing can have no greater precedential effect than the denial of a petition for certiorari, which is to say none." (quotation marks and citation omitted)).

and different factors may be relevant to the balance in each case. Indeed, confirming the view that *Zerilli* ultimately turns on balancing, other decisions of this court have explained that, "in civil cases, the privilege typically prevails because any interest in overcoming the privilege is by definition a private rather than public interest." *U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos.*, 507 F. Supp. 2d 45, 51 (D.D.C. 2007) (citing *Zerilli*, 656 F.2d at 712). And courts have made it express that a plaintiff falls short under *Zerilli* where he "has demonstrated no overwhelming or compelling societal interest in overcoming the presumption favoring First Amendment protections for a reporter's sources." *Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 335–36 (D.D.C. 1994).

### 2. The Balance of Interests Overwhelmingly Favors the Public Interest in First Amendment Protections that Promote a Robust Free Press.

#### a. Plaintiff's Personal Interest in Damages Weighs Little in the Balance, Especially Given the Weaknesses in her Claims.

Here, the balance of interests under *Zerilli* overwhelmingly favors the journalist's privilege. Plaintiff's interest in ferreting out confidential sources so that she can recover damages is a purely parochial, private interest of her own. There is no "overwhelming or compelling societal interest" at stake in her claim for damages. *Grunseth*, 868 F. Supp. at 335. In this case, moreover, even a generalized interest in enforcing the Privacy Act weighs little in the balance, because it will be extraordinarily difficult for Plaintiff to prove that any damages she allegedly suffered arose from Privacy Act violations. There can be no justification for damaging First Amendment protections for journalists in aid of a claim so hobbled by weaknesses that it is unlikely to result in any significant Privacy Act award for Plaintiff in any event.

**(i) Plaintiff Cannot Obtain Privacy Act Damages for DoD's Decision to Terminate Tuition Assistance "Based on National Security Grounds."**

The bulk of damages that Plaintiff seeks arose from DoD's decision to terminate UMT from its tuition assistance program. *See* Compl. ¶¶ 42, 55, 56. [redacted] Based on those findings, DoD terminated UMT "based on national security grounds."

For a host of reasons, Plaintiff cannot recover damages in this Privacy Act suit for that independent action by DoD. To start with, Plaintiff cannot prove causation. *See generally Albright v. United States*, 732 F.2d 181, 186 (D.C. Cir. 1984) (Privacy Act plaintiff must prove damages were caused by the violation of the Act). An independent decision by a government authority is a supervening cause that breaks any chain of causation tracing back to acts (including tortious acts) prior to the government action. *See, e.g.*, *Mideast Sys. & China Civ. Constr. Saipan Joint Venture v. Hodel*, 792 F.2d 1172, 1177–78 (D.C. Cir. 1986); *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 52 (D.D.C. 2018); *Reese v. Geneva Enters., Inc.*, No. CIV.A. 96-1575-LFO, 1997 WL 214864, at *8 (D.D.C. Apr. 18, 1997); *Hotel Oakland Assocs. v. Doyle Real Est. Advisors, LLC*, No. 21-CV-05389-SK, 2022 WL 1493267, at *10 (N.D. Cal. May 3, 2022); *see generally Dellums v. Powell*, 566 F.2d 167, 192–93 (D.C. Cir. 1977). To trace a chain of causation extending from the alleged leak through DoD's independent decision, Plaintiff would have to establish that

the DoD decision itself was somehow tainted and improperly based on the alleged leak of information (the tortious act) and *not* based on review of the record before the agency. *See, e.g.*, *Hand v. Gary* 838 F.2d 1420, 1428 (5th Cir. 1988) ("An independent intermediary breaks the chain of causation unless it can be shown that the deliberations of that intermediary were in some way tainted . . . .").

But even entertaining an argument along those lines would raise a further fatal problem: the agency decision is entitled to a presumption of regularity and cannot be collaterally attacked in this Privacy Act suit. *See, e.g.*, *Kleiman v. Dep't of Energy*, 956 F.2d 335, 337–38 (D.C. Cir. 1992) (the Privacy Act "is not, however, a vehicle for amending the *judgments* of federal officials") (emphasis in original; quotation marks and citations omitted); *Douglas v. Agric. Stabilization & Conservation Serv.*, 33 F.3d 784, 785 (7th Cir. 1994) (explaining that the "Privacy Act does not authorize relitigation of the substance of agency decisions"); *Leib v. Veterans' Admin.*, 546 F. Supp. 758, 762 (D.D.C. 1982) ("The Privacy Act was not intended to be and should not be allowed to become a 'backdoor mechanism' to subvert the finality of agency determinations."). If Plaintiff wanted to attack the DoD decision, she should have pursued further direct review.

In addition, Plaintiff's claim would perversely make the Privacy Act a means to get damages for *correct* agency decisions. Plaintiff was cut off from a stream of taxpayer funding because DoD found that UMT presented a national security threat. Now Plaintiff wants to get *more* taxpayer dollars as Privacy Act damages for that decision simply because someone allegedly released information showing that DoD was *right* that Plaintiff and UMT presented a genuine national security threat. Nothing in the Privacy Act permits that absurd result. And it is more than a bit ironic that Plaintiff now claims the mantel of the Privacy Act after DoD terminated funding

to UMT precisely because it put [redacted] at risk of collection by a foreign power. [redacted]

**(ii) All the Key Elements of the Story Appeared in the Fox Reporting Through Sources *Other Than* the Few Pieces of Information Allegedly Implicating the Privacy Act.**

To the extent Plaintiff claims damages apart from DoD's decision to cut off tuition assistance, she still faces insurmountable hurdles in proving that any alleged damages were caused by the specific information allegedly released in violation of the Privacy Act, rather than from the vast bulk of reporting (not based on any alleged violation) that detailed the years-long investigation into her and UMT. After all, in 2012 it was widely reported that the FBI carried out a very public raid at both her home and at UMT. *See supra* n.2. And in the subsequent Fox Reporting, all the essential elements of the story were set out through sources quite apart from the few specific pieces of information that Plaintiff has identified as underpinning her Privacy Act claims.

Stephen Rhoads, a whistleblower who worked at UMT and served as an undercover FBI informant, told FNN on camera that Plaintiff had admitted to him that she had been a colonel in the PLA—and told him to lie about it to a grand jury. Ex. B at 3. Rhoads also explained that UMT targeted recruiting at U.S. military service members and uploaded their entire service records onto UMT's computer system where they could be accessed remotely. *Id.* An expert on the Chinese military, Peter Mattis, explained why a school like UMT would interest the Chinese military. The personnel records would provide a "curated database" that would be valuable for two reasons: "The first is, militaries everywhere want to know what a potential adversary might look like—what are their capabilities, how will they act? The second is this might also serve as a vehicle for recruiting individuals." Ex. D at 2. Rhoads also explained that the DoD itself was using taxpayer dollars to fund this potential front for Chinese espionage through its tuition assistance program. Ex. B at 3.

Sources told FNN that the FBI and the U.S. Attorney's Office disagreed about prosecuting and that the case had been dropped partly for fear that proceeding might compromise methods of collecting intelligence. *Id.* In 2017, Congressman Jason Chaffetz sent a public letter to the Secretary of Defense demanding to know why more was not being done in the investigation. Ex. D at 1. And the NCIS publicly confirmed that there was "still an active multi-agency investigation" into UMT. Ex. E at 1.

The core concerns underpinning the counterintelligence investigation were thus fully set out quite apart from any Privacy Act information: a person who had been a colonel in the PLA (and who was telling others to lie to hide it) was compiling a database on U.S. servicemembers, their postings, and their previous duties, that could potentially be made available to the Chinese government. And the Pentagon was funding this operation through tuition assistance. Indeed, as Exhibits X and Y make clear, even with all the alleged Privacy Act material removed, the February 24, 2017 and April 28, 2017 articles read like complete stories that convey all the essential elements of the report.[18]

Given that all this other information was available in the Fox Reporting, it will be virtually impossible for Plaintiff to prove that the few additional pieces of information allegedly subject to her Privacy Act claims—which this Court has summarized as "snippets of her immigration forms, a summary of an FBI interview with her daughter, and personal photographs of her and her husband," Dkt 13, at 1—caused whatever damages she attempts to claim.

[18] Exhibits X and Y have been created by removing all alleged Privacy Act material from the stories and eliminating the resulting gaps in order to demonstrate how the articles would read without any of the Privacy Act material.

### (iii) Virtually All the Information Underpinning Plaintiff's Claims Was in an FBI Affidavit That Was Legally a Matter of Public Record Since 2013.

Plaintiff's claims are further fatally undermined by the fact that virtually all the information underpinning her Privacy Act claim was contained in the FBI Affidavit that the Eastern District of Virginia has held was a public document since 2013. As explained above, *see supra* pp. 8–10, the magistrate judge in that case held that his order sealing the affidavit expired on March 4, 2013, that from that point in time "the information that was contained in the application and affidavit . . . was not considered to be under the Court's sealing order," and that it "should have been removed from the sealed portion of the court's files." May 8, 2017 Tr. at 2:19–20, 29:22–24; *see also supra* pp. 8–10. That is, it was part of the public records of the court subject to public inspection and there could be no violation of the sealing order even if someone had released the information.[19] Plaintiff did not challenge that holding, and she is precluded from relitigating the issue here.[20]

---

[19] Indeed, it would have violated the common law right of access to judicial records for the court *not* to make that document publicly available absent a court order. *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 65 (4th Cir. 1989); *see also In re Leopold to Unseal Certain Elec. Surveillance Apps. & Ords.*, 964 F.3d 1121, 1123 (D.C. Cir. 2020) ("The public's right of access to judicial records is a fundamental element of the rule of law.").

[20] All the elements of issue preclusion are satisfied. *See generally Martin v. Dep't of Just.*, 488 F.3d 446, 454 (D.C. Cir. 2007). *First*, the question whether the FBI Affidavit had become a public document was "contested by the parties and submitted for judicial determination." *Id.* Plaintiff based her Motion to Show Cause partly on the argument that the "matter remained under indefinite seal" and that the disclosure of information was a "violation of this Court's seal." Mot. To Show Cause at 2–3. And the government opposed on the ground that "the sealing order was no longer in effect after March 4, 2013." Gov't Response to Mot. To Show Cause at 2, *Search Warrant Litig.*, ECF No. 11. *Second,* the issue was actually and necessarily determined" by the court. *Martin*, 488 F.3d at 454. The quotations cited above from the motion hearing make plain that the court ruled on the issue, *see supra* pp. 8–10, and it was necessary for the court to decide the issue to rule on Plaintiff's claim that the sealing order had been violated. *Third*, it would not work any "basic unfairness" to preclude Plaintiff from relitigating the issue here. *Martin*, 488 F.3d at 454. The effect of the court's own sealing order was best decided by the Eastern District of Virginia and there could be no reason for revisiting that court's ruling about public access to its own docket.

Given that ruling, Plaintiff cannot establish that any release of the information contained in the FBI Affidavit constituted a "disclosure" under the Privacy Act. *See* 5 U.S.C. § 552a(b).There is no disclosure for Privacy Act purposes where there is no "protectable privacy interest" in the information. *Barry v. U.S. Dep't of Just.*, 63 F. Supp. 2d 25, 28 (D.D.C. 1999). And there can be no such interest either where the information has, as a matter of fact, been disseminated publicly, *see, e.g.*, *id.* at 27–28; *FDIC v. Dye*, 642 F.2d 833, 836 (5th Cir. 1981), or where it is legally available as a public record, "subject to public inspection," *e.g.*, *Danks v. Zinke*, No. 1:17-cv-114, 2018 WL 8646658, at *3 (D.N.D. Nov. 27, 2018); *Mitchell v. USDA*, No. 13-cv-500-bbc, 2014 WL 7240671, at *5 (W.D. Wis. Dec. 17, 2014);[21] *see also Hollis v. Dep't of the Army*, 856 F.2d 1541, 1545 (D.C. Cir. 1988) (approving view that, "when a release consists merely of information to which the general public already has access . . . the Privacy Act is not violated"). Indeed, it would make no sense to say that there could be an impermissible "disclosure" of information that was already a public record on a court docket. *Cf. Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494–95 (1975) ("[E]ven the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record."). Nor can a clerk's error failing to make the FBI Affidavit publicly accessible—contrary to the court's sealing order—alter its legal status as a public record or create a protectable interest in information that was supposed to be available to the public for years. *Cf. id.* at 495 ("[T]he First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.").

[21] There is no question here of information that was available only in scattered and isolated public records that would have been difficult to compile. *Cf. U.S. Dep't of Just. v. Reporters' Comm. for Freedom of Press*, 489 U.S. 749, 764 (1989).

In addition, the D.C. Circuit has acknowledged in *dicta* that there is no disclosure under the Privacy Act where information is "in the public domain" and of a type "traditionally released by an agency to the public without a FOIA request." *Bartel v. FAA*, 725 F.2d 1403, 1413 (D.C. Cir. 1984); *see also Russo v. United States*, 576 F. Supp. 2d 662, 672 (D.N.J. 2008) (release of public domain information cannot be a disclosure under the Privacy Act). That principle also applies to the FBI Affidavit. Once the U.S. Attorney's Office filed the FBI Affidavit in support of its application for a search warrant and secured an order sealing it only for 90 days, under settled law concerning access to court records, all that information was required to become public unless DOJ secured a continuation of the seal—which it never attempted to do.

As one court recently summarized, it is "well-established by case law" that "there can be no disclosure as required for a Privacy Act violation, when the information was already public information, subject to disclosure, or releasable." *Danks v. Zinke*, No. 1:17-cv-114, 2018 WL 8646658, at *3 (D.N.D. Nov. 27, 2018). The information in the FBI Affidavit was legally public information and certainly "subject to disclosure" and "releasable," because the order sealing it expired years ago. As a result, release of information included in the affidavit cannot qualify as a "disclosure" under the Privacy Act.

That alone forecloses virtually all of Plaintiff's Privacy Act claim. The FBI Affidavit spelled out, in vivid detail, every bit of information Plaintiff has identified as the basis for her claims—with the one exception that it did not include the actual photographs of Plaintiff in her PLA uniform. The FBI Affidavit included transcribed cuts from tape recordings in which Plaintiff admitted that she had been a colonel in the PLA; FBI Aff. at ¶¶ 15–16. It detailed Plaintiff's false statement on an immigration form that she had never been affiliated with the Communist Party. *Id.* ¶¶ 20–21. It also listed multiple additional false statements on immigration forms that were

not mentioned in the Fox Reporting. *Id.* ¶¶ 18–19, 24–29. It explained that personnel at UMT's Beijing offices could access the database of information UMT had compiled on U.S. servicemembers (corresponding to the information from the FBI's interview with Plaintiff's daughter shown in the Fox Reporting). *Id.* ¶ 14. And it detailed Plaintiff's denial that she had held rank in the PLA during her 2012 interview by the FBI. *Id.* ¶¶ 48–49. Once all of that information is knocked out, the only remaining basis for Plaintiff's Privacy Act claim is the photographs. And there is no likelihood that, with all the other information in the Fox Reporting, Plaintiff will be able to establish that the photographs alone caused her alleged damages.

**(iv) This Case Is Not Like *Hatfill* or *Lee,* Where the Government Had Made Egregious Errors.**

Finally, the weight on Plaintiff's side of the scale is further reduced given that this case is wholly unlike *Hatfill* or *Lee*. In those cases, government leaks either smeared an innocent person who was the completely wrong target for a particular investigation (Hatfill) or grossly exaggerated the target's conduct (Lee). In *Hatfill*, DOJ had even called a university to bar Hatfill from working on DOJ-funded contracts, which allegedly cost Hatfill his job. *Hatfill v. Ashcroft*, 404 F. Supp. 2d 104, 108 (D.D.C. 2005). In *Lee*, government leaks painted Lee as a spy who had handed China the most sensitive nuclear secrets since the Rosenberg case.[22] In the end, after the FBI recanted some testimony[23]—and after Lee had served nine months in solitary pretrial confinement—Lee pleaded guilty solely to one misdemeanor count of mishandling documents. *Lee v. Dep't of Just.*, 401 F. Supp. 2d 123, 126 (D.D.C. 2005). The outrageous circumstances of those cases undoubtedly influenced the rulings on the journalists' privilege. Indeed, in *Lee,* the court went out

[22] Vernon Loeb & Walter Pincus, *Whistleblower or Demagogue?*, Wash. Post (Aug. 29, 1999), https://www.washingtonpost.com/archive/politics/1999/08/29/whistleblower-or-demagogue/4e015bc9-17b2-4fa6-b6d4-0ed9254177b9/.

[23] *See United States v. Lee*, No. CR-99-1417, 2000 WL 36739632, at *4 (D.N.M. Aug. 31, 2000).

of its way to say that "[i]t cannot go unnoted that the manner in which Dr. Lee was treated by the Government appears to have been particularly egregious" and that another federal judge believed that government's handling of the case had "embarrassed our entire nation." *Id.* at 126 n.1.[24]

By contrast, there are no egregious government errors here. Plaintiff makes much of the fact that she was never prosecuted. But decisions not to prosecute in national security cases can be made for many reasons. *See supra* n.9. More important, the government has other means to protect national security. Here, DoD took action. As a result of the investigation, DoD made findings [redacted] DOD then terminated UMT from tuition assistance "on national security grounds." [redacted] Plaintiff, moreover, never challenged those findings on judicial review and they remain unchallenged to this day. This case is thus a far cry from *Hatfill* or *Lee*.

[24] Indeed, the original discovery order in *Lee* balanced the interests at stake given the particular circumstances of that case. The court explained: "It does not detract from the importance of the First Amendment principle at stake to conclude that, *in the instant case at least*, the reasons for concealing from the plaintiff possible governmental complicity (if such there were) in the revelation to the news media of private, personal, and acutely hurtful information about Dr. Lee *do not outweigh* Dr. Lee's interest in having the evidence available for his use at trial." *Lee v. Dep't of Just.*, 287 F. Supp. 2d 15, 24 (D.D.C. 2003) (emphases added).

**b. The Public Interest in First Amendment Protections for a Free Press Overwhelms Plaintiff's Interest in Damages.**

On the other side of the balance, the First Amendment interest in protecting confidential sources to promote a robust free press is at its zenith in a case such as this involving matters of national security. The First Amendment protects the press "primarily because of the important role it can play as 'a vital source of public information.'" *Zerilli*, 656 F.2d at 711 (citation omitted). "The press was protected so that it could bare the secrets of government and inform the people." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). But to fulfill that "essential role in our democracy," *id.*, journalists necessarily rely on confidential sources to secure the information the public needs to know. As the court in *Zerilli* explained, "journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." *Zerilli*, 656 F.2d at 711. As a result, "[c]ompelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability." *Id.*; *see also id.* at 712 ("Unless potential sources are confident that compelled disclosure is unlikely, they will be reluctant to disclose any confidential information to reporters."). Breaching the journalist's privilege thus necessarily impairs news gathering and undermines the ability of the press to serve as a source of information for the people.

All of the factors favoring protection for confidential sources under the First Amendment are magnified where reporting on national security matters is concerned. To start with, the need for confidentiality is particularly acute. Given the potential repercussions for leaking information in the national security field, no government employees would provide information to the press if they could not be assured of confidentiality. *See* Herridge Decl. ¶ 9. In addition, matters touching on national security are some of the most important on which the citizenry depends on the press for information. Such matters range from justifications for war or peace (such as the intelligence

failures preceding the invasion of Iraq in 2003), to errors in the conduct of a war (exposed by the Pentagon Papers concerning Vietnam), to information exposing simple negligence or incompetence in a host of matters relevant to safeguarding the national interest against foreign adversaries. The need for the press to play a role in informing the public is also especially heightened given the tendency toward secrecy in matters involving national security. Secrecy that justifiably shrouds much government activity is also readily subject to misuse. It can be used to conceal embarrassing information that reveals government overreaching impinging on civil liberties or simply mistakes, incompetence, and waste. *Cf. N.Y. Times Co.*, 403 U.S. at 717 (Black, J., concurring in judgment) ("Only a free and unrestrained press can effectively expose deception in government."). Here, FNN's reports brought to light a situation in which it seemed that, for years, DoD had paid millions of taxpayer dollars to an entity that was being investigated by the FBI and NCIS for serving as a front for Chinese espionage and that was placing at risk sensitive information on thousands of U.S. military members. And DoD itself later ended that relationship "on national security grounds."

For the press to fulfill its role in informing the public, it is critical for confidential sources to remain protected. If potential sources knew that, every time a Privacy Act case is filed, it will only be a matter of time until a court orders disclosure of the source's identity, no one would serve as a source. The public would then be deprived of key information necessary to assess how elected officials (and those reporting to them) are handling some of the most critical affairs of the Nation.

Ms. Herridge's broader work further demonstrates both the critical role the press plays in informing the public and the damage to the public interest that would arise from breaching the journalist's privilege in this case. Among other investigative reporting Ms. Herridge has pursued, she uncovered the true extent of the injuries U.S. servicemembers suffered from an Iranian ballistic

missile attack in Iraq in January 2020.[25] The administration had downplayed the injuries for political reasons, both to minimize the effectiveness of the attack and to decrease tensions with Iran—even though that meant denying soldiers Purple Hearts they rightly deserved. Due to Ms. Herridge's reporting, DoD changed course and fifty soldiers received Purple Hearts.[26]

Ms. Herridge also recently received the Kevin Carmody Award for Outstanding Investigative Reporting for an investigation that exposed serious health hazards from toxic waste at a U.S. military base in Uzbekistan where thousands of servicemembers have been stationed. *See* Winners: SEJ 20th Annual Awards for Reporting on the Environment, Soc'y of Environmental Journalists, https://www.sej.org/winners-sej-20th-annual-awards-reporting-environment. As the citation for that award explains, her "tenacious reporting" led to a promise from the Secretary of Defense to remedy the situation. *Id.* Indeed, it drove legislation and led to an Executive Order in January 2021 mandating a comprehensive study to address the health consequences for those who served at the base.[27] None of this reporting could have been accomplished without confidential sources. Herridge Decl. ¶ 7. Ms. Herridge's work is so highly regarded that she has been nominated for an Emmy Award for investigative reporting and The Congressional Medal of Honor Society has awarded her the Tex McCrary Award for Journalism, which "is reserved for those persons from the fourth estate who, *through their life's work*, have distinguished themselves by

[25] Stephen Battaglio, *How this CBS journalist and organ-donating mom finds purpose in military vet reporting*, L.A. Times (May 4, 2022), https://www.latimes.com/entertainment-arts/business/story/2022-05-04/cbs-news-correspondent-catherine-herridge-organ-donation-for-son.

[26] *See* Michael Kaplan, *Army to award Purple Hearts to 50 soldiers injured in Iran missile attack following CBS News investigation*, CBS News (Dec. 20, 2021), https://www.cbsnews.com/news/purple-heart-iran-missile-attack-50-soldiers/.

[27] Exec. Order No. 13982, 86 Fed. Reg. 6833 (Jan. 19, 2021).

service or unbiased coverage of the United States Military through journalism in peace and war." https://www.cmohs.org/about-the-society/awards (emphasis added).

If Ms. Herridge were forced to reveal her source(s), her credibility with contacts across the intelligence community—contacts that have been painstakingly established over a career spanning decades—will be destroyed. And her ability to continue playing a vital role in fulfilling the functions of a free press will be destroyed along with it.

The balance of interests in this case is not even close. The First Amendment interest in upholding the journalist's privilege vastly outweighs Plaintiff's personal interest in damages. As Judge Tatel has put it, "it's hard to imagine" how a plaintiff's personal interest in Privacy Act damages "could outweigh the public's interest in protecting journalists' ability to report without reservation on sensitive issues of national security." *Lee*, 428 F.3d at 302 (Tatel, J., dissenting from denial of reh'g en banc). That is especially true here, given the hurdles Plaintiff faces in proving any damage actually caused by a disclosure of information protected by the Privacy Act.

At a minimum, the Court should exercise its discretion to postpone ruling on discovery from Ms. Herridge until the weaknesses in Plaintiff's case can be tested on motions for partial summary judgment from the government defendants. That would provide a clearer view of the competing interests at stake before the Court rules on overriding First Amendment protections.

## II. THE SUBPOENAS SHOULD BE QUASHED BECAUSE THEY INVADE THE NEWSGATHERING PRIVILEGE UNDER FEDERAL COMMON LAW.

If the Court concludes that the journalist's privilege under the First Amendment does not prevail in this case—and especially if the Court holds that *Zerilli* and *Lee* preclude balancing the competing interests at stake—the Court should recognize a federal common law privilege that allows the Court to consider that balancing. It is well settled that "Rule 501 of the Federal Rules of Evidence authorizes federal courts to define new privileges by interpreting 'common law

principles . . . in the light of reason and experience.'" *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996) (quoting Fed. R. Evid. 501); *see also Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 44 (D.D.C. 2007) (new privileges may be recognized "if doing so is prudent 'in light of reason and experience'"). Although the D.C. Circuit has yet to recognize a common law privilege protecting a journalist's confidential sources, it also has not rejected it. *See generally In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006).[28] As explained below, all the factors the Supreme Court identified in *Jaffee* strongly favor recognizing such a privilege, and other decisions in this district rejecting a common law privilege are not persuasive.

First, like other relationships that have justified evidentiary privileges (such as the psychotherapist-patient privilege in *Jaffee*), the relationship between a journalist and a confidential source is plainly "rooted in the imperative need for confidence and trust." *Jaffee*, 518 U.S. at 10. The D.C. Circuit has readily acknowledged that assurances of confidentiality are often "essential" for journalists to secure information from sources. *Zerilli*, 656 F.2d at 711. In fact, confidentiality is even more central to this relationship than to some others protected by privilege. Confidentiality does not merely promote the better functioning of the relationship by encouraging a more open exchange between two parties. *Cf. Jaffee*, 518 U.S. at 10. Confidentiality is the bedrock condition without which the relationship would never be formed.

Second, recognizing a common law privilege would "serve public ends." *Jaffee*, 518 U.S. at 11. The core purpose of the privilege is to protect journalists' ability to gather news and thereby to ensure that the press can "fulfill its essential role in our democracy" to "bare the secrets of

[28] In *In re Miller*, Judge Sentelle rejected a common law privilege. 438 F.3d at 1154–59 (Sentelle, J., concurring). Judge Tatel argued in favor of it. 438 F.3d at 1164–83 (Tatel, J., concurring in judgment). And Judge Henderson concluded only that, if such a privilege existed, it would have been overcome in that case. *Id.* at 1159 (Henderson, J., concurring).

government and inform the people." *N.Y. Times Co.*, 403 U.S. at 717 (Black, J., concurring). As Judge Tatel has explained, the press cannot fulfill its role without confidential sources. "Reporters could reprint government statements, but not ferret out underlying disagreements among officials; they could cover public governmental actions, but would have great difficulty getting potential whistleblowers to talk about government misdeeds." *In re Miller*, 438 F.3d at 1168 (Tatel, J., concurring in judgment). The public ends served by a journalist's privilege are arguably more direct than those served by other evidentiary privileges. The psychotherapist-patient privilege, for example, directly benefits individuals by removing barriers to seeking counseling. *Jaffee*, 518 U.S. at 11 ("[T]he proposed privilege thus serves important private interests."). It indirectly promotes the public interest through the aggregate effect of improving the "mental health of our citizenry." *Id.* The journalist's privilege, by contrast, is targeted directly at allowing the press to fulfill its role of informing voters on matters of public importance. Promoting the proper functioning of a robust free press that can disclose information otherwise shrouded in government secrecy certainly merits recognition as a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Jaffee*, 518 U.S. at 9.

In rejecting a common law privilege, the court in *Hatfill* decided that "confidential sources" are not a "public good of transcendent importance," and that a free press is not "dependent" on a right to protect confidential sources. *Hatfill*, 505 F. Supp. 2d at 45; *see also Lee,* 401 F. Supp. 2d at 141 (confidential sources "are not a *sine qua non* of journalism but only an important and useful tool"). That reasoning distorts the proper analysis. The question under *Jaffee* is not whether "confidential sources" are a public good, but whether protecting a journalist's confidential source relationship *promotes* a public good. It indisputably does, by furthering the newsgathering functions of a free press. Similarly, it is not a prerequisite to recognizing a privilege that some

public good will be utterly destroyed without it. Marriage would still exist without the spousal privilege and doctors would still see patients without the doctor-patient privilege. The law recognizes, however, that these relationships benefit from an evidentiary privilege. The vigorous functioning of the press is similarly benefitted by a privilege protecting confidential sources.

Third, "policy decisions of the States" overwhelmingly confirm that a privilege protecting confidential sources should be recognized. *Jaffee*, 518 U.S. at 12. The States are in almost complete agreement on the existence of a strong reporter's privilege. Forty-nine States and the District of Columbia have recognized such a privilege.[29] In twenty-one States and the District of Columbia, the privilege is *absolute* in civil cases (with exceptions for narrow circumstances not present here).[30] And in at least twenty-two States and the District of Columbia, where the privilege is qualified (or qualified under certain circumstances, such as in cases involving non-confidential information), overcoming the privilege requires not only (i) showing the that evidence is central to the case and (ii) exhausting other avenues of discovery, but also (iii) showing that the balance

[29] Many States have created the privilege through legislation. As the Supreme Court explained in *Jaffee*, however, "[i]t is of no consequence that recognition of the privilege in the vast majority of States is the product of legislative action rather than judicial decision." 518 U.S. at 13.

[30] Alabama: Ala. Code § 12-21-142; Arizona: A.R.S. § 12-2237; California: Cal. Evid. Code § 1070; District of Columbia: D.C. Code § 16-4702; Indiana: Ind. Code § 34-46-4-2; Kentucky: Ky. Rev. Stat. § 421.100; Maryland: Md. Cts. & Jud. Proc. Code Ann. § 9-112(c)(1); Minnesota: Minn. Stat. §§ 595.023, 595.025 (exception for defamation actions); Montana: Mont. Code § 26-1-902; Nebraska: Neb. Rev. Stat. § 20-146; Nevada: Nev. Rev. Stat. § 49.275; New Jersey: N.J. Stat. § 2A:84A-21; New York: N.Y. Civ. Rights Law § 79-h (McKinney); Ohio: Ohio Rev. Code § 2739.12; Oregon: Or. Rev. Stat. § 44.520 (exception for defamation actions); Pennsylvania: 42 Pa. Cons. Stat. § 5942; South Dakota: S.D. Codified Laws § 19-2-15; Utah: Utah R. Evid. 509(b) (exception where confidential information necessary to prevent substantial injury or death); Vermont: 12 Vt. Stat. § 1615(b)(1); Washington: Wash. Rev. Code § 5.68.010; West Virginia W. Va. Code § 57-3-10 (exception where confidential information necessary to prevent serious bodily injury or imminent death); Wisconsin: Wis. Stat. § 885.14.

of interests favors overcoming the privilege in the particular case.[31] In rejecting a common law privilege, *Hatfill* provided no rationale for ignoring this overwhelming consensus in the States.

Fourth, the benefits arising from the privilege must be weighed against the "likely evidentiary benefit that would result from denial of the privilege." *Jaffee*, 518 U.S. at 11. Here, it is critical that the common law privilege would be qualified, not absolute, and subject to a balancing of interests in each case. Accordingly, the privilege would not deny access to evidence in every case. Instead, where there are sufficiently weighty public interests at stake, the privilege would be overcome and a source would be disclosed. The suggestion in *Hatfill* that recognizing a common law privilege would effectively end enforcement of the Privacy Act is thus misplaced. *Hatfill*, 505 F. Supp. 2d at 45. In Privacy Act cases, as in other cases, a court would simply consider whether the case presented sufficiently weighty interests to overcome the important role

[31] Alaska: Alaska Stat. § 09.25.310(b); Colorado: Colo. Rev. Stat. § 13-90-119(3); Connecticut: Conn. Gen. Stat. § 52-146t(d); District of Columbia; D.C. Code § 16-4703: Florida: *McCarty v. Bankers Ins. Co., Inc.*, 195 F.R.D. 39, 45 (N.D. Fla. 1998); Idaho: *In re Contempt of Wright*, 700 P.2d 40, 44 (Idaho 1985); Illinois: 735 Ill. Compiled Stat. 5/8-907; Iowa: *Lamberto v. Bown*, 326 N.W.2d 305, 309 (Iowa 1982); Kansas: Kan. Stat. § 60-482; Kentucky: *Lexington Herald-Leader Co. v. Beard*, 690 S.W.2d 374, 376 (Ky. 1984); Louisiana: La. Rev. Stat. § 45:1453; Maine: 16 Maine Rev. Stat. § 61(2); Maryland: Md. Cts. & Jud. Proc. Code Ann. § 9-112(d); Massachusetts: *In re John Doe Grand Jury Investigation*, 574 N.E.2d 373, 375 (Mass. 1991); New Mexico: N.M. R. Evid. Rule 11-514; North Dakota: *Grand Forks Herald v. Dist. Ct. in & for Grand Forks Cnty.*, 322 N.W.2d 850, 857 (N.D. 1982); Tennessee: Tenn. Code § 24-1-208; Texas: Tex. Civ. Prac. & Rem. Code § 22.024; Utah: Utah R. Evid. 509(c)–(d); Vermont: 12 Vt. Stat. § 1615(b)(2); Virginia: *Clemente v. Clemente*, 56 Va. Cir. 530, at *1 (2001); Washington: Wash. Rev. Code § 5.68.010(2)(b); Wisconsin: Wis. Stat. § 885.14(2)(c).

The remaining States recognizing the privilege are: Arkansas: Ark. Code Ann. § 16-85-510; Delaware: 10 Del. Code § 4320-26; Georgia: Ga. Code Ann. § 24-5-508; Hawaii: *Belanger v. City and Cnty. of Honolulu*, Civ. No. 93-4047-10 (Haw. 1st Cir. Ct. May 4, 1994) (unpublished) (civil); Michigan: Mich. Comp. Laws Ann. §§ 767.5a, 767A.6; Mississippi: *Hawkins v. Williams*, Civ. No. 2900054 (Cir. Ct. 1st Jud. Dist. Hinds Cnty., Mar. 16, 1983); Missouri: *State ex rel. Classic III Inc. v. Ely*, 954 S.W.2d 650, 655 (Mo. Ct. App. 1997); New Hampshire: *Keene Publ'g Corp. v. Cheshire Cnty. Super. Ct.*, 406 A.2d 137, 138 (N.H. 1979); North Carolina: N.C. Gen. Stat. Ann. § 8-53.11; Oklahoma: Okla. Stat. Ann. tit. 12, § 2506; Rhode Island: R.I. Gen. Laws Ann. §§ 9-19.1-2; South Carolina: S.C. Code Ann. § 19-11-100.

that confidentiality plays in the functioning of a free press. Without any balancing of interests, the alternative rule is that, eventually, the plaintiff will be able to uncover a confidential source in *every* Privacy Act case, whether the case presents any significant public interest or not.

*Hatfill* and *Lee* are also mistaken in suggesting that a balancing of interests is "inherently unworkable" because judges are ill-suited to determine the "newsworthiness" of particular stories. *Hatfill*, 505 F. Supp. 2d at 47. That misunderstands the nature of the balancing. Courts would not weigh the value of a particular story bur rather the broader interest in protecting confidential sources to promote a vigorous free press. The question to be answered is whether undermining *that* interest is justified in a particular case. *See, e.g.*, *Riley v. City of Chester*, 612 F.2d 708, 716 (3d Cir. 1979) (recognizing federal common law reporter's privilege and explaining that "we must balance on one hand the policies which give rise to the privilege").[32]

*Hatfill* and *Lee* err once more in suggesting that, if the constitutionally based privilege in *Zerilli* does not include a balancing of interests, any common law privilege must be similarly limited. *Hatfill*, 505 F. Supp. 2d at 46–47; *Lee*, 401 F. Supp. 2d at 139. That reasoning inverts the ordinary presumptions underpinning the constitutional avoidance rule. Ordinarily, courts prefer to ground a decision on a source of law *other than* the Constitution, to avoid addressing constitutional issues. *See, e.g.*, *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). But pointing to *Zerilli* to constrain the common law effectively constitutionalizes decisions on the scope of any common law privilege. It also improperly stifles

[32] Courts might need to assign different weight to different *types* of reporting, but it is settled law that the First Amendment recognizes some hierarchy in types of speech. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[N]ot all speech is of equal First Amendment importance . . . .") (internal quotation marks and citation omitted); *Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[T]he Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.") (citation omitted).

the development of the law, contrary to the Supreme Court's admonition in *Jaffee* that, under Rule 501, federal courts are to "continue the evolutionary development of testimonial privileges." *Jaffee*, 518 U.S. at 9 (quoting *Trammel v. United States*, 445 U.S. 40, 47 (1980)).

For all these reasons, the Court should adopt a journalists' privilege under the federal common law. And for all the reasons above, Plaintiff cannot overcome that privilege. She has not exhausted other avenues of discovery, *see supra* Part I.C, and she cannot show that her interest in disclosure outweighs the public interest in protecting confidential sources, *see supra* Part I.D. As a result, the common law privilege provides an independent ground for quashing the subpoenas.

## CONCLUSION

For the foregoing reasons, the motion to quash the subpoenas should be granted.

DATED: July 29, 2022

Respectfully submitted,

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Patrick F. Philbin (DC Bar No. 435620)
1155 F St. NW
Suite 750
Washington, DC 20004
Tel.: (202) 249-6633
Fax: (202) 249-6899
pphilbin@egcfirm.com

By: /s/ Patrick F. Philbin
Patrick F. Philbin
*Counsel for Catherine V. Herridge*

Print Close

# Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties

By Catherine Herridge, Pamela Browne, Cyd Upson, ,

Published February 24, 2017

Fox News



Undated photo: UMT academic dean J. Davidson Frame, right, salutes his wife, left, UMT president Yanping Chen Frame.

**EXCLUSIVE:** Based just four miles from the Pentagon in northern Virginia is an innocuous-sounding online school for "management and technology" – which a Fox News investigation reveals has been at the center of multiple federal probes about its leadership's alleged ties to the Chinese military and whether thousands of records from U.S. service members were compromised.

The University of Management and Technology in Rosslyn, Va., which opened in 1998, touts a campus in Beijing and "partnerships" with universities around the world. The U.S. taxpayer-funded school claims to have had 5,000 graduates in the last five years and to be "especially proud of our students stationed in US military bases around the globe."

However, there is another side to the school's leadership that drew the attention of the FBI, the Justice Department, the Pentagon, Immigration and Customs Enforcement, and the Naval Criminal Investigative Service (NCIS) since at least 2012 -- and perhaps as early as 2009.

In December 2012, the FBI made two very public raids of UMT and the northern Virginia home of university president Yanping Chen Frame and its academic dean, her husband J. Davidson Frame. Documents reviewed by Fox News show it was a counter-intelligence case, known as a "200d," one of the most highly sensitive categories for a federal probe.

Photos, exclusively obtained by Fox News, appear to show Chen as a young officer in the People's Liberation Army, the military wing of China's communist party. Another photo shows Frame saluting his wife, Chen, who is holding a uniform. Three independent experts said it was a Chinese military colonel's uniform.

JA111



This undated photo appears to show Yanping Chen Frame before she came to a U.S. graduate school.

Yet since those FBI raids, UMT has continued to collect more than $6 million from Defense Department tuition assistance programs as well as the Department of Veterans Affairs through the post-9/11 GI bill.

"It's a bad deal for the soldiers, and it's a bad deal for the taxpayer," Stephen Rhoads, a military veteran turned whistleblower who says he worked with the FBI on the case, told Fox News in an exclusive interview. "Nobody's getting what they paid for."

Rhoads said he worked at UMT recruiting vets when the FBI approached him in 2012 regarding the federal investigation. Emails and other documents reviewed by Fox News corroborate key elements of Rhoads' story.

"One of the first sentences she [Chen] ever threw out -- after she found out I was an Army officer, was, ‘Well … I was a colonel in the army,’" Rhoads explained. "During our first face-to-face encounter, absolutely ... she did not deny it."

Rhoads said he thought Chen meant the U.S. Army, and asked whether she trained in Texas. "She laughed and said, ‘Oh, no, I was in the Chinese army, you know.’"

Chen, 64, came to the United States in 1987 from Beijing on a non-immigrant visa with her daughter Lele Wang. The Chinese government funded Chen's research at George Washington University where she received a Ph.D. in Public Policy in 1999, the year after UMT was created.

While Rhoads says Chen was upfront about her Chinese military experience, he claimed she hid those ties on immigration applications. Fox News reviewed Chen's immigration records where she consistently denied ties to the Chinese or any foreign military. When asked, "Have you ever been a member of, or in any way affiliated with, the communist party or any other totalitarian regime?" Chen checked "no." She would later become a naturalized U.S. citizen.

While there are no U.S. laws preventing a naturalized citizen from running a school like UMT, the Fox News investigation found that Chen's ties to the Chinese military appear to run deep.

Three outside experts consulted by Fox News confirmed the authenticity of the Chinese uniforms in the photos of Chen and Frame.

"If somebody was wearing that uniform, I would say that there's a very great likelihood that they were in the People's Liberation Army," Dennis Blasko, a leading Chinese military expert said, referring to the photo of what appears to be Chen in uniform.

Asked about the photo of Frame saluting his wife, Blasko observed, "This is a P.L.A. officer's uniform — active duty — from between 1987 and 2007 ... And from the epaulettes, we can see this -- three stars and two red stripes would be a full colonel."

Blasko emphasized that P.L.A. insignia can only be purchased with the permission of the Chinese military, and "you would have to have a certificate from your unit to buy [it.]"

Blasko, a West Point graduate who worked as a military attache in China, wrote "The Chinese Army Today: Tradition and Transformation for the 21st Century," one of the definitive books about the Chinese military.

In her George Washington University dissertation, Chen thanks her father, a P.L.A. general, who directed arms and technology development. "My father, General Chen Bin, gave me the inspiration to pursue this area of study," Chen wrote. "As former Chairman of COSTIND (1982-87), he was an important player in supporting and directing the (Chinese) space program."

In her 2012 FBI interview, Chen denied she ever was a colonel in the P.L.A., emphasizing she had worked as a doctor in the Chinese space program. Chen said it was a "civilian agency." The interview summary suggests federal agents challenged Chen's characterization. Outside experts told Fox News the Chinese civilian and military space programs are intertwined.

While Chen's immigration application is more than a decade old, and past the five-year statute of limitations, there may be a "continuation" of fraud, according to Ray Fournier who worked with the State Department's office of diplomatic security for more than 20 years. Fournier, an expert on visa and passport fraud, worked for the Joint Terrorism Task Force in San Diego, where his investigative work led to an arrest warrant for the American-born cleric Anwar Awlaki, who was later killed by the CIA.

Fournier said, "If she has marked 'no' on the petition, but if in fact, the answer is yes … then we have a false statement. And where that comes into play, most assuredly, is in the arena of passport fraud. It is this application." With each renewal of Chen's U.S. passport, Fournier said, investigators should determine whether the falsehood was repeated. "These are issues of inadmissibility," he said.

While going through the immigration process, Chen was also launching what would become a multi-million-dollar online academy. But that academy's work would eventually attract the attention of federal investigators, who questioned whether students' records were remotely accessed from China.

Before the 2012 raid, Chen's daughter Lele Wang who also works at UMT, told the FBI that "'Contractors' in the UMT Beijing Office have [administrator] privileges" to access the student database.

Rhoads said UMT recruited service members who provided their military history when they enrolled. "It got uploaded into an O-drive, they called it ... their personal military bio, you know, where they were trained, how they were trained, how long, that could be remotely accessed."

Rhoads said Chen had a particular interest in Ohio's Wright-Patterson Air Force Base, which is a research and technology hub.

And there was more. "She wanted me to go out to these remote reserve and National Guard centers, you know … in small-town America and start gettin' U.S. soldiers from those centers. Get their information, basically. Who's out there in the woods? How many units we got?"

Rhoads recalled to Fox News that he was instructed by the FBI to tell Chen that he was going to testify before a Virginia grand jury. "They wanted to, I guess see how … she would react."

At the time, Rhoads said Chen had no idea he was working with the bureau.

He said, "Well, at this point, she didn't know I was working for them at all. And she's like, 'Oh, you don't tell them anything. We don't know each other. You don't … know what you don't know,' was her buzz phrase. 'You don't -- you don't know I was a colonel in the P.L.A. They'll never have proof to say that'."

Emails obtained by Fox News show Rhoads and at least one FBI agent alerted the Defense Department, but another Memorandum of Understanding (MOU) was signed in 2014 through 2019 allowing UMT to collect millions in federal taxpayer aid.

An FBI agent in one email exchange wrote, "I let my management and the AUSAs [assistant U.S. attorneys] know about her renewal with DoD. Incredible."

Asked about the renewal, as well as whether DoD personnel were warned and additional steps were taken to vet UMT, the DoD chief for Voluntary Education Assistance, Dawn Bilodeau, referred questions to Pentagon spokesperson Laura Ochoa. In an email, Ochoa said, "In light of reports regarding University of Management and Technology (UMT), the Department is reviewing the DoD MOU signed between the institution and the DoD for compliance."

No one has been charged with any crime in connection with the investigation. Sources told Fox News that Assistant U.S. Attorney for the Eastern District of Virginia James P. Gilllis got the case, but there was a disagreement with the FBI over how to proceed, based on the case law and the extent to which sources and methods would be revealed.

Neither the FBI nor a spokesman for Gillis would comment to Fox News but separately, a spokesman for NCIS said they cannot comment on an "ongoing investigation." A FOIA request filed by Fox News Senior Executive Producer Pamela Browne confirmed an NCIS investigative file for UMT.

Fox News made repeated requests by phone and via email for interviews with Yanping Chen and J. Davidson Frame. After Chen's daughter said they were too busy to prepare and traveling out of town, Fox News went to their offices in Rosslyn, Va.

A school representative, who would not identify himself, confirmed Chen and Frame were in the office that day, but after learning Fox News was at the front desk, the couple refused to come out. Fox News' questions covered how UMT was run, Chen's suspected military ties, whether service members' records are secure, and how millions in taxpayer dollars are spent.

Fox News also sent a series of questions to the Chinese embassy in Washington, D.C., but there was no immediate response.

According to UMT, nearly 20,000 students have studied there, while 10,710 have earned degrees.

Print Close

**URL**

https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| YANPING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DEPARTMENT OF DEFENSE, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Case No.: 1:18-cv-3074-CRC |

**DECLARATION OF CATHERINE V. HERRIDGE**

I, CATHERINE V. HERRIDGE, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am a Senior Investigative Correspondent at CBS News. I have held the position of Senior Investigative Correspondent since I joined CBS News in 2019.

2. I was the Chief Intelligence Correspondent at Fox News Channel from 2011 until I joined CBS News in 2019. Prior to that, from 1990-1996 I was a London-based radio reporter and TV correspondent for ABC News. In 1996, I joined Fox as a London-based correspondent covering the United Kingdom, Europe, and the Middle East. From 1998-2000, I was a New York City-based investigative correspondent for the Fox Broadcast network newsmagazine "Fox Files." After 9/11, I was named Homeland Security Correspondent covering the Homeland Security, FBI, and Justice Departments, and my reporting focused on anti-terrorism, surveillance, and espionage issues. In all, I have been reporting on national security and intelligence matters for 32 years.

3. Over the course of my career, I have covered matters involving all 18 elements of the U.S. Intelligence Community, including but not limited to, the FBI, the CIA, the Defense Intelligence Agency (DIA), the National Security Agency (NSA), the National Geospatial-Intelligence Agency (NGA), as well as the Director of National Intelligence (DNI). My investigative reporting in this area relies on confidential sources or information.

4. Over the course of my 32 years as a national security and intelligence reporter, I have carefully developed a reputation for protecting the confidentiality of my sources. I have never revealed a confidential source.

5. In 2017, in my role as a Chief Intelligence Correspondent at Fox, I was the lead reporter on three articles, and related broadcast reports, (collectively, "Reporting"), concerning a then-ongoing, multi-agency investigation into The University of Management and Technology ("UMT") and Yanping Chen. The three print articles were published on February 24, 2017, April 28, 2017, and June 28, 2017.

6. I never disclosed my confidential source(s) on those stories to any other person at Fox.

7. Over the course of my career, I have pursued reporting that results in concrete changes. For example, I worked on an investigative report that uncovered the true extent of the injuries U.S. servicemembers suffered from an Iranian ballistic missile attack on a U.S. base in Iraq in January 2020. The U.S. government had downplayed the injuries, even to the point of denying servicemembers the Purple Hearts they rightly deserved. As a result of the reporting, 50 soldiers received Purple Hearts. *See* https://www.cbsnews.com/news/purple-heart-iran-missile-attack-50-soldiers/. I recently received the Kevin Carmody Award for Outstanding Investigative Reporting for an investigation that exposed serious health hazards from toxic waste at a U.S.

military base in Uzbekistan where thousands of U.S. servicemembers have been stationed. *See* https://www.sej.org/winners-sej-20th-annual-awards-reporting-environment. That reporting drove legislation and culminated in President Trump signing an Executive Order in January 2021 requiring a comprehensive health study for those who had been stationed at the base. *See* https://www.cbsnews.com/news/uzbekistan-k2-karshi-khanabad-base-us-troops-radiation/; https://www.cbsnews.com/news/trump-executive-order-veterans-k2-karshi-khanabad/. None of this reporting would have been possible without confidential sources.

8. Based on my 32 years of experience reporting on national security and intelligence matters, I believe confidential sources, and the information they provide, are essential for informing the public on matters relating to national security, including information relating to the military, espionage, government surveillance, and homeland security.

9. Based on my experience, I believe that, without a reliable assurance of confidentiality, no source with access to important national security information with significant value to the public would be willing to bring that information to members of the press.

10. Compelling the disclosure of journalists' confidential sources in the national security and intelligence arena will have an enormous chilling effect on the flow of crucial national security information to the public—information that is central for ensuring that there is an informed electorate, which is a bedrock principle of our democracy. Fear of exposure will make sources less likely to serve as whistleblowers or otherwise act as confidential sources for such matters. Given the secrecy that naturally prevails in the national security and intelligence space, the absence of sources would make it impossible for the press to shine a light on the actions of the government and would blunt accountability. As a result, the role journalists play in informing the public would be diminished, and efforts to produce journalism that provides meaningful oversight

of sensitive national security as well as intelligence matters and ensures the accountability of government officials to the people would be crippled.

11. If I were compelled to disclose a confidential source or sources in this litigation, I believe it would have a ripple effect, discouraging potential sources from confiding in other national security journalists. As a result, it would reduce the ability of my fellow reporters to inform the public and ensure accountability of the government to the voters. In addition, if I were compelled to disclose a confidential source or sources, my own professional reputation as a reporter who protects the confidentiality of sources—a reputation I have built over the course of 32 years—would be irretrievably damaged. Sources would be unlikely to confide in me, and I would no longer be able to produce the kind of journalism that has driven positive change benefitting the public and military servicemembers.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 27, 2022

Catherine V. Herridge

**JA118**

FOX NEWS .com

Print Close

# Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report

By Catherine Herridge, Pamela Browne, Cyd Upson, ,

Published May 01, 2017

Fox News

**EXCLUSIVE:** Four congressional committees are demanding answers from the FBI and departments of Justice and Defense about a taxpayer-funded school that markets to the military, after a Fox News investigation exposed alleged ties between the university's leadership and the Chinese military.

The ongoing Fox News investigation has focused on the Virginia-based University of Management and Technology, its president Yanping Chen Frame and the school's academic dean, J. Davidson Frame, Chen's husband. UMT was raided by the FBI in 2012 as part of a counterintelligence investigation, but multiple sources told Fox News the case ran into roadblocks once it reached the U.S. attorney's office.

"There's not only a lot of smoke coming out of this one, there's some fires out there that need to be extinguished and some people that really have to answer the questions," House Oversight Committee Chairman Jason Chaffetz, R-Utah, said.

In a letter to Defense Secretary James Mattis on April 12, Chaffetz said military service members and their personnel records remain at risk. He questioned why the Defense Department continues to fund the school with taxpayer dollars through the GI Bill and the tuition assistance program.

"There was no obligation to give this money. They didn't have to give this money. Somebody made a proactive decision to authorize this, to move forward, and then why not cut it off?" Chaffetz said.

Since the 2012 FBI raid, UMT received more than $6 million. Some $250,000 has been received by the school since Fox News aired its first report in February.

"It's a bad deal for the soldiers … it's a bad deal for the taxpayer," said former UMT employee Stephen Rhoads, a U.S.-veteran-turned-whistleblower who says he worked as an FBI informant on the case. "It absolutely disgusts me and needs to stop."

After the Fox News investigation, the Defense Department put the school under review but continues to fund it. When he worked there, Rhoads said the school got more than 250,000-$300,000 per month in taxpayer dollars.




Undated photo of Yanping Chen and family wearing PLA uniforms. (Exclusively obtained by Fox News)

JA119

Photos obtained by Fox News apparently show Chen wearing the uniform of a young officer in the Chinese military of the People's Liberation Army, known as the PLA, along with her family. In another undated photo, Chen appears to salute the grave of her father, Chen Bin, who was a senior general in the PLA in charge of technology and arms acquisition.

"Her father joined the Communist Party in the 1930s. He supposedly participated in the Long March and that … gives her credentials not unlike being an officer in the continental army," said Peter Mattis, a fellow with the Jamestown Foundation and leading expert on China. "The Long March," between 1934-1935, has long been referred to as a bloody pillar of the Chinese Communist Revolution which ultimately led to the creation of the People's Republic of China.



Undated photos of Yanping Chen's father, Gen. Chen Bin. (Exclusively obtained by Fox News)

Mattis said a school like UMT would be attractive to the Chinese military.

"You get what you'd call a curated database. You're not just getting a database of a lot of Americans. You're getting a database of people who are interesting to you, people who work in the U.S. military, who have access to a sensitive technology," Mattis said. "This is valuable to China for two reasons. The first is, militaries everywhere want to know what a potential adversary might look like -- what are their capabilities, how will they act? The second is this might also serve as a vehicle for recruiting individuals."

Mattis added, "If intelligence is a numbers game and maybe one out of 100 or one out of 500 people are willing to commit treason, then the faster you can go through those numbers, the better off you are. They're looking for former officials, classmates, spouses, friends and they have no problem recruiting someone with only secondhand access to information."

Fox News has confirmed that the Naval Criminal Investigative Services (NCIS) is also investigating the UMT. Separately, multiple sources told Fox News that the U.S. attorney for the Eastern District of Virginia, James P. Gillis, declined to prosecute in 2014, but that may be about to change.

The FBI, the U.S. attorney for the Eastern District of Virginia and the Defense Department declined to comment, citing the ongoing probe.



Undated photo of Yanping Chen and her husband J. Davidson Frame, who run the University of Management and Technology in Virginia. (Exclusively obtained by Fox News)

Chaffetz stressed his dismay with the reaction of the Department of Justice. "Just turning the other cheek on something that appears at least on the surface to be so blatant -- that begs the question, what are the 100,000-plus people at [the Department of Justice] doing?"

Fox News has an open invitation for an interview with Yanping Chen and J. Davidson Frame. They told Fox News in February they were too busy.

Print Close

**URL**

https://www.foxnews.com/politics/congress-investigating-taxpayer-backed-school-over-alleged-ties-to-chinese-military-after-fox-news-report

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

Print Close

# FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says

By Catherine Herridge, Pamela Browne, Cyd Upson, ,

Published June 28, 2017

Fox News

The FBI is "reopening" its probe of a taxpayer-funded online school for military servicemembers after a six-month Fox News investigation exposed its alleged Chinese military ties, according to a senior Republican lawmaker.

"They've told us they're looking more seriously at it, that they're quote, unquote, reopening that investigation, and I hope to get some answers," retiring Rep. Jason Chaffetz, R-Utah, told Fox News.

Reached by phone, an attorney claiming to represent the university told Fox News he's unaware of any current criminal justice probe implicating his client. Separately, the Naval Criminal Investigative Service (NCIS) confirmed in a statement to Fox News that the investigation into the University of Management and Technology (UMT) "is still an active multi-agency investigation so there's nothing we can say at this point."

In 2012, the FBI raided the Rosslyn, Va.-based UMT and the home of its president, Yanping Chen Frame, a Chinese-born naturalized U.S. citizen, and her husband J. Davidson Frame, the school's academic dean.

**CONGRESS PROBING TAXPAYER-BACKED SCHOOL OVER ALLEGED CHINESE MILITARY TIES**

Documents reviewed by Fox News, as well as recently unsealed court records, show the FBI focused on whether UMT's military personnel records could be remotely accessed from China, potentially compromising military histories of U.S. servicemembers, as well as Chen's alleged false statements on immigration documents that eventually allowed her to gain U.S. citizenship.

Chaffetz stressed that Senate Judiciary Committee Chairman Chuck Grassley, R-Iowa, is going to "take the reins" on the case from the congressional side. "I know he'll be tenacious in trying to get to the truth, but we want to know about [Yanping Chen] specifically, about what has this school been doing -- remember it's taxpayers' funds that are going … to perpetuate this, and yet there are a lot of question marks on whether or not that data, that information, is going directly to the Chinese government."

With heavy marketing to members of the U.S. military, government records show the school has collected upwards of $250,000 per month from U.S. taxpayers via the Department of Defense (DoD) through the GI Bill and tuition-assistance programs.

Fox News' investigation found the school's president has long-standing ties to the Chinese military or PLA (People's Liberation Army). While attending George Washington University, where her education was funded by the Chinese government, Chen wrote about her family's PLA connections, thanking her father, Chen Ben, who was a senior general in the Chinese military in charge of technology and arms acquisition. She received a Ph.D. in Public Policy from the school in 1999.

**DOD-FUNDED SCHOOL AT CENTER OF FEDERAL PROBES**

Photos obtained exclusively by Fox News, and reviewed by a leading national security expert on Chinese military uniforms, appear to show Yanping Chen as a young PLA officer and wearing a PLA uniform alongside family members.

"Her father joined the Communist Party in the 1930s. He supposedly participated in the Long March and that gives her credentials not unlike being an officer in the continental army," said Peter Mattis, a fellow with the Jamestown Foundation and a leading expert on China. The Long March, from 1934-1935, has long been referred to as a bloody pillar of the Chinese Communist Revolution which ultimately led to the creation of the People's Republic of China.

Mattis said a school like UMT could be valuable to China for two reasons: "The first is, militaries everywhere want to know what a potential adversary might look like -- what are their capabilities; how will they act? The second is, this might also serve as a vehicle for recruiting individuals."

The high-profile 2012 FBI raid did not result in any charges against UMT or Yanping Chen. After the initial report on the school aired in February, Fox News was told there was a logjam between the FBI and U.S. Attorney's Office for the Eastern District of Virginia over how to proceed and whether evidence could potentially compromise intelligence collection methods. Since the raid five years ago, UMT has received in excess of $6 million in government funding.

Four congressional committees are now demanding answers as to why the school still receives taxpayer dollars.

“The rub here is that it's all being funded by taxpayers' money, and so here we are, the American taxpayers, feeding this beast that may potentially be giving information directly to the Chinese government, and that better not be the case,” Chaffetz said.

Regarding the UMT investigation, Chaffetz added, "There has been a lot of smoke coming here, and you got whistleblowers who are close to the situation saying something's wrong here, something's not right. … So I hope the Department of Justice, specifically the FBI, is taking it much more seriously than they have in the past.”

Stephen Rhoads -- a whistleblower, former UMT employee and veteran who came forward to Fox News – called it “very encouraging” that the House Oversight and Senate Judiciary committees are getting involved and “law enforcement is no longer turning a blind eye to Yanping Chen and UMT."

"I want to thank Fox News for following up on a story that deeply impacts our servicemembers, tax dollars, and national security,” he said. "As a servicemember, it is important that allocated funds are not misappropriated."

Yet money keeps flowing to UMT. The Defense Department admitted via email that they put the school under review but continue to fund it. "The Department's Memorandum of Understanding with UMT has not changed.  Funding under the MOU flows directly from the Services to institutions," a spokesperson said via email.

Grassley sent a three-page letter on June 14 to Homeland Security Secretary John Kelly citing Fox News' reporting. With a deadline of June 28, Grassley sought information on any Yanping Chen immigration records that may have been "falsified...to conceal her affiliation with the Chinese military."

In the first phone call returned to Fox News, attorney John C. Kiyonaga said he represents Yanping Chen and the University of Management and Technology. Kiyonaga said his client has been charged “with absolutely nothing” and characterized the U.S. government’s handling of the case as “full of bluster and innuendo.”

The FBI had no comment. Legal experts said it would be unusual for the bureau to notify an individual or entity in the event a case is re-opened.

Print Close

**URL**

https://www.foxnews.com/politics/fbi-reopening-probe-of-dod-funded-school-with-suspected-chinese-military-ties-rep-says

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

FILED

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2017 MAR 10 P 4:47

CLERK US DISTRICT COURT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 2122 21st Road North Arlington, Virginia; and | Case Nos. 1:12sw1002 and 1003 |
| IN THE MATTER OF THE SEARCH OF University of Management and Technology | **UNDER SEAL** |

MOTION TO SHOW CAUSE WHY SANCTIONS SHOULD NOT ISSUE

Comes now Movant, Yanping Chen Frame, by counsel, and moves this Court to issue an order setting this motion for a hearing to determine the identity of the Government official/s responsible for wrongfully disclosing to the media documents or information acquired as part of the investigation subject of the above-captioned cases and to determine appropriate sanctions and relief.

Sealing Orders

On December 3, 2012, United States Magistrate Judge John Anderson, on motion of the Government, ruled that the search warrants and applications therefore, to include affidavits in support, be sealed until Close of Business March 4, 2013. Judge Anderson's order covered the search of Movant's home (comprised in Case 1:12sw1002) and of her place of business, the University of Management & Technology ("UMT") (comprised in Case No. 1:12sw1003).

On January 14, 2014, United States District Judge Claude Hilton, on motion of the Government, ordered "partially unsealed" the affidavit in support of the application for search warrant in Case No, 1:12sw1002 (pertaining to Movant's home) for the "limited purpose" of allowing its review in redacted form by counsel for Movant.

Under the terms of Judge Anderson's December 3, 2012 order, the seal would have expired pursuant to its own terms over 10 months earlier. Nonetheless, Judge Hilton's January 14, 2014 order reflects that the matter remained under indefinite seal as of the date. No order has been entered by this Court directing that the search warrants and affidavits be unsealed and Movant has no reason to believe that the seal as to both searches does not remain undiminished. Movant does not wish to disturb the seal in any way.

Disclosure to Media

During the week of February 13th of this year, representatives of the media several times appeared unannounced at Movant's place of business, UMT, seeking access to Movant.

On February 23, 2017, Movant moved the Court for the return under Fed. R. Crim. P. 41(g), of the property seized by the Government during the searches of both locations on December, 12, 2012.

On February 24, 2017, Fox News published online a report claiming Movant, a native of the Peoples' Republic of China ("PRC") and naturalized American citizen, had lied to secure her American citizenship. The report further suggested that Movant employs UMT to pilfer personal information as to UMT's many students from within the United States military for the benefit of the PRC government.

The Fox News report (copy attached) quoted several sources, but notably included two photographs which are the personal property of Movant seized pursuant to one of the search warrants authorized by this Court. One depicts Movant as a younger woman in a uniform. The other depicts Movant more recently, holding a uniform on a hanger in front of herself while her husband salutes it in apparent jest. Upon information and belief, both photographs were seized

by the Government during the search of Movant's home pursuant to the search warrant issued by this Court in Case No. 1:12sw1002.

Argument

It is hard to surmise a scenario in which these photographs could have come into the possession of Fox News unintentionally. Presumably, the party that provided the photographs to the reporters enjoyed official access to the investigation files.

Depending on any actions by and pertaining to the Grand Jury in this case, the disclosure to the Fox News reporters constitutes a violation of Grand Jury secrecy as well as a violation of this Court's seal.

Neither Movant nor her counsel has sufficient familiarity with the investigation at bar to surmise the specific extent to which any of the information or documents disclosed to the reporters constitutes "a matter occurring before the grand jury" as per Fed. R. Crim. P. 6(e)(2)(B). It bears noting, however, that Rule 6(e)(2)(B) is read expansively.

> "[T]he phrase 'matters occurring before the grand jury' encompasses not only what has occurred and what is occurring, but also what is likely to occur, including the identity of witnesses or jurors, the substance of testimony as well as actual transcripts, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like.

*In re Cudahy*, 294 F. 3d 947, 951 (7th Cir. 2002) (internal quotations and citation omitted).

Moreover, a specific purpose of Fed. R. Crim. P. 6(e) is to "protect an innocent accused who is exonerated from disclosure of the fact that he has been under investigation." *In re Grand Jury Investigation,* 903 F. 2d 180, 183 (3rd Cir. 1980) (internal citations omitted). Movant has never been charged with an offense against the United States.

Beyond concern for Grand Jury secrecy and the sanctity of the Court's seal, the disclosure to Fox News flouts this Court's authority to issue a search warrant. A court's

detached scrutiny of an application for a search warrant protects an individual's "privacy interest in being free from an unreasonable invasion and search of his home." *Steagald v. United* States, 451 U.S. 204, 214 (1981). This Court's protection of that privacy interest is undermined when a party to the search or the investigation of which it is a part, decides for his own reasons to publicize the product of the search.

Additionally, the disclosure flouted the Court's continuing authority over property seized pursuant to its warrant. Fed. R. Crim. P. 41(g) allows an owner of seized property to move its return. In the event such a motion is granted, Rule 41(g) calls for "the **court** [to] return the property" (emphasis added). The choice of words indicates that the Court, not the Government, has ongoing control over the seized property. The disclosure to Fox News deprived this Court of its authority to determine the proper disposition of the product of the searches it authorized.

## Conclusion

Wherefore, Movant respectfully requests the Court issue an order setting this motion for hearing to determine:

1. the identity of the official/s responsible for the disclosure to Fox News of the documents or information acquired as part of the investigation of this matter,
2. the circumstances of such disclosure,
3. the appropriate sanctions, and
4. the appropriate relief for Movant.

Respectfully Submitted,

YANPING CHEN FRAME
By Counsel

John C. Kiyonaga

600 Cameron Street
Alexandria, Virginia 22314
Telephone: (703) 739-0009
Facsimile: (703) 549-2988
E-mail: john@johnckiyonaga.com

Counsel for Yanping Chen

Certificate of Service

I hereby certify that on March 10, 2017, I caused a copy of the foregoing to be delivered to the United States Attorney's Office, 2100 Jamieson Ave., Alexandria, VA 22314.

John C. Kiyonaga

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

--------------------------------:
IN THE MATTER OF THE SEARCH OF :
2122 21st Road North :
Arlington, Virginia :
: Case No. 1:12-sw-1002
and : 1:12-sw-1003
:
IN THE MATTER OF THE SEARCH OF :
University of Management :
and Technology :
:
--------------------------------:

MOTIONS HEARING

May 8, 2017

Before: John F. Anderson, Mag. Judge

APPEARANCES:

James P. Gillis, Counsel for the United States

John C. Kiyonaga, Counsel for the Movant

NOTE: The case is called to be heard at 10:02 a.m. as follows:

THE CLERK: In reference to the search warrant 12-sw-1002 and 12-sw-1003.

MR. GILLIS: Good morning, Your Honor. Jim Gillis for the United States.

THE COURT: Thank you.

MR. KIYONAGA: Good morning, Your Honor. John Kiyonaga for Dr. Chen.

With me at counsel table is Marcus Massey, he is a member of this court, he has been assisting with the case.

In the gallery is Fred Sinclair, also a member of the court who has been assisting in the case. And abeam of him is John Davidson Frame, the husband of Dr. Chen.

Your Honor, I wanted as a preliminary matter to ask the Court to unseal the entirety of its file. The practical effect of the unsealing on the 25th of last month was that it left available to the public the search warrant application and affidavit, which of course is deprived of context, context which is provided by our -- by my pleadings, Dr. Chen's pleadings. And at this point, I don't think there is any -- any reason for a continuing seal.

I filed under seal because I've been advised by the Clerk's Office that the matter in its entirety was being treated as under seal, so I didn't want to transgress the

dictates of the court. But at this point, I don't -- I don't see a need for it. I don't believe anybody is asking for it.

So I would ask the Court to consider all the pleadings to be under seal at this point.

THE COURT: That was the -- that was the first thing I had on my list, was the sealing issue. Because I -- I mean, I wanted to be cautious about this because when things first came up, I wanted to make sure -- I saw that your motion was filed under seal, and I wanted to keep things as sealed as much as could be necessary.

I take it the Government doesn't have any opposition to this being unsealed, does it?

MR. GILLIS: No, Your Honor, we do not.

THE COURT: Okay. All right. Well, I'm going to go ahead and have the Clerk's Office unseal the entire file, which will include --

MR. KIYONAGA: Thank you, sir. I just --

THE COURT: -- the application, affidavits, the motions, the oppositions, your responses you filed on Friday of last week as well.

MR. KIYONAGA: And I would assume prospectively as well, Your Honor.

THE COURT: Okay, yes.

MR. KIYONAGA: Your Honor, just to be clear, I'm not conceding that the matter should not have been treated as under

seal prior to the 25th of last month when you entered your order.

THE COURT: Well, I mean, I've looked at the files. And in my view -- and whether the Clerk's Office or the U.S. Attorney's Office agreed with this or not, when I signed the order to seal, it limited the sealing of the file until March 4, 2013. At that point there was no court order that allowed those proceedings to remain under seal.

So my order was limited. It didn't say, until further order of the court, or a time that the Court may specify, or that anyone had to come in and make an application.

But, I mean, my order was pretty specific, and I generally try and do that because, obviously, anything to be filed under court -- under seal with the court, there has to be a reason for it. And I generally like to put in a timetable.

And if the Government needs to have an extension, they can come in an ask for an extension.

But, you know, my view of this issue, that as of March 4, 2014 -- 2013, those matters could have been or should have been removed from the sealed portion of the court's files. So, you know, that's my view of it.

But given what we're doing today of unsealing the matter, then that doesn't really have that much of a significance.

MR. KIYONAGA: Your Honor, I don't take issue with

anything the Court has said, Your Honor. I guess my position would be that the disclosure by Fox News in the first newscast, which was prior --

THE COURT: The February 24, 2017; is that right?

MR. KIYONAGA: Correct, Your Honor, prior, prior to your order unsealing or noting that it was unsealed. It would still function as a contempt because the Clerk's Office was treating it as sealed. The status was unclear because we had the two orders --

THE COURT: Let me just take one thing before we get to that. Because you filed two motions.

MR. KIYONAGA: Correct, sir.

THE COURT: And I want to make sure that the motion for the return of property has gotten resolved; is that correct?

MR. KIYONAGA: It has been resolved, Your Honor. The property has been returned in its entirety. The Government has asked that the motion be treated as moot.

I would propound to the Court that it ought to be treated as conceded. The Government returned all the property and it's now in Dr. Chen's possession anew.

THE COURT: All right. So that's -- we'll go ahead and don't need to deal with that motion any further.

So let's go back to the motion that you've now filed that for some reason -- and I take it, given the unsealing of

the record, there is no reason for this transcript of this proceeding to be under seal, is that -- do you agree with that?

MR. KIYONAGA: I would submit there is not, sir.

THE COURT: The same with the Government on that?

MR. GILLIS: I agree, Your Honor.

THE COURT: Okay, all right. All right. So go ahead and let me hear your argument on your second motion that you filed.

MR. KIYONAGA: Well, Your Honor, you know, I don't think I've uttered this term since law school, I didn't think I would say it again, but this is clearly an issue of res ipsa -- res ipsa loquitur, it speaks for itself. The only way Fox News could have come into the possession of the information and the documentation specifically that appeared in its news was through a law enforcement or at least an official source.

THE COURT: Well, how about Rhoads? I mean, it sounds like a lot of this information came through Rhoads.

MR. KIYONAGA: That's correct, Your Honor, but there is a specificity there that I think exceeds anything that Rhoads would have been -- would have been aware of. The immigration records -- there are passages from within the news items that appear to be lifted verbatim or very close to verbatim from the search warrant affidavit.

And I think it's a leap to assume that Mr. Rhoads was privy to everything the Government was doing in terms of this

investigation. He clearly spoke, he clearly has strong feelings on the issue, but I don't think there's any reason the Court should assume that everything within those two reports could be cabined within Mr. Rhoads' personal knowledge. The breadth of information is far greater than that.

Plus, we have photos that came out of Dr. Chen's house. Pictures of her as a young woman in Chinese uniform. Pictures of family members. Pictures of her father. Pictures of her father's grave. All of those were private property that were seized from her house.

So we have a number of different transgressions afoot. Regardless of how the Court resolves the matter of the seal as of the moment of the first article, the first newscast, you have clearly a nonchalance to disregard the Court's authority in terms of a seal.

You have the fruit of a search being broadcast out to the public as a consequence of being disclosed to Fox News. Your Honor ordered --

THE COURT: Well, that only comes into play if it was a proceeding before the grand jury, right?

MR. KIYONAGA: Your Honor, with respect, I would disagree.

THE COURT: Okay. Help me understand that. And I went back before and read again this morning Judge Ellis' decision in the Rosen case.

MR. KIYONAGA: I don't believe Rosen controls in this case, Your Honor. Rosen, first of all, was a highly publicized matter. And Judge Ellis --

THE COURT: You just submitted something about how significant this Fox News article was.

MR. KIYONAGA: And it's without question significant. But the publicity in Rosen exceeded the news item that was at play in that case. But Judge Ellis specifically found that the news item lacked the specificity to qualify as a 6(e) violation.

These items, these news items were very, very specific, drew directly from the affidavit of search and comprised private property of a very personal nature, seized by consequence of the Court's authorized search and basically converted.

The Government has no right to take private property and dispose of it as it sees fit. These things belong to Ms. Chen. So we have Privacy Act. We have contempt of the Court by virtue of the seal or something approaching it. I don't know whether we have 6(e), Your Honor, because the Government hasn't seen fit to tell us whether a grand jury was ever impaneled.

THE COURT: Well, that was what your motion was all about, your second motion.

MR. KIYONAGA: Your Honor, it was about more.

THE COURT: Having to do with a violation --

MR. KIYONAGA: It certainly comprised 6(e), but it's Privacy Act, it's seal, it's 6(e), it's conversion of private property. Take your pick, Your Honor. But the Government is not supposed to be taking the fruits of the search because somebody within the Government has a personal animus towards the subject of the search and disclosing it to the media.

THE COURT: Well, show me where in your initial motion you raise the issue of a Privacy Act violation.

MR. KIYONAGA: Your Honor, I didn't raise that until a later motion. But the fact of the matter is, it's an issue that should probably be considered by the Court because it clearly offends the Privacy Act.

THE COURT: Well --

MR. KIYONAGA: There is also --

THE COURT: -- you're talking about you didn't raise it until Friday at 4 o'clock?

MR. KIYONAGA: I may have raised it in my reply, Your Honor. But if I raised it Friday at 4 o'clock, I raised it Friday at 4 o'clock. It's still an issue properly before the Court.

The threshold issue, Your Honor, is what sort of restrictions attach to property that is seized pursuant to a Court ordered search warrant. The Court has the authority to return it because that's what 41(e) is all about.

THE COURT: Right.

MR. KIYONAGA: (g). So presumably the Court is the ultimate custodian in legal terms of that property. I'm assuming the Court didn't authorize disclosure to Fox News.

The Court stands to protect the privacy interests of Dr. Chen and other people that are suffering searches, to make sure that there is a good reason for it. And the corollary of that is to make sure that the whole, the entire search process, to include the keeping of the fruits of the search, is handled legitimately, properly, responsibly. This is the anthesis of that.

So it flaunts -- it flouts the Court's authority in authorizing the search. It violates privacy. It may violate 6(e). It's impossible for us to say, Your Honor, we have no idea whether a grand jury was actually impaneled.

Mr. Rhoads certainly indicated to the -- to Dr. Chen that one had been impaneled and that he was scheduled to appear before it. And Fox News clearly repeated that allegation.

So I think the balance of evidence before the Court at this point is that in fact a grand jury was impaneled. That's the only -- the only indicator we have one way or another is Mr. Rhoads, who definitely said that it was.

So we're laboring at a disadvantage because the Government, frankly, is being extremely coy on this point. It could have said --

THE COURT: Well, the Government didn't disclose that Rhoads was testifying in front of the grand jury. Rhoads testified -- Rhoads disclosed that he was scheduled to testify in front of the grand jury, right?

MR. KIYONAGA: Correct, Your Honor.

THE COURT: Okay. So how is it that the Government is responsible, arguably, for what Rhoads told Dr. Chen?

MR. KIYONAGA: Your Honor, I'm not saying the Government is responsible for what Mr. Rhoads says. What I'm saying is that the only logical inference that the Court can draw from those news reports is that somebody within the Government shared with Fox News information beyond what was in the personal knowledge of Mr. Rhoads.

This was filed, excuse me, as a 6(e) motion because the only evidence in the record that Ms. Chen -- Dr. Chen is aware of indicates that a grand jury was impaneled.

The Government hasn't deigned to say. It's reply talks about the fact that no Government official was quoted on the issue. That's irrelevant. It would have been easy for the Government to say, no, we never impaneled a grand jury. Yet that assertion is nowhere to be found in its reply.

So one of the things I'm asking the Court is to ask the Government exactly what happened.

THE COURT: That's making them disclose whether there was or wasn't a grand jury proceeding. Which is something that

you then would say they shouldn't have done, right?

MR. KIYONAGA: Your Honor --

THE COURT: You know --

MR. KIYONAGA: I can't -- Dr. Chen can't prove a negative. The only evidence that the Court has before it at this juncture, that I'm aware of, indicates that a grand jury was impaneled. The only mention of it in the two Fox News articles is Mr. Rhoads saying that he had been -- he had been summoned to testify. I would submit to the Court --

THE COURT: That he had been told to tell Dr. Chen that he had been summoned to testify.

MR. KIYONAGA: Very well, Your Honor. He had been told to tell her. But the fact of the matter is, the only indicator we have is that the impanelment of a grand jury is more likely than not. Other than that, we have silence on the issue.

I mean, grand juries are certainly a routine function of felony investigations, so I don't think it's beyond the pale to surmise that one was in fact impaneled.

But I think it's -- it's unfair and it's self-defeating to tell a movant that there is no relief to be had because it's secret, it's within the sole discretion of the Government to reveal it. It's a process that happens under the auspices of this Court. And the Court has authority over grand jury proceedings. And it's certainly within the Court's

discretion to require an answer from the Government.

If the Court wants to seal that answer, we are certainly happy to live with the seal, but we're dancing around the head of a pin here arguing about what may or may not have happened. I would submit that the evidence is that it happened because that's the only evidence in the record, indicates that it's more likely than not.

THE COURT: Well --

MR. KIYONAGA: But the Government can put an end to speculation with one or two words.

THE COURT: Well, help me understand. Any of the information that you claim that Fox News may have gotten from an official, Government official, that includes the details about the grand jury's likely course of conduct in the near future or details about the grand jury's inner workings or proceedings.

MR. KIYONAGA: Well, as a starter, Your Honor, we have Mr. Rhoads' identity. I understand he is not a Government official, although I think the Court could treat him as one. He's clearly a Government agent. He indicated that he was working for the FBI. So when Mr. Rhoads speaks, the FBI is speaking.

And his identity as a grand jury witness is not supposed to be disclosed. But if you look at my pleading of last Friday --

THE COURT: Well, let me -- before we go beyond that, if someone gets a subpoena to testify before the grand jury, what restrictions does that individual have on disclosing that they are to -- that they have received a subpoena to testify in front of the grand jury?

MR. KIYONAGA: Your Honor, generally speaking, none that I'm aware of. But if that person is an undercover agent of the FBI, working in close concert with the FBI, he or she becomes a Government agent, becomes part of the Government entity and shares its responsibilities.

I mean, he may or may not have been told what his responsibilities were, but he is the responsibility of the FBI. They recruited him or they somehow -- he somehow or another came into their employ and he worked very hard, it would appear, to try to assist them in investigating this matter. So if he discloses, the Government disclosed. And he clearly did disclose.

THE COURT: Okay. All right, I'm sorry, I interrupted you. You were going to --

MR. KIYONAGA: Your Honor, I would -- I think you can take your pick of bases or causes on Dr. Chen's part. 6(e) is certainly a claim. Whether or not it actually has substance is going to depend on knowing whether or not a grand jury was impaneled.

But if the Court had the decide at this instant

whether or not that's the case, I would submit you have the evidence before you, the preponderance of which indicates that it did.

It's a Privacy Act violation. It's a contempt of Court. And it's a conversion of personal property. And there is no question but that that report included personal, very private property, both reports included personal, very private property of Dr. Chen. That's not what's supposed to happen with the fruits of a search.

I would doubt that Mr. Rhoads had custody of those photos. But if he did, he should be treated as a Government agent by virtue of what he said and by virtue of what was in his possession.

So this is a circumstance that speaks for itself. Somebody within the Government disclosed illegitimately information to the media that violates either 6(e), the Privacy Act, your authority to authorize a search, and the Government's seal or apparent -- file seal or apparent seal, and the privacy property rights of Dr. Chen. And it's incumbent on this point for the Government to offer an explanation that enables the Court to conclude that it's not impossible -- that it's not responsible for the breach.

But at this point, I think the only conclusion that the Government -- that the Court can reasonably draw is that it is.

THE COURT: Okay. Thank you. I will hear from Mr. Gillis.

MR. GILLIS: Your Honor, I don't believe that anything Mr. Kiyonaga has said isn't already addressed in our pleadings. And unless the Court has questions, we'll stand on those.

THE COURT: Well, there certainly -- the Privacy Act issue is a new one, at least. And I don't think that was addressed at all in your pleadings.

MR. GILLIS: Well, true enough, Your Honor. I was notified of the filing of that pleading at 4:35 on Friday afternoon. And because a friend from out of town that I hadn't seen in a long time had been in town, I didn't have a chance to review it then. And I had a -- I looked at it this morning. The citation in the -- in the pleading is entirely wrong. It took me about five or so minutes to find it in the first place. And then I found it to be not terribly enlightening.

I don't believe Mr. Kiyonaga has pointed to the aspect of it -- it relies upon the statute. I saw nothing in the section quoted that indicated that -- that in general there is some right to privacy with respect to information.

I suspect, if I had more time to look into it, Your Honor, that it would refer to personal identifying information, such as Social Security numbers and dates of birth and the like. But frankly, Your Honor, I do not know. I have had -- I

have not had enough time to research it.

As the Court pointed out, this started off as a 6(e) motion. I don't know if that is being abandoned at this point or --

THE COURT: No, I mean, he has argued the 6(e) issue.

MR. GILLIS: Yes, I can address that, Your Honor, although I think that's well covered --

THE COURT: Well, let's -- the photographs, help me understand the photographs.

MR. GILLIS: Your Honor --

THE COURT: Were those two paragraphs part of what was seized pursuant to the search warrant?

MR. GILLIS: Excuse me, Your Honor. They were, Your Honor. At least I saw those photographs and I was informed that they came from the search take. Whether there were other sources of those photographs that could have been given to Fox News, I have no idea.

But taking that for granted, Your Honor, this still does not provide a prima facie case. Judge Ellis' opinion makes that abundantly clear. As does the opinion from the D.C. Circuit that is in circumstances much more egregious than these are alleged to be. In that case, Your Honor, if I may refer to it, that's In re Sealed Case, 192 F.3d 995. There, Your Honor, the newspaper quoted from sources inside the Independent Counsel's Office. The Independent Counsel conceded that point.

After initially denying it, they later referred the matter for a perjury investigation against the person who had submitted the declaration.

But in any case, that quote, which you'll find under section -- under section 1 of the statement of facts in the first paragraph indicates that basically there were two grand jury matters that were revealed by that -- by that quotation. One concerning this group of prosecutors asking that Mr. Starr ask the grand jury to return an indictment.

And the second one having to do with alleged lies by President Clinton in his deposition and in his grand jury testimony in August.

So you have there reference to testimony by Mr. Clinton before one grand jury and then the Independent Counsel group asking that Mr. Starr ask another grand jury to return an indictment. And even under those facts, Your Honor, the D.C. Circuit said that that was not sufficient to raise a prima facie case of a violation such that a hearing need be held.

And under section 4 of that opinion, Your Honor, the Court, the D.C. Court of Appeals says: A prima facie violation based on a news report is established by showing that the report discloses matters occurring before the grand jury and indicates that sources of the information include Government attorneys.

It goes on to say that because that second point had

been conceded, the only issue remaining is whether the disclosures qualify as matters occurring before the grand jury.

And it goes on to say in that same, in that same section, Your Honor, in the third paragraph, about midway through: We have never read Rule 6(e) to require that a veil of secrecy be drawn over all matters occurring in the world that happen to be investigating -- investigated by a grand jury. Indeed, we have said that the disclosure of information coincidentally before the grand jury, which can be revealed in such a manner that its revelation would not include the inner workers of the grand jury, is not prohibited.

As Mr. Kiyonaga has just conceded, the only mention of grand jury is Mr. Rhoads' statement. Rule 6(e) explicitly states that no obligation of secrecy could be imposed upon Mr. Rhoads. And, therefore, that could --

THE COURT: Well, this is a little bit different in that if in fact what is stated is true, was that a Government investigative person told Mr. Rhoads to tell Dr. Chen he was going to testify in front of the grand jury so that her response to that request could be determined. Is that -- factually, that's what --

MR. GILLIS: That's what the article states, Your Honor.

THE COURT: -- states.

MR. GILLIS: Yes.

THE COURT: Isn't that what the affidavit in support of the search warrant states?

MR. GILLIS: I believe so, Your Honor, yes.

THE COURT: So a Government agent has sworn to a judicial officer that that is in fact what happened?

MR. GILLIS: Yes, Your Honor.

THE COURT: Okay. So we have a Government investigative person --

MR. GILLIS: Yes.

THE COURT: -- telling someone to disclose that he is going to be testifying in front of a grand jury.

MR. GILLIS: That's correct, Your Honor. That does not make Mr. Rhoads an agent of the Government.

But in any case, even that could not be Rule 6(e) material, Your Honor, because that affidavit was sealed by the Court only until a specific date, after which it was to become disclosed. It was to become unsealed. And the Court has now unsealed it. So those facts could not be Rule 6(e) material.

THE COURT: Well, help me just understand and -- Rule 6(e) doesn't have a time limit on it, does it?

MR. GILLIS: No, Your Honor, it does not.

THE COURT: Okay. So at any point in time the Government is not supposed to disclose the inner workings of a grand jury proceeding.

MR. GILLIS: Absolutely, Your Honor.

THE COURT: And I assume that also means that they are not to instruct others to disclose the inner workings of a grand jury proceeding?

MR. GILLIS: That -- yes, Your Honor, that's true.

THE COURT: Okay. So if in fact a Government employee or investigative personnel, the Government instructed someone to disclose things that the Government itself shouldn't be disclosing, why isn't that a little bit of a problem?

MR. GILLIS: Well, Your Honor, even that does not reveal what occurred, if anything, before the grand jury. What that says is that -- it says that the Government -- the agent instructed Rhoads to tell Ms. Chen that he had been subpoenaed to the grand jury. Assuming that is -- that is what appears in the affidavit, so that is true, Your Honor.

But that does not reveal a single thing about what was occurring before the grand jury. It says nothing about what crimes were allegedly being investigated. It says nothing about whether in fact he had been subpoenaed before the grand jury. It says nothing about what he may have testified about before the grand jury if he had been called. It does not say whether he was called before the grand jury. It does not disclose any matters occurring before the grand jury.

Any more than-- in fact, the instances in Judge Ellis' opinion and those taking place in the D.C. <u>In re Sealed Case</u> are significantly more revealing of what may have been

taking place before an existing grand jury than anything that Rhoads was instructed to tell Chen.

THE COURT: What about Mr. Kiyonaga's invitation for you to say whether there was or wasn't a grand jury proceeding?

MR. GILLIS: Your Honor, that would be inappropriate.

THE COURT: And tell me why?

MR. GILLIS: Well, Your Honor, I mean, first of all, that would be covered by Rule 6(e). Also, what, if anything, we were investigating about Ms. Chen or whomever may have been investigating, this doesn't presuppose that Chen was the object of the grand jury's investigation. Nothing of that kind has been revealed even by Mr. Rhoads.

All that Rhoads said to Chen was that he had been subpoenaed before the grand jury. Whether that furthered -- whether that prompted Ms. Chen to do something, whether that was the case, it doesn't say who or what was being investigated.

As far as revealing to the -- revealing based upon a motion to reveal what the grand jury -- that basically could be done -- there is no reason why that wouldn't then be done in every single case where that -- where an investigation is closed without, without a -- without any charges being brought. The whole purpose is not to do so. The whole purpose of the grand jury secrecy rule is prevent exactly that from happening.

THE COURT: Anything else?

MR. GILLIS: No, Your Honor. To be clear, I don't, I don't support or condone the disclosure of any information regarding an investigation, whether it happens by the FBI director or anyone else. I don't condone it in any manner whatsoever.

So I'm just taking the facts as given and I'm saying that no violation of a Court order took place. No violation of Rule 6(e) took place. And there was no disclosure of Rule 6(e) material.

THE COURT: Okay. Thank you.

Mr. Kiyonaga.

MR. KIYONAGA: Briefly, Your Honor.

Your Honor, Friday's pleading was produced in a fairly short period of time because I didn't realize until late Wednesday that the affidavit was unsealed and available to be read.

But the Privacy Act language speaks for itself, whether or not I cited the right subsection. And it clearly covers more than somebody's name, date of birth, and Social. Without question it covers photographs of Dr. Chen when she was a young woman and a child and photographs with her family.

And I can represent to the Court that there were no copies of those photographs. They were -- the photographs were in her house. There were no copies anywhere else.

But I would add also that Mr. Rhoads is clearly a de

facto agent of the FBI and he should be treated as such for purposes of the Court's analysis.

And what the Government is asking you to do is to basically agree that a grand jury is essentially the Government's toy. That nobody can know about it.

Your Honor, the Court well knows that it has the discretion to examine grand jury proceedings. Under the Bank of Nova Scotia, a Court did dismiss a case if a criminal case has been commenced based on prosecutorial misconduct before a grand jury.

So the Government's protestations about the inappropriateness of answering the question as to whether or not a grand jury ever occurred in this case I think rings somewhat hollow. I don't think, I know.

But the grand jury is only one of several causes before the Court. But 6(e) clearly covers the identity of a witness. And it covers everything to appear before the grand jury.

And under Cudahy, Your Honor, that's a broad ambit. It's the identity. It's the testimony. It's essentially the direction the grand jury is taking, what they plan to do. Anything that goes to the substance of the grand jury's considerations.

The Government has cited to cases which were much more far-flung and dealt with broader investigations with far

more publicity surrounding them. Whitewater had been investigated by everybody from the Arkansas State Police through the Special Prosecutor.

This is a very focussed matter. The FBI undertook to investigate Dr. Chen five years ago, and we've had two news stories about it.

And I should point out, Your Honor, that there is no question but that the search warrant application and the affidavit were under seal at the time of the search. And yet somehow local and network news were on the scene when the searches were conducted at Dr. Chen's home and at the University of Management and Technology. I think, once again, somebody within the law enforcement cadre leaked that, leaked that story.

But beyond grand jury, Your Honor, we have a violation of the Court's seal or apparent seal. If the Clerk's Office is telling callers that a matter is being treated under seal, whether or not the Court later decides to unseal it, there was no mention in the docket about a retroactive application for the Court's order of the 25th.

A person who decides notwithstanding that posture on the part of this Court to disclose, does so at his or her own risk. And I would submit that that's a contempt of the Court's authority.

THE COURT: Well, help me understand that. If, if

someone was given a copy of the affidavit and the search warrant and my order saying, these are to be held under seal until a particular date, and the day after that particular date runs by, why aren't -- why isn't that person able to, without any fear of incrimination, disclose the information because the time period that the Court has set for that information to be held under seal has expired?

MR. KIYONAGA: Your Honor, I don't disagree with that formulation, but we don't know that that's what happened here.

THE COURT: Well, no, but I'm just -- the information is the information. And if it is no longer to be under seal, whether somebody looks at it or not, it still should be public information.

MR. KIYONAGA: Your Honor, with respect, I don't think that's entirely correct. Whatever the status of that information was at the time of the -- of its release to Fox News --

THE COURT: And that was like in 2017. So we're talking about four years later, basically, right?

MR. KIYONAGA: Yes, Your Honor.

THE COURT: Almost four years.

MR. KIYONAGA: We don't know whether somebody received that affidavit at the time of the search and a copy of the sealing order and then opted sua sponte to release it after the expiration of the seal. And that's one of the reasons why

I believe -- one reason why I believe a hearing is called for.

If somebody called in and said, is case such and such under seal, and is told by the Clerk's Office that it is, and opts to disclose it and put it on the evening news anyway, I would submit that's conduct the Court ought to be concerned about. We don't know what happened. I would submit the Government has a good idea.

But be that as it may, that is -- the seal is one issue. The 6(e) is another. The Privacy Act, this is clearly very personal information. And it's also the private property of Dr. Chen. And essentially the Government has converted it by disclosing it without her authority to the media for the entire world to see.

So you have -- the Court has a host of grounds for it's intercession here. And the Court can be much more specific about the ground or grounds, plural, that should attend relief to Dr. Chen. And the Court would be in a much better position to do that if we heard from the Government exactly how all this came to transpire. I think a prima facie case has more than been made, and I think it's time to hear from the people on the ground in this process to figure out how this -- how this information went out.

I should point out, Your Honor, that this has been extremely damaging to Dr. Chen and her family and everybody around her. Her university is basically under siege. All the

Government contracts are being reviewed, if not outright pulled. The military services are telling their students that they need to be cherry of this institution. And people are afraid to talk to her. They're afraid to have anything to do with her.

And I would submit, Your Honor, that's just not how it's supposed to work. If the Government wants to investigate somebody and charge them and subject them to the criminal justice process, that's one thing. But what's happened here is that they investigated. They decided not to charge. And somebody or some people within the Government decided they don't like that. So as a matter of personal preference, they're setting out to ruin her.

And the Government is saying, you know, the Court doesn't know if there was a grand jury, so the Court can't do anything about it. And I would submit the Court ought to be bothered by that response.

THE COURT: Well, thank you. And I appreciate the pleadings that have been filed and the arguments that we've heard here today.

Having reviewed the pleadings and the arguments and the cases cited in the materials that have been submitted, first on the issue of a violation of the Court's order of sealing, I think it's pretty clear what my position is on that already, but let me just explain it a little bit further.

My view is that I entered an order back in 2012 that limited the time period in which those materials were to be -- remained under seal or considered to be under seal. And that time period explicitly expired on the date that I set out in my order, and I believe it was March 3, 2013, if I recall that date right. But it was a date in March of 2013.

I don't find that the order that was -- March 4, 2013. I don't find that the order that was -- or the motion and subsequent order that was entered by Judge Hilton in any way changes that.

You know, unfortunately, the Court and the Clerk's Office deals with a large number of subpoenas. Whether in fact this got overlooked in the Clerk's Office is something that, you know, by the terms of my order should have been taken off the sealing list and put on the public record list, you know, probably, yes.

And I think we've implemented in the recent -- since the end of 2012 procedures that are in place that help track these things better with electronic filing and some other things.

But in fact, you know, my order was specific in that the information that was contained in the application and affidavit and the search warrant itself was not considered to be under the Court's sealing order after March 4, 2013.

So I don't find that there is any violation of the

sealing order and having the information that was contained in the affidavit in support of the search warrant made public to anyone.

The next issue has to do with the motion under 6(e). This one, and as you can probably tell from my questioning, the only issue that I thought came close to that was the information that was provided to Dr. Chen that Rhoads said that he was going to be testifying in front of a grand jury. I don't find that there is anything else that's contained in the pleadings or the Fox News report or anything else that would -- that could even come close to falling under the rule of -- a violation of Rule 6(e).

And I think, you know, having heard the argument and reviewing Judge Ellis' decision in United States of America versus Rosen, 471 F.Supp. 2d 651, that even that information in and of itself doesn't rise to a prima facia showing of a 6(e) violation. You know, it was Rhoads who described the -- who provided that information. It was information that was provided only at the time to Dr. Chen.

The subsequent information that was contained in the affidavit, that is that -- you know, the affidavit outlines that. Is public information now. It was contained in the affidavit.

So I find that there isn't a violation or there hasn't been a showing of a prima facie violation that would

require the Court to have any further proceedings relating to a Rule 6(e) violation.

The privacy claim, I'll tell you, I think is not really before the Court at this time. And I know, Mr. Kiyonaga, you raised this on Friday. I don't think the Government has had a full and fair opportunity to address that in the hearing today. And, honestly, I haven't really had a full opportunity to review what it may be that you're claiming was a Privacy Act violation.

So I'm not going to rule on that issue. I'm not finding that that is properly before the Court on the motion that I set for a hearing back when we -- I entered my order back on March 27, that that was not an issue that was before the Court at the time.

If you want to, given what I have said here today, consider pursuing some sort of Privacy Act issue, you can do so, but it's going to have to be done in a new motion, be considered as a separate motion to be briefed and, if necessary, argued at a later time.

Any questions from the parties about my ruling this morning? Mr. Gillis?

MR. GILLIS: Nothing from the Government, Your Honor.

THE COURT: Mr. Kiyonaga.

MR. KIYONAGA: Your Honor, would the Court indulge me one moment?

UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| IN RE SEARCH OF: | ) | |
| | ) | No. 1:12sw1002 & 1003 |
| UNIVERSITY OF MANAGEMENT AND TECHNOLOGY, *et al* | ) | |
| | ) | **UNDER SEAL** |
| | ) | |

ORDER

The UNITED STATES, pursuant to Local Rule 49(B) of the Local Criminal Rules for the United States District Court for the Eastern District of Virginia, having moved to seal the search warrant application and affidavit in support of the search warrant, the Motion to Seal, and proposed Order in this matter; and

The COURT, having found that revealing the material sought to be sealed would jeopardize an ongoing criminal investigation; having considered the available alternatives that are less drastic than sealing, and finding none would suffice to protect the government's legitimate interest in concluding the investigation; and finding that this legitimate government interest outweighs at this time any interest in the disclosure of the material; it is hereby

ORDERED that the search warrant application and affidavit in support of the search warrant, Motion to Seal, and this Order be Sealed until the close of business March 4, 2013.

/s/ JFA
John F. Anderson
United States Magistrate Judge

Date: Dec. 3, 2012
Alexandria, Virginia

AO 106 (Rev. 06/09) Application for a Search Warrant

UNDER SEAL

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

DEC - 3

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
2122 21ST ROAD NORTH
ARLINGTON, VIRGINIA

Case No.1:12sw 1002

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
2122 21st Road North, Arlington, Virginia, as further described in Attachment A-2

located in the Eastern District of Virginia, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1546 | fraud and misuse of a passport |
| 18 U.S.C. § 1001 | false statement in a matter within the jurisdiction of the executive branch of the U.S. government |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: __________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

James P. Gillis

*Applicant's signature*

Timothy S. Pappa, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: December 3, 2012

/s/
John F. Anderson
United States Magistrate Judge

*Judge's signature*

City and state: Alexandria, Virginia

Hon. John F. Anderson, United States Magistrate Judge

*Printed name and title*

UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE

DEC - 3

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| IN RE SEARCH OF: | ) | No. 1:12sw 1002 |
| | ) | |
| 2122 21ST ROAD NORTH | ) | |
| ARLINGTON, VIRGINIA | ) | UNDER SEAL |

AFFIDAVIT IN SUPPORT OF TWO
APPLICATIONS FOR SEARCH WARRANTS

Timothy S. Pappa, being duly sworn, says:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the FBI's Washington Field Office in the District of Columbia. I am assigned to a counterintelligence squad which investigates crimes involving national security. I entered on duty as an FBI Special Agent in July 2008.

2. As discussed below, I submit that there is probable cause to believe that the operator of an online university, which has access to certain military records for thousands of U.S. military personnel, has fraudulently concealed her past history as an officer with the People's Liberation Army in the People's Republic of China by lying on immigration and naturalization forms, in interviews with federal agents conducting a background investigation, and to federal law enforcement agents.

3. I submit the following affidavit in support of applications for search warrants for the company and residence of Yanping Chen. As discussed below, I submit that there is probable cause to believe that Chen has committed fraud and misuse of a passport, in violation of 18 U.S.C. § 1546, and made false statements in matters within the jurisdiction of the executive

branch of the U.S. government, in violation of 18 U.S.C. § 1001, and that fruits, evidence, and instrumentalities of both crimes, that is, the items listed in Attachment B, will be found at Chen's company, University of Management and Technology, 1901 North Fort Myer Drive, South Building, Suite 700, Arlington, Virginia, as further described in Attachment A-1, and Chen's residence, 2122 21st Road North, Arlington, Virginia, as further described in Attachment A-2.

4. The facts and information contained in this affidavit are based upon my training and experience, participation in investigations, personal knowledge, and observations during the course of this investigation, and my review of records, documents, and other physical evidence obtained during the course of this investigation, as well as the observations of other agents involved in this investigation. This affidavit contains information necessary to support probable cause. It is not intended to include each and every fact and matter observed by me or known to the United States.

## STATEMENT OF PROBABLE CAUSE

### *The University of Management and Technology*

5. The University of Management and Technology (UMT) is an online university with offices in Arlington, Virginia, in the Eastern District of Virginia. UMT is a wholly-owned subsidiary of the Yankee Clipper Group, which is owned by Chen. Chen is the president and founder of UMT. Her husband, J. David Frame, is the dean and a professor at UMT.

6. According to the UMT website, "UMT also has distance learning students enrolling in degree programs in China (including Hong Kong and Taiwan) . . . with support from local universities or colleges who partner with UMT." UMT also provides training to visiting PRC government delegations according to a UMT employee.

7. According to a UMT employee, UMT has had a contract to offer UMT courses toward professional certifications to employees of the Defense Acquisition University. UMT also has a partnership with the Naval Postgraduate School and the U.S. Department of Homeland Security Center for Homeland Defense and Security, according to a UMT employee. This allows any UMT student enrolled in a homeland security degree program or any UMT staff member to access a Center for Homeland Defense and Security database that holds over 98,000 homeland security policy and strategy documents. UMT has provided training to several other U.S. government agencies as well, according to the Yankee Clipper website.

8. The UMT website includes a September 2012 press release announcing that UMT had been selected as a "2013 Military Friendly School" by *G.I. Jobs* magazine. According to the release, UMT has won this title two years consecutively. UMT was to be listed in the annual *G.I. Jobs Guide to Military Friendly Schools*, distributed in print and digital format to hundreds of thousands of active and former military personnel. About seventy percent of UMT's enrollment, or approximately 2,800 students, are affiliated with the U.S. military, according to the *G.I. Jobs* magazine.

9. According to a link to the *G.I. Jobs* magazine web page, UMT, like similar schools, allows a student to receive transfer credit for past military training. Most U.S. military branches will provide transcripts of a service member's military training so that it can be used to obtain potential transfer credits. For example, according to one UMT student in the U.S. Navy, he had provided his Sailor-Marine American Council on Education Registry, or "SMART," transcript to UMT for consideration for transfer credits. This included all military training he had received that was eligible to be translated into course credit.

10. According to the UMT website, UMT offers a military scholarship, essentially a discount on the per-credit-hour tuition, that is available to active duty military personnel and to qualified veterans who were discharged honorably. Spouses of active duty personnel are also eligible for the scholarship. To establish their eligibility, UMT students have been asked to provide a form known as a DD-214, which shows a service member's military record. Trash covers of the UMT offices show that to demonstrate their eligibility, some service members had faxed materials to UMT using official cover sheets that contained information about the particular military units to which they were assigned.

*The SONIS Database*

11. According to UMT personnel, "SONIS" is an online database unique to UMT, which contains students' course grades, as well as students' personal information, such as work and home addresses. Also, UMT student records are scanned and uploaded into the SONIS database.

12. According to a former UMT student who had access to his SONIS account, he found every military document he had ever provided to UMT in his SONIS account. These documents included evaluation reports for each U.S. military training course he had completed, his discharge reports that included information related to his work on military aircraft, and U.S. military training transcripts that included descriptions of the courses he had taken. The student had provided these documents to UMT because he had been encouraged by UMT personnel to supply as much information as possible for him to qualify for transfer credits.

13. A UMT personnel member with access to the SONIS system demonstrated to law enforcement agents how he was able to view information on certain students, including their

official email addresses, and information regarding the U.S. military facility or unit to which they were assigned. The user was able to organize the enrolled students by U.S. military facilities or military units, for example, "183rd Fighter Wing," "188th Fighter Wing," "Fairchild Air Force Base," and "Camp Murray."

14. According to a UMT employee, UMT also has offices in Beijing, PRC, where personnel have administrator privileges to the SONIS database.

*Chen's History with the People's Liberation Army*

15. On October 5, 2011, Chen and her husband, Frame, were recorded while talking to an active duty U.S. military officer who was then enrolled as a student at UMT. During the conversation, Chen mentioned that she had been a colonel in the PRC military:

| | |
|---|---|
| Student: | Now, how long have you been here? |
| Chen: | I have been here since 1987. |
| Frame: | She's a U.S. citizen. |
| Student: | You, were you, ex-military when you came here? |
| Chen: | I was, I was that, so let's not share military secrets (laughed). Yeah, I was ex . . . I was . . . I retired . . . I retired as a colonel. |

16. On October 13, 2011, Chen was recorded while talking with a UMT employee. During the conversation, Chen discussed her background in the PRC military but told the employee that she would not want to publicize it. Chen also mentioned that her father was a three-star general. She also mentioned that her last military post was in the PRC space program.

| | |
|---|---|
| Employee: | I was talking to a student earlier and he was curious . . . whether some of [our instructors] are soldiers. |

Of course I mentioned I was, and [another individual] and everything. At some point didn't you say that you were also . . . ?

| | |
|---|---|
| Chen: | Yeah, I was in the military, yes. |
| Employee: | I think you said you were. You never told me, what branch or what rank, I mean, I was just curious. |
| Chen: | I was a retired as a colonel. |
| Employee: | Really? |
| Chen: | Mm hmm. |
| Employee: | Is that something you would want to put as somewhere . . . ? |
| Chen: | I . . . no, no, I would not because I was in the Chinese military, not in the U.S. military, so normally I would . . . I . . . [unintelligible (UI)] . . . I was in the military . . . military that's it . . . military training . . . very, very . . . you know, even run, even the discipline, everything the same, especially for the . . . [UI]. |
| Employee: | What was your specialty? I mean, I guess they call it MOS. |
| Chen: | I was a medical doctor, I was a medical corps. When I joined the military, I was the army age, even now 16. |
| Employee: | Is it like compulsive? Is it kind of . . . |
| Chen: | Was not. Was voluntary. |
| Employee: | Because Israel is like that. |
| Chen: | No, it was voluntary. It was voluntary. However, the reason I was able to join so early, that was during the Cultural Revolution, and essentially the |

government stop all the schooling, and my dad was, my dad was general in the military, so . . .

Employee: Did they have other rank because there's four generals here.

Chen: Mm hmm, mm hmm. My dad was like, at that point, they abolished rank but he was equivalent of a three-star general.

Employee: They call that a lieutenant general.

Chen: Yeah, in China, was the only thing different is we do have . . . the captain, the colonel, you have like lieutenant colonel, you have colonel. I was full colonel. I retire as full colonel [UI].

* * *

Chen: I kind of not publicly talk about myself unless I talk to students. I wouldn't say I was in the military because, because it's still different. I was in Chinese military, I didn't have U.S. military experience.

* * *

Chen: Actually, military life, I really, I have to say, it benefits a lot. My last post was I was on the space program as the planning director. Actually in China the space program is like dual use. However, for the technical people the government put all the technical people under the military control, everyone has to, they accept the research, they don't have rank. But anyone in the management has rank because they're in the military. Because they wanted to [UI] of the sites the program not going to pick the civilian, so we all have rank in my office. My entire office all of them are colonel, we even don't take any lower rank. Either junior lieutenant colonel and . . . I was the colonel . . . I was four colonels. So, I have five, six staff, all of them man. I enjoy working with them. They are colonel rank,

> but they all below me. So because I was full colonel, of course we have other people, just supporting staff. I'm just saying entire office people has management responsibility, so that was a really fun time.

*Chen's False Statements on Immigration Documents*

17. On or about June 4, 1993, Yanping Chen filed an I-485[1] with the former Immigration and Naturalization Service, presently Citizenship and Immigration Services. The INS received the I-485 on or about July 1, 1993.

18. Chen made a false material statement in Part 3(C) of her I-485, which asked:

> List your present and past membership in or affiliation with every *political organization*, association, fund, foundation, *party*, club, society, or similar group in the United States or in any other place since your 16th birthday. Include any *foreign military service* in this part. If none, write "none". Include the name of organization, location, dates of membership from and to, and the nature of the organization. (Emphasis added)

19. Chen responded to this question by answering, "None." Chen did not disclose her foreign military service on this form.

20. Chen made a false material statement in Part 3, Question No. 6, of her I-485, which asked:

---

[1]An Immigration and Naturalization Form I-485 (Application to Register Permanent Residence or Adjust Status) is an application filed by an alien seeking to adjust his or her status from that of a visa holder to that of a lawful permanent resident. One of the purposes of the I-485 is to ascertain the social, political, and criminal background of the applicant. This includes questions about social, military, and political organizations, and specifically membership in the Communist Party. An adjudicator for CIS will use the information provided by the applicant on the I-485 to interview the applicant. The adjudicator will go over the form with the applicant and confirm the applicant's answers orally. The adjudicator will tailor certain questions concerning the background of the applicant based upon the information provided on the form to determine whether the applicant is eligible to adjust status to that of a lawful permanent resident.

> Have you ever been a member of, or in any way affiliated with, the Communist Party or any other totalitarian party?

21. Chen marked the box "No." Chen did not disclose her affiliation with the Communist Party, therefore thwarting any questioning an INS adjudicator may have had regarding party affiliation through her military service, or otherwise.

22. Chen signed the I-485 under penalty of perjury on or about June 4, 1993. Chen's I-485 was approved by the Immigration and Naturalization Service on or about September 27, 1993.

23. On or about June 2, 2000, Chen filed an N-400[2] with the INS. Chen signed the N-400 under penalty of perjury. The N-400 was received by the INS on or about June 5, 2000.

24. Chen made a false material statement in Part 7, Question No. 1, or her N-400, which asked:

> Are you now, or have you ever been a member of, or in any way connected or associated with the Communist Party, or ever knowingly aided or supported the Communist Party, or indirectly through another organization, group or person, or ever advocated, taught, believed in, or knowingly supported or furthered the interest of Communism?

---

[2]An Immigration and Naturalization Form N-400 (Application for Naturalization) is an application to naturalize as a U.S. citizen. One can do this after one has become a lawful permanent resident for the prescribed period of time (usually five years). One of the purposes of the N-400 is to ascertain the applicant's affiliation with organizations, funds, parties, etc., and specifically the Communist Party. The form also covers questions regarding criminal background, specifically whether the applicant has ever made any false or misleading statements to gain an immigration benefit. An adjudicator for CIS will use the information provided by the applicant on the N-400 to interview the applicant. The adjudicator will go over the form with the applicant and will confirm the applicant's answers orally. The adjudicator will tailor certain questions concerning the background of the applicant based upon the information provided on the form.

25. Chen marked the box "No." Chen failed to disclose her military service in the People's Liberation Army, whose mission is to support and protect the ruling party in the PRC, which is the Communist Party. According to Dr. David Lai from the U.S. Army War College,[3] the People's Liberation Army (or PLA) is the armed branch of the PRC Communist Party. Members of the People's Liberation Army are required to pledge allegiance to the PRC Communist Party. In addition, according to Dr. Lai, there is no separation between the People's Liberation Army and the PRC Communist Party.

26. Chen made a material false statement in Part 7, Question No. 15a, of her N-400, which asked, "Have you ever . . . knowingly committed any crime for which you have not been arrested?"

27. Chen marked the box "No." I submit that this omission constituted a violation of 18 U.S.C. § 1001 (false statement), as well as 18 U.S.C. § 1546 (fraud and misuse of visas, permits, and other documents), because, *inter alia*, while not arrested for them, Chen had knowingly made false material statements on her I-485 and thereby had obtained a visa or permit

[3]According to the Army War College website, "Dr. David Lai is a Research Professor of Asian Security Studies at the Strategic Studies Institute (SSI) of the U.S. Army War College. Before joining SSI, Dr. Lai was on the faculty of the U.S. Air War College. Having grown up in China, Lai witnessed China's 'Cultural Revolution,' its economic reform, and the changes in U.S.-China relations. His teaching and research interests are in international relations theory, war and peace studies, comparative foreign and security policy, U.S.-China and U.S.-Asian relations, and Chinese strategic thinking and operational art. Dr. Lai is the author and co-author of many articles and books on U.S.-China and U.S.-Asian relations, and has co-edited several books on the subject, including *The PLA at Home and Abroad: Assessing the Operational Capabilities of China's Military* (with Andrew Scobell and Roy Kamphausen, Carlisle, PA: Strategic Studies Institute, U.S. Army War College, June 2010), and *Chinese Lessons from Other People's Wars* (with Andrew Scobell and Roy Kamphausen, Carlisle, PA: Strategic Studies Institute, U.S. Army War College, 2011). Dr. Lai holds a bachelor's degree from China and a master's degree and Ph.D. in political science from the University of Colorado."

(her lawful permanent residency card) by false statements and fraud, all violations of 18 U.S.C. § 1546, among other statutes.

28. Chen made a material false statement in Part 9 of her N-400, which asked:

> List your present and past membership in or affiliation with every organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place. Include any military service in this part. If none, write "none". Include the name of organization, location, dates of membership and the nature of the organization.

29. Chen responded to this question by answering, "N/A." Chen did not disclose her foreign military service on this form.

30. The INS approved Chen's N-400 on or about April 5, 2001. Chen was officially naturalized as a U.S. citizen on or about May 17, 2001.

31. Being granted U.S. citizenship, Chen was able to apply for a U.S. passport. On or about May 22, 2001, Chen filled out and submitted a U.S. Department of State Form DSP-11 (Application for Passport), and on or about May 29, 2001, Chen was issued U.S. passport number xxxxx9566 with an expiration of May 28, 2011.

32. Chen traveled outside of the United States on a number of occasions and used her U.S. passport number xxxxx9566 to re-enter the United States through the port of entry at Washington Dulles International Airport (IAD) which is located in the Eastern District of Virginia. Chen used the passport to enter the United States through IAD on March 30, 2008, April 15, 2008, May 24, 2008, December 7, 2008, January 9, 2009, May 19, 2009, July 4, 2009, September 17, 2009, and May 11, 2010.

33. On or about May 18, 2011, Chen filed U.S. Department of State Form DS-82, (U.S. Passport Renewal Application For Eligible Individuals). Chen was issued a new U.S. passport number xxxxx4323 on or about May 24, 2011, with an expiration of May 23, 2021.

34. Chen traveled outside of the United States on a number of occasions and used her U.S. passport number xxxxx4323 to re-enter the United States through the port of entry at IAD. Chen used the passport to enter the United States through IAD on July 30, 2011, September 28, 2011, and May 13, 2012.

35. I submit that by "possess[ing], obtain[ing], accept[ing], or receiv[ing]" a U.S. passport, Chen violated 18 U.S.C. § 1546, among other statutes, because, *inter alia*, her citizenship was obtained through fraud and she therefore knew that her passport was "procured by fraud or unlawfully obtained." I also submit that each entry into the United States was a "use" of the passport that was "procured by fraud or unlawfully obtained" and therefore constituted a violation of 18 U.S.C. § 1546.

*Chen's False Statements to Federal Agents from OPM*

36. On or about September 14 and 15, 2011, the Office of Personnel Management, Federal Investigative Service, interviewed Chen in connection with a background investigation for a security clearance renewal for her son-in-law, Hu Zhen, a/k/a John Hu. Hu is a naturalized U.S. citizen and holds a SECRET security clearance for his work at a U.S. defense contractor.

37. During the interview, Chen denied that she had ever served in the PRC military. She also denied that any of her family members or her first husband had ever served in the PRC

military.[4] Chen also denied that she had any contact with representatives of a foreign government, and she said that her companies, the Yankee Clipper Group and UMT, did not hold any contracts with representatives of a foreign government and did not receive any revenue from representatives of a foreign government.

38. In or about October 2011, the Office of Personnel Management, Federal Investigative Service, interviewed Wang Lele, Chen's daughter and the wife of Hu, in connection with Hu's background investigation. Wang is the director of the dean's office and the marketing director at UMT. She has been working at UMT for approximately twelve years.

39. During the interview, Wang said that her father (Chen's first husband) and her mother both had served in the PRC military. Wang did not know her parents' ranks, but recalled that her mother had had "two bars and one star" and that her father had had "two bars and three stars." Wang told the investigators that sometime after Chen married Frame, in 1996 or 1997, she returned to China and resigned from the PRC military. Wang also said that Chen's father had been a very high ranking member of the PRC military.

40. Wang said that the students who attended UMT were mainly from the U.S. military. She also told the investigators that she believed that UMT received revenues from foreign governments and had contracts with them because the governments paid for students that attended UMT. Wang said that there were Chinese delegations that came to UMT every other month.

[4]During the interview, Chen had discussed her first husband, her mother, her sisters and brother, and family members on her first husband's side. Chen denied that she or any of these family members had any affiliation with the Chinese government or military.

41. Wang was interviewed again by federal agents on May 7, 2012. She told the agents that her mother had served in the People's Liberation Army. She said that after she was interviewed by the Office of Personnel Management, she told her mother that she had told the interviewers that Chen had served in the PLA. Chen told Wang that Wang was mistaken.

*Chen's Efforts To Conceal Her PRC Military History*

42. On March 14, 2012, Chen was recorded while talking with a contractor for UMT. Chen was then aware that FBI agents wanted to interview the contractor about Chen's past in the PRC military. Chen and the contractor discussed what the contractor might say.

> Contractor: But I'm not going to bring up the Army shit because I don't want them getting into my shit.
>
> Chen: No, no, no, you don't have to, yeah, you really didn't know my past. Say, "I really didn't know why you get Army, and I really didn't know her." . . . Just say, "I really don't know her, her past."
>
> Contractor: I don't want them to trip me up and get me bullshittin' them or lying or something.
>
> Chen: No, if you don't know, then you don't know. Even say, "Oh, she was in the military service?" You should say, "I don't know," because you really don't know.

43. On March 27, 2012, Chen had another conversation with the contractor, who had told Chen that now the FBI and the U.S. Army wanted to interview the contractor. The contractor told Chen some of the questions he had been asked by the U.S. Army.

> Contractor: "Why do you work for this woman? Why do you work for a former Army officer of the," what's the government called, "the People's Republic" or something like that?

Chen: Yeah.

Contractor: Yeah, whatever, that shit. "And think about how much money you're getting paid, and work for . . . ."

Chen: That's right, you simply [UI] "I'm working for the university, I'm not working for this lady. And she is not university, university is entire university." And the second thing is that, "Why you working for the former whatever?" "I don't know who she was."

* * *

Chen: . . . The second thing, "Why you work for this former blah blah?" You say, "I don't know about this." . . .

* * *

Chen: . . . If you say, "I choose to work for UMT, not for this lady." [UI] "Until after I work at UMT, I bump into this lady and get to know her." No, not that, "I bump into her and say 'Hi,' that's it. That's all the relationship." . . .

44. On April 25, 2012, Chen was recorded when the contractor told Chen and Frame that he had been served with a grand jury subpoena to testify in May 2012. During the conversation, the contractor brought up how the FBI had called him and again questioned him over the phone about Chen's PRC military history:

Contractor: [T]hey were, over the phone about "Why you working for a," the guy cussed or something, "Why you working for a former" [UI] He said, "Why you working for a former . . ."

Chen: PLA? [UI]

Contractor: . . . Chinese officer, yeah, some shit like that. I don't fuckin' know, she's my boss, she pays me, I

don't know what she did when she was [UI] or whatever.

* * *

| | |
|---|---|
| Contractor: | When we first met, I had a different level of respect for you anyways because you're a soldier too. You can relate to things I tell you, and kind of give me feedback but, I don't know, it just, Army people whether it's in the same country or, I've trained with people from all over the world and there's just a brotherhood and sisterhood whether you're enlisted or officer or whatever. There's just an unspoken underlying respect. |
| Chen: | And also underlying values, right? |

* * *

| | |
|---|---|
| Chen: | You should not express your feeling about this person. Yeah, yeah. See this person understands me, this person has the same experience. They will ask you, what same experience you are talking about? |
| Contractor: | I understand what you're saying, but they can pretty much fuck off, excuse my language. I have respect for your wife, they can, if they bring up her service that's an honorable thing, whether it's China or whoever. |
| Chen: | Golly, you don't reasoning those, they don't share the same reasoning with you, so don't . . . |
| Frame: | Just answer yes or no. I think that's [UI] very surprised if they were going to ask any questions about her and her service or whatever outside of . . . |

45. During the same conversation, Chen told the contractor, "[I]f you don't know, you don't know, and don't be make additional comments, because that always can be the evidence come back to drag you more and more into this process . . . ."

Chen: I would say the attitude is honest. Say what you know, say what you don't know [UI] anything before you work for us, you have no direct knowledge, you don't know anything, so that area, you should not even touch it.

Contractor: No, I won't.

* * *

Chen: . . . Whatever happened to any one of the employee at UMT to anything happen to UMT you have no knowledge whatsoever.

Contractor: No, I don't.

Chen: Yeah, so what can you say?

Contractor: Nobody around here, I really don't socialize with anybody but you.

Chen: Why include me? You don't know me, even two years before that.

46. According to a former UMT student, Chen kept at least through January 26, 2012, a Chinese space rocket model on display in her office. The rocket appeared to be comparable to NASA's Saturn series rockets. After the discussions recounted above, however, a witness familiar with Chen's office noted that Chen no longer had any of her Chinese model rockets by her office window. Chen told the witness that the models had been damaged by a window cleaning crew.

*Chen's False Statements to Federal Law Enforcement Agents*

47. On July 30, 2011, a Customs and Border Protection officer interviewed Chen at Washington Dulles International Airport upon her arrival on a direct flight from mainland China.

Chen told the CBP officer that she had been in the PRC military. During the same interview, however, she denied that her first husband had ever been in the PRC military.

48. On January 31, 2012, FBI and NCIS agents interviewed Chen at her office suite. She told the agents that she had had a "management position" in the PRC space program and was a cardiologist involved in the standards used in the selection of PRC astronaut candidates. Chen said that this was a civilian position and that, while the space program "belongs" to the PRC military, civilian projects are at its core. Chen was asked, "Even as a civilian in a civilian management position in the Chinese space program, did you hold any military rank or wear a military uniform?" Chen replied, "It's like the Pentagon. There are many civilians at the Pentagon." The agents followed this by asking, "But did you have a military rank?" Chen replied, "No, I didn't have any rank."

49. During the interview, Chen denied that she had ever served in the PRC military. Chen also claimed that she does not initiate contact with the PRC government and that, since the 1990s, she has had little interaction with the PRC government.

SEARCHING AND SEIZING COMPUTERS

50. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices (like internal or external hard disk drives, compact discs (CD), digital video disc (DVD), flash drives, and others) can store the equivalent

of millions of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

51. In searching any digital storage media, we will, to the extent possible, use computers and forensic software to conduct the searches. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a. Performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

b. Surveying various file directories and the individual files they contain;

c. Scanning storage areas;

d. Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

e. Examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

f. Opening files in order to determine their contents;

g. Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

52. For the foregoing reasons, I submit that there is probable cause to believe that Yanping Chen has committed violations of 18 U.S.C. §§ 1001 and 1546 and that fruits, evidence, and instrumentalities of such violations, that is, the items listed in Attachment B, will be found at Chen's company, University of Management and Technology, 1901 North Fort Myer Drive,

South Building, Suite 700, Arlington, Virginia, as further described in Attachment A-1, and Chen's residence, 2122 21st Road North, Arlington, Virginia, as further described in Attachment A-2.

Timothy S. Pappa
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed to before me
this 3rd day of December, 2012

/s/ JFA
John F. Anderson
United States Magistrate Judge
Hon. John F. Anderson
United States Magistrate Judge

ATTACHMENT A-1

*Premises to Be Searched*

University of Management and Technology
<u>1901 North Fort Myer Drive, South Building, Suite 700, Arlington, Virginia</u>

The University Management and Technology is in Suite 700 of the South Building at 1901 North Fort Myer Drive, Arlington, Virginia. The South Building is a multi-storied office building. The street-level exterior has concrete pillars, and the covered entrance, which faces 19th Street North, has the words "South Building" above it. The address "'1901 North Fort Myer Drive" appears on the side of the covered entrance. Two glass doors facing 19th Street North lead into the elevator lobby. Suite 700 is on the seventh floor, and entrance to the suite is through two glass doors with wood paneling. A sign to the right of doors reads, "University of Management and Technology."

A photograph of the South Building appears below.



ATTACHMENT A-2

*Premises To Be Searched*

<u>2122 21st Road North, Arlington, Virginia</u>

The residence at 2122 21st Road North, Arlington, Virginia, is a multi-storied residential townhouse with a brick exterior, green-colored door, and attached garage. The numerals "2122" appear to the left of front door, with a light above house number.

A photograph of the premises appears below.



## ATTACHMENT B

*Items To Be Seized*

1. Any and all documents, information, and objects referring or relating to the employment history of Yanping Chen in the People's Republic of China (PRC), including, but not limited to, photographs, PRC passports, and identification documents issued by the PRC government.

2. Any and all documents, information, and objects referring or relating to the People's Liberation Army or any other military branch of the PRC, including, but not limited to, photographs, memorabilia, uniforms, and medals or decorations.

3. Any and all documents, information, and objects referring or relating to the Communist Party of the PRC.

4. Any and all documents, information, and objects referring or relating to any space agency of the PRC.

5. Any and all documents, information, and objects referring or relating to contacts between the PRC government and the University of Management and Technology or Yanping Chen.

6. Any and all travel-related documents, information, and objects for Yanping Chen, including, but not limited to, any passports, itineraries, and receipts.

7. Any and all immigration-related documents, information, and objects for Yanping Chen, including, but not limited to, documents of the Immigration and Naturalization Service, the Department of Homeland Security, the Bureau of Citizenship and Immigration Services, or the Department of State.

8. Any and all computer hardware or electronic media capable of containing any of the documents, information, and objects identified above, including, but not limited to, central processing units, desktop computers, notebook computers, laptop computers, hard drives, external hard drives, palm pilots, personal pocket computers, and tower computers, media capable of holding audio or video recordings, cassettes, disks, compact discs, digital video discs, thumb drives, flash drives, iPods and similar devices. User guides/manuals, cords, and passwords for the hardware and media described above.

# EXHIBIT : February 24, 2017 Article, Edited to Excise Alleged Privacy Act Information

NATIONAL SECURITY · **Published** February 24, 2017 7:34pm EST

By **Catherine Herridge** , **Pamela K. Browne** , **Cyd Upson** , | **Fox News**

**EXCLUSIVE:** Based just four miles from the Pentagon in northern Virginia is an innocuous-sounding online school for "management and technology" – which a Fox News investigation reveals has been at the center of multiple federal probes about its leadership's alleged ties to the Chinese military and whether thousands of records from U.S. service members were compromised.

The University of Management and Technology in Rosslyn, Va., which opened in 1998, touts a campus in Beijing and "partnerships" with universities around the world. The U.S. Taxpayer-funded school claims to have had 5,000 graduates in the last five years and to be "especially proud of our students stationed in US military bases around the globe."

However, there is another side to the school's leadership that drew the attention of the FBI, the Justice Department, the Pentagon, Immigration and Customs Enforcement, and the Naval Criminal Investigative Service (NCIS) since at least 2012.

In December 2012, the FBI made two very public raids of UMT and the northern Virginia home of university president Yanping Chen Frame and its academic dean, her husband J. Davidson Frame.

Yet since those FBI raids, UMT has continued to collect more than $6 million from Defense Department tuition assistance programs as well as the Department of Veterans Affairs through the post-9/11 GI bill.

"It's a bad deal for the soldiers, and it's a bad deal for the taxpayer," Stephen Rhoads, a military veteran turned whistle blower who says he worked with the FBI on the case, told Fox News in an exclusive interview. "Nobody's getting what they paid for."

Rhoads said he worked at UMT recruiting vets when the FBI approached him in 2012 regarding the federal investigation.

"One of the first sentences she [Chen] ever threw out -- after she found out I was an Army officer,was, 'Well … I was a colonel in the army,'" Rhoads explained. "During our first face-to-face encounter,absolutely ... she did not deny it."

Rhoads said he thought Chen meant the U.S. Army, and asked whether she trained in Texas. "She laughed and said, 'Oh, no, I was in the Chinese army, you know.'"

While there are no U.S. laws preventing a naturalized citizen from running a school like UMT, the Fox News investigation found that Chen's ties to the Chinese military appear to run deep.

In her George Washington University dissertation, Chen thanks her father, a P.L.A. general, who directed arms and technology development. "My father, General Chen Bin, gave me the inspiration to pursue this area of study," Chen wrote. "As former Chairman of COSTIND (1982-87), he was an important player in supporting and directing the (Chinese) space program."

While going through the immigration process, Chen was also launching what would become a multi-million-dollar online academy. But that academy's work would eventually attract the attention of federal investigators, who questioned whether students' records were remotely accessed from China.

Rhoads said UMT recruited service members who provided their military history when they enrolled. "It got uploaded into an O-drive, they called it ... their personal military bio, you know, where they were trained, how they were trained, how long, that could be remotely accessed."

Rhoads said Chen had a particular interest in Ohio's Wright-Patterson Air Force Base, which is a research and technology hub.

And there was more. "She wanted me to go out to these remote reserve and National Guard centers, you know … in small-town America and start gettin' U.S. soldiers from those centers. Get their information, basically. Who's out there in the woods? How many units we got?"
Rhoads recalled to Fox News that he was instructed by the FBI to tell Chen that he was going to testify before a Virginia grand jury. "They wanted to, I guess see how … she would react."

At the time, Rhoads said Chen had no idea he was working with the bureau.

He said, "Well, at this point, she didn't know I was working for them at all. And she's like, 'Oh, you don't tell them anything. We don't know each other. You don't … know what you don't know,' was her buzz phrase. 'You don't -- you don't know I was a colonel in the P.L.A. They'll never have proof to say that'."

Emails obtained by Fox News show Rhoads and at least one FBI agent alerted the Defense Department, but another Memorandum of Understanding (MOU) was signed in 2014 through 2019 allowing UMT to collect millions in federal taxpayer aid.

An FBI agent in one email exchange wrote, "I let my management and the AUSAs [assistant U.S. attorneys] know about her renewal with DoD. Incredible."

Asked about the renewal, as well as whether DoD personnel were warned and additional steps were taken to vet UMT, the DoD chief for Voluntary Education Assistance, Dawn Bilodeau, referred questions to Pentagon spokesperson Laura Ochoa. In an email, Ochoa said, "In light of reports regarding University of Management and Technology (UMT), the Department is reviewing the DoD MOU signed between the institution and the DoD for compliance."

No one has been charged with any crime in connection with the investigation. Sources told Fox News that Assistant U.S. Attorney for the Eastern District of Virginia James P. Gilllis got the case, but there was a disagreement with the FBI over how to proceed, based on the case law and the extent to which sources and methods would be revealed.

Neither the FBI nor a spokesman for Gillis would comment to Fox News but separately, aspokesman for NCIS said they cannot comment on an "ongoing investigation." A FOIA request filed by Fox News Senior Executive Producer Pamela Browne confirmed an NCIS investigative file for UMT.

Fox News made repeated requests by phone and via email for interviews with Yanping Chen and J.Davidson Frame. After Chen's daughter said they were too busy to prepare and traveling out of town,Fox News went to their offices in Rosslyn, Va.

A school representative, who would not identify himself, confirmed Chen and Frame were in the office that day, but after learning Fox News was at the front desk, the couple refused to come out. Fox News' questions covered how UMT was run, Chen's suspected military ties, whether service members' records are secure, and how millions in taxpayer dollars are spent.



# EXHIBIT Y: April 28, 2017 Article, Edited to Excise Alleged Privacy Act Information

NATIONAL SECURITY • **Published** May 1, 2017 8:00am EDT

# Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report

By **Catherine Herridge** , **Pamela K. Browne** , **Cyd Upson** , **| Fox News**



**Congress investigating school's alleged ties to China**

Lawmakers demanding answers after Fox News investigation on Virginia-based university

**EXCLUSIVE:** Four congressional committees are demanding answers from the FBI and departments of Justice and Defense about a taxpayer-funded school that markets to the military, after a Fox News investigation exposed alleged ties between the university's leadership and the Chinese military.

The ongoing Fox News investigation has focused on the Virginia-based University of Management and Technology, its president Yanping Chen Frame and the school's academic dean, J. Davidson Frame, Chen's husband. UMT was raided by the FBI in 2012 as part of a counterintelligence investigation, but multiple sources told Fox News the case ran into roadblocks once it reached the U.S. attorney's office.

"There's not only a lot of smoke coming out of this one, there's some res out there that need to be extinguished and some people that really have to answer the questions," House Oversight Committee Chairman Jason Chaffetz, R-Utah, said.

In a letter to Defense Secretary James Mattis on April 12, Chaffetz said military service members and their personnel records remain at risk. He questioned why the Defense Department continues to fund the school with taxpayer dollars through the GI Bill and the tuition assistance program.

"There was no obligation to give this money. They didn't have to give this money. Somebody made a proactive decision to authorize this, to move forward, and then why not cut it off?" Chaffetz said.

Since the 2012 FBI raid, UMT received more than $6 million. Some $250,000 has been received by the school since Fox News aired its first report in February.

"It's a bad deal for the soldiers … it's a bad deal for the taxpayer," said former UMT employee Stephen Rhoads, a U.S.-veteran-turned-whistleblower who says he worked as an FBI informant on the case. "It absolutely disgusts me and needs to stop."

After the Fox News investigation, the Defense Department put the school under review but continues to fund it. When he worked there, Rhoads said the school got more than 250,000-$300,000 per month in taxpayer dollars.

"Her father joined the Communist Party in the 1930s. He supposedly participated in the Long March and that … gives her credentials not unlike being an officer in the continental army," said Peter Mattis, a fellow with the Jamestown Foundation and leading expert on China. "The Long March,"between 1934-1935, has long been referred to as a bloody pillar of the Chinese Communist Revolution which ultimately led to the creation of the People's Republic of China.

Mattis said a school like UMT would be attractive to the Chinese military.

"You get what you'd call a curated database. You're not just getting a database of a lot of Americans. You're getting a database of people who are interesting to you, people who work in the U.S. military, who have access to a sensitive technology," Mattis said. "This is valuable to China for two reasons. The first is, militaries everywhere want to know what a potential adversary might look like -- what are their capabilities, how will they act? The second is this might also serve as a vehicle for recruiting individuals."

Mattis added, "If intelligence is a numbers game and maybe one out of 100 or one out of 500 people are willing to commit treason, then the faster you can go through those numbers, the better off you are. They're looking for former officials, classmates, spouses, friends and they have no problem recruiting someone with only secondhand access to information."

Fox News has confirmed that the Naval Criminal Investigative Services (NCIS) is also investigating the UMT. Separately, multiple sources told Fox News that the U.S. attorney for the Eastern District ofVirginia, James P. Gillis, declined to prosecute in 2014, but that may be about to change.

The FBI, the U.S. attorney for the Eastern District of Virginia and the Defense Department declined to comment, citing the ongoing probe.

Chaffetz stressed his dismay with the reaction of the Department of Justice. "Just turning the other cheek on something that appears at least on the surface to be so blatant -- that begs the question, what are the 100,000-plus people at [the Department of Justice] doing?"

Fox News has an open invitation for an interview with Yanping Chen and J. Davidson Frame. They told Fox News in February they were too busy.

---

**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YANPING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | **Case No. 1:18-cv-03074-CRC**<br><br>**Hon. Christopher R. Cooper**<br>**United States District Judge**<br><br>**Oral Argument Requested** |

**MEMORANDUM IN SUPPORT OF NON-PARTY FOX NEWS NETWORK, LLC'S MOTION TO QUASH**

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Patrick F. Philbin (453620)
pphilbin@egcfirm.com

1155 F Street, NW, Suite 750
Washington, DC 20004
Telephone: (202) 249-6900
Facsimile: (202) 249-6899

*Counsel for Fox News Network, LLC*

July 29, 2022

**PUBLIC VERSION**

# TABLE OF CONTENTS

**Page**

BACKGROUND ....................................................................................................................3

A. The Government's Investigation into Plaintiff and UMT and Fox's Reporting....................................................................................................3

B. Plaintiff's Privacy Act Suit .............................................................................5

C. Plaintiff's Subpoenas to FNN .........................................................................6

ARGUMENT .......................................................................................................................7

I. The Subpoenas Should Be Quashed Because They Invade the First Amendment Journalist's Privilege.........................................................................................7

A. The Subpoenas to FNN Unquestionably Seek Information Protected by the Journalist's Privilege.........................................................................9

B. Plaintiff Cannot Show That the Information Sought in Her Subpoenas Is "Central" to Her Case Because the Subpoenas Are Vastly Overbroad. ................10

C. Exhausting Reasonable Alternatives Requires That Plaintiff Seek Discovery from Ms. Herridge Before Seeking Discovery from FNN. ..................12

II. The Subpoenas Should Be Quashed because they Invade FNN's Newsgathering Privilege under Federal Common Law. ...............................................................13

III. The Subpoenas to FNN Should Be Quashed because they Are Duplicative, Cumulative, and a More Convenient Source of the Information Exists. ...........................14

CONCLUSION....................................................................................................................16

## TABLE OF AUTHORITIES


**Page**

**CASES**

*Carey v. Hume*,
492 F.2d 631 (D.C. Cir. 1974) ....................8

* *Covertino v. Department of Justice*,
No. 07-CV-13842, 2008 WL 4104347 (E.D. Mich. Aug. 28, 2008) ....................14, 15

* *Hatfill v. Gonzales*,
505 F. Supp. 2d 33 (D.D.C. 2007) ....................2, 13

*In re Slack*,
768 F. Supp. 2d 189 (D.D.C. 2011) ....................9

*Lee v. Dep't of Just.*,
401 F. Supp. 2d 123 (D.D.C. 2005) ....................8, 14

*Lee v. Dep't of Just.*,
413 F.3d 53 (D.C. Cir. 2005) ....................10

*Maughan v. NL Indus.*,
524 F. Supp. 93 (D.D.C. 1981) ....................9

*Tavoulareas v. Piro*,
93 F.R.D. 35 (D.D.C. 1981) ....................9

*Yanping Chen v. FBI*,
No. 20-MC-107-CRC, 2020 WL 7668880 (D.D.C. Dec. 24, 2020) ....................12

* *Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) .................... *passim*

**RULES**

Fed. R. Civ. P. 26 ....................3, 12, 14, 15, 16

**OTHER AUTHORITIES**

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com (updated May 1, 2017) ....................5

Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says*, FOXNews.com (June 28, 2017) ....................5

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com (Feb. 24, 2017) ........ 4

*FBI raids in Rosslyn area,* WTOP News (Dec. 5, 2012, 11:20 AM) ........ 4

*FBI Raids Two Locations in Arlington,* NBC4 Wash. (Dec. 5, 2012, 10:26 PM) ........ 4

Gail Huff, *FBI raids Rosslyn University of Management and Technology offices,* WJLA (Dec. 5, 2012, 11:31 AM) ........ 4

## INTRODUCTION

Plaintiff's non-party subpoenas to Fox News Network, LLC ("FNN")—like her subpoenas to Catherine Herridge, formerly the Chief Intelligence Correspondent at FNN—strike at the heart of the First Amendment journalist's privilege. At their core, they seek to uncover confidential source(s) used for reporting on a counterintelligence probe into Plaintiff and the University of Management and Technology ("UMT"). Under governing law, the journalist's privilege protecting such sources must prevail "in all but the most exceptional cases." *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981). Plaintiff cannot remotely carry her burden to show that this is such an exceptional case that merits overriding the privilege.

As explained in detail in the Memorandum in Support of Catherine V. Herridge's Motion to Quash, Dkt. 92-3 ("Herridge Mem." or "Herridge Memorandum"), Plaintiff cannot make the showing required under *Zerilli*.

First, Plaintiff has not "exhausted every reasonable alternative source of information" for finding the identity of any government source(s) for the articles and broadcasts at issue (the "Fox Reporting"). *Zerilli*, 656 F.2d at 713. Plaintiff has identified multiple individuals who had access to a particular document that Plaintiff believes was released in violation of the Privacy Act, but Plaintiff has failed to follow up with discovery to rule out all of those individuals as the source.

Second, *Zerilli* calls for the court to "look to the facts of [the] case, weighing the public interest in protecting a reporter's sources and the private interest in compelling disclosure." *Id.* at 712. But the balance of interests weighs overwhelmingly *against* Plaintiff. Plaintiff's private interest in seeking Privacy Act damages carries no broader societal interest. And her claims for damages are riddled with defects that make her claims weigh little in the balance. On the other side of the scales, the public interest in First Amendment protections that promote the functioning of a free press is at its height in a case like this involving reporting on issues of national security.

To avoid burdening the Court with duplicative briefing, FNN incorporates by reference the arguments on all of these points from the Herridge Memorandum. *See* Herridge Mem. Parts I–II.

But the Court need not even reach those issues to quash the subpoenas to FNN, because the FNN subpoenas also suffer from independent defects.

First, the subpoenas are vastly overbroad. The only information even potentially in FNN's possession that could qualify as "central" to Plaintiff's Privacy Act case as required under *Zerilli* would be information bearing on the identity of any source(s) in the government who allegedly released information covered by the Privacy Act. But Plaintiff's subpoenas sweep far more broadly than that. As written, they seek virtually *every* document in the entire investigative reporting file that FNN employees compiled, whether the document relates to a possible government source or not. And they seek testimony about FNN's entire pre-publication fact-checking and editorial process on the stories, whether related to information allegedly covered by the Privacy Act or not. Their overbreadth alone requires that the subpoenas be quashed or radically restricted by a protective order.

Second, where the target of a subpoena is a media company such as FNN, exhausting other reasonable avenues of discovery under *Zerilli* requires first seeking discovery from the individual reporter responsible for the story. *See Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 49 (D.D.C. 2007). Before seeking discovery from FNN, Plaintiff must exhaust discovery efforts with respect to Ms. Herridge, who was the lead reporter on the Fox Reporting and the individual most likely to know the identity of any source(s). Indeed, that is especially the case here, given that no person at FNN has the information that Plaintiff seeks. The two other Fox employees named in the byline in the Fox Reporting (Pamela Browne and Cyd Upson) have already provided declarations explaining that Ms. Herridge never told them who her source(s) were. *See* Decl. of Pamela Browne ¶¶ 9–10

("Browne Decl.") (Ex. A); Decl. of Cyd Upson ¶¶ 9–10 ("Upson Decl.") (Ex. B). And Ms. Herridge has affirmed that she never told *anyone* at FNN that information. *See* Decl. of Catherine V. Herridge ¶ 6 ("Herridge Decl.") (Ex. C). For all the reasons explained in the Herridge Memorandum, Plaintiff's subpoenas should be quashed in their entirety. But if the Court allows any discovery, it should require Plaintiff to exhaust efforts with Ms. Herridge before entertaining discovery from FNN. And it should certainly restrict Plaintiff to targeted and limited discovery from Ms. Herridge concerning potential government source(s) before allowing Plaintiff to rummage through FNN documents in the hope of finding clues that may bear on the identity of a source.

Third, the FNN subpoenas also should be quashed under Rule 26(b)(2)(C), which requires courts to limit discovery that is "cumulative or duplicative, or [that] can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). Ms. Herridge is obviously a more convenient and less burdensome source for the identity of any government source(s) for the Fox Reporting. There should be no discovery from media sources at all in this case, but if the Court allows discovery, requiring FNN dig through and produce years of emails and documents is obviously less convenient, more burdensome, and more expensive than simply deposing the person who most likely has the information Plaintiff is after.

## BACKGROUND

### A. The Government's Investigation into Plaintiff and UMT and Fox's Reporting

Plaintiff, Yanping Chen, is the founder and sole owner of UMT. Compl. ¶¶ 13–14, ECF No. 1. On December 5, 2012, the FBI executed search warrants at UMT's offices and at Plaintiff's

home. Compl. ¶ 18. The raids were carried out publicly and were widely reported in local media at the time.[1]

In March 2016, the U.S. Attorney's Office for the Eastern District of Virginia informed Plaintiff that she would not be prosecuted. Compl. ¶ 22. As investigative reporting by FNN later revealed, the years-long investigation involved counterintelligence concerns, and not everyone was satisfied that the outcome had protected national security.

On February 24, 2017, FNN ran the first in a series of articles detailing the investigation into UMT and Plaintiff.[2] Ms. Herridge, who at the time was FNN's Chief Intelligence Correspondent, was the lead reporter. *See* Herridge Decl. ¶ 5.[3] Pamela Browne and Cyd Upson also appeared on the bylines. As detailed over the course of three articles published on February

---

[1] *See FBI Raids Two Locations in Arlington,* NBC4 Wash. (Dec. 5, 2012, 10:26 PM), https://www.nbcwashington.com/news/local/fbi-raids-two-locations-in-arlington/1937628/; Gail Huff, *FBI raids Rosslyn University of Management and Technology offices,* WJLA (Dec. 5, 2012, 11:31 AM), https://web.archive.org/web/20121209051420/http:/www.wjla.com:80/articles/2012/12/fbi-raids-rossyln-university-of-management-and-technology-offices-arlnow-reports-82782.html; *FBI raids in Rosslyn area,* WTOP News (Dec. 5, 2012, 11:20 AM), https://wtop.com/news/2012/12/developing-fbi-raids-in-rosslyn-area/.

[2] Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com (Feb. 24, 2017), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties (Ex. D).

[3] Ms. Herridge is now a senior investigative correspondent at CBS News.

24, 2017; April 28, 2017;[4] and June 28, 2017,[5] and in two related news segments[6] (collectively, the "Fox Reporting"), federal officials were concerned that Plaintiff had ties to the Chinese military and that UMT was potentially being used to help the Chinese government collect information on U.S. servicemembers enrolled at UMT.

More information concerning the Fox Reporting, the information it relied upon, and the ultimate decision of the Department of Defense ("DoD") to terminate UMT's participation in its tuition assistance program can be found in the Herridge Memorandum, pp. 1–12. FNN adopts and incorporates by reference the Background discussion in the Herridge Memorandum.

### B. Plaintiff's Privacy Act Suit

In late 2018, Plaintiff sued multiple agencies alleging a Privacy Act violation and seeking damages that she believes tie back to materials used in the Fox Reporting. Plaintiff alleges that the photographs, excerpted immigration forms, and information from two FBI interviews that appeared in the Fox Reporting were released in violation of the Privacy Act. *See* Compl. ¶¶ 23, 25–29, 31. Plaintiff expressly claims damages based, in large part, on DoD's 2018 decision to terminate UMT from its tuition assistance program. *Id.* ¶ 42.

---

[4] Catherine Herridge, Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com (updated May 1, 2017), https://www.foxnews.com/politics/congress-investigating-taxpayer-backed-school-over-alleged-ties-to-chinese-military-after-fox-news-report (Ex. E).

[5] Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says*, FOXNews.com (June 28, 2017), https://www.foxnews.com/politics/fbi-reopening-probe-of-dod-funded-school-with-suspected-chinese-military-ties-rep-says (Ex. F).

[6] Fox News, Taxpayer-funded school suspected of Chinese military ties, https://www.youtube.com/watch?v=jh2Xk42PVA8; Fox News, Congress investigating schools' alleged ties to China, https://video.foxnews.com/v/5417408120001; FOXNews.com, Congress investigating school's alleged ties to China, https://video.foxnews.com/v/5417408120001.

**C. Plaintiff's Subpoenas to FNN**

On May 19, 2022, Plaintiff served FNN with subpoenas seeking documents and a deposition of a corporate representative. Part of the purpose of the subpoenas is to uncover the identity of any source(s) who provided the photos and documents forming the basis for Plaintiff's Privacy Act suit. The document subpoena seeks, for instance, documents "sufficient to identify the individual(s) that transmitted or provided the Private Documents and Information to [FNN]." Subpoena to Produce Documents Issued to Fox News Network, LLC Schedule A at 7 (Ex. G) ("FNN Document Subpoena"). The subpoena for deposition testimony demands that FNN produce a representative to testify to matters such as the "disclosure and/or receipt by [FNN employees] of any Private Documents and Information, including the timing, format, and means of transmission." Subpoena to Testify at a Deposition Issued to Fox News Network, LLC Schedule A at 5 (Ex. H) ("FNN Deposition Subpoena").

But the subpoenas also seek vastly more than just information that might bear on the identity of any source(s) who may have released information from government files. The subpoenas define "Private Documents and Information" as "*any and all* documents and information concerning Dr. Chen and/or the University that were provided to or obtained by personnel of Fox News *from a third party* and that were presented in, referred to, or *considered* in relation to the [Fox Reporting]." FNN Document Subpoena Schedule A at 3 (emphases added). Thus, by seeking production of "all Private Documents and Information," Plaintiff is actually seeking *every* document and piece of information *from anyone* relating to Plaintiff and/or UMT whether the document has any relation to a possible release of Privacy Act information from government files or not. The terms of the subpoena would include, for example, notes from an interview with a neighbor or a student at UMT, even if the material was never actually used in the

Fox Reporting (as long as it was "considered"). The subpoena thus literally seeks production of the *entire* investigative reporting file that FNN personnel assembled while working on the story.

## ARGUMENT

### I. THE SUBPOENAS SHOULD BE QUASHED BECAUSE THEY INVADE THE FIRST AMENDMENT JOURNALIST'S PRIVILEGE.

The subpoenas should be quashed because they plainly seek information protected by the journalist's privilege under the First Amendment and Plaintiff cannot bear her burden of overcoming that privilege. The First Amendment provides journalists a qualified privilege from compelled disclosure of their newsgathering activities, including especially the identity of confidential sources. *See, e.g., Zerilli v. Smith*, 656 F.2d 705, 710–12 (D.C. Cir. 1981). As the D.C. Circuit has explained, "The First Amendment guarantees a free press primarily because of the important role it can play as a 'vital source of public information.'" *Id.* at 710 (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936)). But "journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." *Id.* at 711. As a result, "[c]ompelling a reporter to disclose the identity of a source may significantly interfere with [the press'] news gathering ability." *Id*. at 711. Without confidential sources, the press could not uncover information vital for informing the public—especially about the inner workings of government—and the citizens would be deprived of information essential for them to make "informed political, social, and economic choices." *Id.* To protect the ability of a robust free press to play its role in informing the electorate, the journalist's privilege generally protects against compelled disclosure of sources.

To determine whether a particular plaintiff can overcome the privilege, the D.C. Circuit has instructed that courts must "look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure." *Zerilli*, 656

F.2d at 712.[7] In particular, *Zerilli* identified two "guidelines" that are of "central importance" in the balance. First, to justify disclosure, a plaintiff must show that the information sought goes to "the heart of the matter," *id.* at 713, in other words, that it is "central" to her case. *Lee v. Dep't of Just.*, 401 F. Supp. 2d 123, 132 (D.D.C. 2005). Second, the litigant must have "exhausted every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713. Plaintiff bears the burden of showing that these guidelines have been satisfied and that the balance tips in her favor. And that is a heavy burden. The D.C. Circuit warned that "when striking the balance," courts must "be mindful of the preferred position of the First Amendment" and expressly cautioned that "[i]f the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished." *Id.* at 712.

As discussed in more detail in the Herridge Memorandum, Plaintiff cannot carry her burden under *Zerilli* to justify discovery from media sources here. Plaintiff has not "exhausted every reasonable alternative source of information" because Plaintiff has not followed up with all of the individuals who had access to the document (a PowerPoint) that Plaintiff believes was released from government files. And the balance of interests under *Zerilli* weighs overwhelmingly in favor of upholding First Amendment protections for journalists' sources. Herridge Mem. Part I. FNN hereby adopts and incorporates by reference those sections of the Herridge Memorandum.

Plaintiff's subpoenas to FNN also suffer from additional defects. Plaintiff cannot show that the information she seeks is "central" to her case because the subpoenas to FNN are vastly overbroad. And Plaintiff cannot show that she has exhausted reasonable alternatives to discovery from FNN where she has not pursued discovery from Ms. Herridge to completion.

[7] *See also Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974) ("[T]he court will look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired.").

### A. The Subpoenas to FNN Unquestionably Seek Information Protected by the Journalist's Privilege.

The subpoenas to FNN plainly seek information protected by the journalist's privilege. The privilege broadly protects journalists from "compelled disclosure of information, which they have obtained as part of their news gathering role." *In re Slack,* 768 F. Supp. 2d 189, 193 (D.D.C. 2011). It covers both confidential and nonconfidential information. *Id*. 193–94 (noting that courts "rigorously" protect confidential information). Where a confidential source is involved, the privilege applies not only to discovery that directly seeks the source's identity, but also to discovery that would be likely to identify the source. *Tavoulareas v. Piro*, 93 F.R.D. 35, 40 (D.D.C. 1981). The reporter's privilege also applies to "resource materials prepared by a reporter in anticipation of writing a news article," such as drafts or notes. *Maughan v. NL Indus.*, 524 F. Supp. 93, 95 (D.D.C. 1981) (quoting *United States v. Cuthbertson*, 630 F.2d, 139, 147 (3d Cir. 1980)).

Here, both subpoenas to FNN indisputably seek information protected by the reporter's privilege. The document subpoena seeks *all* documents FNN received from *any* source(s) relating to Plaintiff—whether or not related to any alleged release of information covered by the Privacy Act. FNN Document Subpoena Schedule A at 7. It also seeks documents reflecting the transmission of information from any source(s) to FNN, documents sufficient to identify any source(s), and all communications that the three journalists on the Fox Reporting had with two individuals. *See id.* Similarly, the topics listed in the FNN Deposition Subpoena seek protected information that FNN obtained as part of its newsgathering role, *see In re Slack,* 768 F. Supp. 2d at 193, or created in the course of writing the Articles, *see Maughan*, 524 F. Supp. at 95. Specifically, the subpoena seeks a witness to address the transmission to FNN of *every* document related to Plaintiff or UMT that FNN received, as well as retention of those documents. . FNN

Document Subpoena Schedule A at 7. And it seeks a witness to discuss the details of "[a]ny fact-checking and/or pre-publication review conducted"—in other words, the entire editorial process—with respect to every document FNN received concerning Plaintiff. FNN Deposition Subpoena Schedule A at 5. The subpoenas thus not only seek to uncover confidential government sources potentially relevant to Plaintiff's Privacy Act claim, they also sweep so broadly as to encompass FNN's entire newsgathering and editorial process on the Fox Reporting. *All* of that information is covered by the privilege.

### B. Plaintiff Cannot Show That the Information Sought in Her Subpoenas Is "Central" to Her Case Because the Subpoenas Are Vastly Overbroad.

Plaintiff cannot remotely show that the information she seeks is "central" to her case under *Zerilli,* because her subpoenas are stunningly overbroad. The only information that is even arguably "central" to Plaintiff's case and potentially in FNN's possession is information bearing on the identity of any government source(s) who may have released information allegedly in violation of the Privacy Act. *See, e.g., Lee v. Dep't of Just.*, 413 F.3d 53, 60 (D.C. Cir. 2005). But Plaintiff's subpoenas seek much more than that. Both the FNN Document Subpoena and the FNN Deposition Subpoena center on requests related to "Private Documents and Information" in FNN's possession. The definition of that term, however, has nothing to do with information protected by the Privacy Act or even information that once resided in government files. To the contrary, the subpoenas define "Private Documents and Information" as "*any and all* documents and information concerning Dr. Chen and/or the University that were provided to or obtained by personnel of Fox News *from a third party* and that were presented in, referred to, or *considered* in relation to the [Fox Reporting]." *E.g.*, FNN Deposition Subpoena Schedule A at 3 (emphases added). By seeking production of "all Private Documents and Information," Plaintiff is actually seeking *every* document and piece of information *from anyone* relating to Plaintiff and/or UMT

whether the document has any relation to a possible release of Privacy Act information from government files or not. The terms of the subpoena would include, for example, notes from an interview with a neighbor or a student at UMT, even if the material never made it into the published reporting at all (as long as it was "considered"). The subpoena thus literally seeks production of the *entire* investigative reporting file that FNN personnel assembled while working on the story. It is difficult to imagine a more comprehensive—or more unjustified—invasion of the journalists' privilege. The breathtaking scope of the information sought by this subpoena has nothing to do with information necessary for Plaintiff's Privacy Act case and gives the impression instead of a concerted effort to identify *everyone* who may have talked about Plaintiff with FNN.

The FNN Deposition Subpoena is equally defective. It seeks a corporate representative to testify, for example, about the "disclosure to and/or receipt by" FNN personnel of "*any* Private Documents and Information." FNN Deposition Subpoena Schedule A at 5. That would require FNN to provide a 30(b)(6) witness to testify about *every* conversation that any of the three journalists working on the Fox Reporting had with *anyone* in connection with the story—whether it related to a possible government source or not. Worse, Plaintiff wants to delve even deeper into privileged material by demanding that a witness explain the entire "fact-checking and/or pre-publication review conducted with respect to the Private Documents and Information." *Id.* Once again, that sweeping demand to know everything about FNN's privileged editorial process has nothing to do with the single, targeted piece of information that might arguably be "central" to Plaintiff's case under *Zerilli*—namely, the identity of any government source(s) who released information from government files.

Plaintiff cannot remotely justify these requests under *Zerilli*.[8] They have nothing to do with the only information potentially "central" to Plaintiff's case. Put simply, nothing in *Zerilli* permits Plaintiff to have carte blanche to rummage through *every* document from *every source* preserved in the entire investigative reporting file that was compiled at FNN in producing the Fox Reporting. For that reason alone, Plaintiff's subpoenas should be quashed or at a minimum radically restricted under a protective order. The Court has already rightly recognized that "enforcing an overbroad subpoena in this case might produce an unwelcome chilling effect on First Amendment activity," *Yanping Chen v. FBI*, No. 20-MC-107-CRC, 2020 WL 7668880, at *4 (D.D.C. Dec. 24, 2020), and that caution applies doubly to the overbroad subpoenas at issue here.

### C. Exhausting Reasonable Alternatives Requires That Plaintiff Seek Discovery from Ms. Herridge Before Seeking Discovery from FNN.

In addition to the defects explained in the Herridge Memorandum, *see* Herridge Mem. Part I, Plaintiff's subpoenas to FNN also suffer from an additional failure to exhaust alternative avenues of discovery. Where the target of a subpoena seeking to uncover a government source is a media company, exhaustion also requires that the litigant first depose the individual reporter responsible

[8] Indeed, they cannot even be justified under the ordinary standard of Rule 26. This Court has already ruled that another of Plaintiff's subpoenas—one seeking call and text logs for Stephen Rhoads—imposed a disproportionate burden on Mr. Rhoads' privacy because it indiscriminately sought records without regard for their relevance to the case. *Yanping Chen v. FBI*, No. 20-MC-107-CRC, 2020 WL 7668880, at *4 (D.D.C. Dec. 24, 2020) (noting that "[t]hese private communications are irrelevant to Chen's lawsuit"). The overbreadth of Plaintiff's subpoena here is even worse. Plaintiff again seeks a broad swath of documents irrespective of their relevance to her Privacy Act claims, but here she does so while trampling on a constitutionally recognized privilege. The sources for information used in the Fox Reporting *other than* the few pieces of information that Plaintiff claims were covered by the Privacy Act are utterly irrelevant to Plaintiff's claims. Discovery concerning those sources necessarily falls outside the scope of allowable discovery under Rule 26(b), both because it is not relevant and because the burden of the discovery is disproportionate to its likely benefit. Fed. R. Civ. P. 26(b)(1).

for the story before seeking discovery from the media company itself. *Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 49 (D.D.C. 2007). Indeed, the litigant must pursue discovery from the individual reporter through a motion to compel before resorting to the media company. *See id.* In *Hatfill*, a Privacy Act plaintiff subpoenaed several reporters in an attempt to identify the government employee who had allegedly released the information at issue. *Id.* at 35–36. After deposing the reporters—all of whom invoked the reporter's privilege and refused to name their sources—the plaintiff sought a court order compelling the reporters to identify their sources, and served additional subpoenas on the reporters' employers in an attempt to identify the sources. *Id.* The court, after granting the motion to compel, quashed the subpoenas served to the media companies. *Id.* at 49. The court found that the plaintiff had not exhausted every reasonable alternative source of information as it related to the media companies, because he had not yet deposed the reporters under a motion to compel. *Id.* Because there was no question that the reporters knew the identity of the sources, the court held that they should be deposed, under a motion to compel, first. *Id.* at 49–51.

As the court in *Hatfill* recognized, exhaustion requires that Plaintiff pursue discovery from Ms. Herridge—who doubtless knows her source(s)—before resorting to FNN. FNN agrees with Ms. Herridge that Plaintiff's subpoenas should be quashed in their entirety and Plaintiff should not be allowed to pursue discovery from media sources, including Ms. Herridge, *at all*. But if the Court allows any discovery from media sources, Plaintiff should be required to pursue discovery from Ms. Herridge to completion before resorting to discovery from FNN.

## II. THE SUBPOENAS SHOULD BE QUASHED BECAUSE THEY INVADE FNN'S NEWSGATHERING PRIVILEGE UNDER FEDERAL COMMON LAW.

As detailed in the Herridge Memorandum, if the Court concludes that the journalist's privilege under the First Amendment does not prevail in this case—and especially if the Court

holds that *Zerilli* and *Lee* preclude balancing the competing interests at stake—the Court should recognize a federal common law privilege that provides better protection and allows the Court to consider that balancing. *See* Herridge Mem. Part II. To avoid burdening the Court with duplicative briefing, FNN hereby adopts and incorporates by reference the section of the Herridge Memorandum arguing for a federal common law privilege.

## III. THE SUBPOENAS TO FNN SHOULD BE QUASHED BECAUSE THEY ARE DUPLICATIVE, CUMULATIVE, AND A MORE CONVENIENT SOURCE OF THE INFORMATION EXISTS.

The Court need not reach issues implicating constitutional doctrines under the journalist's privilege—or recognize a federal common law privilege—to quash the subpoenas to FNN because the subpoenas are also facially defective for a more mundane reason. They seek documents and a deposition of a corporate representative from FNN in order to get at information about confidential source(s) for the Fox Reporting when there is only one person who actually knows that information—Ms. Herridge. Under Rule 26(b)(2)(C), courts must limit discovery that is "cumulative or duplicative, or [that] can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). Here, if the Court permits discovery from media sources at all—which it should not—the subpoenas to FNN should be quashed because they seek information that can be obtained more conveniently and economically from Ms. Herridge, without placing an additional and undue burden on FNN.

As other courts have held, where a plaintiff is seeking the confidential sources used in a particular story, the interest in orderly and efficient discovery requires that—after exhausting non-media sources—the litigant should start discovery of media sources with the reporter who wrote the story. For example, in *Covertino v. Department of Justice*, the court quashed a subpoena to a media company under Rule 26 because the litigant had not yet obtained discovery from the reporter who actually wrote the story at issue. No. 07-CV-13842, 2008 WL 4104347, at *9 (E.D. Mich.

Aug. 28, 2008). As the court explained, "When a party notices a newspaper for disclosure of confidential informants mentioned in one of its articles, its logical representative is the reporter who wrote the piece." *Id.* at *9. As a result, the court found that compelling the media company to provide a 30(b)(6) witness would be cumulative and duplicative, in violation of Rule 26(b)(2)(C), and further violated that same rule because there was a more convenient source (the reporter) who could provide the requested information. *See id.* at *9–10.

The same rationale applies here. The only information potentially in FNN's possession that is even arguably "central" to Plaintiff's Privacy Act case (and thus could potentially be the subject of legitimate discovery under *Zerilli*) is the identity of any government source(s) who provided information allegedly in violation of the Privacy Act. But Ms. Herridge is obviously a more convenient, certain, and less burdensome source for obtaining that information. She would certainly know who her source(s) were. And it is clear that no one at FNN knows that information. The two other Fox employees who worked on the Fox Reporting (Pamela Browne and Cyd Upson) have already provided declarations explaining that Ms. Herridge never told them who her source(s) were. *See* Browne Decl. ¶¶ 9–10; Upson Decl. ¶¶ 9–10. And Ms. Herridge has affirmed that she never told *anyone* at FNN that information. *See* Herridge Decl. ¶ 6.

Because no individual at FNN actually knows the information Plaintiff seeks, any discovery efforts at FNN would have to focus on *indirect* means of finding clues to the identity of any government source(s). And even if the gross overbreadth of Plaintiffs' subpoenas were resolved by restricting the subpoenas to focus on information actually related to finding the identity of such source(s), *see supra* Part I.B, that discovery would necessarily be a cumbersome and burdensome process. A narrowed subpoena for documents would still require FNN to sift through five years' worth of emails and documents generated by at least three employees to identify any

that might touch tangentially on the identity of the source(s) at issue, potentially through clues in the meta data on some documents. *See* FNN Document Subpoena Schedule A at 7 (Requests 2 and 3). And under the FNN Deposition Subpoena, FNN would be required to prepare and provide a 30(b)(6) witness who could speak to FNN's document retention policies, presumably including the extent to which meta data is or is not fully preserved in the ordinary document retention process. *See* FNN Deposition Subpoena Schedule A at 5 (Topics 2 and 3). Requiring FNN to go to these lengths to piece together forensic clues is plainly unduly burdensome where there is a more convenient and more direct source (Ms. Herridge) who could provide the only truly relevant information Plaintiff seeks. If the Court allows any discovery from media sources—which it should not—FNN should not have to undertake the burden of scouring its files for tangential clues about a supposed source's identity when Ms. Herridge is a more direct, convenient, and certain source of that information. As a result, both subpoenas must be quashed under Rule 26(b)(2)(C).

## **<u>CONCLUSION</u>**

For the foregoing reasons, the motion to quash the subpoenas should be granted.

DATED: July 29, 2022

Respectfully submitted,

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Patrick F. Philbin (DC Bar No. 435620)
1155 F St. NW
Suite 750
Washington, DC 20004
Tel.: (202) 249-6633
Fax: (202) 249-6899
pphilbin@egcfirm.com

By: /s/ Patrick F. Philbin
Patrick F. Philbin
*Counsel for Fox News Network, LLC*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **YANPING CHEN**,<br><br>Plaintiff,<br><br>v.<br><br>**FEDERAL BUREAU OF INVESTIGATION, *et al.***,<br><br>Defendants. | Case No. 18-cv-3074 (CRC) |

**MEMORANDUM OPINION AND ORDER**

In 2017, Fox News Network aired a series of investigative reports about Plaintiff Yanping Chen. The thrust of the stories, principally authored by journalist Catherine Herridge, was that Ms. Chen had concealed her former membership in the Chinese military on her U.S. immigration forms and might have been using a professional school she founded in Virginia to funnel valuable information about the American military to the Chinese government. The reports also contained materials—including photographs and images of internal government documents—that Chen alleges were leaked by government personnel to Herridge and Fox, in violation of the Privacy Act. After extensive discovery and several opinions by this Court, Chen has been unable to identify the source of the alleged leak. She thus issued subpoenas to Herridge and Fox, seeking to compel them to reveal their confidential source or sources. Asserting the First Amendment's qualified privilege for journalists, and urging the Court to adopt a federal common law newsgathering privilege, Herridge and Fox moved to quash the subpoenas.

The Court recognizes both the vital importance of a free press and the critical role that confidential sources play in the work of investigative journalists like Herridge. But applying the binding case law of this Circuit, the Court concludes that Chen's need for the requested evidence

overcomes Herridge's qualified First Amendment privilege in this case. The identity of Herridge's source is central to Chen's claim, and despite exhaustive discovery, Chen has been unable to ferret out his or her identity. The only reasonable option left is for Chen to ask Herridge herself.

## I. Background

As it has already detailed the factual and procedural background of this case in several previous opinions, the Court provides only a brief summary here. See Chen v. FBI, 435 F. Supp. 3d 189 (D.D.C. 2020); Chen v. FBI, Case No. 20-mc-107 (CRC), 2020 WL 7668880 (D.D.C. Dec. 24, 2020); Chen v. FBI, Case No. 20-mc-107 (CRC), 2021 WL 6125379 (D.D.C. Nov. 23, 2021); Chen v. FBI, Case No. 22-mc-0074 (CRC), 2022 WL 17851618 (D.D.C. Oct. 18, 2022). Plaintiff, Dr. Yanping Chen, founded the University of Management and Technology ("UMT"), an educational institution that attracted a substantial number of military servicemembers who attended with tuition assistance from the Department of Defense ("DOD"). Compl. ¶¶ 13, 42. Beginning in 2010, Chen, a naturalized U.S. citizen, became the focus of an FBI investigation concerning statements she made on certain immigration forms about her work in China in the 1980s. Id. ¶ 15. As a part of that investigation, the FBI executed search warrants for Chen's home and the main office of UMT, seizing materials during both searches. Id. ¶¶ 18, 20.

Prosecutors eventually informed Chen that no charges would be filed against her, but about a year later, Fox News Network ("Fox") ran a series of television segments and news articles about her. The articles, authored by then-Fox reporter Catherine Herridge, focused on Chen's alleged ties to the Chinese military and former role as a colonel in the People's Liberation Army. Id. ¶¶ 22, 25–31; see Catherine Herridge, Fox News Investigation: DoD-Funded School at Center of Federal Probes over Suspected Chinese Military Ties, Fox News (Feb. 24, 2017), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-

probes-over-suspected-chinese-military-ties. The reporting also included family photographs of Chen; excerpts from Chen's immigration forms; and a snippet from what appears to be an FBI memorandum summarizing an interview conducted for the investigation. Compl. ¶¶ 25–31.

Believing that someone in the government leaked these materials to Herridge and Fox, in December 2018, Chen filed this Privacy Act lawsuit against the FBI, the Department of Defense ("DOD"), and two other federal agencies. Compl. ¶ 23. Since then, Chen has endeavored to suss out the identity of the potential leaker, including by serving scores of document requests, interrogatories, and requests for admission, taking eighteen depositions of current and former government employees, issuing over a dozen third-party subpoenas, and obtaining declarations from 22 government personnel who had a connection to the FBI's investigation. Opp. to Herridge Mot. at 2. Through that discovery, Chen has developed a theory for how Herridge and Fox obtained the allegedly leaked materials: that they came from an internal FBI PowerPoint presentation created by the lead agent on Chen's case. Id. at 1. She has also homed in on a few individuals who, she thinks, may have leaked that PowerPoint—namely FBI special agent Timothy Pappa (who created the PowerPoint), alleged FBI-informant Stephen Rhoads (who was an on-the-record source for Herridge's reporting), and a few other government agents who, at one time or another, might have possessed the PowerPoint. Id. at 10–11. Despite her efforts, Chen has been unable to obtain direct evidence that any of them, or any other person, was responsible for the alleged leak.

Accordingly, Chen now seeks to pursue the one seemingly surefire method to discover how Herridge and Fox obtained the materials in question: to ask them herself. Chen served Fox and Herridge with deposition subpoenas in May and June of 2022, respectively. See Notice of Filing Dep. Subpoena (Herridge deposition subpoena); Fox Mot. to Quash ("Fox Mot."), Ex. H. (Fox deposition subpoena). She also served both with subpoenas for documents and

communications relating to the materials in question. See Herridge Mot. to Quash ("Herridge Mot."), Ex. L (Herridge document subpoena); Fox Mot., Ex. G (Fox document subpoena). Among other things, the document subpoenas ask Herridge and Fox to produce "all Private Documents and Information in your possession" and to produce documents or communications "sufficient to identify the individual(s) that transmitted or provided the Private Documents and Information to you." Herridge Mot., Ex. L, Schedule A at 6–7. The subpoenas define "Private Documents and Information" to include "any and all documents and information concerning Dr. Chen and/or the University that were provided to or obtained by you from a third party and that were presented in, referred to, or considered in relation to the" Fox reporting on Chen, including in particular the photographs depicting her, FBI and immigration documents relating to her, and any "PowerPoint presentation, compilation, and/or report concerning" her. Id. at 3.

Herridge and Fox moved to quash the subpoenas, relying primarily on the qualified First Amendment journalist's privilege. Specifically, Herridge and Fox contend that Chen's subpoenas are overbroad, that she has not sufficiently exhausted alternative avenues to identify the alleged leaker, and, more broadly, that the public interest in maintaining the confidentiality of journalists' sources outweighs Chen's personal interest in her Privacy Act suit. Additionally, Herridge and Fox urge the Court to apply a common law newsgathering privilege to quash the subpoenas. Having held a hearing, the Court will now address the motions.

## II. Legal Standards

The Court "must quash or modify a subpoena" that "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A). "The individual or entity seeking relief from subpoena compliance bears the burden of demonstrating that a subpoena should be modified or quashed." U.S. Dep't of the Treasury v. Pension Benefit Guar. Corp., 301 F.R.D. 20, 25 (D.D.C. 2014) (quoting Sterne Kessler Goldstein & Fox, PLLC v.

Eastman Kodak Co., 276 F.R.D. 376, 379 (D.D.C. 2011)). As relevant here, a "party asserting the reporter's privilege . . . bears the burden of showing that it applies in a particular case." U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos., 507 F. Supp. 2d 45, 50 (D.D.C. 2007). If the information sought by the subpoena falls within the privilege as a threshold matter, the party seeking the information may nevertheless compel compliance with the subpoena by showing that the balance of factors set forth in Zerilli v. Smith, 656 F.2d 705 (D.C. Cir. 1981), warrants disclosure. See Lee v. Dep't of Justice, 413 F.3d 53, 59–60 (D.C. Cir. 2005); Hutira v. Islamic Republic of Iran, 211 F. Supp. 2d 115, 119 n.4 (D.D.C. 2002) ("Courts engage in the [Zerilli] balancing test . . . only after the reporter . . . has demonstrated that the privilege applies." (citing Shoen v. Shoen, 5 F.3d 1289, 1296 (9th Cir. 1993))); Goldberg v. Amgen, Inc., 123 F. Supp. 3d 9, 15 (D.D.C. 2015) ("In other words, if the privilege applies, [the requesting party] bears the burden of abrogating it.").

## III. Analysis

Herridge and Fox primarily invoke the First Amendment journalist's privilege. The Court therefore begins by assessing whether Chen has overcome that privilege, which she does not dispute applies in the first instance. The Court then assesses whether a federal common law newsgathering privilege may also warrant quashing the subpoenas.

### A. First Amendment Journalist's Privilege

The D.C. Circuit's opinion in Zerilli provides the test for applying "a non-party journalist's qualified privilege in a civil action such as this one, where testimony of journalists is sought because government officials have been accused of illegally providing the journalists with private information." Lee, 413 F.3d at 59. As a threshold matter, the parties agree that the Zerilli test governs this case and that the test begins, at least, by considering whether the information Chen seeks goes to "the heart of the matter" and whether Chen has exhausted "every reasonable

alternative source of information." Id. (quoting Zerilli, 656 F.2d at 713). They disagree, however, about whether the Zerilli test ends with those two considerations or, instead, requires (or at least permits) the Court to balance a host of other factors bearing on the parties' interests and the stakes of the case. The Court therefore begins by clarifying the contours of the Zerilli inquiry before proceeding to apply the relevant factors.

*1. The Zerilli Framework*

Chen asserts that Zerilli established a "two-part test for determining when a Privacy Act plaintiff seeking information about the disclosure of her protected information is entitled to obtain that information from a non-party reporter." Opp. to Herridge Mot. at 14. Those two elements, she says, are (1) whether the information sought is "central" to her claim and (2) whether she has exhausted other reasonable avenues of obtaining the information before seeking it from the journalist. Id. Herridge and Fox counter that the "[a]nalysis under Zerilli does not abruptly end with a mechanical assessment" of those two factors but rather requires "a broad balancing analysis," weighing such considerations as the plaintiff's personal interest in damages, her likelihood of success on the merits, the egregiousness of the government's alleged misconduct, and the importance of journalism in the context of reporting on national security matters. See Herridge Mot. at 22–39. In the Court's view, Zerilli, particularly as interpreted and applied in Lee, does not contemplate the kind of free-form, anything-goes analysis that Herridge and Fox seek. To be sure, Zerilli calls for a balancing test and counsels that, properly applied, the test should result in the privilege "prevail[ing] in all but the most exceptional cases." 656 F.2d at 712. But, as the Court will explain, Zerilli also channeled district courts' discretion by identifying the specific factors that weigh in the balance.

As here, Zerilli concerned the application of the First Amendment reporter's privilege to a Privacy Act suit brought against government officials accused of leaking sensitive information

about the plaintiffs—transcripts of incriminating conversations obtained during an FBI investigation—to the Detroit News. Id. at 707–08. In affirming the district court's denial of the plaintiffs' motion to compel the reporter to reveal his source for the transcripts, the D.C. Circuit first reiterated its previous conclusion that "to determine whether the privilege applies courts should look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure." Id. at 712 (citing Carey v. Hume, 492 F.2d 631, 636 (D.C. Cir. 1974)). "In general," Zerilli explained, courts must "be mindful of the preferred position of the First Amendment and the importance of a vigorous press." Id. Accordingly, the rules governing compelled disclosure of confidential sources must "minimize impingement upon the reporter's ability to gather news." Id. Zerilli further predicted that, properly applying those rules, "the civil litigant's interest in disclosure should yield to the journalist's privilege" in "all but the most exceptional cases." Id.

Zerilli did not, however, end the analysis with that "general" guidance; rather, it proceeded to identify a "number of more precise guidelines" that "can be applied to determine how the balance should be struck in a particular case." Id. at 712–13. First, the court explained that the "civil litigant's need for the information he seeks" must be "of central importance," that is, go to "the heart of the matter" and be "crucial to his case." Id. at 713 (quoting Carey, 492 F.2d at 636). If the requested information is of central importance, "then the argument in favor of compelled disclosure may be relatively strong." Id.

Zerilli then added a second consideration—the "efforts made by the litigants to obtain the information from alternative sources"—which the court explained was "also of central importance." Id. "Even when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." Id. That reasonable exhaustion requirement, the

court added, would reflect the "values resident in the protection of the confidential sources of newsmen." Id. (quoting Carey, 492 F.2d at 638).

Last, Zerilli explained that courts must mind the distinction "between civil cases in which the reporter is a party, as in a libel action, and cases in which the reporter is not a party." Id. at 714. If "the journalist is a party, and successful assertion of the privilege will effectively shield him from liability," that fact will "weigh somewhat more heavily in favor of disclosure," as application of the privilege in such circumstances, particularly in libel cases, "would effectively prevent recovery" most of the time. Id. Even so, the court emphasized that this third factor must be balanced against the "other relevant factors" recounted in the opinion—such as whether the information sought is crucial for the plaintiff's case—to determine whether "the privilege should prevail." Id.

"Applying *these* guidelines to the facts of the case," Zerilli concluded that the district court did not abuse its discretion by upholding the assertion of the First Amendment privilege. Id. (emphasis added). Although the suit was "not frivolous" and the information sought was "crucial" to the case, Zerilli held that the plaintiffs had "not fulfilled their obligation to exhaust possible alternative sources of information," noting in particular the plaintiffs' failure to depose individuals the Government identified as either possessing or knowing a great deal about the allegedly leaked transcripts. Id. at 714–15 (citing failure to depose "the four employees who had the greatest knowledge about the logs"). Zerilli thus prescribed a balancing test, but it did not give district courts free rein to populate that test with whatever factors they please. Rather than judge in the abstract "the civil litigant's interest" against "the public interest in protecting a newspaper's confidential sources," Zerilli instructed courts to weigh three "more precise guidelines" of "central importance" to the balancing analysis. Id. at 712–713.

That courts must tailor the balancing test to those central factors identified in Zerilli is confirmed by the D.C. Circuit's subsequent application of the analysis in Lee v. Department of Justice, 413 F.3d 53 (D.C. Cir. 2005). There, as here, the court considered the application of the First Amendment reporter's privilege to a Privacy Act claim stemming from an alleged leak by government personnel of sensitive personal information about the plaintiff. Id. at 55–56. After making hundreds of written discovery requests and deposing twenty government officials, the plaintiff finally issued subpoenas to the journalists who had published the information. Id. at 56. Applying Zerilli, the district court denied the journalists' motions to quash the subpoenas, and the D.C. Circuit affirmed in relevant part.[1] Id. at 55, 57.

Zerilli, Lee explained, "provides for a non-party journalist's qualified privilege in a civil action such as this one, where testimony of journalists is sought because government officials have been accused of illegally providing the journalists with private information." Id. at 59. After acknowledging Zerilli's consideration of the distinction between cases in which the reporter is a party and those in which the reporter is not a party, id. 57 n.1, Lee proceeded to identify the two remaining "guidelines [for] determining when a court can compel a non-party journalist to testify about a confidential source"—namely, whether the information sought goes to "the heart of the matter" and whether the litigant has exhausted "every reasonable alternative source of information," id. at 59 (quoting Zerilli, 656 F.2d at 713).

Emphasizing that "the protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist, no matter how newsworthy the government official

[1] The Circuit vacated the district court's contempt order as to one of the reporters not based on the Zerilli analysis but rather because it found no clear and convincing evidence that that reporter had actually violated the district court's discovery order requiring the journalists to truthfully answer questions regarding the identities of the alleged leakers. Id. at 56, 63–64.

may feel the information is," Lee applied "the factors laid out in Zerilli" to find that the district court "did not abuse its discretion in requiring the journalists to testify." Id. at 60. Without the "identities of the leakers," the court reasoned, the plaintiff's ability "to show the other elements of the Privacy Act claim, such as willfulness and intent, will be compromised." Id. As to exhaustion, Lee observed that "the number of depositions necessary for exhaustion must be determined on a case-by-case basis" and concluded that, although the plaintiff "did not depose every individual who conceivably could have leaked the information," such absolute exhaustion is not necessary. Id. at 61. Requiring exhaustion of "every individual who could have had any kind of access to the information regardless of other evidence that the deponents on whom [the plaintiff] focused were in fact the sources of the leaks," the court continued, would impose an "unreasonable burden of discovery" on Privacy Act plaintiffs. Id.

Like Zerilli, then, Lee did not apply a free-form balancing of interests but rather struck the balance between private and public interests by reference to the specific factors identified in Zerilli—the centrality of the requested discovery and the exhaustion of reasonable alternatives. To be sure, the Court does not read Lee and Zerilli to *prohibit* district courts from considering additional factors. For instance, as Herridge points out, Zerilli also observed at the outset of its balancing analysis that "appellants' suit" there was "not frivolous." Zerilli, 656 F.2d at 714; see Herridge Reply at 9. One of Zerilli's chief sources for its balancing test, Carey v. Hume, 492 F.2d 631 (D.C. Cir. 1974), likewise noted that "the facts disclosed by the record" there were "inadequate to support a conclusion that" the plaintiff's likelihood of ultimate success on the merits was so remote "that no purpose would be served by disclosure of the identity of the sources." Id. at 638. These comments are fairly read to contemplate some limited consideration of the merits of a Privacy Act plaintiff's underlying claim, at least insofar as requiring disclosure

in a frivolous suit would serve "no purpose."[2] But consideration of a lawsuit's patent futility is a far cry from the full-blown preview of summary judgment briefing that Herridge and Fox seek here. Moreover, Carey itself cautioned against such an extensive interrogation of the merits at this stage of a case, observing that there had "been no motion by appellant for summary judgment" and "thus no showing of facts bearing upon the likelihood" of plaintiff's success on the merits, and emphasizing that the court did not "intimate any opinion as to" whether the plaintiff "will ultimately prevail." Id. at 637–38. In any case, whether or not Carey and Zerilli suggest that some consideration of the merits in frivolous cases might be permitted, Lee's affirmance of the district court based on balancing centrality and exhaustion alone suggests that those factors will be dispositive in the mine-run of cases.

Reading Zerilli and Lee to require a balancing test focused primarily, even if not exclusively, on centrality and exhaustion (and, where applicable, whether the journalists are parties or non-parties) also accords with the approach of other courts in this district. Take Hatfill v. Gonzales, 505 F. Supp. 2d 33 (D.D.C. 2007). Although the court there rejected "[a]s an initial matter" the non-party journalists' arguments that "the disclosures at issue" did not violate the Privacy Act, id. at 37–39, it then explained that Lee provided "direct and unequivocal guidance and instruction" for the plaintiff's motion to compel responses from the journalists, holding that the plaintiff had "satisfied both prongs of the Zerilli guidelines necessary to defeat the journalists' qualified privilege," id. at 40–43. In later rejecting the journalists' request that the court recognize a federal common law reporters' privilege, the court concluded that requiring courts to balance the

[2] Indeed, some consideration of the merits of a plaintiff's case may also factor into the analysis of the centrality of the sought-after information; if an obvious flaw will prevent a plaintiff from succeeding on her Privacy Act claim, then it might be said that the leaker's identity does not go to "the heart of the matter." Zerilli, 656 F.2d at 713 (quoting Carey, 492 F.2d at 636).

private interest, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value—the same considerations invoked by Herridge and Fox here—would be "inherently unworkable," putting courts in the position of judging "the newsworthiness of" a reporter's story. Id. at 46–47 & n.8 (quoting Lee v. Dep't of Justice (Lee II), 401 F. Supp. 2d 123, 139 (D.D.C. 2005)). Herridge correctly observes that there is some variation in how other courts have categorized or numbered the relevant factors. But the weight of authority is that Zerilli and Lee set forth the applicable considerations and did not give trial courts free rein to consider private and public interests in disclosure in the abstract. See, e.g., Tripp v. Dep't of Def., 284 F. Supp. 2d 50, 55 (D.D.C. 2003) (describing factors to be considered as centrality, exhaustion, "whether the journalist" is a party, and "whether the information sought is confidential or non-confidential in nature"); Hutira, 211 F. Supp. 2d at 119, 121–22 & n.8 (listing centrality and exhaustion as primary considerations, although exhaustion was dispositive, and noting that "the Court was unable to find any case in this circuit that suggests that it should appraise the underlying civil action so as to decide whether it is worth abrogating the privilege"); Goldberg, 123 F. Supp. 3d at 16 ("Courts must consider two main factors in deciding whether to compel a journalist to provide evidence."); id. at 17 (evaluating "the two Zerilli factors"); In re Subpoena to Goldberg, 693 F. Supp. 2d 81, 85 (D.D.C. 2010) (explaining that Zerilli "articulated a three-part test to determine the appropriate balance between the litigant's interest in the information and the public's interest," composed of centrality, exhaustion, and party-non-party status); McGraw-Hill Cos., 507 F. Supp. at 50 ("The balancing test requires evaluation of two factors: (1) the need for the information and (2) whether the party seeking the information has exhausted all reasonably available alternative sources.").[3]

[3] Herridge cites Grunseth v. Marriott Corp., 868 F. Supp. 333 (D.D.C. 1994), as an example of a court looking beyond the factors identified in Zerilli to consider also the relative

Before applying the Zerilli test to the facts at hand, the Court emphasizes that restricting the test largely to the "precise guidelines" set forth in that case "does not leave journalists without protection." Lee, 413 F.3d at 60. Herridge and Fox worry that if the Zerilli test mainly boils down to consideration of centrality and exhaustion, then Privacy Act plaintiffs "will eventually get access to confidential sources in *every* case," contrary to Zerilli's admonition that the privilege should prevail "in all but the most exceptional cases." Herridge Mot. at 3 (quoting Zerilli, 656 F.2d at 712); see also id. at 23–24. Vigilant application of the centrality and exhaustion factors, however, should ensure that compelled disclosure will be the exception, not the rule. For one, ensuring that the requested information is central to a plaintiff's claim, even in Privacy Act cases, will preclude overly broad subpoenas that reach further into the journalist's privilege than is required. Moreover, it is no easy task to exhaust all reasonable alternative sources of information. Many of the cases cited above concluded that plaintiffs had failed to do just that. See, e.g., Hutira, 211 F. Supp. 2d at 121–22; Tripp, 284 F. Supp. 2d at 60–61; In re Subpoena to Goldberg, 693 F. Supp. 2d at 88. In the Court's view, it is likely that, when forced to exhaust all reasonable alternatives, plaintiffs will often be able to identify the source of a journalist's reporting without resort to the journalist. And even where the Zerilli factors favor disclosure, "the usual requirements of relevance, need, and limited burdens on the subpoenaed person still apply." Lee,

"societal interest[s]" implicated by a request for disclosure of a journalist's source, id. at 335–36 (after analyzing the three Zerilli factors, observing that the case did not involve "election fraud, or governmental corruption, or any other issue that affects the fundamental validity of the electoral process" but only the plaintiff's demand for damages). Grunseth's consideration of societal interests unmoored from the Zerilli factors, however, is inconsistent with both Lee's analysis and the trend in this district. And as explained below, even if the Court were to analyze such considerations, Chen's interest in enforcing the Privacy Act here implicates public interests to a greater degree than the gubernatorial candidate in Grunseth who sought to identify sources of a newspaper report that he had an extramarital affair. Id. at 334.

413 F.3d at 60. In short, the Court is less troubled by Herridge and Fox's parade of horribles, particularly since there appears to have been no such widespread fallout since Lee.[4]

*2. Centrality*

The Court now turns to the first Zerilli factor: whether the information sought by Chen's subpoenas goes to "the heart of" her Privacy Act claim. Lee, 413 F.3d at 59 (quoting Zerilli, 656 F.2d at 713). The document subpoena to Herridge consists of four requests:

> **REQUEST NO. 1:**
> Produce all Private Documents and Information in your possession, in the form in which you received them.
>
> **REQUEST NO. 2:**
> Produce all Documents and Communications comprising, reflecting, or relating to transmission or provision of the Private Documents and Information to you.
>
> **REQUEST NO. 3:**
> Produce Documents or Communications sufficient to identify the individual(s) that transmitted or provided the Private Documents and Information to you.
>
> **REQUEST NO. 4:**
> Produce all Communications between or among, you, on the one hand, and, on the other hand, Stephen Rhoads and/or Timothy Pappa.

Herridge Mot., Ex. L, Schedule A at 6–7. The phrase "Private Documents and Information," in turn, is defined to include "any and all documents and information concerning Dr. Chen and/or the University that were provided to or obtained by you from a third party and that were presented in, referred to, or considered in relation to" Fox's broadcasts and news stories that contained the allegedly leaked information about Chen. Id. at 3. The document subpoena to Fox includes four similar requests. Fox Mot., Ex. G, Schedule A at 7. Herridge and Fox contend that these

[4] In his dissent from the denial of rehearing en banc in Lee, Judge Tatel expressed a concern similar to the one raised by Herridge and Fox, but they point to no evidence that the floodgates to journalists' notepads have opened in the eighteen years since then. See Lee v. Dep't of Justice, 428 F.3d 299, 301–02 (D.C. Cir. 2005) (Tatel, J., dissenting from denial of reh'g en banc).

subpoenas are overbroad as written because they would require disclosure of every document or piece of information obtained from anyone relating to Chen or her university, whether or not the documents or information bear any relation to the alleged release of records protected under the Privacy Act. Herridge Mot. at 17.

The Court agrees with Herridge and Fox that, as drafted, the subpoenas sweep beyond the information that is central to Chen's case. "As in Zerilli, the relevant information is the identity of the individuals who may have leaked information in violation of the Privacy Act," and without that information, Chen's "ability to show the other elements of the Privacy Act claim, such as willfulness and intent, will be compromised." Lee, 413 F.3d at 60. Read at their broadest, however, the subpoenas could require the disclosure of all of Herridge's sources who contributed information to her reporting, even if that information is not protected by the Privacy Act.

But this overbreadth does not doom Chen's requests. The Court has authority under Rule 45 to "quash or modify" a subpoena, Fed. R. Civ. P. 45(d)(3)(A), and "when appropriate," courts should "consider the possibility of modifying the subpoena rather than quashing" it, Est. of Klieman v. Palestinian Auth., 293 F.R.D. 235, 240 (D.D.C. 2013) (quoting Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 403 (D.C. Cir. 1984)). Here, Herridge and Fox's counsel suggested at oral argument that the centrality factor would not be an obstacle for Chen if the subpoenas are "cut down to focus only on the deposition for the . . . identity of the source or sources" who provided Herridge with the material purportedly covered by the Privacy Act, namely, the photographs of Chen, the FBI interview reports, the immigration or naturalization documents, and the PowerPoint presentation created by Agent Pappa. Hearing Transcript at 9; see also Herridge Mot., Ex. L, Schedule A at 3 (listing relevant documents). The Court thus finds that the centrality factor favors disclosure if, as discussed below, the Court quashes the other subpoenas but enforces Chen's deposition subpoena of Herridge.

*3. Exhaustion of Alternatives*

Next, Zerilli and Lee require that "reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." Zerilli, 656 F.2d at 713; accord Lee, 413 F.3d at 59. Although the exhaustion requirement is "very substantial," "there are some limits to the obligation to pursue alternative sources." Zerilli, 656 F.2d at 714. A Privacy Act plaintiff need not, for instance, "depose every individual who conceivably could have leaked the information" or "who could have had any kind of access to the information regardless of other evidence that the deponents on whom [she] focused were in fact the sources of the leaks and were denying it." Lee, 413 F.3d at 61. To that end, litigants need not "be made to carry wide-ranging and onerous discovery burdens where the path is . . . ill-lighted." Id. (alteration in original) (quoting Carey, 492 F.2d at 639). Nor does Zerilli "require proof positive that the knowledge exists nowhere else on earth but in the minds of the journalists and their anonymous confidants." Lee v. U.S. Dep't of Justice (Lee III), 287 F. Supp. 2d 15, 23 (D.D.C. 2003). The number of depositions or extent of other discovery required for "reasonable" exhaustion "must be determined on a case-by-case basis," considering such factors as the efforts already undertaken, the burden of further discovery, and the likelihood that it would uncover the relevant information. Lee, 413 F.3d at 60–61.

Here, Chen's request to compel disclosure of the leaker's identity from Herridge and Fox has come at "the end, and not the beginning, of the inquiry." Zerilli, 656 F.2d at 713 (quoting Carey, 492 F.2d at 638). Chen has served the defendants in this case with 67 requests for production of documents, 67 interrogatories, and 57 requests for admission. Opp. to Herridge Mot. at 2. She has taken eighteen depositions of current and former government employees, including four 30(b)(6) depositions of FBI employees, issued thirteen third-party subpoenas, and obtained 22 declarations from other government personnel who were either part of or aware of the

underlying investigation into Chen. Id. In particular, she has deposed both FBI Agent Pappa—the creator of the PowerPoint Chen believes to be the source of the leaked material—and Stephen Rhoads—Herridge's on-the-record source who was privy to Pappa's work, who, in an email intended to prompt a Congressional investigation into Chen, boasted that "[n]obody on the planet [knew] more about this case than" he, and who proclaimed that he had "documents, emails, recordings and pictures that nobody else has." Id., Ex. 25 (cleaned up). During her depositions of other government employees, moreover, Chen also asked if they had any idea who might have provided the private documents used in Herridge's reporting. See, e.g., id., Ex. 17 at 164 [redacted]; id., Ex. 18 at 248 [redacted]; id., Exs. 20 & 21 [redacted]; id., Ex. 32 at 129 [redacted]. In a word, Chen's pursuit of discovery has been probing, yet she has been unable to ascertain the alleged leaker's identity. Indeed, her efforts have been far more extensive than those of the plaintiffs in Zerilli, who had made no attempt to depose any of the individuals who were most familiar with or who had access to documents from the investigation there. 656 F.2d at 714–15; see also Tripp, 284 F. Supp. 2d at 59 (upholding privilege where "the party seeking to compel disclosure has made no effort whatsoever, or insufficient efforts, to obtain the information sought from alternative sources, or has made conclusory claims that the information cannot be obtained from other sources"); In re Subpoena to Goldberg, 693 F. Supp. 2d at 88 (requiring litigant to seek out other sources that could "likely" provide requested information); Goldberg, 123 F. Supp. 3d at 20 (pointing out failure to seek "information from the obvious alternative sources").

Despite Chen's efforts, Herridge and Fox identify several stones they believe she must turn to exhaust reasonable alternative sources. Particularly in light of the extensive discovery Chen has already undertaken, however, the Court does not believe further exploration of any of these additional sources offers more than a speculative prospect of identifying the source of the leak.

First, Herridge and Fox insist that Chen should have secured a comprehensive list of—and either deposed or sought declarations from—all FBI personnel who might have had access to Agent Pappa's PowerPoint [redacted]. That group, they say, would include [redacted]. Herridge Mot. at 18. But Chen did try, unsuccessfully, to identify the relevant subset of those individuals who accessed the PowerPoint from that location. See Opp. to Herridge Mot., Ex. 30 at 29 (FBI 30(b)(6) deponent stating that [redacted]); id., Ex. 11 at 6 (FBI response to interrogatory stating that the [redacted]). In any event, requiring Chen to seek depositions or declarations from every person who nominally had access [redacted]—without any evidence that those individuals actually did access the PowerPoint (or, for that matter, were aware of its existence)—would be contrary to Lee's instruction that plaintiffs need not depose every individual "who could have had any kind of access to the information." 413 F.3d at 61.

Similarly speculative is Herridge and Fox's argument that Chen should have further pursued information about individuals who [redacted]. Specifically, Herridge and Fox point to [redacted].

See Herridge Mot. at 19; Opp. to Herridge Mot., Ex. 30 at 100. They also point to [redacted] to his supervisors. Herridge Mot. at 18; id., Ex. P at 90–91, 178–79. [redacted], Herridge and Fox contend that Chen should have identified and deposed (or sought declarations from) [redacted].

The foundation for such suppositions, however, is far too shaky. Although Pappa stated in his deposition that he believed [redacted], he also emphasized [redacted] Opp. to Herridge Mot., Ex. 5 at 214. At best, he could not recall [redacted] Id. at 215; see also id. at 217 (Pappa stating he could not recall [redacted]); id. at 228–29 (Pappa stating that he could not recall [redacted]); id. at 298 (Pappa stating he did not recall [redacted]). One [redacted] recalled that [redacted] but also remembered that [redacted]. Opp. to Herridge Mot., Ex. 33 at 28. [redacted] Id., Ex. 14 at 88–91. As lukewarm as these leads are, Chen nevertheless attempted to

ascertain the identities of [redacted] through the FBI's 30(b)(6) deponent, who stated [redacted]. Id., Ex. 30 at 35–36, 38. In short, Chen did conduct follow-up discovery to ascertain [redacted], and in any case, Herridge and Fox have identified nothing in the record to suggest it is reasonably likely someone from [redacted] accessed, absconded with, or leaked the PowerPoint.

Finally, the Court is unpersuaded by the remaining specters Herridge and Fox cite as potential recipients of the PowerPoint. They point to the possibility that Agent Pappa might have given a copy of the PowerPoint to [redacted] employee named [redacted] to convey to [redacted] (whom Chen deposed). But [redacted]. Id., Ex. 13. And [redacted] testified that he could not [redacted]. Id., Ex. 15 at 86–87. Herridge and Fox cite another email in which a [redacted], requested that Pappa send [redacted] based on the PowerPoint to [redacted]. Herridge Mot. at 18–19. But neither [redacted] nor another recipient of that email, both of whom Chen deposed, could say [redacted], Opp. to Herridge Mot., Ex. 16 at 114; id., Ex. 32 at 65, nor is there any reason to believe [redacted], had any contact with or reason to leak to Herridge. Last, Herridge and Fox cite [redacted]. Herridge Mot., Ex. R. Once again, Chen asked [redacted] in his deposition. He replied that [redacted]

[redacted]. Opp. to Herridge Mot., Ex. 32 at 110–11.

To summarize, none of the potential leads on which Herridge and Fox rely amounts to anything more than speculation that some government officials might have seen or potentially had access to the alleged Privacy Act materials in this case. Moreover, far from amounting to "a reasonably well-defined number of possible alternative sources," Goldberg, 123 F. Supp. 3d at 18, the number of potential sources Herridge and Fox would require Chen to exhaust would balloon to [redacted], all without any non-speculative evidence that they ever possessed, let alone leaked, the relevant materials. To require Chen to pursue these "ill-lighted" paths after the extensive discovery she has already conducted, and when evidence suggests that other individuals (such as Rhoads) both had access to the Chen investigation and an interest in publicizing it, see Opp. to Herridge Mot., Ex. 18 at 90–91, 184–86; id., Ex. 25, would read the word "reasonable" out of Zerilli's exhaustion requirement. This factor, accordingly, tilts sharply in Chen's favor.

*4. Reporter's Status*

Next, as instructed by Zerilli, the Court considers the distinction between cases in which "the reporter is a party" and those "in which the reporter is not a party." 656 F.2d at 714. As Zerilli explained, this factor can point strongly in favor of disclosure when the reporter is a party and "successful assertion of the privilege will effectively shield him from liability," as in libel cases that require proof of actual malice. Id. Herridge and Fox are not parties to this case, so Zerilli's concern about the "equities" does not decisively favor disclosure. At the same time, neither does that fact weigh against disclosure. Indeed, Lee acknowledged that the reporters there

were all non-parties and yet did not hesitate to affirm the district court's disclosure ruling based on the weight of the centrality and exhaustion factors there. 413 F.3d at 57 n.1.

*5. Other Factors and Considerations*

For the reasons discussed above, the Court does not read Zerilli or Lee to require either a full-bore analysis of Chen's likelihood of success on the merits of her Privacy Act claim or an assessment of the public and private interests at play beyond the factors discussed above. But, for the sake of completeness, the Court briefly explains here why Herridge and Fox's arguments along these lines likely would not change the outcome here in any event.

The Court will group Herridge and Fox's remaining arguments into two considerations. First, they maintain that their First Amendment interests outweigh Chen's interest in pursuing her Privacy Act claim because, in their view, she will be unable to obtain damages at the end of the day, either because Chen's alleged damages were caused by the Defense Department's independent decision to cut off tuition assistance to her university or because much (but not all) of Fox's reporting on her was derived from sources that do not implicate the Privacy Act. Herridge Mot. at 26–34. To these arguments, it is sufficient to repeat Zerilli's observation that Chen's "suit is not frivolous." 656 F.2d at 714. The Court need not, and does not, decide now whether Herridge and Fox are correct that Chen is barred from pursuing damages based on the Defense Department's revocation of tuition assistance, as those are not the only damages Chen alleges she suffered. She also seeks economic damages for consulting fees and reputation management services she claims to have incurred to remediate the harm caused by the Fox reporting. Opp. to Herridge Mot., Ex. 34 at 2; cf. Fleck v. Dep't of Veterans Affs. Off. of Inspector Gen., 596 F. Supp. 3d 24, 57 (D.D.C. 2022) ("Legal fees that a plaintiff incurs to protect against the effects of an agency's Privacy Act violations are cognizable damages under Section 552a(g)(4)."). She seeks further damages for lost profits, a sum that might include lost business opportunities without

regard to the loss of tuition assistance from the Defense Department. Opp. to Herridge Mot., Ex. 34 at 2; Compl. ¶ 56 ("The illegal leak of personal information has diminished Dr. Chen's income, limited her professional opportunities, and decreased the value of the university that she wholly owns and into which she has invested the last two decades.").

Even if Chen may ultimately have to distinguish between damages caused by the leak of information covered by the Privacy Act—such as the compromising photographs of herself and her husband—and not by other information in the Fox reporting that was either not so protected or was publicly available, the Court cannot say at this juncture that she will be unable to do so, particularly without expert opinions that could be crucial to that analysis. Indeed, even if Herridge and Fox are correct that only the photographs that appeared in the reporting could serve as the basis for Privacy Act damages—a question the Court does not decide—the Court does not doubt that the images of Chen holding or wearing a Chinese military uniform could have given the Fox reporting more traction than it otherwise would have had and caused Chen more damage than she otherwise would have suffered. A picture, after all, "is worth a thousand words." Andy Warhol Found. for the Visual Arts v. Goldsmith, 143 S. Ct. 1258, 1295 (2023) (Kagan, J., dissenting). Were the photographs here irrelevant, moreover, the Court wonders why Herridge would have thought to include them in her reporting, notwithstanding the rather obvious legal implications of doing so. Although the Court does not intimate "any opinion as to whether" Chen "will ultimately prevail," the current record does not support the conclusion "that no purpose would be served by disclosure of the identity of the sources." Carey, 492 F.2d at 638.

Second, Herridge and Fox urge the Court to conclude that Chen's "purely parochial, private interest" in her Privacy Act claim, absent evidence that the government "smeared an innocent person," simply does not outweigh the First Amendment interest in promoting a robust free press, particularly in the area of reporting on national security. Herridge Mot. at 26, 34–39.

At the outset, the Court rejects the assertion that Chen's Privacy Act claim implicates only her own personal interests. To make out a Privacy Act claim, a litigant must show that the government's disclosure of covered material was "intentional or willful," 5 U.S.C. § 552a(g)(4), and Congress has recognized the weightiness of such willful disclosures by creating a private right of action to deter them. Nor does the Court read Lee, Hatfill, or any of the other D.C. Circuit cases discussing the reporter's privilege to turn on whether the Privacy Act plaintiff was wrongfully "smeared" by government leaks or, to paraphrase Herridge and Fox's argument, "had it coming." For good reason: The Privacy Act protects not just Chen but all private citizens, whether blameworthy or blameless, from the risk that government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals.

Of course, the Court does not question the vital role of a free press in "bar[ing] the secrets of government and inform[ing] the people." N.Y. Times Co. v. United States, 403 U.S. 713, 717 (1971) (Black, J., concurring). But here, if Herridge and Fox are correct that only a few (in their view, insignificant) elements of their stories even implicated the Privacy Act, then that press function, including the reliance on confidential sources, need not have come into conflict with Chen's statutory privacy rights at all. And, at the end of the day, the binding precedent of this Circuit does not permit this Court to cast aside all the "more precise guidelines" analyzed above based solely on the abstract "importance of a vigorous press." Zerilli, 656 F.2d at 712–13.

* * *

The Court is mindful both "of the preferred position of the First Amendment," Zerilli, 656 F.2d at 712, and of the fact that "the protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist, no matter how newsworthy the government official may feel the information is," Lee, 413 F.3d at 60. As described above, the

two most important factors identified by Zerilli and Lee point decidedly in Chen's favor. The subpoenas, as modified, go to the heart of her Privacy Act claim, and she has exhausted all but the speculative alternative sources of information suggested by Herridge and Fox. That Herridge and Fox are not parties to the case does not outweigh those factors, nor do their concerns about the extent of Chen's damages or the importance of Herridge's work. Accordingly, balancing the foregoing factors, the Court concludes that Chen has overcome the qualified First Amendment privilege in this case.

B. Common Law Newsgathering Privilege

Although most of the parties' briefing is devoted to the qualified First Amendment privilege, Herridge and Fox also urge the Court to recognize a newsgathering privilege under federal common law. See Herridge Mot. at 39–45; Fox Mot. at 13–14. For the same reasons stated by Judge Collyer in Lee II and Judge Walton in Hatfill, the Court declines to recognize a federal common law newsgathering privilege here.

Herridge and Fox contend that the relationship between a journalist and her confidential source is "rooted in the imperative need for confidence and trust" and serves important public ends. Herridge Mot. at 40–41 (quoting Jaffee v. Redmond, 518 U.S. 1, 10 (1996)). But to "qualify as an exception from the general rule disfavoring testimonial privileges requires a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." Hatfill, 505 F. Supp. 2d at 44 (alterations and internal quotation marks omitted) (quoting Jaffee, 518 U.S. at 9). The "transcendent importance of a free press is that reporters can report the news and express opinions without fear of Government oppression or interference," and the use of confidential sources is "not a *sine qua non* of journalism but only an important and useful tool." Lee II, 401 F. Supp. 2d at 141; accord Hatfill, 505 F. Supp. 2d at 45.

Moreover, "[u]nlike the psychotherapist's privilege recognized in Jaffee, 'the likely evidentiary benefit that would result from the denial of the [reporter's] privilege'" could be substantial. Hatfill, 505 F. Supp. 2d at 45 (second alteration in original) (quoting Jaffee, 518 U.S. at 11). Even if not absolute, a common law privilege that would preclude disclosure of a confidential source in a case such as this one, which the Court has found satisfies the Zerilli and Lee test, would "circumvent" this Circuit's First Amendment privilege case law and would risk undermining "the fundamental purpose of the Privacy Act" of "discourag[ing] the kind of [alleged] leaks that are at issue in this action." Lee II, 401 F. Supp. 2d at 139, 141–42. Moreover, as noted above, the balancing of interests contemplated by Herridge and Fox's proposed common law privilege "would create a subjective and elastic standard whose outcome could not be predicted," saddling district courts with the "daunting and well-nigh impossible task" of determining "whether the harm caused by leaked information outweighs the 'value' of that information to the citizenry." Id. at 139. Given that this Circuit already has a well-established First Amendment privilege that both protects journalists' interests and channels judicial discretion in balancing that interest against evidentiary need, Herridge and Fox fail to "demonstrate with a high degree of clarity and certainty that" their proposed privilege "will effectively advance a public good" relative to these potential drawbacks. Id. at 137 (quoting In re Sealed Case, 148 F.3d 1073, 1076 (D.C. Cir. 1998)).

To be sure, as Herridge and Fox point out, almost all of the states have adopted some form of reporter's privilege, although the contours of those protections vary significantly from state to state. See In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1157–58 (D.C. Cir. 2006) (Sentelle, J., concurring). That factor weighs somewhat in favor of recognizing a similar federal common law privilege. But "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." United

States v. Nixon, 418 U.S. 683, 710 (1974). For that reason, "new privileges should be created sparingly and with caution." Lee II, 401 F. Supp. 2d at 136. And, although not dispositive, recognizing the common law privilege Herridge and Fox seek would stand in some tension with the Supreme Court's pronouncement that "the common law recognized no such privilege," at least in the criminal context. Branzburg v. Hayes, 408 U.S. 665, 698 (1972); see id. at 685 ("At common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury."). Accordingly, the Court will not create a federal common law newsgathering privilege here.

C. Sequencing of Discovery

The Court must tackle one last question—Fox's arguments that the subpoenas to it should be quashed as duplicative of the Herridge subpoenas, at least until discovery efforts are exhausted with respect to her. Fox contends that Zerilli's exhaustion requirement demands that Chen seek discovery from Herridge first and that requiring Fox to submit to a deposition would be unnecessarily cumulative and duplicative under Federal Rule of Civil Procedure 26(b)(2)(C). Fox Mot. at 12–13, 14–16. Although Chen contends that Herridge and Fox may be able to provide different materials relevant to her claim, she does not oppose sequencing discovery to require Fox's compliance with the subpoenas only if the discovery sought from Herridge is incomplete. Opp. to Fox Mot. at 18–19.

The Court agrees with this proposed approach. The "names of the sources who leaked information about Dr. [Chen] to the media are central to [her] Privacy Act claim[]," and Chen's subpoena to depose Herridge is "directly targeted at obtaining" that information. Hatfill, 505 F. Supp. 2d at 49. Until Chen has exhausted her efforts to obtain the alleged leaker's identity from Herridge, she will not have exhausted reasonable alternative sources sufficient to require Fox to submit to a subpoena as well. Id. Of course, "depending upon the outcome of the reporter's

deposition[], it may be necessary for the Court to revisit in the future whether corporate representatives of" Fox "should be compelled to provide deposition testimony." Id. But, at least for now, the Court believes it prudent to proceed one step at a time.

Accordingly, the Court will grant Herridge's motion insofar as it defers enforcement of Chen's document subpoena and cabins her deposition subpoena, but it will otherwise deny her motion. Consistent with this opinion, Chen may depose Herridge regarding the identity and intent of the source or sources of the documents and images allegedly provided to her in violation of the Privacy Act, and any non-privileged other matters relevant to her Privacy Act claim. The Court will grant Fox's motion, without prejudice to Chen renewing her subpoenas to Fox in the event Herridge cannot provide the information she seeks.

## IV. Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. Nos. 94 & 96] Catherine Herridge's Motion to Quash is GRANTED in part and DENIED in part. It is further

**ORDERED** that [Dkt. Nos. 95 & 97] Fox News Network's Motion to Quash is GRANTED.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: August 1, 2023

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **YANPING CHEN**, Plaintiff, v. **FEDERAL BUREAU OF INVESTIGATION, *et al.***, Defendants. | Case No. 18-cv-3074 (CRC) |

**OPINION AND ORDER**

Plaintiff Yanping Chen brought this Privacy Act lawsuit against multiple federal agencies and personnel for allegedly leaking information to journalist Catherine Herridge, who published a series of investigative reports about Chen's affiliations with the Chinese military on Fox News Network in 2017. After discovery failed to identify the source of the alleged leak, Chen issued subpoenas to Herridge and Fox. Both non-parties then moved to quash these subpoenas on the grounds that requiring them to divulge their source or sources violated the First Amendment's qualified privilege for journalists and a federal common law newsgathering privilege. Last month, the Court partially denied Herridge's motion and permitted Chen to depose her. Herridge responded by requesting that the Court certify that order for interlocutory appeal under 28 U.S.C. § 1292(b) and stay the order pending appeal. Although the Court appreciates the weightiness of Herridge's concerns and the values she seeks to vindicate, the proper procedure for Herridge to challenge the subpoena is by refusing to comply and appealing an ensuing contempt order. The Court is obligated to abide by this standard practice and, for that reason, denies her motions.

Before delving into the reason why Herridge's motions must be denied, it is worth calling out the merits of her arguments. Under 28 U.S.C. § 1292(b), a court may certify an appeal only

if: "(1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion concerning the ruling exists; and (3) an immediate appeal would materially advance the litigation." APCC Servs., Inc. v. AT&T Corp., 297 F. Supp. 2d 101, 104 (D.D.C. 2003). At first glance, it appears that Herridge checks all three boxes.

First, the order denying Herridge's motion to quash turned on a controlling question of law. The accompanying memorandum opinion rejected Herridge's argument that a district court must engage in a free-form weighing of the interests when evaluating the First Amendment reporter's privilege under Zerilli v. Smith, 656 F.2d 705 (D.C. Cir. 1981). See Mem. Op. & Order at 6–14. It instead held that Zerilli—as construed in Lee v. Department of Justice, 413 F.3d 53 (D.C. Cir. 2005)—largely cabined the relevant inquiry to (1) whether the information sought was "central" to the claim and (2) whether the plaintiff exhausted reasonable alternative avenues of discovery. Mem. Op. & Order at 14–21. The Court also declined Herridge's invitation to open a back door to a broader balancing test by recognizing a federal common law newsgathering privilege. Id. at 25–27. Restricting review to centrality and exhaustion (as well as Herridge's non-party status), the Court determined that the balance weighed in Chen's favor. Id. at 14–15, 21. While the Court may have presaged that this outcome "likely" would not change even if it entertained the entire panoply of possible interests, id. at 22, this prediction was far from conclusive. It thus remains possible that any refinement of the applicable test by the Circuit on appeal would alter the result.

Second, there are also substantial grounds for a difference of opinion regarding the Court's ruling. For starters, there is a substantial difference of opinion over whether Zerilli and Lee were correctly decided, as evidenced by the Circuit's evenly split vote in deciding whether to rehear Lee en banc. See Lee v. Dep't of Just., 428 F.3d 299 (D.C. Cir. 2005) (per curiam); see

also id. at 300 (Rogers, J., dissenting from denial of reh'g en banc) (noting it was "evident" that "there are different views regarding the proper application of Zerilli"). Given this disagreement and the importance of the First Amendment issues here, there is good reason to believe this case might generate en banc activity that could upend existing precedents. Moreover, a panel bound by these precedents might still take the opportunity to reshape the legal landscape by recognizing a federal common law newsgathering privilege—an option that Zerilli and Lee leave open.

Third, it is likely that permitting an interlocutory appeal would materially advance the litigation. Herridge has suggested she does not intend to comply with the subpoena, in which case she will be held in contempt and can appeal that contempt order. Reply at 10–11. Under these conditions, Herridge maintains that it makes little sense to "force the parties and the Court through a largely duplicative round of briefing on a contempt motion in order to arrive at the same spot at the end of the day—an interlocutory appeal challenging the rulings in the Court's Order." Id. at 11. The Court agrees this roundabout path to the D.C. Circuit is antithetical to the vision of judicial economy that animates the general rule against interlocutory appeals. While a shortcut may emerge if the source opts to release Herridge from the privilege rather than watch her incur a contempt citation, denying certification will probably further delay resolution here.

To the extent courts have layered on top of these statutory considerations an additional limitation that certification is reserved for the truly "exceptional" cases, In re Vitamins Antitrust Litig., No. 99-cv-197, 2000 WL 673936, at *2 (D.D.C. Jan. 27. 2000), this case rises to that level. Requiring an investigative reporter to divulge her source is serious business, and it is better to be safe than sorry when it comes to First Amendment rights.

With all that said, the Court cannot certify Herridge's interlocutory appeal. It is well-established that "a district court's ruling on a subpoena's validity is not enforceable unless and

until the subpoenaed party defies an enforcement order and is cited for contempt. Under this general rule, it is only after entry of contempt that the underlying discovery dispute becomes ripe for appellate review." Kemp v. Gay, 947 F.2d 1493, 1495 (D.C. Cir. 1991) (citations and quotation marks omitted). Although the Supreme Court cited the "necessity for expedition in the administration of the criminal law" when first articulating this rule in United States v. Ryan, 402 U.S. 530, 532 (1971), the Supreme Court (and other courts) subsequently applied this restriction on interlocutory appeals in the civil context as well, see, e.g., Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 111 (2009); 15 Charles A. Wright & Arthur Miller, Federal Practice and Procedure § 3914.23 (2d ed. 2023) (noting that the civil rule derives from the criminal sphere). Indeed, courts routinely have applied this rule in this precise context: where a non-party in a civil case seeks to challenge the denial of its motion to quash a subpoena on First Amendment grounds. See Perry v. Schwarzenegger, 602 F.3d 976, 979 (9th Cir. 2010); In re Motor Fuel Temperature Sales Pracs. Litig., 641 F.3d 470, 485 (10th Cir. 2011); Ohio A. Philip Randolph Inst. v. Larose, 761 F. App'x 506, 510–12 (6th Cir. 2019). The court in each of these cases refused to exercise jurisdiction over an interlocutory appeal challenging the denial of a motion to quash and insisted that the proper way for the non-party to vindicate its First Amendment rights was to violate the order and appeal an ensuing contempt citation.[1] That is exactly how reporter's privilege claims

[1] The Fifth Circuit recently deviated from this standard practice in Whole Woman's Health v. Smith, 896 F.3d 362 (5th Cir. 2018), as revised (July 17, 2018), when permitting the Texas Conference of Catholic Bishops to proceed with an interlocutory appeal of a discovery order because the First Amendment interests at stake were "*sui generis*," id. at 368. But the Fifth Circuit failed to acknowledge that a subpoenaed party can vindicate its First Amendment rights by challenging an ensuing contempt citation and attempted to distinguish contradictory out-of-circuit precedents on the ground that these cases did not involve discovery against a third party, even though that was the case in all three cases cited above.

have made their way to the Circuit in other Privacy Act cases, see, e.g., Lee, 413 F.3d at 55, and the Court will abide by this practice here and deny the motion to certify an interlocutory appeal.

Because there is little reason to believe the Circuit will deviate from this regular order and exercise jurisdiction over an appeal under 28 U.S.C. § 1291, the Court will also deny Herridge's request for a stay pending appeal. The first, and most important, factor a court considers when deciding whether to grant a stay pending appeal is "the likelihood that the party seeking the stay will prevail on the merits of the appeal." Cuomo v. U.S. Nuclear Regul. Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam). There is scant prospect of success in Herridge's appeal given that the Circuit will likely not reach the merits due to the jurisdictional defects.

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 144] Motion for Certification for Interlocutory Appeal is DENIED. It is further

**ORDERED** that [Dkt. No. 145] Motion for Stay Pending Appeal is DENIED.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: September 6, 2023

**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| YANPING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br>U.S. DEPARTMENT OF JUSTICE,<br>U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 1:18-cv-03074-CRC**<br><br>**Hon. Christopher R. Cooper**<br>**United States District Judge**<br><br>**ORAL ARGUMENT REQUESTED** |

**NON-PARTY CATHERINE V. HERRIDGE'S MEMORANDUM IN RESPONSE TO THE ORDER TO SHOW CAUSE**

Patrick F. Philbin (D.C. Bar No. 453620)
Kyle T. West (D.C. Bar No. 24093346)
Chase Harrington (D.C. Bar No. 1619501)
ELLIS GEORGE CIPOLLONE
O'BRIEN LLP
1155 F Street, N.W.
Suite 750
Washington, DC 20004
(202) 249-6633
pphilbin@egcfirm.com

*Counsel for Catherine V. Herridge*

December 14, 2023

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ....................1

1. Rather than Making a Finding of Contempt, the Court Should Modify Its Disclosure Order. ....................2

2. Any Contempt Sanction Should Be Nominal and Should Be Stayed. ....................5

BACKGROUND ....................7

A. Ms. Herridge's Work as an Investigative National Security Journalist ....................7

B. Ms. Herridge's Reporting on Plaintiff and Evidence That Plaintiff Was a Former Colonel in the People's Liberation Army—the Military Arm of the Chinese Communist Party ....................8

C. DOD Determines that [redacted] and Publicly Announces that Funding to Her School Must Be Terminated "On National Security Grounds" ....................11

D. Plaintiff Sues the Government and Ultimately Subpoenas Ms. Herridge to Uncover Ms. Herridge's Confidential National Security Sources ....................12

E. Ms. Herridge Seeks to Appeal Without the Burden and Expense of a Contempt Proceeding, But Plaintiff Insists on a More Expensive Process ....................13

F. Ms. Herridge Is Deposed and Declines to Reveal Her Confidential Source(s), and Plaintiff Seeks Contempt Sanctions ....................14

LEGAL STANDARD ....................16

ARGUMENT ....................17

I. The Court Should Not Hold Ms. Herridge in Contempt and Instead Should Modify Its Disclosure Order. ....................17

A. The Court Should Consider Additional Information Bearing on the *Zerilli* Balance of Interests. ....................19

1. Forcing Disclosure of Ms. Herridge's Sources Would Have a Broad Chilling Effect Undermining the Ability of the Press to Keep the People Informed. ....................19

2. Forcing Disclosure of Ms. Herridge's Source(s) Raises National Security Concerns That Should Be Considered Under *Zerilli*. ....................21

**TABLE OF CONTENTS**
**(Continued)**

**Page**

II. The Court Cannot Hold Ms. Herridge in Contempt for Refusing to Answer Questions Intruding on Matters Within the Reporter's Privilege *Other Than* the Identity of Confidential Source(s). ....26

III. If the Court Enters a Contempt Order, Any Fine Should be Nominal and It Should Be Stayed Pending Appeal....28

A. Any Sanction Should Be Nominal....29

B. The Court Should Reject Compensatory Sanctions for Costs or Fees Related to Ms. Herridge's Deposition or this Contempt Motion....32

C. Any Contempt Sanction Should Be Stayed Pending Appeal. ....35

CONCLUSION....39

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Akiachak Native Cmty. v. Jewell*,
995 F. Supp. 2d 7 (D.D.C. 2014) .....37

*Atlanta Journal-Constitution v. Jewell*,
555 S.E.2d 175 (Ga. App. 2001) .....18

*Blocksom & Co. v. Marshall*,
582 F.2d 1122 (7th Cir. 1978) .....17

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*,
633 F.2d 583 (1st Cir. 1980) .....18

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) .....35

*Citizens for Responsibility & Ethics in Washington v. Office of Admin.*,
565 F. Supp. 2d 23 (D.D.C. 2008) .....37

*State ex rel. Classic III, Inc. v. Ely*,
954 S.W.2d 650 (Mo. App. 1997) .....19

*Cobell v. Norton*,
224 F.R.D. 266 (D.D.C. 2004) .....17

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
772 F.2d 972 (D.C. Cir. 1985) (per curiam) .....36

*Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*,
750 F. Supp. 2d 31 (D.D.C. 2010) .....29

*Harris v. One Hope United, Inc.*,
28 N.E.3d 804 (Ill. 2015) .....32

*Hatfill v. Ashcroft*,
No. 1:03-cv-01793-RBW (D.D.C. Oct. 2, 2007) .....35

*Hatfill v. Mukasey*,
539 F. Supp. 2d. 96 (D.D.C. 2008) .....32, 35, 36

*Hatfill v. Mukasey*,
No. 08-5049, Doc. No. 1104546 (D.C. Cir. March 11, 2008) .....32, 36

**TABLE OF AUTHORITIES**
**(Cont'd)**

**Page(s)**

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944)....29

*Herridge v. Chen*,
No. 23-5198, Doc. No. 2018838 (D.C. Circuit Sept. 25, 2023) ....14, 30

*Hospitality Staffing Sols., LLC v. Reyes*,
736 F. Supp. 2d 192 (D.D.C. 2010)....36

*Hutira v. Islamic Repub. of Iran*,
211 F. Supp. 2d 115 (D.D.C. 2002)....27

*In re Paoli R.R. Yard PCB Litig.*,
221 F.3d 449 (3d Cir. 2000)....33

*In re Roche*,
448 U.S. 1312 (1980)....37

*In re Search of: 2122 21st Road North, Arlington, Virginia*,
No. 1:12- sw-01002-JFA (E.D. Va. Mar. 10, 2017) ....3

*In re Slack*,
768 F. Supp. 2d 189 (D.D.C. 2011)....27

*Landmark Legal Found. v. EPA*,
272 F. Supp. 2d 70 (D.D.C. 2003)....35

*Lee v. Dep't of Justice*,
327 F. Supp. 2d 26 (D.D.C. 2004)....34, 35, 36

*Lee v. Dep't of Justice*,
428 F.3d 299 (D.C. Cir. 2005)....37

*Maness v. Meyers*,
419 U.S. 449 (1975)....36

*Maughan v. NL Indus.*,
524 F. Supp. 93 (D.D.C. 1981)....27

*Molock v. Whole Foods Mkt. Grp.*,
317 F. Supp. 3d 1 (D.D.C. 2018)....13, 16, 29

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971)....21, 38

**TABLE OF AUTHORITIES**
**(Cont'd)**

**Page(s)**

*NAACP v. Button*,
371 U.S. 415 (1963)....................31, 33

*Negley v. FBI*,
766 F. Supp. 2d 190 (D.D.C. 2011)....................28

*NRDC v. Train*,
510 F.2d 692 (D.C. Cir. 1974)....................29

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945)....................33

*Robert Half Int'l Inc. v. Billingham*,
315 F. Supp. 3d 419 (D.D.C. 2018)....................36

*Said v. Nat'l R.R. Passenger Corp.*,
390 F. Supp. 3d 46 (D.D.C. 2019)....................17, 18

*Toledo Scale Co. v. Computing Scale Co.*,
261 U.S. 399 (1923)....................35

**United States v. Cuthbertson*,
630 F.2d 139 (3d Cir. 1980)....................31, 34, 36

**United States v. Cutler*,
6 F.3d 67 (2d Cir. 1993)....................29, 31, 36

*United States v. Latney's Funeral Home, Inc.*,
41 F. Supp. 3d 24 (D.D.C. 2014)....................17, 30

*United States v. Libby*,
467 F. Supp. 2d 20 (D.D.C. 2006)....................11

*United States v. Two Gen. Elec. Aircraft Engines*,
317 F. Supp. 3d 516 (D.D.C. 2018)....................29

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947)....................17

*Whole Woman's Health v. Smith*,
896 F.3d 362 (5th Cir. 2018)....................14

**Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981).................... *passim*

**TABLE OF AUTHORITIES**
**(Cont'd)**

**Page(s)**


**STATUTES**

18 U.S.C. app. III §§ 1–16 ....................11

28 U.S.C. § 1291 ....................14

28 U.S.C. § 1292(b) ....................13, 30

**RULES**

Fed. R. Civ. P. 54(b) ....................17

**OTHER AUTHORITIES**

11A C. Wright, A. Miller, & M. Kayne, Fed. Prac. & Proc. § 2960 (3d ed. 1998) ....................17

Air Force News Service, *CSAF Issues Warning of PLA Recruitment of U.S. Air Force Members, Veterans* (Sept. 8, 2023) ....................10, 24

Awards and Recognitions, Cong. Medal of Honor Soc'y, https://www.cmohs.org/about-the-society/awards ....................8

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com (Feb. 24, 2017) ....................8, 9, 10, 11

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com (updated May 1, 2017) ....................9, 10

Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says* (June 28, 2017) ....................9

Catherine Herridge & Jessica Kegu, *Uzbek base that housed U.S. troops allegedly had "7 to 9 times higher than normal" radiation, yellowcake uranium*, CBS News (Oct. 26, 2020) ....................8

Catherine Herridge & Jessica Kegu, *In last hours of presidency, Trump signs executive order for veterans who served at toxic base after 9/11*, CBS News (Jan. 27, 2021) ....................8

Dan Lamothe, *China's military seeks to exploit U.S. troops, veterans, general warns*, Wash. Post (Sept. 8, 2023) ....................10, 11, 24

**TABLE OF AUTHORITIES**
**(Cont'd)**

**Page(s)**

Ellen Nakashima, *Chinese breach data of 4 million federal workers*, Wash. Post (July 4, 2015) ....................23

Exec. Order No. 13982, 86 Fed. Reg. 6833 (Jan. 19, 2021) ....................8

Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980) ....................11

Natalie Gross, *DoD bans popular TA school from accepting the benefit* Military Times (Apr. 6, 2018) ....................1, 11

Michael Kaplan & Catherine Herridge, *Army to award Purple Hearts to 50 soldiers injured in Iran missile attack following CBS News investigation*, CBS News (Dec. 20, 2021), ....................7

S. Rep. No. 96-823 (1980) ....................11

"Winners: SEJ 20th Annual Awards for Reporting on the Environment," Soc'y of Env't Journalists (Oct. 20, 2021), https://perma.cc/FR4C-86MZ ....................7, 8

**PUBLIC VERSION**

## INTRODUCTION AND SUMMARY

The Department of Defense (DOD) has determined that [redacted] In an official decision in 2018, DOD cut off taxpayer funding for a university founded and run by Plaintiff. DOD determined that the university [redacted] DOD publicly announced that it was cutting off funds "on national security grounds."[1]

Plaintiff did not challenge DOD's determinations in court. Instead, she filed this Privacy Act suit arguing that she should be paid taxpayer funds as damages to compensate her for the stream of taxpayer funds that DOD cut off for national security reasons. Her theory: DOD never would have taken action to address a national security risk if it had not been for a series of articles published by Ms. Herridge. Ms. Herridge believes that summary judgment briefing would establish that DOD's independent national security decision—[redacted]—breaks any alleged causal chain that could be traced to Ms. Herridge's articles and would eliminate any need for discovering Ms. Herridge's source(s). The Court, however, has ordered Ms. Herridge to hand over to Plaintiff her confidential national security source(s) now. To preserve her right to appeal, Ms. Herridge respectfully declined to disclose her source(s) at a deposition and Plaintiff now seeks a contempt order.

---

[1] Natalie Gross, *DoD bans popular TA school from accepting the benefit*, Military Times (Apr. 6, 2018), https://tinyurl.com/3sfzyxbu.

### 1. Rather than Making a Finding of Contempt, the Court Should Modify Its Disclosure Order.

Ms. Herridge does not intend to burden the Court by re-arguing her points under *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981). Because the Court has discretion to modify its order, however, Ms. Herridge believes it is important for the Court to consider additional information that is relevant under *Zerilli* balancing.

First, Ms. Herridge has submitted declarations from the Dean of the Columbia Journalism School, Jelani Cobb, and from Steve Coll, a two-time Pulitzer Prize winning investigative journalist specializing in the national security field. As they explain, holding Ms. Herridge in contempt would have a broad chilling effect on investigative journalism by deterring sources from working with journalists. As a result, it would undermine the ability of the press to fulfill its function of keeping the people informed about their government. *See* Decl. of Jelani Cobb ¶¶ 11–12 ("Cobb Decl.") (Ex. B); Decl. of Steve Coll ¶ 11 ("Coll Decl.") (Ex. C). The Court did not previously have before it declarations from experts in the field, and it should take them into account to reevaluate the balance the Court struck under *Zerilli*.

Second, the Court should consider the national security risks implicated by this case. Ms. Herridge has submitted declarations from two former counterintelligence officials. William Evanina was director of the National Counterintelligence and Security Center and Holden Triplett led the FBI's office in China and served as FBI Faculty Chair at the National Intelligence University. As they explain, based on their review of record materials, there is a serious risk that Plaintiff was involved in making information about U.S. military members available to the CCP, and disclosing the identity of Ms. Herridge's source(s) to Plaintiff would entail a further national security risk. *See* Decl. of William R. Evanina ¶¶ 11, 22 ("Evanina Decl.") (Ex. D); Decl. of Holden Triplett ¶¶ 15, 19 ("Triplett Decl.") (Ex. E).

The information in the record is telling. [redacted] Plaintiff [redacted] who has more than a decade-long history of lying about her service in the PLA. [redacted] She lied about it on immigration forms (which allowed her to become a U.S. citizen), she lied about it on multiple occasions to federal investigators, and she was recorded encouraging a confidential source for the FBI to lie about it for her—to a federal grand jury. [redacted] Aff. in Support of Two Appls. for Search Warrants at 8–14, *In re Search of: 2122 21st Road North, Arlington, Virginia*, No. 1:12- sw-01002-JFA (E.D. Va. Mar. 10, 2017), ECF No. 1 (filed in this case as ECF No. 94-11).

While her deception was ongoing, she set up and ran the University of Management and Technology (UMT), a university in Arlington, Virginia, [redacted] in 2018 DOD publicly terminated UMT's participation in the taxpayer funded DOD Tuition Assistance Program "on national security grounds." *Id.* at 1.

Mr. Evanina and Mr. Triplett explain that the record materials indicate a serious risk that Plaintiff was involved in making information about U.S. military members available to the CCP.

The information that UMT gathered on service members, including training history, coincides exactly with information that CCP intelligence services would find valuable and would seek to obtain. Information that became public only three months ago reinforces that point. In September 2023, the Chief of Staff of the Air Force issued a service-wide warning that the PLA was actively using front companies to target veterans with particular skills to "fill gaps" in the PLA's capabilities. Mem. from Gen. Charles Q. Brown, Jr., Chief of Staff, USAF, Sept. 5, 2023 (Ex. F). The fact that the training histories gathered by UMT match the information needed to target former service members in a known CCP intelligence-gathering effort strongly bolsters the conclusion that there is a serious risk that Plaintiff and UMT were involved in making information available to the CCP. Triplett Decl. ¶ 15.

As Mr. Evanina and Mr. Triplett explain, the mere fact that Plaintiff was not prosecuted does not undermine their assessment of risk. In counterintelligence cases, the government often decides not to prosecute, even when it has sufficient evidence, to avoid disclosing sensitive sources and methods of gathering information. *Id.* ¶ 18; Evanina Decl. ¶¶ 20–21. And DOD's decision to cut off Plaintiff's funds was based squarely on a determination that she did, in fact, pose a national security risk.

Forcing Ms. Herridge now to turn over her confidential source(s) means (under the premise of Plaintiff's case) disclosing the identity of a government employee(s) who had access to detailed information about a counterespionage investigation to a person who was found to be a national security risk—and, indeed, may have been collecting intelligence for the CCP. Such a disclosure necessarily creates additional risk. And that risk ought to be taken into account under the *Zerilli* balancing test. Under the Court's current approach to *Zerilli*, such risks are excluded from

consideration, because all that matters is whether the information Plaintiff seeks is "central" to her case and whether she exhausted other alternatives. The Court should modify that approach.

The Court has recognized that "[r]equiring an investigative reporter to divulge her source is serious business, and it is better to be safe than sorry when it comes to First Amendment rights." Opinion and Order at 3, ECF No. 152 ("Certification Order"). Especially in the national security context of this case, the way to be safe rather than sorry is, at a minimum, to require Plaintiff to establish that she can survive summary judgment on other elements of her case (such as causation) *before* forcing Ms. Herridge to take the irretrievable step of turning over her confidential national security source(s).

**2. Any Contempt Sanction Should Be Nominal and Should Be Stayed.**

If the Court enters a contempt order, it should impose only a nominal sanction. Ms. Herridge has made it clear that the last thing she wanted to do in this case was to violate a court order. She took every step she possibly could to bring an interlocutory appeal in order to avoid the need to disobey the Court's order to secure an appeal. The Court determined, however, in its discretion, *see* Opinion and Order at 2, ECF No. 158 ("Reconsideration Order"), to make contempt the only path to an appeal. Ms. Herridge believes as a matter of conscience that pursuing an appeal is essential for preserving her constitutional rights, protecting her most important professional obligations as a journalist, and avoiding a further national security risk. Imposing a substantial fine on Ms. Herridge for pursuing the only available avenue for an appeal would be inequitable and improperly burden the exercise of her First Amendment rights—especially where the Court itself has acknowledged that she may have a meritorious appeal and "there is good reason to believe this case might generate en banc activity that could upend existing precedents." Certification Order at 3.

The Court should reject Plaintiff's request for *compensatory* contempt sanctions. It takes extraordinary chutzpah for Plaintiff to ask for an award of costs and attorney's fees for Ms. Herridge's deposition and this contempt proceeding. Ms. Herridge sought an interlocutory appeal precisely to "sav[e] the parties from [the] needless expense" of these proceedings. Mem. ISO Mot. for Interlocutory Appeal at 2, ECF No. 144-1. Plaintiff fought to block an appeal and insisted on the more expensive deposition-and-contempt pathway—even though it was clear that Ms. Herridge would not disclose her confidential source(s). Having secured the more expensive process she demanded, Plaintiff is in no position to ask the Court—as a matter of *equitable* discretion—to make Ms. Herridge pay for it. Such a sanction would also be unprecedented. Plaintiff cannot point to a single case in similar circumstances in which a journalist was required to pay plaintiff's costs and fees for pursuing the only avenue to appeal. This Court should not be the first to impose such an impermissible burden on the exercise of a journalist's First Amendment rights.

Finally, any sanction should be stayed pending appeal. The Court has acknowledged that "there are substantial grounds for difference of opinion" over the ruling requiring disclosure of Ms. Herridge's confidential source(s) and that "there is good reason to believe this case might generate en banc activity that could upend existing precedents." Certification Order at 3. In a case presenting such serious questions under the First Amendment, Ms. Herridge should not be forced to face the irreparable harm of either being coerced to reveal her confidential source(s) or racking up daily fines simply for exercising her right to seek appellate review.

**PUBLIC VERSION**

## BACKGROUND

### A. Ms. Herridge's Work as an Investigative National Security Journalist

Catherine Herridge is an Emmy Award-winning investigative journalist with 32 years of experience reporting on national security and intelligence matters. She is currently Senior Investigative Correspondent at CBS News. Over the course of her career, she has covered matters involving all elements of the U.S. Intelligence Community, including the FBI, the Department of Justice, the CIA, the Defense Intelligence Agency (DIA), the National Security Agency (NSA), the National Geospatial-Intelligence Agency (NGA), and the Director of National Intelligence (DNI). *See* Decl. of Catherine V. Herridge ¶ 3, ECF No. 96-4 ("Herridge Decl.").

Her work has repeatedly focused on stories raising issues of accountability in matters that will have a concrete, positive impact on the lives of members of the military and veterans. For example, she worked on investigative reporting that uncovered the true extent of the injuries U.S. servicemembers suffered from the Iranian ballistic missile attack on a U.S. base in Iraq in January 2020. The government had downplayed the injuries, even to the point of denying servicemembers the Purple Hearts they rightly deserved. As a result of Ms. Herridge's reporting, 50 soldiers received Purple Hearts. *See* Michael Kaplan & Catherine Herridge, *Army to award Purple Hearts to 50 soldiers injured in Iran missile attack following CBS News investigation*, CBS News (Dec. 20, 2021), https://perma.cc/G564-ZNYU; *see also* Herridge Decl. ¶ 7.

Ms. Herridge also received the Kevin Carmody Award for Outstanding Investigative Reporting for a series of reports that exposed serious health hazards from toxic waste at a U.S. military base in Uzbekistan where thousands of U.S. servicemembers have been stationed. *See* "Winners: SEJ 20th Annual Awards for Reporting on the Environment," Soc'y of Env't Journalists (Oct. 20, 2021), https://perma.cc/FR4C-86MZ. As the citation for that award explains, her

"tenacious reporting" led to a promise from the Acting Secretary of Defense to remedy the situation. *Id.* Indeed, it drove legislation and led to an Executive Order in January 2021[2] mandating a comprehensive study to address the health consequences for those who served at the base.[3]

Ms. Herridge and the CBS News Investigative Unit's Emmy-nominated series "Decades of Exposure" probing toxic water supplies at Camp Lejeune is credited with helping to spur passage of the Camp Lejeune Justice Act in August 2022 as part of the PACT Act, benefiting nearly a million veterans.

Ms. Herridge's work has earned the Congressional Medal of Honor Society's Tex McCrary Award for Journalism, which "is reserved for those persons from the fourth estate who, *through their life's work*, have distinguished themselves by service or unbiased coverage of the United States Military through journalism in peace and war." Awards and Recognitions, Cong. Medal of Honor Soc'y, https://www.cmohs.org/about-the-society/awards (emphasis added).

### B. Ms. Herridge's Reporting on Plaintiff and Evidence That Plaintiff Was a Former Colonel in the People's Liberation Army—the Military Arm of the Chinese Communist Party

In 2017, Ms. Herridge, then the Chief Intelligence Correspondent for Fox News Network, was the lead reporter on three articles[4] and related broadcast reports focusing on another matter

---

[2] Exec. Order No. 13982, 86 Fed. Reg. 6833 (Jan. 19, 2021).

[3] *See* Catherine Herridge & Jessica Kegu, *Uzbek base that housed U.S. troops allegedly had "7 to 9 times higher than normal" radiation, yellowcake uranium*, CBS News (Oct. 26, 2020), https://perma.cc/EY4F-KQLG; Catherine Herridge & Jessica Kegu, *In last hours of presidency, Trump signs executive order for veterans who served at toxic base after 9/11*, CBS News (Jan. 27, 2021), https://perma.cc/K93D-EGAW.

[4] *See* Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com (Feb. 24, 2017), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties ("February Article"); Catherine Herridge,

that involved U.S. servicemembers potentially being placed at risk. Her reports described a counterespionage investigation into Plaintiff and a possible PLA intelligence operation focused on gathering information about U.S. military personnel. Plaintiff founded and runs the University of Management and Technology (UMT), a university in Arlington, Virginia that caters primarily to U.S. military personnel.

The stories presented evidence that Plaintiff had been a colonel in the PLA and that she sought to hide that fact by lying on immigration forms and telling others to lie under oath to conceal her past. Among other things, the stories featured on-camera interviews with Stephen Rhoads, a whistleblower who had worked at UMT and had served as an undercover FBI informant for the counterespionage investigation. Rhoads explained that Plaintiff had admitted that she had been a colonel in the PLA and made efforts to conceal that fact. "One of the first sentences she [Plaintiff] ever threw out—after she found out I was an Army officer, was, 'Well . . . I was a colonel in the army.'" February Article at 2. When Rhoads asked where she trained, Plaintiff "laughed and said, 'Oh, no, I was in the Chinese army, you know.'" *Id.* But when Rhoads told Plaintiff that the FBI wanted him to testify before a grand jury, Plaintiff told him to lie: "Oh, you don't tell them anything. We don't know each other. . . . You don't—you don't know I was a colonel in the P.L.A. They'll never have proof to say that." *Id.* at 3.

---

Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com (updated May 1, 2017), https://www.foxnews.com/politics/congress-investigating-taxpayer-backed-school-over-alleged-ties-to-chinese-military-after-fox-news-report ("April Article"); Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says*, FOXNews.com (June 28, 2017), https://www.foxnews.com/politics/fbi-reopening-probe-of-dod-funded-school-with-suspected-chinese-military-ties-rep-says. These articles are attached as Exhibits B, D, E to Ms. Herridge's Mem. ISO Mot. to Quash, ECF Nos. 94-3, 94-5, 94-6.

Rhoads also explained how UMT could be used by the CCP to collect information on U.S. servicemembers who attended the school. According to Rhoads, UMT was collecting copious amounts of information about U.S. servicemembers' military history that could then be remotely accessed: "It got uploaded into an O-drive, they called it . . . their personal military bio, you know, where they were trained, how they were trained, how long, that could be remotely accessed." *Id.* Plaintiff asked Rhoads specifically to recruit students for UMT at one of the Air Force's most technology-and-research-heavy locations—Ohio's Wright-Patterson Air Force Base. *Id.* An expert on the Chinese military, Peter Mattis, explained why a school like UMT would be of interest to the Chinese military. The personnel records would provide a "curated database" that would be of interest for two reasons: "The first is, militaries everywhere want to know what a potential adversary might look like—what are their capabilities, how will they act? The second is this might also serve as a vehicle for recruiting individuals." April Article at 2.

In fact, information that has subsequently become public shows that the data gathered by UMT would have fit perfectly into an ongoing, coordinated effort by the PLA to identify, target, and recruit former U.S. servicemembers with particular training or skill sets. On September 5, 2023, the Chief of Staff of the Air Force sent a memorandum to all Airmen warning that foreign companies were being used by the PLA to "targe[t] and recrui[t] U.S. and NATO-trained military talent" to "exploit your knowledge and skill to fill gaps in their military capability." Ex. F. Using front companies that might seem innocuous, the PLA is focused on "exploit[ing] veterans with valuable skills" to get them to "train the trainer."[5]

[5] Air Force News Service, *CSAF Issues Warning of PLA Recruitment of U.S. Air Force Members, Veterans* (Sept. 8, 2023), https://www.af.mil/News/Article-Display/Article/3520635/csaf-issues-warning-of-pla-recruitment-of-us-air-force-members-veterans/; *see also* Dan Lamothe, *China's*

**PUBLIC VERSION**

Rhoads explained that UMT was also receiving approximately $250,000 to $300,000 per month in taxpayer dollars from DOD. *Id.* at 1. UMT was a participant in DOD's tuition assistance program. As Rhoads summed up the situation: "It's a bad deal for the soldiers . . . it's a bad deal for the taxpayer." *Id.*

Finally, Ms. Herridge's stories explained that, according to sources, the FBI and the U.S. Attorney's Office were not able to agree whether to prosecute Plaintiff and that the conflict had been based in part on concerns about disclosing intelligence gathering sources and methods.[6] February Article at 3.

### C. DOD Determines [redacted] and Publicly Announces that Funding to Her School Must Be Terminated "On National Security Grounds"

DOD publicly announced in 2018 that it had concluded an inquiry into Plaintiff and UMT and had determined that UMT must be terminated from the tuition assistance program "on national security grounds." Gross, *supra* note 1.

DOD formally determined that [redacted]

---

*military seeks to exploit U.S. troops, veterans, general warns*, Wash. Post (Sept. 8, 2023), *available at* https://tinyurl.com/mrvcmhdv.

[6] Prosecuting an espionage case consistent with the defendant's constitutional rights may force the government to disclose classified information, including sensitive intelligence gathering sources and methods. The government may decide that the prosecution is not worth further compromising national security. *See generally* Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980). The Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. III §§ 1–16, does not eliminate this dilemma. It primarily provides procedures allowing courts to rule on evidentiary issues "to permit the government to ascertain the potential damage to national security of proceeding with a given prosecution before trial." *United States v. Libby*, 467 F. Supp. 2d 20, 24 (D.D.C. 2006) (quoting S. Rep. No. 96-823, at 1 (1980)).

[redacted] Plaintiff never challenged those factual determinations in court.

**D. Plaintiff Sues the Government and Ultimately Subpoenas Ms. Herridge to Uncover Ms. Herridge's Confidential National Security Sources**

Rather than challenging DOD's findings, Plaintiff sued several agencies under the Privacy Act seeking to have the federal government compensate her for the revenue she lost when DOD found UMT to be a national security threat and publicly announced that fact. She sought to blame her losses, not on DOD's national security finding, but instead on an alleged leak of Privacy Act information to Ms. Herridge.

Over the next several years, Plaintiff obtained substantial discovery into the details of the counterespionage investigation into her activities. She conducted eighteen depositions of government personnel with knowledge of the investigation or related briefings and received 8,000

pages of documents from the FBI alone. Govt's Opp. to Plf's Second Mot. to Compel at 3, ECF No 67.

On June 16, 2022, Plaintiff served Ms. Herridge with subpoenas for documents and a deposition seeking to discover the confidential source(s) for Ms. Herridge's stories. Ms. Herridge moved to quash the subpoenas, invoking the First Amendment reporter's privilege and a federal common law reporter's privilege. *See* ECF No. 94-1. On August 1, 2023, the Court denied Ms. Herridge's motion to quash and held that Ms. Herridge should be required to reveal her confidential national security source(s). *See* Memorandum Opinion and Order, ECF 140 ("Disclosure Order").

### E. Ms. Herridge Seeks to Appeal Without the Burden and Expense of a Contempt Proceeding, But Plaintiff Insists on a More Expensive Process

In an effort to reduce litigation expenses and streamline further proceedings, Ms. Herridge moved to have the Disclosure Order certified for interlocutory appeal under 28 U.S.C. § 1292(b). *See* ECF No. 144. As Ms. Herridge explained at the time, certifying an immediate appeal would "sav[e] the parties from needless expense." Mem. ISO Mot. for Interlocutory Appeal at 2, ECF No. 144-1 (quoting *Molock v. Whole Foods Mkt. Grp.*, 317 F. Supp. 3d 1, 6 (D.D.C. 2018)). Ms. Herridge made it unequivocally clear that, if she were deposed, she would not reveal her confidential source(s). *See id.* As a result, Ms. Herridge argued that an interlocutory appeal was by far the more efficient route for reaching the court of appeals in this case: "Immediate appeal will save resources by obviating the need for Plaintiff to schedule a deposition, wait for Ms. Herridge to refuse to answer questions, and then move for an order of contempt. And it would also avoid the need for the parties (and the Court) to prepare and address a largely duplicative round of briefing on the motion for a contempt order." *Id.* at 14.

Nonetheless, Plaintiff adamantly opposed Ms. Herridge's effort to reduce litigation expenses and insisted that the Court (and Plaintiff) must pursue the more expensive and

burdensome route of taking Ms. Herridge's deposition and then pursuing proceedings on contempt before Ms. Herridge could appeal. *See* Pltf's Omnibus Mem., ECF No. 147. On September 6, 2023, the Court denied Ms. Herridge's motion for an interlocutory appeal. Certification Order at 1. On Ms. Herridge's motion for reconsideration, the Court explained that, although the Court could have authorized an interlocutory appeal, the Court had determined in its discretion not to do so and that Ms. Herridge would be required to go through the contempt pathway before she could appeal. Reconsideration Order at 2.

Ms. Herridge also sought to avoid the expense of a deposition and contempt proceedings by attempting to appeal from the Disclosure Order directly under 28 U.S.C. § 1291 pursuant to the collateral order doctrine. *See, e.g.*, *Whole Woman's Health v. Smith*, 896 F.3d 362, 368 (5th Cir. 2018) ("[I]nterlocutory court orders bearing on First Amendment rights remain subject to appeal pursuant to the collateral order doctrine."). The D.C. Circuit, however, dismissed that appeal for lack of jurisdiction, holding that Ms. Herridge could defy the Disclosure Order and "appea[l] from any contempt citation." *Herridge v. Chen*, No. 23-5198, Per Curiam Order 1, Doc. No. 2018838 (D.C. Circuit Sept. 25, 2023). Accordingly, Ms. Herridge was left with no avenue for an appeal other than through a contempt hearing.

### F. Ms. Herridge Is Deposed and Declines to Reveal Her Confidential Source(s), and Plaintiff Seeks Contempt Sanctions

On September 26, 2023, Plaintiff deposed Ms. Herridge. When Plaintiff's counsel asked Ms. Herridge to identify her confidential source(s), Ms. Herridge made clear that she fully respected the Court's order and had no wish to defy it, but that the Court's rulings left her with no other alternative to secure appellate review of her rights. As she stated:

> I have complete respect for the court and its authority and for the order. I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek further judicial review, I must now disobey the order, and for that

> reason, among others, I am invoking my First Amendment rights and declining to answer the question.

Deposition of Catherine V. Herridge Dep. at 19:17-20:13 ("Herridge Dep.") (Ex. G).

In addition, Ms. Herridge explained particular a concern that reinforced her reasons for asserting privilege to secure appellate review. Ms. Herridge does not want to provide any additional information about U.S. government personnel who may have been involved in a counterintelligence investigation to a person whom DOD publicly announced was a national security risk. *Id.* at 220:6-12.

Because Ms. Herridge had made clear that she would not disclose her confidential source(s), the deposition could have been brief. Plaintiff's counsel could have asked directly about confidential source(s), elicited an assertion of privilege, and established that Ms. Herridge would similarly assert privilege to all questions about confidential source(s). Plaintiff then could simply have stipulated to preserve the ability to question Ms. Herridge further after an appeal, in the event that the Court's Disclosure Order was upheld. That is what the government did in less than five minutes at the end of the deposition. Herridge Dep. 210:6-212:18.

Instead, Plaintiff's counsel questioned Ms. Herridge on the record for over four hours, asking her individually about the source for every photograph and document that appeared in the stories, requiring Ms. Herridge to assert privilege over and over again to preserve her right to have an appellate court hear her claims under the First Amendment and common law privileges.

Plaintiff's counsel also asked numerous questions about matters that were not privileged, which Ms. Herridge answered. *See, e.g.*, 24:24-25:6, 35:2-12; 75:18-76:5; 77:25-78:6; 130:11-133:4; 146:4-147:18; 148:2-19; 149:1-18; 150:9-151:1; 154:1-7; 183:17-23; 184:14-24; 185:1-186:7; 200:10-15; 204:10-13. And Plaintiff's counsel also lengthened the deposition by asking questions about Ms. Herridge's newsgathering process that are subject to the First Amendment

reporter's privilege and that were *not* covered by the Court's Disclosure Order. That order overrode the privilege solely with respect to Ms. Herridge's confidential source(s) for alleged Privacy Act information about Plaintiff.

On October 30, 2023, Plaintiff filed a motion seeking to have Ms. Herridge held in contempt for disobeying the Court's Disclosure Order. Application for Order to Show Cause, ECF No. 159-2 ("Contempt Motion"). Plaintiff asks the Court to impose a fine escalating from $500 per day to $5,000 per day to coerce Ms. Herridge's compliance with that order. Contempt Mot. at 19.

In addition, Plaintiff asks the Court to impose a *compensatory* sanction requiring Ms. Herridge "to compensate [Plaintiff] for the costs and [attorneys'] fees associated with preparing for and taking the deposition and for preparing this [Contempt] Motion." Contempt Mot. at 20. Plaintiff is literally asking the Court—as an exercise of its *equitable* discretion—to require Ms. Herridge to pay for the costs and fees of the very deposition and contempt proceeding that Ms. Herridge took every possible step to avoid by seeking an immediate interlocutory appeal—an appeal that she sought precisely to "sav[e] the parties from needless expense." Mem. ISO Mot. for Interlocutory Appeal at 2, ECF No. 144-1 (quoting *Molock v. Whole Foods Mkt. Grp.*, 317 F. Supp. 3d 1, 6 (D.D.C. 2018)). Plaintiff asks for that compensation even though Plaintiff, by contrast, voluntarily *insisted* on incurring those extra expenses, knowing full well that the deposition would be futile and that Ms. Herridge would not disclose her confidential source(s).

## LEGAL STANDARD

The Court may hold Ms. Herridge in contempt only if Plaintiff carries her burden of demonstrating "by clear and convincing evidence that: (1) there was a clear and unambiguous court order in place; (2) that order required certain conduct by [Ms. Herridge]; and (3) [Ms.

Herridge] failed to comply with that order." *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 29–30 (D.D.C. 2014).

Even where an order has been violated, rather than entering a finding of contempt, it is always open to a court to modify or revise the underlying order. Under Federal Rule of Civil Procedure 54(b), "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The Court may reconsider a prior order "as justice requires." *Said v. Nat'l R.R. Passenger Corp.*, 390 F. Supp. 3d 46, 50 (D.D.C. 2019) (brackets, quotation marks, and citations omitted). "[A]sking 'what justice requires' amounts to determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances." *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004).

## ARGUMENT

### I. The Court Should Not Hold Ms. Herridge in Contempt and Instead Should Modify Its Disclosure Order.

Rather than holding Ms. Herridge in contempt, the Court should modify its underlying Disclosure Order that overrode the First Amendment reporter's privilege and required Ms. Herridge to disclose her confidential source(s). It is well settled that "a defendant in a civil-contempt proceeding may challenge the underlying decree." 11A C. Wright, A. Miller, & M. Kayne, Fed. Prac. & Proc. § 2960 (3d ed. 1998); *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1124 (7th Cir. 1978) ("[C]ivil contempt may be defended on the ground that the underlying order was erroneously issued."); *see also United States v. United Mine Workers of Am.*, 330 U.S. 258, 295 (1947) (distinguishing civil from criminal contempt on this point). Indeed, the entire purpose of this contempt proceeding is to ensure that, if the Court adheres to its decision requiring Ms.

Herridge to disclose her confidential source(s), there will be an appealable order that will allow Ms. Herridge to present her arguments in support of quashing the subpoena to the court of appeals. It is necessarily open to Ms. Herridge to reassert those arguments in this proceeding before presenting them on appeal.[7] In addition, the Court may revise its prior order at any time "as justice requires." *Said v. Nat'l R.R. Passenger Corp.*, 390 F. Supp. 3d 46, 50 (D.D.C. 2019).

Ms. Herridge does not intend to burden the Court by reproducing here all of her arguments concerning the First Amendment reporter's privilege, the proper scope of balancing under *Zerilli*, or the federal common law reporter's privilege. As Ms. Herridge has explained, *Zerilli* calls for a broad-ranging balancing inquiry that "weigh[s] the public interest in protecting the reporter's sources against the private interest in compelling disclosure." *Zerilli*, 656 F.2d at 712. Proper evaluation of that balance may require the Court to consider issues in the posture of partial summary judgment before ordering the disclosure of confidential source(s)—to determine, for example, whether Plaintiff will be unable to establish elements of her Privacy Act claim, such as causation of damages. *See* Mem. ISO Mot. to Quash at 27–28.

That is exactly the sort of inquiry that other courts have required before compelling disclosure of confidential sources. As the First Circuit explained, before a court compels discovery of confidential sources protected by the First Amendment privilege, "plaintiff should show that it can establish jury issues on the essential elements of its case not the subject of the contested discovery." *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597 (1st Cir. 1980); *see also, e.g., Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175, 181 (Ga. App. 2001) (requiring plaintiff to show that he can prove other elements of his case before compelling

---

[7] *Cf.* Mem. ISO Mot. for Interlocutory Appeal at 14, ECF No. 144-1 (explaining that there would likely be "a largely duplicative round of briefing on the motion for a contempt order").

disclosure and explaining, "[w]e recognize that, in many respects, the application of this balancing test will involve legal analysis similar to, perhaps even identical to, that required in ruling upon a motion for summary judgment"); *State ex rel. Classic III, Inc. v. Ely*, 954 S.W.2d 650, 659 (Mo. App. 1997) (demanding analysis of the strength of plaintiff's case, because "[i]f the case is weak, then little purpose will be served by allowing such discovery, yet great harm will be done by revelation of the privileged [confidential source] information"). There is no point in overriding First Amendment protections and disclosing confidential source(s) in aid of a claim that will fail (or largely fail) on summary judgment.

As this Court has acknowledged, "[r]equiring an investigative reporter to divulge her source is serious business, and it is better to be safe than sorry when it comes to First Amendment rights." Certification Order at 3. One way to be safe rather than sorry in this case would be to evaluate whether (and to what extent) Plaintiff's Privacy Act claim may survive summary judgment *before* taking the irretrievable step of compelling disclosure of confidential source(s). Ms. Herridge incorporates here by reference her prior arguments on all these points from her briefing on the Motion to Quash. *See* Mem. ISO Mot. to Quash at 13–45; Reply ISO Mot. to Quash at 3–25, ECF No. 129.

### A. The Court Should Consider Additional Information Bearing on the *Zerilli* Balance of Interests.

The Court should also consider additional information bearing on the balance of interests.

#### 1. Forcing Disclosure of Ms. Herridge's Sources Would Have a Broad Chilling Effect Undermining the Ability of the Press to Keep the People Informed.

The Court now has the benefit of submissions from experts in the field of journalism and investigative reporting explaining the chilling effect that entering a contempt sanction against Ms. Herridge would have on the functioning of a free press. The Dean of the Columbia Journalism

School, Jelani Cobb, explains that confidential sources are "vital for the functioning of a free and independent press." Cobb Decl. ¶ 5. As he explains, one of the most important functions of the press "is to ensure accountability of government officials to the people by keeping the people informed about their government." *Id.* ¶ 6. The press cannot play that informational role, however, without confidential sources. Without confidential sources, reporters cannot "contradict official government narratives on sensitive matters of policy" or uncover other government actions that might be hidden from view. *Id.* ¶ 7. But sources will come forward with such information only if they can be given credible assurances of confidentiality. As a result, "[t]he act of disclosing a confidential source, even as the result of a court order, erodes the ability of journalists everywhere to credibly promise confidentiality to sources who demand it, and would have a chilling effect on the flow of important information to journalists reporting on government matters." *Id.* ¶ 11. That is why, at Columbia, journalists are taught that a pledge of confidentiality is "a sacred aspect of the profession that, if broken, would undermine the ability of the press to fulfill its core function of informing the populace about the government's actions." *Id.* ¶ 13.

Concerns for preserving the confidentiality of sources are particularly acute in the field of national security reporting. Steve Coll, a professor at the Columbia Journalism School and a two-time Pulitzer Prize winning investigative journalist in the national security field, explains that the press "could not effectively report" on matters of national security and international affairs without using confidential sources. Coll Decl. ¶6. Based on his experience as a reporter focusing on national security and international affairs, "it simply is not possible" to contradict official government positions on these important topics—or to evaluate leaks directed by high-level officials—without using confidential sources who have access to protected information. *Id.* ¶ 6–8. As Mr. Coll further explains, "a contempt order that successfully forces a reporter to disclose a

national security source would have a broad chilling effect on the flow of critical information to the press and thus to the people." *Id.* ¶ 11. The effect of a contempt order in this case thus would be much broader than simply its impact on Ms. Herridge. "It would have a ripple effect discouraging government personnel with critical knowledge—including whistleblowers with knowledge of wrongdoing or government incompetence—from serving as sources." *Id.* The result would be "undermin[ing] the ability of the press to hold powerful decisionmakers accountable before the public" and "impair[ing] the ability of the press to fulfill its function of keeping the people informed about the actions of their government." *Id.* The effect of such an order, in other words, would be to hobble the ability of the press to "bare the secrets of government and inform the people." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).

Under *Zerilli*, the Court should take into account the broad, systemic effects that would result from forcing disclosure of sources in this case.

**2. Forcing Disclosure of Ms. Herridge's Source(s) Raises National Security Concerns That Should Be Considered Under *Zerilli*.**

The Court should also take into consideration the national security implications of its order requiring Ms. Herridge to reveal the identity of her confidential national security source(s) to Plaintiff—a former colonel in the PLA whom DOD has expressly determined to be a national security risk. [redacted] The elephant in the room in this case is the fact that, although Plaintiff was not criminally prosecuted, DOD formally determined that she was a national security risk and there remains a serious risk that the she was, in fact, involved in providing U.S. servicemember information to the CCP. That risk is plain on the face of DOD's determination that Plaintiff is a national security risk [redacted]

That means that the Court's Disclosure Order requires disclosing information—presumptively the

identity (or identities) of government employee(s) who had access to details of a counterintelligence investigation—to a person who potentially was collecting intelligence for the CCP. As explained below, that necessarily raises a national security risk. And that risk ought to be taken into account in the way the Court weighs interests under the *Zerilli* balancing test.

Along with this opposition, Ms. Herridge is submitting two declarations from experts in the field of counterintelligence to explain the national security implications of this case and to place the Disclosure Order in context so that the Court may fully evaluate the implications of that order. William Evanina spent 24 years working in counterintelligence in the FBI and CIA. Evanina Decl. ¶ 2. From 2009 through 2013, he served as a Special Agent in Charge in the FBI's National Security Office overseeing counterintelligence operations with respect to Russia and counterterrorism, and from 2013 through 2014, he ran the FBI and CIA's joint Counterintelligence Division/Counterespionage Group. *Id.* ¶¶ 3–4. In 2014, he became Director of the National Counterintelligence and Security Center within the Office of the Director of National Intelligence, a position he held until 2021. *Id.* at ¶ 5. Holden Triplett served for almost 15 years with the FBI. Triplett Decl. ¶ 2. He was stationed with the FBI in Moscow and in Beijing and then served as Director for Counterintelligence at the National Security Council. *Id.* ¶ 3–4. His last position in government was as FBI Faculty Chair at the National Intelligence University. *Id.* at ¶ 2.

As Mr. Evanina and Mr. Triplett explain, in their opinion, several factors lead them to conclude that there is a serious risk that Plaintiff was using UMT to provide information on U.S. servicemembers to the CCP. Evanina Decl. ¶ 19; Triplett Decl. ¶¶ 15–17. The affidavit the FBI submitted to secure a search warrant in 2012 provides substantial evidence that Plaintiff was a colonel in the PLA. DOD's decision finding that [redacted] And Plaintiff's repeated deceptions about her past

detailed in the FBI affidavit—which included lying on immigration forms, lying to federal investigators, and encouraging others to lie for her—buttress the assessment that there is a serious risk that she was involved in collecting information for the CCP. Evanina Decl. ¶ 11; Triplett Decl. ¶¶ 15–17.

In addition, using an organization like UMT to collect information and the type of information UMT was collecting from U.S. servicemembers fit the pattern of CCP intelligence methods. Evanina Decl. ¶ 11; Triplett Decl. ¶¶ 10–16. The CCP is adept at using "non-traditional collectors," including academics and front organizations, to carry out information gathering in the United States. Evanina Decl. ¶¶ 12–13; Triplett Decl. ¶ 12. Non-traditional collectors are in positions involving legitimate work and research, and they use those positions to collect information. Evanina Decl. ¶¶ 12–13; Triplett Decl. ¶ 12. UMT fit that pattern. Evanina Decl. ¶ 11; Triplett Decl. ¶¶ 10–16.

Past cases show that the CCP has been focused on gathering large swaths of data about U.S. government personnel, security clearance holders, and servicemembers. Evanina Decl. ¶ 13–16. The CCP, for example, was behind the hacking of the Office of Personnel Management, an incident in which security clearance questionnaire information (SF86s) for millions of U.S. government employees was stolen. *See* Ellen Nakashima, *Chinese breach data of 4 million federal workers*, Wash. Post (July 4, 2015), https://perma.cc/ES7C-59MQ. Such information is highly valuable for the CCP, as it provides a guide to U.S. government personnel who may be targeted for recruitment. Evanina Decl. ¶ 14; Triplett Decl. ¶¶ 14–15. Here again, the type of information about servicemembers that UMT was gathering, which included military training history and information on a student's assigned unit, is the type of information the CCP would seek to gather. *See* Evanina Decl. ¶¶ 17–18; Triplett Decl. ¶¶ 14–16.

In fact, information that has become public only recently further confirms that the data gathered by UMT would have fit perfectly into an ongoing effort by the PLA to identify, target, and recruit former U.S. servicemembers with particular training or skill sets. On September 5, 2023, the Chief of Staff of the Air Force set a letter to all Airmen warning that foreign companies were being used by the PLA to "targe[t] and recrui[t] U.S. and NATO-trained military talent" to "exploit your knowledge and skill to fill gaps in their military capability." Ex. F. Using front companies that might seem innocuous, the PLA is focused on "exploit[ing] veterans with valuable skills" to get them to "train the trainer."[8] The fact that the information about servicemembers' training history that was being stored at UMT coincides exactly with the type of information that the government has now publicly warned the PLA would target to "fill gaps" in its capabilities provides strong support for the assessment that there is a serious risk that Plaintiff and UMT were involved in providing information to the CCP. Evanina Decl. ¶ 17–18; Triplett Decl. ¶¶ 14–16.

As Mr. Evanina and Mr. Triplett explain, the fact that Plaintiff was not ultimately prosecuted does not undermine their assessment that there is a serious risk that Plaintiff was making U.S. servicemember information available to China. Counterespionage cases are often not prosecuted even when the government has sufficient evidence to convict. Evanina Decl. ¶¶ 20–21; Triplett Decl. ¶ 18. That is because bringing a prosecution will often risk disclosing sources and methods of gathering information, and the government may decide that it better serves the interests of the United States to stop the intelligence activity rather than to risk disclosing sources

[8] Air Force News Service, *CSAF Issues Warning of PLA Recruitment of U.S. Air Force Members, Veterans* (Sept. 8, 2023), https://www.af.mil/News/Article-Display/Article/3520635/csaf-issues-warning-of-pla-recruitment-of-us-air-force-members-veterans/; *see also* Dan Lamothe, *China's military seeks to exploit U.S. troops, veterans, general warns*, Wash. Post (Sept. 8, 2023), *available at* https://tinyurl.com/mrvcmhdv.

and methods in a prosecution. Evanina Decl. ¶ 21; Triplett Decl. ¶ 18. A decision not to prosecute does not establish an absence of genuine national security risk. To the contrary, the only actual finding in this record is DOD's finding that Plaintiff *did* present a national security risk and that she had created a vulnerability for DOD personnel that required DOD to take action.

Requiring Ms. Herridge now to identify her confidential national security source(s) to Plaintiff raises a further risk. The basic premise of Plaintiff's case is that a government employee with detailed knowledge of the counterespionage investigation into Plaintiff leaked information to Ms. Herridge. Given Plaintiff's allegations, the Court must proceed on the assumption that ordering disclosure of Ms. Herridge's confidential source(s) would require handing over to a person whom DOD deemed to be a national security risk the identity of U.S. government personnel who were involved in a counterespionage investigation. That inherently raises additional risk. As Mr. Triplett explains, "[e]very piece of information that is disclosed about counterintelligence operations and personnel can allow an adversary to build a more complete picture of counterintelligence operations and capabilities. In my assessment, providing the names of counterintelligence personnel to a person whom DOD has found to be a national security risk creates an additional risk that should be avoided." Triplett Decl. ¶ 19.

Ms. Herridge submits that the Court should properly take at least two distinct risks into account in "weigh[ing] the public interest in protecting the reporter's sources against the private interest in compelling disclosure." *Zerilli*, 656 F.2d at 712. Where there is a substantial risk that Plaintiff's "private interest in compelling disclosure" also raises a national security risk, that should be taken into account in the Court's balancing. Similarly, if there is a substantial risk that Plaintiff was making U.S. servicemembers' information available to a foreign power—and thus that her "private interest" in this Privacy Act suit is, in effect, seeking taxpayer money to recover

funding for that conduct—that must matter under *Zerilli*. The Court's current holding that the *Zerilli* balancing test is limited to considering (i) the centrality of the information sought, and (ii) exhaustion of alternative sources improperly prevents the Court from giving due weight to important circumstances in this case.

## II. The Court Cannot Hold Ms. Herridge in Contempt for Refusing to Answer Questions Intruding on Matters Within the Reporter's Privilege *Other Than* the Identity of Confidential Source(s).

To the extent Plaintiff asks the Court to hold Ms. Herridge in contempt for refusing to answer questions that intrude on the First Amendment reporter's privilege *other than* questions targeted at the identity of Ms. Herridge's confidential source(s), that would be improper. The Court has never ordered Ms. Herridge to answer such questions.

By its terms, the Court's Disclosure Order requires Ms. Herridge to answer only two types of questions: (i) questions "regarding the identity and intent of the source or sources of the documents and images allegedly provided to her in violation of the Privacy Act"; and (ii) questions regarding "any non-privileged other matters relevant to [Plaintiff's] Privacy Act claim." Disclosure Order at 28. As noted above, when Ms. Herridge was asked to reveal the identity of her source(s), she respectfully declined to answer in order to preserve her ability to have appellate review of her First Amendment rights. *See, e.g.*, Herridge Dep. 19:17-20:13. When she was asked about non-privileged matters, she answered. Thus, she answered dozens of questions ranging from the names of other people who worked on the stories, *id.* at 24:24-25:6, to her interactions with Agent Pappa at a wedding, *see id.* at 180:13-181:4, to whether Agent Pappa was frustrated by the government's decision not to prosecute Plaintiff, *id.* at 184:14-25, to whether Stephen Rhoads (who had worked for the FBI as an informant) hoped that Ms. Herridge's stories would result in Plaintiff's DOD funding being cut off, *id.* at 190:6-192:16.

Plaintiff, however, appears to be asking the Court to hold Ms. Herridge in contempt for refusing to answer additional questions that intrude on the First Amendment reporter's privilege, but that are not covered by the Court's Disclosure Order. Plaintiff complains that Ms. Herridge declined to answer questions on matters such as "the preparation of the Fox News stories, the timing of their publication, and why certain materials and information were included or omitted." Contempt Mot. at 9. All of those questions intrude onto matters protected by the First Amendment reporter's privilege. It is well settled that the privilege broadly protects the newsgathering process. The privilege extends to information about a reporter's "newsgathering activities" to prevent questioning that would have a "chilling effect upon the newsgathering and editorial process." *Maughan v. NL Indus.*, 524 F. Supp. 93, 95 (D.D.C. 1981). As a result, the "privilege for journalists shields both confidential and nonconfidential information from compelled disclosure." *Hutira v. Islamic Repub. of Iran*, 211 F. Supp. 2d 115, 120 (D.D.C. 2002); *accord In re Slack*, 768 F. Supp. 2d 189, 193 (D.D.C. 2011). It broadly "protect[s] [reporters] from compelled disclosure of information which they have obtained as part of their newsgathering role," *In re Slack*, 768 F. Supp. 2d at 193, including "resource materials and notes" prepared "in anticipation of writing a news article," *Maughan*, 524 F. Supp. at 95. And it is established law that "a reporter cannot be made to disclose information . . . concerning his editorial judgment." *Id.*[9]

Because Plaintiff's questions—such as "why certain materials and information were included or omitted" in Ms. Herridge's stories, Contempt Mot. at 9—are plainly covered by the privilege (and also not covered by the Disclosure Order), Ms. Herridge was not required to answer

[9] Counsel for Ms. Herridge asserted privilege on these grounds, with case citations, at multiple points during the deposition. *See, e.g.*, Herridge Dep. 16:14-17:10 (citing *Maughan v. NL Indus.*, 524 F. Supp. 93 (D.D.C. 1981) and *In Re Slack*, 768 F. Supp. 2d 189 (D.D.C. 2011)); 25:19-26:14; 27:8-17; 30:22-32:4; 49:6-7; 78:18-19; 123:25-124:1; 125:14-15; 154:19-20; 167:19-20.

**PUBLIC VERSION**

them. At a minimum, Plaintiff cannot establish by "clear and convincing evidence" that there was a "clear and unambiguous court order" requiring Ms. Herridge to answer such questions. *See Negley v. FBI*, 766 F. Supp. 2d 190, 193 (D.D.C. 2011). The Court has never held that such matters are *not* covered by the privilege, nor has it held that Plaintiff has overcome the privilege on such matters. Those questions have never been presented in this case. As a result, the Court cannot hold Ms. Herridge in contempt for declining to answer questions intruding on the First Amendment privilege *other than* questions about the identity of Ms. Herridge's confidential source(s).

## III. If the Court Enters a Contempt Order, Any Fine Should be Nominal and It Should Be Stayed Pending Appeal.

If the Court enters a contempt order, any sanction imposed on Ms. Herridge should be nominal. As the Court is well aware, Ms. Herridge took every possible step to avoid a situation in which disobeying the Disclosure Order would be the only pathway for an appeal. The Court determined, however, in its discretion, *see* Reconsideration Order at 2, that it would deny an interlocutory appeal and leave contempt as the only route to an appeal. Under the circumstances, imposing a substantial fine on Ms. Herridge for pursuing the only available avenue for an appeal would be inequitable and improperly burden the exercise of her First Amendment rights. And that is especially the case where the Court itself has acknowledged that she may have a meritorious appeal and "there is good reason to believe this case might generate en banc activity that could upend existing precedents." Certification Order at 3.

The Court should reject Plaintiff's request for *compensatory* sanctions requiring Ms. Herridge to pay costs and attorney's fees for the deposition and this contempt proceeding. Not only would such an award be unprecedented in any case involving an order to disclose a journalist's sources, it would be wholly inequitable where Ms. Herridge sought an interlocutory appeal precisely to "sav[e] the parties from needless expense." Mem. ISO Mot. for Interlocutory

Appeal at 2, ECF No. 144-1 (quoting *Molock v. Whole Foods Mkt. Grp.*, 317 F. Supp. 3d 1, 6 (D.D.C. 2018)). It takes extraordinary chutzpah for Plaintiff to ask the Court to force Ms. Herridge to pay for expenses that Ms. Herridge sought to avoid and that Plaintiff *insisted* on incurring—even though Plaintiff knew full well that a deposition would be futile and Ms. Herridge would not disclose her source(s).

Finally, the Court should stay any contempt sanction pending appeal. The Court has already held that this is a "truly exceptional case[]" raising serious questions. Certification Order at 3. Ms. Herridge should not be forced to face the irreparable harm of either being coerced to reveal confidential sources or paying fines simply for exercising her right to seek appellate review of her First Amendment rights.

**A. Any Sanction Should Be Nominal.**

If the Court determines it must hold Ms. Herridge in contempt, it should impose no more than a nominal sanction, such as the $1 per day fine entered by multiple courts in similar circumstances. *See, e.g.*, *United States v. Cutler*, 6 F.3d 67 (2d Cir. 1993).

Crafting a civil contempt remedy is an exercise of the court's "broad" equitable discretion. *United States v. Two Gen. Elec. Aircraft Engines*, 317 F. Supp. 3d 516, 522 (D.D.C. 2018) (quoting *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 36 (D.D.C. 2014)). "'Flexibility rather than rigidity has distinguished' equity jurisprudence," *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)), and the Court must be guided by the rule that the "purpose of civil contempt sanctions" is "not to punish." *Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 750 F. Supp. 2d 31, 34 (D.D.C. 2010); *see also Hecht Co.*, 321 U.S. at 329–30 (finding sanction should comport with "practicality" and the "public interest").

Here, no more than a nominal sanction is warranted. Ms. Herridge is not flouting the Court's order. She made clear that she respected the Court's order and had no wish to defy it, and that the only reason she did not comply was that the courts have left her no alternative for securing appellate review of her First Amendment rights. *See* Herridge Dep. at 20:7-13 ("I have complete respect for the court and its authority and for the order. I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek further judicial review, I must now disobey the order."); *see also id.* 20:23-21:5; 208:2-10. As the Court knows, Ms. Herridge pursued every possible avenue for securing an appeal *without* disobeying the Court's order, precisely because she wanted to do everything in her power to avoid the current situation. She sought an interlocutory appeal under 28 U.S.C. § 1292(b), *see* ECF No. 144, and also attempted to appeal under the collateral order doctrine, *see* ECF No. 150. The D.C. Circuit held that there was no jurisdiction under the collateral order doctrine, *see Herridge v. Chen*, No. 23-5198, Per Curiam Order 1, Doc. No. 2018838 (D.C. Cir. Sept. 25, 2023), and this Court decided, in its discretion, to deny an interlocutory appeal, *see* Reconsideration Order at 1. Those rulings have left Ms. Herridge with no avenue for securing appellate review of her First Amendment rights other than through contempt. In such circumstances, imposing a substantial sanction as the price for allowing Ms. Herridge to appeal would be inequitable.

That is especially true given that the Court itself has acknowledged that "there are substantial grounds for difference of opinion" concerning the proper application of the balancing test under *Zerilli*, and "there is good reason to believe this case might generate en banc activity that could upend existing precedents." Certification Order at 3. Imposing substantial fines on Ms. Herridge for seeking an appeal in such a case would improperly burden her First Amendment rights and send a signal chilling the free speech rights of other journalists. In the First Amendment

context, the Supreme Court has consistently recognized that "[t]he threat of sanctions may deter [speech] . . . almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Here, imposing significant fines on Ms. Herridge would have an unnecessary chilling effect on free speech rights and would wrongly impose what is, in effect, a penalty as the price for securing access to the courts to vindicate First Amendment freedoms.

Indeed, given the Court's recognition that this is a "truly exceptional case[]" in an area where the law is unsettled and an appeal is plainly warranted, Certification Order at 2–3, it is fair to conclude that, under the particular circumstances of this case, the proper purpose of any contempt sanction is not to coerce immediate compliance with the Court's Disclosure Order before any appeal, but rather to establish the procedural prerequisite of a final order that will allow Ms. Herridge to appeal. Any sanction should be calibrated to that limited purpose. Because a nominal sanction is sufficient to make "the underlying discovery dispute . . . ripe for appellate review," Certification Order at 4 (quotation omitted), that is the only sanction the Court should enter.

Not surprisingly, many courts in similar circumstances have held that, where a nonparty journalist has disobeyed an order to disclose a confidential source, there should be only a nominal contempt sanction of $1 a day. In *United States v. Cutler*, for example, the district court imposed a $1 per day sanction (and stayed it pending appeal) so that the reporters could pursue an "expedited appeal." 6 F.3d 67 (2d Cir. 1993). And in *United States v. Cuthbertson*, the district court imposed a $1-per-day sanction immediately after ruling on the motion to quash so that an appeal could ensue. 630 F.2d 139 (3d Cir. 1980). In both cases, the district courts recognized that, where (as here) the function of the contempt order was to create a final order subject to appeal, it would make no sense to impose crushing penalties on a non-party who simply wanted appellate review of their First Amendment rights. *See Cutler*, 6 F.3d at 75; *Cuthbertson*, 630 F.2d at 149.

Indeed, at least one court has termed sanctions imposed to "facilitate . . . appellate review of [a] privilege issue" a "'friendly' contempt" meriting only a nominal $1 per day fine. *See Harris v. One Hope United, Inc.*, 28 N.E.3d 804, 806 (Ill. 2015) ("To facilitate One Hope's request for appellate review of the privilege issue, the court found One Hope's law firm in "friendly" contempt of court and fined it $1 per day."). A similar fine of $1 per day is all that is warranted in this case.[10]

### B. The Court Should Reject Compensatory Sanctions for Costs or Fees Related to Ms. Herridge's Deposition or this Contempt Motion.

The Court should flatly reject the request for *compensatory* sanctions to reimburse Plaintiff for the expenses of a deposition and contempt proceeding that she insisted on pursuing—even when she knew full well that Ms. Herridge would not answer questions identifying confidential source(s). Ms. Herridge repeatedly sought to obtain an immediate interlocutory appeal to "sav[e] the parties [the] needless expense" of undergoing a futile deposition and then a contempt proceeding. Mem. ISO Mot. for Interlocutory Appeal at 2, ECF No. 144-1 (first brackets original, second added). Plaintiff nevertheless argued against an interlocutory appeal at every turn and insisted on the more expensive deposition-and-contempt route for perfecting an appeal. Under these circumstances, there is no justification for making Ms. Herridge foot the bill for Plaintiff's self-imposed expenses.

To start with, where the Court has made a contempt proceeding the *only* avenue available to Ms. Herridge to secure an appeal, it would place an unconstitutional burden on Ms. Herridge's

[10] *Hatfill v. Mukasey*, 539 F. Supp. 2d. 96 (D.D.C. 2008), does not provide any meaningful precedent supporting a more onerous sanction in this case. When the district court in *Hatfill* entered a hefty sanction and refused to stay it, the court of appeals immediately issued a stay to ensure that the fine would have no effect pending the appeal. *Hatfill v. Mukasey*, No. 08-5049, Doc. No. 1104546 (D.C. Cir. March 11, 2008) (per curiam) (attached as Exhibit H); *see also infra* Part III.C. Nothing in the court of appeals' action endorsed the approach adopted by the district court in *Hatfill*.

First Amendment rights to require Ms. Herridge to pay Plaintiff's fees and costs as the price for securing appellate review. Fee shifting in this scenario would effectively impose a penalty on Ms. Herridge simply for pursuing an appeal, and that result cannot be reconciled with the usual recognition in First Amendment jurisprudence that even the threat of sanctions can have an improper chilling effect on First Amendment rights. *See, e.g.*, *NAACP*, 371 U.S. at 433.

In addition, as a matter of equitable discretion in fashioning a contempt order, it would be improper to award compensatory sanctions to Plaintiff. "[H]e who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Under that principle, Plaintiff cannot be awarded compensation for costs that Plaintiff herself insisted on creating. *Cf. In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 463, 467 (3d Cir. 2000) (explaining that the "'unclean hands' factor" permits a district court to "reduce a costs award, on equitable grounds, if the prevailing party, through bad faith or dilatory tactics, has turned a relatively simple case into a complex morass"). Here, Ms. Herridge did everything in her power to *avoid* the unnecessary expense of these proceedings by seeking an interlocutory appeal. As she argued in seeking that appeal: "Immediate appeal will save resources by obviating the need for Plaintiff to schedule a deposition, wait for Ms. Herridge to refuse to answer questions, and then move for an order of contempt. And it would also avoid the need for the parties (and the Court) to prepare and address a largely duplicative round of briefing on the motion for a contempt order." Mem. ISO Mot. for Interlocutory Certification at 14. Plaintiff, by contrast, argued against any interlocutory appeal and insisted that there must be a futile deposition followed by contempt briefing. *See* Pltf's Omnibus Opp'n at 7–8. Having insisted on the more expensive path to an appeal, Plaintiff cannot now claim that she deserves compensation for receiving the procedure that she asked for.

**PUBLIC VERSION**

Worse, Plaintiff also made the deposition much longer (and more expensive) than it needed to be. Plaintiff's counsel could have asked a few questions to establish that Ms. Herridge would assert privilege over the identity of her source(s) and then could have stipulated to the right to continue the deposition after an appeal. That is exactly the approach the government took. Herridge Dep. 210:6-212:18. Instead, Plaintiff's counsel asked hours of questions on matters other than the identity of Ms. Herridge's confidential source(s). Counsel asked about the nature of Fox's internal collaboration, *id.* 25:13-18, the identity of the Fox employee who decided to air the broadcast reports on the Fox cable channel, *id.* at 121:22-23, why there was a delay between taping the Rhoads interview and the broadcast, *id.* At 122:10-12, 123:20-24, the format and timing of Ms. Herridge's receipt of certain photographs, 39:9-10, 40:3-5, 65:6, 86:1, 88:6-8, and dozens of other questions invading the editorial and newsgathering process. *See id.* at 27:5-7 (origins of the story), 28:2-3 (origin of Fox's interest in Plaintiff), 29:8 (origin of federal agency interest in Plaintiff), 31:6-7 (nature of documents Fox reviewed). Plaintiff's counsel even asked about Fox's internal "file storage system," *id.* at 126:13-15—even though this Court specifically quashed the subpoenas seeking documents from Fox and from Ms. Herridge. Disclosure Order at 28. Thus Plaintiff needlessly prolonged the deposition by asking questions far afield from Ms. Herridge's sources. Ms. Herridge certainly cannot be made to bear that expense.

Plaintiff also cannot cite a single precedent to support the extraordinary sanction she seeks. She fails to cite any case in which a nonparty journalist, as the price to appeal an adverse disclosure order, was required to pay compensatory sanctions related to the costs of a deposition and contempt proceedings. Such sanctions were expressly denied in *Lee v. Dep't of Justice*, 327 F. Supp. 2d 26, 33 (D.D.C. 2004); *see also Cuthbertson*, 630 F.2d at 149 (ordering each party to bear its own costs). And the *Hatfill* court tacitly denied a similar request by failing to award fees and costs

despite a request. *Compare* Mem. ISO Mot. That James Stewart Be Held In Civil Contempt at 7, *Hatfill v. Ashcroft*, No. 1:03-cv-01793-RBW (D.D.C. Oct. 2, 2007), ECF 204-1 (requesting "costs and fees associated with [a journalist's] deposition"), *with Hatfill v. Mukasey*, 539 F. Supp. 2d 96, 107 (D.D.C. 2008) (contempt order providing no compensatory sanctions).

The *only* precedent Plaintiff cites in support of her request for compensatory sanctions, *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70 (D.D.C. 2003), is irrelevant. That case did not involve contempt on a refusal to disclose a journalist's confidential sources. Instead, it involved a defendant that had "reformatted" hard drives and "erased and reused" "email backup tapes" thereby destroying documents that were subject to a preliminary injunction requiring preservation. *Id.* at 74. The court centered its analysis on the principle that an "award of costs and attorney's fees" is "an appropriate sanction for conduct which *abuses the judicial process*." *Id.* at 86 (emphasis added, quotation omitted). Ms. Herridge's decision to pursue the only path left open to her to secure appellate review of her First Amendment rights is not an "abuse of the judicial process," and the analysis in *Landmark Legal* has no bearing on this case.[11]

**C. Any Contempt Sanction Should Be Stayed Pending Appeal.**

Finally, if the Court enters a contempt order, any sanction should be stayed pending appeal. A stay pending appeal has routinely been granted in prior cases involving contempt sanctions imposed on journalists to compel the disclosure of confidential sources, *see, e.g.*, *Lee v. Dep't of*

[11] Plaintiff's passing suggestion that she could be entitled to the "entire cost of the litigation as a sanction," Contempt Mot. at 19, is even further afield. Plaintiff does not actually request that relief for good reason. The reference to such a sanction in *Landmark Legal* traces back to a 1923 decision that involved an improper attempt by a party to secure an injunction from a lower court preventing enforcement of a judgment issued by the Seventh Circuit and is wholly irrelevant here. *See Landmark Legal*, 272 F. Supp. 2d at 86 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (citing *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 428 (1923))).

*Justice*, 327 F. Supp. 2d 26, 33 (D.D.C. 2004), including cases involving only nominal fines. *See Cutler*, 6 F.3d at 70; *Cuthbertson*, 630 F.2d at 144. Indeed, when the district court denied a stay of contempt sanctions in *Hatfill*, *see* 539 F. Supp. 2d at 106, the D.C. Circuit immediately stepped in and granted a stay, *see Hatfill v. Mukasey*, No. 08-5049, Doc. No. 1104546 (D.C. Cir. March 11, 2008) (per curiam) (attached as Exhibit H). When Ms. Herridge previously sought a stay pending appeal in this case, this Court denied that motion based solely on the ground that, at that point in time, there was no jurisdiction for an immediate appeal. *See* Certification Order at 5. If the Court enters a contempt order, the jurisdictional problem will be solved and a stay will be warranted. All four factors that courts consider on a stay application overwhelmingly favor a stay here. *See generally Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam) (listing factors).

*First*, Ms. Herridge will "be irreparably harmed absent a stay." *Cuomo*, 772 F.2d at 974. If Ms. Herridge is coerced to reveal her source(s), her promise(s) of confidentiality will be irretrievably breached, the identity of the source(s) will be irrevocably disclosed, and no court will ever be able to unring the bell and make the identity of the source(s) secret again. *See Maness v. Meyers*, 419 U.S. 449, 458–60 (1975) (finding "[c]ompliance could cause irreparable injury because appellate courts cannot always 'unring the bell' once the information has been released"). Not surprisingly, "[c]ourts in this District have recognized that the disclosure of confidential information is, by its very nature, irreparable 'because such information, once disclosed, loses its confidential nature.'" *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433–34 (D.D.C. 2018) (quoting *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010)). It is also an irreparable harm to require Ms. Herridge to rack up potentially hundreds of thousands of dollars in fines as the price for obtaining judicial review of her First Amendment rights. *See In*

*re Roche*, 448 U.S. 1312, 1316 (1980) (Brennan, J., in chambers) (granting stay where reporter "must either surrender his secrets" or face civil contempt).

*Second*, Ms. Herridge's appeal presents, at a minimum, serious legal questions. Where, as here, the movant makes a strong showing of irreparable injury, she need only raise a "serious legal question on the merits" to warrant a stay. *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 12 (D.D.C. 2014). A "court is not required to find that ultimate success by the movant is a mathematical probability." *Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 565 F. Supp. 2d 23, 28 (D.D.C. 2008) (quotation marks and citation omitted).

The "serious legal question" standard is plainly met here. Ms. Herridge's appeal will present at least two serious legal questions: (1) whether analysis of the First Amendment reporter's privilege under *Zerilli* requires a broad-ranging balancing of interests or can be cabined largely to weighing the factors of centrality and exhaustion, and (2) the existence and applicability of a federal common law reporter's privilege. This Court has already acknowledged that there are "substantial grounds for a difference of opinion regarding" both of these issues. Certification Order at 2. As the Court explained, given "the importance of the First Amendment issues here, there is good reason to believe this case might generate en banc activity that could upend existing precedents." *Id.* at 3.

The last time the D.C. Circuit considered the scope of *Zerilli*, it resulted in a tied four-four vote denying rehearing en banc and no definitive resolution. *See Lee v. Dep't of Justice*, 428 F.3d 299, 300 & nn. 1&5 (D.C. Cir. 2005) (Judges Edwards, Rogers, Tatel, and Garland voted to grant rehearing, and Judges Brown and Griffith did not participate). This case could provide that resolution. In addition, as this Court acknowledged, the D.C. Circuit might also "take the opportunity to reshape the legal landscape by recognizing a federal common law newsgathering

privilege—an option that *Zerilli* and *Lee* leave open." Certification Order at 3. Thus, there can be no question that Ms. Herridge's appeal presents serious legal questions, and Ms. Herridge should not be fined while the court of appeals takes the time it needs to fully consider the important issues presented in this case.

*Third*, Plaintiff will not suffer any injury, much less irreparable injury, from a stay of a contempt sanction. If the Court enters a contempt order, an appeal as of right is inevitable and staying the contempt sanction will not delay Plaintiff's access to confidential sources. It will only ensure that Ms. Herridge is not erroneously penalized for pursuing an appeal in a case in which the Court itself has indicated there is "good reason to believe" there might be "en banc activity." Certification Order at 3. In addition, Plaintiff's claimed need for information from Ms. Herridge is not time sensitive. Plaintiff filed this case in 2018 and did not subpoena Ms. Herridge until 2022. The case has been pending for almost five years, and the subpoena to Ms. Herridge is a year and a half old. A short additional delay to address important constitutional issues and to ensure that Ms. Herridge's First Amendment rights are not irretrievably breached will not harm Plaintiff.

*Fourth*, the public interest also strongly favors a stay. Plaintiff is seeking to uncover confidential source(s) related to reporting on a counterintelligence probe into Plaintiff and UMT. The First Amendment interest in protecting the ability of journalists to gather information from confidential sources is at its zenith in such national security cases. "[C]onfidentiality is often essential" for a journalist "to establish[] a relationship with an informant." *Zerilli*, 656 F.2d at 711. Erroneously forcing disclosure of confidential sources before the court of appeals has had a chance to weigh in would risk broadly chilling all potential government sources from working with reporters and thereby impair the public's interest in being able to rely on the press to "bare the secrets of government and inform the people." *N.Y. Times Co. v. United States*, 403 U.S. 713,

**PUBLIC VERSION**

717 (1971) (Black, J., concurring). And subjecting reporters to hundreds of thousands of dollars in fines as the price for securing appellate review of their privilege arguments—even where the court acknowledges that those arguments "might generate en banc activity," Certification Order at 3—would also chill journalistic activity by placing a prohibitive price tag on the assertion of First Amendment rights.

If the Court denies a stay, Ms. Herridge respectfully requests that the Court enter an administrative stay to allow Ms. Herridge sufficient time to seek a stay from the court of appeals.

## CONCLUSION

The Court should reject Plaintiff's request to hold Ms. Herridge in contempt. Alternatively, the Court should impose only a nominal fine of $1.00 per day, payable to the Court, and should stay its order pending appeal.

December 14, 2023

Respectfully submitted,

/s/ *Patrick F. Philbin*

Patrick F. Philbin (D.C. Bar No. 453620)
Kyle West (D.C. Bar No. 24093346)
ELLIS GEORGE CIPOLLONE
O'BRIEN LLP
1155 F Street, N.W.
Suite 750
Washington, DC 20004
(202) 249-6633
pphilbin@egcfirm.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| YANPING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | ) | **Case No. 1:18-cv-03074-CRC**<br><br>**Hon. Christopher R. Cooper**<br>**United States District Judge** |

I, William Jelani Cobb, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Dean of the Columbia Journalism School, a position I have held since 2022. Prior to becoming Dean, I served for six years as the Ira A. Lipman Professor of Journalism at the Columbia Journalism School.

2. In addition, I have been a staff writer at The New Yorker since 2015. My articles and essays have also appeared The Washington Post, Essence, Vibe, Emerge, The Progressive, The Washington City Paper, One Magazine, Ebony and TheRoot.com. I have also been a featured commentator on National Public Radio, CNN, Al-Jazeera, CBS News, and other national broadcast outlets.

3. In 2020, I received a Peabody Award for my PBS Frontline film *Whose Vote Counts?* In 2018, I was a finalist for the Pulitzer Prize in commentary. I am currently a member

of the Board of Directors of the American Journalism Project. I am also an *ex-officio* member of the Pulitzer Prize Board.

4. I received my B.A. in English from Howard University in 1994, and an MA and PhD in American History from Rutgers in 2003.

5. Based on my years of experience as a journalist and journalism professor, it is my opinion that confidential sources are vital to the functioning of a free and independent press.

6. One of the most important roles of the press—likely its most important—is to ensure accountability of government officials to the people by keeping the people informed about their government. The press cannot serve this function without confidential sources.

7. The public often associates the term "confidential source" with government sources who provide a reporter with previously unknown information that forms the basis for new reporting. "Deep Throat," who leaked the Watergate story, is an example of such a source. Reporters, however, use confidential sources in much more varied ways. For example, before unquestioningly reporting the official government line on a policy or event—itself often the result of a leak from a higher level of government—journalists are taught to reach out to confidential sources they have developed to see whether the government's position or narrative provides the whole truth. Without such confidential sources, the press would be unable to contradict official government narratives on sensitive matters of policy.

8. Confidential sources are also useful for confirming information developed through other means. Without such information, stories reporting on sensitive government actions often could not run due to lack of verification.

9. Based on my experience, it is often critical to guarantee sources anonymity in order to effectively report on government. Given various restrictions on providing government information outside official channels, it is often impossible to report on matters of key national importance without using sources whose cooperation risks serious sanctions.

10. However, promises of confidentiality alone are insufficient to secure the trust of a confidential source: those promises must also be credible. In my opinion and based on my experience, absent effective assurances of confidentiality, no one with access to important information bearing on sensitive governmental matters would be willing to serve as a confidential source. Without reliable assurances of confidentiality, an increased fear of exposure would make government sources unwilling to provide information to journalists even when it is key to informing the electorate of important issues.

11. The act of disclosing a confidential source, even as the result of a court order, erodes the ability of journalists everywhere to credibly promise confidentiality to sources who demand it, and would have a chilling effect on the flow of important information to journalists reporting on government matters.

12. Forcing Ms. Herridge to disclose her source(s) would have a broad chilling effect on investigative journalism. By indicating to sources that promises of confidentiality may not be reliable, it would discourage sources from coming forward and would thereby broadly damage the ability of all reporters covering government to do their jobs effectively.

13. Because disclosure of confidential sources can have such broad effects on the profession generally, journalists are trained on the importance of strictly adhering to promises of confidentiality. At Columbia, we teach students that such obligations are a sacred aspect of the

profession that, if broken, would undermine the ability of the press to fulfill its core function of informing the populace about the government's actions. Most journalists therefore operate on an understanding that they will not reveal confidential sources even when under threat of contempt for violating a court order.

14. A reporter who discloses a confidential source would also irreparably damage her own ability to report effectively on government matters in the future. Other sources who require confidentiality but become aware of the disclosure will be less willing to work with that reporter. This is yet another reason why we teach aspiring journalists that it is vitally important for them to strictly maintain their promises of confidentiality.

Date: December 12, 2023

William Jelani Cobb
Dean, Columbia Journalism School

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YANPING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | **Case No. 1:18-cv-03074-CRC**<br><br>**Hon. Christopher R. Cooper**<br>**United States District Judge** |

I, Stephen W. Coll, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am currently a professor at the Columbia Journalism School and from July 2013 to July 2022 served as Dean of the Journalism School.

2. From 2007 to 2013, I served as the President and CEO of New America, a think tank focusing on a number of issues, including national security studies, technology, asset building, education, and the economy.

3. I have been a staff writer for the New Yorker since 2005, writing on national security, intelligence controversies, and the media. From 2004 through 2005, I was an associate editor at the Washington Post. Prior to that I served as a managing editor at the Post from 1998 until 2004. I was a reporter, editor, and foreign correspondent at the Post from 1985 to 1998.

4. I am the author of a number of nonfiction books involving investigative reporting on issues of foreign affairs and national security, including *Directorate S: The C.I.A. and America's Secret Wars in Afghanistan and Pakistan* (2018); *The Bin Ladens: An Arabian Family*

*in the American Century* (2008); and *Ghost Wars: The Secret History of the CIA, Afghanistan, and Bin Laden, from the Soviet Invasion to September 10, 2001* (2004).

5. I have received a number of awards for my reporting, including two Pulitzer Prizes, the National Book Critics Circle Award, the PEN/John Kenneth Galbraith Award, the Arthur Ross Book Award, the Cornelius Ryan Award, the Lionel Gelber Price Award, the Ed Cunningham Award, the Robert F. Kennedy Journalism Award, and the Livingston Award for International Reporting. In addition, from 2012 to 2013, I was a voting member of the Pulitzer Prize Board and as Dean of the Columbia Journalism School served as a non-voting *ex officio* member of the Pulitzer Prize Board from 2013 to 2022.

6. Based on my years of experience as an investigative journalist focusing on national security and international affairs, it is my opinion that the press could not effectively report on such matters without the use of confidential sources. Confidential sources are absolutely essential for the press to fulfill its function of keeping the people informed about the their government.

7. Throughout my career I have found it essential to rely on confidential sources to keep the public informed about government activities. Confidential sources are vital for uncovering the truth and reporting on matters of public importance, especially to inform the public about government actions in the national security realm that might otherwise be shielded from view.

8. In the national security field, it simply is not possible to contradict official government positions (or to evaluate leaks directed by high-level government officials) without the use of confidential sources. In this field, most information of significance is often officially protected from disclosure in some way. Given restrictions on providing such information to the

press openly, those with information about important government activities would not serve as sources unless they could be provided with credible promises of confidentiality.

9. Assurances of confidentiality must be credible if they are going to convince a potential source to provide national security information. Developing a confidential source is one of the most difficult parts of national security reporting and requires that the source have a high degree of trust that the reporter will maintain confidentiality as a matter of course.

10. A reporter who discloses a confidential source—even if it is done only under compulsion of a court order—would seriously damage his or her ability to successfully report on government activities in the national security field in the future. In my opinion, sources would likely no longer trust such a reporter to work with him or her.

11. More importantly, a contempt order that successfully forces a reporter to disclose a national security source would have a broad chilling effect on the flow of critical information to the press and thus to the people. It would have a ripple effect discouraging government personnel with critical knowledge—including whistleblowers with knowledge of wrongdoing or government incompetence—from serving as sources because it would undermine their confidence that any reporter could promise them confidentiality. As a result, it would undermine the ability of the press to hold powerful decisionmakers accountable before the public. That would impair the ability of the press to fulfill its function of keeping the people informed about the actions of their government.

Date: December 13, 2023

Stephen W. Coll

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| YANPING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 1:18-cv-03074-CRC**<br><br>**Hon. Christopher R. Cooper**<br>**United States District Judge** |

I, William R. Evanina, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am the CEO of The Evanina Group, LLC, a company I founded to advise other CEOs and Boards of Directors on strategic corporate risks, particularly those backed by foreign state actors.

2. Prior to founding The Evanina Group, I spent 32 years working in the United States government, 24 of which were with the FBI, CIA, and National Counterintelligence and Security Center ("NCSC").

3. From 2009 through 2010, I served as a Special Agent in Charge in the FBI's National Security Office. From 2010 to 2012, I served as the Assistant Special Agent in Charge of the FBI's Washington Field Office, where I oversaw counterintelligence operations involving Russia and counterterrorism matters.

4. From 2013 through 2014, I ran the FBI and CIA's joint Counterintelligence Division/Counterespionage Group, where I coordinated personnel from multiple intelligence agencies in countering foreign espionage.

5. In 2014, I was appointed to serve as the Director of the National Counterintelligence and Security Center ("NCSC") within the Office of the Director of National Intelligence. Congress subsequently made the position subject to the Appointments Clause and, in February 2018, President Donald Trump formally nominated me to the position. On May 6, 2020, the United States Senate confirmed my nomination by a 84-7 vote.

6. While serving as the Director of the NCSC, I was responsible for leading and supporting U.S. government and U.S. private sector entities at risk from intelligence collection or attack by foreign adversaries.

7. As a result of my years of experience working on counterintelligence matters, I am deeply familiar with the methods commonly employed by the Communist Party of China ("CCP") and its security services to engage in intelligence gathering in the United States.

8. I cannot provide, and in this declaration I do not purport to provide, any testimony as to facts about Plaintiff. I am presenting only my opinions assessing likely risks based on the information in the record that I have reviewed.

9. In order to form my opinions about this case, I have reviewed the following:

a. Catherine V. Herridge's Memorandum in Support of Her Motion to Quash, Dkt. 96-1;

b. the FBI's Search Warrant Affidavit for the Search of the University of Management and Technology ("UMT") and the home of Plaintiff, Yanping Chen, Dkt. 96-11 ("FBI Affidavit");

c. the three articles ("Articles") Ms. Herridge wrote concerning Plaintiff and UMT, Dkts. 96-3, 96-5, 96-6;

d. a Military Times article describing DOD's decision to terminate Plaintiff's university from DOD's Tuition Assistance Program;

e. Plaintiff's Opposition to the Motion to Quash, Dkt. 122;

f. and the Deposition Transcript of Catherine Herridge ("Herridge Tr.").

10. These materials present substantial evidence that Plaintiff was a colonel in the People's Liberation Army ("PLA"). In fact, the FBI Affidavit indicates that the FBI had her on tape admitting to an informant that she was a "full colonel" in the Chinese military. The Affidavit also presents substantial evidence that she lied about her service in the PLA on immigration forms and to federal investigators. The university that she founded, UMT, catered particularly to U.S. servicemembers and collected information about their military training and current duty stations. As the FBI Affidavit explains, the FBI had concerns that this information was remotely accessible from China.

11. Based on my familiarity with the CCP's intelligence gathering methods, it is my opinion that this pattern of activities is consistent with common CCP intelligence methods and there is a serious risk that Plaintiff was involved in making U.S. servicemember information available to China.

12. The CCP has a history of sending PLA members to the United States on academic visas with instructions to lie about their PLA affiliation on their immigration paperwork and, once embedded, to engage in intelligence gathering. For example, in 2020, DOJ charged four researchers with doing just that. *United States v. Wang*, 3:20-mj-70720-MAG (N.D. Cal. June 8, 2020); *United States v. Tang*, 2:20-mj-00096-DB (E.D. Cal. June 26, 2020); *United States v. Song*,

21-CR0011-WHA (N.D. Cal. Feb. 18, 2021) (superseding indictment); *United States v. Zhao*, 1:20-cr-187-JRS (S.D. Ind. Aug. 4, 2020).

13. As I have explained in prior testimony before Congress, the PRC routinely utilizes non-traditional collectors to conduct a plurality of its information collection efforts here in the U.S. due to their successful ability to hide in plain sight. Non-traditional collectors are in positions involving legitimate work and research, and they use those positions to collect information.

14. The information these non-traditional collectors gather is often biographical in nature. Once that information is gathered and analyzed, the CCP uses it to aggressively target government employees and servicemembers who may have access to sensitive, non-public, or classified information or valuable skill sets.

15. In another recent case, a CCP asset admitted to participating in scheme in which he created a fake company that he then used to solicit resumes from U.S. servicemembers. *United States v. Yeo*, 20-cr-87 (July 24, 2020 D.D.C.). Chinese intelligence services then used those resumes to identify servicemembers for potential recruitment.

16. Finally, in another recent case, DOJ charged four Chinese nationals with using an academic institution, seemingly created for the purposes of intelligence gathering, to target and recruit U.S. persons to serve as sources for the CCP. *United States v. Lin*, 3:22-cr-00710-MAS (D.N.J. Oct. 20, 2022).

17. In my opinion, the type of information UMT gathered from its students in this case would be of great interest to the CCP. Chinese intelligence operations regularly seek to collect large databases of information on U.S. government personnel. For example, the CCP was responsible for a data breach at the Office of Personnel Management in which the security clearance forms (SF-86s) for millions of government employees were stolen. Data on military

members would be particularly valuable for the CCP. At a minimum, UMT would have access to information similar to the servicemember resumes the CCP was specifically targeting for collection in the *Yeo* case, if not more detailed service information.

18. As the Chief of Staff of the Air Force recently warned, the CCP hopes to recruit U.S.-trained military personnel to help "fill gaps" in their military capabilities and training regimes. Air Force News Service, *CSAF Issues Warning of PLA Recruitment of U.S. Air Force Members, Veterans*, https://www.af.mil/News/Article-Display/Article/3520635/csaf-issues-warning-of-pla-recruitment-of-us-air-force-members-veterans/. The information that allegedly was at issue here is exactly the kind of information needed to identify and target servicemembers for that intelligence gathering effort.

19. DOD's decision to terminate UMT's participation in its Tuition Assistance Program and to announce publicly that the termination was made on national security grounds indicates that DOD decided that there was a national security risk here. This further indicates to me that there is a serious risk that Plaintiff was making U.S. servicemember information available to CCP intelligence services.

20. Based on my familiarity with counterintelligence investigations and prosecutions, the fact that Plaintiff was not prosecuted for these activities does not provide a sound basis for drawing the conclusion that Plaintiff was not, in fact, making information about U.S. servicemembers available to the CCP.

21. In my experience, counterintelligence cases are often not prosecuted, even when the government has sufficient evidence to establish a case. Bringing a prosecution risks identifying confidential sources and methods that were used to obtain the relevant evidence, and in many cases the U.S. government may determine that it is preferable to put a stop to the collection activity

without prosecution. DOD effectively ended any further intelligence collection here by terminating UMT's participation in the Tuition Assistance Program and publicly announcing that the termination was on "national security grounds."

22. Under the premise of Plaintiff's case, the confidential source or sources for Ms. Herridge's stories were government employees who had access to the details of a counterintelligence investigation. In my opinion, disclosing the identity of such employee(s) to a person whom DOD has found to be a national security risk (for the reasons above) would itself create an additional layer of risk. If I were making a decision on national security grounds, I would take all steps possible to avoid the additional risk of disclosing information about government counterintelligence personnel to a person who was a colonel in the PLA and whom DOD had found to be a national security risk.

Date: December 13, 2023

William R. Evanina

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS UNITED STATES AIR FORCE**
**WASHINGTON DC**

SEP 05 2023

Airmen,

The U.S. Air Force and our allies, with whom we train, represent the greatest airpower the world has ever known, and the People's Liberation Army (PLA) wants to exploit your knowledge and skill to fill gaps in their military capability.

Our vastly superior capabilities and overwhelming airpower are key in deterring increasingly aggressive behavior in the Indo-Pacific and if necessary, defeating threats. I have made it clear since publishing the original CSAF Action Orders that I am committed to ensuring Airmen have what is required to compete, deter, and win in a high-end fight. However, as you may have seen in the news, foreign companies are targeting and recruiting U.S. and NATO-trained military talent across specialties and career fields to train the PLA abroad to fill gaps in their military capabilities.

By essentially training the trainer, many of those who accept contracts with these foreign companies are eroding our national security, putting the very safety of their fellow servicemembers and the country at risk, and may be violating the law. Just as I am asking for your help, I have also asked for help from our allied Air Chiefs to address the same issue within their ranks. Protecting our national defense information is the responsibility of each servicemember and veteran.

If you or someone you know is being targeted for recruitment, or was recruited, to train foreign militaries, please report it to your local Office of Special Investigations detachment or submit a report via www.osi.af.mil/Submit-a-Tip/.

I am committed to protecting this great Nation, our Airmen and mission…*Fly, Fight, and Win…Airpower anytime, anywhere*!

As always, I am proud to serve alongside you.

CHARLES Q. BROWN, JR.
General, USAF
Chief of Staff

**Transcript, Deposition of Catherine V. Herridge**

**[Pages 2-5, 20-22, 220-221]**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

YANPING CHEN,

Plaintiff,

vs.

FEDERAL BUREAU OF INVESTIGATION, et al,

Defendants.

Case Number: 18-cv-3074(CRC)

Video Deposition of

CATHERINE HERRIDGE

Tuesday, September 26, 2023

10:11 a.m.

Job No. 6455898

Reported by: Laurie Donovan, RPR, CRR, CLR

September 26, 2023

10:11 a.m.

Video Deposition of CATHERINE HERRIDGE, held in person in Washington, D.C., with the witness and all parties participating in person, pursuant to the Rules of the United States District Court for the District of Columbia, subject to such stipulations as may be recited herein or attached hereto, before Laurie Donovan, a Registered Professional Reporter and notary public of the District of Columbia, who officiated in administering the oath to the witness.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

Meier Watkins Phillips Pusch, LLP
1629 K Street, NW
Suite 300
Washington, D.C. 20009
(847)951-7093
By: Andrew Phillips, Esq.
andy.phillips@mwpp.com
Shannon Timmann, Esq.
shannon.timmann@mwpp.com

ON BEHALF OF THE DEFENDANTS:

U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20005
(202)616-8016
By: Garrett Coyle, Esq.
garrett.coyle@usdoj.gov
Leslie Cooper Vigen, Esq.
leslie.vigen@usdoj.gov
Sopha Y. Kil, Esq.
Carol Federighi, Esq.

(Appearances continued)

ON BEHALF OF NON-PARTY CATHERINE HERRIDGE:

Ellis George Cipollone O'Brien LLP
1155 F Street, NW
Suite 750
Washington, D.C. 20004
(212)413-2600
By: Patrick F. Philbin, Esq.
pphilbin@egcfirm.com
Chase Harrington, Esq.

ALSO PRESENT:

Matt Jones, Esq. (via telephone)
Kim Johnson, videographer

***   *   ***

**[Pages 20-22 Follow]**

(Witness peruses document.)

BY MR. PHILLIPS:

Q Are you familiar --

MR. COYLE: Counsel, I'm sorry to interrupt, but I believe there are two versions of this. One is redacted and one is not and contains materials subject to the protective order.

Do you or can you get a copy of the redacted version, the corrected version on the docket?

MR. PHILLIPS: I can do that on a break.

MR. COYLE: Thank you. Can we retrieve the copy?

MR. PHILLIPS: Yes. Ms. Herridge, I'm going to need to take that back from you.

MR. COYLE: Thank you.

BY MR. PHILLIPS:

Q Ms. Herridge, do you understand that -- and I'll represent it was August 1, 2023 -- that on August 1, 2023, the district court entered an order requiring you to sit for a deposition and identify the source or sources of any Privacy Act material related to Dr. Chen that you received in the course of your reporting on Dr. Chen and the University of Management & Technology?

A Yes.

Q You are here today for the deposition that the court ordered you to attend, correct?

A Yes.

Q Do you intend to provide substantive answers to questions related to your source or sources for the Privacy Act materials in question?

A I have complete respect for the court and its authority and for the order. I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek further judicial review, I must now disobey the order, and for that reason, among others, I am invoking my First Amendment rights and declining to answer the question.

Q So it is your intention during today's deposition to, as you put it, "disobey" the district court's August 1, 2023 order?

A I refer you to my original answer.

Q So the answer to my question is yes?

MR. PHILBIN: Asked and answered, Counsel.

BY MR. PHILLIPS:

Q Do you intend to comply with the district court's order or to defy the district court's order?

A I explained I have complete respect for the court and its authority and for the order, and I have no desire to defy a court order.

My understanding is that the courts have ruled that in order to seek further judicial review in this case, I must now decline the order, and respectfully I am invoking my First Amendment rights in declining to answer the question.
Q Ms. Herridge, what is your home address?
A [redacted]
Q And are you currently employed?
A Yes.
Q By whom?
A I'm a senior investigative correspondent for CBS News.
Q And how long have you been at CBS News?
A I began working at CBS News in November of 2019.
Q Prior to joining CBS News in 2019, where were you employed?
A I began my career at ABC News in London in 1987. I worked there for about a decade, rising through the ranks from radio reporter to a television correspondent, and then in 1996, I joined Fox News Channel and worked there until 2019 when I was the chief intelligence correspondent.
Q So you were at Fox News, am I correct, from

*     *     *

**[Pages 220-221 Follow]**

BY MR. PHILBIN:

Q And was there anything that, in your mind, at the particular time these two events happened so close to each other, that connected it to this case?

MR. PHILLIPS: Objection; form, relevance, calls for speculation.

THE WITNESS: My recollection is that I had heard from one of my team members on this reporting that they had been served with a subpoena, and my belief, based on the proximity of these events, is that to say they are all a coincidence is to disconnect the dots.

BY MR. PHILBIN:

Q Okay. Then the last thing just generally I wanted to ask you is, I know that you've made it clear on the record that you respect the court's order and you have no desire to disobey it, but the courts have effectively told you that the only way you can get judicial review is to disobey the order.

Are there other factors that make you think it's particularly important in this case for you to protect the confidentiality of your sources and therefore to insist on having judicial review?

MR. PHILLIPS: Objection; form.

THE WITNESS: There are two factors. The

first is that there really is a sacred trust between reporters and their sources, and this is true for me and other journalists that work, and I remain committed to that pledge in this story and all of the reporting that I do.

And the second reason is, based on my reporting in this case and the Defense Department's publicly available finding that denied your client money on a national security grounds, it is my belief that she was a colonel in the Chinese military, and that she was engaged in espionage.

MR. PHILBIN: Thank you. I don't have any other further questions.

MR. PHILLIPS: Nothing further from me.

THE VIDEOGRAPHER: Read and sign?

MR. PHILBIN: Well, subject to being able to review the transcript.

THE VIDEOGRAPHER: We are off the record at 4:00.

(Discussion held off the video record.)

MR. PHILLIPS: What's the standard turnaround versus a rush?

THE REPORTER: The standard turnaround is two weeks.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **YANPING CHEN**, Plaintiff, v. **FEDERAL BUREAU OF INVESTIGATION, *et al.***, Defendants. | Case No. 18-cv-3074 (CRC) |

## MEMORANDUM OPINION AND ORDER

In August 2023, the Court partially denied journalist Catherine Herridge's motion to quash a subpoena in this Privacy Act lawsuit, thereby permitting Plaintiff Yanping Chen to depose Herridge regarding the sources for her investigative reports on Chen's affiliations with the Chinese military. At her deposition the following month, though, Ms. Herridge refused to answer any questions about the identity and intent of her sources. The question now is whether Herridge should be found in civil contempt for defying the Court's clear and unambiguous order. After careful consideration, the Court concludes that a finding of civil contempt is warranted.

The Court does not reach this result lightly. It recognizes the paramount importance of a free press in our society and the critical role that confidential sources play in the work of investigative journalists like Herridge. Yet the Court also has its own role to play in upholding the law and safeguarding judicial authority. Applying binding precedent in this Circuit, the Court resolved that Chen's need for the requested information to vindicate her rights under the Privacy Act overcame Herridge's qualified First Amendment reporter's privilege in this case. Herridge and many of her colleagues in the journalism community may disagree with that decision and prefer that a different balance be struck, but she is not permitted to flout a federal

court's order with impunity. Civil contempt is the proper and time-tested remedy to ensure that the Court's order, and the law underpinning it, are not rendered meaningless.

At the same time, Herridge does have a right to appeal this contempt order in the hopes of persuading the D.C. Circuit to recalibrate the existing qualified reporter's privilege in her favor or forge a new federal common law newsgathering privilege that sweeps more broadly than the Constitution. To provide ample room for her to exercise that right, the Court will stay the contempt sanction pending a timely appeal.

## I. Background

Before delving into the present dispute, it is worth recounting the long journey to this point. Dr. Yanping Chen is a naturalized U.S. citizen who, in 1998, founded the University of Management and Technology ("UMT"), an educational institution that attracted a substantial number of military servicemembers who attended with tuition assistance from the Department of Defense. Compl. ¶¶ 13, 42. Beginning in 2010, Chen became the focus of an FBI investigation concerning statements she made on immigration forms about her work in China in the 1980s. Id. ¶ 15. As a part of that investigation, the FBI executed search warrants for Chen's home and the main office of UMT, seizing materials during both searches. Id. ¶¶ 18, 20.

Prosecutors eventually informed Chen that no charges would be filed against her, but about a year later, Fox News Network ("Fox") ran a series of television segments and news articles about her. The thrust of the stories, principally authored by then-Fox reporter Catherine Herridge, was that Chen had concealed her former membership in the Chinese military on her U.S. immigration forms and might have used UMT to funnel valuable information about the American military to the Chinese government. Id. ¶¶ 22, 25–31; see Catherine Herridge, Fox News Investigation: DoD-Funded School at Center of Federal Probes over Suspected Chinese

Military Ties, Fox News (Feb. 24, 2017, 1:58 PM), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties. The reporting also included family photographs of Chen, excerpts from Chen's immigration forms, and a snippet from what appears to be an internal FBI memorandum summarizing an interview of Chen's daughter conducted for the investigation. Compl. ¶¶ 25–31.

Believing these materials could only have come from the FBI's search and that someone in the government leaked them to Herridge and Fox in violation of the Privacy Act—which generally prohibits federal agencies from disclosing internal records about a person without her consent—Chen filed suit in 2018 against the FBI, the Department of Defense, and two other agencies. Id. ¶ 23; see 5 U.S.C. § 552a. Over the next five years, Chen pounded the pavement to uncover the identity of the potential leaker. She served scores of document requests, interrogatories, and requests for admission; took 18 depositions of current and former government employees; issued over a dozen third-party subpoenas; and obtained declarations from 22 government personnel who had a connection to the FBI's investigation. Opp'n to Herridge Mot. to Quash at 2. Through that discovery, Chen developed a theory for how Herridge and Fox obtained the allegedly leaked records: that they came from an internal FBI PowerPoint presentation created by the lead agent on her case. Id. at 1. She also homed in on a few individuals who, she thinks, may have leaked the PowerPoint—namely, the lead case agent who created the PowerPoint, self-identified FBI-informant Stephen Rhoads (who was an on-the-record source for Herridge's reporting), and a few other government agents who might have possessed the PowerPoint. Id. at 10–11. Despite her best efforts, Chen has been unable to obtain direct evidence that any of them, or any other person, was responsible for the suspected leak.

After years of failed efforts and false starts, Chen sought to pursue the one seemingly surefire method to discover how Herridge and Fox obtained the materials in question: to ask them herself. Chen served Fox and Herridge with deposition subpoenas in May and June of 2022, respectively. See Notice of Filing Dep. Subpoena (Herridge deposition subpoena); Fox Mot. to Quash, Ex. H. (Fox deposition subpoena). She also served both with subpoenas for relevant documents and communications. See Herridge Mot. to Quash, Ex. L (Herridge document subpoena); Fox Mot. to Quash, Ex. G (Fox document subpoena). Herridge and Fox moved to quash the subpoenas, asserting the qualified First Amendment reporter's privilege and, alternatively, urging the Court to adopt a federal common law newsgathering privilege.

The Court partially denied Herridge's motion on August 1, 2023. See Chen v. Fed. Bureau of Investigation, No. 18-cv-3074 (CRC), 2023 WL 5289432 (D.D.C. Aug. 17, 2023) (redacted public version). Following binding case law, the Court explained that Chen's need for the requested evidence overcame Herridge's qualified First Amendment privilege and that it would be improper for the Court to circumvent that precedent by fashioning a wider common law privilege. Id. at *11.

Starting with the First Amendment, the Court faithfully applied the test that the D.C. Circuit established over forty years ago in Zerilli v. Smith, 656 F.2d 705 (D.C. Cir. 1981). Zerilli began from the premise that the *qualified* reporter's privilege requires courts to weigh "the public interest in protecting the reporter's sources against the private interest in compelling disclosure." Id. at 712. Zerilli did not, however, end its analysis with that "general" guidance or contemplate that district courts would engage in a free-form, anything-goes balancing exercise. Id. It instead identified a "number of more precise guidelines" that "can be applied to determine how the balance should be struck in a particular case." Id. Chief among those considerations are

(1) whether the information sought is "central" to the claim and (2) whether the plaintiff has "exhausted every reasonable alternative source of information." Id. at 713. Twenty-four years later, the Circuit doubled down on this test in Lee v. Department of Justice, reiterating that, in deciding when to "compel a non-party journalist to testify about a confidential source," courts must focus on whether the information goes to "the heart of the matter" and whether the litigant has "exhausted 'every reasonable alternative source of information.'" 413 F.3d 53, 59 (D.C. Cir. 2005) (quoting Zerilli, 656 F.2d at 713). Thus, while not forbidding consideration of other factors, the Circuit has made clear—not once, but twice—that district courts should anchor their analysis to Zerilli's two guideposts: centrality and exhaustion.

Both factors weigh heavily in Chen's favor, the Court concluded. On centrality, directly tracking the Circuit's reasoning when confronted with the identical issue in Lee, "it is clear that the information [Chen] is seeking goes to the heart of [her] case." Id. at 60. "[T]he relevant information is the identity of the individuals who may have leaked information in violation of the Privacy Act. If [Chen] cannot show the identities of the leakers, [her] ability to show the other elements of the Privacy Act claim, such as willfulness and intent, will be compromised." Id. As to exhaustion, Chen's five-year odyssey to uncover the leaker's identity assured the Court that her request to depose Herridge had come at "the end, and not the beginning, of the inquiry." Zerilli, 656 F.2d at 713 (quoting Carey v. Hume, 492 F.2d 631, 638 (D.C. Cir. 1974)). The only reasonable option left was for Chen to ask Herridge herself. With the two central factors lopsided in Chen's favor, the Court resolved that Herridge's qualified First Amendment privilege must give way. See Chen, 2023 WL 5289432 at *3–11.

The Court could have stopped there. But for sake of completeness and in recognition of the important First Amendment rights at stake, it proceeded to explain why a full-bore analysis

of Chen's likelihood of success on the merits of her claim or a free-form balancing of the public and private interests was unlikely to tilt the scales back in Herridge's direction. Though it was premature to preview summary judgment, the Court recognized that Zerilli permits courts to sneak a peek at the merits to ensure the case is "not frivolous" such that no purpose would be served in forcing disclosure. 656 F.2d at 714. Peering around the corner, the Court found that Chen's Privacy Act claim easily surpassed that low bar. The Court was also unmoved by Herridge's contention that Chen's "parochial" interest in her Privacy Act claim should yield to the public interest in a robust free press, especially when the reporting touches on national security and the subject is not an "innocent person." See Herridge Mot. to Quash at 26, 34–39. Privacy Act claims vindicate more than the personal interests of the litigant, the Court explained; they serve a systemic function in deterring the "intentional or willful" dissemination of private records maintained by our government. Chen, 2023 WL 5289432 at *11 (quoting 5 U.S.C. § 552a(g)(4)). That is as true here as in any other case. On the other side of the ledger, the Court questioned just how much the public interest was actually advanced by Herridge including the purportedly leaked materials in the reporting when, on her own account, these records added little of substance to her stories. If they were just garnish, as Herridge claims, any conflict between the Privacy Act and the First Amendment could have been avoided without a serious loss to public understanding. Therefore, even if it were to venture beyond the Circuit's "more precise guidelines" and consider the full panoply of possible interests, the Court found the outcome would likely remain the same. See id. at *10–11.

Moving beyond the First Amendment's scope, the Court rejected Herridge and Fox's invitation to open a back door to a broader balancing test by recognizing a federal common law newsgathering privilege. Id. at *11–12. In doing so, the Court followed the lead of other courts

in this district that have uniformly declined similar requests to "circumvent" the D.C. Circuit's First Amendment case law by forging a more protective common law privilege. Lee v. Dep't of Just. ("Lee II"), 401 F. Supp. 2d 123, 139 (D.D.C. 2005); accord Hatfill v. Gonzales, 505 F. Supp. 2d 33, 43–48 (D.D.C. 2007). As these courts recognized, a federal common law newsgathering privilege of the sort Herridge and Fox advocated "would create a subjective and elastic standard," saddle courts with the "daunting and well-nigh impossible task" of determining "whether the harm caused by leaked information outweighs the 'value' of that information to the citizenry," and undermine "the fundamental purpose of the Privacy Act" of "discourag[ing] the kind of [alleged] leaks that are at issue in this action." Lee II, 401 F. Supp. 2d at 139, 141–42. Given that the Circuit recognizes a well-established First Amendment privilege that protects journalists' interests and channels judicial discretion in balancing that interest against evidentiary need, the Court found that Herridge and Fox had not carried their burden of "demonstrat[ing] with a high degree of clarity and certainty that" their proposed privilege would "effectively advance a public good" relative to these potential drawbacks. Chen, 2023 WL 5289432 at *12 (quoting Lee II, 401 F. Supp. 2d at 137).

To minimize any intrusion into the press function, the Court concluded its opinion by sequencing discovery. Id. at *12–13. It first provisionally granted Fox's motion to quash both subpoenas directed against the network as duplicative of the Herridge subpoenas. Id. at *12. By the same token, the Court granted Herridge's motion to quash the document subpoena for the time being because this request would have proven unnecessary if Herridge provided the missing link in her deposition. Id. at *13. It further cabined Herridge's deposition subpoena to ensure she did not have to answer any questions concerning sources who did not provide her information covered by the Privacy Act. Id. at *7, 13. Having whittled down the subpoenas to

their core, the Court concluded with a clear order: "Chen may depose Herridge regarding the identity and intent of the source or sources of the documents and images allegedly provided to her in violation of the Privacy Act, and any non-privileged other matters relevant to her Privacy Act claim." Id. at *13.

Herridge then requested that this Court certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Exercising its discretion, the Court declined to certify because, in part, Herridge could refuse to comply with the Order and appeal from any subsequent finding of civil contempt. See Op. & Order, ECF No. 152 ("Certification Order"); Op. & Order, ECF No. 158 ("Motion for Reconsideration Order"). As the Court explained, that procedure is customary both in this jurisdiction and throughout the country. Herridge simultaneously sought an immediate appeal of this Court's Order to the D.C. Circuit under 28 U.S.C. § 1292(b)'s collateral-order doctrine. The Circuit dismissed the appeal for lack of jurisdiction, reasoning along similar lines that Herridge could adequately vindicate her assertion of privilege by "seek[ing] appellate review of the district court's order denying her motion to quash by defying that order and appealing from any contempt citation." Order, Chen v. Fed. Bureau of Investigation, No. 23-5198 (D.C. Cir. Sept. 25, 2023). As a result, the Court's Order remained in full effect.

Pursuant to that Order, Herridge sat for her deposition on September 26, 2023. See Contempt Mot., Ex. 3 ("Herridge Dep."). In it, Herridge acknowledged that the Court's Order required her to "identify the source or sources of any Privacy Act material related to Dr. Chen that [she] received in the course of [her] reporting on Dr. Chen and the University of Management & Technology." Id. at 19:20–24; see id. at 19:25 (answering "yes"). Herridge also repeatedly admitted that she knew who the source was. See id. at 84:20–85:12, 86:11–87:5, 91:5–14, 94:18–95:10. Nonetheless, she steadfastly refused to disclose her source's identity or

provide any information on when and in what form she received the allegedly leaked materials. See, e.g., id. at 33:19–41:23, 44:20–49:11. When pressed, Herridge declared:

> I have complete respect for the court and its authority and for the order. I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek further judicial review, I must now disobey the order, and for that reason, among others, I am invoking my First Amendment rights and declining to answer the question.

Id. at 20:7–13; see also id. at 208:2–10 (repeating that statement).

Chen responded by filing an application for an order to show cause why Ms. Herridge should not be found in civil contempt for defying the Court's Order. Herridge opposes the application, urging the Court to modify its Order based on "additional information." Alternatively, she requests that any civil-contempt sanction be nominal and stayed pending appeal.

## II. Legal Standards

This Court has both an "inherent and a statutory power to enforce compliance with its orders through the remedy of civil contempt." SEC v. Bilzerian, 112 F. Supp. 2d 12, 16 (D.D.C. 2000). The "power to punish for contempts is inherent in all courts; its existence is essential to . . . the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice.'" Broderick v. Donaldson, 437 F.3d 1226, 1234 (D.C. Cir. 2006) (quoting Ex parte Robinson, 86 U.S. (19 Wall.) 505, 510 (1874)). Building on that innate power, Federal Rule of Civil Procedure 45(e) provides that an "issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena."

A person is in contempt of court if she "violates a definite and specific court order requiring [her] to perform or refrain from performing a particular act or acts with knowledge of that order." SEC v. Bankers All. Corp., 881 F. Supp. 673, 678 (D.D.C. 1995) (citation omitted).

The party seeking a finding of contempt must demonstrate, by clear and convincing evidence, that (1) there was a court order in place; (2) the order clearly and unambiguously required certain conduct; and (3) the alleged contemnor failed to comply with that order. Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC, 736 F. Supp. 2d 35, 38 (D.D.C. 2010). The alleged contemnor's intent in failing to comply is irrelevant, so a court need not find that an individual acted in bad faith to hold her in contempt. Bilzerian, 112 F. Supp. 2d at 16.

The purpose of civil contempt is not to punish but "to obtain compliance with a court order or to compensate for damage sustained as a result of noncompliance." NLRB v. Blevins Popcorn Co., 659 F.2d 1173, 1184 (D.C. Cir. 1981). Accordingly, civil-contempt sanctions "must be calibrated to coerce compliance or compensate a complainant for losses sustained." In re Fannie Mae Sec. Litig., 552 F.3d 814, 823 (D.C. Cir. 2009).

## III. Analysis

### A. Herridge Is in Contempt of Court

There is no genuine dispute that Herridge is in contempt of the Court's August 1, 2023 Order partially denying her motion to quash Chen's deposition subpoena. The Order clearly and unambiguously required Herridge to answer questions about "the identity and intent of the source or sources of the documents and images allegedly provided to her in violation of the Privacy Act, and any non-privileged other matters relevant to [Chen's] Privacy Act claim." Chen, 2023 WL 5289432, at *13. Herridge understood that straightforward directive. In her motion for certification, filed ten days later, she acknowledged the Court had directed her "to respond to the deposition subpoena to answer questions identifying confidential source(s) for the Fox reporting." Mot. to Certify Appeal at 4. At her deposition the following month, however,

Herridge willfully disobeyed the Order by refusing to answer questions about the identity of the sources who supplied the allegedly leaked materials. See Herridge Dep. at 20:11 ("I must now disobey the order."). That obvious violation of "a definite and specific court order" warrants a finding of civil contempt. Bankers Alliance Corp., 881 F. Supp. at 678.

Herridge does not attempt to argue otherwise. She instead requests that, in lieu of finding her in contempt, the Court modify its Order based on "additional information that is relevant under Zerilli balancing"—including declarations from two esteemed journalists on the importance of confidential sources and from two former counterintelligence officials discussing the national-security interests purportedly at play here. See Opp'n at 17–28. But this "additional information" is just a new chapter in the same book of arguments Herridge raised, and the Court rejected, in her motion to quash the subpoenas. It does not undermine the Court's prior decision or support the requested modification.

For starters, none of the additional information speaks to the two "precise guidelines" established in Zerilli and echoed in Lee: (1) whether the requested discovery is central to the plaintiff's claim and (2) whether the plaintiff has exhausted other reasonable alternatives of accessing the information. See Zerilli, 656 F.2d at 712–13; Lee, 413 F.3d at 57–60. As the Court explained previously, in defining the contours of the reporter's privilege, Zerilli and Lee did not embrace an open-ended weighing of all possible interests but rather struck the balance between private and public interests by reference to these two central factors. See Chen, 2023 WL 5289432, at *3–6. Applying this framework here, the Court found that both considerations favored Chen. Identifying the alleged leaker was central to Chen's Privacy Act claim, and she had exhausted all reasonable alternative avenues of identifying Herridge's source. See id. at *7–

9. With a one-sided score on the two most important factors, the Court concluded, the balance weighed in Chen's favor and supported her request to depose Herridge.

Herridge's current motion does not refute any of this analysis. She does not contend that the Court erred in finding Chen had satisfied her burden on both factors. Nor does she point to any new authority indicating that the Court misconstrued Zerilli and Lee when resolving that the balancing test should center on centrality and exhaustion—an understanding shared by numerous courts in this district.[1] Herridge simply renews her prior claim that "Zerilli calls for a broad-ranging balancing inquiry" to decide whether to pierce the reporter's privilege. See Opp'n at 18–19. The Court rejected this contention once before and, upon second look, it is equally unpersuaded. It therefore reaffirms the core rationale behind its prior decision: Zerilli and Lee call on courts to focus primarily (even if not exclusively) on centrality and exhaustion, and those two factors are dispositive here.

Moreover, as was true the last go-around, the Court continues to believe that a free-wheeling balancing of interests would not change the outcome in any event. Herridge urges the Court to place three more considerations onto the scale: (1) the merits of Chen's Privacy Act claim, including her prospects for recovering damages; (2) the national-security interests at stake; and (3) the broad chilling effect that Herridge fears will result from forcing her to disclose her sources. The Court mulled each of these considerations in its prior opinion, see Chen, 2023 WL 5289432, at *10–11, and nothing in the current motion alters the Court's thinking.

[1] See, e.g., Hatfill, 505 F. Supp. 2d at 37–47; Lee II, 401 F. Supp. 2d at 139; In re Subpoena to Goldberg, 693 F. Supp. 2d 81, 85 (D.D.C. 2010); U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Companies, Inc., 507 F. Supp. 2d 45, 50 (D.D.C. 2007); Tripp v. Dep't of Def., 284 F. Supp. 2d 50, 55 (D.D.C. 2003); Hutira v. Islamic Republic of Iran, 211 F. Supp. 2d 115, 119, 121–22 & n.8 (D.D.C. 2002).

*First*, Herridge plows old ground in arguing that her First Amendment interests outweigh Chen's interest in pursuing her Privacy Act claim because, in her view, Chen will be unable to recover any damages. Herridge asserts that any financial harm to UMT was caused by the Defense Department's independent decision in January 2018 to cut off tuition assistance, not her reporting, and that any reputational harm is impossible to trace to the alleged Privacy Act violation because the lion's share of her reporting came from lawful sources. See Opp'n at 1, 18–19. As the Court has explained, however, this effort to pick apart Chen's claim far exceeds Zerilli's cursory inspection to ensure the "suit is not frivolous." See Chen, 2023 WL 5289432, at *10–11 (quoting Zerilli, 656 F.2d at 714). And regardless, even if it proves true that only a snippet of Herridge's reporting—such as the compromising photographs of Chen and her husband—could support a Privacy Act claim, the Court still "does not doubt that the images of Chen holding or wearing a Chinese military uniform could have given the Fox reporting more traction than it otherwise would have had and caused Chen more damage than she otherwise would have suffered." Id. at *10.

Downplaying the significance of the leaked materials is also a double-edged sword for Herridge. If the leaked materials truly did not affect the substance of her reporting on Chen but were instead mere ornamentation, as Herridge says, the press function need not have come into conflict with Chen's statutory privacy rights at all. Herridge could have published the same set of stories minus the records—the incriminating photographs, excerpts from immigration forms, and snippets of FBI interviews—without compromising the informational value of her pieces. Had she done so, the Privacy Act would not be implicated, Chen would have no case, and the subpoenas would never have issued. Herridge (or her producers) instead decided to gild the lily

by including these evocative (and click-inducing) details—opening the door for a Privacy Act claim and discovery into the identity of the potential leaker.

*Second*, Herridge again urges the Court to consider the national-security implications of requiring her "to reveal the identity of her confidential source(s) to Plaintiff—a former colonel in the [People's Liberation Army] whom [the Department of Defense] expressly determined to be a national security risk." Opp'n at 21. She submits declarations from two counterintelligence experts who contend that, from their vantage, there is a "serious risk" Chen used UMT "to provide information on U.S. servicemembers" to Chinese officials and that Chen was not absolved of wrongdoing just because she was never prosecuted. Id. at 22–24. But whether or not these charges are true, any national-security concerns over requiring Herridge to reveal her source ring hollow. It is hard to fathom how disclosing Herridge's source would place America in jeopardy. In fact, it is much more plausible that ferreting out the government agent who may have leaked the records would benefit, not harm, national security by exposing someone inclined to mishandle highly sensitive law-enforcement records. And on the off chance there were an actual security risk, the government is a party to this action and could easily intervene to protect these interests (as it has done on occasion in this case already).

Under the banner of "national security," Herridge also maintains that it is appropriate to consider the "risk that Plaintiff was making U.S. servicemembers' information available to a foreign power—and thus that her 'private interest' in this Privacy Act suit is, in effect, seeking taxpayer money to recover funding for that conduct." Id. at 25–26. The Court strongly disagrees. The Court's job is to apply the law evenhandedly, not to adjudicate who is worthy of the law's protection. That the plaintiff "had it coming" is not a viable defense under the Privacy Act. The Act protects "all private citizens, whether blameworthy or blameless, from the risk that

government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals." Chen, 2023 WL 5289432, at *11. Whatever her past, Chen is no exception.

*Third*, Herridge asserts that forcing her to disclose her source would have a chilling effect and undermine the ability of the press to inform the public on important matters. On this score, Herridge submits declarations from the Dean of the Columbia Journalism School, Jelani Cobb, and Pulitzer Prize winning investigative journalist Steve Coll. See Opp'n at 19–21. Dean Cobb explains that confidential sources are "vital to the functioning of a free and independent press" and contends that the "act of disclosing a confidential source, even as the result of a court order, erodes the ability of journalists everywhere to credibly promise confidentiality to sources who demand it, and would have a chilling effect on the flow of important information to journalists reporting on government matters." Id., Ex. B ¶¶ 5, 11. Mr. Coll adds that these concerns are only magnified in the areas of national security and international affairs, where it is often impossible to uncover what's going on without confidential sources who are willing to turn over protected information. Id., Ex. C ¶¶ 6–8. The Reporters Committee for Freedom of the Press echoes these worries in its amicus brief. After touting that confidential sources have enabled journalists to tell some of the most important public-interest stories of the past half century—from Watergate to the Iran-Contra affair to warrantless surveillance post-9/11—the Reporters Committee warns that compelled disclosure here could stifle similar stories going forward, especially those involving sensitive issues of national security. Reps. Comm. Br. at 2–3, 11–13.

The Court appreciates these concerns and does not question the vital role of a free press in "bar[ing] the secrets of government and inform[ing] the people." N.Y. Times Co. v. United States, 403 U.S. 713, 717 (1971) (Black, J., concurring). It also recognizes and respects that, in

many instances, confidential sources provide an essential ingredient for investigative reporting. That does not give the Court a free pass to ignore binding precedent, however. The Circuit in Zerilli was also "mindful of the preferred position of the First Amendment and the importance of a vigorous press." 656 F.2d at 712. Yet, recognizing that the reporter's privilege is not ironclad, the Circuit crafted a balancing test to determine when confidentiality must give way to competing interests—the central one being the interest of a litigant who needs the information to vindicate her rights and has exhausted every reasonable alternative source. Id. at 712–13; see also Carey, 492 F.2d at 639 (rejecting the contention that there is "an absolute First Amendment barrier to the compelled disclosure by a newsman of his confidential sources under any circumstances"). The Court is not free to disregard the balance the Circuit has struck by placing a thumb on the scale in favor of confidentiality.

Even if the Court enjoyed such discretion, it is important not to overstate the impact of requiring disclosure here. Judge Tatel expressed similar concerns about the detrimental effect compelling disclosure may have on journalists' ability to gather information in his dissent from the denial of rehearing en banc in Lee back in 2005. See Lee v. Dep't of Just., 428 F.3d 299, 301–02 (D.C. Cir. 2005) (Tatel, J., dissenting from denial of reh'g en banc). Time has told a somewhat different story. Almost two decades have passed since Lee reaffirmed Zerilli and required the reporter there to divulge his source, yet there is limited evidence that the floodgates to journalists' notepads have opened or the wellspring of confidential sources has dried up during that period. At most, there appears to have been an uptick in the number of subpoena requests for confidential sources in federal proceedings during the early 2000s. See RonNell Andersen Jones, Avalanche or Undue Alarm? An Empirical Study of Subpoenas Received by the News Media, 93 Minn. L. Rev. 585, 637–52 (2008); see also id. at 586 (acknowledging that the uptick

in subpoena requests did "not constitute an avalanche in scale"). But whether this was a blip or a sustained increase, a matter Herridge does not plumb, it has not resulted in widespread piercing of the privilege. Other courts in this district have long embraced and applied this Court's reading of Zerilli and Lee. See supra pg. 12 n.1. And still, cases requiring reporters to divulge confidential sources have remained few and far between, as the Reporters Committee acknowledges. See Reps. Comm. Br. at 2 ("Privacy Act cases involving efforts to compel the identities of confidential journalistic sources are rare[.]"). That's because, as Lee recognized, vigilant application of the centrality and exhaustion factors should ensure that compelled disclosure is the exception, not the rule. Lee, 413 F.3d at 60 (finding that an inquiry centered on these guidelines "does not leave journalists without protection"). Consistent with this expectation, courts applying the Circuit's framework often have found that plaintiffs' subpoena requests falter on one or both of these factors. See, e.g., In re Subpoena to Goldberg, 693 F. Supp. 2d at 88; Hatfill, 505 F. Supp. 2d at 49–50; Tripp, 284 F. Supp. 2d at 60–61; Hutira, 211 F. Supp. 2d at 121–22. That suggests Zerilli and Lee may have found the right balance after all.

To be sure, beyond actual case results, stakeholders in this area should remain attuned to the ripple effects that court decisions have on confidential sources' willingness to come forward in the first place. Identifying this impact can be tricky business, however. Much of the reporting on this score is anecdotal, and systematic studies lend only mild support for the notion that confidential sources may be slightly more hesitant to speak up nowadays. See Jones, supra, at 648–49 (finding 62.5% of newsroom leaders in 2007 reported that sources were as willing to speak on condition of confidentiality as five years before whereas 25.5% reported they were "somewhat less" willing to do so). But even then, it is uncertain whether sources are holding their tongues because, in their view, courts appear more solicitous of requests to compel

reporters to disclose sources. See Randall D. Eliason, The Problems with the Reporter's Privilege, 57 Am. U. L. Rev. 1341, 1359 (2008) (contending that "of all of the risks of exposure that a source faces, the danger that a reporter will be subpoenaed and compelled to testify is probably the most remote"). At a minimum, any marginal chilling effect has certainly not frozen the information pipeline. Instances of journalism built on confidential sources remain legion. See Reps. Comm. Br. at 12–13 (offering a "small sampling" of examples). The current dispute is a case in point. The Court's interpretation of Zerilli and Lee was the prevailing law in this district at the time of the alleged leak. But Herridge's source was still apparently undeterred by the prospect that, at some point in the future, a court might order Herridge to name her source. Projecting forward, then, it is far from clear that the Court's decision will unnecessarily clog the free flow of information.

*Finally*, beyond these three considerations Herridge raised, the Reporters Committee also notes that the Department of Justice recently amended its internal policies to restrict its own use of compulsory processes to pierce the reporter's privilege. See Reps. Comm. Br. at 8–10 (citing 28 C.F.R. § 50.10). That amendment may well be a salutary development deserving of applause, but it does not alter how the Court should resolve the current dispute based on this Circuit's precedent. In fact, the Department of Justice's forbearance showcases that federal court enforcement of the First Amendment is not the final word when it comes to protecting confidential sources. There is a robust body of local, state, and federal laws promoting the freedom of speech and press in ways that extend beyond the First Amendment's safeguards. See Genevieve Lakier, The Non-First Amendment Law of Freedom of Speech, 134 Harv. L. Rev. 2299 (2021). One need look no further than the reporter's privilege. Almost every State has enacted some form of "shield law" protecting reporters from having to disclose their sources.

See Chen, 2023 WL 5289432, at *12. Congress could do the same with a few strokes of a pen, but it has not done so. See Branzburg v. Hayes, 408 U.S. 665, 706 (1972) ("At the federal level, Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate."). Absent congressional intervention or a shift in Circuit precedent, the Court's duty is to apply and enforce the law on the books.

* * *

In sum, after considering all the "additional information" Herridge has provided, the Court finds no compelling reason to modify its August 1, 2023 Order requiring her to answer questions concerning the identity and intent of the source or sources of the records allegedly given to her in violation of the Privacy Act, as well as any non-privileged other matters relevant to her Privacy Act claim. Herridge plainly violated that Order when she refused to divulge the identity of the suspected leaker during her deposition last September. That defiance warrants a finding of civil contempt, no matter how noble Herridge's justification for refusing to reveal her source. See Bilzerian, 112 F. Supp. 2d at 16 (noting a contemnor's intent is irrelevant). Herridge may disagree with the Court's decision, as is her right, and she may believe that the Circuit's reporter's privilege doctrine strikes the wrong balance by undervaluing the importance of confidentiality for a free press. Still, the fact remains that "[l]itigants may not defy court orders because their commands are not to the litigants' liking. If the rule of law is to be upheld, it is essential that the judiciary takes firm action to vindicate its authority and to compel compliance with lawfully issued directives." Am. Rivers v. Army Corps of Eng'rs, 274 F. Supp.

2d 62, 70 (D.D.C. 2003). A finding of civil contempt is therefore appropriate and necessary to uphold those principles here.

Yet contempt must be confined to the clear and unambiguous scope of the Court's order, see Int'l Painters, 736 F. Supp. 2d at 38, so it cannot extend as far as Chen advocates. To repeat, the August 1, 2023 Order required Herridge to divulge her source and answer questions about any non-privileged other matters relevant to Chen's Privacy Act claim. Chen complains that, in addition to not naming the leaker, Herridge also declined to answer questions on various other matters such as "the preparation of the Fox News stories, the timing of their publication, and why certain materials and information were included or omitted." Contempt Mot. at 9. But those matters at least arguably fall within the First Amendment reporter's privilege, which "shields both confidential and nonconfidential information from compelled disclosure," Hutira, 211 F. Supp. 2d at 120, and generally guards against compelled disclosure of information that would have "a chilling effect upon the newsgathering and editorial processes," Maughan v. NL Indus., 524 F. Supp. 93, 95 (D.D.C. 1981). Disclosing these other items would intrude upon, and possibly chill, Herridge's newsgathering and editorial processes. The Court's Order therefore did not clearly require Herridge to answer these questions, so she cannot be found in contempt for refusing to do so.

B. Contempt Sanction

The remaining question is: What is the appropriate sanction for Herridge's contempt? Civil-contempt sanctions may "be employed for either or both of two purposes; to coerce the [contemnor] into compliance with the court's order, and to compensate the complainant for losses sustained." United States v. United Mine Workers of Am., 330 U.S. 258, 303–04 (1947). In considering these twin purposes, courts have "wide discretion" and "broad equitable powers to

craft remedial sanctions." United States v. Two Gen. Elec. Aircraft Engines, 317 F. Supp. 3d 516, 522 (D.D.C. 2018) (quotation marks omitted). Exercising that discretion here, the Court will impose a fine of $800 per day until Herridge complies with the Court's Order but stay that fine for thirty days or until completion of proceedings on a timely appeal, whichever is later.

Herridge requests that the Court impose no more than a nominal sanction, such as $1 per day. See Opp'n at 29. But such a trivial sanction would not serve the fundamental purpose of civil contempt: ensuring compliance with a court order. It would permit Herridge to pay pittance in perpetuity while continuously violating the Court's directive and effectively vitiating Chen's right to pursue her Privacy Act claim. That cannot be correct. Judicial orders are not tollbooths that can be bypassed with spare change. Recognizing this reality, other courts in this district have imposed far stiffer penalties in similar contexts to ensure journalists comply with disclosure orders. In Hatfill II, for example, the court imposed a graduated fine of $500 for the first seven days following entry of the contempt order, which increased to $1,000 per day the following week, escalating to $5,000 per day thereafter. Hatfill v. Mukasey ("Hatfill II"), 539 F. Supp. 2d 96, 99 n.5 (D.D.C. 2008). Similarly, in Lee III, the court rejected the reporter's request for a nominal sanction as "insufficient to [ ] coerce compliance" and imposed a fine of $500 per day. Lee v. U.S. Dep't of Just. ("Lee III"), 327 F. Supp. 2d 26, 33 (D.D.C. 2004). The Court will adopt the low-end of this range (roughly adjusted for inflation) and impose a fine of $800 per day until Herridge complies with the August 1, 2023 Order.

The Court will stay that contempt sanction, however, to afford Herridge an opportunity to appeal this decision. Courts in this district and beyond have routinely stayed contempt sanctions to provide journalists ample room to litigate their assertions of privilege fully in the court of appeals before being coerced into compliance. See, e.g., Lee III, 327 F. Supp. 2d at 33; United

States v. Cutler, 6 F.3d 67, 70 (2d Cir. 1993); United States v. Cuthbertson, 630 F.2d 139, 143 (3d Cir. 1980). Indeed, when the district court denied a stay of contempt sanctions in Hatfill III, 539 F. Supp. 2d at 106, the D.C. Circuit stepped in and granted the stay request, see Hatfill v. Mukasey, No. 08-5049, Doc. No. 1104546 (D.C. Cir. March 11, 2008) (per curiam). Following suit, the Court will stay the contempt sanction against Herridge pending a timely appeal.

Apart from being the standard practice in this context, a stay pending appeal is justified here under the four-factor test for determining whether such a stay is warranted: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." Cuomo v. U.S. Nuclear Regul. Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam). First, given that prior reporter's privilege cases have divided the Circuit and attracted en banc activity, and that almost two decades have passed since the Circuit decided Lee, it is possible that the Circuit may take the opportunity to refine the applicable First Amendment test in Herridge's favor or recognize a new federal common law newsgathering privilege broader than the constitutional analog. See Citizens for Resp. & Ethics in Washington v. Off. of Admin., 565 F. Supp. 2d 23, 28 (D.D.C. 2008) (noting a "court is not required to find that ultimate success by the movant is a mathematical probability" (quotation marks omitted)). Second, absent a stay, Herridge would have to choose between disclosing her source's identity—a decision that "is, by its very nature, irreparable," Robert Half Int'l Inc. v. Billingham, 315 F. Supp. 3d 419, 433–34 (D.D.C. 2018)—or face possible financial hardship by racking up potentially hundreds of thousands of dollars in fines in the interim. Third, though the Court appreciates that an appeal will further delay resolution of Chen's Privacy Act claim, the time it will take to pursue an

appeal is somewhat marginal in comparison to the five years Chen has already spent to suss out the leaker's identity. Fourth, the Court recognizes there are competing public interests at stake—namely, the First Amendment interest in protecting confidential sources versus a substantial interest in ensuring compliance with court orders and enforcement of the Privacy Act. But given that the question now is only whether to defer contempt sanctions in the interim to ensure that Herridge can litigate her First Amendment claim to the hilt before revealing her source, the Court finds that the public interest also favors the stay request. See Certification Order at 3 ("[I]t is better to be safe than sorry when it comes to First Amendment rights.").

The Court concludes that these two elements—a $800 per day fine combined with a stay pending appeal—will adequately ensure compliance with the Court's Order while preserving Herridge's right to appeal that decision. See Lee III, 327 F. Supp. 2d at 33 ("[T]he journalists' argument that the fine should be nominal where constitutional issues will be presented on appeal can be addressed simply by staying the fine pending appeal."). At the present juncture, the Court does not deem it necessary to award Chen any compensatory sanctions for costs and fees related to Herridge's deposition or the ensuing contempt proceeding. Chen argued all along (and the Court and the Circuit agreed) that refusing to comply with the Court's Order and being found in contempt was the ordinary and proper route for obtaining appellate review here. That Herridge ultimately chose to pursue this avenue to appellate review does not necessarily warrant compensation for Chen. The Court also opts, for now, not to follow the approach adopted in Hatfill II and forbid Herridge from accepting funding from any other persons or entity to pay her contempt sanction. See 539 F. Supp. 2d at 107. The Court may reconsider these matters down the line depending on how things play out after any appellate proceedings.

## IV. Conclusion

For these reasons, it is hereby

**ORDERED** that Herridge is in civil contempt of the August 1, 2023 Order of this Court; it is further

**ORDERED** that Herridge is fined in the sum of $800.00 per day, payable to the United States, until she complies therewith; it is further

**ORDERED** that the aforementioned fine will be stayed for a period of thirty days, or until completion of proceedings on a timely appeal, whichever is later; it is further

**ORDERED** that Chen's application for a compensatory award of sanctions is denied without prejudice.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: February 29, 2024

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YANPING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | **Case No. 1:18-cv-03074-CRC**<br><br>**Hon. Christopher R. Cooper**<br>**United States District Judge** |

**NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT**

Non-Party witness Catherine V. Herridge hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from the Order of the United States District Court for the District of Columbia entered on February 29, 2024 (ECF No. 193), adjudging her in civil contempt, and from the Order of August 1, 2023 (ECF No. 140) (redacted version filed on August 17, 2023, ECF No. 148), denying in part her motion to quash and compelling her to give deposition testimony identifying her confidential source(s) in this matter, and from all orders antecedent to such orders and thus incorporated therein.

Respectfully submitted.

/s/ *Patrick F. Philbin*
Patrick F. Philbin (D.C. Bar No. 453620)
Kyle West (D.C. Bar No. 24093346)
Chase Harrington (D.C. Bar No. 1619501)
TORRIDON LAW PLLC
1155 F Street, NW Suite 750
Washington, DC 20004
(202) 249-6633
pphilbin@egcfirm.com

March 8, 2024

*Attorneys for Catherine Herridge*