No. 24-5050

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

YANPING CHEN,
*Plaintiff-Appellee,*

*v.*

FEDERAL BUREAU OF INVESTIGATION, et al.,
*Defendants-Appellees,*

CATHERINE HERRIDGE,
*Appellant.*

On Appeal from the United States District Court for the District of Columbia,
No. 1:18-cv-03074-CRC

## BRIEF FOR PLAINTIFF-APPELLEE DR. YANPING CHEN

Andrew C. Phillips (Bar No. 64792)
MEIER WATKINS PHILLIPS PUSCH LLP
919 18th St NW, Suite 650
Washington, DC 20006
Email: andy.phillips@mwpp.com

July 22, 2024                    *Counsel for Plaintiff-Appellee Yanping Chen*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Appellee, Yanping Chen, certifies as follows:

### A. Parties

All parties, intervenors, and amici appearing before the district court are listed in the Brief of Appellant Catherine V. Herridge.

### B. Rulings Under Review

The rulings under review are: (1) the Memorandum Opinion and Order of the District Court for the District of Columbia entered on August 1, 2023 [Dkt. 140] denying Appellant Catherine V. Herridge's motion to quash a subpoena and compelling her to give deposition testimony identifying her confidential source(s); (2) the Memorandum Opinion and Order of the District Court for the District of Columbia entered on February 29, 2024, holding Appellant Catherine V. Herridge in civil contempt [Dkt. 193], and; (3) all other orders antecedent to such orders and thus incorporated therein.

### C. Related Cases

This case was previously before this Court in *Chen v. FBI*, No. 23-5198 (2023), which the Court dismissed for lack of appellate jurisdiction. Undersigned counsel is unaware of any related cases pending in this Court or any other court.

i

# **TABLE OF CONTENTS**

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**........i

**TABLE OF AUTHORITIES**.....................................................................iv

**GLOSSARY** ............................................................................................iv

**INTRODUCTION** ...................................................................................1

**STATEMENT OF THE ISSUES** ............................................................5

**STATEMENT OF THE CASE** ...............................................................5

   A.  U.S. Citizen Yanping Chen is an Accomplished Scientist and Educator. ......5

   B.  After the Government Investigates Chen but Charges Her with No Crime, a Federal Official Leaks Her Protected Private Information and Documents to Herridge. ....................................................................................6

   C.  Chen Exhausts Reasonable Efforts to Uncover the Leaker's Identity Before Seeking it from Herridge. .........................................................9

   D.  The District Court Rules that Herridge's Qualified Privilege is Overcome, and She Must Divulge Her Source........................................10

   E.  Herridge Defies the District Court's Order and is Held in Contempt..........12

**SUMMARY OF ARGUMENT** ...............................................................14

**ARGUMENT** .........................................................................................17

**I.   THE DISTRICT COURT CORRECTLY APPLIED CIRCUIT PRECEDENT WHEN IT HELD HERRIDGE MUST DISCLOSE THE IDENTITY OF THE GOVERNMENT OFFICIAL THAT VIOLATED CHEN'S RIGHTS.** ..............................................................................17

   A.  *Zerilli* and *Lee* Do Not Call for a Free-Form, Subjective Balancing of Interests. ...............................................................................18

   B.  The District Court's Application of *Lee* and *Zerilli* Was Consistent with Other District Courts in this Circuit.....................................22

C.   The District Court Properly Rejected Herridge's Superficial Critiques of the Merits of Chen's Case.............................................................................29

**II.   HERRIDGE'S PROPOSED FREE-FORM BALANCING TEST IS UNWORKABLE AND WOULD PUT DISTRICT COURTS IN AN IMPOSSIBLE POSITION. ...........................................................35**

A.   Herridge's Contention that District Courts Should Subjectively Decide Who is Worthy of the Protection of the Law is Insidious. ...........................................36

B.   Herridge Has No Standing to Demand a Mid-Discovery "Partial Summary Judgment" on Chen's Claims, Nor Does She Identify Any Fatal Flaw in Chen's Claims in Any Event..............................................................................39

C.   Herridge Ignores the Powerful Public Interest in Holding Accountable Government Officials Who Abuse Citizens' Civil Rights................................42

**III. THE COURT SHOULD REJECT HERRIDGE'S INVITATION TO CREATE A COMMON-LAW PRIVILEGE THAT WOULD GUT CONGRESS' WILL IN ENACTING THE PRIVACY ACT. ...........................46**

**CONCLUSION......................................................................................52**

**CERTIFICATE OF COMPLIANCE................................................53**

**CERTIFICATE OF SERVICE.........................................................54**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Cases*

*Agster v. Maricopa Cnty.*,
   422 F.3d 836 (9th Cir. 2005) ..............................................................48

*Aleyska Pipeline Serv. Co. v. Wilderness Soc'y*,
   421 U.S. 240 (1975).............................................................................32

*Atlanta Journal-Constitution v. Jewell*,
   555 S.E.2d 175 (Ga. App. 2001) ........................................................41

*Branzburg v. Hayes*,
   408 U.S. 665 (1972)..............................................................43, 47, 48

*Brunotte v. Johnson*,
   892 F. Supp. 2d 199 (D.D.C. 2012) ...................................................41

*Carey v. Hume*,
   492 F.2d 631 (D.C. Cir. 1974) ...............................................20, 26, 40

*Estate of Parsons v. Palestinian Auth.*,
   952 F. Supp. 2d 61 (D.D.C. 2013) .....................................................21

*Fleck v. Dep't of Veteran Affairs of Inspector Gen.*,
   596 F. Supp. 3d 24 (D.D.C. 2022) .....................................................41

*Hatfill v. Gonzalez*,
   505 F. Supp. 2d 33 (D.D.C. 2007) ......................24, 28, 33, 38, 42, 44, 50, 51, 52

*In re Grand Jury Subpoenas*,
   438 F. Supp. 2d 1111 (N.D. Cal. 2006) ..............................................47

*In re Grant*,
   635 F.3d 1227 (D.C. Cir. 2011) .........................................................22

*In re Miller*,
   438 F.3d 1141 (D.C. Cir. 2006) ...........................................48, 49, 50

*In re Special Proceedings*,
    373 F.3d 37 (1st Cir. 2004) ..................................................................47

*In re Subpoena Issued to CFTC*,
    370 F. Supp. 2d 201 (D.D.C. 2005) ....................................................48

*Irons v. Diamond*,
    670 F.2d 265 (D.C. Cir. 1981) ...........................................................22

*Jaffee v. Redmond*,
    518 U.S. 1 (1996) ................................................................................50

*Khairkhwa v. Obama*,
    703 F.3d 1227 (D.C. Cir. 2012) .........................................................22

*LaShawn A. v. Barry*,
    87 F.3d 1389 (D.C. Cir. 1996) (*en banc*) .....................................22, 29

*Lee v. Dep't of Justice*,
    401 F. Supp. 2d 123 (D.D.C. 2005) ("*Lee II*") ..........23, 28, 33, 38, 39, 42, 44, 49

*Lee v. Dep't of Justice*,
    413 F.3d 53 (D.C. Cir. 2005) ........2, 3, 4, 5, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 33, 35, 38, 39, 42, 43, 44, 45, 46, 50, 51

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*,
    5 F.3d 1508 (D.C. Cir. 1993) .............................................................46

*O'Grady v. Superior Court*,
    44 Cal. Rptr. 3d 72 (Cal. Ct. App. 2006) ...........................................41

*Pennsylvania v. EEOC*,
    493 U.S. 182 (1990) ............................................................................48

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ............................................................................37

*State ex rel. Classic III, Inc. v. Ely*,
    954 S.W.2d 650 (Mo. App. 1997) ......................................................41

*United States v. Nixon*,
    418 U.S. 683 (1974) ............................................................................46

*United States v. Sterling*,
724 F.3d 482 (4th Cir. 2013) ................................................................47

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) ........................2, 3, 4, 5, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 33, 35, 36, 38, 40, 42, 43, 44, 45, 46, 49, 50

### Statutes

28 U.S.C. §552a ..........................................................................1, 9, 31, 40

5 U.S.C. §552a ....................................................................................43

### Rules

Fed. R. Civ. P. 56 ..................................................................................40

# <u>GLOSSARY</u>

| **Abbreviation** | **Meaning** |
|---|---|
| Br. ………………… | Brief of Appellant Catherine V. Herridge (June 20, 2024) |
| Cruz Br. …………..… | Brief of Amicus Curiae Senator Tom Cruz in Support of Interested-Appellant (June 27, 2024) |
| DoD ……………..… | Department of Defense |
| DoJ ………………… | Department of Justice |
| DHS ……………… | Department of Homeland Security |
| GWU ……………… | George Washington University |
| RCFP Br. …………... | The Reporters' Committee for Freedom of the Press and 25 Media Organizations of the Press Amici Curiae in Support of the Appellant (June 27, 2024) |
| UMT ……………… | University of Management and Technology |

## INTRODUCTION

Appellee Dr. Yanping Chen, a U.S. citizen, brought the underlying action to seek accountability for an egregious violation of her rights under the Privacy Act, 28 U.S.C. §552a. After she was subjected to a grueling, years-long FBI investigation over alleged misstatements on immigration forms—after which she was never charged with, let alone convicted of, any wrongdoing—an unknown government official leaked protected records from that investigation to Appellant Catherine Herridge, a reporter then working for Fox News. While the leaker's motivations cannot be definitively determined because their identity remains shielded by Herridge, Herridge's source was likely a federal law enforcement official unhappy with the decision not to prosecute Chen, and who decided to abuse their access to records to leak materials in order to smear Chen in the court of public opinion. That effort succeeded when Herridge published a series of Fox stories aggressively and falsely insinuating that Chen—an accomplished educator and grandmother who has lived in the U.S. for nearly four decades—is a Chinese spy.

