# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 18, 2024     Decided September 30, 2025

No. 24-5050

YANPING CHEN,
APPELLEE

v.

FEDERAL BUREAU OF INVESTIGATION, ET AL.,
APPELLEES

CATHERINE HERRIDGE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-03074)

*Patrick F. Philbin* argued the cause for appellant. With him on the briefs were *Kyle T. West* and *Chase Harrington*.

*Judd E. Stone II* was on the brief for *amicus curiae* Senator Ted Cruz in support of appellant.

*Bruce D. Brown*, *Katie Townsend*, *Gabe Rottman*, and *Grayson Clary* were on the brief for *amici curiae* Reporters Committee for Freedom of the Press, et al. in support of appellant.

2

*Andrew C. Phillips* argued the cause and filed the brief for appellee Yanping Chen.

*Jane Shim* was on the brief for *amici curiae* Asian American Legal Defense and Education Fund, et al. in support of appellee.

Before: KATSAS and CHILDS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: Yanping Chen alleges that federal officials violated the Privacy Act by disclosing records about her compiled as part of an FBI investigation. The records were published by Fox News. In discovery, Chen sought to compel Catherine Herridge—one of the journalists involved in publishing the records—to identify who had leaked them. Herridge invoked a First Amendment reporter's privilege to avoid being compelled to testify. The district court held that Chen had overcome that qualified privilege and ordered Herridge to answer Chen's questions. When Herridge refused to do so, the court held her in contempt. On appeal, Herridge reasserts the privilege. We affirm the district court.

I

The First Amendment to the Constitution provides that "Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. Amend. I. In *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981), this Court recognized a "qualified reporter's privilege" based on the First Amendment. *Id*. at 712–14. Where it applies, the privilege allows reporters to resist civil discovery into the identity of their confidential

3

sources. *See id.* We identified two considerations as being "of central importance" in determining whether the privilege applies—the litigant's "need for the information" and her efforts "to obtain the information from alternative sources." *Id.* at 713. We further noted that the "equities weigh somewhat more heavily in favor of disclosure" if, as in libel cases, the journalist is a party and successful assertion of the privilege "will effectively shield him from liability." *Id.* at 714.

The reporter's privilege often arises in litigation under the Privacy Act, which prohibits government agencies from publicly disclosing certain records about individuals without prior consent from the individual to whom the record pertains. 5 U.S.C. § 552a(a)(4), (b). An individual harmed by a Privacy Act violation may bring a civil action against the offending agency. *Id.* § 552a(g)(1), (5). If the agency acted "in a manner which was intentional or willful," then the affected individual may recover "actual damages," subject to a statutory floor of $1,000. *Id.* § 552a(g)(4)(A).

II

A

We recite the facts as alleged in the complaint. Yanping Chen was born in China. In 1987, she moved to the United States to study at George Washington University, from which she eventually obtained graduate degrees. Chen became a lawful permanent resident in 1993 and a citizen in 2001.

In 1998, Chen founded the University of Management and Technology (UMT), an educational institution headquartered in Arlington, Virginia. Until January 2018, UMT participated in the Department of Defense's "Tuition Assistance Program," which pays a portion of tuition expenses for military students.

4

In 2010, the Federal Bureau of Investigation began investigating Chen for statements made on her immigration forms. The FBI interviewed Chen's family and colleagues, seized her computer, used an informant to gather information about her, monitored her travel, and recorded her private conversations. In 2012, the FBI executed search warrants at Chen's home and UMT's main office. The FBI seized materials including tax records, business documents, family photographs, and electronic storage devices. In 2016, the U.S. Attorney's Office for the Eastern District of Virginia decided not to file charges against Chen.