After years of exhaustive discovery of the government Defendants and numerous third parties failed to definitively uncover the leaker's identity, Chen sought to obtain it through discovery of Herridge. Following extensive briefing on a motion to quash Chen's deposition subpoena, the District Court (Cooper, J.) held that Chen had satisfied her burden to overcome Herridge's claim of a qualified

privilege.  After the District Court ordered Herridge to testify about the identity of her source and Herridge defied that order, the District Court held Herridge in contempt and issued a second, detailed decision that again rejected Herridge's arguments for concealing the identity of the lawbreaking government official.

The District Court's orders requiring Herridge to testify about her source's identity and holding her in contempt for refusing to do so are well-reasoned and represent straightforward application of established Circuit precedent.  They should be affirmed, and the arguments Herridge raises on appeal rejected, for the following reasons.

First, the District Court correctly held that Circuit precedent dictates that, in a Privacy Act case where a non-party reporter asserts a qualified privilege against disclosing a source's identity, assessment of that privilege claim should focus on the factors identified in *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) and *Lee v. Department of Justice*, 413 F.3d 53 (D.C. Cir. 2005) .  The "precise guidelines" identified in *Zerilli*—whether the information sought is central to the plaintiff's claim, and whether the plaintiff has exhausted reasonable alternative avenues of discovery before seeking the source's identity from the journalist, 656 F.2d at 712-13—are the "two guidelines determining when a court can compel a non-party journalist to testify about a confidential source."  *Lee*, 413 F.3d at 60.  The District Court correctly rejected as inconsistent with Circuit precedent Herridge's

2

argument that it should also engage in a free-wheeling, expansive "balancing of interests" that would pit Herridge's interest in protecting her source against Chen's perceived interest in seeking a remedy for the violation of her rights. The District Court's conclusion that the *Lee* and *Zerilli* factors govern, that Chen had satisfied them, and that an amorphous, free-form "balancing of interests" is not permitted was a straightforward application of Circuit precedent, and it was in keeping with how other district courts in this Circuit have interpreted and applied it. Herridge's argument that the applicable privilege test should also allow for an expansive balancing of interests is, in reality, a call for this Court to **overrule** *Lee* and *Zerilli*. Herridge's argument for overhauling the long-existing status quo must await potential *en banc* consideration.

Second, even if the panel decisions in *Lee* and *Zerilli* could be overruled absent an *en banc* decision (they cannot be), Herridge's call to glom an additional "balancing of interests" factor onto the assessment of a qualified privilege claim should be rejected. As numerous judges in this Circuit confronted with the same argument have observed, such an approach would be inherently problematic, unworkable, and downright troubling. Herridge's arguments here just underscore the point. In addition to lobbing superficial critiques at Chen's case-in-chief— critiques that she lacks standing to raise—Herridge repeatedly suggests that the District Court should have placed little weight on Chen's interest in pursuing her

claims based on wild accusations about her character. The District Court held that even if it were permitted to engage in that type of analysis, it would still reject Herridge's arguments and order disclosure. The Privacy Act is designed to deter and punish wrongdoing by federal officials. Fundamentally, neither Chen's nor any Privacy Act plaintiff's right to obtain a remedy for a violation of their rights should hinge on a district court's subjective perception of a plaintiff's character or motives. The notion that district court judges should be empowered to apply the law unequally based on subjective impressions of the relative value or worth of the plaintiff's cause is insidious and offensive, and it should be rejected.

Finally, the Court should reject Herridge's invitation to create a new common-law privilege that would permit the free-wheeling balancing that *Lee* and *Zerilli* already considered and rejected. No federal court has ever recognized such a privilege, and to do so would usurp Congress's role and frustrate its intent that the Privacy Act deter government officials from abusing their positions to harm private citizens. Moreover, whether categorized as part of a First Amendment privilege or a newfound common law privilege, the unmoored "balancing of interests" for which Herridge advocates would be impractical, problematic, and impossible for district court judges to implement in any fashion consistent with their obligation to apply the law evenhandedly.

The District Court's orders denying Herridge's motion to quash and holding her in contempt should be affirmed.

## STATEMENT OF THE ISSUES

1.      Whether the District Court correctly held that *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981), and *Lee v. Department of Justice*, 413 F.3d 53 (D.C. Cir. 2005) direct district courts to assess a non-party reporter's qualified privilege claim in a Privacy Act case by focusing on the centrality of the information sought and whether the plaintiff has exhausted reasonable alternative avenues before seeking the information from the reporter.

2.      Whether the District Court correctly held that a freewheeling "balancing of interests" that attempts to subjectively weigh the reporter's interest in protecting her source against the plaintiff's interest in a remedy is not a required component of the test for assessing a qualified privilege claim in a Privacy Act case.

3.      Whether this Court should recognize a federal common-law reporter's privilege that has never been adopted by any federal court.

## STATEMENT OF THE CASE

### A.      U.S. Citizen Yanping Chen is an Accomplished Scientist and Educator.

Chen is an accomplished scientist, entrepreneur, and educator. Before moving to the U.S. in 1987, she earned a medical degree as a cardiologist and worked as a Medical Researcher and the Director of Planning for the Chinese astronaut program.

5

(JA003 ¶ 11].)  She came to the U.S. as a visiting scholar at GWU, earning a master's and PhD in Public Policy.  (*Id*.)  She met her late husband, an academic and U.S. citizen, while at GWU and decided to make the U.S. her home.  (*Id.* ¶ 12].)  Chen became a permanent resident in 1993 and a U.S. citizen in 2001.  (*Id*.)

In 1998, Chen founded UMT, an accredited university that provides post-secondary and graduate education to working adults.  (JA004 ¶ 13.)  Given UMT's location in Arlington, Virginia, many of its students worked for the U.S. Government, and—like thousands of other educational institutions—UMT participated in the DoD's Tuition Assistance program, which provides funding to military students to further their secondary education.  UMT excelled under Chen's leadership, with more than 12,000 students receiving degrees as of December 2018, (*id*.), and thousands more since.  Chen wholly owns UMT and derives a substantial portion of her income from its operations.  (*Id.* ¶ 14.)

### B.    After the Government Investigates Chen but Charges Her with No Crime, a Federal Official Leaks Her Protected Private Information and Documents to Herridge.

No later than 2010, Chen became the target of an FBI investigation focused on statements she made on immigration documents relating to her work in the 1980s as a scientist for the Chinese astronaut program.  (*Id.* ¶ 15.)  As part of that investigation, the FBI spent seven years probing Chen's personal and professional lives.  (*Id.* ¶ 16.)  Government agents interrogated her family, obtained her

immigration records, monitored her travel, employed an undercover informant, and secretly recorded her conversations. (*Id.*) On December 5, 2012, the FBI executed search warrants for Chen's home and UMT's office. (*Id.* ¶ 18.) During the searches, the FBI seized dozens of boxes of material, including tax and business records, communications, personal memorabilia, and years of personal family photographs. (JA005 ¶ 20.) After years of investigation, in 2016, the U.S. Attorney's Office for the Eastern District of Virginia informed Chen that no charges would be filed against her, and she was never charged with, let alone convicted of, any crime. (*Id.* ¶ 22.)

On February 24, 2017, Fox News aired on its cable channel the first of several broadcast reports about Chen. (JA006 ¶ 25.)[1] Fox subsequently published a digital version of that February 24, 2017 report on its website.[2] These would be followed by broadcast and website stories published on April 28, 2017,[3] and June 28, 2017.[4]

---

[1] *Taxpayer-funded school suspected of Chinese military ties*, Fox News (Feb. 24, 2017), https://www.youtube.com/watch?v=jh2Xk42PVA8.

[2] C. Herridge, et al., *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, Fox News (Feb. 24, 2017), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties.

[3] C. Herridge, et al., *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, Fox News (May 1, 2017), https://www.foxnews.com/politics/congress-investigating-taxpayer-backed-school-over-alleged-ties-to-chinese-military-after-fox-news-report.

[4] C. Herridge, et al., *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says*, Fox News (June 28, 2017), https://www.foxnews.com/politics/fbi-reopening-probe-of-dod-funded-school-with-suspected-chinese-military-ties-rep-says.

These stories, primarily authored and reported by Herridge, strung together selective portions of leaked materials and information about Chen and coupled them with misleading insinuations about Chen's background to accuse her of spying for China. The Fox reports displayed, among other things:

- Information derived from, and images of, an FBI FD-302 Form memorializing an FBI interview of Chen's daughter;

- Information taken from, and images of, Chen's immigration and naturalization forms;

- Information taken from, and images of, Chen's certificate of U.S. citizenship;

- Numerous personal photographs of Chen, including a photograph depicting her and her husband, a photograph of Chen's family members, and a photograph of Chen visiting her father's gravesite;

- An excerpt of an interrogation of Chen's daughter indicating that the case was a "200d," which Fox News described as a "counter-intelligence case" and "one of the most highly sensitive categories for a federal probe."

(JA006-08 ¶¶ 26–31.)  These materials came from the FBI's investigation of Chen, including materials seized from Chen's home during the 2012 FBI search.  (*Id.* ¶ 26–34.)  In addition to the records displayed onscreen, the Fox reports also disclosed an array of other confidential information from the FBI case file, including:

- The identities of the law enforcement agencies investigating Chen;

- That the investigation began in at least 2012—and perhaps as early as 2009;

- The year Chen first entered the U.S.;

- The type of visa under which Chen first visited the U.S.;

- The identity of a child who accompanied Chen when she entered the country;

- The name of an Assistant U.S. Attorney assigned to investigate Chen; and
- Details of a disagreement between the FBI and prosecutors about whether to prosecute Chen.

After unsuccessfully petitioning federal Inspectors General to investigate the leak, Chen filed this action under the Privacy Act, 28 U.S.C. §552a, against Defendants the FBI, DoD, DoJ, and DHS, seeking accountability for the unlawful leak of her protected records to Herridge.