In 2017, Fox News aired a report alleging that Chen had concealed her prior work for the Chinese military. The network later published an FBI form memorializing an interview with Chen's daughter, personal photographs seized from Chen's home during the FBI search, and information from Chen's immigration and naturalization papers. The reports stated that the FBI searches had occurred as part of a counter-intelligence operation. They also cited anonymous sources describing a conflict between the FBI and the U.S. Attorney's Office over whether to file charges against Chen, as well as comments from an anonymous FBI agent who was upset that UMT continued to receive payments from DoD. The print versions of these reports were authored by Catherine Herridge.

In 2018, DoD terminated UMT's participation in the Tuition Assistance Program. That decision, along with a broader hit to UMT's reputation, caused its enrollment and revenue to fall sharply. These losses impacted Chen's income and the value of her personal investment in UMT.

B

In December 2018, Chen filed this Privacy Act lawsuit against the FBI and various other federal agencies. She sought

5

damages and an injunction prohibiting further disclosures of information about her.

In discovery, Chen served various document requests, interrogatories, and requests for admission, took eighteen depositions of current and former government employees, issued over a dozen third-party subpoenas, and obtained declarations from 22 government personnel who were connected to the FBI investigation. Despite all of this, Chen was unable to determine who was responsible for leaking the materials aired in the Fox reports. Ultimately, in mid-2022, Chen served Herridge and Fox with deposition and document subpoenas. Both Herridge and Fox moved to quash the subpoenas on the ground that they sought information protected by reporter's privileges grounded in the First Amendment and federal common law.

The district court denied Herridge's motion to quash in relevant part. It concluded that Chen had met her burden to overcome the qualified First Amendment privilege recognized in this Court's precedents. The court then refused to recognize a distinct newsgathering privilege under federal common law. The court sequenced discovery so that Chen could depose Herridge regarding her sources for the records allegedly disclosed in violation of the Privacy Act before seeking potentially the same information from Fox News. The court thus largely denied Herridge's motion and granted Fox's while allowing Chen to renew her subpoenas at a later time if necessary.

Following unsuccessful attempts to appeal the discovery order, Herridge sat for a deposition on September 26, 2023. When questioned, she refused to disclose the identity of her source, and she refused to provide information on when and how she received the leaked items. Herridge stated that she

6

was disobeying the discovery order so that she could seek appellate review of it.

The district court held Herridge in civil contempt. It imposed a fine of $800 per day until Herridge complied with the discovery order, but stayed the fine pending resolution of this appeal.

III

A non-party may appeal an adjudication of civil contempt even before the entry of final judgment in the underlying case. *See*, *e.g.*, *U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*, 487 U.S. 72, 76 (1988); *In re Clinton*, 973 F.3d 106, 112 (D.C. Cir. 2020). And our review of the contempt order "logically includes" a review of the discovery order underlying the contempt. *Lee v. DOJ*, 413 F.3d 53, 59 (D.C. Cir. 2005). Whether a discovery order correctly articulates our test for the reporter's privilege is a legal question that we review *de novo*. *Id.* We review a district court's application of that test for abuse of discretion. *Id.*

We begin with a survey of the caselaw recognizing a reporter's privilege under the First Amendment. Next, we discuss the district court's application of governing precedent to this case. Finally, we consider Herridge's invitation to announce a new reporter's privilege rooted in federal common law rather than the Constitution.

IV

A

Under *Zerilli*, reporters have a qualified First Amendment privilege to protect the identity of their sources from civil discovery. 656 F.2d at 710–12. After recognizing the

7

privilege, we set forth "more precise guidelines" for determining when it can be overcome. *Id.* at 713. We identified two considerations "of central importance" for doing so—whether the information is "crucial" to the case and whether the litigant seeking the information "has exhausted every reasonable alternative source of information." *Id.* In addition, we stated that a litigant may be more likely to overcome the privilege in cases where the reporter is a party (as in libel cases) than in cases where she is not (as in Privacy Act cases like this one). *Id.* at 714.