### C.    Chen Exhausts Reasonable Efforts to Uncover the Leaker's Identity Before Seeking it from Herridge.

On January 27, 2020, Chen defeated the Defendant agencies' motion to dismiss. (JA015-27.)  For two-plus years, Chen engaged in exhaustive discovery of Defendants and third parties, mostly focused on seeking to identify the source(s) of FBI documents and information leaked to Herridge in violation of the Privacy Act. She served scores of written discovery requests, issued over a dozen third-party subpoenas, took eighteen depositions, and obtained twenty-two declarations of federal employees.  (JA515.)

When those efforts failed to definitively identify the leaker(s), Chen served Fox and Herridge with document and deposition subpoenas in May and June of 2022.  (*Id*.)  Both moved to quash, (JA054-110; JA192-212), arguing Chen had not overcome the journalists' qualified privilege to withhold the identity of the leaker because (1) the subpoenas sought information not central to Chen's Privacy Act

9

claims; (2) Chen had not exhausted reasonable alternative means to discover the identity of the leaker; (3) the District Court should engage in a wide-ranging balancing of Herridge's interest in maintaining her source(s)' confidentiality against Chen's personal interest in prosecuting her claims; and (4) alternatively, the District Court should create a federal common law reporter's privilege that allowed it to engage in expansive balancing. (JA516.)  In response, Chen argued that (1) the qualified privilege was overcome because she sought only information central to her claims and had exhausted reasonable alternative means to identify the leaker; (2) under Circuit precedent, the District Court's analysis must focus on centrality and exhaustion, and not an amorphous, subjective balancing of interests; and (3) there is no federal common law reporter's privilege allowing for an end-run around established precedent regarding the scope of the qualified privilege. (*See generally* JA406-480.)

### D.    The District Court Rules that Herridge's Qualified Privilege is Overcome, and She Must Divulge Her Source.

On August 1, 2023, the District Court issued its Order Denying Herridge's Motion to Quash.  It held that, in Privacy Act cases, binding precedent instructed district courts to focus their analysis on whether the information sought is central to the plaintiff's claims, whether the plaintiff has exhausted reasonable alternative avenues of discovery, and whether the journalist is a party to the underlying litigation. (JA517-26.)  The District Court rejected Herridge and Fox's arguments

10

that it should engage in a "free-form balancing of interests" as inconsistent with Circuit precedent. (JA522-23.) It also concluded that, with respect to the deposition subpoena to Herridge, Chen had demonstrated that the leaker's identity was central to her claims, and she had exhausted alternative avenues to obtain it. (JA526-33.)

The District Court then held that although Circuit precedent did not require "either a full-bore analysis of [Plaintiff's] likelihood of success on the merits … or an assessment of the public and private interests at play," it would nevertheless, "explain[] why Herridge and Fox's arguments along those lines likely would not change the outcome here in any event." (JA534.) The District Court evaluated and weighed the interests Fox and Herridge asserted against their claimed infirmities in Chen's case, and their assertion that Chen's claims involved only her private and personal interests. (JA534-36.) The District Court concluded the arguments regarding supposed flaws in Chen's case were misguided or premature and that Chen's case did not advance a purely private interest because it also implicated Congress's intent, in enacting the Privacy Act, to deter unlawful leaking of private records by government officials. (*Id*.) Finally, the District Court rejected the invitation to recognize a federal common-law reporter's privilege that would allow district courts to engage in the same free-form balancing test not encompassed by this Circuit's prior decisions on the scope of a reporter's privilege in a Privacy Act case. (JA537-39.)

Ultimately, the District Court determined that Chen was entitled to depose Herridge about the identity of her source(s) for any Privacy Act-protected information.  (JA540.)  It granted Fox's motion to quash, without prejudice to Chen renewing her subpoenas to Fox if Chen did not obtain that information from Herridge.  (*Id*.)

### E.    Herridge Defies the District Court's Order and is Held in Contempt.

In September 2023, Chen's counsel deposed Herridge, and Herridge defied the District Court by refusing to identify the source that leaked Chen's protected records to her.  (JA558.)  After Chen moved for an order finding Herridge in contempt, the District Court entered an Opinion and Order on February 29, 2024 so holding.  (JA319.)  The District Court found "no genuine dispute that Herridge is in contempt of the Court's August 1, 2023 Order partially denying her motion to quash Chen's deposition subpoena," noted that order "clearly and unambiguously required Herridge to answer questions" about the source or sources of the documents leaked to Herridge in violation of the Privacy Act, and concluded, "Herridge willfully disobeyed the Order by refusing to answer questions about the identity of the sources who supplied the allegedly leaked materials."  (JA328-29.)

The District Court rejected Herridge's arguments as retreads of the arguments already rejected in the Order Denying the Motion to Quash.  (JA329.)  It reiterated that established Circuit precedent instructs that, in a Privacy Act case, the question

of whether the plaintiff can discover the identity of the leaker from a non-party journalist is guided by the two "precise guidelines" and "central factors" of centrality and exhaustion. (*Id.*) It again held that both factors favored Chen and rejected Herridge's argument for an "open-ended weighing of all possible interests" that would require it to "adjudicate who is worthy of the law's protection." (JA329-33.) It further held that "a free-wheeling balancing of interests would not change the outcome in any event" and rejected as unpersuasive Herridge's arguments that Chen's damages are minimal, that disclosure of Herridge's source raised national security concerns, and that a contempt finding would have a chilling effect on the press. (JA330-37.)

Concluding that Herridge gave "no compelling reason to modify [the order] requiring her to answer questions concerning the identity and intent of the source or sources of the records allegedly given to her in violation of the Privacy Act" and that "Herridge plainly violated that Order when she refused to divulge the identity of the suspected leaker during her deposition," the District Court concluded that Herridge's "defiance" warranted civil contempt. (JA337.) It imposed a sanction of $800 a day but stayed the sanction pending a timely appeal. (JA342.) Herridge noticed her appeal on March 8, 2024. (JA343.)

## SUMMARY OF ARGUMENT

1.    The District Court correctly held that, in a Privacy Act case where a non-party reporter claims a qualified privilege against disclosing the identity of the source who violated the plaintiff's rights, assessment of that privilege claim should focus on the factors identified in *Lee* and *Zerilli*.  The "precise guidelines" identified in *Zerilli*—whether the information sought is central to the plaintiff's claim, and whether the plaintiff has exhausted reasonable alternative avenues of discovery before seeking the source's identity from the journalist, 656 F.2d at 712-13—are the "two guidelines determining when a court can compel a non-party journalist to testify about a confidential source." *Lee*, 413 F.3d at 60.  Applying these guidelines, the District Court correctly held that Herridge's source's identity is central to Chen's Privacy Act claim and that Chen exhausted alternative avenues of obtaining it.[5]  The District Court was thus correct to order Herridge to identify her source, and to hold her in contempt for defying that order.

Herridge's argument that the District Court should have engaged in a free-wheeling "balancing of interests" that weighs Herridge's interest in protecting her source against Chen's interest in obtaining redress for the violation of her rights—and, as conceived by Herridge, can involve consideration of boundless factors like

---

[5] Herridge does not challenge on appeal the District Court's findings on centrality and exhaustion.

14

whether the reporting invokes "national security," the amount of damages the plaintiff could potentially recover, whether the plaintiff has ever been accused of misconduct or unlawful activity, and the perceived "importance or value" of the plaintiff's claim—cannot be squared with the plain language of *Lee* and *Zerilli*. In contrast, the District Court's conclusion that *Lee* and *Zerilli* do not condone such an unmoored approach was entirely consistent with how other district courts in this Circuit have interpreted them. What Herridge really seeks is an overruling of *Lee* and *Zerilli*. Because those decisions are binding precedent, any overruling is not for this panel.

2.    Herridge also glosses over the fact that the District Court—in both the August 1, 2023 and the February 29, 2024 Memorandum Opinion and Orders—addressed Herridge's "balancing of interests" arguments "for the sake of completeness." *See* JA513-540 ("Order Denying the Motion to Quash"); JA319-342 ("Contempt Order"). Twice, it rejected Herridge's superficial critiques of Chen's case-in-chief, and it concluded that even if it was required to engage in the expansive balancing Herridge advocated for, that analysis "would not change the outcome in any event." (JA534; JA330.) Thus, even if this Court accepts Herridge's arguments that *Lee* and *Zerilli* call for a broad balancing of the litigants' perceived interests, it should affirm on the basis that the District Court correctly held that such an approach favors Chen.

3.     As multiple judges in this Circuit confronted with the same argument have concluded, Herridge's free-form balancing would be impractical and unworkable.  It would put judges in the impossible position of making highly subjective policy judgments about the relative value of a given plaintiff's claim, rather than applying the law evenhandedly to all litigants.  It would require district courts to engage in some kind of summary-judgment-lite procedure concerning the merits of a plaintiff's claim—at the request of a non-party, amid fact discovery, and before the defendants have moved for summary judgment.  And, as proposed by Herridge, the weighing of "interests" would ignore Congress's intent, in passing the Privacy Act, to discourage government officials from abusing their access to records to violate citizens' rights.

4.     The District Court also correctly rejected Herridge's request that it recognize a new common law reporter's privilege that would allow for the expansive balancing approach.  To recognize such a privilege—which no federal court has— would amount to an end-run around *Lee* and *Zerilli* and would frustrate the Privacy Act's fundamental purpose.  And, whether nestled under the rubric of a First Amendment privilege or a common law privilege, the free-wheeling balancing approach would remain unworkable and impossible to implement.

# **ARGUMENT**

## I.    The District Court Correctly Applied Circuit Precedent When It Held Herridge Must Disclose the Identity of the Government Official that Violated Chen's Rights.