In *Lee v. Department of Justice*, 413 F.3d 53 (D.C. Cir. 2005), this Court held that a litigant may overcome the privilege by showing centrality and exhaustion—even in a case where the reporter is not a party. Like this case, *Lee* involved an appeal by non-party journalists held in contempt for refusing to identify their confidential sources in Privacy Act litigation. *Id.* at 55. Applying *Zerilli*'s "two guidelines [for] determining when a court can compel a non-party journalist to testify about a confidential source," we held that the district court had not abused its discretion in requiring the reporters to testify. *Id.* at 59–60. First, the plaintiff had shown that the information he sought went to the "heart" of the case, given the difficulty in proving intent or willfulness without knowing the identity of the leakers. *Id.* at 60. Second, by deposing numerous witnesses before seeking to compel the reporters' testimony, the plaintiff had met his burden to exhaust reasonable alternative sources of information. *Id.*

For the *Lee* Court, that was the end of the matter. We expressly declined to engage with *Zerilli*'s distinction between journalists who are parties to a lawsuit and those who are not, since all the journalists in the case before the court were non-parties. *Lee*, 413 F.3d at 57 n.1. And in response to an objection that we were leaving journalists without enough

8

protection, we explained that a litigant's power to subpoena a journalist remains constrained by the requirements of centrality and exhaustion, which are not perfunctory, and by "the usual requirements of relevance, need, and limited burdens on the subpoenaed person" embodied in federal procedural and evidentiary rules. *Id.* at 60.

B

On appeal, Herridge does not contest the district court's determination that *Lee*'s centrality and exhaustion requirements for overcoming the privilege were satisfied. Herridge nonetheless asks us to rule in her favor because (1) Chen's Privacy Act claim is frivolous or meritless and (2) *Lee* conflicts with prior circuit precedent and therefore does not bind us. We reject both contentions.

1

Herridge argues that we should uphold the privilege because Chen's Privacy Act claim is frivolous. We agree that our governing framework is flexible enough to accommodate such an inquiry. In *Zerilli*, we noted that the claim at issue was "not frivolous" as part of our inquiry into whether the information sought was "crucial" to the plaintiff's case. 656 F.2d at 714. And although *Lee* did not separately discuss frivolousness, we did reiterate the importance of considering whether the information sought "goes to the heart of his case." 413 F.3d at 60. Such an inquiry can readily accommodate assessing whether the underlying claims are frivolous. For if a claim would fail regardless of what the requested discovery might reveal, there is no good reason for deeming the discovery to be centrally important, much less for abrogating the privilege on that basis. *See*, *e.g.*, *Carey v. Hume*, 492 F.2d 631, 637–38 (D.C. Cir. 1974).

9

We reject Herridge's contention that the Privacy Act claim here is frivolous. Herridge presses two main points: "most" of Chen's alleged damages were caused by DoD's independent decision to cut off funds to UMT, Appellant's Br. at 34, and "almost all" of Herridge's reporting came from sources other than Privacy Act information, *id.* at 42. But "most" is not all, and Chen does seek damages not flowing from a loss of business after DoD severed its ties with UMT. Likewise, even if Herridge collected "almost all" of her information from material that was already in the public domain, Chen plausibly alleges that some of it had to have come from Privacy Act violations—such as the disclosure of photographs seized from Chen's home during the FBI search. And so long as Chen establishes that *some* Privacy Act violation harmed her, she may recover actual or statutory damages if it was willful. 5 U.S.C. § 552a(g)(4)(A); *Doe v. Chao*, 540 U.S. 614, 627 (2004). In sum, Herridge's arguments at most suggest that Chen is likely to recover only a small amount of damages, but that does not render her claim frivolous.