The District Court correctly held that, in a Privacy Act case, whether a non-party reporter may conceal the identity of the source that unlawfully leaked protected information depends on whether the source's identity is central to the plaintiff's case and whether the plaintiff first exhausted reasonable alternative avenues of obtaining the leaker's identity before seeking it from the reporter.  (JA523-25.)  This Court so held more than forty years ago in *Zerilli*, when it announced these are the "precise guidelines" to be applied in such situations.[6]  656 F.2d at 712-713.  It then affirmed that holding in *Lee*, reiterating that centrality and exhaustion are the "two guidelines determining when a court can compel a non-party journalist to testify about a confidential source."  413 F.3d 53 at 60.  Herridge's argument that the District Court erred by not engaging in a free-form, subjective weighing of Herridge's interests against Chen's cannot be squared with the plain language of *Lee* and *Zerilli*, or with the multiple district court decisions that have interpreted both just as the District Court did here.  Thus, what Herridge truly seeks is an ***overruling*** of the panel

---

[6] *Zerilli* also identified as a factor whether the reporter is a party to the case.  Herridge agrees this factor is not relevant here as she is not a party.  (Br. for Appellant at 23 n.6.)

decisions in *Lee* and *Zerilli*, which this Court cannot do without *en banc* consideration.

Moreover, Herridge largely ignores the fact that the District Court—while rejecting the notion that *Lee* and *Zerilli* allow for the expansive "balancing of interests" she urges—**did** consider and address Herridge's arguments on that score "for the sake of completeness" in the Order Denying the Motion to Quash, and again when Herridge raised them in the context of the Contempt Order. (JA534-36; JA323-25, JA329-37.) The District Court concluded that even if it engaged in a "freewheeling balancing of interests," Herridge's arguments about Chen and her case "would not change the outcome in any event." (JA330.) Thus, even if the Court agrees with Herridge that district courts can and should engage in a subjective pitting of the plaintiff's interests against the reporter's (it should not), the District Court already concluded (correctly) that such balancing would favor Chen—and its orders can be affirmed on that basis.

## A.    *Zerilli* and *Lee* Do Not Call for a Free-Form, Subjective Balancing of Interests.

First, Herridge's insistence that *Zerilli* calls for "a broad balancing analysis," (Br. at 22), cannot be squared with the plain language of that opinion or that of the subsequent *Lee* decision.

It is true that the *Zerilli* opinion referred to a general desire to balance between "the public['s] interest in protecting a newspaper's confidential source" and the

interest in compelling their disclosure in a Privacy Act case. *Zerilli*, 656 F.2d at 712. But in repeatedly relying on that general statement, Herridge ignores that *Zerilli* then proceeded to give district courts specific instructions as to the factors that should be utilized "to determine how the balance should be struck in a particular case." *Id.* at 713. *Zerilli* identified centrality and exhaustion as the two "precise guidelines" that district courts should apply, and then held that while those appellants had demonstrated that the reporter's source's identity was central to their case, they had not demonstrated that they had exhausted reasonable alternative avenues to obtain it. *Id.* at 712-715. Nowhere did the Court endorse a subjective and untethered balancing inquiry, suggest that district courts should consider the plaintiffs' (there, convicted members of the Mafia) value as litigants, or indicate that judges should conduct a deep dive on the merits of a plaintiff's claims.[7] Instead, the Court announced a limited test and applied it.

*Zerilli* was unambiguous. It did not open the door for district courts to ignore the "precise guidelines" it identified in favor of an anything-goes, free-form assessment of litigants' perceived interests. (*See* Br. at 29.) But even if there could have been doubts about the proper interpretation of *Zerilli*, they were put to rest by this Court's 2005 *Lee* decision. In that case, a Privacy Act plaintiff sought an order

---

[7] The Court's commentary on the appellant's claims was limited to observing they were "not frivolous." *Zerilli*, 656 F.2d at 714.

of contempt after several journalists defied the district court's order to reveal their sources. *Lee*, 413 F.3d at 55. On appeal, the journalists argued they were entitled to the protection of a qualified First Amendment privilege. *Id*. at 57. Thus, this Court again had occasion to consider what a Privacy Act plaintiff must demonstrate to overcome a non-party journalist's claim of privilege against revealing the identity of a source that leaked protected information. *Id*.

In a straightforward reiteration of *Zerilli's* core holding, this Court confirmed that *Zerilli* set forth a two-factor test, and took pains to emphasize that the First Amendment privilege is qualified in a Privacy Act case—in no small part because the reporter's confidential source is a government official who broke the law:

> *Zerilli* provides for a non-party journalist's qualified privilege in a civil action such as this one, where testimony of journalists is sought because government officials have been accused of illegally providing the journalists with private information. *Zerilli* cites *Carey* for the two guidelines determining when a court can compel a non-party journalist to testify about a confidential source. First, the information sought must go to 'the heart of the matter.' Second, the litigant must exhaust 'every reasonable alternative source of information.' When applying this analysis, however, the court must keep in mind that this privilege is not absolute…. [T]he protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist, no matter how newsworthy the government official may feel the information is.

*Lee*, 413 F.3d at 59-60 (citing references omitted). This Court then "appl[ied] the factors laid out in *Zerilli*," holding the source's identity was central to the plaintiff's

20

case and that the plaintiff had exhausted reasonable alternative avenues. *Id*. at 60-61.

Herridge largely ignores *Lee*, failing to engage in any substantive discussion of it until twenty-seven pages into her brief. Even then, she limits her discussion of *Lee* to two sentences and completely fails to grapple with the language confirming that *Zerilli* announced a two-factor test. (*See* Br. at 27.) Stranger still, Herridge then pivots to discussing the fact that this Court denied rehearing *en banc* in the *Lee* case, which was sought by the non-party journalists because "the panel had failed to conduct" the "broader balancing of interests" Herridge advocates for here. (*Id*. at 27-28.) Herridge's argument that denial of rehearing *en banc* holds no precedential value is correct, but she misapprehends the upshot of her own argument. (*See* Br. at 28 (citing *Estate of Parsons v. Palestinian Auth.*, 952 F. Supp. 2d 61, 69 n.6 (D.D.C. 2013).) It means that the *Lee* panel's affirmance that *Zerilli* laid out a limited test focused on centrality and exhaustion is the law of this Circuit.

Herridge's argument for a broad "balancing of interests" inquiry is not an application of *Lee* and *Zerilli*; it is an attempt to get this Court to **overrule** the framework announced and applied in those precedents.[8] However, it is black-letter

---

[8] Herridge's own *amici* appear to recognize this reality. Senator Cruz acknowledges in his June 27, 2024 *Amicus Curiae* Brief that district courts who have interpreted *Zerilli* and *Lee* as dictating a test focused on centrality and exhaustion were "hewing to this Court's instructions, as most recently announced in *Lee*…," and then argues

*(cont'd)*

law that "one three-judge panel of this court may not overrule another three-judge panel." *Khairkhwa v. Obama*, 703 F.3d 1227, 550 (D.C. Cir. 2012).  Under this "law-of-the-circuit doctrine," the same issue presented in a later case in the same court must lead to the same result.  *See In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011).  Because *Lee* and *Zerilli* dictate the result here, Herridge's arguments for upending that precedent must be disregarded.  Instead, they are properly raised, if Herridge so desires, in a future request for *en banc* review after the District Court's orders are affirmed.  *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (*en banc*) (prior panel decision may only be overruled by formal *en banc* review, or the informal practice adopted in *Irons v. Diamond*, 670 F.2d 265, 268 n.11 (D.C. Cir. 1981)).

### B.    The District Court's Application of *Lee* and *Zerilli* Was Consistent with Other District Courts in this Circuit.

Since *Lee*, multiple district courts in this Circuit have applied *Lee* and *Zerilli* in Privacy Act cases where a journalist claimed a qualified privilege against revealing a source.  ***All*** agreed that the plain language of *Lee* and *Zerilli* mandates an analysis focused on centrality and exhaustion.   And all have rejected an

---

that this Court should allow district courts to engage in more expansive balancing. (Cruz Br. at 10.)  In its June 27, 2024 *Amicus Curiae* Brief, the Reporters' Committee for Freedom of the Press, while avoiding suggesting that *Zerilli* and *Lee* need to be overruled, insists that the analysis they dictate needs to be "properly calibrated" to allow for more expansive balancing.  (RCFP Br. at 7-8.)

interpretation permitting district courts to perform the sort of unmoored balancing test for which Herridge advocates.

For example, immediately following this Court's decision in *Lee*, Judge Collyer was tasked with applying that decision to determine whether the journalists in that case should be held in contempt for continuing to refuse to reveal the lawbreaker. *Lee v. DoJ*, 401 F. Supp. 2d 123, 130-32 (D.D.C. 2005) ("*Lee II*"). Judge Collyer observed that *Zerilli* "articulated a two-part test to determine whether a court may compel a reporter to disclose confidential sources," and that those factors are whether the information is of central importance to the plaintiff's case and whether the plaintiff has exhausted every reasonable alternative source for obtaining the information. *Id.* at 132. She held that "*Zerilli* and *Lee* set the standard in this Circuit for determining when a reporter's First Amendment privilege must yield to a plaintiff's need for information," and that this "standard" is the "two-part analysis" focused on centrality and exhaustion. *Id.* Judge Collyer also rejected the argument Herridge advances here, noting that "[t]he law in this Circuit requires no more" than consideration of centrality and exhaustion, and that the recent effort by the journalists in the *Lee* case to have the Circuit Court "reconsider its application of *Zerilli* in *Lee*," and to create a third prong allowing a district court to "balance the public benefits and private harms of forced disclosure," had failed when this Court declined to grant a rehearing *en banc*. *Id.* at 132 n.14.

23

Two years later, in *Hatfill v. Gonzalez*, 505 F. Supp. 2d 33, 40 (D.D.C. 2007), Judge Walton held that "*Lee* provides direct and unequivocal guidance and instruction for the [district] Court's assessment" of whether to compel a reporter to divulge a source in a Privacy Act case. Judge Walton matter-of-factly interpreted *Lee* as holding that "'[t]wo guidelines' [centrality and exhaustion] were established by *Zerilli* 'to determine when a plaintiff may compel a non-party journalist to testify to the identity of [] confidential sources.'" *Id.* at 36 (quoting *Lee*, 413 F.3d at 57). He rejected the request to "weigh the plaintiff's private interest in obtaining the information against the public's interest in newsgathering," concluding that doing so would "circumvent" the holding in *Lee*. *Id.* at 43, 47.