2

Beyond this discrete point about frivolousness, Herridge more broadly urges that Chen's claim is simply *not that important*. In Herridge's view, regardless of centrality and exhaustion, the reporter's privilege should prevail if a court determines that the social importance of the news story outweighs the plaintiff's personal interest in vindicating her claim. Here, for example, Herridge argues that "the public's interest in protecting journalists' ability to report without reservation on sensitive issues of national security" should outweigh Chen's merely private interest in recovering perhaps as little as $1,000 in statutory damages. Appellant's Br. at 3 (quoting *Lee v. DOJ*, 428 F.3d 299, 302 (D.C. Cir. 2005) (Tatel, J., dissenting from denial of rehearing en banc)).

10

Herridge's proposed balancing test echoes the view advanced by the judges dissenting from denial of rehearing *en banc* in *Lee*. *See* 428 F.3d at 300–03. As they were in dissent, we are left simply to apply the *Lee* panel opinion. And although Herridge describes that opinion as silent on the questions whether and how to weigh factors *beyond* centrality and exhaustion, even silence is fatal to her position here. Again, Herridge contends that the district court erred in ordering her to disclose the identity of her confidential source, despite its findings as to centrality and exhaustion. Given this posture, it makes no difference whether *Lee* affirmatively forbade the broader interest-balancing favored by Herridge or simply failed to apply it. Either way, *Lee* held that a district court permissibly found a reporter's privilege overcome based on findings of centrality and exhaustion in a Privacy Act case, without any broader balancing of private and public interests. 413 F.3d at 60. And that suffices to foreclose Herridge's privilege claim here.

Perhaps recognizing as much, Herridge falls back to an argument that *Zerilli* affirmatively requires case-by-case balancing regardless of *Lee*. She therefore asks us to disregard *Lee* as inconsistent with prior circuit precedent. But there is no inconsistency. *Zerilli* upheld an assertion of the reporter's privilege in a case where the plaintiff had failed to exhaust, *see* 656 F.2d at 714, and it expressly reserved the question "whether compelled disclosure would have been appropriate if [plaintiffs] had fulfilled their obligation to exhaust alternative sources," *id.* at 714 n.52. Then, *Lee* answered that question in the affirmative, in a Privacy Act case where the plaintiff had established both centrality and exhaustion. *See* 413 F.3d at 57–61. Herridge points us to *Zerilli*'s more general statement that "courts should look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure." 656 F.2d at 712.

11

But *Zerilli* made that statement in the course of deciding whether to recognize a reporter's privilege at all. *See id.* at 710–12. Having done so, the Court then established "more precise guidelines … to determine how the balance should be struck in a particular case." *Id.* at 713. And as explained above, it crystallized those guidelines into two inquiries "of central importance"—whether the information is "crucial" to the case and whether the litigant could obtain it from a "reasonable alternative source." *Id.*

V

Finally, Herridge urges us to recognize, as a matter of federal common law, a reporter's privilege broad enough to permit the case-by-case interest balancing urged by the *Lee* dissentals. We decline this invitation to end-run our precedent.

Rule 501 of the Federal Rules of Evidence authorizes federal courts to recognize new privileges "in the light of reason and experience." Fed. R. Evid. 501; *see Jaffee v. Redmond*, 518 U.S. 1, 8 (1996). But Herridge has provided little cause to think that "reason and experience" support the privilege that she propounds. As to reason, the First Amendment analysis in cases like *Zerilli* and *Lee* thoroughly lays out the competing considerations of encouraging newsgathering while also respecting the elemental principle that "the public has a right to every man's evidence." *Trump v. Vance*, 591 U.S. 786, 791 (2020). As to experience, Herridge contends that virtually every state has recognized some form of a reporter's privilege. She attached to her opening brief a chart summarizing the relevant law in every state. But as this chart demonstrates, the privilege varies widely in its scope from state to state, both in the abstract and on the question whether case-by-case interest balancing is appropriate. In short, if the First Amendment itself does not entitle Herridge to disobey

12

discovery obligations imposed on every other citizen in the circumstances of this case, we see little reason to create that entitlement as a matter of judge-made common law.

For these reasons, we decline to recognize a federal common law newsgathering privilege.

*Affirmed.*