The District Court's rulings here are entirely in accord with Judges Collyer and Walton's plain language interpretations of *Lee* and *Zerilli*. The District Court devoted eight pages of its Order Denying the Motion to Quash to examining that precedent. (JA517-25.) It acknowledged that *Zerilli* sought to strike a balance between the interest in protecting reporters' sources and a Privacy Act litigant's interest, but correctly observed that "*Zerilli* [] channeled district courts' discretion by identifying the specific factors that weigh in the balance." (JA518.) It noted that *Zerilli* did not "end the analysis with that 'general' guidance," but "proceeded to identify a 'number of more precise guidelines' that 'can be applied to determine how the balance should be struck in a particular case.'" (JA519 (quoting *Zerilli*, 656 F.2d

24

at 712-713).)    It then reviewed the language in *Zerilli* mandating that "these guidelines" are whether the information sought is central to the case, whether the plaintiff has exhausted reasonable alternative avenues of obtaining the source before seeking it from the reporter, and whether the reporter is a party to the case. Ultimately, the District Court correctly concluded that "*Zerilli* thus prescribed a balancing test, but it did not give district courts free rein to populate that test with whatever factors they please." (JA520.)  Instead, the *Zerilli* opinion itself mandated the "precise guidelines" that district courts are to consider in conducting that analysis. (*Id*.)

Turning to *Lee*, the District Court held, "[t]hat courts must tailor the balancing test to those central factors identified in *Zerilli* is confirmed by the D.C. Circuit's subsequent application of the analysis in *Lee v. Department of Justice*, 413 F.3d 53 (D.C. Cir. 2005)." (JA521.)   It observed that, after acknowledging the (here, irrelevant) factor of whether the journalist is a party, the Court in *Lee* "proceeded to identify the two remaining 'guidelines [for] determining when a court can compel a non-party journalist to testify about a confidential source'—namely, whether the information sought goes to 'the heart of the matter' and whether the litigant has exhausted 'every reasonably alternative source of information.'" (*Id.* (quoting *Lee*, 413 F.3d at 59).)  The District Court correctly noted that *Lee* itself applied only those

"specific factors identified in *Zerilli*" in determining whether the journalists in that case were properly held in contempt for refusing to reveal their sources. (JA522.)

Finally, the District Court held that "*Zerilli*, particularly as interpreted and applied in *Lee*, does not contemplate the kind of free-form, anything-goes analysis that Herridge [] seek[s]." (JA518.) "Like *Zerilli*, then, *Lee* did not apply a free-form balancing of interests but rather struck the balance between private and public interests by reference to the specific factors identified in *Zerilli*—the centrality of the requested discovery and the exhaustion of reasonable alternatives." (JA522.) The District Court concluded by allowing that *Zerilli's* observation that the plaintiff's case was "not frivolous" could be "fairly read to contemplate some limited consideration of the merits of a Privacy Act plaintiff's underlying claim, at least insofar as requiring disclosure in a frivolous suit would serve 'no purpose.'" (JA522-23 (quoting *Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974).) But it concluded that "consideration of lawsuit's patent futility is a far cry from the full-blown preview of summary judgment briefing that Herridge [] seek[s] here," and further noted that *Carey*, one of the sources for *Zerilli's* two-factor test, had "itself cautioned against such an extensive interrogation of the merits at this stage of a case, observing there had 'been no motion by appellant for summary judgment,' and 'thus no showing of facts bearing upon the likelihood' of plaintiff's success on the merits…" (JA523 (quoting *Carey*, 492 F.2d at 637-38).) Finally, after concluding

26

that Chen satisfied her burdens as to centrality and exhaustion—a finding Herridge does not challenge on appeal—the District Court discussed Herridge's various attacks on the merits of Chen's Privacy Act claim and had little trouble concluding that Chen's suit is "not frivolous."  (JA534.)

When Herridge renewed her argument that *Zerilli* allows for a broad, unmoored balancing of interests in opposing a contempt order, the District Court was "equally unpersuaded" by Herridge's argument.  (JA330.)  Noting that Herridge could not "point to any new authority indicating that the Court misconstrued *Zerilli* and *Lee* when resolving that the balancing test should center on centrality and exhaustion—an understanding shared by numerous courts in this district," it reiterated that in *Lee*, this Court "doubled down" on *Zerilli's* identification of centrality and exhaustion as the "precise guidelines" to be used to assess a qualified privilege claim in a Privacy Act case, held that *Lee* and *Zerilli* are "binding precedent" on this score, and again concluded that they "did not embrace an open-ended weighing of all possible interests but rather struck the balance between private and public interests by reference to these two central factors."  (JA 319, 329.)  Next, the District Court held that the "central factors" of centrality and exhaustion were "lopsided in Chen's favor."  (JA323.)  Finally, it reiterated its prior holding that, to the extent *Zerilli* can be read to allow courts to "sneak a peek at the merits to ensure the case is 'not frivolous' such that no purpose would be served in forcing

27

disclosure," this was of no aid to Herridge because "Chen's Privacy Act claim easily surpassed that low bar."  (JA324.)

At bottom, Judge Cooper's analysis of *Lee*, *Zerilli*, and the district court cases applying them was thorough and persuasive.  Herridge does not meaningfully grapple with it, other than to repeatedly refer to *Zerilli's* general statement about a need to balance competing interests, while largely ignoring that (1) *Zerilli* identified specific factors to apply to channel district courts' discretion in conducting that balancing, and (2) *Lee* confirmed that centrality and exhaustion are the precise guidelines to be applied.[9]  The clear weight of authority—from this Court's decision in *Lee*, to the subsequent district court decisions in *Hatfill*, *Lee II*, and this case— demonstrate that Herridge advances an untenable, outlier interpretation of *Zerilli*. Herridge's real argument is not that the District Court misapplied this Court's precedents but that she thinks those precedents should be replaced with a different test.  While Herridge is certainly entitled to argue—as the District Court put it—that "a different balance [should] be struck," and to seek an appellate ruling that would "recalibrate the existing qualified reporter's privilege in her favor," (JA319-20), her

---

[9] Herridge also does not discuss the reasoning of the *Hatfill* and *Lee II* district court cases that reached the same conclusion as Judge Cooper as to the proper interpretation of *Zerilli* and *Lee*.  She mentions these decisions only in the context of a strawman argument that the plaintiffs in those case suffered more egregious Privacy Act violations than Chen.  (*See* Br. at 47-48.)  While irrelevant, her argument on that score is also undermined by her acknowledgment that the plaintiff in the *Lee* case was actually convicted of a crime, unlike Chen.

arguments must await potential *en banc* consideration.  *See LaShawn A.*, 87 F.3d at 1395.  At this stage, because the District Court's orders applied Circuit law correctly, they must be affirmed.

### C.    The District Court Properly Rejected Herridge's Superficial Critiques of the Merits of Chen's Case.

Herridge's argument that the District Court erred by not engaging in a "broad balancing of interests," including an assessment of "the importance or value of the claim in aid of which disclosure is sought," and "an assessment of the weaknesses" of Chen's claim, also papers over the fact that the District Court ***did*** conduct that analysis for the sake of argument, and concluded that Herridge failed to identify any weaknesses in Chen's claims that would cause it to rule against disclosure, even if *Lee* and *Zerilli* allowed for a deep dive on the merits of Chen's case.  (*See* Br. at 22, 29.)  Specifically, although rejecting that *Lee* and *Zerilli* require a "full-bore analysis of Chen's likelihood of success on the merits of her Privacy Act claim or an assessment of the public and private interests at play beyond the factors [of centrality and exhaustion]," the District Court nevertheless entertained Herridge's arguments "for the sake of completeness" and explained why they were unavailing.  (JA534.)  When Herridge raised the same arguments in opposing contempt, the District Court again reiterated its conclusion that "a free-wheeling balancing of interests would not change the outcome in any event."  (JA330.)  Thus, while this Court should hold that *Lee* and *Zerilli* do not permit the type of free-form balancing and deep-dive merits

inquiry Herridge urges, even if the Court determines otherwise, it should affirm the Order Denying the Motion to Quash and the Contempt Order on the alternative grounds that the District Court correctly determined that the "balance of interests" favors Chen and requires Herridge to identify the government official who violated Chen's rights.[10]

First, the District Court addressed the same damages-causation argument that Herridge advances here; namely, that "[Chen] will not be able to recover most of the damages she claims," because the DoD's decision to terminate UMT from its tuition assistance program following Herridge's stories about Chen is an "independent decision" that breaks the chain of causation from the unlawful leak of Chen's protected records to Herridge.  (Br. at 34-36.)  The District Court declined to address the specific question of causation of damages arising from the DoD tuition decision at this stage—a question, which, as discussed below, cannot even be resolved without first obtaining the identity of Herridge's source.[11]  As the District Court correctly observed, "[t]he Court need not, and does not, decide now whether Herridge [] [is] correct that Chen is barred from pursuing damages based on the Defense Department's revocation of tuition assistance, as those are not the only

---

[10] At a minimum, if this Court holds that a broad "balancing of interests" approach is required and believes that the District Court should have approached that balancing inquiry differently, then the case should be remanded to the District Court to apply whatever new test the Court announces.

[11] *See* Section II.B, *infra*.

damages Chen alleges she suffered." (JA534.) The District Court noted that Chen seeks other categories of damages and lost profits resulting from the leak to Herridge and that Herridge did not even argue—just as she does not argue here—that Chen cannot recover them. (JA534-35.)

Because Herridge does not argue that Chen has *no* valid damages claims and only questions the ultimate *quantum* of damages Chen might recover, her arguments are a red herring. To accept they have any relevance to a balancing analysis, this Court would have to decide—and instruct District Courts to consider—that there is some magical number below which a plaintiff's claim is not worthwhile and she is not entitled to the same protections of the Privacy Act as another citizen with larger damages. That's essentially what Herridge argues. (Br. at 45-47.) But she points to no case, or any general principle, that would support the notion that district courts should decide what quantum of damages entitles one plaintiff to a remedy under the Privacy Act while another's ability to vindicate her rights is foreclosed.

The text of the Privacy Act itself belies any such notion. It not only allows a plaintiff to receive "actual damages sustained," but it also includes statutory minimum damages, prescribing that "in no case shall a person entitled to recovery receive less than the sum of $1,000." 28 U.S.C. §552a(g)(4)(A). It also provides that a prevailing plaintiff "shall" be entitled to recover attorneys' fees, which reflects a Congressional intent to encourage plaintiffs to pursue claims for Privacy Act

31

violations.  *See Aleyska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260-

63 (1975) (recognizing that Congress has opted to "make specific and explicit

provisions for the allowance of attorneys' fees under selected statutes granting or

protecting various federal rights," with the intent to "implement public policy and to

allow counsel fees so as to encourage private litigation").  Given that Congress

ensured that any plaintiff who has a cause of action under the Privacy Act is entitled

to at least minimum damages plus attorneys' fees, regardless of whether that person

has suffered a certain threshold of economic damages, it stretches credulity to argue

Congress intended for courts to foreclose a right to recovery based on a subjective

belief that a plaintiff's harm was not sufficiently egregious.

Next, the District Court rejected Herridge's argument, which she raises again

here, that Chen's Privacy Act claim should be assigned little "weight" because of

the "risk" that Chen was at one time "passing information to the [Chinese]…"

(Br. at 38; *see* JA536.)  The District Court aptly paraphrased Herridge's argument

as suggesting that Chen "had it coming." (JA536.)  The District Court observed that

the Privacy Act protects all citizens, "whether blameworthy or blameless," and

found no support for the notion that the scope of a reporter's privilege in a Privacy

Act case should turn on a court's assessment of whether the plaintiff was fairly or

unfairly "smeared" by an unlawful government leak.  (*Id*.)  The District Court was

even more emphatic in its Contempt Order, adding that it "strongly disagrees" with

Herridge's position, because a court's job is to "apply the law evenhandedly, not to adjudicate who is worthy of the law's protection." (JA332.) The District Court also held that any claimed "national security" concerns about identifying the leaker "ring hollow," since the government is a party and can intervene to protect such interests where necessary, and more fundamentally, "it is much more plausible that ferreting out the government agent who may have leaked the records would benefit, not harm, national security by exposing someone inclined to mishandle highly sensitive law-enforcement records." (*Id.*)

As discussed further in Section II.A, the District Court was right to reject this argument twice. Nothing in the Privacy Act's text suggests a plaintiff's right to recover hinges on whether a judge believes she "had it coming," nor does *Lee* or *Zerilli* suggest that whether a plaintiff can obtain necessary evidence turns on a judge's personal view of whether the plaintiff somehow deserved to have her rights violated. Indeed, just as the District Court did here, other judges in this Circuit have observed that such a notion is "inherently unworkable," "troubling," and "extremely problematic." *Lee II*, 401 F. Supp. 2d at 139-40; *Hatfill*, 505 F. Supp. 2d at 46-47. That is particularly so in the case of Chen, where despite Herridge hurling unsubstantiated allegations, the objective reality is that a years-long investigation resulted in Chen never being charged with, let alone convicted of, any crime.

Finally, the District Court also properly rejected the same argument Herridge makes here, that "almost all" of the "information in Ms. Herridge's stories [] came from sources *other than* a Privacy Act violation."  (Br. at 42 (emphasis in original).)  As the District Court recognized, Herridge's argument that some of the material included in her stories was not protected by the Privacy Act is an unambiguous acknowledgment that the stories **did** in fact contain protected material.  (JA535.)  While the District Court allowed that Chen may "ultimately have to distinguish between damages caused by the leak of information covered by the Privacy Act," it found no basis to suggest that Chen would "be unable to do so," noting that if the protected materials were "irrelevant," then "the Court wonders why Herridge would have thought to include them in her reporting, notwithstanding the rather obvious legal implications of doing so."  (*Id*.)[12]

As with her argument on the DoD tuition assistance damages, Herridge's argument on this score goes only to the potential quantum of Chen's ultimate recovery rather than raising serious doubt that she can recover at all.  And again, to credit it, this Court would have to decide that a Privacy Act remedy is foreclosed to

---

[12] Curiously, Herridge complains about the District Court's reasoning here being a "post-hoc," "second-guessing [of] journalists' editorial judgments" about what was or was not "important" to a story.  (Br. at 46).  But she ignores that the balancing test she proposes—which would require a court to weigh the importance or newsworthiness of a given news story against the plaintiff's interest in compelling disclosure—would similarly require courts to make "post hoc" judgments about the "informational value" of a news story.

certain plaintiffs if the Court subjectively deems their harm to be below an elusive threshold, and that vindication of their civil rights is simply not worthwhile. That is not, and cannot be, the law.

## II. Herridge's Proposed Free-Form Balancing Test is Unworkable and Would Put District Courts in an Impossible Position.

Herridge's position that District Courts should be required to engage in an expansive balancing of the plaintiff's interests versus the reporter's before requiring a reporter to divulge a source in a Privacy Act case is inconsistent with established precedent in this Circuit. The District Court should be affirmed on that basis alone. But if this Court determines that it has the authority to overrule *Lee* and *Zerilli*, and that it ***can*** require a free-wheeling balancing of interests in evaluating reporter's privilege claims in a Privacy Act case, the Court must also consider whether it ***should***.

In that regard, it is important to note that Herridge proposes that the Court eschew an established test that appropriately channels judicial discretion in favor of a "broad, case-by-case balancing" that apparently has no limits at all. (*See* Br. at 3.) In this case, for example, Herridge contends that in assessing Herridge's and Chen's "interests," the District Court should have considered not just centrality and exhaustion, but other factors as varied as the fact that Herridge's reporting invoked "national security," that (according to Herridge) the amount of damages Chen might recover is low, that Chen was once investigated by federal law enforcement (but

35

never charged or convicted), and finally, the perceived overall "importance" of Chen's claims.  (*See* Br. at 34-50.)  As numerous judges in this Circuit have observed in rejecting calls for such boundless "balancing," Herridge's approach would prove unfeasible for several reasons.

### A.    Herridge's Contention that District Courts Should Subjectively Decide Who is Worthy of the Protection of the Law is Insidious.

One of Herridge's core arguments in favor of her free-form balancing test should raise alarm bells not just for this Court, but all observers—not simply because it is unworkable or misguided, but because it is downright offensive and un-American.  As in her Fox reporting, Herridge devotes large portions of her brief to repeatedly insinuating that Chen spied for China.  (*See, e.g.*, Br. at 4, 17, 38-41, 48.)  Notably, however, Herridge never directly makes this allegation; instead, she refers to the "risk" that Chen "may" have done so.  (*Id*. at 4, 50.)  Herridge couches this argument in equivocal terms because Chen has never even been charged with, much less found guilty of, espionage (or any other crime).  (*Id.* at 7.)  No matter for Herridge.  She argues explicitly that as part of a free-form balancing test, a district court should be not just empowered, but ***required***, to assess the "importance or value" of a Privacy Act plaintiff's claim, ***as well as*** to attempt to define what the plaintiff's "objectives" are in pursuing redress for a Privacy Act violation.  (*Id.* at 29, 40-41.)  Thus, Herridge argues, *Zerilli* should be read to require a district court to attempt to suss out whether the plaintiff is a bad actor or has undesirable motives

for pursuing relief—even if it can only do so based on unsubstantiated allegations—and to deny her the protection of the Privacy Act.

That is outrageous. Herridge would place district court judges in the position of enforcing their own subjective value judgments of a litigant's worth, or whether they are individually deserving of a remedy the law affords to all citizens. Not only does that fly in face of the fundamental notion that all Americans are innocent until proven guilty, but it would make a mockery of the notion of judicial impartiality, which "assures equal protection of the law" by "guarantee[ing] a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party." *See Republican Party of Minn. v. White*, 536 U.S. 765, 775-76 (2002). In rejecting this argument for the second time when it issued its Contempt Order, the District Court aptly summarized why it should be rejected:

> Under the banner of "national security," Herridge also maintains that it is appropriate to consider the "risk that Plaintiff was making U.S. servicemembers' information available to a foreign power—and thus that her 'private interest' in this Privacy Act suit is, in effect, seeking taxpayer money to recover funding for that conduct." The Court strongly disagrees. The Court's job is to apply the law evenhandedly, not to adjudicate who is worthy of the law's protection. That the plaintiff "had it coming" is not a viable defense under the Privacy Act. The Act protects "all private citizens, whether blameworthy or blameless, from the risk that government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals." Whatever her past, Chen is no exception.

(JA332-33 (citing references omitted).)  In both the *Hatfill* and *Lee II* district court cases, Judges Collyer and Walton also rejected similar calls for an open-ended balancing test in Privacy Act cases for the same reasons.  In *Lee II*, for example, the journalist argued—as Herridge does here—that the court should announce a common law journalist privilege that allows for the free-form balancing that *Zerilli* and *Lee* do not.  Judge Collyer observed that such a "subjective and elastic" approach would be not only "inherently unworkable" but "troubling," because it would put judges in the impossible position of trying to place a value on the "newsworthiness" of a particular piece of reporting, as well as on the perceived righteousness of the plaintiff's cause—and then to somehow determine which has more value in a particular case.  *Lee II*, 401 F. Supp. 2d at 139-40.  Similarly, in *Hatfill*, Judge Walton observed that such an approach would be "extremely problematic," and he echoed Judge Collyer's observation that courts are ill-suited to attempt to determine how to weigh the subjective value of a news story against a plaintiff's perceived interest in a remedy.  *Hatfill*, 505 F. Supp. 2d at 47.

At bottom, Chen is a proud American citizen who has been convicted of no crime.  She is entitled to the same protections that the Privacy Act grants other citizens, and her entitlement to pursue a remedy for a violation of her rights should not hinge on stale, false allegations, or on the subjective value a judge places on her

worth as a person or as a litigant. Herridge's offensive and insidious arguments on this score should be emphatically rejected.

> **B.** **Herridge Has No Standing to Demand a Mid-Discovery "Partial Summary Judgment" on Chen's Claims, Nor Does She Identify Any Fatal Flaw in Chen's Claims in Any Event.**

Similarly unworkable is Herridge's suggestion that some kind of "partial summary judgment" procedure should be employed before a reporter can be ordered to disclose a source in a Privacy Act case. (*See* Br. at 29-31.) No authority in this Circuit remotely supports the notion that *discovery* of the leaker's identity—an issue of central importance to any Privacy Act case—should wait until after summary judgment. The *Lee* case, for example, reached this Court on appeal during discovery, and this Court affirmed the contempt order without mention of a requirement to strictly scrutinize the merits of the plaintiff's claim, let alone to only adjudicate a reporter's privilege dispute after summary judgment. *See Lee*, 413 F.3d at 60-63. In that same case in the district court, Judge Collyer explicitly rejected the notion that the non-party reporter had a right to mount a substantive challenge to the merits of the plaintiff's case. *Lee II*, 401 F. Supp. 2d at 142 n.24 ("[The journalist] is a non-party and this case is in discovery. Not only does [the journalist] lack standing to raise arguments concerning the merits of [the plaintiff's] lawsuit, but at this stage of the litigation, the resolution of such issues is wholly premature.").

In *Zerilli* itself, this Court's only reference to the merits of the underlying case was to observe that the suit was "not frivolous." 656 F.2d at 714.  There was no suggestion whatsoever that assessing a privilege claim requires awaiting summary judgment or engaging in the vaguely defined "summary judgment-lite" procedure Herridge suggests.  Moreover, in *Carey*, from which *Zerilli* derived the factors it applied to assess a qualified privilege claim, this Court noted that the case was pre-summary judgment, yet held that a disclosure order would only be unwarranted in a situation where it was clear that the plaintiff was "so unlikely" to prevail on his claims that "no purpose would be served by disclosure of the identity of the sources." *Carey*, 492 F.2d 631, 637-38.  As the District Court noted after considering Herridge's merits-based arguments, that is decidedly not the case with respect to Chen's claims.  (*See* JA534-35; JA324.)

Fundamentally, Herridge is a non-party, and she cannot move for summary judgment, force Defendants to do so, or dictate what arguments Defendants may make if they elect to seek summary judgment.  *See* Fed. R. Civ. P. 56 (only a "party" may move for summary judgment).  Her proposal that some sort of summary judgment-like approach be applied before a disclosure is required also makes little sense in a Privacy Act case, where the very question of liability may hinge on discovering the identity of the wrongdoer, as it must be demonstrated that the agency's actions were "intentional or willful." *See* 28 U.S.C. §552a(g)(4).  Herridge

also ignores that her own arguments about causation for (a portion of) Chen's damages are not ripe for summary judgment until Chen has discovered the source's identity, as the question of causation often turns on the question of whether the damages in question were foreseeable to the liable party.  *See Fleck v. Dep't of Veteran Affairs of Inspector Gen.*, 596 F. Supp. 3d 24, 58 (D.D.C. 2022).[13] Herridge's argument that the DoD decision to cut off tuition assistance funding to UMT is an independent action, and that those damages cannot be proximately attributed to the Privacy Act violation, would carry little weight if the source is revealed and shown to have foreseen or intended for his actions to result in DoD cutting off funding.  To suggest the question of causation should be adjudicated before the source's identity is known thus puts the cart before the horse and only underscores why Herridge's proposal is impractical and unworkable.[14]

---

[13] *See also Brunotte v. Johnson*, 892 F. Supp. 2d 199, 207, 208 n.11 (D.D.C. 2012) (denying agency's motion for summary judgment on claim that unlawful disclosure by one government agency caused another to decide not to hire plaintiff).

[14] Herridge's argument that the Court should engage in a summary-judgment like analysis of the merits of Chen's claims before requiring Herridge to reveal her source also relies solely on out-of-circuit, state court cases, none of which involve the issue of disclosure in the context of a Privacy Act suit. (Br. at 30-31 (citing *Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175 (Ga. App. 2001) (libel case); *State ex rel. Classic III, Inc. v. Ely*, 954 S.W.2d 650 (Mo. App. 1997) (libel case); *O'Grady v. Superior Court*, 44 Cal. Rptr. 3d 72, 115 (Cal. Ct. App. 2006) (trade secrets case).)

**C.    Herridge Ignores the Powerful Public Interest in Holding Accountable Government Officials Who Abuse Citizens' Civil Rights.**

Finally, Herridge's contention that applying her self-serving balancing test would show that her interest in source confidentiality "outweighs Plaintiff's personal interest in damages" ignores the importance and purpose of the Privacy Act. (*See* Br. at 52.)  Unsurprisingly, Herridge focuses entirely on the "essential role" of journalists and the supposed chilling effect that a test without a free-form balancing component would have on journalists' ability to rely on confidential sources. (*Id*. at 48-52.)  Herridge's scaremongering "chilling" argument is undermined by the fact that *Lee* and *Zerilli* have been the law in this Circuit for decades, and as the District Court aptly observed, there is little evidence this long-existing legal regime has hampered journalists' ability to rely on confidential sources.  Indeed, the relatively recent *Hatfill* and *Lee II* cases make plain to any would-be government leaker that his identity can be revealed by court order, yet Herridge was able to rely on a confidential source for her reporting on Chen.  (JA334-36.)  But fundamentally, Herridge's myopic focus on the interest in protecting source confidentiality also ignores the purpose and importance of the Privacy Act.

In Herridge's telling, while her arguments against revealing her source carry the banner for journalism and the First Amendment writ large, Chen's case advances only her "personal interest in damages."  (Br. at 52.)  But as the District Court

explained in "reject[ing] the assertion that Chen's Privacy Act claim implicates only her own personal interests," a Privacy Act claim involves a government official's "intentional or willful" disclosure of a citizen's private records in violation of the law.  (JA536 (quoting 5 U.S.C. §552a(g)(4)).)  The entire purpose of the Privacy Act is to protect private citizens "from the risk that government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals," and in passing the Act, "Congress has recognized the weightiness of such willful disclosures [and] creat[ed] a private right of action to deter them."  (*Id.*)

The District Court's emphasis on the important purposes served by the Privacy Act echoes that of this Court in *Lee*, where it began its analysis of *Zerilli* by emphasizing that in the context of a Privacy Act case, "testimony of journalists is sought because government officials have been accused of illegally providing the journalists with private information."  *Lee*, 413 F.3d at 59.  Thus, not only is the "qualified" privilege a journalist may assert in such cases "not absolute," but it must be remembered that the subject of the privilege claim is "a newsman's agreement to conceal the criminal conduct of his source…."  *See id*. at 59-60 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 692 (1972).)  While the qualified privilege grants significant protection to the journalist because it requires centrality and exhaustion before the journalist will be required to divulge a source, "the protections of the Privacy Act do

not disappear when the illegally disclosed information is leaked to a journalist…." *Id*. at 60.

Herridge erects a false dichotomy when she asks this Court to view her as advancing a public interest and Chen a purely personal one. While Chen has yet been unable to identify the government official who leaked her private information, the evidence developed in discovery strongly suggests that, as in *Lee II* and *Hatfill*, a disgruntled law enforcement official did so to harm Chen and convict her in the court of public opinion after a thorough investigation yielded no charges against her. (*See* JA514-15.) This is the type of malfeasance the Privacy Act is designed to deter, and there is a clear public interest in sending the message to officials tempted to commit similar abuses in the future that laundering unlawful conduct through a journalist will not guarantee freedom from consequences.

Ultimately, while Herridge claims that the District Court's decisions applying the established framework in this Circuit somehow "gutted" and "eviscerate[d]" *Zerilli* and reduced it to a "mere exhaustion requirement," (Br. at 2), she offers scant evidence to support the notion that the existing qualified privilege approach is hostile to the First Amendment or journalism, or that it has opened the floodgates to reporters' confidential sources. As the years of expensive efforts Chen had to undertake in this case underscore, the exhaustion requirement is a supremely difficult one to satisfy, and in most cases where the plaintiff has exhausted

44

alternative avenues of discovery, those efforts should reveal the leaker without having to subpoena a journalist. (JA335.) Indeed, as Herridge's *amici* acknowledge, Privacy Act cases involving efforts to compel the identity of a reporter's source are a "rare" event. (RCFP Br. at xvi.) The District Court, observing that these types of cases are "few and far between," noted that "vigilant application" of the centrality and exhaustion requirements should result in "compelled disclosure [being] the exception, not the rule," and ultimately concluded that lived experience with the current framework "suggests [that] *Zerilli* and *Lee* may have found the right balance after all." (JA335.)

That the two-factor approach laid out in *Lee* and *Zerilli* was an effort at balancing competing interests is important. Herridge's narrow focus on only the journalists' interests ignores the competing interests at stake. Given that discouraging government abuse of citizens' rights is an important consideration, that efforts to compel a source from a journalist are rare, and that Herridge offers no evidence that this longstanding legal regime has heavily impacted journalism, the District Court's observation that the existing framework strikes the right balance between competing interests is a perceptive one. Herridge does not make a compelling case for change, particularly given the obvious, incurable pitfalls of her freewheeling "balancing of interests" approach.

### III. The Court Should Reject Herridge's Invitation to Create a Common-Law Privilege that Would Gut Congress' Will in Enacting the Privacy Act.

Finally, in a tacit acknowledgment that the law of this Circuit does not permit district courts to engage in the unmoored, free-form balancing that she advocates for, Herridge alternatively asks this Court to announce a new federal common-law privilege that would allow district courts to engage in that approach. This Court should follow the lead of the numerous decisions in this Circuit that have rejected similar calls for a new common-law privilege, both because Herridge's proposed balancing approach is impractical and unworkable, and because the requested end-run around *Lee* and *Zerilli* would frustrate Congress's intent in passing the Privacy Act.

To begin with, Herridge's passing reference to Rule of Evidence 501 fails to acknowledge that both the U.S. Supreme Court and this Court have cautioned that evidentiary privileges should be created sparingly and with caution. *United States v. Nixon*, 418 U.S. 683, 710 (1974) ("Exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (noting that "federal courts should not create evidentiary privileges lightly"). Thus, "the federal courts' latitude for adopting evidentiary privileges under Rule 501 remains quite narrow indeed," and courts must always start from the principle that evidentiary privileges

46

are disfavored because they obstruct the goal of ascertaining truth.  *United States v. Sterling*, 724 F.3d 482, 502 (4th Cir. 2013).

Since the Supreme Court declined to recognize a common-law privilege against revealing confidential sources in the grand jury context in *Branzburg v. Hayes*, 408 U.S. 665 (1972), numerous federal decisions have held that courts are foreclosed from recognizing one unless the Supreme Court revisits the issue.  *See, e.g., Sterling*, 724 F.3d at 499–500 (holding that *Branzburg* precludes lower federal courts from recognizing "a qualified, federal common-law reporter's privilege protecting confidential sources"); *In re Grand Jury Subpoenas*, 438 F. Supp. 2d 1111, 1119 (N.D. Cal. 2006) (holding that "the Ninth Circuit's position on the issue appears clear to this Court: unless and until the Supreme Court states that a common law reporter's privilege exists, or unless Congress enacts such a privilege, *Branzburg's* mandate is binding"); *In re Special Proceedings*, 373 F.3d 37, 44 (1st Cir. 2004) ("In *Branzburg*, the Supreme Court flatly rejected any notion of a general-purpose reporter's privilege for confidential sources, whether by virtue of the First Amendment or of a newly hewn common law privilege.").  Tellingly, Herridge does not cite a single federal court decision that has ever recognized a common-law reporter's privilege.  (*See* Br. at 52-55.)

This Court should decline to recognize a common-law privilege incorporating a free-form balancing component for the same reasons stated above in Section II,

and for the additional reasons stated by Judges Sentelle and Henderson when this Court was asked to, and did not, recognize such a privilege in *In re Miller*, 438 F.3d 1141 (D.C. Cir. 2006). In that case, only one Circuit Judge on a three-judge panel was willing to hold that such a privilege existed, while the others gave persuasive reasons for why it should not. In his concurrence, Judge Sentelle—who wrote the majority opinion—gave several reasons why creating a common-law reporter's privilege would be inappropriate. *Id*. at 1153-59. First, he noted that the Supreme Court already rejected a common-law reporter's privilege in *Branzburg*, and thus it would be "presumptuous if not overreaching" for a circuit court to adopt one. *Id*. at 1155. He also noted the difficulties of defining who is a "reporter" entitled to claim the privilege and observed that while many states have adopted statutory journalist shield laws, they differ in their scope of protection and who can claim it. *Id*. at 1156-58. Judge Sentelle thus concluded it should be left to Congress to determine whether to enact a federal shield law and its scope and reach. *Id*. at 1158.[15] In her concurrence, Judge Henderson also explained why even if the Court

---

[15] Indeed, courts must consider whether "Congress has considered the relevant competing concerns [implicated in creating a new privilege] but has not provided the privilege itself." *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182, 189 (1990). Courts have declined to recognize new privileges where Congress "twice had occasion … to consider the privilege and not granted it," *Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005), and even where Congress weighed the issues and remained silent, *In re Subpoena Issued to CFTC*, 370 F. Supp. 2d 201 (D.D.C. 2005). Here, Congress has repeatedly considered the matter numerous times, each time *(cont'd)*

were to recognize a federal common-law reporter's privilege, it should be limited to the analysis of centrality and exhaustion. *Id*. at 1160. She explained that the "multi-factor balancing test" that Herridge proposes lacks "analytical rigor," and would put district courts in the impossible position of having to subjectively weigh the value of a news story against the perceived harm to a victim of an unlawful act. *Id*. at 1162-63. Thus, two of the three judges on the *Miller* panel disapproved of recognizing a common-law privilege with a subjective "balancing" approach that would require district courts to make value judgments between a litigant's interest in recovery and the journalist's interest in shielding a source.

District courts in this Circuit have echoed these warnings in the two decades since *Miller*. First, in *Lee II*, Judge Collyer considered the arguments for adopting a common-law reporter's privilege that permits subjective weighing of the reporter's interest in protecting a source against a plaintiff's interest in compelling disclosure (after holding that *Lee* and *Zerilli* do not permit it). 401 F. Supp. 2d at 135. She identified several reasons why such an approach would be "inherently unworkable," including that it would represent an end-run around the *Lee* Circuit Court decision,

---

failing to enact the privilege. *See, e.g.,* H.R.581, 109th Congress (2005); H.R.3323, 109th Congress (2005); S.340, 109th Congress (2005); S.1419, 109th Congress (2005); S.2831, 109th Congress (2006); S.2035, 110th Congress (2007); H.R.2102, 110th Congress (2007); S.1267, 110th Congress (2007); H.R.985, 111th Congress (2009); S.448, 111th Congress (2009); H.R.2932, 112th Congress (2011); S.987, 113th Congress (2013); H.R.1962, 113th Congress (2013); H.R.4382, 115th Congress (2017); S.2074, 118th Congress (2023).

it would be "impossible to construct a reasonable or useful definition of who would be a 'reporter' eligible to claim protection," and that requiring a district court to determine whether a plaintiff's perceived harm outweighs the newsworthiness of a story would be not just "troubling," but "a daunting and well-nigh impossible task." *Id.* at 139-140. Similarly, in *Hatfill*, Judge Walton refused to recognize a common-law privilege that called for pitting the assessed value of a news story against the plaintiff's perceived harm or interest in redress, calling such an approach "extremely problematic," noting that it would circumvent the decisions in *Lee* and *Miller*, and— as discussed further below—that to recognize such a privilege would frustrate the very purpose of the Privacy Act. *Hatfill*, 505 F. Supp. 2d at 45-48. In similarly rejecting Herridge's request to recognize a common-law reporter's privilege, the District Court below echoed those concerns and concluded that because this Circuit "already has a well-established First Amendment privilege that both protects journalists' interests and channels judicial discretion in balancing that interest against evidentiary need," Herridge could not demonstrate that a common-law privilege would advance a public good "relative to these potential drawbacks." (JA537-38.)[16]

---

[16] Indeed, unlike in *Jaffee v. Redmond*, 518 U.S. 1 (1996), where confidentiality was inherently required for any functioning therapist-patient relationship, the use of confidential sources is not a "sine qua non," *id.* at 10, of journalism writ large.

Besides the fact that Herridge's proposed common-law privilege would be impractical, the Court should also decline to create it because to do so would frustrate the purpose of the Privacy Act. As the District Court recognized, the Privacy Act is designed to protect private citizens "from the risk that government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals," and in passing it, "Congress has recognized the weightiness of such willful disclosures [and] creat[ed] a private right of action to deter them." (JA536.) And as this Court affirmed in *Lee*, "the protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist…." *Lee*, 413 F.3d at 60. In rejecting a call to create a common-law reporter's privilege in the *Hatfill* case, Judge Walton aptly summarized why doing so would be particularly inappropriate in Privacy Act cases:

> Denying civil litigants access to the identity of government officials who have allegedly illegally leaked information to reporters would effectively leave Privacy Act violations immune from judicial condemnation, while leaving potential leakers virtually undeterred from engaging in such misbehavior when the communications are made to reporters…. Thus, the reporters' concern of not "chilling" the free flow of information to the media must be subordinate in the context of an actionable Privacy Act violation claim. This result is called for because affording supremacy to a reporter's privilege in such situations would erect a potentially insurmountable hurdle for a Privacy Act litigant seeking to hold the government accountable for leaks condemned by the Act. Therefore, even assuming arguendo, that a qualified common law reporter's privilege is recognizable in this Circuit, extending the privilege to Privacy Act cases where a viable claim has been pled would be inappropriate.

*Hatfill*, 505 F. Supp. 2d at 45. To recognize a qualified common-law privilege in this context would have the perverse effect of immunizing a government official's abuse of power when he leaks protected information to a reporter ***intending that it be widely publicized***, while leaving intact the protections of the Privacy Act when the disclosure is relatively mundane and more limited in scope and audience. It makes little sense that the most far-reaching and damaging violations of a citizen's rights should have the least protection and remedy.

## <u>CONCLUSION</u>

The Order Denying the Motion to Quash and the Contempt Order should be affirmed.


Dated: July 22, 2024

                        Respectfully Submitted,


                        */s/ Andrew C. Phillips*
                        Andrew C. Phillips (Bar No. 64792)
                        MEIER WATKINS PHILLIPS PUSCH LLP
                        919 18th St NW, Suite 650
                        Washington, DC 20006
                        Email: andy.phillips@mwpp.com

                        *Counsel for Plaintiff-Appellee Yanping Chen*

## **CERTIFICATE OF COMPLIANCE**

This Response Brief by Plaintiff-Appellee complies with the type-volume limit of Federal Rule of Appellate Procedure 28(a)(10) because it contains 12,798 words.  It also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 28(a)(10) and 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionately spaced typeface.

July 22, 2024                                         */s/ Andrew C. Phillips*
                                                                Andrew C. Phillips

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 22, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using that Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

July 22, 2024                                    */s/ Andrew C. Phillips*
                                                    Andrew C. Phillips